BENJAMIN B. WAGNER
United States Attorney
RUSSELL L. CARLBERG
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, California 95814
Telephone: (916) 554-2700

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>v.<br><br>GARRET GRIFFITH GILILLAND III, et al.<br><br>  Defendants. | CASE NO. S-08-376 EJG<br><br>GOVERNMENT'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS |

## I. SUMMARY OF ARGUMENT

Defendants' motion to dismiss is frivolous. When a defense attorney is conflicted, "the only meaningful remedy" is conflict-free counsel at trial. United States v. Allen, 831 F.3d 1486, 1503 (9th Cir. 1987). Defendants now have conflict-free counsel. Moreover, defendants fail to present any evidence of "intentional government intrusion" into "defense plans or strategy" that "substantially prejudices" the defendants. See Weatherford v. Bursey, 429 U.S. 545, 557-58 (1977); Clutchette v. Rushen, 770 F.2d 1469, 1471-72 (9th Cir. 1985). Rather, they pile speculation upon speculation. In denying their motion, the Court should find that: (1) there has been no government misconduct; (2) there has been no intentional government intrusion into defense plans or strategy; and (3) the meeting with Wing and Bonjour, and the sealed email, could not substantially prejudice the defendants, even had the government learned their content. See United States v. Hernandez, 937 F.2d 1490, 1493-94

1

(9th Cir. 1991); Williams v. Woodford, 384 F.3d 567, 585 (9th Cir. 2004).

## II.  LEGAL STANDARD

Defendants seek dismissal of the indictment for purported violations of the Fifth and Sixth Amendments.  They erroneously suggest the California state law of attorney conflicts creates a mandatory presumption of dismissal.  Somehow, they miss an entire line of governing Supreme Court and Ninth Circuit law, which sets forth the correct legal standard for Fifth and Sixth Amendment challenges.

To warrant the extreme remedy of dismissal under a Sixth Amendment claim, defendants must first show that the government "deliberately invaded the defense camp." Weatherford, 429 U.S. at 557-58.  Second, "mere government intrusion into the attorney-client relationship ... is not itself violative of the Sixth Amendment right to counsel.  Rather, the right is only violated when the intrusion substantially prejudices the defendant." United States v. Irwin, 612 F.2d 1182, 1186-87 (9th Cir. 1980); accord United States v. Stringer, 535 F.3d 929, 942 (9th Cir. 2008) (defense must show that affirmative government misconduct substantially prejudiced the defendant).   The Ninth Circuit, in affirming this very trial Court, held that the defense must show that the government "deliberately intrude[d]" into "defense plans or strategies." Clutchette, 770 F.2d at 1471-72.

Likewise, under a Fifth Amendment claim, to obtain dismissal, the defense must show intentional, outrageous government conduct that "shocks the conscience." Rochin v. California, 342 U.S. 165, 172 (1952).  Government misconduct must rise to a "demonstrable level of outrageousness" before dismissal is warranted. Hampton v. United States, 425 U.S. 484, 495 n.7 (1980) (Powell, J., concurring).  Here, the defense allegation solely concerns the attorney-client relationship and a private defense attorney's breach of the duty of loyalty.  Thus, under either a Fifth or Sixth Amendment rubric, defendants must show the government's "deliberate intrusion into the attorney-client relationship" caused "actual and substantial prejudice." United States v. Voigt, 89 F.3d 1050, 1067 (3rd Cir. 1996).  In other words, the analysis under both challenges is essentially the same.

For example, in Hernandez, a cooperating co-defendant attended joint defense meetings with defense attorneys.  The district court denied defendants' motion to dismiss, based on declarations alone, finding that (1) there was no purposeful government conduct, (2) nothing of import was learned

regarding "defense plans or strategy;" and (3) the defendant could not be substantially prejudiced from the disclosures. The Ninth Circuit affirmed, holding that the trial court's denial of the motion was not an abuse of discretion. 937 F.2d at 1493-94. Similarly, in Clutchette, passive government receipt of evidence from a defense investigator did not rise to the level of a violation requiring dismissal. 770 F.2d at 1471-72. Likewise, in Weatherford, an undercover government agent was invited into a meeting with defense attorneys. His passive acceptance of the invitation to a meeting where defense strategy was discussed did not violate the Sixth Amendment. 429 U.S. at 557-58.

Even where intentional government violations have been shown, the remedy of dismissal is highly disfavored. According to the Supreme Court, absent demonstrable prejudice, "dismissal of the indictment is plainly inappropriate." United States v. Morrison, 449 U.S. 361, 365 (1981) (discussing need to narrowly tailor remedies for a Sixth Amendment violation). Typically, if the government comes into contact with privileged communications, the remedy is exclusion of the privileged communication at trial, not dismissal. United States v. Shapiro, 669 F.2d 593, 598 (9th Cir. 1982). Other circuits agree. "Only the most intolerable government conduct justifies dismissal." United States v. Janotti, 673 F.2d 578, 608 (3rd Cir. 1982). "The banner of outrageous misconduct is often raised, but seldom saluted." United States v. Santana, 6 F.3d 1, 4 (1st Cir. 1993) (adding "courts have rejected it with almost monotonous regularity"). Even in cases where attorneys have been found to have been used as informants against their own clients, courts have not ordered the extreme remedy of dismissal. See e.g. Voigt, 89 F.3d 1050; United States v. Ofshe, 817 F.2d 1508 (11th Cir. 1987).[1]

///

///

---

[1] Moreover, the defendants' own cited authority, United States v. Allen, *supra*, demonstrates their remedy has already been provided. There, Allen suffered from attorneys with "gross conflicts underlying [] joint representation" with co-defendants and other unindicted co-conspirators. 831 F.3d. at 1502. In order "to minimize the damage to Allen," the defense team brought in independent counsel for Allen on the eve of trial. Id. at 1493. Even assuming earlier prejudice, the court stated that the test was whether the defendant received "sufficiently independent and effective counsel at trial and sentencing to render the pretrial conflicts immaterial." Id. at 1502. In affirming the conviction, the Ninth Circuit held that Allen had already "received the only meaningful remedy" he was entitled to when independent attorneys were brought into the case for trial. Id. at 1503.

### III.  ANALYSIS

Defendants have not made any showing of intentional, outrageous government misconduct. They have shown no purposeful intrusion into the defense camp that has caused "substantial prejudice." They have not shown the government even passively received anything to which Wing was privy. They have not demonstrated that anything in the 1.5 hour meeting with Wing and Bonjour amounted to "defense plans or strategy." They have not even demonstrated that the sealed "Joey Burnner" email to Bonjour contains valuable "defense plans or strategy." On the defendants' failures alone, the Court should rule that there has been no showing of affirmative government intrusion into defense plans or strategy amounting to substantial prejudice.   The present record, as well, demonstrates that there has been no cognizable government intrusion.  Wing has made clear that he recalled little and shared nothing with Symmes or the government.[2]  If the Court deems Wing credible on that point, that should also end the matter once and for all.

Moreover, the Court is on firm ground in finding that nothing in the meeting or email could have prejudiced the defendants even had the government learned it.  The Court already found Bonjour credible because he kept contemporaneous notes and has no dog in the fight.[3]  Bonjour's declarations state that little of substance was communicated at the 1.5 hour meeting, beyond Gililland's denials, his emotional outpouring, and fees.[4]  Bonjour stated, from a review of his meeting notes, that he could not follow the basic outline of Gililland's business because Gililland was an emotional wreck.  Likewise, the government has reason to suspect that the "Joey Burnner" email to Bonjour is simply background information on the names listed in the search warrant because that is what Bonjour requested.[5]  If so, then the Court can safely conclude that Gililland communicated little or nothing of substance to Wing

---

[2]  Exhibit A (Supplemental Declaration of Christopher Wing).

[3]  Exhibit B (Excerpt of Transcript, 1/28/11).

[4]  See Docket 163 ("Exh. A," Bonjour Decl. at 2:6-7): "at times he became very emotional." See also Docket 170 (Bonjour Suppl. Decl. at 3:2-3): "[H]is emotional state combined with the complexity of his business dealings made it difficult to follow" what he was saying.  Names in the search warrant were mentioned, but "no one was discussed in detail." Bonjour Decl. at 2:12.

[5]  Bonjour Decl. at 2:11-14.

4

and Bonjour, and certainly nothing rising to the level of substantially prejudicial information had the government even learned it.  More to the point, the government never passively received anything from Wing.  Even if it had, the remedy would be exclusion of the statements at trial, not dismissal.

In addition, the current record indicates that the government acted in good faith.  Nobody disputes that, when Wing called regarding representing Symmes, the undersigned AUSA inquired of Wing whether he had a conflict due to his brief association with Magpusao.  In that call, Wing described his interaction with Magpusao as a "meet and greet."  Evidently, Wing, engulfed in a stressful trial at the time he met with Gililland and Magpsuao in June 2008, had a failure of recollection a year later when he agreed to represent Symmes.  And it was the government that alerted the Court to the attorney conflict soon after it learned of Gililland's accusations.  Gililland did not raise this issue until shortly before the government filed its motion for miscellaneous relief on November 12, 2010.[6]  Counsel for Magpusao never raised the issue with the government before the government's motion.

Rather than offering anything factually supporting (1) deliberate government intrusion into the privilege or (2) substantial prejudice, the defendants simply speculate as to harm.  For instance, defendants speculate that Gililland's second attorney, George Boisseau, would have negotiated "cooperation" for Gililland, but for the conflict of Chris Wing.  The defense argument defies basic logic.  Way back in **July 2008**, Gililland's second attorney, George Boisseau, told the undersigned AUSA that Gililland would not even proffer without an advance guarantee of immunity from prosecution.  This AUSA rejected that.  At that point, neither cooperation nor a proffer were on the table.  In **August 2008**, when Boisseau was warned that charges were imminent, he replied that Gililland had taken "a long vacation" and "good luck finding him."  Boisseau added that Gililland would return if total immunity were promised.  So, when Wing entered the picture **a year later**, there was nothing for Boisseau to negotiate.[7]

---

[6] Docket #153 (Government's Motion for Court Inquiry Into Potential Attorney Conflict, filed 11/12/10), Cr. No. 08-376 EJG.

[7] During the extradition fight, the government never heard a word from Boisseau or anybody claiming to represent Gililland.  The defense does not supply a single declaration from Boisseau.  Gililland, of course, suggests that, in the course of the search warrant, Special Agents Roberts promised

Gililland's conduct immediately after the search warrant also underscores how silly his cooperation claim is. The day of the search warrant, or shortly thereafter, Gililland discussed the search with Remy Heng, Jay Grivette, Christopher Warren, and Michael Llamas, all subjects in this and other criminal investigations.[8] Heng is a co-defendant in this case. Grivette was a subject of this investigation.[9] Grivette is also presently under indictment for an indoor marijuana grow.[10] In a proffer, Grivette himself admitted that he was conspiring with Gililland in connection with various mortgage fraud schemes.[11] Christopher Warren was the subject of another mortgage fraud case and is presently in custody for a large fraud scheme.[12] Count 24 of the First Superseding Indictment in this case concerned joint conduct between Gililland and Christopher Warren. In his own declaration, at paragraph 3, Gilliland mentions immediately calling Michael Llamas after the search warrant. Like Warren, Llamas was a subject of another fraud investigation. Later that summer, Llamas, Warren, and Grivette were mentioned in paragraph 14 of two search warrants.[13] So, the day after the search warrant Gililland demonstrated that the only "cooperation" he intended was with other criminals. And, of course, in the spirit of cooperation, he fled the United States and was extradited from Spain over his objection.

Defendants' vague argument for "dismissal of the indictment" illustrates how inappropriate that

---

him three to five years if he cooperated. Were he to testify, Roberts would categorically deny he said that. Roberts has been an FBI agent for 14 years. He knows that sentencing is a matter for the Court and that only the U.S. Attorney's Office can make sentencing recommendations to the Court. The Court should reject Gililland's incredible suggestion.

[8] Exhibit C (FBI FD-302 interview summary of Remy Heng).

[9] Grivette was the seller of the house at 14718 Masterson Way, Magalia, CA, which was charged as Count 23 of the First Superseding Indictment, and then as Count 34 of the Second Superseding Indictment, in this case.

[10] See United States v. Grivette, Cr. No S-10-220 GEB, Docket # 1 (Indictment).

[11] See Exhibit D (FBI FD-302 interview summary of Grivette); see Exhibit E (checks from Grivette seized in search warrant of Gililland's Chico house).

[12] See United States v. Warren, Cr. No. S-09-121 FCD, Docket # 4 (Indictment).

[13] See 2:08-SW-361 DAD, Docket #5, and 2:08-SW-362 DAD, Docket # 4.

remedy is. Defendants fail to note that **three indictments** have been filed against them. The initial indictment was filed **August 14, 2008**.[14] After the two were arrested in Spain on October 16, 2008, a First Superseding Indictment was filed **October 29, 2008.**[15]  That was **nine months** before the FBI interviewed Tony Symmes.[16]  It was **ten months** before Wing and Symmes sat down for a proffer on **August 26, 2009**. In twenty-four counts of mail fraud, and a money laundering conspiracy, the First Superseding Indictment already laid out the same scheme defendants face in the Second Superseding Indictment they claim Wing tainted. As is evident from a review of the First Superseding Indictment, there is a money trail among the conspirators reflected in the bank records. The government knew it before Symmes and Wing came along. So, dismissal of the Second Superseding Indictment would still leave defendants charged with the same crimes under the First Superseding Indictment. For that reason, too, defendants' motion fails.

## IV.  CONCLUSION

In denying the defendants' motion, the Court is respectfully requested to make the following findings of fact and conclusions of law: (1) there has been no showing of government misconduct; (2) there has been no intentional government intrusion into defense plans or strategy; and (3) the meeting with Wing and Bonjour, and the sealed email, could not substantially prejudice the defendants, even had the government learned the contents of the communications. See Hernandez, 937 F.2d at 1493-94; Williams, 384 F.3d at 585; Clutchette, 770 F.2d at 1471-72.

BENJAMIN B. WAGNER
United States Attorney

Date: 3/18/11                      */s/ Russell L. Carlberg*
                                   By: RUSSELL L. CARLBERG
                                   Assistant United States Attorney

---

[14]  Docket #1 (Indictment), Cr. No. S-08-376 EJG.

[15]  Docket #10 (First Superseding Indictment), Cr. No. S-08-376 EJG.

[16]  FBI SA Mark Roberts interviewed Symmes in Chico on **July 9, 2009.** See Exhibit F (FBI FD-302 regarding interview of Symmes).