# EXHIBIT D

**FBI FD-302 interview summary of Grivette**

# Internal Revenue Service
# Criminal Investigation

## Memorandum of Interview

| | | | |
|---|---|---|---|
| **In Re:** | GILILLAND | **Location:** | U.S Attorney's Office Sacramento, CA |

**Investigation #:** 1000220026
**Date:** March 23, 2009
**Time:** 11:00am-4:30pm
**Participant(s):** Jay Grivette, Interviewee
Mark Reichle, Grivette's Attorney
Mark Roberts, Special Agent, FBI
Andrew Harrison, Special Agent, IRS-CID
Russell Carlberg, AUSA

At the time, date, and location indicated above GRIVETTE met with federal agents. In response to our questions, GRIVETTE provided the following information:

1. Garret GILILLAND (GILILLAND) found a buyer (Earl ARMOR) for GRIVETTE'S property located on Masterson Way in Magalia. Originally, GILILLAND tried to sell this property to a lady named SANTILLY but she was unable to make the purchase. The appraisal for this property was done in the name of SANTILLY. GRIVETTE used his computer to change the name and lender on this appraisal so that it could be used for ARMOR. GRIVETTE did this at GILILLAND'S instruction. GILILLAND had changed names like this in the past on appraisals.

2. Prior to GILILLAND finding a buyer, GRIVETTE had this property listed for sale for 5-10 months. GRIVETTE originally listed this property for $329,000. GRIVETTE reduced the price to $299,000 and eventually to $259,000. GILILLAND sold it to ARMOR for $320,000. GILILLAND wanted 50% of what GRIVETTE would make above his payoff on his loan. GRIVETTE paid him what he owed after he deducted what GILILLAND owed him from GILILLAND'S business FLOORS TO GO.

3. Prior to selling this property, GRIVETTE rented it to his foreman. After the sale to ARMOR, the foreman stayed in the house but GRIVETTE no longer collected the rent. It was ARMOR who was supposed to receive the rent.

4. After the sale, GRIVETTE received a telephone call from the mortgage broker, Carlos CHAMORRO. CHAMORRO advised GRIVETTE that the loan was in a first month default and asked GRIVETTE why the tenant was not paying ARMOR. CHAMORRO explained that this would create a problem for CHAMORRO'S wife (her broker's license was used). CHAMORRO suggested that he and GRIVETTE each pay half of the monthly mortgage payment. GRIVETTE declined to do this.

5. ARMOR and GILILLAND represented to GRIVETTE that ARMOR had an entertainment company, rented equipment, and had several rental properties in Atlanta and Southern California. Because GRIVETTE was trying to start a business (Tires to Fuel), he bought aged shelf corporations from ARMOR that could be used to obtain lines of credit. Those companies were Platinum Star Enterprises and King Star Entertainment. Besides this, the only money GRIVETTE ever paid to ARMOR was pro-rated rent on the Masterson property after the sale. ARMOR also claimed to GILILLAND that he could get false identification, as well.

6. GRIVETTE remembers hearing GILILLAND threaten EARL ARMOR over some car payments that ARMOR was supposed to make on one of GILILLAND'S cars but was not making.

7. GILILLAND was in the business of purchasing properties from developers and re-selling them for a profit. GILILLAND represented that he would negotiate deals with a builder to purchase properties. GILILLAND would put 20% down and re-sell the property. GILILLAND used a title company in southern California to transfer title and GILILLAND would get cash back. GRIVETTE figured out that GILILLAND wasn't putting any money down on these properties. Eventually, GILILLAND explained the scam to him.

8. GILILLAND did real estate deals with builder Tony SYMMES. In March or April of 2008, GRIVETTE was at GILILLAND'S house in Chico when GRIVETTE observed GILILLAND with a large escrow check payable to

SYMMES. During this visit, GRIVETTE also heard GILILLAND having a telephone conversation with SYMMES. GRIVETTE recalls that they were having an argument. SYMMES was trying to keep his escrow checks from being sent directly to GILILLAND. GRIVETTE heard GILILLAND state, "Hahaha this is my escrow company, now let's get together and do the deal."

9. GRIVETTE accompanied GILILLAND to a meeting with SYMMES in the parking lot of Tri-Counties bank on Mangrove Avenue in Chico. SYMMES arrived in a black Toyota Tacoma pick-up. GRIVETTE observed GILILLAND and SYMMES exchange checks in the parking lot. GILILLAND received a check from SYMMES in the amount of $54,000 (GRIVETTE is not positive on the amount). GILILLAND took the check directly to the Wells Fargo Bank in downtown Chico where he deposited it.

10. Shortly before the raid on GILILLAND's house, GILILLAND told GRIVETTE that ARMOR and one or two others blackmailed SYMMES for $30,000 or $60,000. GILILLAND told GRIVETTE that the person who blackmailed SYMMES was a straw buyer. GILILLAND told GRIVETTE this after he took a cell phone call at BIG AL'S Restaurant in Chico.

11. GRIVETTE has also come to know well one of GILILLAND's close associates, Eric CLAWSON. GILILLAND threatened a lot of people with CLAWSON, who is a 6'5" cage fighter. For example, GILILLAND told GRIVETTE that he took CLAWSON to Justin MONACO'S house and had CLAWSON slap MONACO around. CLAWSON would pick up rent checks for GILILLAND, too. At GILILLAND'S request, CLAWSON purchased two houses through GILILLAND. Ultimately, even CLAWSON told GRIVETTE that he felt like he had paid too much for the houses, that GILILLAND had "screwed" him.

12. On one occasion, GILILLAND asked GRIVETTE to do a verification of employment for one of GILILLAND's buyers. GILILLAND wanted GRIVETTE to confirm for a lender that an individual worked for GRIVETTE and was paid $10,000 per month. GRIVETTE refused to do this because he knew it was wrong.

13. The same day that the search warrant was served at GILILLAND'S house in Chico, GRIVETTE met with GILILLAND at the Italian Cottage restaurant in Chico. GILILLAND was in a panic and explained that he wanted to sell his custom motorcycle to get money to pay an attorney. GILILLAND said that it was the worst day of his life and he was, "busted for sure".

14. GILILLAND also discussed deeding his Kanaka Ranch Road property (in Feather Falls, California) to GRIVETTE. The plan was for GRIVETTE to sell the property and apply the proceeds to an attorney for GILILLAND. GRIVETTE and GILILLAND spent the rest of the day getting this property transferred to GRIVETTE'S name.

15. GILILLAND said he was not going to tell SYMMES about the search warrant because SYMMES was already in the process of pulling properties from GILILLAND'S inventory because GILILLAND wasn't performing according to their agreement. GRIVETTE had met SYMMES once with Allan Chambers.

16. GRIVETTE, GILILLAND, and Chris WARREN were working together to sell several properties in Florida through a company called SunVest. Michael LLAMAS had found the properties. CHAMORRO found some Southern California buyers for GILILLAND to use. United Financial Investment (UFI) was WARREN'S business. The plan was that everyone who bought a property would put money into UFI. GRIVETTE never put his own money into UFI.

17. GRIVETTE pushed ten deals with SunVest for four different people, including two condos for himself. WARREN told GRIVETTE that they had falsified ("fab'd") bank statement on GRIVETTE'S Florida SunVest purchases. These properties are now in foreclosure.

18. GRIVETTE said that what had been wrong with the SunVest deals was that not everything was getting disclosed to the lenders. In addition, WARREN represented to GRIVETTE that these condos were being rented for much more than they really were.

19. GRIVETTE'S employee, NICK TROVER, had his name submitted for one of the SunVest condo properties, and GRIVETTE'S foremen, DIAZ-INFANTE, had done the verification of employment (VOE) for TROVER. However, the

amount of his earnings was inaccurate. WARREN used a much higher income amount on TROVER'S loan application than he actually made. When GRIVETTE found out about this, he contacted WARREN and instructed him to cancel the deal.

20. One condo was for a guy named COREY BOYKIN, who GRIVETTE employed and paid $7,000-8,000/ month.

21. After the search warrant, GILILLAND asked GRIVETTE for money. Twice GILILLAND threatened GRIVETTE that he would turn him in on the ARMOR deal and the Florida SunVest deals. GRIVETTE gave GILILLAND money on three different occasions in two payments of $15,000 and one of $10,000.

22. Regarding AFP and Lee LOOMIS, GRIVETTE purchased two homes from builder Larry BIEGLER in GRIVETTE'S name, at LOOMIS' request. BIEGLER built the house 1000 Pearson in Paradise and two others, perhaps on Russo and Grenada. These properties were to be re-sold to AFP clients with the profits going to AFP. Freedom Financial did 7-8 loans on properties for AFP. Also at LOOMIS' request, GRIVETTE was the guarantor. LOOMIS told GRIVETTE that this would be the fastest way to get money for AFP. Christina McClain was the processor for these deals.

23. Regarding the Laburnum Avenue properties in Chico, an AFP of California investor had deeded those lots to AFP, and AFP in turn deeded them to GRIVETTE. The investors in AFP would feed the "machine" that was necessary to keep the real estate sales program running. At one time LOOMIS told payroll at AFP of California to stop paying payroll taxes for AFP of California employees.

24. When asked if he was the president of Nationwide Lending Group, GRIVETTE responded; "I may or may not have been. I don't think I was." GRIVETTE never reviewed loan applications.

25. AFP had a line of credit with Freemont Bank. LOOMIS negotiated the line of credit using the AFP of Chicago business model. There was one line of credit for $7.5 million and one for $2.5 million. These credit lines were collateralized by properties. GRIVETTE had his own $250,000 line of credit

at Freemont Bank. GRIVETTE and LOOMIS dealt with Doug COOK at Freemont Bank (510-505-5305/510-207-7703).

26. When GRIVETTE was Manager of AFP of California, GRIVETTE flew to Chicago and met with Chris Rowlan, Randy Rants, and Robert Block.

27. LOOMIS owed GRIVETTE $530,000 for houses that GRIVETTE had sold to AFP, and $500,000 on commissions, based upon the LOOMIS compensation structure. Noel Gudrow was the attorney with whom GRIVETTE negotiated this deal.

28. LOOMIS created the NARAS Fund. At LOOMIS' direction, GRIVETTE signed documents verifying $10 million in deposits with the NARAS Fund. GRIVETTE knew there was never $10 million in the NARAS Fund when he signed the documents.

29. LOOMIS had told GRIVETTE that WARREN had done some fraudulent deals and that is why he had fired him. This happened before the SunVest deals.

30. In July 2008, GRIVETTE met with GILILLAND, CHARLOS CHAMORRO, ERIC ESTRADA, and WARREN in Sacramento at the 13th Street Steakhouse. At the meeting, they discussed the recent search warrant at GILILLAND's house. GRIVETTE remembers ESTRADA discussing how he had connections in Las Vegas for VIP treatment. GRIVETTE was intimidated by ESTRADA because GILILLAND used to say that ESTRADA was connected to the Mexican Mafia. GRIVETTE also recalls GILILLAND explaining a theory to him that if GILILLAND left the country he would be able to negotiate a better deal through his attorney.

31. In September or October, 2008, WARREN told GRIVETTE that he was cooperating with the government. WARREN had said that he told the government that he and CAVELL were off limits and that it had endorsed TRIDUANUM MORTGAGE BANK. TRIDUANUM was unique because it would turn out documents in three days, and this was supposed to appeal greatly to brokers.

32. Some time after that, a man named SCOTT HARVEY accompanied GRIVETTE to a meeting that GRIVETTE had with CAVELL and WARREN

at their place in Sacramento. HARVEY has an extensive criminal record and he was very "protective" of GRIVETTE when talking to WARREN. HARVEY told WARREN that he would commit a federal crime if he took down GRIVETTE. HARVEY drove a vehicle with a Washington State license plate. HARVEY is a separatist and a "Peckerwood." GRIVETTE does not know what a Peckerwood is exactly, but he had heard ERIC CLAWSON mention it in the past.

33. GRIVETTE is known to hire and help out some parolees with construction work. For example, COREY and MATT BOYKIN, Dean LNU, SCOTT HARVEY, and GUNNER ROGERS all have criminal records. ROGERS would work directly for COREY BOYKIN.

*Andrew Harrison* (signature)
Andrew Harrison
Special Agent

*Mark H. Roberts* (signature)
Mark Roberts
Special Agent