BENJAMIN B. WAGNER
United States Attorney
CHRISTOPHER HALES
AUDREY B. HEMESATH
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. CRS-08-0376-WBS |
| Plaintiff, | GOVERNMENT'S TRIAL BRIEF |
| v. | DATE: July 8, 2014 |
| LEONARD WILLIAMS, | TIME: 9:00 a.m. |
| | COURT: Hon. William B. Shubb |
| Defendants. | |

# CONTENTS

I. INTRODUCTION ..................................................................................................................3

II. STATEMENT OF FACTS .....................................................................................................
    A. Beginnings of the Fraud Scheme ................................................................................3

    B. Diamond Hill Financial................................................................................................4

    C. Bay Area Real Estate ...................................................................................................5

III. PROPOSED JOINT STATEMENT OF THE CASE ............................................................9

IV. EVIDENCE ............................................................................................................................9
    A. Witnesses ....................................................................................................................9

    B. Documents ................................................................................................................10

V. THE INDICTMENT ............................................................................................................10
    A. Elements of Conspiracy to Commit Mail and Wire Fraud .......................................10

    B. Transactions in Criminally Derived Property – 18 U.S.C. § 1957 ...........................12

VI. EVIDENTIARY ISSUES .....................................................................................................13
    A. Intent to Repay is No Defense ..................................................................................13

    B. Reckless Disregard for Truth is Sufficient to Convict ..............................................13

    C. Lender Negligence is No Defense .............................................................................14

    D. The Defendant's Own Statements ............................................................................14

    E. Co-Conspirator Statements .......................................................................................15

    F. Expert Testimony......................................................................................................16

    G. Summary Witness Andrew Harrison ........................................................................17

    H. Testimony of Joshua Clymer ....................................................................................18

    I. Possible Fifth Amendment Assertions By Witnesses...............................................18

    J. Admission of Business and Public Records..............................................................19

    K. Issues Raised in Williams' Trial Brief......................................................................19

VII. POSSIBLE DEFENSES ......................................................................................................20

VIII. WITNESS EXCLUSION AND CASE AGENT DESIGNATION .....................................20

IX. CONCLUSION....................................................................................................................20

I. **INTRODUCTION**

Trial begins July 8, 2014, at 9:00 a.m. The estimated trial time is approximately two weeks. The defendant is out of custody. In a third superseding indictment returned on February 23, 2012, Leonard Williams was charged with one count of conspiracy to commit mail and wire fraud (18 U.S.C. § 1349) and two counts of money laundering (18 U.S.C. § 1957).[1]

II. **STATEMENT OF FACTS**

A. **Beginnings of the Fraud Scheme**

This is a mortgage fraud case. Defendant Leonard Williams was a licensed real estate salesperson. From 2006 through 2008, he conspired with co-defendant Joshua Clymer and others in a property flipping and loan origination fraud scheme involving houses in Chico and Sacramento. Williams and Clymer encouraged underqualified buyers to purchase homes at an inflated price, and then distributed the fraud proceeds to their co-conspirators, keeping the biggest chunks of money for themselves. There were two primary hallmarks of the fraud: (1) falsifications on the loan application of the home buyer; and (2) in most cases, cash back outside of escrow and not disclosed to the lender. Many of the properties included a third hallmark: (3) falsified down payments.

Williams and Clymer facilitated the falsifications on the loan application in order to obtain as large a loan as possible from the lenders. Williams and Clymer routed cash outside of escrow to pay kickbacks to co-conspirators in the fraud scheme outside of the scrutiny of the lenders.

The scheme began in 2006, when Williams was working for the Sacramento-area mortgage broker Great American Mortgage. Clymer joined Williams at Great American Mortgage that same year, after responding to a Craigslist ad. Williams and Clymer were tasked with meeting prospective customers looking for loans. While at Great American Mortgage, Williams and Clymer purchased several houses that they then flipped to straw buyers using a double escrow scheme. Two of these properties are listed in the third superseding indictment (3332 X Street and 7320 Florinda Way) but the

---

[1] Williams was originally indicted on June 17, 2010 in the second superseding indictment, on two counts of mail fraud (18 U.S.C. § 1341). These two counts of mail fraud relate to the current charge of conspiracy to commit mail fraud, and the government intends to prove the mail fraud on these two properties as part of its proof of the conspiracy.

Williams is the last remaining defendant in the 08-cr-376 case, though his co-defendant Joshua Clymer has yet to be sentenced.

government does not intend to prove these properties at trial.

Also while Williams and Clymer were still at Great American Mortgage, Williams induced a straw buyer named Arthur Watson to purchase one of three houses that Watson would eventually purchase through the scheme. Watson was a long-time Air Force friend of Williams; in 2006 he had just come out of a difficult chapter of his life which included eviction and drug use. Williams assisted Watson in rebuilding his credit and generally providing friendship. Williams offered Watson cash in exchange for his participation in the scheme as a straw buyer. The first property Williams had Watson purchase was 964 Gidda Loop Drive in Yuba City. Watson understood that he would never live in the house. Williams promised Watson a chunk of money back after the loan went through, out of which Watson would pay the first three months' mortgage on the house, and then Watson could keep the remainder of the money for himself. After the first three months, the verbal agreement was that Williams would be responsible for paying the mortgage on the house. Watson trusted Williams to prepare all the paperwork for the loan. Watson signed whatever Williams asked him to. The loan application for this property listed Watson's employer as D and W Handyman Services, which was true, but falsely inflated his income to $8,078 per month, which was false. The loan bears Williams' signature as the interviewer. This loan was funded, and Watson received a kickback of approximately $14,000 outside of escrow from this deal.

### B. Diamond Hill Financial

In 2007, Williams and Clymer left Great American Mortgage to work together. This work was done largely through Williams' shelf company, Diamond Hill Financial. Williams had previously given Clymer treasury authority at Diamond Hill Financial and permitted him to sell Diamond Hill Financial assets. When the pair began working at Diamond Hill Financial in 2007, they moved their real estate licenses to a new broker, Unifund. The two opened an office on Watt Avenue. Williams was the signatory on the Diamond Hill Financial bank account.

Williams approached Arthur Watson about buying another house: **2640 Ceanothus Avenue** in Chico. Watson was pleased with the Gidda Loop deal and trusted Williams, so he agreed. Once again, Watson was only responsible for signing documents; Williams handled the rest of the loan application. This loan application falsely listed Watson as an 8-year employee of Diamond Hill Financial – indeed,

the Marketing Director at Diamond Hill – and again inflated his monthly income. Williams verified Watson's employment in a letter in the loan file. The loan application also falsely indicated that Watson was receiving monthly rental income from Gidda Loop; in fact the rental income from Gidda Loop went to Williams. The loan file also contained falsified monthly bank account statements for Watson, showing inflated liquid assets. The lender approved a 100% financed loan of $375,000.

The seller of the Ceanothus property was a Chico home builder named Tony Symmes. Symmes pleaded guilty in 2:10-cr-200 EJG to conspiracy to commit mail fraud and money laundering, conduct related to the instant case. He cooperated and received a reduced sentence pursuant to a government motion under Sentencing Guidelines § 5K1.1. Symmes worked with promoter Garrett Gililland, who pleaded guilty in the instant case to mail fraud and money laundering. Through Gililland, Symmes found buyers for his residential homes. Gililland found Williams, and Williams found Watson. Symmes sold the Ceanothus house to Watson for $375,000, even though according to Symmes the true price of the home was $290,000. Symmes gave $46,250 back to Diamond Hill Financial (Williams) outside of escrow, understanding that this cash back outside of escrow was a kickback check to the promoters and straw buyer for facilitating the sale. From this $46,250, Williams paid: Watson, Clymer, and a loan processor named Jan Vawter. He kept most of the kickback for himself.

Watson was the straw buyer for a third Chico property, **3294 Rockin M Drive**. Symmes was also the seller on this property. The Ceanothus and Rockin M deals closed within one month of each other in the summer of 2007. The Rockin M loan application contains many of the same falsehoods: Watson's employment at Diamond Hill Financial, inflated income, rental income, altered bank statements, and inflated assets. Symmes kicked $30,000 back to Diamond Hill Financial on Rockin M, which Williams once again distributed, keeping the majority for himself.

Watson never even visited the three properties he bought through Williams, let alone lived there, notwithstanding the fact that each of the loan applications stated the property would be Watson's primary residence. Each of the properties went into default within about a year of purchase.

C. **Bay Area Real Estate**

In the spring of 2007, Williams and Clymer formed a new company, Bay Area Real Estate Holdings LLC ("B.A.R.E."). Whereas Diamond Hill Financial was primarily Williams' company,

GOVERNMENT'S TRIAL BRIEF         5

1  B.A.R.E. was to be an equal partnership between Williams and Clymer, with proceeds shared 50/50.
2  The two shared bank signature authority over the B.A.R.E. bank account. Williams and Clymer kept the
3  Diamond Hill Financial company going as well, and in fact, they used Diamond Hill Financial to prop
4  up the real estate deals done by B.A.R.E., by falsely listing Diamond Hill Financial as the place of
5  employment for several recruited home buyers. The B.A.R.E. business model was similar to that of
6  Diamond Hill Financial: find trusting, unqualified buyers to buy homes at an inflated price, obtain as
7  high a loan amount as possible through fraud, and distribute the fraud proceeds outside of escrow.

8      The B.A.R.E. deals are all fraudulent double-escrow deals, which worked as follows: Williams
9  and Clymer would first identify a home that they believed they could put under contract for a low price,
10 but would appraise for a high price. They would make an offer for B.A.R.E. to buy the house at the low
11 price. Once the house was under contract for the low price, Williams and Clymer would try to find a
12 buyer to whom they planned to sell the house on the same day they were going to buy it. Williams and
13 Clymer would recruit a buyer by promising cash back (though in the end it was not always given),
14 offering illusory "equity" in the home that resulted from a fictional down payment that never actually
15 changed hands, and/or touting the property as an investment that the recruited buyer could rent out.
16 B.A.R.E. would enter into a purchase agreement with the recruited buyer for the high price. Williams
17 and Clymer would assist the recruited buyer in obtaining a loan to fund the high purchase price with a
18 fraudulent loan application. The property would then go into the double escrow. The only real source
19 of funds in these double escrows was the fraudulently obtained loan proceeds. Those loan proceeds
20 would be used to pay the original owner of the house off at the lower price, satisfying B.A.R.E.'s
21 contract to purchase the house. The remainder of the loan amount (minus various transaction costs)
22 would go to B.A.R.E. as the proceeds of the fraud, to be divided among the participants. The higher the
23 loan amount, the greater the proceeds of the fraud. Williams and Clymer were reliant on the double
24 escrow scheme because B.A.R.E. did not have enough money to buy the houses outright and then flip
25 them – they had to flip them within the double escrow.

26     The first recruited buyer Williams and Clymer used at B.A.R.E. was Josh Frye. Frye was a very
27 young real estate agent who had no job at the time. B.A.R.E. went into contract on **4824 Baker Avenue**
28 in Sacramento with the first seller for a purchase price of $250,000. While under contract, B.A.R.E.

then prepared a purchase agreement indicating B.A.R.E. was selling Baker to Frye for $350,000. Williams and Clymer did not make any improvements on the house to justify the new, higher sale price. To fund the $350,000 sale, Williams and Clymer facilitated the preparation of a fraudulent loan application for Frye. Rather than accurately listing no income, the loan application falsely stated that Frye made $7292 a month, working as a Sales Rep at Diamond Hill Financial (still a Williams/Clymer company). The loan application also stated that Frye had $61,488 in liquid assets; this was false. The lender on this property verified employment at Diamond Hill Financial by searching for contact information for the company on the internet, calling the listed number, and speaking to Leonard Williams. The lender funded a $315,000 loan. In addition to the falsehoods in the loan application, the lender was unaware that B.A.R.E. would be willing to forego the down payment. The lender was also unaware that cash would go back to Frye outside of escrow. Through the double escrow, B.A.R.E. was able to pay the original seller the low purchase price (the $250,000) with the funds from the $315,000 loan Williams and Clymer obtained for Frye. Williams and Clymer paid Frye a $17,859 kickback. Williams and Clymer each profited $15,166 as their kickback on this sale. Frye eventually defaulted on the loan and the property was sold at foreclosure.

The next buyer was Juan Reynaga. Reynaga is a Corrections Officer at San Quentin State Prison. B.A.R.E. went into contract on **2976 Trap Rock** in Sacramento with the first seller for a purchase price of $279,000. While under contract, B.A.R.E. then prepared a purchase agreement indicating B.A.R.E. was selling Trap Rock to Reynaga for $420,000. To fund this sale, Williams and Clymer assisted in preparing Reynaga's loan application. This loan application does not contain false employment information, but it does contain a false gift affidavit indicating that Reynaga received an $84,000 gift from his brother. The loan file also contains a check in that amount purporting to be Reynaga's $84,000 down payment, but the check was never cashed. The purpose of the gift affidavit and the check were to give the impression that Reynaga was able to make a sizable down payment. In fact, Williams and Clymer (as B.A.R.E.) were willing to forego this down payment entirely. The lender gave a $336,000 loan. Reynaga was not a straw buyer in the sense that he did reside in the Trap Rock home. He received no cash back for his participation, though cash back was a part of the initial pitch he had received from Williams and Clymer. Via the double escrow flip and loan origination fraud,

1   Williams and Clymer were able to profit $16,540 each. Reynaga later defaulted and went into
2   bankruptcy. He entered a loan modification agreement with the lender that significantly reduced the
3   amount that he owed.
4       The next buyer was Lacie Clymer, Josh Clymer's sister. Lacie Clymer worked part-time in retail
5   sales jobs at Aaron Brothers and Pottery Barn. B.A.R.E. went into contract on **11516 Linday Way** in
6   Gold River with the first seller for $315,000. While under contract, B.A.R.E. then prepared a purchase
7   agreement indicating B.A.R.E. was selling Linday way to Lacie Clymer for $500,000. When the
8   appraisal did not come back high enough, the purchase amount was amended to $478,000. To fund this
9   sale, Williams and Clymer assisted in preparing Lacie Clymer's loan application. Rather than listing
10  Lacie Clymer's approximate $800 per month earnings as a retail sales clerk, the loan application falsely
11  stated that she worked as a sales representative at Diamond Hill Financial, making $8,893 per month.
12  Williams verified this employment telephonically, as in the Frye deal. The loan application also falsely
13  listed $147,764 in liquid assets. The lender funded a loan for $382,400. The lender was unaware that
14  B.A.R.E. was willing to forego an almost $100,000 down payment from Lacie Clymer. The lender was
15  unaware that Lacie Clymer would receive $9,500 cash back outside of escrow. For this deal, Josh
16  Clymer profited approximately $36,000. Because he "originated" the deal with his sister, he did not
17  have to share the profits with Williams under their B.A.R.E. partnership agreement; however, Diamond
18  Hill Financial also profited $825 for its role in this deal. Lacie Clymer later defaulted on her loan and
19  the house was sold at foreclosure.
20      The next buyer was Anthony Petri. Petri was a used car salesman. B.A.R.E. went into contract
21  on **5548 Woodforest** in Sacramento with the first seller for $179,000. While under contract, B.A.R.E.
22  then prepared a purchase agreement indicating that B.A.R.E. was selling Woodforest to Petri for
23  $300,000. To fund this sale, Williams and Clymer assisted in preparing Petri's loan application. The
24  loan application falsely listed Petri as a Sales Manager at Diamond Hill Financial, making $11,200 per
25  month. Williams verified this employment telephonically. The loan application also contained falsified
26  W-2s and Diamond Hill Financial pay stubs. The application lists approximately $60,000 in liquid
27  assets; a claim buttressed by a purported gift letter from Petri's mother for $60,000. There was no real
28  $60,000 gift. The lender funded a loan for $240,000. The lender was unaware that B.A.R.E. was

GOVERNMENT'S TRIAL BRIEF                    8

willing to forego a $60,000 down payment.  Though he was initially promised cash back, Petri did not receive cash back from this deal.  Williams and Clymer each profited $16,599 from the Woodforest deal.  Petri later defaulted on his loan and went into bankruptcy, after which his loan terms were modified.

There are eleven properties listed in the conspiracy charge in the indictment; the government will focus on the six highlighted above at trial.

### III. PROPOSED JOINT STATEMENT OF THE CASE

Leonard Williams is charged with one count of conspiracy to commit mail and wire fraud and two counts of money laundering in connection with his real estate businesses, Diamond Hill Financial and Bay Area Real Estate.  The government alleges that Mr. Williams was a licensed real estate broker who conspired with others to conceal or misrepresent facts to lenders on real estate transactions, and to use or cause to be used the United States mail or interstate wires in connection with those transactions.  Mr. Williams is also charged with two counts of money laundering in connection with the sale of one particular house.  Mr. Williams has pleaded not guilty to all of these allegations.

### IV. EVIDENCE

#### A. Witnesses

A witness list has been concurrently filed with this brief.  The government has erred on the side of including witnesses and may not call every witness on the list, particularly in view of how the case develops at trial.  The government's investigation of the case and preparation for trial continues, and the government reserves the right to add witnesses should it become necessary.

In summary form, these witnesses are:

- the buyers (Arthur Watson, Josh Frye, Juan Reynaga, Lacie Clymer, and Anthony Petri)
- one seller (Tony Symmes)
- lender witness from the primary loans on most of the houses, and some lender witnesses from the secondary loan market
- a witness from MLS (William Miller)
- expert witness Tom Pool
- bank witnesses from Bank of America, Safe Credit Union, and U.S. Bank

- County Recorders from Butte and Sacramento counties
- Josh Clymer (co-defendant)
- Jan Vawter (loan processor for Diamond Hill Financial and Bay Area Real Estate)
- Jessica Sawyer (office employee of Garrett Gililland)
- Melissa Maclay (verification of employment for one lender)
- Terrence Murrell (friend of Williams and former "CFO" of Diamond Hill Financial)
- Summary agent (Andrew Harrison)

Because several of the buyers and lenders are responsible for two or more of the properties, it will not be possible to present all of the evidence in order. The government will make every effort to present the evidence to the jury in an understandable sequence.

**B.    Documents**

The documentary evidence in this case is organized by property, for each of the six properties the government will prove at trial. The government will offer the following from each loan file: the loan application; the purchase agreement; any supporting documentation (gift letter, verification of employment, bank account statements, W2s, pay stubs). The government will offer HUD-1s and settlement statements to indicate the failure to disclose the willingness to forego the down payment and the cash outside escrow.

The government will also offer various financial records to document the money trail through the escrow (or double escrow) and back out to Williams. The government will introduce the checks and cashier's checks specific to the two money laundering counts, as well as the bank account statement from the month of those transactions.

Finally, the government will offer documents to demonstrate the use of the mail and/or wires on some of the transactions.

**V.    THE INDICTMENT**

Williams is charged in count one of the indictment with conspiracy to commit mail fraud and wire fraud. He is also charged in counts two and three with transactions in criminally derived property.

**A.    Elements of Conspiracy to Commit Mail and Wire Fraud**

To prove conspiracy to commit mail and wire fraud, the United States must prove that:

      (1)      there was an agreement between two or more persons to commit the crime of mail/wire fraud;

      (2)      the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it.

Ninth Circuit Model Criminal Jury Instructions § 8.20.

This is a multiple object conspiracy (mail and wire fraud), but the government prevails if it proves either one or the other. *United States v. Arlt*, 15 Fed.Appx. 431 (9th Cir. 2001) ("A general guilty verdict on a multiple object conspiracy count is adequate as long as the evidence is sufficient as to any one of the objects charged."); *Griffin v. United States*, 502 U.S. 46, 56–57 (1991). The agreement that forms the basis for the conspiracy need not be explicit, but may be inferred from the defendant's acts or from other circumstantial evidence that the conspirators acted together for a common illegal goal. *United States v. Calabrese*, 825 F.2d 1342, 1348 (9th Cir. 1987); *United States v. Hayes*, 190 F.3d 939, 941 (9th Cir. 1999), *reh'g en banc*, 231 F.3d 663 (9th Cir. 2000) (vacated on other grounds). The Ninth Circuit has held that "[i]nferences of the existence of such an agreement may be drawn 'if there be concert of action, all the parties working together understandingly, with a single design for the accomplishment of a common purpose.'" *United States v. Hubbard*, 96 F.3d 1223, 1226 (9th Cir. 1996), *quoting United States v. Monroe*, 552 F.2d 860, 862 (9th Cir. 1997). The Ninth Circuit has also held that an implicit agreement may be inferred from circumstantial evidence if "the nature of the acts would logically require coordination and planning." *United Stated v. Garcia*, 151 F.3d 1243, 1244 (9th Cir. 1998) (9th Cir. 1999).

Williams is not charged with wire fraud or mail fraud (only the conspiracy to commit wire/mail fraud). To prove the conspiracy count, the government need not prove actual mailings or wirings, but only the agreement to commit the fraud. *United States v. Stewart*, 988 F.2d 125, *1 (9th Cir. 1993) ("In any event, as Stewart recognizes, the government need not prove an actual mailing in order to prove conspiracy to commit mail fraud."). The government will need to prove actual mail or wire fraud in conjunction with the two money laundering counts on one of the properties, discussed in the next subsection.

     A false statement is material if it has "a natural tendency to influence, or is capable of

GOVERNMENT'S TRIAL BRIEF      11

influencing," a lending institution. *United States v. Gaudin*, 515 U.S. 506, 509 (1995). Because this standard examined whether the statement is capable of influencing the addressee's action, the Ninth Circuit explains: "a misrepresentation may be material without inducing any actual reliance. What is important is the intent of the person making the statement that it be in furtherance of some fraudulent purpose." *United States v. Blixt*, 548 F.3d 882, 889 (9th Cir. 2008) (quotation omitted). Stated otherwise, "capable of influencing is an objective test, which looks at the intrinsic capabilities of the false statement itself, rather than the possibility of the actual attainment of its end." *United States v. Peterson*, 538 F.3d 1064, 1072 (9th Cir. 2008) (quotation omitted).

### B. Transactions in Criminally Derived Property – 18 U.S.C. § 1957

Section 1957 makes it an offense for any person to conduct any monetary transaction involving more than $10,000 in criminally derived property. Its purpose is to make it difficult for wrongdoers to place their ill-gotten gains in the banking system. *United States v. Rutgard*, 116 F.3d 1270, 1291 (9th Cir. 1997) (Section 1957 is designed to freeze criminal proceeds out of the banking system).

The United States must prove that:

(1) The defendant knowingly engaged or attempted to engage in a monetary transaction;

(2) The defendant knew that the transaction involved criminally derived property;

(3) The property had a value of greater than $10,000;

(4) The property was, in fact, derived from the conspiracy alleged in the indictment; and

(5) The transaction occurred in the United States.

9th Cir. Crim. Jury Instr. 8.123A.

To support the § 1957 counts, the government will need to prove that mail or wire fraud in fact occurred on the Petri/Woodforest deal. Section 1957 requires proof that the money derives from "specified unlawful activity": both mail and wire fraud are specified unlawful activities (18 U.S.C. § 1957(f)(3); 18 U.S.C. § 1956(c)(7)(A); 18 U.S.C. § 1961(1)).

Wire fraud has the following elements: a scheme to defraud, use of the wires, and the specific intent to defraud. Ninth Circuit Model Criminal Jury Instruction §8. 124; *United States v. Jinian*, 725 F.3d 954, 960 (9th Cir. 2013). Mail fraud has the same basic elements: a scheme to defraud, use of the mail in furtherance of the scheme, and the specific intent to defraud. Ninth Circuit Model Criminal Jury

Instruction § 8.121; *United States v. Meredith*, 685 F.3d 814, 820–21 (9th Cir.2012). Proof of wire fraud requires proof that the interstate wire communication actually occurred. *Jinian*, 725 F.3d at 967. Proof of mail fraud requires proof of mailing, and that the use of the mail was reasonably foreseeable. When one "does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he 'causes' the mails to be used." *United States v. Hubbard*, 96 F.3d 1223, 1229 (9th Cir.1996) (internal quotation omitted).

## VI.     EVIDENTIARY ISSUES

### A.     Intent to Repay is No Defense

Williams may seek to argue that he did not intend for the lenders to suffer permanent loss. That is irrelevant. Intent to repay is "no defense at all" to the charge of lying to obtain credit. *United States v. Benny*, 786 F.2d 1410, 1417 (9th Cir. 1986) (mail fraud scheme to defraud commercial real estate lenders); *see also United States v. Treadwell*, 593 F.3d 990, 996-97 (9th Cir. 2010); *United States v. Molinaro*, 11 F.3d 853, 863 (9th Cir. 1993). Indeed, evidence of intent to repay is inadmissible because intent to repay is not a viable defense. *United States v. Ross*, 206 F.3d 896, 899 (9th Cir. 2000) (citing *Benny*); Fed. R. Evid. 401, 402 and 403.

### B.     Reckless Disregard for Truth is Sufficient to Convict

Williams may claim that he did not know if the false statements in the loan applications were false. If he did not care about the truth, he should still be convicted. Under Ninth Circuit law, someone who does not care if his or her statements are false is just as culpable as someone who knows that they are false. In a mail or wire fraud prosecution, reckless disregard as to falsity satisfies the knowledge requirement. *United States v. Sayakhom*, 186 F.3d 928, 942 (9th Cir. 1999); *United States v. Gay*, 967 F.2d 322, 326 (9th Cir. 1992) ("We have repeatedly held that reckless indifference alone will support a mail fraud conviction."); *United States v. Schaflander*, 719 F.2d 1024, 1027 (9th Cir. 1983) ("The instruction correctly stated the law in this Circuit that reckless disregard for truth or falsity is sufficient to sustain a mail fraud conviction."); *United States v. Federbush*, 625 F.2d 246, 255 (9th Cir. 1980); *United States v. Farris*, 614 F.2d 634, 638 (9th Cir. 1979); *United States v. Beecroft*, 608 F.2d 753, 757 (9th Cir. 1979); *Irwin v. United States*, 338 F.2d 770, 774 (9th Cir. 1964).

### C. Lender Negligence is No Defense

Whether any mortgage lender acted prudently is irrelevant to whether Williams acted with intent to defraud. *United States v. Ciccone*, 219 F.3d 1078, 1083 (9th Cir. 2000); *United States v. Hanley*, 190 F.3d 1017, 1023 (9th Cir. 1999) (superseded by statute on other grounds); *Lemmon v. United States*, 278 F.2d 369, 373 (9th Cir. 1960). Williams may seek claim that certain employees of lenders were negligent in detecting his fraud. Evidence associated with this defense should not be admitted under Rules 401, 402, and 403 of the Federal Rules of Evidence.

The defendant should be precluded from advancing this defense because it is not a defense that is recognized at law. *United States v. Jimenez*, 513 F. 3d 62, 74 (3rd Cir. 2007) ("Defendant confuses the notion of defrauding a federally insured bank with the idea of defrauding its owner or directors. Thus, even if a bank officer knew the true nature of the loan transactions, the institutions could nevertheless be defrauded."); *see also Molinaro*, 11 F.3d at 857 ("[i]t is the financial institution itself—not its officers or agents—that is the victim of the fraud the statute proscribes"); *accord United States v. Ripinsky*, 109 F.3d 1436 (9th Cir. 1997).

### D. The Defendant's Own Statements

The United States may elicit testimony regarding Williams' own statements and representations. Fed.R. Evid. 801(d)(2). On the other hand, Williams' own out-of-court statements, when offered by him, are hearsay and thus inadmissible. Fed.R.Evid. 801(c). Thus, Williams cannot introduce his own statements through other witnesses but, instead, must testify in Court if he wishes to offer such testimony. *United States v. Mitchell*, 502 F.3d 931, 964-65 (9th Cir. 2007) ("There statements [by defendant] were inadmissible hearsay; as [defendant] was attempting to introduce them himself, they were not party-opponent admissions, nor did the fact that they were made more broadly self-inculpatory confession bring them within the statement-against-interest exception."); *United States v. Ortega*, 203 F.3d 675, 682 (9th Cir. 2000) (affirming trial court's preclusion of defendant eliciting on cross-examination exculpatory statements given to law enforcement officer); *United States v. Fernandez*, 839 F.2d 639, 640 (9th Cir. 1988) ("It seems obvious defense counsel wished to place [defendant's denial to police officer] before the jury without subjecting [defendant] to cross-examination, precisely what the hearsay rule forbids.").

The rule against a defendant eliciting his own hearsay statements through examination of other witnesses includes situations in which the witnesses have testified as to other statements made by the defendant during the same conversation that are inculpatory. *Ortega*, 203 F.3d at 682 (rejecting arguments that defendant should be permitted to introduce own statements because agent testified as to other inculpatory statements made as part of the same conversation, and holding rule of completeness does not apply to oral statements). A defendant is not permitted "to use the Confrontation Clause as a means of admitting hearsay testimony through the 'back door' without subjecting himself to cross-examination."). *Id.*

### E. Co-Conspirator Statements

Out-of-court statements by Clymer and uncharged co-conspirators in this case will be offered by the government as co-conspirator statements. Fed. R. Evid. 801(d)(2)(E). Williams was in business with Clymer throughout the charge period. Clymer's out-of-court statements about Diamond Hill Financial and Bay Area Real Estate are admissible co-conspirator statements, whether or not what he was doing in the joint enterprise was illegal. Co-conspirator statements made during and in furtherance of a conspiracy are admissible against all conspirators. Fed. R. Evid. 801(d)(2)(E). The predicate "conspiracy" does not have to be an illegal enterprise. Rather, "Rule 801(d)(2)(E) applies to statements made during the course and in furtherance of any enterprise, whether legal or illegal, in which the declarant and the defendant jointly participated." *United States v. Layton*, 855 F.2d 1388, 1400 (9th Cir. 1988), *overruled on other grounds in Guam v. Ignacio*, 10 F.3d 608, 612 n.2 (9th Cir. 1993). "[T]he question is merely whether there was proof of a sufficient concert of action to show the individuals to have been engaged in a joint venture." *Layton*, 855 F.2d at 1398 (internal quotation omitted).

A statement is "in furtherance" if it "furthers the common objectives of the conspiracy or sets in motion transactions that are an integral part of the conspiracy." *United States v. Yarbrough*, 852 F.2d 1522, 1536 (9th Cir. 1988). This includes:

- "statements made to induce enlistment or further participation in the group's activities;"
- statements made to prompt further action on the part of the conspirators;
- statements to "reassure" members of a conspiracy's continued existence;
- statements to allay a co-conspirator's fears; and

GOVERNMENT'S TRIAL BRIEF         15

• statements made to keep co-conspirators abreast of an ongoing conspiracy's activities. *Id*. at 1535. It is immaterial whether a statement is made to a co-conspirator or an outsider, so long as it was during and in furtherance of the conspiracy. The Confrontation Clause allows admission of co-conspirator statements. *United States v. Larson*, 495 F.3d 1094, 1099 n.4 (9th Cir. 2007) (en banc).

None of this should affect the order in which witnesses are called and exhibits offered. It is entirely proper for courts to admit co-conspirator statements before the existence of a conspiracy is established, with the statements to be striken from the evidence if the government ultimately fails to satisfy foundational requirements. *United States v. Perez*, 658 F.2d 654, 658 (9th Cir. 1981); *United States v. Zemek*, 634 F.2d 1159, 1169 n. 13 (9th Cir. 1980); *Parente v. United States*, 249 F.2d 752, 754 (9th Cir. 1957).

The preponderance of the evidence standard applies and the Court may consider the statements themselves in conjunction with surrounding circumstances. *Boujaily v. United States*, 483 U.S. 171, 176-76 (1987). Here, the government will offer a very substantial amount of evidence that Williams and Clymer were involved in jointly conducted activity, with various others assisting them in their enterprise. Williams gave Clymer treasury authority in Diamond Hill Financial via a written document. The pair co-signed the business formation agreement for Bay Area Real Estate, making them 50-50 partners. They had a joint signature card on the B.A.R.E. bank account. They used both companies in concert to facilitate the double escrow deals.

Finally, an out-of-court statement that does not meet the requirements for admission as a co-conspirator statement may nonetheless be admissible, not for the truth, but as evidence linking those involved to the conspiracy. *United States v. Sanchez-Lopez*, 879 F.2d 541, 554 (9th Cir. 1989), as a verbal act establishing the conspiracy, *United States v. Lim*, 984 F.2d 331, 336 (9th Cir. 1993), or as a non-hearsay statement offered to prove its falsity, not its truth. Fed. R. Evid. 801(c)(2). Indeed, in a fraud case, co-conspirators' false statements are admissible on that basis and as co-conspirator statements. *United States v. Gibson*, 690 F.2d 697, 700-01 (9th Cir. 1982).

F. **Expert Testimony**

The government has provided notice pursuant to Fed.R.Crim.P. 16(a)(1)(G) that it may call Tom Pool from the California Department of Real Estate as an expert witness. Fed. R. Evid. 702. Mr. Pool's

testimony would be limited to explaining the basics of a real estate transaction, obtaining a loan, and the function of escrow. Mr. Pool has never reviewed the transactions in this case and has no familiarity with the facts, except for Williams and Clymer's real estate licensing. Therefore, he will not be testifying to any ultimate issue, including the Defendant's mens rea. Fed. R. Evid. 704(b). Mr. Pool will not be offering expert "opinions," but will be testifying "otherwise" under Rule 702.

### G. Summary Witness Andrew Harrison

Some of the government's case will be proven through summaries of the business records of third parties such as banks and title companies. IRS Special Agent Andrew Harrison will present this testimony as a summary witness.

A number of charts will summarize the real estate transactions and the flow of money for each of the six properties presented. The government may use additional charts based upon records produced from MLS, a public database utilized by the real estate industry to market residential properties for sale. These charts track changes in price of the property over a relevant period of time. Fed. R. of Evid. 1006 provides that "the contents of voluminous writings, recordings or photographs which cannot be conveniently examined in court may be presented in the form of a chart, summary or calculation." The Ninth Circuit has recognized that summary evidence "can help the jury organize and evaluate evidence which is factually complex and fragmentally revealed in the testimony of the multitude of witnesses." *United States v. Shirley*, 884 F.2d 1130, 1133 (9th Cir. 1989), *quoting United States v. Lemire*, 720 F.2d 1327, 1348 (D.C. Cir. 1983).

The Ninth Circuit has also approved the use of a summary witness where, as here, the sequence of events may be confusing, with some of the lender witnesses testifying about loans on multiple properties. *United States v. Meyers*, 847 F.2d 1408, 1412 (9th Cir. 1988) (summary witness and chart contributed to the clarity of presentation).

Testimony about the review of financial records is not expert testimony when it merely reports how the figures add and subtract. *United States v. Hamaker*, 455 F.3d 1316, 1331-32 (11th Cir. 2006); *United States v. Caballero*, 277 F.3d 1235, 1247 (10th Cir. 2006). A summary witness may rely on the analysis of others where he has sufficient experience to judge another person's work and incorporate it as his own. *United States v. Soulard*, 730 F.2d 1292, 1299 (9th Cir. 1984); *Diamond Shamrock Corp. v.*

*Lumbermens Mutual Casualty Co.*, 466 F.2d 722, 727 (7th Cir. 1972) ("It is not necessary . . . that every person who assisted in the preparation of the original records or the summaries be brought to the witness stand."). The summary witness may review the evidence in a manner that advocates the government's theory of the case and need not give effect to the contentions of the defendant. *United States v. Moore*, 997 F.2d 55, 58-59 (5th Cir. 1993). The government has already produced to the defense draft versions of the summary charts.

Special Agent Harrison also will testify about his interview of Williams, a written record of which was provided in discovery. SA Harrison will testify that he asked Williams if Arthur Watson worked for him at Diamond Hill Financial, and that Williams answered "yes." This was false. The government will ask no further questions on direct examination of SA Harrison regarding the interview because Williams then invoked his right to counsel. SA Harrison is aware of his obligation not to reveal Williams's invocation of counsel to the jury during direct examination by the government. If necessary, the government asks permission to lead this portion of SA Harrison's testimony to avoid revelation of the invocation of the right to counsel.

### H. Testimony of Joshua Clymer

Clymer has pleaded guilty, agreed to cooperate with the government, and is no doubt hoping to benefit from his testimony. The government may introduce this in its direct examination, as a party may impeach its own witness. Fed. R. Evid. 607. If Williams uses Clymer's co-defendant plea agreement to challenge his credibility, the government may introduce the document itself, including any "truthful testimony" provision, so long as the Government does not "imply a guarantee of [] truthfulness, refer to extra-record facts, or reflect a personal opinion." *United States v. Necoechea*, 986 F.2d 1273, 1278-79 (9th Cir. 1993); *United States v. Monroe*, 943 F.2d 1007, 1013-14 (9th Cir. 1991).

Clymer is the only witness so-situated. Tony Symmes is already serving his sentence from the 10-cr-200 case; indeed, his sentence is near completion. He has already received the benefit of 50% off his sentence. Symmes can receive no further benefit from his testimony, other than a day's furlough from FCI Herlong to facilitate his testimony.

### I. Possible Fifth Amendment Assertions By Witnesses

The government anticipates calling a number of witnesses who participated, to varying degrees,

in the charged scheme. The buyer witnesses, for example, have admitted signing loan documents containing false statements. Some of the acts committed by these witnesses may subject them to liability as a member of the scheme to defraud, and additionally under 18 U.S.C. § 1014 (false statements in a loan application).

If the government becomes aware that any of its witnesses intend to assert the Fifth Amendment, it will notify the Court of that fact before the witness takes the stand. If a valid assertion of privilege is made, the government will be prepared to seek an order from the Court pursuant to 18 U.S.C. §§ 6002-3.

### J.     Admission of Business and Public Records

With respect to each real estate transaction, the government has produced loan files and escrow files. In addition, the government has produced various bank records relating to accounts relevant to this case. At trial, rather than seeking the admission of entire files or collections of records, the government will offer only selected documents from the relevant files.

The government will seek the admission of these documents as self-authenticating business records or public records pursuant to Fed. R. Evid. 902(4), (11) and 803(6), (8), and the government has provided the defendant with notice of the specific files and corresponding Rule 902 declarations, where applicable, upon which it intends to rely. The parties have reached agreement regarding the admissibility of most of these records and are conferring to resolve a few outstanding issues. The defendant has indicated he does not oppose admissibility under the business records exception but retains the right to challenge admissibility on other grounds. The government will also introduce various certified public records. Fed.R.Evid. 803(8).

### K.     Issues Raised in Williams' Trial Brief

In his trial brief, Williams asks the Court to exclude certain evidence under Fed. R. Evid. 404(b). ECF No. 518, pg. 6. However, the two properties Williams suggests should be excluded from the government's case-in-chief are actually properties specifically listed in the Third Superseding Indictment: 864 Gidda Loop and 4824 Baker Avenue. Evidence of these two properties is clearly direct evidence of the charged conspiracy, not 404(b).

Williams also flags a meeting with Brandon Resendez regarding cash back; the government does not intend to include Brandon Resendez as part of its case-in-chief at this time.

## VII. POSSIBLE DEFENSES

The defense has indicated a possible defense that centers on Williams' intent (or lack of intent) to defraud. The defense has not provided notice of any defenses for which the Federal Rules of Criminal Procedure require notice. The government will move to bar any such defense should it be raised during trial.

## VIII. WITNESS EXCLUSION AND CASE AGENT DESIGNATION

The government will move for the exclusion of all witnesses until their testimony has been completed, pursuant to Fed. R. Evid. 615. The government will further move that FBI Special Agents Matt Catalano and Mark Roberts be designated as case agents and thus exempt from the exclusion order, pursuant to Fed. R. Evid. 615; *see also United States v. Little*, 735 F.2d 1420, 1441 (9th Cir. 1984). In addition, it is anticipated that USAO supervisory paralegal Donna Castruita will be present with the government throughout trial to aid in the organization and presentation of exhibits.

## IX. CONCLUSION

The foregoing is a summary of issues the government anticipates may arise at trial. Should any legal issues arise that have not been covered in this trial brief, the government respectfully requests leave to submit such further memoranda as may be necessary.

Dated:  June 27, 2014                              BENJAMIN B. WAGNER
                                                   United States Attorney


                                              By:  /s/ Audrey B. Hemesath & Christopher Hales
                                                   CHRISTOPHER HALES
                                                   AUDREY B. HEMESATH

                                                   Assistant United States Attorneys