JOSEPH J. WISEMAN, ESQ., CSBN 107403
WISEMAN LAW GROUP, P. C.
  1477 Drew Avenue, Suite 106
  Davis, California 95618
  Telephone:  530.759.0700
  Facsimile:   530.759.0800

**Attorney for Defendant**
LEONARD WILLIAMS

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>LEONARD WILLIAMS,<br><br>    Defendant. | Case No.: CR-S 08-0376 WBS<br><br>**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF RENEWED MOTION FOR ACQUITTAL (RULE 29) AND NEW TRIAL (RULE 33)**<br><br>Date:  September 8, 2014<br>Time:  9:30 a.m.<br>Ctrm:  Hon. William B. Shubb |

Defendant, LEONARD WILLIAMS, ("Williams") renews his Rule 29 Motion for Acquittal and also moves for a new trial under Rule 33. These motions are made, first, on general grounds that the government failed to provide sufficient evidence to support any of the counts. Second, the government provided insufficient evidence of materiality in Count One, and therefore also could not show that the money involved in Counts Two and Three was criminally derived. Finally, the evidence presented on Count One was a variance from the Indictment, and instead of one conspiracy, two conspiracies were shown.

/ / / / /

## STATEMENT OF THE LAW AND ARGUMENT

After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction. Fed. R. Crim. Pro. 29(a)."A motion for Judgment of Acquittal is reviewed on a sufficiency-of-the-evidence standard." *United States v. Graf,* 610 F.3d 1148, 1166 (9th Cir. 2010) (quoting *United States v. Stoddard*, 150 F.3d 1140, 1144 (9th Cir. 1998)).

The test for determining whether to grant a motion for judgment of acquittal under Rule 29 is whether at time of motion, viewing the evidence in the light favorable to government, there is relevant evidence from which jury can reasonably find the accused guilty beyond reasonable doubt of **each element of crime charged**. *United States v. Dior,* 671 F.2d 351, 357 (9th Cir. 1982); *United States v. Cruz*, 554 F.3d 840 (9th Cir. 2009) (district court plainly erred in denying Fed. R. Crim. P. 29 motion where the essential element of the defendant's Indian status under § 1153 was not proven beyond a reasonable doubt because evidence did not establish any of the four factors outlined in the Ninth Circuit's *Bruce* test).

Likewise, a court may vacate any judgment and grant a new trial if the interest of justice so requires. Fed. R. Crim. P. 33(a). A district court's authority "to grant a motion for a new trial is much broader than its power to grant a motion for judgment of acquittal." *United States v. Kellington*, 217 F.3d 1084, 1097 (9th Cir. 2000) (citing *United States v. Alston*, 974 F.2d 1206, 1211 (9th Cir. 1992)). In considering a motion for a new trial, the court "is not obliged to view the evidence in the light most favorable to the verdict, and it is free to weigh the evidence and evaluate for itself the credibility of the witnesses." *Id.* Upon a determination that a jury's verdict is not supported by sufficient substantial evidence, the judge may set aside the verdict as contrary to the weight of evidence and grant a motion for a new trial. *United States v. Parelius*, 83 F.Supp. 617, 618 (D. Haw. 1949). The decision to

grant a new trial rests with the sound discretion of the trial court. *United States v. Mack*, 362 F.3d 597, 600 (9th Cir. 2004).

## I. General Question of Sufficiency.

"Rule 29 motions for acquittal do not need to state the grounds upon which they are based because 'the very nature of such motions is to question the sufficiency of the evidence to support a conviction.'" *United States v. Viayra,* 365 F.3d 790, 793 (9th Cir. 2004).

Williams therefore moves this court to grant judgment of acquittal for failure to present sufficient evidence on any of the counts.

## II. The Government Provided Insufficient Evidence From Which a Jury Could Reasonably Find That the False Statements Alleged in Count One Were "Material."

### a. In Order to Show that Williams Conspired to Commit Mail/Wire Fraud, the Government Must Show that the Agreed Upon Scheme Was to Commit Mail/Wire Fraud, Including the Use of Material Misstatements

In Count One of the Third Superseding Indictment, Williams was charged with and convicted of Conspiracy to Commit Mail Fraud and Wire Fraud in violation of 18 U.S.C. § 1349.

"The elements of conspiracy under 18 U.S.C. § 1349 are: (1) two or more persons made an agreement to commit an unlawful act; (2) the defendant knew the unlawful purpose of the agreement; and (3) the defendant joined in the agreement willfully, with the intent to further the unlawful purpose." *United States v. Simpson,* 741 F.3d 539, 547 (5th Cir. 2014). If a jury is asked to determine whether a defendant conspired to commit an offense, the jury needs to know the elements of that offense. *United States v. Alghazouli*, 517 F.3d 1179, 1189 (9th Cir.), *cert. denied*, 129 S. Ct. 237 (2008). In order to show mail fraud, the Ninth Circuit jury instructions require the government to prove (1) that the defendant knowingly participated in a scheme to defraud; (2) that the statements made or omitted were

material; (3) that the defendant acted with the intent to defraud; and (4) that the defendant used or caused to be used the mails/wires. 9th Cir Crim. Jury Inst. 8.121 (2012).

In other words, the government alleged that Williams participated in a conspiracy to commit an illegal act to defraud the lenders, specifically to receive money by submitting **materially** false information. In order to prove this, the government had to show that Williams and Clymer agreed to a scheme wherein the charged false statements would be "material." *See* Ninth Circuit Model of Criminal Jury Instruction 8.121 (2012). The test for materiality, as articulated in *United States v. Peterson*, 538 F. 3d 1064 (9th Cir. 2008), is that the statement must have "**a natural tendency to influence, or [be] capable of influencing, the decision of the decision-making body to which it was addressed**." *Id.* at 1072 (emphasis added) (citing *Kungys v. United States,* 485 U.S. 759, 770 (1988); *United States v. Gaudin*, 515 U.S. 506, 509 (1995)); *see also Fedorenko v. United States*, 449 U.S. 490, 509 (1981).

First, not only did the government presented no testimony from the actual underwriters themselves, but also the individuals who testified were not in a position to know the policies actually used by the underwriters. In all cases, the government used a representative commenting on the loan files six to seven years later.

Kelly Updegraff from NL Inc. testified that it was not within her knowledge whether the underwriting standards were ignored in these cases. Ms. Updegraff gave generalities as to NL standards to fund a loan, but admitted that the standards actually used on these loans would have been the underwriting standards as to the investors, in this case GMAC and CitiMortgage, not NL.

In one case, the witnesses did not even work at the lending institution who originated the loan, but merely for the lender who later purchased the loans. Brett Hellstrom previously worked for Washington Mutual ("WaMu") until JPMorgan

Chase acquired WaMu, at which time he continued to work. for JPMorgan Chase. Yet Hellstrom testified regarding a loan which originated from Novelle, a company under Chase, before Hellstrom worked for Chase. These individuals' personal knowledge hardly establishes what the lenders at issue would have relied upon in the loan file.

Second, the testimony that was elicited by the government merely stated that the "correct numbers" were necessary for the loan to continue to be processed. The witnesses did not state that the actual underlying income and assets were necessary in their decisions to make the loan. In fact, the testimony as to the lending practices of the time implied that the lenders did not care what the individual's *actual* income or assets were. The goal of the game was to ensure that the right numbers were on the loan so that the funding went through and the loan could be packaged and sold.

At trial, the government presented evidence from Kevin Walsh, VP Acquisitions, Caliber Home Loans (CIT) that who stated that a borrower's income was important to the lending decision to ensure the borrower's ability to repay.  He also stated 100-percent loans treated differently than others, higher interest rates, tighter underwriting standards; and that Residency/occupancy statement was important because CIT did not make loans for investment properties. He also stated that the bank documents were important. Finally, he said knowing whether someone else was paying the loan would be vital because he would want to know that person's credit worthiness.

However, Walsh also admitted that his company bought loans from other lenders for the interest and the servicing fees. He testified that stated income loans were offered "to borrower who couldn't verify regular income, self-employed" but that the lender purposefully did not limit these loans to those borrowers. He agreed that some loans originated with the intent to sell, and that the Watson Ceonothus file was a stated income loan, with no income verification and "light" documentation. He admitted that CIT did subprime loans, loans that didn't meet

the underwriting standard for Freddie Mac/Fannie Mae loans. The rate and other information indicated that Watson's Ceonothus was a subprime loan. Walsh admitted that CIT did not use the IRS form 4506-T to verify the borrower's information, but blamed it on the IRS, despite the fact that the IRS says it takes 10 days to process. He also admitted that a verification of employment purposefully did not verify income, that the two were different. In other words, CIT specifically *avoided* verifying the individual's actual income. Walsh also stated that other lenders were the investors for these types of loan.

Finally, Walsh testified that after the meltdown in 2007, there were changes in underwriting industry-wide. These changes did not occur at CIT, though, because CIT stopped originating loans and sold its assets. He admitted that **industry-wide, it is a fair statement to say that underwriting standards were not followed and that lenders were not paying attention to loans, or buyers.**

Kelly Updegraff testified generally as to NL standards, although she admitted that it was not LN standards, but the standards of the investor would be used in approving the loan. She testified that undisclosed money back to a borrower at closing is material to the lending decision, that a down payment lowers the risk because a buyer is more invested, that 100 percent financing is more risky, and that being employed is important to the decision maker, and that the ability to save and pay is important. She also stated that Investors had matrixes of LTV (loan to value) rates they would fund, and that the income was important in finding that number, and that a loan would not fund if the individual made less than they expended.

However, she noted that the loans she reviewed were stated income loans, where the investor did not care to verify the individual's income. At some point in their lending history, the lenders did not even require verifications of employment. While she testified that the loan would stop if the employment was not verified, she could not state whether Melissa MaClay actually verified the employment in this case. She was not impressed with Watson's credit report.

Although she testified that there are warranties for NL to buy back the loan if there was fraud, she did not know how many NL ever had to buy back, and believed that there was no documentation showing that these loans had been bought back.

Finally, although Brett Hellstrom stated that factors considered in making a loan decision include income, assets, credit and collateral,[1] he also agreed that the stated income, or subprime lines were for borrowers with less than stellar credit, and were inherently more risky. This appears to be a risk the lenders were apparently willing, if not eager to take.

Since the government failed to produce evidence that the misstatements were material to the decision of the lenders, Count One should be dismissed under Rule 29.

### b. The Government Provided Insufficient Evidence From Which a Jury Could Reasonably Find That the Money in Counts Two and Three Was Criminally Derived.

Similarly, if the omissions and misrepresentations were not material, the monetary transactions in Counts Two and Three are not transaction involving criminal property.

Williams was charged and convicted in Counts Two and Three with Money Laundering in violation of 18 U.S.C. § 1957.  Under § 1957, it is a crime for a defendant to knowingly engage or attempt to engage in a monetary transaction in criminally derived property of a value greater than $10,000. *See United States v.*

---

[1] Fortunately or unfortunately, "it is not the district court's function to determine witness credibility when ruling on a Rule 29 motion." *United States v. Alarcon-Simi*, 300 F.3d 1172, 1176 (9th Cir. 2002). However, the court has broader authority under Rule 33 (see *Kellington*, 217 F.3d at 1097). It is worth noting for the record Hellstrom's apparent complete lack of knowledge of Washington Mutual having lending problems, his lack of knowledge of the government's investigation of WaMu, his lack of knowledge of loans being funded to be sold on the open market, his lack of knowledge of a pool of junk loans being sold to investors during this time period, his lack of knowledge as to why JPMorgan Chase purchased WaMu in 2008, his lack of knowledge about WaMu's high risk lending strategy.

Memorandum of Points and Authorities  CR-S 08-0376-WBS
In Support of Acquittal and New Trial

*Messer*, 197 F.3d 330, 341 (9th Cir. 1999). To prove a conviction under § 1957, the government must establish that Appellants: (1) knowingly engaged in a financial transaction; (2) knew that the transaction involved criminal property; (3) the property's value exceeded $10,000; and (4) the property was in fact derived from a specific unlawful activity. *Id.*

Since, as Williams contends, the money involved was not acquired through a scheme to endantraud, due to no material misrepresentations being used, the money was not criminally derived. Therefore, no money laundering occurred and the counts should be dismissed.

### III. The Evidence At Trial Varied From the Indictment and Showed Multiple Conspiracies, Not One Conspiracy

Williams contends that there was an impermissible variance between the indictment (which alleged a unitary conspiracy) and the government's case-in-chief (which demonstrates the existence of multiple conspiracies). *United States v. Bibbero*, 749 F.2d 581, 586 (9th Cir. 1984). "The question of whether a single conspiracy has been proved, rather than multiple conspiracies, is a recurring one, which is essentially a question of the sufficiency of the evidence." *Id.* (citing cases). If the indictment alleges a single conspiracy, but the evidence at trial establishes only that there were multiple unrelated conspiracies, there is insufficient evidence to support the conviction on the crime charged, and the affected conviction must be reversed. *United States v. Fernandez*, 388 F.3d 1199, 1226-1227 (9th Cir. 2004) (citing *Kotteakos v. United States*, 328 U.S. 750 (1946)).

A conspiracy requires (1) an agreement to accomplish an illegal objective and (2) intent to commit the underlying substantive offense. See *United States v. Yossunthorn*, 167 F.3d 1267, 1270 (9th Cir. 1999). "To establish the existence of a single conspiracy, rather than multiple conspiracies, the government must prove that an overall agreement existed among the conspirators." *United States v. Bibbero,* 749 F.2d 581, 587 (9th Cir. 1984). The evidence must show that each of the

defendants was involved, and a meeting of the minds must be demonstrated. *United States v. Kenny*, 645 F.2d 1323, 1335 (9th Cir. 1981).

In assessing whether a single conspiracy has been proved, the Ninth Circuit considers "the nature of the scheme; the identity of the participants; the quality, frequency, and duration of each conspirator's transactions; and the commonality of time and goals." *Bibbero,* 749 F.2d at 587.

It is true that an agreement to commit multiple crimes may be alleged in a single count. "The allegation in a single count of a conspiracy to commit several crimes is not duplicitous, for 'The conspiracy is the crime, and that is one, however diverse its objects.'" *United States v. Smith,* 891 F.2d 703, 712 (9th Cir. 1989) (quoting *Braverman v. United States,* 317 U.S. 49, 54 (1942)). However, this is a different circumstance, wherein the Indictment instead alleges two separate conspiracies, or two separate agreements (made with entirely different people) to complete two entirely different schemes.

**1. The Two Schemes: The Chico Gililland deals, and the Sacramento Clymer deals.**

Count One charged Williams with conspiring with Josh Clymer and using their companies, Diamond Hill and Bay Area Real Estate Holdings ("BARE") in a property flipping scheme. Page 3, para. 9. This included purchasing a property in the company's name, and then reselling the property on the same day for an increased price to a strawbuyer. Page 3, para. 9. It states that Williams and Clymer "did knowingly and intentionally combine, conspire, confederate, and agree with each other and with others" to defraud lenders by means of mail and wire fraud. Page 3-4, para. 10. The Indictment then states that Williams, Clymer, and others recruited various individuals to purchase properties, including properties at eleven addresses, specifically listed. Page 4-5, para. 12. These include 2640 Ceanothus Ave, Chico, California; and 3294 Rockin M Drive, Chico, California. Page 5, para. 12, chart.

However, the evidence reveals that these two properties were not purchased as a part of any agreement between Williams and Clymer. The evidence is that the purchases were part of a separate agreement between Williams, Garrett Gililland, and Anthony Symmes.

All of the six Clymer deals shown at trial took place after the two Watson deals. Rockin M closed in May 2007 and Ceanothus closed in July 2007. On the other hand, the Frye purchase of the Baker residence closed in February 2008; the Reynaga purchase of Trap Rock closed in March 2008; the Lacie purchase of the Linday Way residence closed in May 2008, and the Petri Purchase of the Woodforest home took place in July 2008.

Moreover, the evidence shows that the purchase of these two houses were structured in a different manner than the alleged Clymer/Williams agreement. The summary agent, Special Agent Andrew Harrison, testified that there were two different types of deals. The Symmes transactions were a typical buyer/seller transaction. But the Sacramento transactions in 2008 involved a seller selling to BARE, and at the same time, BARE would sell to a buyer. The paperwork showed that the Clymer/Williams' agreement was a sale by Diamond Hill Financial or Bay Area Real Estate Holdings as part of a "double escrow" intended to turn the lower market price into equity for the seller, whereas the Watson purchases were completed as a straightforward sale from the seller, Tony Symmes' holding company, to the buyer Arthur Watson. Symmes' testimony was that the houses were sold vastly above Symmes' asking price, and Gililand instructed Symmes to pay the difference to Williams' company.

Similarly, every single person who testified as to the Watson sales could not connect Clymer to the purchase of the Watson's houses. The seller, Symmes, barely knew Williams or Williams' company, and gave no testimony at all about Clymer. Similarly, Watson testified only that he knew that Clymer was Williams business partner, and could not give any evidence that Clymer was part of Watson's purchase.

Memorandum of Points and Authorities
In Support of Acquittal and New Trial

CR-S 08-0376-WBS

1  Although the summary agent testified that Clymer received money on the Chico
2  transactions, he noted that the transactions were with Diamond Hill (not BARE),
3  and could not add any more information connecting Clymer to the Chico deals.
4  Finally, the loan documentation associated with the properties makes no reference
5  to Clymer or his company Bay Area Real Estate Holdings.

6  Therefore, the nature/structure of the scheme; the identity of the
7  participants; the geography; and the time period involved all indicate that these
8  were separate conspiracies. The Court indicated that perhaps Williams himself was
9  the one unifying factor. This would mean that the conspiracy was the wheel and that
10 Williams was the hub. But "[t]o establish the overall conspiracy, the government
11 must 'supply proof that the spokes are bound by a rim.'" *United States v. Martin*, 4
12 F.3d 757, 760 (9th Cir. 1993) (quoting *United States v. Kenny,* 645 F.2d 1323,
13 1334 (9th Cir.), *cert. denied,* 452 U.S. 920 (1981)). In other words, the evidence
14 must show that "there was one overall agreement among the various parties to
15 perform various functions in order to carry out the objectives of the conspiracy." *Id.*

16 The payments to Clymer are simply not enough to show that there was one
17 overall agreement to perform various functions to carry out the conspiracy's
18 objectives. The Chico deals were discrete, time-bound actions, with zero evidence of
19 Clymer's involvement or participation. Moreover, the difference in the structure of
20 the scheme shows that it was not part of the same agreement that Williams and
21 Clymer came to the next year. There is no evidence that the spokes (Clymer versus
22 Gililand and Symmes) were bound by the same rim.

23

24  **2. Prejudice**

25 The problem with this variance is the same problem as that which appears in
26 duplicity. Duplicity occurs when an indictment charges two or more separate and
27 distinct offenses in a single count. *United States v. Garcia*, 400 F.3d 816 (9th Cir.
28 2005). "The principal vice of a duplicitous indictment is that the jury may convict a

---

Memorandum of Points and Authorities                                   CR-S 08-0376-WBS
In Support of Acquittal and New Trial

defendant without unanimous agreement on the defendant's guilt with respect to a particular offense." *Id.*

Prejudice occurs when charges are obscured, preventing the jury from separately deciding the issue of guilt or innocence with respect to each particular offense, and creating uncertainty as to whether the defendant's conviction was based on a unanimous jury decision. *United States v. Garcia*, 400 F.3d 816, 819 (9th Cir. 2005).

Duplicitous indictments may also hinder the defendant's ability to argue double jeopardy in a subsequent prosecution. *United States v. Rigas,* 605 F3d 194, 212 (3d Cir. 2010) (duplicity does have "constitutional dimensions," including protecting against double jeopardy). Finally, duplicitous indictments raise the risk of prejudicial evidentiary rulings, and may prevent appropriate sentencing because the basis of the defendant's conviction is uncertain. *United States v. Schlei,* 122 F3d 944, 977 (11th Cir. 1997); *United States v. Sturdivant,* 244 F.3d 71, 77 (2d Cir. 2001).

In this case, the danger is that the jury convicted Williams on the Symmes/Gililand conspiracy, even while the jury found insufficient evidence to convict Williams on the charged Williams/Clymer conspiracy.  A second danger may be that some members of the jury found Williams guilty of the Symmes/Gililand conspiracy, but other members found Williams guilty on the charged Williams/Clymer conspiracy.  In either case, all members would have found Williams guilty of conspiracy without unanimity.

Because of this, Williams contends that there was an impermissible variance between the indictment (which alleged a one conspiracy) and the government's case-in-chief. Under this variance, there is insufficient evidence to find him guilty of *one* conspiracy.  Therefore, he requests this court to enter a judgment of acquittal on Count One.

/ / / /

---

Memorandum of Points and Authorities
In Support of Acquittal and New Trial

CR-S 08-0376-WBS

**CONCLUSION**

Based on the foregoing, Williams respectfully requests this court to grant his renewed Rule 29 Motion for Acquittal and his Rule 33 Motion for New Trial.

Dated: July 31, 2014                   Respectfully submitted,

By: /s/ Joseph J. Wiseman
JOSEPH J. WISEMAN
Attorney for Defendant
LEONARD WILLIAMS

---

Memorandum of Points and Authorities                              CR-S 08-0376-WBS
In Support of Acquittal and New Trial