BENJAMIN B. WAGNER
United States Attorney
CHRISTOPHER S. HALES
AUDREY B. HEMESATH
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>LEONARD WILLIAMS,<br><br>Defendant. | CASE NO. CRS-08-0376-WBS<br><br>GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR ACQUITTAL (RULE 29) AND NEW TRIAL (RULE 33)<br><br>DATE: September 8, 2014<br>TIME: 9:30 a.m.<br>COURT: Hon. William B. Shubb |
|---|---|

The United States hereby opposes Defendant Williams' Motion for Acquittal under Rule 29 and Motion for New Trial under Rule 33 of the Federal Rules of Criminal Procedure. At trial the Government presented overwhelming evidence of Defendant's guilt. Nothing has changed since the Court denied Defendant's Rule 29 motion at the end of the Government's case in chief. There was no defense case or rebuttal, leaving the evidentiary record the same as it was when the Court previously ruled. Defendant now makes the same two arguments that the Court rejected: (1) that there was insufficient evidence of materiality, and (2) that there was an impermissible variance between the indictment and the evidence at trial, because two separate conspiracies were supposedly shown. Defendant also generally argues insufficiency of the evidence as to all three counts of conviction, but does not identify any specific ground for this argument. Mot. at 3. The Court should again find that Defendant's arguments lack merit and deny the motion.

## I.     BRIEF PROCEDURAL HISTORY

In a third superseding indictment returned on February 23, 2012, Defendant was charged with one count of conspiracy to commit mail and wire fraud in violation of 18 U.S.C. § 1349, and two counts of money laundering in violation of 18 U.S.C. § 1957.  Trial commenced on July 8, 2014.  Following an outburst by Defendant in the presence of the jury on July 23, 2014, Defendant moved for a mistrial. The Court refused to grant Defendant a mistrial for his own misconduct.  At the close of the government's case, also on July 23, 2014, Defendant moved for a judgment of acquittal pursuant to Rule 29 on the same two specified grounds raised again here.  The Court denied the motion. The following day, a jury returned a guilty verdict on all three counts.  On July 31, 2014, Defendant filed the instant motion, renewing his Motion for Acquittal under Rule 29 and moving for a new trial under Rule 33.

## II.     FACTS

As the parties recently completed a six-day trial, the Government assumes the Court's general familiarity with the evidence presented, and below reiterates certain evidence in summary fashion as necessary.

## III.     LEGAL STANDARDS

When considering a Rule 29 motion, the Court views the evidence presented at trial in the light most favorable to the prosecution, and the verdict must be sustained where "*any* rational trier of fact would find each essential element of the crime beyond a reasonable doubt."  *United States v. Mosley*, 465 F.3d 412,415 (9th Cir. 2006) (emphasis in original) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *United States v. Merriweather*, 777 F.2d 503, 507 (9th Cir. 1985); *see also United States v. Nevils*, 598 F.3d 1158 (9th Cir. 2010) (en banc).

A Rule 33 motion for a new trial "should be granted only in exceptional cases in which the evidence preponderates heavily against the verdict."  *United States v. Rush*, 749 F.2d 1369, 1371 (9th Cir. 1984) (quotation and citation omitted).   In considering a Rule 33 motion for a new trial, the court is free to weigh the evidence and witnesses itself.  *United States v. Kellington*, 217 F.3d 1084, 1097 (9th Cir. 2000).  For a new trial to be granted, the court must find that the evidence preponderates so heavily against the verdict "that a serious miscarriage of justice may have occurred."  *Id.* at 1097 (quoting *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980)).

# IV. ARGUMENT

## A. The Government Presented Extensive Evidence of Materiality

Viewing the facts presented at trial in the light most favorable to the government, the evidence of materiality in this case was overwhelming. Lender witnesses repeatedly discussed the significance of the fraudulent sections of the loan applications, and explained how and why lies in those areas were capable of influencing the decision to lend.

To prove materiality, the government does not need to show actual reliance, or prove that the lenders met some standard of vigilance in detecting fraud. A false statement is material if it has "a natural tendency to influence, or is capable of influencing," the entity to which it is directed. *United States v. Gaudin*, 515 U.S. 506, 509 (1995); *see also Kungys v. United States*, 485 U.S. 759, 770 (1988). "The false statement need not have actually influenced the agency, and the agency need not rely on the information in fact for it to be material." *United States v. Serv. Deli Inc.*, 151 F.3d 938, 941 (9th Cir.1998); *see also United States v. King*, 735 F.3d 1098, 1108 (9th Cir. 2013). Stated another way, "capable of influencing is an objective test, which looks at the intrinsic capabilities of the false statement itself, rather than the possibility of the actual attainment of its end." *United States v. Peterson*, 538 F.3d 1064, 1072 (9th Cir. 2008) (quotation and citation omitted). A lender's negligence in discovering the false statements is not a defense to materiality. *See United States v. Ciccone*, 219 F.3d 1078, 1083 (9th Cir. 2000) ("[i]t is immaterial whether only the most gullible would have been deceived by the defendants' scheme") (citations and quotations omitted); *United States v. Hanley*, 190 F.3d 1017, 1023 (9th Cir. 1999) (same); *Lemmon v. United States*, 278 F.2d 369, 373 (9th Cir. 1960) (same).

### 1. Kevin Walsh, CIT (Arthur Watson's loan for Ceanothus):

The evidence from Arthur Watson, Anthony Symmes, Jessica Sawyer, the Bank of America witness, and from various admitted exhibits established that Arthur Watson's 2007 loan application and supporting documents for the Ceanothus property contained the following falsities: inflated purchase price due to undisclosed cash back outside of escrow, false employment information, falsely inflated monthly income, falsely inflated asset information, false rental income information, false liabilities information, falsified intent to occupy as a primary residence, and forged bank account statements. *See, e.g.,* Government Exhibits ("GX") 201-204, 206-208, 209a, 210a, 214, 223, 226-229, and 230.

1    Kevin Walsh testified that he has worked at CIT and its successor companies for 34 years, and
2 that as a vice president with responsibilities related to consumer loans in 2007, he was familiar with
3 CIT's underwriting guidelines and practices in place when Arthur Watson got the loan for the Ceanothus
4 property. He explained that CIT simply did not provide 100% financing on investment properties in
5 2007, which is exactly what was happening (unbeknownst to CIT), since Mr. Watson never intended to
6 live in the Ceanothus property at all. Mr. Walsh also explained that CIT never knowingly made loans in
7 excess of the actual purchase price, which is also exactly what was happening (unbeknownst to CIT),
8 because of the cash being kicked back outside of escrow from the seller, Mr. Symmes. The analysis on
9 this loan could stop there, because the loan would not have issued if CIT had been given true
10 information about occupancy and purchase price. Mr. Walsh further explained why each of the other
11 pieces of information was important to CIT and capable of affecting CIT's decision to extend the loan.
12 For example, he explained that Mr. Watson's supposed employment at Diamond Hill Financial for eight
13 years showed stable employment, and that if the employment could not be verified, that would be a tip
14 off to a major problem, meaning that the loan likely would not be approved. Mr. Walsh provided
15 similar testimony regarding the importance of the borrower's income and assets to CIT.

16    2.    **Keli Updegraff, NL Inc. (loans for Baker Ave. and Linday Way)**

17    The evidence from Joshua Frye's testimony and from various admitted exhibits established that
18 his 2008 loan application and related documents for the Baker Ave. property falsified the purchase price,
19 falsified his place of employment, falsely inflated his income, falsely inflated his assets, and
20 fraudulently concealed over $17,0000 in cash back that he received outside of escrow from the
21 Defendant. *See, e.g.*, GX 401-405, 407-409, 413, and 427.

22    The evidence from Lacie Clymer's testimony and from various admitted exhibits established that
23 her 2008 loan application and related documents for the Linday Way property falsified the purchase
24 price, falsified the existence of a nearly $100,000 down payment, falsified her place of employment,
25 falsely inflated her income, falsely inflated her assets, and fraudulently concealed approximately $9,500
26 in cash back that she received outside of escrow. *See, e.g.*, GX 601-607, 611-613, 620.

27    Keli Updegraff testified that she has worked at NL Inc. and its predecessor / successor
28 companies since 1991, and that she was an underwriter at NL Inc. in 2008 when the Baker Ave. and

GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION
FOR ACQUITTAL AND NEW TRIAL

4

1  Linday Way loans were issued.  Though these were correspondence loans subject to the underwriting
2  guidelines of the ultimate purchasers of the loans, Ms. Updegraff testified that NL Inc. had its own
3  internal processes and procedures in place for underwriting, and that the loans had to pass a basic Fannie
4  Mae underwriting analysis (which in turn relied on the information in the loan application) before it
5  could be sold.  *See, e.g.*, GX 407.  Ms. Updgegraff testified that a loan would not be approved if the
6  borrower's monthly income was less than the monthly mortgage payment, which (unbeknownst to NL
7  Inc.) was the actual situation of both Joshua Frye and Lacie Clymer.  Ms. Updegraff testified that even
8  though NL Inc. sold its loans, it did indeed care if borrowers were capable of repaying them, because
9  NL Inc. could be forced to buy back a delinquent loan, especially where misrepresentations were found
10 in the loan application.  On both the Baker Ave. and Linday Way loans, NL Inc. sought to verify the
11 borrowers' bogus employment information with the Defendant before funding, and the Defendant
12 verified it.  *See* GX 404-405 and 603-604.  Ms. Updegraff testified that if the employment information
13 had not been verified, the loan process would have stopped.  Finally, with specific reference to sections
14 of the loan applications and loan files for Joshua Frye and Lacie Clymer, Ms. Updegraff confirmed that
15 false statements regarding the purchase price, the existence of a down payment, the borrower's
16 employment, the borrower's monthly income, the borrower's assets, and the borrower's receipt of
17 undisclosed cash back outside of escrow were capable of influencing NL Inc.'s decision of whether to
18 extend a loan.

       3.    **Brett Helstrom, WaMu and JP Morgan (Trap Rock, Woodforest, and Rockin M)**

21 The evidence from Juan Reynaga's testimony and related exhibits established that his 2008 loan
22 application and supporting documents to Washington Mutual for the Trap Rock Way property falsely
23 inflated the purchase price by approximately $84,000, falsified the existence of his $84,000 down
24 payment, and falsified his assets by including a fraudulent gift affidavit and a photocopy of a never-
25 cashed down payment check.  *See, e.g.*, GX 501-502, 504-510, 514a.  Brett Helstrom was an underwriter
26 working for the lender Washington Mutual ("WaMu") at the time in early 2008.  He testified that the
27 true purchase price was important to WaMu's underwriting, and that a fake purchase price could have
28 affected WaMu's willingness to extend the loan.  He further testified that an internal WaMu document

1  reflected that Mr. Reynaga's receipt of the purported $84,000 gift from his brother had to be verified

2  before the loan could proceed (*see* GX 509), and that the extent of a borrower's assets was a key piece

3  of information to WaMu's underwriting, because it showed the borrower's ability to save money and

4  complete the transaction.  Mr. Helstrom explained that if the true purchase price had only been $336,000

5  (instead of the $420,000 stated on the loan application) and no down payment had been made, this could

6  affect the lending decision because the loan to value ratio would have been 100%, which involves much

7  higher risk to WaMu because the borrower has nothing vested in the property.

8        The evidence from Anthony Petri's testimony and related exhibits established that his 2008 loan

9  application and supporting documents to JP Morgan for the Woodforest property falsified the purchase

10 price, falsified the existence of a $60,000 down payment, falsified his place of employment, falsely

11 inflated his income, falsely inflated his assets, falsely indicated his intent to occupy as a primary

12 residence, included a fraudulent gift affidavit stating that he had received a $60,000 gift from his mother

13 for the down payment, and included forged paystubs and W-2s for his fake job at Defendant's company

14 Diamond Hill Financial.  *See, e.g.*, GX 701-708, 712, and 728.  This is the transaction underlying the

15 money laundering counts, Count Two and Count Three.  Mr. Helstrom, who became employed by JP

16 Morgan in 2008 as an underwriter, also testified regarding JP Morgan's underwriting.  With specific

17 reference to the pertinent sections of Anthony Petri's loan application and related documents, Mr.

18 Helstrom testified that false statements regarding the purchase price, down payment, borrower's income,

19 borrower's assets, intent to occupy as a primary residence, existence of a $60,000 gift for the down

20 payment, and forged paystubs and W-2s all had the capacity to affect JP Morgan's decision to extend

21 this loan.

22       The evidence from Arthur Watson's testimony, from related witnesses, and from various

23 admitted exhibits established that Arthur Watson's 2007  loan application and supporting documents for

24 the Rockin M property contained the following falsities: inflated purchase price, falsified down

25 payment, false employment information, falsely inflated monthly income, falsely inflated asset

26 information including with funds that belonging to Defendant rather than Watson, false rental income

27 information, falsified intent to occupy as a primary residence, and forged bank account statements.  *See,*

28 *e.g.*, GX 301-311, 314-315, 318-319, 326a, 328.  Mr. Helstrom did not work at Novelle Financial, the

1 original lender on the Rockin M loan. Nevertheless, he did later work at JP Morgan, which purchased
2 the loan and maintained the loan file. He was familiar with and able to explain the form Uniform
3 Underwriting Transmittal Summary contained in that file, which reflected the reliance of Novelle
4 Financial on the stated purchase price (which was false) and the supposed down payment (also false) to
5 conduct its underwriting, and to calculate the loan-to-value ratio before selling it to JP Morgan. *See* GX
6 315.

7 The evidence of materiality summarized above goes well beyond what a rational juror would
8 need to find that this element was satisfied as to all three counts.[1]

### 4. **Defendant's Arguments are based on Incorrect Assumptions about the Law and a Misrepresentation of the Evidence**

11 Defendant implicitly argues that materiality requires actual reliance. He does so by faulting the
12 Government for not calling the original underwriters of the loans to discuss whether or not
13 representations did in fact affect their actual underwriting decisions. Defendant cites no authority for
14 this argument, because it is not supported by the law. The government need only prove that the
15 misrepresentations had a *natural tendency* to influence, or were *capable* of influencing, whether or not
16 the loans funded. *See Guadin*, 515 U.S. at 509; *Kungys*, 485 U.S. at 770. The representations can be
17 material regardless of whether they actually influenced the lender, and regardless of whether the lender
18 actually relied upon them. *See Serv. Deli Inc.*, 151 F.3d at 941; *see also King*, 735 F.3d at 1108. The
19 Government called qualified witnesses from the lenders with extensive experience, who testified that the
20 misrepresentations and omissions in this case were capable of influencing their employers' lending
21 decisions. That, plus the corroborating documents from the loan files and the testimony of the buyers,
22 was more than sufficient basis for a rational juror to find that materiality was satisfied.[2]

---

[1] As a technical matter, the Government does not need to prove materiality as to Count 1, the conspiracy count, because it does not need to prove that mail or wire fraud actually was committed for that count – just that an agreement to commit mail or wire fraud existed, and that the Defendant became a member of the conspiracy. Nevertheless, the substantial evidence of materiality establishes that the object of the conspiratorial agreement was indeed to commit mail and/or wire fraud by making misrepresentations and omissions that were material to the lenders.

[2] The defense was free to cross examine the lender witnesses on the point that they were not the original underwriters, and the defense did so. The jury was free to take this into account in weighing their testimony, for what it was worth.

1  Defendant next implicitly argues that lender negligence in underwriting is a defense, despite the
2  law to the contrary.  He does so by arguing, among other things, that underwriting standards were not
3  followed, and that on stated income loans, lenders assumed more risk and did not verify the income.
4  Again, defendant cites no legal authority for this lender negligence defense, because it isn't one.  The
5  gullibility or susceptibility of the victim to fraud simply does not exculpate the Defendant.  *See Ciccone*,
6  219 F.3d at 1083; *Hanley*, 190 F.3d at 1023; *Lemmon*, 278 F.2d at 373.  It also bears noting that
7  Anthony Petri's loan for the Woodforest property (which was both part of the conspiracy and the basis
8  for the two money laundering counts) was not a stated income loan, but rather a full document loan that
9  contained forged paystubs and W-2s to document his supposed income.

10  Finally, as a sister argument to lender negligence, Defendant claims that the lenders did not care
11  about the borrowers' true income and assets at all.  To make this argument, Defendant misrepresents the
12  evidentiary record.  He claims: "The [lender] witnesses did not state that the actual underlying income
13  and assets were necessary in their decisions to make the loan."  Mot. at 5:7-9.  This is false.  Kevin
14  Walsh, Keli Updegraff, and Brett Helstrom each explained why the borrower's true income and assets
15  were key pieces of information and could affect the decision whether to extend a loan.  Defendant also
16  affirmatively claims that "the testimony as to the lending practices of the time implied that the lenders
17  did not care what the individuals' actual income or assets were."  Mot. at 5:9-11.  Though this may be
18  what the defense had hoped to prove with the inadmissible Levin Report, that hearsay was not admitted,
19  and the evidence presented at trial contradicted this claim.

20  **B.     The Government Proved the Conspiracy Charged**

21  Defendant next argues that there was an impermissible variance between the indictment and the
22  evidence proved at trial.  Specifically, he argues that the evidence demonstrated multiple unrelated
23  conspiracies instead of the single conspiracy charged in Count One of the Third Superseding Indictment.
24  For the same reasons the Court articulated when it denied Defendant's original Rule 29 motion, this
25  argument lacks merit.

26  Count One of the Third Superseding Indictment clearly alleged that Defendant conspired with
27  Joshua Clymer and "others known and unknown to the grand jury."  Third Superseding Indictment (ECF
28  300), Count 1 at ¶¶ 10, 12, 13, 14, 17-20.  Defendant persists in his argument that Joshua Clymer must

GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION         8
FOR ACQUITTAL AND NEW TRIAL

have had the same level of involvement in all of the transactions, and that all the transactions must have been uniform in structure and participants to make it one conspiracy instead of two. That is not how the case was charged, nor is that the law.

A single conspiracy can be established even though it took place during a long period of time during which new members joined and old members dropped out. *United States v. Green*, 523 F.2d 229, 233 (2d Cir. 1975); *see also United States v. Perry*, 550 F.2d 524, 532-33 (9th Cir. 1977) (holding that the law of conspiracy does not require the government "to prove that all of the defendants met together at the same time and ratified the illegal scheme"). A single conspiracy may include multiple subagreements or subgroups, and a person may be a member of a conspiracy even though the person does not know all of the purposes of, or participants in, the conspiracy. *United States v. Bauer*, 84 F.3d 1549, 1560 (9th Cir. 1996); *United States v. Escalante*, 637 F.2d 1197, 1200 (9th Cir. 1980); *United States v. Kearney*, 560 F.2d 1358, 1362 (9th Cir. 1977). The Government does not have to prove that each defendant participated in all the acts alleged, and the members of the conspiracy "need not know every other member nor be aware of all acts committed in furtherance of the conspiracy." *United States v. Camacho*, 528 F.2d 464, 470 (9th Cir. 1976). "A mere change in participants and a lapse of time, without more, are insufficient to support a finding of multiple conspiracies." *United States v. Taren-Palma*, 997 F.2d 525, 530 (9th Cir. 1993) (per curiam), *overruled on other grounds by United States v. Shabani,* 513 U.S. 10, 11 (1994). In order to distinguish a single conspiracy from multiple, the court examines "the nature of the scheme; the identity of the participants; the quality, frequency, and duration of each conspirator's transactions; and the commonality of time and goals." *United States v. Bibbero*, 749 F.2d 581, 587 (9th Cir. 1984).

The nature of the scheme proven at trial was as follows: the Defendant worked with buyers and others (including but not limited to Joshua Clymer) to defraud lenders with fraudulent loan applications, and to profit from the proceeds of those loans. Several common methods persisted throughout the six transactions, both in Chico and Sacramento. In every single instance, the loan applications painted a false picture of the buyer's ability to repay the loan by inflating the buyer's income, assets, or both. In every single instance, the lender was misled as to the true purchase price of the home because of a falsified down payment, undisclosed cash back outside of escrow, or both. Five out of the six loan

applications falsely listed Diamond Hill Financial as the buyer's employer, including both of Arthur Watson's loan applications for the Chico properties. *See* GX 202, 301, 402, 602, 702. [3] Moreover, all five of those loan files reflected that Defendant himself was involved in verifying this false employment information. *See* GX 203, 206, 303-304, 404-405, 603-604, 704, 708. For every one of the transactions either the Defendant, Joshua Clymer, or both of them met with and helped recruit the buyers, and had discussions with them about their loan applications. There were additional forms of fraud common to some of the Chico and Sacramento deals. These included false statements of intent to occupy as a primary residence (on both Arthur Watson deals in Chico, and Anthony Petri's purchase of Woodforest), and forged financial documents (the forged bank statements used for Watson's Chico deals, and the forged Diamond Hill Financial W-2s and paystubs used for Mr. Petri's Woodforest deal). In sum, the general contours of the fraud scheme were consistent.

Regarding the second factor, the identity of those involved in the Chico and Sacramento transactions is also not as disparate as Defendant would like the Court to believe. Joshua Clymer received proceeds from every single one of the six transactions. *See* GX 227, 327, 426, 521, 619, 718. Joshua Clymer was associated with Defendant's company Diamond Hill Financial as of October 2006, before all six transactions took place. *See* GX 5 (Defendant appointing Joshua Clymer as treasurer of Diamond Hill Financial on October 9, 2006, "with authority to make purchases in the Corporation's name and behalf"). Diamond Hill Financial was thereafter used as the fake employer for Arthur Watson on both Chico deals, and Mr. Watson was able to identify Joshua Clymer as Defendant's business partner, even though Mr. Watson did not deal directly with him. GX 202, 301. The two kickback checks from Anthony Symmes on the Chico properties were written to Diamond Hill Financial in June and July of 2007, and Defendant then promptly shared a portion of these kickback checks with Joshua Clymer. GX 223, 326a, 227, 327. This is strong circumstantial evidence of an agreement. After the Defendant and Joshua Clymer formed Bay Area Real Estate Holdings LLC in April 2007 (GX 14), they used Diamond Hill Financial as the supposed employer for buyers, including with Joshua Clymer's own

---

[3] Only buyer Juan Reynaga's loan application for Trap Rock Way accurately listed his employer. The fraud with his application involved the fake $84,000 down payment, and the falsified gift in of the same amount from Mr. Reynaga's brother.

sister, Lacie Clymer.  *See, e.g.*, GX 602.  Thus, Joshua Clymer "knew that he was plotting in concert with others to violate the law," and had reason to know "that his benefits were probably dependent on the success of the entire operation," which in turn is "sufficient to raise the necessary inference that he joined in the overall agreement."  *Kearney,* 560 F.2d at 1362.  Based on the foregoing, there was ample evidence to conclude that the Chico transactions were part of one overall conspiracy.

As to the third factor, which is the quality, frequency, and duration of the conspirators' transactions, it should be noted that Joshua Clymer also had a transaction in which only he dealt face to face with the buyer: the Linday Way transaction with his sister Lacie Clymer.  This parallels how Defendant dealt directly with his longtime friend Arthur Watson, the only other buyer besides Lacie Clymer who had a prior personal relationship with either of them.  This indicates it was within the scope of the conspiracy for either the Defendant or Joshua Clymer to play the primary role in a transaction when they knew the buyer well, with the other having less involvement in the details or in meeting directly with the buyer.

Finally, regarding commonality of time and goals, the evidence showed that Defendant and Joshua Clymer were working together in real estate during the time that all six of these transactions took place; that the goal of Defendant's conspiracy with Joshua Clymer and others was to get money by way of fraudulent loan applications; and that both the Defendant and Joshua Clymer profited monetarily at the same time from multiple deals in both Chico and Sacramento.

Defendant certainly did conspire with additional others on the Chico transactions, including Anthony Symmes, Arthur Watson, and Garret Gililland.  This does not negate the existence of a single conspiracy.  Such a subagreement or subgroup is well within the realm of a single conspiracy.  *See Bibbero*, 749 F.2d at 587.  Joshua Clymer did not need to know of these other members of the conspiracy or all the details of their activities, nor did they need to know about him.  *Camacho*, 528 F.2d at 469-70; *Kearney*, 560 F.2d at 1362.   Moreover, because earlier members can leave the conspiracy while others can join later, Symmes, Watson, and Gililland did not have to stay in the picture for the same conspiracy to have continued on.  *Green*, 523 F.2d at 233; *Perry*, 550 F.2d at 532-33.  Joshua Clymer likewise did not have to be a member of the conspiracy at the earliest time Defendant first carried out his scheme, for example with Arthur Watson's Yuba City property on Gidda Loop in

September 2006 (*see* GX 101-102, 105, 107, 112, 116-117), but could have joined later and still been a part of the same overall conspiracy. *United States v. Traylor*, 656 F.2d 1326, 1337 (9th Cir. 1981).

As one Ninth Circuit panel has observed, "[a]lmost any venture, criminal or legitimate, is analyzable into a series of bits, each of which, in turn, is characterizable as an independent plan or goal." *Kearney*, 560 F.2d at 1362. Because of this, "the evidence does not have to exclude every hypothesis other than that of a single conspiracy." *Bauer*, 84 F.3d at 1560. The evidence presented here was more than sufficient for a rational juror to find one conspiracy as alleged in the Third Superseding indictment, and Defendant's motions should be denied.

### C. The Government Proved All Elements of Each Count

Defendant challenges the general sufficiency of the evidence as to all three counts of conviction, but does not identify a single element that he contends went unproven, or raise any other issue to which the Government can respond with any particularity (other than the materiality argument already discussed at length above). *See* Mot. at 3:3-9. Rather than restating the entire trial, the Government stands on the evidence presented at trial, and asserts that the evidence adequately and completely proved all elements of the conspiracy and money laundering crimes alleged in Counts 1, 2, and 3. Should the Court have questions about particular elements or issues not raised by the Defendant, the Government requests an opportunity to address those at the hearing, and to file any supplemental briefing the Court deems necessary.

### V. CONCLUSION

For the foregoing reasons, the Court should deny Defendant's Motion for Acquittal and Motion for New Trial.

Dated: August 22, 2014                     BENJAMIN B. WAGNER
                                           United States Attorney

                                           By:  /s/ Christopher S. Hales
                                                CHRISTOPHER S. HALES
                                                AUDREY B. HEMESATH

                                           Assistant United States Attorneys