JOSEPH J. WISEMAN, ESQ., CSBN 107403
WISEMAN LAW GROUP, P. C.
  1477 Drew Avenue, Suite 106
  Davis, California 95618
  Telephone:  530.759.0700
  Facsimile:   530.759.0800

**Attorney for Defendant**
LEONARD WILLIAMS

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>vs.<br><br>LEONARD WILLIAMS,<br><br>        Defendant. | Case No.: CR-S 08-0376 WBS<br><br>**DEFENDANT'S REPLY TO GOVERNMENT'S OPPOSITION TO MOTION FOR ACQUITTAL (RULE 29) AND NEW TRIAL (RULE 33)**<br><br>Date:  September 8, 2014<br>Time:  9:30 a.m.<br>Ctrm:  Hon. William B. Shubb |

      The government's opposition to the motion by Defendant, LEONARD WILLIAMS ("Williams") does not establish that the government provided sufficient evidence to support the counts. The evidence the government points to in its brief does not show that the misrepresentations were actually material to the lenders. The government also cannot show that the Chico deals were part of the same conspiracy as the Clymer/Williams deals, and thus the evidence presented on Count One showing two conspiracies was a variance from the Indictment.

/ / / / /

/ / / / /

I. **The Government's Opposition Still Does Not Show that the Misrepresentations were Material to the Lenders at the Time.**

The test for materiality, as articulated in *United States v. Peterson*, 538 F. 3d 1064 (9th Cir. 2008), is that the statement must have "a natural tendency to influence, or [be] capable of influencing, **the decision of the decision-making body to which it was addressed**." *Id.* at 1072 (emphasis added) (citing *Kungys v. United States,* 485 U.S. 759, 770 (1988); *United States v. Gaudin*, 515 U.S. 506, 509 (1995)).[1]

In *Fedorenko v. United States*, 449 U.S. 490, 509 (1981), the allegedly material false statement was made in a visa application. There, the Supreme Court found that materiality must be measured "in terms of its effect on the applicant's admissibility into this country…[A] misrepresentation must be considered material if disclosure of the true facts would have made the applicant ineligible for a visa." In the mortgage loan context, this would translate to whether the defendant's false statements would have made the strawbuyer ineligible for a loan. If the lender was in the business of granting loans even after knowledge of a false statement on the loan application, then the false statements are immaterial.

Defendant agrees that the government does not have to show actual reliance. *See Government Opposition,* p. 7. However, the government has to show that the misrepresentations were capable of influencing the decision-maker. The defendant's argument is that no misrepresentations were capable of influencing these decisions-makers at this time. Instead, the lenders would have made the loan, even if they

---

[1] The government argues in a footnote that it does not need to prove materiality. *Government Opposition,* p. 7, fn. 1. However, as raised in the defendant's motion, the government needed to show an agreement to commit mail/wire fraud, i.e., that the defendant agreed to offer **material** misrepresentations to get money to which he would not otherwise be entitled. The defense argues that the defendant never conspired to commit mail/wire fraud because the defendant never agreed to put forward material misrepresentations. The misrepresentations were never thought to be material, because it was well known, industry-wide, that the lenders did not care about the truth of the assertions.

---

Reply to Government Opposition of  
Motion for Acquittal and New Trial

CR-S 08-0376-WBS

knew the true facts, as long as the numbers on the paper were what the lenders wanted to see.

At the end of its argument on this issue, the government finally addresses the defendant's argument, only to say that "Kevin Walsh, Keli Updegraff, and Brett Helstrom each explained why the borrower's true income and assets were key pieces of information and could affect the decision whether to extend a loan." *Government Opposition,* p. 8. However this overstates their testimony.

The government adds facts when it states in its *Opposition* that the true facts of the Watson Ceanothus purchase were happening "unbeknownst" to CIT. *Government Opposition,* p. 4, lines 5 and 7. While the loan would not have issued if the true facts were written on paper, *see Government Opposition, p. 4,* line 9, the defendant argues that lenders like CIT knew but did not care that the facts written on paper did not reflect the true state of affairs. It bears repeating that Walsh admitted at trial that industry-wide, underwriting standards were not followed. CIT only cared about completing the loan so that it could sell the loan. None of the facts raised by the government in its papers refute this. As such, the government cannot show materiality.

Similarly, Ms. Updegraff testified why it was important that certain numbers added up to ensure a loan went through. However, the defendant's argument is that NL cared that the "correct" facts were on paper for the loan to go through, regardless of whether the correct facts were true or not. Defendant argues that as long as the documents looked good enough to sell the mortgage, the investors did not care. Ms. Updegraff's testimony cannot refute this argument, since Ms. Updegraff gave generalities as to NL, Inc.'s standards to fund a loan, but admitted that the standards actually used on these loans would have been the underwriting standards of the investors GMAC and CitiMortgage.

Finally, besides the damning view of the industry raised in Brett Hellstrom's testimony, already rasied in the defendant's motion, the government does not

explain how Hellstrom could establish materiality for the company Novelle. The government merely states that Hellstrom could explain Novelle's documents. *Government Opposition,* page 7. At no point in time did Hellstrom work for Novelle: the company he currently works for merely acquired the company. Hellstrom was never in a position to know whether the facts presented to Novelle in the application for a loan, as opposed to the true facts, were capable of influencing Novelle's decision.

Instead, as argued previously, the facts show that the lenders were eager to take on risky loans: it was in fact a business strategy. The wide usage of stated income loans for individuals who had the ability to provide documentation; the refusal to ask about an employee's income when doing an employment verification; the intent to package and sell the loans immediately upon closing; the refusal to use the IRS' information to verify the borrower's income; the utter disregard of a borrower's poor credit history: these facts raised at trial show that *any* loan was acceptable to make, because it would be immediately resold. The only thing that mattered was that the loan looked acceptable on paper. The lenders invited these misrepresentations, so that they could profit from creating thousands of loans and pass the risk onto the next line of investors.

This is not arguing lender negligence; it is not arguing gullibility or susceptibility to fraud. *See Government Opposition,* p. 8. Instead, the defendant is arguing that this was the way the "victim" banks did business. The lenders were not susceptible to fraud: they invited it as part of their business strategy. The lenders knew of the misrepresentations and ignored them because the truth did not look good enough on paper to sell.  Therefore, the defendant in this case never conspired to submit materially false documents, as the misrepresentations were not capable of influencing the decision of the decision-making body to which it was addressed. The decision-making body did not care whether the representations were false or not.

Since the government witnesses only testified to what information was necessary on the documentation in order to allow the loan to go through, the government has not established materiality.

## II. The Evidence At Trial Varied From the Indictment and Showed Multiple Conspiracies, Not One Conspiracy

The government argues that one conspiracy occurred during which new members joined and old members dropped out.  The government also says that the scheme was that the defendant Williams worked with buyers to defraud lenders. *Government Opposition*, Page 9.  But the core of a conspiracy charge is an overarching *agreement*. *United States v. Bibbero,* 749 F.2d 581, 587 (9th Cir. 1984); s*See generally United States v. Ching Tang Lo*, 447 F.3d 1212, 1225-1226 (9th Cir. 2006) ("Before being convicted of a conspiracy, an individual must conspire with at least one coconspirator.") The government never clearly states exactly who had an agreement with who or when. Instead, the government merely points to Williams and some vague similarities between the transactions, and concludes it was one agreement.

In looking at the nature of the scheme, the government describes virtually every mail or wire fraud scheme involving mortgage fraud, arguing that this means it was all one agreement. *Government Opposition,* p. 9 ("In every single instance, the loan applications painted a false picture of the buyer's ability to repay the loan by inflating the buyer's income, assets, or both. In every single instance, the lender was misled as to the true purchase price of the home because of a falsified down payment, undisclosed cash back outside of escrow, or both.") This is true of hundreds of mortgage fraud cases. These vague similarities do not show one overarching agreement.

The government next focuses on Williams' role in the transactions, "that Defendant himself was involved in verifying this false employment information." *Government Opposition,* p. 9. Once again, this merely describes the defendant's

Reply to Government Opposition of                                                          CR-S 08-0376-WBS
Motion for Acquittal and New Trial

guilty acts: it does not establish that he had an overarching agreement with anyone. Instead, as argued in the defendant's moving papers, the structure of the two types of deals were radically different, from how the purchase was arranged to how money was removed from the transaction. The two types of schemes were of a fundamentally different nature.

The government also, almost paradoxically, says that because the buyer could not connect Williams with the Lacie Clymer deal, that this explains the lack of evidence connecting Clymer with the Chico deals. *Government Opposition,* p. 11. The lack of evidence connecting Clymer to the Chico deals is not evidence that Clymer was part of the Chico deals.

Second, the identity of those involved in the deals is different. It is not clear from the government's papers what comprises the one overarching conspiracy/agreement that Williams agreed to be a part of. At first, it appears that the overarching conspiracy is with Clymer, as the government admits that Symmes, Watson, and Gililland were only involved in a couple transactions. *Government Opposition,* p. 11. However, the government concedes that Clymer was not part of the first transaction with these individuals on the Gidda Loop property. *Government Opposition,* p. 11. The government must therefore be arguing that Williams, Symmes, Watson and Gilliland created a conspiracy; then Clymer joined; and then Williams and Clymer continued the same conspiracy after Symmes, Watson, and Gililland left.  This is far from what was shown by the evidence. First, the government did not show that Clymer joined, or really played any role in, the Chico transactions whatsoever. The checks and William's use of his own company, Diamond Hill Financial, simply do not show that Clymer was any part of the conspiracy. Second, as argued before, the differences in the transactions (nature, geography, and time, as well as the difference in strawbuyers) belie the government's theory that the deals between only Clymer and Williams were a continuation of the same agreement between Williams, Symmes, Watson and

Reply to Government Opposition of  
Motion for Acquittal and New Trial

CR-S 08-0376-WBS

Gilliland. Instead, the evidence shows one scheme with Williams, Symmes, Watson and Gilliland, and a second scheme between Williams and Clymer and various different strawbuyers.

The nature/structure of the scheme; the identity of the participants; the geography; and the timing all indicate that these were separate conspiracies.

## CONCLUSION

Based on the foregoing, Williams respectfully requests this court to grant his renewed Rule 29 Motion for Acquittal and his Rule 33 Motion for New Trial.

Dated:  August 27, 2014                    Respectfully submitted,

By: /s/ Joseph J. Wiseman
JOSEPH J. WISEMAN
Attorney for Defendant
LEONARD WILLIAMS