IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

---oOo---

BEFORE THE HONORABLE WILLIAM B. SHUBB, JUDGE

---oOo---

UNITED STATES OF AMERICA,

          Plaintiff,

vs.                    No. 2:08-cr-376 WBS

LEONARD WILLIAMS,

          Defendant.

_____/

---oOo---

REPORTER'S TRANSCRIPT

EXCERPT OF PROCEEDINGS

WEDNESDAY, JULY 23, 2014

---oOo---

Reported by:      KELLY O'HALLORAN, CSR #6660

                              APPEARANCES




  For the Plaintiff:


        UNITED STATES ATTORNEY'S OFFICE
        501 I Street, Suite 10-100
        Sacramento, CA  95814
        BY:  CHRISTOPHER HALES
             AUDREY B. HEMESATH
             Assistant U.S. Attorneys

  For the Defendant:

        WISEMAN LAW GROUP, P.C.
        1477 Drew Avenue, Suite 106
        Davis, CA  95616
        BY:  JOSEPH J. WISEMAN, Attorney at Law
             JENNIFER NOBLE, Attorney at Law

```
 1                     SACRAMENTO, CALIFORNIA

 2              WEDNESDAY, JULY 23, 2014, 9:00 A.M.

 3                          ---oOo---

 4          (* * * * Excerpt of proceedings.)

 5          (Jury present.)

 6          THE COURT:  Good morning, ladies and gentlemen.

 7   Everyone is present and appears ready to go.

 8          Mr. Wiseman, you were in the process of

 9   cross-examining Mr. Harrison.

10          MR. WISEMAN:  Your Honor, I have no further questions

11   for Mr. Harrison.

12          THE COURT:  No further questions.  Any redirect?

13          THE DEFENDANT:  My apologies.  Your Honor, the Court

14   needs to be made aware that at 8:57 last night, I received an

15   email from Joseph Wiseman that said he was not going --

16          THE COURT:  Just a minute.  I'm going to ask you to

17   address me outside the presence of the jury.  All right?  And

18   when I speak, you stop speaking.

19          THE DEFENDANT:  Your Honor, he said he wasn't going to

20   put on a defense.

21          THE COURT:  Would you please wait until I excuse the

22   jury?  Ladies and gentlemen, please step outside.  Remember

23   the admonition.  Disregard what has gone on since you came in

24   the courtroom.

25          THE DEFENDANT:  If you believe in the America I
```

1    believe in, please don't participate in this railroad.

2         (Jury not present.)

3         THE COURT:  Mr. Hales, I would like to have your

4    advice on what you think I should do in response to this

5    outburst.  And I'll give you some time to think about it,

6    maybe consult with somebody else in your office, because I

7    want to do the right thing.

8         MR. HALES:  Thank you, your Honor.

9         THE COURT:  We'll take a five-minute recess.

10        (Recess taken.)

11        (Jury not present.)

12        THE COURT:  We're meeting outside the presence of the

13   jury.  The defendant is present.  The reason for the extended

14   delay was that I wanted to make sure that there were enough

15   security officers in the courtroom to preserve order in the

16   event that things became disrupted again.

17        Now, I asked you to tell me what you think I ought to

18   do about this, Mr. Hales.

19        MR. HALES:  Yes, your Honor.  Mr. Wiseman advised me

20   that he's likely to ask for a mistrial.  The government's

21   position is that there are no grounds for a mistrial at this

22   time.  The defendant cannot invite a mistrial by his own

23   conduct.

24        Our belief is that there should be a curative

25   instruction given at some point.  We don't have the language

 1    on that.  And if the Court was inclined to give one now, we

 2    could go downstairs and draft it.

 3            THE COURT:  Well, instinctively I told the jury to

 4    disregard what went on.  I tried my best to shut him up, and

 5    he just kept yelling into the microphone, and I tried to yell

 6    louder, and he just kept getting louder and louder, and he

 7    wouldn't stop.  And then as the jury was filing out, he

 8    continued to stand up, look at the jury, and shout at them.

 9            MR. HALES:  It was at least apparent to the government

10    counsel, your Honor, that the Court was simply trying to

11    preserve order in the face of all that.  And the government

12    counsel, we observed the same things you just described that

13    happened.  One additional suggestion we had is that the

14    defendant be admonished not to do this again.  And if there

15    are further disruptions, something that can be done is that

16    he can be removed from the courtroom and be forced to watch

17    the proceedings remotely if order can't be maintained in the

18    courtroom.  And I think that would be appropriate because,

19    frankly, the government's assessment of this is that it's at

20    least in part designed to create exactly this kind of

21    problem.

22            THE COURT:  Not in part.  In total.

23            MR. HALES:  In total to create --

24            THE COURT:  This is an educated man.  This is not some

25    ignorant defendant.  He has been involved in the system now

1    for a long time.  I have no doubt that this was a deliberate

2    effort to create a mistrial.

3            Mr. Wiseman, what did you want to say?

4            MR. WISEMAN:  Your Honor, I think the Court did what

5    it -- I agree with government's counsel about the Court's

6    response to the outburst.  Nevertheless, I am compelled to

7    ask for a mistrial because of the effect of the outburst on

8    the jury.  As the Court knows, what he said is that he's --

9    I'm paraphrasing -- sounds like he's getting railroaded.  And

10   that not only do I think his comments and outbursts

11   prejudiced the jury against him, but I think his comments and

12   outbursts prejudiced the jury against me in the sense that

13   now I have to do a closing argument, the jury knowing that

14   this individual has no respect for what I'm doing, and I'm

15   completely undermined.

16           THE COURT:  But what's your answer to the government's

17   point that the defendant can't create a mistrial by his own

18   misconduct?  The system would never function.  We're back to

19   the Chicago Seven, or whatever it was, back in '60s.

20           MR. WISEMAN:  Your Honor, I understand the Court's

21   point.  I haven't had an opportunity to do the research on

22   that exact point on an invited mistrial by the defendant, but

23   I don't believe that it was a deliberate -- just my sense of

24   seeing the outburst, it was a deliberate, calculated attempt

25   to derail the trial.

1           THE COURT:  Well, here's in part the reason I come to

2     that conclusion.  He had all night and this morning before

3     trial to talk to you about whether you were going to

4     cross-examine this witness, whether you were going to put on

5     a defense, whether he was going to testify, and any other

6     details that he wanted to talk to you about.  And my

7     observation is that, as he told me, there is now good

8     communication between you and him.

9           THE DEFENDANT:  May I address your Honor?

10          THE COURT:  No.  And if you continue to disrupt these

11    proceedings, Mr. Williams, you're going to leave in shackles.

12          MR. WISEMAN:  Your Honor.

13          THE COURT:  No, I'm not finished.

14          MR. WISEMAN:  I'm sorry.

15          THE COURT:  He waited until the jury was seated and he

16    had them as an audience before standing up, not only

17    addressing me, but as the jury walked out of the courtroom,

18    looking right at them and shouting at them.  Now, if he

19    wanted to address me before the jury came in, he could have

20    told you that he wanted to address me, as apparently he has

21    done before, because that's why we met Monday morning without

22    the jury.  He told you that he wanted to talk to me, and we

23    arranged for him to do that.  If he wanted to talk to me

24    before the jury came in, there was ample opportunity for him

25    to do that.

1          I am compelled to conclude that this is a cunning

2     effort on his part to create a mistrial because he knows

3     there is no way a jury is going to find him not guilty in the

4     face of this overwhelming evidence that the government has

5     presented and that he has heard.  That's why I come to that

6     conclusion.

7          Now, if you have some cases about mistrials and

8     talking about how or when a court can grant a mistrial when

9     it was caused by the defendant's own misconduct, I'll look at

10    it.

11         MR. WISEMAN:  And we're in the process of getting that

12    for the Court now.  I just don't have them presently.

13         THE COURT:  He asked to address me.  So you go back

14    and talk to him, and you tell me what it was he wanted to

15    say, and I'll hear what you have to say.

16         (Discussion held off the record between Mr. Wiseman

17    and the defendant.)

18         MR. WISEMAN:  Mr. Williams has advised me that he

19    wants to address the Court concerning this case, just in

20    general about this case.  I suspect it's going to be about my

21    defense strategy.  And I will say, though, what may have

22    precipitated this, and I think Mr. Williams is trying to say

23    something about this, is an email I sent him yesterday.  I'm

24    not going to get into the details to violate any

25    attorney-client privileges.  But it was an email I sent last

1    night to him about 9:00 o'clock p.m. telling him what I, as

2    his lawyer, decided to do with respect to the remainder of

3    the case.  And I think Mr. Williams wants to address that.

4            THE COURT:  Okay.  I'll address that with him.  But I

5    want to say, Mr. Williams, that notwithstanding my view of

6    the evidence and notwithstanding how strong I think the

7    evidence has been so far in this trial against you, I want

8    you to have a fair trial.  That is my job.  When you stand up

9    in the presence of that jury and misbehave the way you did,

10   you are doing the worst thing you can possibly imagine for

11   yourself if you ever wanted to have a chance of acquittal.

12   So come up here now and tell me what you wanted to tell me.

13           MR. WISEMAN:  Your Honor, my only concern is that

14   Mr. Williams does that in the presence of government counsel.

15           MR. HALES:  We should probably excuse ourselves.

16           THE COURT:  All right.  I'm also mindful of the public

17   trial aspect.  And I am always reluctant to close the

18   courtroom to spectators and members of the public because

19   I've seen litigation on that subject.  Every time he asks to

20   address me in camera, I have to do that.  So as long as he

21   agrees that everybody should be excluded from the courtroom,

22   I'll do it.  But if he wants to talk in the presence of God,

23   the United States Attorney and everybody else in the

24   courtroom, then I'm going to let him do that.

25           Do you want me to clear the courtroom of the

1    prosecutor?

2            THE DEFENDANT:  No, your Honor.

3            THE COURT:  All right.  Go ahead.

4            MR. WISEMAN:  I want to make sure I understand.

5    Excuse me for a second.

6            (Discussion held off the record between Mr. Wiseman

7    and the defendant.)

8            MR. WISEMAN:  Okay.

9            THE DEFENDANT:  Your Honor, I apologize for wasting

10   your time.  Mr. Wiseman lied to me, he lied to you, and he

11   lied to them when he said he was going to put on a defense.

12   It's obvious he was not going to do that because of that odd

13   question he asked them in the beginning about if Mr. Williams

14   decided not to put on a case, would it unfairly ruin your

15   chances to render a fair decision or however he phrased it.

16   I'm not sure.  That, to me, told me that that email that I

17   got last night was a plan.  He planned to do this from the

18   beginning.  He lied to the Court.  He wasted two weeks of the

19   Court's time, wasted two weeks of the jury's time, wasted two

20   weeks of my time.  He planned it all along.

21           THE COURT:  Is that what you wanted to tell me?

22           THE DEFENDANT:  I'm simply a man here, your Honor,

23   trying to get a fair shot at due process.  That's it.  And

24   that's clearly not happening.

25           THE COURT:  So have you said what you wanted to say?

1          THE DEFENDANT:  I have.

2          THE COURT:  The only thing I can say in response to

3    that, Mr. Williams, is that I've seen -- you may not

4    believe this -- hundreds of trials.  And that's one of the

5    most common things that defense attorneys will say at the

6    beginning of a trial.  Why do they say that?  Because they

7    want to keep their options open.  They want to see how the

8    case presented by the government proceeds, and then they want

9    to make an educated decision whether to call witnesses and,

10   if so, which witnesses to call and whether to advise their

11   client to testify or not.  That depends in almost every case

12   upon how the government's evidence proceeds.  So I've just

13   heard that in almost every trial.

14          The next thing I want to say to you is -- I'm sure

15   Mr. Wiseman told you this -- the decision of what witnesses

16   to call and what questions to ask is the lawyer's decision.

17   But the decision of whether you want to testify, that's your

18   decision.  So I just want to make sure that you don't think

19   Mr. Wiseman has ordered you not to testify or has ordered you

20   to testify.  That's your call.  Do you understand that?

21          THE DEFENDANT:  In all fairness, your Honor, why on

22   Earth would I not want my attorney to put on a defense?

23          THE COURT:  I'm not asking you to ask me questions.

24   I'm asking you if you understand what I just said.

25          THE DEFENDANT:  I do, your Honor.

 1          THE COURT:  And do you understand that the decision of

 2     whether to testify or not is your decision?

 3          THE DEFENDANT:  I do, your Honor.

 4          THE COURT:  All right.  So you're going to make that

 5     decision.  Mr. Wiseman is going to make the decision of what

 6     witnesses to call.  He's going to listen to you before he

 7     makes that decision.  And I assume you've had a chance to

 8     tell him what you think about the witnesses he ought to call.

 9          THE DEFENDANT:  Actually, no.

10          THE COURT:  Okay.  Well, tell him.

11          THE DEFENDANT:  When I got the email, I just

12     automatically assumed it was a high-tech lynching.  I haven't

13     seen anything like this since the slave days.  I didn't even

14     know it still existed.

15          THE COURT:  Mr. Wiseman, has he told you what

16     witnesses he wants to call?

17          MR. WISEMAN:  Well, your Honor, I'm a little

18     uncomfortable responding to the Court's inquiry in front of

19     government's counsel.

20          THE COURT:  My question is did he tell you what

21     witnesses he wanted to call?

22          MR. WISEMAN:  We asked him a series of --

23          THE COURT:  Not which witnesses.  Just did he tell

24     you.

25          THE DEFENDANT:  All four.

 1          THE COURT:  He says all four.

 2          MR. WISEMAN:  No.  Your Honor --

 3          THE COURT:  As a matter of fact, I think I saw the

 4    memo where he did that.  So I think I do know the answer to

 5    that question, and obviously you got the memo.

 6          MR. WISEMAN:  I got the memo.  I made a calculated

 7    decision, spent a good deal of time looking at all the

 8    witnesses that we could have called.  Those witnesses that

 9    were subpoenaed, in fact, subpoenas were issued to witnesses,

10    but based upon what I considered the results of

11    cross-examination yesterday and the previous days, at what I,

12    in my professional judgment, elicited from the witnesses, I

13    do not believe that those witnesses that Mr. Williams wanted

14    me to call that I had originally under subpoena would have

15    done anything of any benefit to Mr. Williams.

16          THE COURT:  All right.  Well, I'm not going to get

17    into the details while the government attorney is here, but I

18    just wanted to know that you did listen to him and read what

19    he had to say and that you've made your decision.

20          MR. WISEMAN:  Correct.

21          THE COURT:  All right.  Now, maybe I should not ask

22    you this in the presence of government counsel either, but

23    since Mr. Williams seems to want to air his dirty linen in

24    public, I do want to know at some point in time whether he's

25    going to testify and, if so, whether that's his own decision.

1    So how do you want me procedurally to address that?  Do you

2    want me to excuse everybody and ask him?

3            MR. WISEMAN:  Yes.  I think that would be the

4    appropriate thing.

5            THE COURT:  All right.  I am going to do that.

6            THE DEFENDANT:  I can answer now without having to

7    excuse everybody.

8            THE COURT:  Okay.  You see, here's my dilemma.  If I

9    excuse everybody, I'm bending over backwards to make sure

10   that his attorney-client privilege is protected and to make

11   sure that his tactical position vis-à-vis the government is

12   preserved.  But then I run the risk of him saying he wanted

13   everybody present, and he was denied a public trial.  So

14   since he wants to tell me in the presence of everybody in the

15   courtroom, then I'm going to let him do that.  Just tell me.

16           THE DEFENDANT:  Let's continue the high-tech lynching,

17   sir.

18           THE COURT:  What does that mean?

19           THE DEFENDANT:  Let's continue.

20           THE COURT:  I need -- okay.  I am going to excuse

21   everybody because I need to ask him a question which he very

22   cunningly has declined to answer.

23               (Proceedings held in camera.)

24               (Proceedings resumed in open court.)

25           THE COURT:  The U.S. Attorney is back in court.  The

1    following proceedings are on the record.  Mr. Williams has

2    been remanded to the custody of the marshal for the remainder

3    of this trial.  He will be present during the trial, and he

4    will not be shackled in the presence of the jury.  There will

5    be no indicia of his being in custody in the presence of the

6    jury.  But during the breaks and evening recesses, he will be

7    in the custody of the marshal.

8          I'm going to hear argument on the motion for mistrial

9    sometime later today after both of you have had an

10   opportunity to present to the Court any points and

11   authorities relating to when and if a court should grant a

12   motion for mistrial when it's been occasioned by the

13   misconduct of the defendant himself.

14         In the meantime, I'm going to have the jury come back,

15   and we're going to proceed with the evidence in this case.

16   All right.

17         MS. HEMESATH:  Just to clarify, we would not do

18   instructions and closing before we heard that motion or we

19   would go all the way through?

20         THE COURT:  No.  If I can hear the motion before you

21   do instructions and closing, I'll do that.  When do you plan

22   on finishing?

23         MS. HEMESATH:  This is our last witness.

24         THE COURT:  All right.  I know whether the defendant

25   is going to testify, but I can't tell you until you rest.

1            MS. HEMESATH:  We'll do that now then.

2            THE COURT:  No, don't rest yet.

3            MS. HEMESATH:  No.

4            THE COURT:  We'll bring the jury back, and you're

5    going to rest?

6            MR. HALES:  Yes, your Honor.

7            THE COURT:  All right.  What are you going to do,

8    Mr. Wiseman?

9            MR. WISEMAN:  Your Honor, I'm going to ask the Court

10   to entertain motions, appropriate motions.

11           THE COURT:  Let's bring the jury back, and we'll tell

12   them what we're doing.  Yes.

13           THE MARSHAL:  Your Honor, can we have one second for

14   security purposes?

15           THE COURT:  Yes, before the jury comes in.

16           (Brief recess.)

17           THE COURT:  All right.  So the marshals are in the

18   back of the courtroom, and they're seated.  Let's bring the

19   jury back.  The defendant is present.

20           (Jury present.)

21           THE COURT:  All right.  Ladies and gentlemen, the

22   jurors are all present.  I'm instructing you to disregard

23   anything that you heard or saw when we came in earlier this

24   morning and pretend that we're just starting now.  Good

25   morning, ladies and gentlemen.

1            All right.  Mr. Wiseman, do you have any questions,

2    further questions on cross-examination for Mr. Harrison?

3            MR. WISEMAN:  No further questions.  Thank you, your

4    Honor.

5            THE COURT:  Mr. Hales, any redirect?

6            MS. HEMESATH:  No thank you, your Honor.

7            THE COURT:  Oh, Ms. Hemesath, you did the direct

8    examination.  Thank you, Mr. Harrison.  You may step down.

9    You're excused.

10           THE WITNESS:  Thank you, sir.

11           MS. HEMESATH:  The United States rests.

12           THE COURT:  The government rests.  Is there a matter

13   you want to take up outside the jury?

14           MR. WISEMAN:  Yes, your Honor.

15           THE COURT:  All right.  Ladies and gentlemen, this is

16   that portion of the trial where the Court needs to confer

17   with the attorneys regarding the exhibits and any motions

18   that they have to make to the Court as well as to agree upon

19   the instructions I'm going to give you on the applicable law

20   because, as I told you at the beginning of the trial, the

21   next phase of the trial is the arguments of counsel which

22   will begin with an argument on behalf of the government and

23   then Mr. Wiseman's argument on behalf of Mr. Williams and

24   then a rebuttal argument on behalf of the government.  After

25   their arguments, I instruct the jury on the law.  But when

1    they present their arguments to you, the lawyers need to know

2    how I am going to instruct you on the law.  So I have to talk

3    with them, listen to their suggestions as to how I should

4    instruct you on the law, and then I decide upon the

5    instructions that I'm going to give based upon the evidence

6    and the arguments that they've made to me.  And then I

7    provide them with a copy of the instructions that I'm going

8    to give to you.  Then in the process of their final arguments

9    to you, they're allowed to refer to my instructions.  So they

10   can say the judge is going to instruct you as follows, and

11   here is how I think you should apply that instruction to the

12   evidence that you've heard.  That's going to take a little

13   while.  So I wasn't aware of the precise timing, but I think

14   I need the rest of the morning to hear what they have to say

15   and to write out my instructions and to give them to the

16   lawyers.

17        So I'm going to ask you to come back at 1:30 this

18   afternoon.  Luckily, it's a little bit nicer day than we've

19   had, so you can do whatever you want and come back at 1:30

20   this afternoon to hear the arguments of counsel.  Remember

21   although you've heard all the evidence, there are still parts

22   of the trial that you have not heard.  So you still have to

23   keep an open mind, and you still have to follow all the other

24   parts of the Court's admonition to you.  So leave your books

25   on your seats, and we'll see you all back here at 1:30.

```
 1                    (Jury not present.)

 2            THE COURT:  Mr. Wiseman, I did not ask in the presence

 3      of the jury whether you intended to call any witnesses

 4      because I thought that would be more prejudicial to

 5      Mr. Williams, knowing what I know, than it was simply to

 6      assume that you were not going to and then let the jury

 7      wonder -- let the jury not have to wonder.  Do you agree with

 8      that?

 9            MR. WISEMAN:  I do.

10            THE COURT:  All right.  Do you agree, Counsel?

11            MS. HEMESATH:  We do.

12            MR. HALES:  Yes.

13            THE COURT:  All right.

14            MR. WISEMAN:  Your Honor, there's only one issue I

15      think in terms of evidence I don't recall the Court having

16      ruled on, which was my motion in limine with respect to the

17      Levin report.

18            THE COURT:  I ruled to the extent that I said I wasn't

19      going to let you just put the report in evidence.

20            MR. WISEMAN:  Correct.

21            THE COURT:  I told you I was going to let you ask

22      questions about it.  And if the questions were appropriate,

23      you could ask them.  If there was an objection and I didn't

24      think the question was appropriate, I would sustain the

25      objection.  You asked questions, and there was no objection,
```

1    so the answers you got were pretty neutral because nobody --

2    or at least the one witness you asked about it didn't know

3    anything about it.

4              MR. WISEMAN:  Right.

5              THE COURT:  So I don't know that there's anything more

6    for me to rule upon with regard to that motion.

7              MR. WISEMAN:  Well, my only conundrum is in closing

8    argument, since it hasn't been admitted or any portion of has

9    been admitted, I don't want to argue a point that evidence

10   has not been introduced over.  And so I think that in light

11   of the questions I asked the witness, I think I should be

12   permitted to allude to the report.

13             THE COURT:  You know, what I would think you could do

14   is you could say he doesn't even know about a report, and

15   this is a report that came from the Senate, and he didn't

16   even know about it.  That shows how little he knows about how

17   his bank is being run.

18             MR. WISEMAN:  And that's precisely what I intended to

19   do, but I did not want to do that in the face of not having

20   the report actually in evidence.

21             THE COURT:  I think what I just said is fair.  It may

22   stretch it a little bit in your favor.  But what would not be

23   fair would be to allow you to suggest what's in that report.

24             MR. WISEMAN:  That's fine.

25             THE COURT:  Okay.  Now, give me a little time, and

1    I'll give you a little time.  You can come back and make your

2    motion for mistrial.  If there are any other motions you want

3    to make, you can make those.  I'll get my draft instructions,

4    and we can go over those.  Let's come back here at 10:15.

5         MS. HEMESATH:  Your Honor, we had one more thing

6    hanging out there.  And that was the summary charts.  We did

7    take the pictures off last night and replaced them.  The one

8    I'm intending to use in my closing no longer has images on

9    it.

10        THE COURT:  How about the others?

11        MS. HEMESATH:  There are no more images on any chart.

12        THE COURT:  Did you show those to Mr. Wiseman?

13        MR. WISEMAN:  I did get to see them, but I think the

14   underlying issue still is unresolved, and I think the Court

15   hasn't ruled on it.  And that is I still believe that the

16   charts themselves, even with the redacted portions of the

17   photographs, should not be introduced as evidence that will

18   go back to the jury room.

19        THE COURT:  Can I see the charts as they have been

20   modified?

21        MR. HALES:  Yes, your Honor.  May I approach, your

22   Honor?

23        THE COURT:  Yes.  Can you point to which parts of

24   these charts you think relate to documents that the witness

25   reviewed and were made available but are not in evidence?

1          MS. HEMESATH:  Yes.  Can we pull them up on the

2    screen?

3          THE COURT:  You can put them on the screen.

4          MS. HEMESATH:  So on this one, on 802, just this fact

5    is not in evidence.  That's based on review of the bank

6    account.

7          THE COURT:  Okay.  It's $32,552.45 remains in DHF

8    account.

9          MS. HEMESATH:  Yes.

10          THE COURT:  And so how was that derived?

11          MS. HEMESATH:  That is derived by his review of the

12    bank account records.

13          THE COURT:  Why is that in red?  Is that because it

14    was something outside the exhibits?

15          MS. HEMESATH:  We put it in red because it's not a

16    hard number that ties to a specific exhibit, and it is not

17    pegged a specific date in the bank account.  He gave

18    testimony as to how he derived that number.

19          THE COURT:  All right.  Well, I see that you've got

20    other things in red, and I understand 803.  Why is the

21    $15,000 in 804 in red?

22          MS. HEMESATH:  So on this one, that is the check that

23    goes into the Diamond Hill Financial account.  So that is the

24    account controlled solely by Mr. Williams, and that is funds

25    that we argue are to his benefit exclusively.

1          THE COURT:  So the red are the ones that you want to

2    argue to the jury went to him.

3          MS. HEMESATH:  Yes.  Also on this 804 chart, this is

4    another example where there's more that is not in evidence.

5          THE COURT:  Tell me which ones.

6          MS. HEMESATH:  I'm circling on the screen right now,

7    your Honor.  So basically the entire first escrow portion and

8    as well this concept, the outside escrow concept.  And I

9    should have mentioned that on the 802.  Anywhere where the

10   term "outside escrow" is written, that's based on the

11   agent's -- he testified that is based on his review of the

12   escrow files.

13         THE COURT:  Well, in effect, isn't everything below

14   the blue line outside of escrow?  Isn't that outside of

15   escrow?

16         MS. HEMESATH:  On the first two charts, the Tony

17   Symmes' charts, yes.

18         THE COURT:  What's the sense of the blue line on the

19   other charts then?

20         MS. HEMESATH:  It shows -- so this right here, the

21   $50,000 check, that is the monies that were made on the flip

22   sale in the second escrow.

23         THE COURT:  Why do you draw a blue line there?

24         MS. HEMESATH:  Sorry.  I'm just showing you where I'm

25   talking about that number.  That's not outside escrow because

1    that is the money that was made on the second transaction.

2            THE COURT:  So now I know that everything below the

3    blue line is not necessarily outside of escrow.  What is the

4    meaning of having a blue line there?

5            MS. HEMESATH:  The meaning is to show that the real

6    estate portion of the transaction is done, and now this goes

7    into the transfer of monies down here.

8            THE COURT:  So is it that what's above the blue line

9    is the real estate portion and what's below the blue line is

10   what happens afterwards?

11           MS. HEMESATH:  Correct.

12           THE COURT:  Okay.

13           MS. HEMESATH:  And on this chart, the outside escrow

14   portion only refers to this.  That is the check that is

15   outside escrow.

16           THE COURT:  Here's my observation.  And I'm not ruling

17   because I haven't decided what to do.  But this is kind of a

18   hybrid exhibit.  It's not what you typically see under

19   Rule 1006 where they're just a bunch of numbers and they're

20   added up from exhibits or documents that were made available,

21   and they're put on some kind of a -- I can't remember the

22   name of the term -- on a spreadsheet.  That's the more

23   typical 1006 summary exhibit that goes to the jury.

24           The other type of exhibit is what looks like a

25   flowchart, and it's used by an expert witness to explain his

1    analysis.  And those typically are not 1006 exhibits.

2    They're illustrative of the witness's testimony.  The former

3    are exhibits that go into the jury room.  The latter

4    typically do not go into the jury room.

5           So I have to decide whether this is more like a visual

6    aid to assist the expert's testimony or whether it's more

7    like a summary or compilation of evidence that goes into the

8    jury room.  And I see the elements of both here, so I have to

9    decide which way to handle it.

10          Now, I'm not sure it makes a lot of difference, but

11   given the strength of the government's evidence -- and I

12   don't know why you need this in the jury room.  And if we're

13   going to err, why not just keep it outside the jury room, let

14   you use it in your argument and talk about it?

15          MS. HEMESATH:  I think that's probably fine, your

16   Honor.  My only concern is that it was my understanding that

17   for demonstrative aids, all of the elements of the chart did

18   have to be in evidence, and there are things on this chart

19   which are not in evidence.

20          THE COURT:  Well, I don't think you're right that

21   everything has to be in evidence, because I think I have seen

22   expert witnesses give visual aids that relate to literature

23   and other things that experts are allowed to consider that

24   are not necessarily in evidence.  In other words, if it's not

25   error to --

1          MR. WISEMAN:  Your Honor.

2          THE COURT:  I don't know that you're right on that,

3      but maybe you are.

4          MR. WISEMAN:  Your Honor, my view is this.  My view is

5      that this should not go into the jury room as evidence

6      because I agree with the Court's --

7          THE COURT:  I know.  But what's your answer to the

8      question that if it doesn't go in as evidence, then it's even

9      worse to allow a witness to refer to it because it has

10     information on it which is not in evidence?

11         MR. WISEMAN:  Well, if the point of the chart or the

12     use of the chart will be simply to assist counsel in closing,

13     then during the break, I'll look at the case law on that

14     particular issue, if, in fact, there's information on the

15     chart that's not supported by admissible evidence.  So I'll

16     look at that.

17         THE COURT:  But see, that's the point.  It is

18     admissible evidence because it's his opinion based upon the

19     documents that he reviewed which were made available to the

20     defense.  So that was admissible.  His opinion that went into

21     these numbers is admissible, and he already said it was.  So

22     I think that's what I'm inclined to do, to just not allow

23     these diagrams themselves to go into the jury, but that the

24     witness has already used them to illustrate his testimony,

25     and I'll let counsel on either side use those same exhibits

1    in argument, but they won't go in the jury room.

2              MR. WISEMAN:  That's fine.

3              THE COURT:  Okay.  That's what I'm going to do.

4              MS. HEMESATH:  Thank you.

5              THE COURT:  So let's come back here in 15 minutes.

6              (Recess taken.)

7              (Jury not present.)

8              THE COURT:  The defendant is present.  We're meeting

9    outside the presence of the jury.

10             Mr. Wiseman, did you want to make your motion?

11             MR. WISEMAN:  Yes, your Honor.  But before I make my

12   motion under Rule 29, I did want to respond to the Court's

13   earlier comment about providing additional time to look at

14   any cases with respect to this unfortunate outburst.  And if

15   the Court wants me to address that first --

16             THE COURT:  I thought we were going to address the

17   motion for mistrial before the Rule 29 motion.  So why don't

18   you tell me what you wanted to say about that.

19             MR. WISEMAN:  Sure.  We looked at the case law, and it

20   appears that U.S. vs. McCormac, which is 309 F.3d 623, a

21   Ninth Circuit 2002, seems to be the salient case on point.

22   That was a case in which the Ninth Circuit upheld the

23   district court's discretion not to declare a mistrial when,

24   in fact, there was an outburst.  Nevertheless, there's

25   language in McCormac that says the district court can grant a

1   mistrial if the outburst had substantially prejudiced the

2   jury.  And certainly curative instructions can be used to

3   sort of minimize any prejudicial effect of the outburst.

4          But in this particular case, based upon the intensity

5   and the nature of the outburst, I do believe that the jury is

6   unduly prejudiced against Mr. Williams and therefore suggest

7   and request that the Court grant a mistrial based upon that.

8          If the Court is inclined not to grant a mistrial based

9   upon my view of the prejudicial effect on the jury, the Court

10  also has the option to poll the jury as to if the outburst

11  had any prejudicial effect on them.

12         There's a case, U.S. vs. Cunningham.  It's 194

13  Fed.Appx.  I'm not sure, your Honor, if it's a published

14  case, but it's at 582.  So 194 Fed.Appx. at 582.  It's out of

15  the Eleventh Circuit.  And that case does allude to one

16  curative method the Court could use to ensure that the jury

17  is not unduly prejudiced, and that would be to poll the jury.

18         THE COURT:  Well, what would I ask them if I polled

19  them?

20         MR. WISEMAN:  Well, I think they would have to be

21  asked whether or not Mr. Williams' outburst prejudiced their

22  view of him and whether or not it would have any effect on

23  their ability to render a fair, impartial, and just verdict

24  in the case.

25         THE COURT:  Did you have anything else to add?

1      MR. WISEMAN:  No.  With respect to that issue, no.

2      THE COURT:  Let me hear from the government with

3  respect to this last suggestion that the Court might want to

4  consider polling the jury.

5      MR. HALES:  From the government's perspective, we've

6  had limited time to look at this.  We haven't found a

7  Ninth Circuit case that says that that's what should be done

8  here.  And from our perspective, the disruption was not so

9  severe or extended that -- it seems that polling the jury

10 would draw more attention to it.

11     THE COURT:  Let me say this with regard to McCormac.

12 There is that language that Mr. Wiseman just mentioned.  But

13 when you look at the facts of McCormac, they are not only

14 parallel to the facts here, but arguably the disruption was

15 even greater.  What happened there, it almost sounds like

16 this case.  The judge came out and asked the defense counsel

17 if he was ready for trial.  Defense counsel said, "Yes, your

18 Honor."  Then the defendant said, "Defendant is not ready for

19 trial, your Honor."  The court then immediately said, "You're

20 in contempt."  The defendant said, "That's fine, your Honor."

21 The court said, "Be seated."  And then the defendant made

22 this little speech:  "No, your Honor.  I am not going to

23 proceed with any trials.  I told you that already.  I feel

24 that this is a biased situation, and there's not going to be

25 any justice served by wasting the jurors' time."

1          The court said, "Just a moment."

2          The defendant said, "No."

3          The court said, "Be quiet, please."

4          The defendant said, "No."

5          Then the court said, "I want the marshal to remove the

6     defendant and bring her to my chambers.  I'll see counsel in

7     chambers, please."

8          So in that case, the court actually in the presence of

9     the jury adjudicated the defendant in contempt which

10    conceivably could be more prejudicial than what occurred

11    here.  The court also in that case, in the jurors' presence,

12    ordered the marshals to remove the defendant from the

13    courtroom, which did not occur here, and could, quite

14    arguably, be more prejudicial to the defendant in that case

15    than what occurred here.  The court, nevertheless, affirmed

16    the trial court's denial of a mistrial by saying that

17    although there was no finding that the defendant's outburst

18    was calculated with malign purpose to delay the trial -- and

19    let me stop there.  That is also different from this case.  I

20    have, as I said, to my own surprise, seen hundreds of jury

21    trials, and I have a pretty good understanding of what's

22    going on out there.  And there's no doubt in my mind that

23    that was precisely Mr. Williams' purpose here.

24          But to go on, they said:  "We must consider effect:

25    the district court would have been de facto granting a

1    continuance by declaring a mistrial and summoning new jurors.

2    We decline to find that the district court abused its

3    discretion in denying a mistrial when the defendant's own

4    misconduct caused the alleged impartiality of the jurors and

5    the court took reasonable steps to ensure the jurors could

6    serve impartially."

7         Well, here, I took I think even further steps than the

8    court did in that case because I instructed them immediately

9    to disregard what went on.  And then after the delay, I

10   further instructed them to just disregard everything that had

11   gone on earlier and to pretend we were just starting the

12   trial again.  And it just worked out perfectly because that's

13   something that the jurors can compartmentalize and put out of

14   their minds.

15        The court cited Williams vs. Woodford where the

16   Ninth Circuit had previously said, "The Sixth Amendment

17   affords no relief when the defendant's own misconduct caused

18   the alleged juror partiality and the trial judge employed

19   reasonable means under the circumstances to preserve the

20   trial's fairness."  And they cited a Seventh Circuit case

21   holding that a defendant should not profit from his own

22   misconduct.

23        Now, the court in McCormac apparently did afford the

24   prospective jurors an opportunity to voice any potential

25   impact of the outburst on their partiality.

1           I'm not going to exercise my discretion to do that

2    here.  One of the reasons was mentioned by the government.

3    It calls undue further attention to the outburst which we're

4    hoping they could put out of their mind for purposes of their

5    deliberations.

6           Beyond that, we have to be realistic.  A juror is not

7    going to admit that they're biased even if they are.  I can't

8    structure a voir dire that would be any semi-accurate measure

9    of whether the outburst had some kind of a lasting impression

10   on the jury.  I couldn't just ask one question.  I could.  I

11   could say:  Are any of you biased against the defendant

12   because of his outburst?  And I know that no hands would go

13   up.  I could ask.  But the reason I'm not going to ask is

14   that it's not going to elicit any kind of a meaningful

15   response, and it is further going to call attention to the

16   incident, which I do not want to do.

17          If I tried further to structure a series of questions

18   that would elicit some subconscious effect that this had on

19   the jury, it would be even worse.

20          The defendant can't expect to stand up here and throw

21   the gauntlet down to the Court, challenge me, challenge the

22   jurors, and then put us all on the defensive.  I'm not going

23   to do that.  So the motion for mistrial is denied.

24          Just because the case has an interesting name, I'll

25   also cite United States vs. Williams in the Ninth Circuit,

1    428 Fed.Appx. 723, where the court said, "The Sixth Amendment

2    'affords no relief when the defendant's own misconduct caused

3    the alleged juror partiality and the trial judge employed

4    reasonable means under the circumstances to preserve the

5    trial fairness.'"

6          So let's go on now to the Rule 29 motion.

7          (End of excerpt of proceedings.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1             I certify that the foregoing is a correct transcript

2       from the record of proceedings in the above-entitled matter.

3

4

5                              /s/ Kelly O'Halloran

6                              KELLY O'HALLORAN, CSR #6660

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25