BENJAMIN B. WAGNER
United States Attorney
CHRISTOPHER HALES
AUDREY B. HEMESATH
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

Plaintiff,

v.

LEONARD WILLIAMS,

Defendants.

CASE NO. CRS-08-0376-WBS

GOVERNMENT'S SENTENCING MEMORANDUM AND RESPONSE TO DEFENDANT'S OBJECTIONS

DATE: December 15, 2014
TIME: 9:30 a.m.
COURT: Hon. William B. Shubb

## I. INTRODUCTION

The Court has seen the evidence of Defendant Leonard Williams' mortgage fraud at trial and dealt with his attempt to derail these proceedings. The government agrees with the sentencing calculations set forth in the Pre-Sentence Investigation Report (PSR), with one exception: the Defendant should receive a two level obstruction of justice enhancement for his deliberate attempt to cause a mistrial. With this enhancement Defendant's offense level is 31, and his sentencing range is 108-135 months. A sentence of 108 months is reasonable, sufficient, and not greater than necessary.

The government submits this sentencing memorandum in support of its recommended sentence and to respond to Defendant's objections. Defendant objects to the loss amount, sophisticated means enhancement, and leadership enhancement recommended in the PSR. The leadership and sophisticated means enhancements can be readily supported by trial evidence. With respect to loss amount and relevant conduct, below the government proffers the evidence it intends to present at the sentencing

hearing through testimony of IRS Special Agent Andrew Harrison, and through related exhibits.

## II. GOVERNMENT'S OBJECTION

### A. Obstruction of Justice Enhancement

The government argued in its informal and formal objections that the obstruction of justice enhancement should apply to Defendant's attempt to cause a mistrial, and reiterates its position here. The probation officer did not add the enhancement to the final PSR, but responded to the government's objection by deferring the issue "to the Court for resolution" because the officer had not yet received the pertinent transcript and believed that "the Court is in a better position to rule on this matter." ECF 570-4 at 1. The government has now received the transcript of the proceedings on July 23, 2014 (attached herewith as Exhibit A to this filing), and submits that it fully supports imposition of the obstruction enhancement.

On the final day of trial, as defense counsel announced he had no further questions for the government's last witness, Defendant began speaking loudly in front of the jury about an email he had received from his counsel the prior evening. Ex. A at 1:10-15. The Court instructed Defendant to stop speaking until the jury could be excused. *Id.* at 1:16-18. The Defendant promptly disobeyed the Court's order by standing up and stating loudly, "Your Honor, he [defense counsel] said he wasn't going to put on a defense." *Id.* at 1:19-20. The Court again asked the Defendant to wait until the jury could be excused, and then asked the jury to depart, with an instruction to disregard what had just happened. *Id.* at 1:21-24. Before the jury could leave, the Defendant (still standing) turned towards the jury and yelled at them, "If you believe in the America I believe in, please don't participate in this railroad." *Id.* at 1:25-2:2. According to Government counsel's memory, the Court had to issue at least one more order for the Defendant to be quiet that does not appear in the transcript, likely because of the commotion caused by Defendant's outburst and the fact that he tried to speak over the Court. As the Court later described it, when the Court tried to quiet the Defendant, the Defendant "just kept yelling into the microphone, and I tried to yell louder, and he just kept getting louder and louder, and he wouldn't stop. And then as the jury was filing out, he continued to stand up, look at the jury, and shout at them." *Id.* at 3:4-8.

The Court found that Defenant's conduct was a deliberate attempt to cause a mistrial. *Id.* at 3:24-4:2 ("This is an educated man. This is not some ignorant defendant. He has been involved in the

system now for a long time. I have no doubt that this was a deliberate effort to create a mistrial"). The Court further explained "I am compelled to conclude that this is a cunning effort on [Defendant's] part to create a mistrial …" both because of the strength of the evidence against him, and because Defendant already knew he could address the Court outside the presence of the jury and had previously done so. *Id.* at 5:1-8, 5:15-6:6; *see also* 28:15-23.

In light of this record and the findings by the Court, the Defendant's conduct was a literal "attempt[] to obstruct[] or impede[] the administration of justice with respect to the … prosecution of the instant offense of conviction," because if successful, it would have caused a mistrial and stopped the trial proceedings altogether. USSG § 3C1.1.[1] The two level obstruction should be imposed.

## III. RESPONSE TO DEFENDANT'S OBJECTIONS

### A. Leadership Enhancement

The PSR correctly applies a four-level leadership enhancement. Defendant was an organizer or leader of a criminal activity that involved five or more participants. *See* USSG § 3B1.1, comment. (n.2, n.4). As proven at trial, the overall conspiracy had over five people who could be held criminally responsible. This includes the following:

1) **Defendant**, convicted at trial in this case;

2) **Joshua Clymer**, convicted by plea in this case;

3) **Tony Symmes**, the Chico deverloper who testified at trial and admitted to his criminal conduct related to the 2640 Ceanothus and 3294 Rockin M properties. Symmes was convicted by plea in a related case, and the factual basis to his plea agreement specifically admitted his criminal conduct in the 2640 Ceanothus transaction, *see United States v. Symmes*, 2:10-cr-200 EJG, ECF #3 at 22-23; and

4) **Garret Gililland**, who was criminally culpable in the Chico deals in this case as a recruiter of straw buyers who helped Symmes artificially inflate home prices to generate fraud proceeds and then received kickbacks, as shown with the trial testimony of Tony Symmes and Jessica Sawyer.

[1] Seeking to cause one's own mistrial is not specifically listed in as an example of covered conduct in Guideline § 3C1.1, but the commentary is clear that said list is "non-exhaustive." USSG § 3C1.1, comment (n.4). The list of examples contains behavior similar to what Defendant did, including attempting to unlawfully influence jurors, and failing to appear for trial (which has the same effect of grinding trial proceedings to a halt). *Id.*

The list also includes includes those buyers who admitted at trial they knew their loan applications were false and that they were using the false statements to get money in the form of a loan to buy a house, which establishes their criminal responsibility:

5) **Arthur Watson**, for the Chico properties;

6) **Joshua Frye**, for 4824 Baker Ave.;

7) **Juan Reynaga**, for 2976 Trap Rock Way; and

8) **Anthony Petri**, for 5548 Woodforest Drive. [2]

This is at least eight people with criminal responsibility in the scheme, and the evidence at trial showed that Defendant controlled and directed several of the buyers in the fraud. Per the buyers' testimony, Defendant recruited Arthur Watson and directed Watson as to the false statements on his loan applications; Defendant helped recruit Joshua Frye in person, directed Frye as to the false statements in his loan applications, and allayed Frye's concerns about using false information; Defendant directed Juan Reynaga as to the fake gift affidavit, fake down payment check, and false statements in his loan application; and Williams participated in directing Anthony Petri regarding the false statements in his loan application. Considered together, the evidence showed that Williams personally recruited others to the scheme, that he directly participated in devising and organizing the fraud, and that he exercised control over the buyers when directing the fraud. Defendant's conduct fits the factors set out in Guideline § 3B1.1, and the leadership enhancement should apply. *See* USSG § 3B1.1, comment. (n.4, n.2).

**B. Sophisticated Means**

The PSR also correctly applies a two-level sophisticated means enhancement. *See* USSG §2B1.1(b)(1)(10)(C). "Conduct need not involve highly complex schemes or exhibit exceptional brilliance to justify a sophisticated means enhancement." *United States v. Jennings*, 711 F.3d 1144, 1145 (9th Cir. 2013). The creation of multiple fraudulent documents in support of a fraud scheme is sufficient to warrant the enhacement. *See United States v. Tanke*, 743 F.3d 1296, 1307–08 (9th Cir.

[2] The buyers in the scheme do not need to have been convicted to count as participants for purposes of the leadership enhancement. *See* USSG § 3B1.1, comment. (n.1). The other buyer who testified at trial, Lacie Clymer, basically claimed not to know what was in her loan application.

2014) ("Although Tanke did not use 'fictitious entities, corporate shells, or offshore financial accounts,' as the Sentencing Commission's commentary contemplates, he created at least six false invoices and falsified carbon copies of checks in Azteca's check register on at least 10 occasions to conceal the payments."). Likewise, the manipulation of other people to lie, in conjunction with the creation of false documents in a fraud scheme, warrants the enhancement. *See United States v. Horob*, 735 F.3d 866, 872 (9th Cir. 2013) ("Horob did more than lie to obtain a loan. He manipulated several people to lie for him, used several different bank accounts (including accounts of other people) to move funds around, and fabricated numerous documents. Moreover, the complicated and fabricated paper trail made discovery of his fraud difficult.")

The testimony at trial in this case showed that Defendant manipulated Arthur Watson, Joshua Frye, Juan Reynaga, and Anthony Petri to lie on loan applications and related documents in furtherance of the conspiracy. The evidence also showed that Defendant was involved in the creation of fraudulent documents such as Arthur Watson's fraudulent bank statements,[3] Anthony Petri's false W-2 and pay stubs,[4] and false verification of employment documents that Defendant himself signed.[5] Defendant also repeatedly used his own company Diamond Hill Financial as the fake employer for buyers in the scheme, so that he could falsely verify their employment when the banks called, making the scheme more difficult to detect. Furthermore, in the double escrow transactions proved at trial, the Defendant

---

[3] As proved at trial, Watson gave Defendant online access to Watson's Bank of America account, and forged bank statements subsequently ended up in Watson's loan files, with obvious forging to inflate Watson's apparent assets and income. Defendant also seeded Watson's account with $8,000 that did not belong to Watson, to make it appear as if Watson had more assets than he actually did. *See* GX 209a (fake inflated bank statements from loan file); GX 230 (real bank statements from Bank of America); GX 307-309 (checks showing Defendant seeding $8,000 in Watson's account and promptly receiving the $8,000 back, and related email from Jessica Sawyer).

[4] Petri testified that he and the Defendant explicitly discussed the fraudulent W-2s and pay stubs before Petri signed his loan application. The fraudulent W-2s and pay stubs were for Defendant's own company Diamond Hill Financial, leading to the reasonable inference that the Defendant was involved in creating these documents, at a minimum by at least supplying the necessary information about his company to be placed on them. *See* GX 705-707 (fake W-2 and earnings statements for Petri); GX 704 (fraudulent verification of employment signed by Williams). It should also be noted that Terrance Murrell (an old military friend who declined to buy a house when solicited by Defendant) testified that the Defendant offered to get fake W-2s for him.

[5] *See, e.g.*, GX 203 and 704 (false verification of employment documents admitted at trial that were signed by defendant); *see also* GX 206, 303-304, 404-405, 603-604, and 708 (documents showing that Leonard Williams falsely verified employment verbally to lenders on numerous occasions).

and Joshua Clymer used their other company, Bay Area Real Estate Holdings LLC, to do the actual buying and selling of properties, with Joshua Clymer signing most of the transaction documents. This helped them conceal their relationship with Diamond Hill Financial, which was the supposed employer of the buyers. It also helped to conceal that the Defendant was both directly involved in the real estate transaction and verifying the buyers' employment information at the same time. Defendant's manipulation of others, involvement in creation and use of fraudulent documents, and use of his companies to conceal his fraud conspiracy support the sophistication enhancement under Guideline §2B1.1(b)(1)(10)(C).

**C. <u>Loss Amount and Relevant Conduct</u>**

The PSR holds Defendant accountable only for fraudulent transactions in which he was involved. Relevant conduct includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant." U.S.S.G. § 1B1.3(a)(1)(A). In a fraud case, relevant conduct includes all such acts and omissions "that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2). In a mortgage fraud case, loss is the entire amount of the fraudulently obtained loan, minus any amount recovered by the creditor on the sale of the house. *United States v. Morris*, 744 F.3d 1373, 1374-75 (9th. Cir. 2014). Actual loss includes consequential loss. *See United States v. May*, 706 F.3d 1209, 1213 n.3 (9th Cir. 2013).

With relevant conduct, the loss amount associated with Defendant's conduct is approximately $1.9 million. The government will present evidence at the sentencing hearing in support of this loss amount, including those properties not discussed at trial that are listed in the PSR. *See* PSR ¶ 15. Special Agent Andrew Harrison of IRS Criminal Investigations will testify regarding the loss estimate included as Attachment B to this filing. In support of the estimate the government will present exhibits that have been numbered 901-941 (so as not to duplicate exhibit numbers already used at trial).[6] As a preview the government proffers the following:

[6] Government Exhibits ("GX") discussed below that are in the range 901-941 will be presented at the sentencing hearing and are proffered here. All other exhibits referenced in this section were admitted at trial.

1. **864 Gidda Loop, Chico, CA (A. Watson)**

It is unclear from Defendant's sentencing memorandum if he maintains his objection to the Gidda Loop property. Arthur Watson was the straw buyer for this property and testified about it at trial. Watson's loan application for Gidda Loop was admitted into evidence (GX 101) and his testimony revealed that it contained multiple lies, including inflated income and falsified intent to occupy as a primary residence. *See* GX 105 ("Occupancy Statement" signed by Watson for Gidda Loop loan, admitted at trial and which Watson confirmed was false). Watson testified that it was the Defendant who encouraged him to purchase Gidda Loop, that the Defendant helped him with the documentation including the loan application, and that they essentially agreed Watson was going to be a straw buyer, with the Defendant responsible for finding renters and managing the property after the purchase. The government proved that the Defendant did in fact subsequently receive rent checks from the renters of Gidda Loop. *See* GX 116 and 117. This was relevant for Watson's later purchases, because in his later loan applications (for Ceanothus and Rockin M, both in Chico), Watson claimed that he was receiving income from renters at Gidda Loop, which was false because the Defendant was receiving this income, not Watson. Watson also received a kickback check of $14,993 from the Defendant outside of escrow on the Gidda Loop transaction. GX 112. This cash back to Watson was not disclosed in escrow. GX 901 (HUD-1 from Gidda Loop loan file, showing only $365 in cash back to the borrower, and not disclosing the $14,993). The loans from Gidda Loop totaled $365,000, and after foreclosure the property sold for $205,000. GX 902 at 5.

2. **3332 X Street, Sacramento, CA (C. Washington)**

The X Street property was included in the conspiracy charge in Count 1 of the Third Superseding Indictment, but was not focused on at trial. Defendant's company Diamond Hill Financial, Inc. bought and sold the X Street property in a same-day double escrow on October 16, 2006. GX 903-904, 915. One week before this transaction closed, the Defendant appointed coconspirator Joshua Clymer as treasurer of Diamond Hill Financial (see GX 5, "Resolution to Appoint a Treasurer, dated October 9, 2006, admitted at trial) and specifically authorized Joshua Clymer to sell assets of Diamond Hill Financial to Christopher Washington (see GX 4, "Resolution for Blanket Authority to Sell Assets" dated October 9, 2006, admitted at trial).

The primary provable fraud on X Street is undisclosed cash back to the buyer outside of escrow. The final HUD-1 for Diamond Hill's purchase shows that Diamond Hill purchased the property for $304,000 on October 16, 2006. GX 903. The final HUD-1 for Christopher Washington's purchase shows that he purchased X Street from Diamond Hill on the same day for $380,000. GX 904. Following Christopher Washington's purchase of this property, Washington received an undisclosed kickback of $25,000 out of the difference, as shown by the following:

- 10/17/06 - $67,530.10 wired into Defendant's Diamond Hill account as proceeds of the X Street sale; at the time the Diamond Hill account only has $500 in it. GX 905-906.
- 10/18/06 - $46,000 wire leaves Diamond Hill account to Ivy Jackson. GX 907-908. Ivy Jackson explained to investigators that she left her business, Soft Notes (the DBA on the bank account receiving the wire) to be run by Carldell King when she became ill in 2005-2008. Ivy Jackson and Carldell King were the only signers on the Soft Notes account.
- 10/25/06 – Carldell King signs a $25,000 check from Soft Notes' Bank of America account (check 1040) to Christopher Washington. GX 909.
- 10/27/06 – The $25,000 check (check 1040) to Christopher Washington is cashed and amount is drawn from the Ivy Jackson / Soft Notes account. GX 908.

This kickback to Washington was not disclosed in escrow. GX 904 (Final HUD-1 and settlement statement, not disclosing the large kickback to Soft Notes/Ivy Jackson and then to Christopher Washington). In a cooperation interview with the government, Joshua Clymer confirmed that he knew Christopher Washington was receiving cash back outside of escrow, and that he did not think it was disclosed to the lender. GX 911 at 3. Joshua Clymer also confirmed that Defendant controlled the Diamond Hill account and often used it as his personal account. The Defendant kept and/or spent approximately $10,000 of the proceeds remaining after the kickback, and wrote a check for $11,200 to Joshua Clymer in connection with this transaction. GX 912-914.

The loans on X Street totaled $380,000, and it was sold after foreclosure for $146,000. GX 904, 915.

3. **6539 Lang Avenue and 2914 La Solidad Way, Sacramento, CA (C. Theus)**

Buyer Chrislie Theus purchased three properties in just over a single month from December 6, 2006 through January 9, 2007. All three were double escrows with Diamond Hill Financial buying and selling the property to Theus on the same day, and with Theus's purchase price being substantially

higher. The first was a property on Florinda Way purchased December 6, 2006, which the government does not seek to include in the loss amount. GX 917. The second and third properties Theus purchased were Lang Avenue and La Solidad Way, respectively. Theus purchased Lang Avenue on December 27, 2006. GX 918. Theus purchased La Solidad Way on January 9, 2007. GX 919.

The primary provable fraud on both Lang and La Solidad is false statement of intent to occupy as a primary residence. In both cases her loan applications falsely stated that Theus intended to occupy the homes as her primary residence. GX 920-921. Theus was interviewed by FBI agents and confirmed that she purchased these properties as investment properties, not primary residences, and that she never lived in them. GX 916. Theus was assisted by her mother and step-father on the transactions, and doesn't recall ever meeting or talking to Defendant or Joshua Clymer. Id. The Lang property was listed in Count 1 of the Third Superseding Indictment, but was not focused on at trial. The La Solidad property was not listed in the Third Superseding Indictment, but should still be included as relevant conduct under Guideline § 1B1.3.

The profits from these sales came into the Diamond Hill Financial account that Defendant controlled, and from them Defendant wrote Joshua Clymer checks for his share of the profits. GX 922-924. The loan amounts on the Lang property totaled $390,000, and after foreclosure it sold for $68,000. GX 918, 925. The loan amount on the La Solidad Way property was $400,000, and after foreclosure it sold for $80,000. GX 919, 926.

**4. 2201 Drusy Avenue, Sacramento, CA (D. and J. Clymer)**

The Drusy property was actually purchased by Joshua Clymer and his father on April 30, 2007. It was not included in the Third Superseding Indictment, but should be included in the loss amount for Defendant as relevant conduct under USSG § 1B1.3. Like the Christopher Washington and Chrislie Theus properties, the Drusy transaction was structured as a double escrow, with Diamond Hill Financial buying the Drusy property for $530,000, and reselling it to Joshua Clymer and his father for $630,000 on the very same same day. GX 927, 930. The provable fraud on this transaction is undisclosed cash back to Clymer outside of escrow. Following the transaction, after Diamond Hill received the proceeds, Leonard Williams wrote four checks to Clymer totaling $49,516 with the memo "Drusy." GX 929. When interviewed, Joshua Clymer acknowledged receiving cash back outside of escrow after the Drusy

transaction, although he thought it was closer to $18,000 rather than $49,516. GX 911 at 5. The kickbacks to Joshua Clymer were not disclosed in escrow. GX 927 (final HUD-1 and Closing Statement for Clymer's purchase of Drusy). The loan on Drusy was $567,000, and it eventually sold after foreclosure for $410,000. GX 927, 930.

5. **2640 Ceanothus Avenue and 3294 Rockin M Drive, Chico, CA (A. Watson)**

The evidence presented at trial of Defendant's involvement in fraud related to Ceanothus and Rockin M properties in Chico was overwhelming and Defendant does not challenge it, claiming simply that it was part of a different conspiracy. The Court already rejected the Defendant's argument that these properties were part of a separate conspiracy, and both properties should be included in the loss amount. *See* ECF 561 at 8-12 (Government's opposition to Rule 29 motion, discussing Defendant's multiple conspiracy argument); ECF 564 (Order denying Defendant's Rule 29 motion). The loan on the Ceanothus property was $375,000, and after foreclosure it sold for $225,000. GX 31, 931, 933. The lender, CIT Group, provided a detailed loss calculation for Ceanothus totaling $185,624. GX 932. The loan on the Rockin M property was $418,000, and after foreclosure it sold for $270,000. GX 37, 936, 937. The lender provided a detailed loss calculation for Rockin M totaling $186,390. GX 934.

6. **4824 Baker Avenue, Sacramento, CA (J. Frye)**

Joshua Frye's loan on the Baker property was $315,000. GX 45. After foreclosure the Baker property sold for $105,000. GX 938, 939.

7. **11516 Linday Way, Gold River, CA (L. Clymer)**

Lacie Clymer's loan on the Linday property was $382,000. GX 53. After foreclosure the Linday property sold for $240,000. GX 940, 941.

## IV. 3553 FACTORS

### A. Nature and characteristics of the offense and the Defendant

At trial the testimony revealed that Williams has good qualities: years of dedicated military service, a spark for entrepreneurship, an aptitude for computers, and charisma that won him loyal friends. Unfortunately, he used those good qualities to further a fraud scheme. The buyers in this scheme were complicit, but they were also vulnerable, and the Defendant preyed upon those vulnerabilities.

Arthur Watson, Williams' longtime Air Force friend, testified that Williams helped him rebuild his credit score after a difficult time that included eviction from his apartment and drug use. Williams then offered much-needed cash in exchange for the use of that credit score. By the third house Williams had Watson purchase, Williams lied to Watson that there was no cash left at the end of the deal: in reality, Williams knew he couldn't use Watson as a straw buyer again, so he had no need to continue to incentivize Watson. Joshua Frye was so young and inexperienced when he met Williams and co-defendant Joshua Clymer that he testified he needed to practice speaking on the telephone. Williams and Clymer manipulated Frye's aspirations and uninformed understanding of the real estate market to use his good credit as a buyer. Anthony Petri was also young and saw himself as a budding real estate investor – Williams and Clymer offered the promise that he could do so with little risk. Juan Reynaga had a girlfriend and four children; the family had just lost the lease on their rental housing and was in a desperate rush when Williams and Clymer offered a path to home ownership with no down payment. Finally, Lacie Clymer, Josh Clymer's sister, had never lived out of her parents' house, had no understanding of the mechanics of home buying, and trusted her brother Joshua Clymer – Defendant's coconspirator - to work magic to get her into a Gold River house with no down payment and almost $10,000 cash back.

Defendant disregarded the ability of the buyers to afford the monthly mortgage payments – a factor that the lenders testified was crucial to their decision whether to fund a loan, and which ultimately led to a loss of nearly $2 million to lenders. The deals were an opportunity for the Defendant to squeeze personal profit out of the mortgage system with fraud, in the form of bald lies on loan applications, falsified down payments, and inflated purchase prices to serve his greed.

**B. <u>Any disparity with Clymer is proper and warranted</u>**

In what appears to be a disparity argument, Defendant contends he should receive essentially the same sentence that he expects his coconspirator Joshua Clymer to receive, despite the fact that Clymer negotiated a plea and agreed to cooperate with the government before the government had fully prepared for trial. Doing what Defendant suggests would undermine the system of plea bargaining. For purposes of § 3553(a), "A defendant who chooses to enter into a plea bargain is not similarly situated to a defendant who contests the charges against him." *United States v. Flores-De-Jesus*, 569 F.3d 8, 38 (1st

Cir. 2009); *see also United States v. Carter*, 560 F.3d 1107, 1121 (9th Cir. 2009) (defendants who cooperate are not similarly situated); *United States v. Monroe*, 943 F.2d 1007, 1017 (9th Cir. 1991) (defendant who went to trial was not similarly situated with defendant who had participated in same conduct but had a plea agreement to lesser charges); *United States v. Conatser*, 514 F.3d 508, 522 (6th Cir. 2008).

"[T]he guilty plea and concommittant plea bargain are important components of this country's criminal justice system." *Bordenkircher v. Hayes*, 434 U.S. 357, 361-362 (1978). Indeed, "[d] isposition of charges after plea discussions is not only an essential part of the process but a highly desirable part for many reasons." *Santobello v. New York*, 404 U.S. 257, 261 (1971). The Supreme Court recognizes that plea agreements necessarily flow from "the mutuality of advantage" between prosecutors and defendants. *See United States v. Goodwin*, 457 U.S. 368, 379 (1982). The Ninth Circuit knows how important that system is and teaches,

> When a defendant voluntarily chooses to reject or withdraw from a plea bargain, he retains no right to the rejected sentence. Having rejected the offer of a lesser sentence, he assumes the risk of receiving a harsher sentence. If defendants could demand the same sentence after standing trial that was offered in exchange for a guilty plea, all incentives to plead guilty would disappear. Defendants would lose nothing by going to trial. The reality of plea bargaining is that once the defendant elects to go to trial, all bets are off.

*United States v. Carter*, 804 F.2d 508, 513-514 (9th Cir. 1986) (internal citations and quotations omitted), see also *United States v. Vasquez-Landaver*, 527 F.3d 798, 805 (9th Cir. 2008).

Section 3553(a)(6) was not intended as a device to even out sentences among co-defendants in the same case. "Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Saeteurn*, 504 F.3d 1175, 1181 (9th Cir. 2007) (quoting *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006)). National uniformity is what the Guidelines are intended for, and a district court is "entitled to rely on the Guidelines range in determining that there [is] no 'unwarranted disparity' between [Williams] and other offenders convicted of similar frauds." *See Treadwell*, 593 F.3d at 1011. Under Ninth Circuit law, this Court has discretion to think about where different defendants fit in vis-à-vis their sentences and relative culpability. *Id*. at 1012; *Saeteurn*, 504 F.3d at 1181. But the Ninth Circuit has

twice rejected arguments like the one Defendant raises. Even when the Ninth Circuit has assumed that an unwarranted sentencing disparity among co-defendants did exist, it has held that single factor alone was insufficient to reverse a sentence. *See United States v. Vasquez*, 654 F.3d 880, 886 (9th Cir. 2011); *United States v. Marcial- Santiago*, 447 F.3d 715, 719 (9th Cir. 2009). Moreover, varying downward for Defendant would actually undermine the § 3553(a)(6) goal of national sentencing uniformity.

> Instead of one low sentence, there will be two low sentences. But why should one culprit receive a lower sentence than some otherwise-similar offender, just because the first is 'lucky' enough to have a confederate [receive a plea bargain]? Yet that is [Defendant's] position, which has neither law nor logic to commend it.

*See United States v. Boscarino*, 437 F.3d 634, 638 (7th Cir. 2006). Defendant cites no authority that would entitle him to a sentence leveled down to that of his co-defendant who pleaded guilty.  The opposite is true. Section 3553(a)(6) does not require a separate analysis of any claim of unwarranted sentencing disparities within the same case.  *See, e.g., United States v. Johnson*, 505 F.3d 120, 124 (2d Cir. 2007); *United States v. Parker*, 462 F.3d 273, 277 (2d Cir. 2006); *Conatser*, 514 F.3d at 521 (6th Cir. 2008).

Defendant ignores the Supreme Court's "acceptance of plea negotiation as a legitimate process." *Goodwin*, 457 U.S. at 379.  In this case, there is no unwarranted disparity, because the sentence Clymer receives will be the result of the ordinary charge bargaining that the Executive Branch routinely conducts to preserve its resources and serve its other legitimate interests. "Disparities between the sentences of coconspirators can exist for valid reasons, such as differences in criminal histories, the offenses of conviction, or one coconspirator's decision to plead guilty and cooperate with the government." *See Conatser*, 514 F.3d at 522 (emphasis added). When co-defendants negotiate charge bargains and plead guilty to lesser offenses, a holdout tried and convicted of the crimes that he actually committed cannot complain of any unwarranted disparity. *Id*.  Defendant's argument is similar to the argument rejected by the Sixth Circuit in *Conatser*, a case which involved multiple defendants with different plea bargains. *Conatser* held that such sentencing disparity is warranted disparity. This is true for very practical reasons. Clymer saved the Court and the government all of the time, expense, and anguish of a trial. To get him to do that, the government offered him certain concessions in contested areas, and did so before it had fully prepared for trial and had all of the evidence before it. That was

proper. Defendant cites no authority to support the idea that the Executive Branch is limited to induce pleas by offering only three levels off for acceptance of responsibility. Long before the Guidelines, the Supreme Court taught that the "mutuality of advantage" of a plea agreement is both ordinary and lawful:

> For a defendant who sees slight possibility of acquittal, the advantages of pleading guilty and limiting the probable penalty are obvious—his exposure is reduced, the correctional processes can begin immediately, and the practical burdens of a trial are eliminated. For the State there are also advantages—the more promptly imposed punishment after an admission of guilt may more effectively attain the objectives of punishment; and with the avoidance of trial, scarce judicial and prosecutorial resources are conserved for those cases in which there is a substantial issue of the defendant's guilt or in which there is substantial doubt that the State can sustain its burden of proof. It is this mutuality of advantage that perhaps explains the fact that at present well over three-fourths of the criminal convictions in this country rest on pleas of guilty, a great many of them no doubt motivated at least in part by the hope or assurance of a lesser penalty than might be imposed if there were a guilty verdict after a trial to judge or jury.

*Brady v. United States*, 397 U.S. 742, 752 (1970). Recognizing that ninety-seven percent of federal cases resolve by pleas and yield sentences lower than would result from trial of the same cases, the Supreme Court recently held that the Sixth Amendment extends to plea negotiations. *See Frye*, 132 S.Ct. at 1407. *Frye* again emphasized mutual benefits of plea bargains. "To note the prevalence of plea bargaining is not to criticize it. The potential to conserve valuable prosecutorial resources and for defendants to admit their crimes and receive more favorable terms at sentencing means that a plea agreement can benefit both parties." *Id*. In this context, it is no surprise that the various interests favoring plea bargains establish warranted sentencing disparities.

Williams did not want a mutually advantageous bargain with the government. He now stands convicted of the crimes that he actually committed and that the government could prove. Without any mutuality of benefit, Defendant cannot claim entitlement to Clymer's benefits from Clymer's deal. "[T]he negotiated guilty plea represents a bargained-for quid pro quo." *United States v. Partida–Parra*, 859 F.2d 629, 633 (9th Cir. 1988). Defendant argues that another man's plea bargain should allow him a quid with no quo. He had his chance. In this sentencing, "all bets are off." *Carpenter*, 804 F.2d at 513.

///

///

///

## V. CONCLUSION

Based on the foregoing, the government submits that with the two-level obstruction enhancement, Defendant's offense level is 31, resulting in a sentencing range 108-135 months. Taking into account all of the circumstances of Defendant's offenses, the government submits that a low end sentence of 108 months is sufficient, but not greater than necessary, to comply with the sentencing purposes set forth in 18 U.S.C. § 3553(a)(2).

Dated: December 8, 2014

BENJAMIN B. WAGNER
United States Attorney

By: /s/ CHRISTOPHER HALES
CHRISTOPHER HALES
AUDREY B. HEMESATH
Assistant United States Attorneys