IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

---oOo---

BEFORE THE HONORABLE WILLIAM B. SHUBB, JUDGE

---oOo---

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                  No. 2:08-cr-376 WBS

LEONARD WILLIAMS,

        Defendant.

_____/

---oOo---

REPORTER'S TRANSCRIPT

JURY TRIAL

VOLUME 1

TUESDAY, JULY 8, 2014

---oOo---

Reported by:    KELLY O'HALLORAN, CSR #6660

APPEARANCES


For the Plaintiff:


          UNITED STATES ATTORNEY'S OFFICE
          501 I Street, Suite 10-100
          Sacramento, CA  95814
          BY:  CHRISTOPHER HALES
               AUDREY B. HEMESATH
               Assistant U.S. Attorneys

For the Defendant:

          WISEMAN LAW GROUP, P.C.
          1477 Drew Avenue, Suite 106
          Davis, CA  95616
          BY:  JOSEPH J. WISEMAN, Attorney at Law
               JENNIFER NOBLE, Attorney at Law

INDEX

PAGE

Jury selection                                    1

1           SACRAMENTO, CALIFORNIA

2        TUESDAY, JULY 8, 2014, 9:00 A.M.

3                  ---oOo---

4           THE CLERK:  Case criminal S-08-376; United States

5    versus Leonard Williams.

6           THE COURT:  Good morning, ladies and gentlemen.

7           MR. WISEMAN:  Good morning, your Honor.

8           THE COURT:  You've all been summonsed here as

9    prospective jurors in the case that the clerk has just read.

10   In a few moments, I'm going to ask you some questions bearing

11   upon your qualifications to serve as jurors in this case.

12   Before I do that, I'm going to ask that the clerk administer

13   an oath to all prospective jurors, including those in the

14   back of the room.

15          THE CLERK:  Please stand and raise your right hand.

16          (Jury panel sworn.)

17          THE COURT:  Thank you.  You may be seated.

18          Before I ask you any questions, let me tell you a

19   little bit about the schedule and give you some information

20   about the case.

21          The trial is going to begin today, and we will be in

22   session tomorrow.  However, we will not be in session

23   Thursday of this week.  We will be in session Friday.  And we

24   will not be in session all of next week.  Let me suggest that

25   you write that down so that there is no confusion later on.

1    We will be in session today and tomorrow.  We will be off

2    Thursday of this week.  We will be in session Friday of this

3    week.  But we will not be in session next week.  Next week is

4    the week of the 14th through the 18th.  We will not be in

5    session that week.  However, we will be in session the

6    following week.  I can tell you that we will not meet on

7    Monday, the 21st of July.  So we will be in session the 22nd,

8    23rd, 24th, and 25th.  All of that week.  And I anticipate,

9    based upon the estimates that the lawyers have given me, that

10   the trial will probably conclude sometime the following week.

11   But for scheduling purposes, I want you all to assume that we

12   will be in session the week of the 28th.  And that week goes

13   until Friday, August the 1st.  I want you to assume that we

14   will be in session and hearing evidence, conducting the trial

15   on those dates.

16        Ordinarily, trial begins at 9:00 o'clock in the

17   morning, and we end at 4:30 in the afternoon.  That may give

18   or take a few minutes in the afternoon depending on where we

19   are in the trial.  If we're in the middle of the testimony of

20   some witness, we may go a little longer or we may break a

21   little earlier if it's convenient.  But that's generally the

22   schedule, from 9:00 in the morning until 4:30 in the

23   afternoon.

24        We always take a lunch break.  The lunch break may be

25   from anywhere from an hour to an hour and a half.  Today I

1    have to tell you we're going to break just a little before

2    noon and we will not come back until 2:00 o'clock from lunch

3    today.  I have to give a little talk at the Rotary Club, so

4    that's going to take a little longer.  But ordinarily, an

5    hour to an hour and a half for lunch.  And we always take a

6    short recess midmorning of 10 to 15 minutes and another short

7    recess midafternoon of 10 to 15 minutes.  That's to give the

8    court reporter a break and to give everyone else a little

9    short recess.  That is how the trial will proceed.

10        I also want to tell you a little bit about the case so

11   that you're better able to answer my questions.  This is a

12   criminal case.  The action is brought by the United States

13   Government, and the defendant in the case is Leonard

14   Williams.

15        Let me ask the parties to introduce themselves.  The

16   United States is represented by assistant United States

17   Attorneys Christopher Hales and Audrey Hemesath.

18        Mr. Hales and Ms. Hemesath, would you please stand,

19   introduce yourselves, and introduce the others who are at the

20   table with you.

21        MR. HALES:  Yes, your Honor.  Good morning.  I'm

22   Christopher Hales from the United States Attorney's Office.

23   With me is assistant United States Attorney Audrey Hemesath.

24   And next to Ms. Hemesath is FBI Special Agent Matthew

25   Catalano.  Next to him is paralegal Donna Castruita from the

 1   United States Attorney's Office.  And sitting behind them are

 2   FBI Special Agent Mark Roberts and a summer clerk in the

 3   United States Attorney's Office, Ashley Eickhof.

 4           THE COURT:  Thank you.  Mr. Williams is represented by

 5   Attorney Joseph Wiseman.  Mr. Wiseman, would you please

 6   stand, introduce yourself, your client, and the others at the

 7   table with you.

 8           MR. WISEMAN:  Thank you.  Good morning, ladies and

 9   gentlemen.  As Judge Shubb indicated, I'm Joseph Wiseman.  To

10   my right is my client, Leonard Williams.  Next to him is our

11   paralegal, Nancy Percy, who you will see throughout the

12   trial.  Next to Nancy is Jennifer Noble, who is my law

13   partner, who will be assisting me throughout the trial.  And

14   lastly is Jacky Larson, who is one of the lawyers from my

15   office as well, who you may see in and out periodically

16   during the trial.

17           THE COURT:  I also want you to know what the charges

18   are before you answer my questions.  So I'm going to ask the

19   United States Attorney to read the charges to you.  I want

20   you to understand that the indictment that is about to be

21   read to you is not evidence.  It is simply a method of

22   bringing a defendant to court.  The defendant in the case is

23   presumed to be innocent, and the burden is upon the United

24   States Government to prove every one of the essential

25   elements of the charges that you're about to hear read beyond

1    a reasonable doubt.

2          You're also going to hear reference to another

3    individual when the indictment is read, Joshua Clymer.

4    Mr. Clymer is not before you in this case in this trial.  The

5    only defendant before you in this trial is Leonard Williams.

6          Now, which one of the assistant U.S. Attorneys would

7    like to read the relevant charges from the indictment?

8          MR. HALES:  I will, your Honor.

9          THE COURT:  All right.  Proceed.

10          MR. HALES:  Thank you.  The third superseding

11    indictment reads as follows:  Count 1, 18 U.S.C.

12    Section 1349, conspiracy to commit mail fraud and wire fraud.

13          The grand jury charges Leonard Williams and Joshua

14    Clymer, defendants herein, as follows:

15          Introduction.

16          At all times relevant to this third superseding

17    indictment, defendant Leonard Williams resided in Sacramento

18    County, in the State and Eastern District of California.

19    Defendant Joshua Clymer resided in Sacramento County, in the

20    State and Eastern District of California.

21          Defendants Leonard Williams and Joshua Clymer were

22    real estate salespersons licensed in the State of California.

23          Defendant Leonard Williams, having acquired an entity

24    incorporated in Wyoming called Diamond Hill Financial, Inc.,

25    Diamond Hill, caused Diamond Hill to be qualified to transact

1    intrastate business in California with the Secretary of State

2    of California on or about December 3, 2004.  Defendant

3    Williams served as president, chief executive officer,

4    secretary, and agent for service of process of Diamond Hill.

5    Diamond Hill purported to provide financial management

6    consulting services to its clients.

7            On or about April 11, 2007, defendant Leonard Williams

8    organized and caused to be incorporated in California an

9    entity known as Bay Area Real Estate Holdings, LLC, Bay Area

10   Real Estate, listing defendants Williams and Clymer as two

11   members of the LLC with equal percentage interests in the

12   entity.

13           Diamond Hill maintained a bank account at U.S. Bank

14   for which defendant Williams was a signatory.  Defendant

15   Williams used this account to receive funds from the scheme

16   and to disburse proceeds of the scheme.

17           Bay Area Real Estate maintained a business bank

18   account at U.S. Bank for which defendants Williams and Clymer

19   were joint signatories.  Defendant Williams used this account

20   to receive funds from the scheme and to disburse proceeds of

21   the scheme.

22           Defendants Leonard Williams and Joshua Clymer acted as

23   business partners, with defendant Williams often providing

24   loan brokering services and defendant Clymer often acting as

25   the real estate salesperson.  Defendants Williams and Clymer

 1   jointly maintained a business location on Watt Avenue in

 2   Sacramento, California.

 3          Defendants Williams and Clymer used Diamond Hill and

 4   Bay Area Real Estate to operate a property flipping scheme

 5   that included, among other things, acquiring properties in

 6   the name of Diamond Hill or Bay Area Real Estate; often

 7   reselling the properties the same day for as much as a

 8   hundred thousand dollars over the acquisition price to

 9   individuals whom defendants recruited as investors and straw

10   purchasers; arranging mortgage loans for purchasers that

11   included materially false statements concerning income,

12   employment history, assets, and intent to occupy the

13   properties as primary residence; and providing funds back to

14   the purchasers outside of escrow while concealing these

15   payments from the lenders making the loans.

16          Objects of the conspiracy.  Beginning not later than

17   in or about October 2006 and continuing through in or about

18   August 2008, in the State and Eastern District of California

19   and elsewhere, defendants Leonard Williams and Joshua Clymer

20   did knowingly and intentionally combine, conspire,

21   confederate, and agree with each other and with others known

22   and unknown to the grand jury to commit certain offenses

23   against the United States, to wit:

24          A.  To attempt to execute and to execute a material

25   scheme and artifice to defraud and to use materially false

1    and fraudulent pretenses, representations, and promises in

2    order to obtain funds from lenders and participants in the

3    secondary loan market, and for the purpose of executing such

4    scheme to cause mail matter to be deposited and sent by

5    private and commercial interstate carriers, in violation of

6    Title 18, United States Code, Section 1341;

7             B.  To attempt to execute and to execute a material

8    scheme and artifice to defraud and to use materially false

9    and fraudulent pretenses, representations, and promises in

10   order to obtain funds from lenders and participants in the

11   secondary loan market, and for the purpose of executing such

12   scheme to knowingly transmit and cause to be transmitted by

13   means of wire communication in interstate commerce certain

14   writings, signs, signals, pictures and sounds, in violation

15   of Title 18, United States Code, Section 1343.

16            An object of the scheme was to obtain money and

17   property to which defendants were not entitled.

18            Ways and means.  The principal ways and means by which

19   the scheme was accomplished were as follows:  Between in or

20   about October 2006 through in or about August 1, 2008,

21   defendants Leonard Williams, Joshua Clymer, and others known

22   and unknown to the grand jury recruited various individuals,

23   including family members, investors and straw or nominal

24   purchasers, to purchase residential real properties in

25   various communities in the State and Eastern District of

1    California, including those listed below:

2              864 Gidda Loop, Yuba City, California.  Purchaser, AW.

3              3332 X Street, Sacramento, California.  Purchaser, CW.

4              7320 Florinda Way, Sacramento, California.  Purchaser,

5    CT.

6              6539 Lang Avenue, Sacramento, California.  Purchaser,

7    CT.

8              2728 Norcross Drive, Sacramento, California.

9    Purchaser, CW.

10             2640 Ceanothus Avenue, Chico, California.  Purchaser,

11   AW.

12             3294 Rockin M Drive, Chico, California.  Purchaser,

13   AW.

14             4824 Baker Avenue, Sacramento, California.  Purchaser,

15   JF.

16             2976 Trap Rock Way, Sacramento, California.

17   Purchaser, JR.

18             11516 Linday Way, Gold River, California.  Purchaser,

19   LC.

20             5548 Woodforest Drive, Sacramento, California.

21   Purchaser, AP.

22             Defendant Leonard Williams, defendant Joshua Clymer,

23   and others known and unknown to the grand jury, orchestrated

24   and otherwise participated in the real estate transactions

25   described above.

1              Defendant Leonard Williams, defendant Joshua Clymer,

2     and others known and unknown to the grand jury, often using

3     the entities Bay Area Real Estate and Diamond Hill, first

4     acquired many of the properties described in paragraph 12.

5     They then immediately resold the properties at substantially

6     higher prices to the purchasers identified in paragraph 12.

7              Defendants arranged for the sellers, usually Bay Area

8     Real Estate or Diamond Hill, to credit back to the purchasers

9     thousands of dollars after the close of escrow from the

10    sellers' proceeds.

11             Defendants then split amongst themselves the remainder

12    of the difference between the acquisition price and sale

13    price of the properties.

14             Defendants Leonard Williams, Joshua Clymer, and others

15    known and unknown to the grand jury, deliberately caused the

16    credits back to purchasers to be concealed from the lenders

17    by not disclosing them in purchase agreements, by concealing

18    them from appraisers, by concealing them from escrow

19    companies, and by not disclosing the credits on HUD-1

20    settlement statements.

21             Defendant Leonard Williams, defendant Joshua Clymer,

22    and others known and unknown to the grand jury, assisted in

23    obtaining mortgage loans to finance the transactions

24    described in paragraph 12 above; caused materially false loan

25    applications to be prepared on behalf of the purchasers using

1    personal information obtained from them; submitted other

2    false documents to mortgage lenders in connection with the

3    real property transactions; and provided false verifications

4    to lenders.  Such loan applications and other documents

5    submitted to mortgage lenders contained materially false

6    representations and omissions, including false

7    representations and omissions about the borrowers' monthly

8    income and/or employment, the borrowers' intent to occupy the

9    property as a primary residence, the borrowers' assets and/or

10   liabilities, and the true price of the real properties.

11          Defendants Leonard Williams, Joshua Clymer, and others

12   known and unknown to the grand jury, caused county recorder's

13   offices to send deeds of trust to lenders and loan servicers

14   via United States mail in connection with the financing and

15   purchase of the properties described in paragraph 12.

16          Defendants Leonard Williams, Joshua Clymer, and others

17   known and unknown to the grand jury, caused funds to be sent

18   via interstate wire in connection with the financing and

19   purchase of the properties described in paragraph 12.  All in

20   violation of Title 18, United States Code, Section 1349.

21          Counts 2 and 3.  18, United States Code, Section 1957,

22   money laundering.

23          The grand jury further charges Leonard Williams and

24   Joshua Clymer, defendants herein, as follows:

25          The grand jury realleges and incorporates by reference

1    the allegations set forth in paragraphs 1 through 20 of

2    Count 1 of this third superseding indictment.

3         On or about the dates set forth below, in the State

4    and Eastern District of California, the defendants identified

5    below did knowingly engage in monetary transactions as set

6    forth below, each of which was by, through, and to a

7    financial institution affecting interstate and foreign

8    commerce, in criminally derived property of a value greater

9    than $10,000, such property having been derived from

10   specified unlawful activity, that is, mail fraud, in

11   violation of Title 18, United States Code, Section 1341; and

12   wire fraud, in violation of Title 18, United States Code,

13   Section 1343.

14        Count 2.  August 5, 2008, check for $11,599.07 from

15   Bay Area Real Estate Holdings, LLC, U.S. Bank account ending

16   in 7944 deposited to U.S. Bank account ending in 8373.

17   Defendant Williams.

18        Count 3.  August 7, 2008, check for $16,599.07 from

19   Bay Area Real Estate Holdings, LLC, U.S. Bank account ending

20   in 7944 deposited to SAFE Credit Union account ending in

21   3742.  Defendants Williams and Clymer.

22        All in violation of Title 18, United States Code,

23   Sections 2 and 1957.

24        THE COURT:  Those are the charges.  I don't expect you

25   to understand at this point everything that you have just

1    heard.  Count 1 charges conspiracy to commit mail fraud and

2    wire fraud.  And Counts 2 and 3 charge money laundering.  At

3    the end of the trial, I will explain to the jury what the

4    government needs to prove in order to establish each of these

5    charges.

6           The indictment, as I have indicated, is not evidence

7    in the case.  It is simply a way of bringing the defendant to

8    trial.  And, Mr. Wiseman, would you tell the jury how the

9    defendant has pled to these charges.

10          MR. WISEMAN:  Your Honor, the defendant, my client,

11   Mr. Williams, has pled not guilty to all of the charges.

12          THE COURT:  And as I explained earlier, the burden is

13   upon the United States Attorney to prove each of these

14   charges beyond a reasonable doubt.

15          I'm going to ask a series of questions that can be

16   answered yes or no.  I'll refer to these questions as my

17   general questions.  I'm going to direct the questions first

18   to those 12 of you that are seated in the jury box.  The rest

19   of you in the back of the courtroom should listen to the

20   questions that I ask.  You have notebooks, and you have been

21   provided with pens.  If your answers to any of the general

22   questions I ask would be yes, make a note of it in your

23   notebook.  And don't just write question number one, question

24   number 2, because I don't keep track of the numbers of the

25   questions.  Make a little notation as to what the subject

 1    was.  Because during the course of jury selection, you may

 2    well be called to the jury box to take the place of a juror

 3    who has been excused.  If you are called to the jury box, the

 4    first question I will ask you is whether your answers to any

 5    of my general questions would be yes, and then I may ask some

 6    follow-up questions if you answered yes to any of the general

 7    questions.  So keep notes as to the general questions and

 8    make a notation if you would answer any of those questions

 9    yes.

10            The first question directed primarily to those of you

11    in the jury box.  Having heard the schedule and knowing what

12    you do about the case, would serving on this jury pose a

13    hardship for any of you?  Before you answer, let me explain

14    to you what we mean.  We understand and we appreciate that

15    jury service is an imposition.  It's an imposition on your

16    jobs, it's an imposition on your family, and it's an

17    imposition on your lives in general.  But that is the way our

18    system works.  We do not have professional juries.  We have

19    to call upon citizens like you selected at random from a

20    cross-section of the community in order to decide these

21    cases.  But what we want to know is whether serving on this

22    particular jury at this time might pose an unusual hardship

23    on you, such as if you have a paid vacation scheduled or if

24    there's something particular going on in your life that you

25    think would make this a hardship for you to serve as a juror.

1    If you have a doubt about it, raise your hand, and we'll

2    explore it.

3           Would serving on this jury pose a hardship for any of

4    you?  If so, please raise your hand.

5           All right.  We'll start at the beginning.  And we have

6    a microphone.  Ms. Pascual, you're holding the microphone, so

7    you're the first one.  What is your situation?

8           PROSPECTIVE JUROR:  My mom works, and I'm basically

9    babysitting my little brothers and sisters.  And her schedule

10   is like at times she works early in the morning and at times

11   she doesn't.  So it's like hard for me to get a ride here

12   because I don't know how to drive.

13          THE COURT:  Where do you live?

14          PROSPECTIVE JUROR:  Stockton.

15          THE COURT:  Are you employed?

16          PROSPECTIVE JUROR:  No.  I just go to school.  And if

17   I'm not done by August, school starts.

18          THE COURT:  Well, we expect to be done before school

19   starts.  When is school going to start?

20          PROSPECTIVE JUROR:  August 5th.

21          THE COURT:  We expect to be done by then, hopefully.

22   You're the babysitter for your brothers and sisters.  What

23   are you going to do when school starts?

24          PROSPECTIVE JUROR:  Well, they start before I start.

25          THE COURT:  I see.  How old are they?

1          PROSPECTIVE JUROR:  They're in elementary, from six

2    to -- I got a six-year-old, an eight-year-old, a

3    ten-year-old and a 12, I think.  I'm not sure.  There's so

4    many of us.

5          THE COURT:  There's nobody else to take care of them?

6          PROSPECTIVE JUROR:  My brother, but he works.

7          THE COURT:  I see.  How old is your brother?

8          PROSPECTIVE JUROR:  He's 23.

9          THE COURT:  And he works full time?

10          PROSPECTIVE JUROR:  Yeah.

11          THE COURT:  During the day?

12          PROSPECTIVE JUROR:  During the day, yeah.

13          THE COURT:  So there's nobody else to take care of

14    your brothers and sisters but you?

15          PROSPECTIVE JUROR:  There's my sister, she's 18, but

16    she's hardly home.  I can't really count on her to be there.

17          THE COURT:  Well, that's her problem.  Why isn't she

18    home?

19          PROSPECTIVE JUROR:  Well, she goes out.

20          THE COURT:  Well, she could be home; right?  She could

21    be home?

22          PROSPECTIVE JUROR:  Yeah, she could.

23          THE COURT:  Is she qualified to take care of the

24    children?

25          PROSPECTIVE JUROR:  I don't think she is.

1            THE COURT:  She's qualified enough to go out and run

2    around; right?  Does she drive a car?

3            PROSPECTIVE JUROR:  No, she doesn't.

4            THE COURT:  All right.  It's a close question,

5    Ms. Pascual, but I don't want to put your brothers and

6    sisters at risk, so I'm going to excuse you.

7            Now, everybody who is excused, not just Ms. Pascual,

8    but if I excuse anybody else during the course of jury

9    selection, you're instructed to call in Friday after 5:00

10   o'clock.  And I can't guarantee that you might not be

11   selected for another jury.  It's up to the individual judge

12   and it depends on the circumstances of the case whether you

13   might be excused from another jury if you're called.  So take

14   that into account.  Also, I don't know how long any other

15   trial might be.  This may sound like a relatively long trial

16   because we have a little hiatus in here next week, but it's

17   actually, as trials go in federal court, relatively a short

18   trial.  So I'm going to excuse you, Ms. Pascual.  You're to

19   call in after 5:00 o'clock on Friday.  Step down.

20           Also, when you leave, you can tear out any pages that

21   you've made notes upon in your book, but leave the notebook

22   and your pen so we can use it for somebody else on the little

23   table on the way out.  All right.  You're excused.

24           And I think Ms. Fancher had her hand up also.  Am I

25   right?

 1              PROSPECTIVE JUROR:  Yes, sir.

 2              THE COURT:  What is your situation?

 3              PROSPECTIVE JUROR:  I have a history of migraines.

 4              THE COURT:  How often does it bother you?

 5              PROSPECTIVE JUROR:  It depends.  Bright light and the

 6   tensions.  And I'm taking prescriptions medication.  And I've

 7   had migraines since I was 31 years old.

 8              THE COURT:  Have you ever served on a jury before?

 9              PROSPECTIVE JUROR:  I've not been selected because of

10   my history in the county.  And I live in Manteca.

11              THE COURT:  Well, I don't want to the prevent you from

12   serving on a jury because of your disability.  That would be

13   wrong for me to do that.  You are entitled as much as anyone

14   else to serve on this jury.  Jury service is an imposition,

15   as I have told you.  It's also a privilege.  And I think if

16   you do serve on a jury, when it's all over, you'll understand

17   what I mean.  It is an experience that every citizen should

18   be allowed to have.

19              But I gather from what you're telling me you don't

20   want to serve on a jury.  If you want to try it, I'm not

21   going to excuse you.

22              PROSPECTIVE JUROR:  It's not that I don't want to.

23   It's just I'm afraid that I'll have migraine, something like

24   that, and I'm afraid I'm gonna --

25              THE COURT:  Do you want to be excused or not?

1          PROSPECTIVE JUROR:  Yes, I want to be excused.

2          THE COURT:  All right.  Then you're accused.

3          PROSPECTIVE JUROR:  Thank you.

4          THE COURT:  Call in after 5:00 o'clock this evening

5    and leave your notebook.  Friday, after 5:00 o'clock Friday.

6          Who was the next in the top row that had their hand

7    up.  Ms. Patrick?

8          PROSPECTIVE JUROR:  Yes.

9          THE COURT:  What is your situation?

10         PROSPECTIVE JUROR:  I'm taking care of my mom three

11   days a week.  There's just my sister and I.

12         THE COURT:  Is that microphone working?

13         PROSPECTIVE JUROR:  I'm sorry.

14         THE COURT:  It's like *The Voice*.

15         PROSPECTIVE JUROR:  Yeah.  My mom is very, very ill.

16   And I've been taking care of her from three to four days a

17   week.  My sister works three days a week.

18         THE COURT:  Which three days or four days a week do

19   you take care of her?

20         PROSPECTIVE JUROR:  I take care of her like on Sunday,

21   Monday, Tuesday, Wednesday.  And then sometimes it varies a

22   little bit because my sister's work schedule will vary.

23         THE COURT:  Do you think you could work around it?

24   Because next week, not a problem.  We're not going to ever

25   sit on Sunday.  Next Monday is not a problem.  And then if

1    you could be a little bit flexible after that, you might be

2    able to make it work.  What do you think?

3              PROSPECTIVE JUROR:  Well, I don't know.  My mom's

4    waiting to get an MRI back, and I think she might have

5    pancreatic cancer.  She's got chronic pancreatitis.

6              THE COURT:  Well, but as far as the need for you to

7    take care of her, if you could trade off with your sister

8    during the days that we're in session.

9              PROSPECTIVE JUROR:  She works.  I don't.  But yeah,

10   she works.  It would be kind of hard to do that.

11             THE COURT:  You're excused.  Thank you.

12             PROSPECTIVE JUROR:  Thank you.

13             THE COURT:  You may step down.

14             PROSPECTIVE JUROR:  Okay.

15             THE COURT:  You're excused.

16             PROSPECTIVE JUROR:  Okay.

17             THE COURT:  Did anybody else in the top row have their

18   hand up?  Who in the bottom row had their hand up?  Pass the

19   microphone down to the juror here in the second seat,

20   Ms. Barry.

21             PROSPECTIVE JUROR:  Hello.

22             THE COURT:  Hello.

23             PROSPECTIVE JUROR:  Can everybody hear me?

24             THE COURT:  Yes.

25             PROSPECTIVE JUROR:  My husband's a firefighter for the

1  forest service.  He happens to be on a fire right now.  And

2  so we have an almost two-year-old daughter, and so there's no

3  parent at home for her.  And so I have gotten my mom to watch

4  her today, but I don't have child care for her 24 hours a

5  day.

6          THE COURT:  Well, having seen what I've seen on

7  television about the fire season, I'm not sure when he's

8  going to be back.

9          PROSPECTIVE JUROR:  He's on the Monticello.

10          THE COURT:  All right.  I'll excuse you.  I hope he is

11  back soon.

12          PROSPECTIVE JUROR:  Me too.

13          THE COURT:  Ms. Walling-Sisi.

14          PROSPECTIVE JUROR:  Yes.

15          THE COURT:  What is your situation?

16          PROSPECTIVE JUROR:  I'm fine except that I have a

17  scheduled trip July 30th to August 4th up north, a cabin that

18  we --

19          THE COURT:  Well, that's going to be probably when

20  we're in session.  It starts July 30th?

21          PROSPECTIVE JUROR:  Yeah.

22          THE COURT:  All right.  I'm going to excuse you.

23          PROSPECTIVE JUROR:  Thanks.

24          THE COURT:  Where is the cabin?

25          PROSPECTIVE JUROR:  It's up near Eureka.

1          THE COURT:  Not in the smoke?

2          PROSPECTIVE JUROR:  I hope not.

3          THE COURT:  All right.  Who was next?  Anybody else?

4    Before I fill those seats, is there anybody else presently

5    seated in the jury box who believes that service on this jury

6    would pose a hardship for you?

7          All right.  I'm going to ask the clerk to fill those

8    five vacated seats, starting with seat number 1.

9          THE CLERK:  Debra Brown, B-R-O-W-N.  Debra Brown.

10         THE COURT:  Ms. Brown, if you'll come forward and take

11   the first seat in the top row over here.  And you can come in

12   from the entrance closest to me.

13         Next.

14         THE CLERK:  Lawrence Bianchi-Rossi, B-I-A-N-C-H-I,

15   R-O-S-S-I.  Lawrence Bianchi-Rossi.

16         THE COURT:  Mr. Bianchi-Rossi, take seat number 2,

17   please.

18         THE CLERK:  Armando DeAnda.  D-E-A-N-D-A.  Armando

19   DeAnda.

20         THE COURT:  Mr. DeAnda, you can enter from that side

21   over there.

22         Next.

23         THE CLERK:  Ileana Diver, D-I-V-E-R.  Ileana Diver.

24         PROSPECTIVE JUROR:  Your Honor, I just want to tell

25   you I have a --

```
 1              THE COURT:  You already have what?

 2              PROSPECTIVE JUROR:  A ticket to fly on July 28th.

 3              THE COURT:  All right.  I'm going to excuse you.  But

 4    just so we have a better record and we get a chance to give

 5    the jurors a microphone -- you can leave now, but for other

 6    jurors, if you have something to say to me, wait until you

 7    get to the jury box.

 8              PROSPECTIVE JUROR:  I'm sorry.

 9              THE COURT:  But if it's the 28th, I will go ahead and

10    excuse you.  So, Ms. Diver, you're excused.  Leave your book.

11         Next.

12              THE CLERK:  Mike Engler, E-N-G-L-E-R.  Michael Engler.

13              THE COURT:  Mr. Engler, we call that seat number 8.

14              PROSPECTIVE JUROR:  This way?

15              THE COURT:  Yes, front row.

16              THE CLERK:  And Annette Macias, M-A-C-I-A-S.  Annette

17    Macias.

18              THE COURT:  There are many doors to the jury box.

19    Take the one closest to the seat you're going to fill.  So

20    that would be this door over here.

21         Ms. Brown, Mr. Bianchi-Rossi, Mr. DeAnda, Mr. Engler,

22    and Ms. Macias, would serving on this jury pose a hardship

23    for any of you?

24         All right.  Let's start with Ms. Brown.

25              PROSPECTIVE JUROR:  We have a vacation scheduled the
```

1   21st through the 26th.

2           THE COURT:  All right.  Have a nice trip.  Where are

3   you going to go?

4           PROSPECTIVE JUROR:  San Diego.

5           THE COURT:  All right.  That's not bad.

6           PROSPECTIVE JUROR:  Thank you.

7           THE COURT:  And I think Mr. DeAnda had his hand up.

8   Would you pass the microphone down.

9           PROSPECTIVE JUROR:  I am currently in the process of

10  going into the academy for corrections.  Tomorrow at 8:00

11  a.m., I have my psych test and my vision test.  And my

12  sergeant told me that if everything goes well, I would be

13  going in --

14          THE COURT:  The academy of what?

15          PROSPECTIVE JUROR:  Academy for correctional officer.

16          THE COURT:  Oh, correctional officer.

17          PROSPECTIVE JUROR:  Yes.

18          THE COURT:  So is that an intensive program that

19  starts immediately?

20          PROSPECTIVE JUROR:  After the vision test and the

21  psych test tomorrow morning, they'll let me know.  They send

22  me an email.  After every test, they send me an email letting

23  me know what's the next step before the academy.  My sergeant

24  told me I'd be going in early August, but there's no exact

25  date.

1        THE COURT:  But right now, the problem is you can't be

2   here tomorrow?

3        PROSPECTIVE JUROR:  Not at 8:00 in the morning.

4        THE COURT:  All right.  I don't want to mess you up in

5   your application, so I don't want you to miss that meeting.

6   I'll excuse you.

7        PROSPECTIVE JUROR:  Thank you.

8        THE COURT:  How about Mr. Engler or Ms. Macias?  All

9   right.  Thank you.

10        Let me ask the clerk to fill seats 1 and 5.

11        THE CLERK:  Pamela Baker, B-A-K-E-R.  Pamela Baker.

12        THE COURT:  Ms. Baker, you may enter over here.

13        THE CLERK:  William Dittmar, D-I-T-T-M-A-R.  William

14   Dittmar.

15        THE COURT:  Mr. Dittmar, why don't you enter on the

16   other side over there.

17        Ms. Baker and Mr. Dittmar, would serving on this jury

18   pose a hardship for either of you?

19        All right.  Before I go on to the next question,

20   having thought about it, is there anybody presently seated in

21   the jury box who believes that service on this jury would

22   pose a hardship for them?  If so, raise your hand.  All.

23        Right.  We got past the first question.  The second

24   question is whether any of you have any disability or

25   physical condition that might make it difficult for you to

 1    serve on a jury in this case.  For example, a hearing problem

 2    or problem remaining seated for an hour and a half or so

 3    while we hear testimony.  I've even had a couple of jurors

 4    that had a problem where they couldn't stay awake, and it was

 5    actually a medical condition.  Anything that you think might

 6    make it difficult for you to perform the duties as a juror.

 7            Mr. Bianchi-Rossi.

 8            PROSPECTIVE JUROR:  Yes.  I have tachycardia which may

 9    or may not kick off during this.  If it does, probably for

10    about two hours.

11            THE COURT:  How often do you have episodes?

12            PROSPECTIVE JUROR:  It's probably been about six weeks

13    since the last one.

14            THE COURT:  And do you have some medication that you

15    take?

16            PROSPECTIVE JUROR:  No, sir.

17            THE COURT:  What do you do?

18            PROSPECTIVE JUROR:  Wait it out usually for a couple

19    hours while it's pounding away and sweat.  And then when it's

20    over, continue my life.

21            THE COURT:  All right.  But there's no medication that

22    you're taking for that?

23            PROSPECTIVE JUROR:  No, sir.

24            THE COURT:  Six weeks ago was the last episode?

25            PROSPECTIVE JUROR:  Yes, sir.

```
 1              THE COURT:  And then who I often does it occur?

 2              PROSPECTIVE JUROR:  It could happen every day.  It

 3    could go another week.  It could go a month.  Nobody knows.

 4    I can do this, but if it kicks off --

 5              THE COURT:  You let me know.

 6              PROSPECTIVE JUROR:  I just want you to know.  I don't

 7    want to be disruptive, but it will be hard to concentrate

 8    during that period of time.

 9              THE COURT:  Is it relative?  In other words, sometimes

10    it's worse than other times.

11              PROSPECTIVE JUROR:  Basically my heart rate goes from

12    about 65 beats a minute to 165.  And my chest will start

13    pounding, and I'll start sweating.

14              THE COURT:  So you recognize it when it's happening?

15              PROSPECTIVE JUROR:  Oh, yeah.

16              THE COURT:  And you could raise your hand and let me

17    know?

18              PROSPECTIVE JUROR:  Yes.

19              THE COURT:  If you should remain on the jury and

20    something like that happens, I may be looking over here or I

21    may be focused on something else.  If you have a condition

22    and you have a problem, raise your hand and say "judge."

23              PROSPECTIVE JUROR:  Sure.

24              THE COURT:  All right.

25              PROSPECTIVE JUROR:  Okay.
```

1              THE COURT:  Thank you for letting me know.

2              Does anybody else have any condition?  Yes.

3       Ms. Donahue.  Down in the front row.  I'm sorry.  I didn't

4       tell the rest of the people where Ms. Donahue is.  I thought

5       you all knew her.

6              PROSPECTIVE JUROR:  I have a muscle condition in my

7       leg.  I need to stretch it.

8              THE COURT:  How often?

9              PROSPECTIVE JUROR:  Two hours might be the max that I

10      can sit.

11             THE COURT:  I don't think that we will be in session

12      for any longer than two hours at a stretch.  The first reason

13      for that is the court reporter.  The court reporter has to

14      take everything that we say, and she can't just go

15      indefinitely.  So I think you're pretty safe in assuming at

16      least every two hours.

17             PROSPECTIVE JUROR:  Thank you.

18             THE COURT:  Anybody else?  Do any of you know anything

19      about this case or have you heard anything about this case?

20      Just knowing what you do so far about the charges in the

21      indictment, do any of you think you've heard about the case?

22             Do any of you know any of the attorneys who introduced

23      themselves to you or the parties at the tables who were

24      introduced to you?

25             I'm going to ask the United States Attorney to read

1       now the list of people who may be called as witnesses.

2       Listen to those names, and then I'm going to ask you if you

3       know or think you might know any of the potential witnesses

4       in the case.

5               MR. HALES:  Yes, your Honor.  Andrew Harrison, special

6       agent, IRS Criminal Investigations, Redding, California.

7       Anthony Petri, Sacramento, California.  Anthony Symmes,

8       Paradise, California.  Arthur Watson, Carmichael, California,

9       Brett Hellstrom from JPMorgan Chase, Illinois.  Colleen

10      Brown, SAFE Credit Union, Sacramento.  Donna Allred,

11      Sacramento County Recorder, Sacramento.  Janice Vawter,

12      Lafayette, California.  Jeffrey Jackson, Bank of America,

13      Southern California.  Jessica Sawyer, Chico, California.

14      Joshua Clymer, San Francisco, California.  Joshua Frye, West

15      Sacramento, California.  Juan Reynaga, Sacramento,

16      California.  Judy Taylor, Citibank, from Missouri.  Keli

17      Updegraff, NL, Inc., Alamo, California.  Kevin Walsh from

18      Caliber Home Loans, New Jersey.  Lacie Clymer, Yuba City,

19      California.  Mark Roberts, FBI, Chico, California.  Mark

20      Zarate, Butte County Recorder's Office, Chico, California.

21      Matthew Catalano, FBI, Chico, California.  Melissa Maclay,

22      San Jose, California.  Nancy Crum, Placerville, California.

23      Stacy Frierson, U.S. Bank, Sacramento, California.  Terrance

24      Murrell, Fair Oaks, California.  Tom Pool, California

25      Department of Real Estate, Sacramento, California.  And

1    William Miller, MLS, Sacramento, California.

2           THE COURT:  Do any of you know or think you might know

3    any of those people?  If you think you might know them, raise

4    your hand, and we can ask some more questions about them.

5           All right.  Mr. Wiseman, are there any other potential

6    witnesses that you know of who may testify in this case?

7           MR. WISEMAN:  No, your Honor.

8           THE COURT:  All right.  Do any of know anything about

9    any of those addresses that you heard Mr. Hales read from the

10   indictment earlier?  Any of those in your neighborhood or do

11   you think you might know anything about those houses?

12          Do any of you know anyone who works in the United

13   States Attorney's Office?

14          Are any of you now or have you in the past been

15   employed by a law enforcement agency?  All right.  I saw

16   Mr. Dittmar's hand go up.  Mr. Fossen, you're just scratching

17   your head; right?

18          PROSPECTIVE JUROR:  Yeah, I was scratching.

19          THE COURT:  All right.  Mr. Dittmar.  Where is the

20   microphone?

21          PROSPECTIVE JUROR:  Department of Child Support

22   Services, Sacramento County.

23          THE COURT:  All right.  And that's where you're

24   employed now?

25          PROSPECTIVE JUROR:  No, I'm retired.

1          THE COURT:  You were employed there how long?

2          PROSPECTIVE JUROR:  14 years.

3          THE COURT:  And what was your job?

4          PROSPECTIVE JUROR:  Child support officer.

5          THE COURT:  All right.  Is that a law enforcement

6    officer?

7          PROSPECTIVE JUROR:  It is a law, yeah.

8          THE COURT:  All right.  Do you make arrests?

9          PROSPECTIVE JUROR:  No.

10         THE COURT:  Anybody else employed now or in the past

11   as a law enforcement officer or by a law enforcement agency?

12   Yes.  Mr. Crow.

13         PROSPECTIVE JUROR:  Yes, your Honor.  I'm retired from

14   the California Department of Justice as a Deputy Attorney

15   General.  I still am employed part-time in that same capacity

16   as a retired annuitant.

17         THE COURT:  And which division or branch of that

18   office were you employed in?

19         PROSPECTIVE JUROR:  Land Law Section, Public Rights

20   Division.

21         THE COURT:  Were you ever in the criminal law section?

22         PROSPECTIVE JUROR:  Never in the criminal law section.

23         THE COURT:  All right.  You're a lawyer?

24         PROSPECTIVE JUROR:  Yes.

25         THE COURT:  All right.  Anybody else?

1          How about the members of your immediate family?  I'm

2     not talking about distant aunts, uncles, or cousins, but your

3     parents, your children, your husband, wife, or significant

4     other, your brothers and sisters.  Are any of the members of

5     your immediate family now or have they in the past been

6     employed by a law enforcement agency?

7          Ms. Sullivan.

8          PROSPECTIVE JUROR:  My son works as a correctional

9     officer in Glenn County.

10         THE COURT:  All right.  When you say correctional

11    officer, is he employed by the state or the county?

12         PROSPECTIVE JUROR:  County.

13         THE COURT:  The county.  He works at the jail?

14         PROSPECTIVE JUROR:  Yes.

15         THE COURT:  Anybody else?

16         Have any of you had a bad experience with a law

17    enforcement officer or a law enforcement agency that might in

18    any way affect your ability to be a fair and impartial juror

19    in a criminal case such as this?  I'll give you a minute to

20    think about that, because it's something we don't ordinarily

21    think about.  But if there's been an experience that you've

22    had with a law enforcement officer or agency that might

23    affect your ability to serve as a fair and impartial juror in

24    a criminal case, I'd like to know about that.

25         Ms. Sullivan, you still have the microphone.

 1          PROSPECTIVE JUROR:  My son-in-law was arrested for a

 2     drug felony a few years ago, and they've had just a really

 3     hard time with everything.  It really has nothing to do with

 4     what's going on here, but I just think his punishment has

 5     went on way too long.  Because even when you serve your

 6     time --

 7          THE COURT:  But yet your son is a correctional

 8     officer?

 9          PROSPECTIVE JUROR:  One son's a correctional officer.

10     My son-in-law is the other way.

11          THE COURT:  So in balance --

12          PROSPECTIVE JUROR:  In balance, he assures me that

13     mostly -- my one son who is a correctional officer assures me

14     that mostly everybody in there deserves to be in there.  And

15     on the other hand, my other son-in-law, I mean, you know, he

16     kind of got caught up in something.  Whether he's innocent or

17     not, he took a plea deal.  He served his time.  He's been

18     out.  He's still struggling.  He can't find a job.  You can't

19     go to an employment agency and have them look for your job

20     because you've got this felony on your record.  And my

21     daughter is, you know, they're just struggling to make it.

22          THE COURT:  Do you think he was treated fairly by the

23     courts?

24          PROSPECTIVE JUROR:  I really don't think he was

25     treated that fairly.

1          THE COURT:  What do you think happened?

2          PROSPECTIVE JUROR:  I think that he had to make hard

3     choices in his plea agreement because he was caught up into

4     something.  He got involved with it.  They had him mailing a

5     package or whatever that he shouldn't have mailed.  And

6     whether or not they would believe he knew what was in that

7     package or not, that was not, so he made the decision just to

8     take the plea agreement and serve his time and hopefully put

9     it behind him, and that's not happened.  He's not put it

10    behind him because, you know, we were really naive.  You

11    think that you serve your time and you get out and it's all

12    behind you, but it's not.

13         THE COURT:  With that in mind, do you think you could

14    be a fair and impartial juror to both sides in this case?

15         PROSPECTIVE JUROR:  I would hope so, but I'm not

16    100 percent positive.

17         THE COURT:  Well, let me put it to you this way,

18    because you're the only one that knows your state of mind.

19    We can all speculate on your state of mind.  But you're the

20    only one that knows, so let me put it to you this way.  If

21    you were in the position of the defendant charged in this

22    case or if you were in the position of the United States

23    Attorney charged with the responsibility of presenting the

24    evidence on behalf of the government, would you be satisfied

25    to have your case heard by 12 jurors who are in the frame of

1     mind that you presently have?

2           PROSPECTIVE JUROR:  Probably not.

3           THE COURT:  All right.  I'm going to thank you,

4     Ms. Sullivan, for being candid and honest, but I'm going to

5     excuse you.

6           PROSPECTIVE JUROR:  Thank you.

7           THE COURT:  All right.  Is there anybody else on the

8     panel here who has had a bad experience with a law

9     enforcement officer or agency that might in any way affect

10    your ability to be a fair and impartial juror in a criminal

11    case such as this?  Anybody else?  All right.  Let me ask the

12    clerk to fill that seat.

13          THE CLERK:  Beverly Callao, C-A-L-L-A-O.

14    Beverly Callao.

15          THE COURT:  Ms. Callao, good morning.

16          PROSPECTIVE JUROR:  Good morning.

17          THE COURT:  Take the microphone, please.  From where

18    you were seated in the back of the courtroom, did you hear

19    the general questions I've asked so far to the other

20    prospective jurors?

21          PROSPECTIVE JUROR:  Yeah, I heard them.

22          THE COURT:  Would your answers to any of my general

23    questions so far be yes?

24          PROSPECTIVE JUROR:  No.

25          THE COURT:  In other words, no hardship?

 1          PROSPECTIVE JUROR:  None.

 2          THE COURT:  All right.  All the other questions you

 3   would answer no?

 4          PROSPECTIVE JUROR:  Yes.

 5          THE COURT:  Good.  Next question.  Some of the

 6   witnesses whose names have been read obviously are law

 7   enforcement officers.  Would any of you give more weight to

 8   the testimony of a law enforcement officer than you would to

 9   the testimony of any other witness in the case simply because

10   that person is a law enforcement officer?  Would any of you

11   give less weight to the testimony of a law enforcement

12   officer than you would to the testimony of any other witness

13   simply because that person is a law enforcement officer?

14          All right.  Now, none of you have raised your hands to

15   either of these questions which means that you are assuring

16   us that you would judge the testimony of law enforcement

17   officers by the same standards that you judge the testimony

18   of all other witnesses, and that is as it should be.

19          Have any of you ever been a party to a lawsuit, either

20   a plaintiff or a defendant in a civil case or a defendant in

21   a criminal case?  Mr. Crow.

22          PROSPECTIVE JUROR:  Yes.  Fairly early in my legal

23   career, I was sued by a person I had filed a lawsuit against

24   on behalf of the California Coastal Commission.

25          THE COURT:  How did that come out?

```
1              PROSPECTIVE JUROR:  I was dismissed.

2              THE COURT:  At an early stage of the proceedings?

3              PROSPECTIVE JUROR:  Yes.

4              THE COURT:  Has anybody else ever been a party to a

5    lawsuit?  All right.  Pass the microphone to the top row to

6    Ms. Baker.

7              PROSPECTIVE JUROR:  Didn't you ask if we were a

8    witness or --

9              THE COURT:  Not yet.  I'm going to ask that a little

10   later.  I said a party to a lawsuit, a plaintiff or a

11   defendant in a civil case or a defendant in a criminal case.

12             PROSPECTIVE JUROR:  Okay.  No.

13             THE COURT:  Not yet.  Okay.  Ms. Donahue.

14             PROSPECTIVE JUROR:  In my capacity as the director of

15   special education for the Vacaville School District, I was

16   the plaintiff in several lawsuits.

17             THE COURT:  In your official capacity?

18             PROSPECTIVE JUROR:  Correct.

19             THE COURT:  Did any of them go to trial?

20             PROSPECTIVE JUROR:  No.

21             THE COURT:  Anybody else?  Next question.  For

22   Ms. Baker and everybody else, has anybody ever been a witness

23   who testified at a trial?  Ms. Baker.

24             PROSPECTIVE JUROR:  I worked at a bank and it was

25   robbed, and I saw the guy and so I was a witness in that
```

1    trial.

2              THE COURT:  Do you remember if that case was brought

3    in the federal court or in the county court?

4              PROSPECTIVE JUROR:  I don't remember.

5              THE COURT:  You testified.  Do you remember where you

6    went?

7              PROSPECTIVE JUROR:  San Diego.

8              THE COURT:  San Diego.

9              PROSPECTIVE JUROR:  Well, because he robbed other

10   banks.

11             THE COURT:  A lot of times --

12             PROSPECTIVE JUROR:  It was like 35 years ago.

13             THE COURT:  All right.  Because the deposits of a bank

14   are insured by a federal agency, a lot of bank robbery

15   prosecutions are brought in federal court.  It really doesn't

16   make a lot of difference for purposes of my questioning.

17   There are some differences in procedure in the state and

18   federal court.  But if all you were was a witness, those

19   probably wouldn't affect you.

20             Is there anything about the experience of testifying

21   as a witness for the government, I assume, in a criminal case

22   that would cause you to be more favorable to the government

23   in a criminal case such as this?

24             PROSPECTIVE JUROR:  No.

25             THE COURT:  Or more favorable to the defendant?

1           PROSPECTIVE JUROR:  No.

2           THE COURT:  Do you know how that case came out?

3           PROSPECTIVE JUROR:  Yeah.  He was found guilty.

4           THE COURT:  Found guilty.  All right.  Has anybody

5    else ever been a witness in a trial?

6           Do any of you have any very close friends who are law

7    enforcement officers?  Ms. Callao.  Do we pronounce it right,

8    Callao?

9           PROSPECTIVE JUROR:  Yeah.  My friend, she's an officer

10   at Chico.

11          THE COURT:  Would your relationship to her -- now, you

12   heard there's some people from Chico on the list.

13          PROSPECTIVE JUROR:  I didn't hear her name come up.

14          THE COURT:  Would your relationship to her cause you

15   to be more favorable to one side than the other in a case

16   such as this?

17          PROSPECTIVE JUROR:  I don't think so.

18          THE COURT:  All right.  Have any of you ever studied

19   law?  Mr. Crow.

20          PROSPECTIVE JUROR:  Yes.

21          THE COURT:  Anybody besides Mr. Crow?  Have any of you

22   ever studied criminal justice?

23          Now, I've already alluded to the presumption of

24   innocence and the burden that is placed upon the United

25   States Attorney to prove its case beyond a reasonable doubt.

KELLY O'HALLORAN, OFFICIAL COURT REPORTER, USDC -- (916) 448-2712

1          Do any of you have any quarrel with the proposition of

2     law that a defendant in a criminal case is presumed to be

3     innocent and that the burden is upon the prosecution to prove

4     his guilt beyond a reasonable doubt?  Do any of you have any

5     quarrel with that proposition of law?  I'll explain what is

6     meant by reasonable doubt to you if you're selected as jurors

7     at the end of the trial.

8          If you're selected as jurors, it will be your job to

9     listen to the evidence and to decide from the evidence what

10    the facts are.  You're the judges of the facts if you're

11    selected as a juror.  I'm the judge of the law.  At the end

12    of the trial, I will instruct the jury on the applicable law.

13    And it will be the duty of the jury to apply the facts as

14    they find them to the law as I give it to them.

15         Is there any one of you who could not follow the law

16    as I give it to you whether you agree with it or not?

17    Whether you think it's good law or bad law, is there any one

18    you of who could not follow the law as I give it to you?  If

19    so, raise your hand.

20         And we have had jurors who said well, I have

21    religious, moral, philosophical, or other reasons why I could

22    not follow the law.  I can only follow the law that I think

23    is correct.  Now, we need to know that before you're selected

24    as a juror if this is your state of mind.  Because if you are

25    selected as jurors, it will be your duty to apply the law as

1   I give it to you whether you agree with it or not, whether

2   you think it's good law or bad law.  Is there any one of you

3   who could not do that?  All right.

4           Have any of you ever been employed in the field of

5   real estate, either as an agent, appraiser, escrow officer,

6   broker, or a lender representative?  Have any of you ever

7   been employed in the real estate business?  How about the

8   members of your immediate family?  And I told you we're not

9   concerned with distant relatives.  Have any of the members of

10  your immediate family ever been employed in the real estate

11  business?

12          PROSPECTIVE JUROR:  My wife's a retired real estate

13  agent.

14          THE COURT:  I heard you talking but didn't see who it

15  was.  Mr. Engler.

16          PROSPECTIVE JUROR:  Yes.

17          THE COURT:  She's a retired real estate agent?

18          PROSPECTIVE JUROR:  Yes, your Honor.

19          THE COURT:  How long has she worked as a real estate

20  agent?

21          PROSPECTIVE JUROR:  Approximately two to three years.

22          THE COURT:  Was she ever involved in the process of

23  acquiring loans?

24          PROSPECTIVE JUROR:  No, your Honor.

25          THE COURT:  All right.  And I think, Ms. Baker, did

 1     you start to raise your hand?  Yes.

 2               PROSPECTIVE JUROR:  My sister was a real estate agent,

 3     and my brother-in-law is now an appraiser.

 4               THE COURT:  All right.  An agent and appraiser.  Was

 5     your sister who is the agent ever involved in the loan

 6     business, loan brokering, or anything to do with the loan

 7     process?

 8               PROSPECTIVE JUROR:  I don't think so.

 9               THE COURT:  Not that you know of?

10               PROSPECTIVE JUROR:  No.

11               THE COURT:  Anybody else?  Members of your immediate

12     family.

13               Have any of you ever worked in a financial institution

14     that made home loans, like a bank or a credit union?

15     Ms. Baker.

16               PROSPECTIVE JUROR:  Well, I worked at that bank.  I

17     don't think they made real estate loans, but I could be

18     wrong.

19               THE COURT:  I don't know of any bank that doesn't.

20     Which bank was it?

21               PROSPECTIVE JUROR:  It was Mid-State Bank.

22               THE COURT:  Oh, may be.  At least the department that

23     you worked in had nothing to do with --

24               PROSPECTIVE JUROR:  Right.  We just did personal and

25     car loans, those type of things.

KELLY O'HALLORAN, OFFICIAL COURT REPORTER, USDC -- (916) 448-2712

1          THE COURT:  All right.  And then Mr. Bianchi-Rossi.

2          PROSPECTIVE JUROR:  Yeah, I worked for Gill Savings

3   and Loan back in the '70s.  Took care of their land

4   development for them.

5          THE COURT:  When you say land development for them,

6   what is that?

7          PROSPECTIVE JUROR:  Land development.  We'd buy land,

8   have them come in, put in the streets, the pads, sell them

9   off to the contractors to build on.

10          THE COURT:  Did you ever get involved with mortgages?

11          PROSPECTIVE JUROR:  People I worked with did, but I

12   did not, no.

13          THE COURT:  Do you know anything about mortgages other

14   than what everybody else in the general public knows?

15          PROSPECTIVE JUROR:  No.

16          THE COURT:  All right.  Thank you.  Anyone else ever

17   worked in a financial institution that made home loans?

18   Mr. Crow.

19          PROSPECTIVE JUROR:  Shortly after I graduated from

20   college a long time ago and before I went to law school, I

21   worked in a bank in Colorado Springs, Colorado.  I was

22   basically a teller.

23          THE COURT:  A teller.  All right.

24          PROSPECTIVE JUROR:  I didn't work with mortgages or

25   the lending part of the bank.

1              THE COURT:  You didn't get involved in that part of

2       the business?

3              PROSPECTIVE JUROR:  No.

4              THE COURT:  Where did you go to law school?

5              PROSPECTIVE JUROR:  McGeorge.

6              THE COURT:  And when did you graduate?

7              PROSPECTIVE JUROR:  1976.

8              THE COURT:  All right.  Thank you.  You may have to

9       think about this a moment, but have any of you had a

10      particularly bad experience in the past with a mortgage

11      broker or a lender representative or escrow officer that

12      comes to mind?  Bad experience.  All right.  Ms. Baker.

13             PROSPECTIVE JUROR:  A couple years ago refinancing

14      with Chase Bank.  It was after four months, I just told them

15      I was done.  They ran me around and around and around.

16             THE COURT:  I've heard other examples of that.  They

17      tell you that you have to stop making payments before they

18      can --

19             PROSPECTIVE JUROR:  No, it wasn't that.  It was just

20      they wanted to refinance our existing home, you know, gave me

21      all the no cost blah, blah, blah, blah, blah, it will be done

22      in 30 days, and that was February.  And June I finally called

23      them and said give me my money back, the 395 to do the loan,

24      and you guys are idiots.

25             THE COURT:  So they gave your money back or not?

1              PROSPECTIVE JUROR:  Yes, they did.

2              THE COURT:  At least they gave you your money back.

3              PROSPECTIVE JUROR:  Took a couple of months to do that

4    too.

5              THE COURT:  All right.

6              PROSPECTIVE JUROR:  But yeah.

7              THE COURT:  So you're not going to try that again.

8              PROSPECTIVE JUROR:  No, we did, and it took them only

9    two months that time.

10             THE COURT:  Did they refinance the loan?

11             PROSPECTIVE JUROR:  They finally did.

12             THE COURT:  Chase Bank again?

13             PROSPECTIVE JUROR:  Yes.

14             THE COURT:  Well, there you are.  You were persistent.

15             PROSPECTIVE JUROR:  It wasn't fun.

16             THE COURT:  All right.  Mr. Engler, front row.

17             PROSPECTIVE JUROR:  Just one.  I retired about five

18   years ago, but in the middle of the retirement, I was

19   applying for a loan and put down a deposit, and I think it

20   was with Schwab.  And it just kind of fell through the cracks

21   where because I was retiring, they were not accepting my

22   income, so I wound up losing the -- I think it was 5 or $800.

23   Even though it was a PERS income, it was a solid income, they

24   just said legally they didn't have to accept it.  So I ended

25   up losing money.  So I did have a little bit of a bad, we

1    went around a little bit on it.

2            THE COURT:  What period of time was that?

3            PROSPECTIVE JUROR:  It was in '09.

4            THE COURT:  '09.  All right.  Thank you.  Anybody

5    else?  Bringing back some bad memories here.

6            Have any of you ever gone through a foreclosure

7    proceeding on a home?  More bad memories.  Anybody?

8            Just a couple of questions about investments.  Do any

9    of you have any specialized knowledge, training, or job

10   experience in the field of property investing?

11           Have any of you ever purchased real estate as an

12   investment rather than your own home to live in?

13           All right.  Mr. Fossen.

14           PROSPECTIVE JUROR:  It may only be tangentially

15   related.  It's sort of -- well, my father-in-law did a lot of

16   that before he passed away four years ago.  He actually -- he

17   purchased I think it was two houses as investments.  And then

18   after he passed away, we had to do a lot of dealing with the

19   estate dealing with how to basically just deal with the

20   homes.  You know, they were -- both of them were underwater

21   at the time because he bought them when prices were high, and

22   we all know what happened with the real estate market.  So

23   there was a lot of that going on, in addition to all the

24   inheritance issues and things.  So I personally didn't do

25   that, but I was closely sort of involved in the process at

 1    that time.

 2            THE COURT:  All right.  Thank you.  You mentioned when

 3    the market was high and then when it fell.  Just by a show of

 4    hands here -- and this is not one of the general questions

 5    that I'm asking you to answer yes or no, but just by a show

 6    of hands, how many of you have taken out a loan to buy your

 7    own home?  Everybody but one.  Oh, everybody.  All right.

 8            I want you all to answer some individual questions for

 9    me now.  And I'm going to ask the clerk to put those on the

10    screen to make it easier for you.  When you see what comes on

11    the screen, I want you to tell me as you receive the

12    microphone your name, the city or county where you live, how

13    long you've lived there, your occupation.  If you're retired,

14    we'd like to know how long you were employed.  The name of

15    your husband, wife, or significant other and his or her

16    occupation.  Tell us whether you have any children.  And if

17    they're adults, we'd like to know their occupations.  And

18    then, finally, we'd like to know whether you've ever served

19    on a jury in the past.  If you have, we'd like to know when

20    that was, what court, whether it was a criminal or a civil

21    case.  If it was a criminal case, we'd like to know what the

22    charges were, and then tell us whether the jury reached a

23    verdict.  We don't need to know what that verdict was,

24    however.

25            We'll start with Ms. Baker.

1             PROSPECTIVE JUROR:  Pamela Baker.  I live in Yolo

2    County in West Sacramento, and I've lived there almost six

3    years.  I am a housewife.  My husband works in Davis for

4    Schilling Robotics.  I have three sons.  The oldest one works

5    for a company similar to Pitney-Bowes.  The middle one works

6    for Paychex.  And our youngest son works at Schilling

7    Robotics.  I have been on a jury before in Ventura County.

8    And it was state, not federal.  It was a man was accused of

9    drunk driving, and we did reach a verdict.

10            THE COURT:  Are robotics medical devices?

11            PROSPECTIVE JUROR:  No.  They're the underwater ROVs,

12    like, you know, in the Gulf where they -- you saw that

13    robotic arm come and try to turn the knob off.

14            THE COURT:  Underwater?

15            PROSPECTIVE JUROR:  Yeah, underwater.  They go down to

16    the Mariana Trench.

17            THE COURT:  Thank you.

18            Mr. Bianchi-Rossi.

19            PROSPECTIVE JUROR:  Larry Bianchi-Rossi.  Currently

20    live in Orangevale for about 20 and a half years.  I'm

21    retired.  My prior employer was SMUD for 30 years.  My spouse

22    is Delores Lynn.  No children.  I served in Placer County on

23    a civil case somewhere prior to 1994.  I don't remember.

24            THE COURT:  What did you do for SMUD?

25            PROSPECTIVE JUROR:  I was a database administrator.

1          THE COURT:  Now, you served as a juror in a civil

2     case.  Some of the others of you may have served as a juror

3     in a civil case as well.  There are some significant

4     differences between civil cases and criminal cases.  There

5     are also differences between state and federal cases.  A

6     significant difference between a civil case and a criminal

7     case is that in a civil case, the party making the claim or

8     asserting the affirmative defense has the burden of proving

9     its claim or defense by what we call a preponderance of the

10    evidence, which simply means more evidence on one side than

11    the other, more probable than not.

12          That is an entirely different burden than the burden

13    that is placed upon the prosecution in a criminal case such

14    as this.  The burden of proof beyond a reasonable doubt is a

15    heavier burden to bear.  And I just want you to understand

16    that it is entirely different than the burden of proof that

17    you may have heard about in a civil case.

18          Also, in a civil trial in state court, you only have

19    to have 9 out of 12 jurors in order to reach a verdict.  In a

20    case in federal court, whether it's criminal or civil, in

21    order to reach a verdict, the jury has to be unanimous.  And

22    in a criminal case, there are 12 jurors.  So those are some

23    significant differences between civil cases in state court

24    that you may have seen or participated in and a criminal case

25    such as this in federal court.

1              Thank you, Mr. Bianchi-Rossi.

2              Ms. Callao.

3              PROSPECTIVE JUROR:  Beverly Callao.  I've been in Sac

4     County for about ten years now.  My husband is employed at

5     U.S. GIA as an industrial hygienist.  No children.  And I've

6     never served on a jury before.

7              THE COURT:  Thank you.

8              Mr. Fossen.

9              PROSPECTIVE JUROR:  Matthew Fossen.  I've lived in

10    Sacramento for about ten years now.  I'm a senior

11    environmental scientist specialist at the California

12    Department of Pesticide Regulation, and I've been there about

13    nine years.  My spouse is Lindsay Fossen, and she is now a

14    housewife.  I have two children, a two-year-old daughter and

15    a six-year-old son.  And I've never served on a jury.

16             THE COURT:  You said your wife is now a housewife.

17    Was she previously employed?

18             PROSPECTIVE JUROR:  She was.  She was basically a

19    clerical for Sutter Medical.

20             THE COURT:  Thank you.

21             Mr. Dittmar.

22             PROSPECTIVE JUROR:  Yes.  My name is William Dittmar.

23    I go by Neal.  I've lived in Sacramento for 14 years.  As I

24    said, I worked for Sacramento County Department of Child

25    Support Services for 14 years.  My registered domestic

1   partner is Glen Miltenberger.  He's retired.  He did work for

2   the Army Corps of Engineers.  No children.  Prior jury duty

3   in the early '80s, District of Columbia.  It was a ten count

4   of rape at gunpoint case.

5            THE COURT:  The jury reached a verdict?

6            PROSPECTIVE JUROR:  Yes.

7            THE COURT:  Okay.  Ms. Manley, we haven't heard from

8   you very much yet.

9            PROSPECTIVE JUROR:  My name is Laini Manley.  I've

10  been around Sacramento County my entire life.  I now live in

11  Citrus Heights.  I am a seventh grade English and history

12  teacher and have been so for 18 years.  My husband, Dirk

13  Manley, is a physical therapist.  I have two children, a

14  10-year-old and a 12-year-old.  I am hoping that this doesn't

15  lead to any hardships with this trial.  But I didn't say

16  anything earlier because I think I should be able to find

17  care.  I have not ever served on a jury.

18            THE COURT:  I hope so because I think a seventh grade

19  history teacher could really benefit from the experience of

20  jury service.

21            PROSPECTIVE JUROR:  Absolutely.  And this is the first

22  week, my children are away at camp, so I was going to enjoy

23  the lovely -- I mean I do teach because I get my summers off.

24            THE COURT:  And I think you will enjoy it.  This is

25  actually probably the best time for a teacher to serve on a

1    jury because you're not in class.  I don't like to take

2    teachers away from their jobs because I think it's important.

3    But we had a group of teachers here from different schools.

4    I think they were all high school.  And we had a little

5    class, well, actually a three-day program for them, educating

6    the teachers about the work of this court so that they could

7    go back and use some of our cases in this court right here as

8    a tool to teach civics in their schools.  So I think it's

9    really valuable, and I appreciate your willingness to serve.

10   And I know it will be an experience that you can take back

11   and use on your job.

12           Had we finished all of the other questions with you?

13           PROSPECTIVE JUROR:  I believe so.  Thanks.

14           THE COURT:  All right.  Thank you.  Pass the

15   microphone up front to Ms. Donahue, please.

16           PROSPECTIVE JUROR:  My name is Lynda Donahue.

17           THE CLERK:  Please press the bottom and see if it's

18   muted.

19           PROSPECTIVE JUROR:  Lynda Donahue.  I reside in

20   Fairfield.  I've lived in Fairfield for 18 years.  I'm a

21   retired educator.  I was the director of special education

22   for the Vacaville School District.  My spouse is retired from

23   the City of Oakland.  I have one daughter who is a teacher in

24   the Vacaville School District.  And I have not served on a

25   jury.

1          THE COURT:  What did your spouse do for the City of

2    Oakland?

3          PROSPECTIVE JUROR:  He worked in the code compliance

4    office in the city with condemning property and making sure

5    they had a city plan to refurbish blighted buildings and the

6    downtown area in Oakland.

7          THE COURT:  Thank you.

8          Mr. Engler.

9          PROSPECTIVE JUROR:  My name is Michael Engler.  I live

10   in Red Bluff, and I've been there about ten years.  Prior to

11   that, it was Pacifica, about 30 or 40 years in Pacifica.

12   Occupation is I'm a retired fire department battalion

13   chief/paramedic who worked 2 years volunteer, 29 years as

14   paid.  Currently enlisted with the California State Military

15   Reserve as a paramedic also and also work with a state

16   disaster medical assistance team, California-6, also as a

17   paramedic.  My wife's name is Elaine.  She's, as I said,

18   retired as a real estate agent.  But also she worked a little

19   bit in the medical field for about 15 years prior to becoming

20   -- to getting into real estate.  We have two children.  One

21   is an apprentice plumber, and the other is studying to get

22   her nursing degree.  And I did work once in the jury.  It was

23   roughly in the '80s, so I don't remember a lot.  It was a

24   DUI.  The man represented himself, because normally with the

25   fire service, you usually don't get on the courts, but he

 1   represented himself so I did actually serve on the jury, and

 2   we did come to a verdict.

 3            THE COURT:  Mr. Bianchi-Rossi, if you're both still on

 4   the jury when we select the jury, instead of telling me if

 5   your heart starts to flutter, maybe you better tell

 6   Mr. Engler.

 7            PROSPECTIVE JUROR:  Sure.  Not a lot he can do.

 8            THE COURT:  Mr. Tran.

 9            PROSPECTIVE JUROR:  Good morning, sir.  My name is

10   Dung Tran.  I live in Sacramento about almost 30 years.  My

11   job, electronic technician.  Right now, I retired.  I work

12   about 26 years.  My wife, she about 57, and she do manicures,

13   she do nails.  I have one son only.  He automobile

14   technician.  He repair car.  So before, I never serve for

15   jury, none.

16            THE COURT:  Who did you work for before you retired?

17            PROSPECTIVE JUROR:  I work for four, five companies.

18   Before I work in Aurora Electronics, NEC, Packard Bell, Intel

19   Corporation before retire.

20            THE COURT:  And you're an electronic technician?

21            PROSPECTIVE JUROR:  Yes, sir.

22            THE COURT:  Tell us a little bit about the work that

23   you did.

24            PROSPECTIVE JUROR:  We build and testing of computer

25   CPU.  Memory inside a computer.  We have a lot of Internet

 1    board, CPU system, and a lot of things in there we have to do

 2    troubleshooting.  We build a system like the computer you

 3    use.

 4         THE COURT:  Right.  Well, if we have a problem during

 5    the trial, we'll know what to do.

 6         PROSPECTIVE JUROR:  We can do that.  You know, we try.

 7         THE COURT:  We have an IT department, but they may

 8    need some help.

 9         PROSPECTIVE JUROR:  Well, they have information

10    technology about Internet, you know.  I would not take care

11    of Internet.  I mean another department.

12         THE COURT:  You take care of the hardware.

13         PROSPECTIVE JUROR:  Right.  Hardware, software, but

14    not about Internet.  Internet, they have a separately other

15    department.

16         THE COURT:  Thank you.

17         Ms. Macias.

18         PROSPECTIVE JUROR:  Morning.  I'm Annette Macias.  I

19    live in Folsom, Sacramento County, about seven and a half

20    years.  I'm an accountant.  I spent the last seven years as

21    an accountant for a commercial property management, but I've

22    recently moved over to Vision Service Care.  My spouse, he is

23    a mechanical and aerospace engineer.  I have three adult

24    children that live in Denver, Colorado, and I've never served

25    on a jury.

1                    THE COURT:  Thank you.

2               Mr. Crow.

3                    PROSPECTIVE JUROR:  My name is Michael Crow.  I've

4      lived in Sacramento for about 42 years, except for two years

5      in Los Angeles.  I'm an attorney.  I'm retired from the

6      California Department of Justice.  My spouse, Katherine, is

7      retired, and she was a teaching assistant with the Sacramento

8      City Unified School District.  We have three adult children.

9      My oldest, my son, is a professor of history at Hobart &

10     William Smith College in Geneva, New York.  My middle

11     daughter is developmentally disabled.  She works part-time

12     for the California Department of Developmental Services.  And

13     my youngest daughter just started a job there as -- she's

14     essentially a social worker.  And before that, she worked for

15     a private service, social service, that works with

16     developmentally disabled and other disabled clients.  I have

17     had two juries I served on.  One was a civil case in

18     Sacramento County, and the other was a criminal case in

19     Sacramento County.  And they both reached verdicts.

20                    THE COURT:  Both reached verdicts?

21                    PROSPECTIVE JUROR:  Yes.

22                    THE COURT:  Were you the foreperson on either of these

23     juries?

24                    PROSPECTIVE JUROR:  No.

25                    THE COURT:  Thank you.

1          Ms. Vocke.

2          PROSPECTIVE JUROR:  My name is Sandy Vocke.  I live in

3     Elk Grove, California, and I've been there 59 years.  I am an

4     RN at Kaiser Permanente.  My spouse passed away three years

5     ago, but he was a retired Lutheran minister.  I have one

6     daughter.  She works at the Secretary of State's Office.  And

7     I was on jury duty two years ago, and it was a child

8     molestation case, and we did have a verdict.

9          THE COURT:  Which Kaiser facility do you work at?

10         PROSPECTIVE JUROR:  South Sacramento.

11         THE COURT:  Any particular department?

12         PROSPECTIVE JUROR:  I'm what they call a PICC nurse.

13    I put in peripherally inserted central catheters, central

14    lines.

15         THE COURT:  I see.  Thank you.

16         Just a couple more general questions.  Having heard

17    the answers of other jurors and the questions that I've

18    asked, is there anything about any of you that you think

19    either I or the lawyers need to know in order to judge your

20    ability to be a fair juror in this case?  Anything that we

21    haven't asked that you are thinking he should have asked that

22    question because I think there's something about me they

23    should know?

24         And the last general question.  Is there any reason,

25    whether I've mentioned it or not, that you could not be a

1    fair, impartial juror in this case?  Fair to the government

2    on the one hand and fair to the defendant on the other hand.

3    None of you have raised your hands.

4         I told you we'd take a break midmorning and

5    midafternoon.  So I'm going to do that.  It's a little bit

6    harder now to do that because we have jurors in the box and

7    all of you folks in the back of the courtroom.  So what I'm

8    going to do is this.  Look on both sides of you and see who

9    is seated there.  Is there anybody in the back of the

10   courtroom who is not a prospective juror?  Raise your hand.

11   Okay.  Forget those people that raised their hands.  Because

12   I just want to make sure that all the prospective jurors are

13   back.  When we come back from the break, I'm going to ask you

14   whether there's anybody missing because I don't want the

15   clerk to have to take roll again.  So you look on both sides,

16   and if there's an empty seat that was filled when we took the

17   break, you let me know.

18        And hopefully it won't be a problem because it's very

19   important that if we take a break, everybody is present when

20   we come back.

21        It's also important during this break that you follow

22   certain instructions that I'm about to give you.  Number one,

23   do not talk to anybody about the case or anything that you

24   might think is an issue in the case because that might affect

25   your ability to become a juror later on.

 1              Secondly, do not talk to any of the lawyers or the

 2    parties that are seated at these two tables this side of the

 3    bar about anything.  And I'm telling them also not to speak

 4    with you.

 5              Finally, take your books with you and be sure that you

 6    bring them back from the break because I need to ask you some

 7    questions that you're going to need your books in order to

 8    answer.

 9              All right.  Let's just take a short break, and it will

10    be until quarter to 11:00.  Come back and don't all trickle

11    into the courtroom because that's harder for us to manage.

12    Come back and be standing at the back door at quarter to

13    11:00, and the clerk will bring you all in.  All right.

14    We'll take a recess until quarter to 11:00.

15              (Recess taken.)

16              (Jury not present.)

17              THE COURT:  Mr. Wiseman, your client is present.

18    Before we bring the jury in, was there something you wanted

19    to ask the Court?

20              MR. WISEMAN:  Just briefly, your Honor.  I trust that

21    the Court is going to allow the parties to ask some questions

22    of the potential jurors.

23              THE COURT:  That's what I told you.

24              MR. WISEMAN:  That's correct.  But I just wanted to

25    make sure that I don't ask a question that is inappropriate,

1   the Court doesn't want me to.  So we had some proposed voir

2   dire questions.  We didn't discuss it before we got started,

3   so I just wanted to address that briefly.

4           THE COURT:  Which questions do you want to test run

5   with me?

6           MR. WISEMAN:  I want to ask the jurors, especially

7   since all of them, at least those that are on the panel right

8   now, have had experience with getting a mortgage loan.  So I

9   want to probe a little about their experience with that

10  process, what it was like.  I want to ask them some questions

11  about whether their loan was stated income.

12          THE COURT:  That's fine.  You can ask them those

13  questions.

14          MR. WISEMAN:  That's fine.  If I can ask that, that's

15  essentially what I'm interested in.

16          THE COURT:  That's fine.

17          MR. WISEMAN:  Okay.

18          THE COURT:  All right.  So let's see if they're all

19  present.  Why don't we bring them in.

20          (Jury panel present.)

21          THE COURT:  All of the prospective jurors in the box

22  are present.  Are there any missing in the back?  One.

23          THE CLERK:  There's one missing in the box.

24          THE COURT:  Oh, yes.  There is one missing in the box.

25          Mr. Tran, move over one.  I think you're in the wrong

1    seat.  Now they're not missing.  One of them was trying to be

2    an alternate.

3           How about the back now?  There's still one person

4    missing?  They're here.  Thank you very much.  You're all

5    present.  I'm going to allow the attorneys now to ask some

6    questions.  We'll begin with Mr. Wiseman.

7           MR. WISEMAN:  Thank you, your Honor.  Good morning

8    again.

9           Mr. Crow, since you're the lawyer on the panel, I'm

10   going to put you on the hot seat first.  I take it that your

11   experience as a lawyer was not in the area of criminal law;

12   is that right?

13          PROSPECTIVE JUROR:  Yes, that's correct.  Although

14   having thought about it, I did spend about a month early in

15   my career over at the Sacramento County District Attorney's

16   Office just getting trial experience in their misdemeanor

17   trial unit.  And then when I joined the Attorney General's

18   Office, I handled one appellate court criminal case just to

19   get appellate oral argument experience.  But that is the

20   extent of my criminal law experience.

21          MR. WISEMAN:  And, sir, while you were with the AG's

22   Office, although you didn't have direct criminal law

23   experience, did you ever interact with any of the deputies

24   that prosecuted cases for the Attorney General?

25          PROSPECTIVE JUROR:  Not on a case-related basis.

1          MR. WISEMAN:  And let me ask this question.

2     Judge Shubb asked the panel about the idea of the burdens,

3     the burdens that the parties have in a criminal case, that

4     is, the prosecution that has the burden of proof.  That's

5     something I presume you understand; right?

6          PROSPECTIVE JUROR:  Yes.

7          MR. WISEMAN:  Is there any -- do you have any issues

8     with that as a lawyer, with your legal training, what it

9     means and is there any problem you have with having the

10    prosecution having the burden of proof?

11         PROSPECTIVE JUROR:  No.

12         MR. WISEMAN:  Does anybody on the panel have any

13    doubts as to what that means?  In other words, that the

14    prosecution in a criminal case has the burden of proving

15    their case beyond a reasonable doubt.  Does anybody have any

16    issue with that or misunderstanding about it, perhaps?  Okay.

17         And, Mr. Crow, let me ask you this then sort of as a

18    follow-up.  Sort of the flip side of the idea that the

19    government, the prosecution in this case, has the burden of

20    proof, the other side of the coin is that the defense and the

21    defendant has no obligation to put on a defense.  Is that

22    something that you also understand?

23         PROSPECTIVE JUROR:  Yes.

24         MR. WISEMAN:  And do you have any issue with that?  In

25    other words, the defense doesn't have to do anything in a

 1    criminal case.  The burden is always with the prosecution.

 2              PROSPECTIVE JUROR:  No.

 3              MR. WISEMAN:  The folks on the panel, do you all

 4    understand the concept that the defendant in a criminal case

 5    does not have to do anything?  It's always the burden on the

 6    prosecution to prove its case.  Everybody understand that

 7    concept?  Does anybody have an issue with that?

 8              Does anybody think that in a criminal case, the

 9    defendant has to put on a defense in order to defend himself

10    or herself?  Does anybody believe that the defendant has that

11    obligation?  Okay.

12              So if in this case the defense decides not to put on a

13    case, would that create a problem in your mind as to whether

14    or not Mr. Williams is guilty or innocent?  Just because he

15    decides, assuming he decides not to put on a case, does

16    anybody have any problem with that if he did not put on a

17    case?  Okay.

18              Now, I wanted to ask specifically, Ms. Macias, you

19    answered the question that you're, I believe, an accountant

20    for a commercial property management company; right?

21              PROSPECTIVE JUROR:  I was, correct.

22              MR. WISEMAN:  You were formerly?

23              PROSPECTIVE JUROR:  Right.

24              MR. WISEMAN:  Sort of briefly tell us what you did in

25    the capacity as an accountant.

1              PROSPECTIVE JUROR:  I did all the accounting for the

2      property itself, collecting rent, everything around running

3      the financial part of the building.

4              MR. WISEMAN:  Okay.  Did you have anything to do with

5      renting the property?  Were you involved in renting the

6      property out or were you just the financial side?

7              PROSPECTIVE JUROR:  Just the financial side.

8              MR. WISEMAN:  How many properties did you typically

9      manage from the financial side when you were working?

10             PROSPECTIVE JUROR:  Two or three depending.  I would

11     have one building, to two to three at a time.

12             MR. WISEMAN:  Two to three at a time.  And would those

13     properties change over time if they were sold?

14             PROSPECTIVE JUROR:  Yes, that's correct.

15             MR. WISEMAN:  Okay.  And how long were you in that

16     professional role as an accountant?

17             PROSPECTIVE JUROR:  Seven years.

18             MR. WISEMAN:  Are you a licensed CPA?

19             PROSPECTIVE JUROR:  No.

20             MR. WISEMAN:  Okay.  And during your tenure as an

21     accountant with the commercial property company, did any of

22     the properties, if you recall, go into foreclosure?

23             PROSPECTIVE JUROR:  Properties in our portfolio went

24     in foreclosure, not the properties that I was assigned to.

25             MR. WISEMAN:  Some of those that were in the portfolio

1    of the company went to foreclosure?

2              PROSPECTIVE JUROR:  Correct.

3              MR. WISEMAN:  And just a follow-up question on that,

4    if you know or recall, how many properties were actually in

5    the company's portfolio at the time you were there?

6              PROSPECTIVE JUROR:  We had 17 to 20 buildings.

7              MR. WISEMAN:  I'm sorry?

8              PROSPECTIVE JUROR:  17 to 20 at a time.

9              MR. WISEMAN:  Okay.  Okay.  Now, all of you mentioned,

10   I think you all raised your hand that you've all had

11   experience with having acquired a mortgage loan; is that

12   right?  Is there anybody who hasn't gotten a mortgage?  Okay.

13   Can I get a raise of hand, if I may, of how many folks got

14   their mortgage between, let's say, 2006 and 2008?  Okay.

15             Now, Ms. Baker, when did you get your mortgage, if you

16   recall?

17             PROSPECTIVE JUROR:  It closed December of 2008.

18             MR. WISEMAN:  December of 2008.  Now, do you know --

19   strike that.  Let me ask you this question.  Do you recall --

20   I think you mentioned that the bank that you used was Chase.

21   Was that for the refinance or for the original loan?

22             PROSPECTIVE JUROR:  They have the original loan, but

23   it was for a refinance.

24             MR. WISEMAN:  Okay.  And in 2008 was when you

25   attempted to refinance or to get the original loan?

1          PROSPECTIVE JUROR:  When we got the original loan.

2          MR. WISEMAN:  And do you recall when you got that loan

3    what kind of a loan it was?  In other words, was it a stated

4    income loan, was it a full documentation loan, if you know?

5          PROSPECTIVE JUROR:  I believe full documentation.

6          MR. WISEMAN:  Do you recall having to submit documents

7    like tax returns and financial statements, bank records to

8    the lender?

9          PROSPECTIVE JUROR:  Yes.

10          MR. WISEMAN:  Okay.  Anybody who -- who else got a

11    loan during that period of time?  Okay.

12          Ms. Macias, a similar question to you.  Do you recall

13    if that was a stated income loan or a full doc loan?

14          PROSPECTIVE JUROR:  It was full document loan.

15          MR. WISEMAN:  Again, you were required to submit

16    certain documents to the lender?

17          PROSPECTIVE JUROR:  Correct.

18          MR. WISEMAN:  And do you recall the closing event when

19    you finally got the loan?

20          PROSPECTIVE JUROR:  Yes.

21          MR. WISEMAN:  Did you have to sign certain documents?

22          PROSPECTIVE JUROR:  Yes.

23          MR. WISEMAN:  Were those documents fairly voluminous?

24          PROSPECTIVE JUROR:  They were the typical, what I

25    would consider the typical loan documents.  This was our

 1    third home purchase, so it was, you know, what I would

 2    consider typical.  There wasn't anything I would consider

 3    suspect.

 4         MR. WISEMAN:  Okay.  And do you recall reading all the

 5    documents that were presented before you?

 6         PROSPECTIVE JUROR:  No, I did not read every word.

 7         MR. WISEMAN:  Okay.  Of all you folks who have gotten

 8    loans, did anyone read all the documents that were placed

 9    before you?  By show of hands.  Okay.

10         Anybody else during that period of time, '06 and '08?

11    I think there was another hand that went up who had a loan

12    during that period.  No?  Okay.

13         Of all you folks, do you recall, other than the two

14    folks that have already answered, what kind of loan that you

15    acquired, whether it was a full doc loan or a stated income

16    loan or any other kind of loan?  A show of hands.  Do you

17    remember what kind of loan?

18         Okay.  Mr. Fossen.

19         PROSPECTIVE JUROR:  It was a full doc loan.

20         MR. WISEMAN:  It was a full doc loan where you were

21    required to submit documents?

22         PROSPECTIVE JUROR:  Correct.

23         MR. WISEMAN:  Okay.  Anybody else remember what kind

24    of loan they got at that time?

25         PROSPECTIVE JUROR:  I believe I got a full document

1        loan as well.

2              MR. WISEMAN:  Okay.  Where again, you had to submit

3        bank records and checks and all that stuff?

4              PROSPECTIVE JUROR:  Yes.

5              MR. WISEMAN:  Mr. Tran, I wanted to ask you, you

6        explained a bit about your professional career.  Now, as I

7        understand it, you are an electronic technician?

8              PROSPECTIVE JUROR:  Yes, sir.

9              MR. WISEMAN:  And that requires -- do you put the

10       actual physical parts of the computer together or is it a

11       software work?

12             PROSPECTIVE JUROR:  We assembly.  We put together all

13       the parts in the computer, inside computer, and then you

14       connect everything, wiring and board and power supply,

15       everything, and then you put the system through testing.

16             MR. WISEMAN:  Okay.

17             PROSPECTIVE JUROR:  Not software.  Software, that in

18       the software department.  We are hardware.

19             MR. WISEMAN:  You're the hardware department?

20             PROSPECTIVE JUROR:  Yeah.  After we done and the

21       software come in, they put in and load the hard drive and CD

22       and load the system for Microsoft Windows and something like

23       that, everything, and then we test it.

24             MR. WISEMAN:  But when you're putting, let's say, a

25       computer together, the end of the process that you do,

1    actually putting it together, do you run some sort of

2    diagnostic test on the hardware?

3              PROSPECTIVE JUROR:  Yes, sir.  We run the bundling

4    system about three days, something like that, and we -- in

5    the bundling system, you run the software, you're testing the

6    hardware.  Because if there's something wrong in the

7    hardware, you need software to detect it.  And then you run

8    the bundling, that mean you have a temperature.  A

9    temperature, that mean they can take a look about the

10   hardware.  They have a problem about temperature.  They

11   cannot handle temperature, something like that, from zero

12   degree to 150 degree.

13             MR. WISEMAN:  All right.  So you have to be very

14   careful on the steps that you take?

15             PROSPECTIVE JUROR:  Right.  We have a step by step for

16   each engineer.

17             MR. WISEMAN:  And likewise, Ms. Macias, with respect

18   to the professional accounting you were doing, it requires

19   you to be very precise about keeping the numbers and the

20   debits on the left and the credits on the right; right?

21             PROSPECTIVE JUROR:  That's correct.  That's right.

22             MR. WISEMAN:  Okay.  Now, Ms. Vocke, you indicated --

23   did I pronounce your name correctly?

24             PROSPECTIVE JUROR:  Vocke.

25             MR. WISEMAN:  Excuse me.  Ms. Vocke, you indicated

1    that you had some prior jury experience; correct?

2              PROSPECTIVE JUROR:  Yes.

3              MR. WISEMAN:  And that was a case that involved child

4    molestation, I think you said.

5              PROSPECTIVE JUROR:  Yes.

6              MR. WISEMAN:  And you all reached a verdict?

7              PROSPECTIVE JUROR:  Yes.

8              MR. WISEMAN:  In that particular case, if you recall,

9    did the defendant take the witness stand?

10             PROSPECTIVE JUROR:  No.

11             MR. WISEMAN:  And did you have any problems with that

12   when it came to deliberations that the defendant didn't take

13   the witness stand?

14             PROSPECTIVE JUROR:  No.

15             MR. WISEMAN:  You knew it was his or her right not to

16   do that; correct?

17             PROSPECTIVE JUROR:  Yes.

18             MR. WISEMAN:  Okay.  And Mr. -- a few more questions,

19   your Honor.

20             Mr. Engler, you, if I understood you correct, you

21   indicated that you're presently in the military reserves?

22             PROSPECTIVE JUROR:  Yes, sir.

23             MR. WISEMAN:  And in what capacity?

24             PROSPECTIVE JUROR:  Paramedic.

25             MR. WISEMAN:  Are you formerly an active duty?

1          PROSPECTIVE JUROR:  No, it's reserve.  It's California

2   State.  So we actually backfill for the National Guard who is

3   pretty much overseas, so we cover in their absence.  But it

4   requires training one weekend a month.

5          MR. WISEMAN:  So you would backfill, for example, if

6   there's a natural disaster and the guard unit was not

7   available?

8          PROSPECTIVE JUROR:  Correct.

9          MR. WISEMAN:  Has that occurred since you've been in

10  reserves, have you had to go out?

11         PROSPECTIVE JUROR:  No.

12         MR. WISEMAN:  But it's something that you train for on

13  a regular basis?

14         PROSPECTIVE JUROR:  Yes, sir.

15         MR. WISEMAN:  And your prior career as a professional

16  firefighter was in Pacifica; correct?

17         PROSPECTIVE JUROR:  Yes, sir.

18         MR. WISEMAN:  And that's on the coast; correct?

19         PROSPECTIVE JUROR:  Bay Area.

20         MR. WISEMAN:  Bay Area.  Okay.  And that was for 29

21  years?

22         PROSPECTIVE JUROR:  Yes, sir.

23         MR. WISEMAN:  And your wife is a retired real estate

24  agent.  During her tenure when she was actively practicing,

25  did you discuss with her anything about how real estate

1    transactions occur, how the deals are done?

2            PROSPECTIVE JUROR:  Yeah.  I mean, we had the typical

3    -- she was very conscientious on everything, on a lot of

4    stuff.  The reason why she got out is it became so

5    complicated, so legal, you know, that each document, you

6    know, when you go to sell a house, it was, you know, winded

7    up being 50 pages, 60 pages.  And if you didn't disclose one

8    little thing, you were open to lawsuits.  And there was a

9    couple where, you know, she felt that she represented it and

10   they said no, you didn't tell us, and so it always bothered

11   her that she was always under the gun that she could be sued,

12   so she just said I'm done with it.  It's not worth the worry

13   to have to worry about any little thing, you know, a chip of

14   paint, you know, something minor, and she could actually be

15   held liable, so she gave it up.

16           MR. WISEMAN:  How long was she actually in that

17   profession?

18           PROSPECTIVE JUROR:  It was two or three years, I

19   think.

20           MR. WISEMAN:  Now, Mrs. Callao.

21           PROSPECTIVE JUROR:  Yes.

22           MR. WISEMAN:  You indicated, if I recall, that you

23   have a friend who is a law enforcement officer up in Chico;

24   right?

25           PROSPECTIVE JUROR:  Yes.

1            MR. WISEMAN:  Is it male or female?

2            PROSPECTIVE JUROR:  Female.

3            MR. WISEMAN:  Do you speak with her about what it's

4    like to be a cop in Chico?

5            PROSPECTIVE JUROR:  When she first started, which was

6    a couple years ago.

7            MR. WISEMAN:  Okay.

8            PROSPECTIVE JUROR:  But now we only talk every once in

9    a while.  She was a friend from high school.  So sometimes

10   she'll tell stories.

11           MR. WISEMAN:  All right.  But you don't speak to her

12   regularly now?

13           PROSPECTIVE JUROR:  No, not regularly.

14           MR. WISEMAN:  All right.  Your Honor, I think that's

15   it for now.  Thank you.

16           THE COURT:  Mr. Hales or Ms. Hemesath, did you have

17   any questions?

18           MR. HALES:  Yes.  Thank you, your Honor.

19           Mr. Wiseman asked a few of you questions about your

20   real estate transactions.  And I think everyone has gotten a

21   loan.  And I wanted to go back to more the style of the

22   general question that the judge asked earlier, which is does

23   anything stick out for any of you about your home purchases

24   or the loans that you got that might affect how you think

25   about this case or how you view the evidence?  Anything that

1    was strange or that you remember when you think back about

2    your home purchases?

3          I don't see any responses.

4          Ms. Baker, you seem to have a pretty vivid memory of

5    dealing with J.P. Morgan Chase and some negative feelings

6    about that.  If a witness from J.P. Morgan Chase testifies

7    during the trial, do you think that your past experience will

8    affect how you view that testimony or will you be able to set

9    that aside?

10          PROSPECTIVE JUROR:  I can set that aside.

11          MR. HALES:  Is the experience that you had, is it

12    something that has lingered that you still talk about with

13    family and friends today or would you say that you're kind of

14    past it?

15          PROSPECTIVE JUROR:  I talk to friends about it

16    occasionally, yes.

17          MR. HALES:  So it has stuck with you a little bit?

18          PROSPECTIVE JUROR:  Yeah.

19          MR. HALES:  On a different topic, this case may

20    require you to evaluate -- I'm sorry.  This case may require

21    you to make a determination as to a person's state of mind

22    based on evidence of that person's conduct.  And what I want

23    to ask is if any of you feel that there's any reason that you

24    can't or that you shouldn't do that for any reason.  No

25    response to that.

1          Ms. Manley, before you were a teacher, did you work in

2    any other profession?

3          PROSPECTIVE JUROR:  No, I've been a teacher since '96.

4          MR. HALES:  Have you always taught seventh grade or

5    have you taught at other levels?

6          PROSPECTIVE JUROR:  No, I taught first grade for 14

7    years then I moved from first grade to seventh grade.

8          MR. HALES:  Okay.  Why did you change?  Was that your

9    choice?

10          PROSPECTIVE JUROR:  The State of California was taking

11    our reduced class size away, and so then there was some

12    openings in the middle school.  I work in a K-8 school, and

13    so I was able to move up from first grade to seventh grade.

14    Not by choice, but I am very glad for that professional move.

15          MR. HALES:  How would you compare it?  So you like

16    teaching seventh grade better?

17          PROSPECTIVE JUROR:  I do.

18          MR. HALES:  Why?

19          PROSPECTIVE JUROR:  Well, I was done with --

20    five-year-olds and six-year-olds are wonderful, but after 14

21    years, I was more -- I was ready more for some nice dialogue.

22    So seventh graders roll their eyes a little bit, but that's

23    okay.

24          MR. HALES:  Thank you.  Thank you, your Honor.

25          MR. WISEMAN:  Your Honor, may I have a brief follow-up

1    with one particular juror?

2            THE COURT:  All right.

3            MR. WISEMAN:  Mr. Dittmar, I wanted to ask you just

4    briefly, you're in child support services; correct?

5            PROSPECTIVE JUROR:  Yes.

6            MR. WISEMAN:  And you indicated that you were not law

7    enforcement, right, so you didn't have the power to arrest?

8            PROSPECTIVE JUROR:  No, we could initiate a warrant,

9    but I could not arrest anybody.

10           MR. WISEMAN:  All right.  And then in those situations

11   where you felt that somebody needed to be arrested, you'd

12   just call law enforcement, like a sworn officer?

13           PROSPECTIVE JUROR:  It was more involved than that,

14   and I never directly did that myself.

15           MR. WISEMAN:  Okay.  Just in general, if you can, is

16   there a typical reason why somebody doesn't pay child

17   support?  Is it financial problems or just not caring, which

18   is your experience?

19           PROSPECTIVE JUROR:  Off the top of my head, I would

20   say it's always financial problems.

21           MR. WISEMAN:  Okay.  Thank you, your Honor.  Nothing

22   else.

23           THE COURT:  Is there any challenges for cause?

24           MR. HALES:  No, your Honor.

25           MR. WISEMAN:  No, your Honor.

1          THE COURT:  Here on in the process, unless I hear a

2     challenge for cause, I will assume there are no additional

3     challenges for cause.  The first peremptory challenge is with

4     the government.

5          MR. HALES:  Yes, your Honor.  The United States would

6     like to thank and excuse Juror Number 1, Ms. Baker.

7          THE COURT:  Ms. Baker, thank you very much.  You're

8     excused.  Don't forget to make that call Friday after 5:00.

9          Call the next juror, please.

10         THE CLERK:  Christine Ringer, R-I-N-G-E-R.

11     Christine Ringer.

12         THE COURT:  Ms. Ringer, you can come around this side

13     here.  Do you have the microphone?  From where you were

14     seated in the back of the courtroom, did you hear the general

15     questions that I asked the other prospective jurors?

16         PROSPECTIVE JUROR:  Yes, I did.

17         THE COURT:  Would your answers to any of my general

18     questions be yes?

19         PROSPECTIVE JUROR:  The only one was I did work in a

20     financial institution.  I worked in the loan department of a

21     bank, but it's been 35 years, and it was auto loans only.

22         THE COURT:  Auto loans only?

23         PROSPECTIVE JUROR:  Yes.

24         THE COURT:  All right.  Then you may answer the

25     individual questions.

```
 1              PROSPECTIVE JUROR:  My name is Christine Ringer.  I'm

 2    a resident of Stockton, San Joaquin County.  I've lived there

 3    for about 42 years.  I'm a kindergarten teacher for Stockton

 4    Unified.  I've worked for them for 17 years.  My husband is

 5    Bill Ringer.  He is a CPA and tax attorney.  I have three

 6    children.  A daughter who lives in Southern California.  She

 7    works for Scott Boras Corp in HR.  My oldest son works for my

 8    husband's CPA firm.  And my youngest son is a baseball coach

 9    for Los Medanos Junior College.

10              THE COURT:  Now, in addition to being a CPA, you said

11    your husband is also an attorney.

12              PROSPECTIVE JUROR:  Yes, he is an attorney.

13              THE COURT:  If you're selected as a juror, I'm going

14    to instruct the jurors not to discuss the case or any issues

15    in the case with anyone, including your husbands and wives.

16    I'm assuming that you would follow the Court's instruction.

17    Beyond that, would you be sure not to discuss any of the

18    legal issues with your husband?

19              PROSPECTIVE JUROR:  I would not.

20              THE COURT:  All right.  Thank you.

21              PROSPECTIVE JUROR:  Prior service was on a jury maybe

22    40 years ago.  It was a civil case.  And they did reach a

23    verdict.

24              THE COURT:  Thank you.

25              Mr. Wiseman, do you have any questions for Ms. Ringer?
```

1              MR. WISEMAN:  Mrs. Ringer, I presume you heard my

2     question about whether you had experience with getting a

3     mortgage loan.

4              PROSPECTIVE JUROR:  Yes.

5              MR. WISEMAN:  Did you get a mortgage loan between 2006

6     and 2008?

7              PROSPECTIVE JUROR:  No, much longer ago.

8              MR. WISEMAN:  Much before that?

9              PROSPECTIVE JUROR:  Yes.

10             MR. WISEMAN:  Any refinancing during that period of

11    time?

12             PROSPECTIVE JUROR:  Yes.  Actually we did have

13    refinancing I think around -- I don't remember the year.

14    2005, somewhere around there possibly.

15             MR. WISEMAN:  Do you recall anything about that

16    refinance?  Well, let me ask it this way.  When you

17    refinanced, do you remember if it was a full doc loan where

18    you had to submit documents to the lender?

19             PROSPECTIVE JUROR:  I believe it was.

20             MR. WISEMAN:  It was a full doc loan.  And your

21    husband, does he practice both CPA work and as an attorney?

22             PROSPECTIVE JUROR:  Yes, he has.

23             MR. WISEMAN:  Does he do any criminal, for example,

24    criminal tax matters?  If you know?

25             PROSPECTIVE JUROR:  No.  I think it's mostly divorce.

1    Dividing up property and --

2          MR. WISEMAN:  That's worse.  Dividing up property and

3    that sort of thing.

4          PROSPECTIVE JUROR:  Yes.

5          MR. WISEMAN:  Okay.  And do you have occasion to

6    discuss with him the kinds of cases that he's working on?

7          PROSPECTIVE JUROR:  You don't know my husband.  He

8    never discusses his work, never.

9          MR. WISEMAN:  Okay.  And I do have just a couple

10   follow-ups about some of the topics I explored with some of

11   the other folks.  Do you have any problems with this notion

12   that the prosecution has the burden of going forward with

13   this case and proving Mr. Williams' guilt?

14         PROSPECTIVE JUROR:  No.

15         MR. WISEMAN:  You have no problems with the defense --

16   well, let me ask you, do you have any problems with the

17   defense not having to do anything in a criminal case?

18         PROSPECTIVE JUROR:  No.

19         MR. WISEMAN:  Okay.  And you had prior jury experience

20   in a civil case?

21         PROSPECTIVE JUROR:  Yes.

22         MR. WISEMAN:  Was there a verdict reached?

23         PROSPECTIVE JUROR:  Yes.

24         MR. WISEMAN:  Okay.  Thank you, your Honor.

25         THE COURT:  Mr. Hales, any questions?

 1                    MR. HALES:  Quickly, your Honor.

 2                    Ms. Ringer, you mentioned working I believe it was

 3      with auto loans?

 4                    PROSPECTIVE JUROR:  Yes.

 5                    MR. HALES:  What years was that?  That was a long time

 6      ago?

 7                    PROSPECTIVE JUROR:  35 years ago.

 8                    MR. HALES:  35 years ago.  When you were doing that,

 9      as long ago as it was, what was your role?

10                    PROSPECTIVE JUROR:  I was the one that took the

11      application from the auto dealer and passed it on to the loan

12      officer.

13                    MR. HALES:  I see.  How many years were you doing

14      that?

15                    PROSPECTIVE JUROR:  About five.

16                    MR. HALES:  And I know it's a long time ago, but I'm

17      trying to get a sense of how much you did.  I mean over those

18      years, what would you estimate ballpark the number of loans

19      you assisted with?

20                    PROSPECTIVE JUROR:  Oh, I can tell you on a daily

21      basis, there might be five to six loans per day.

22                    MR. HALES:  So it was busy?

23                    PROSPECTIVE JUROR:  Yes.

24                    MR. HALES:  There have been some questions about the

25      presumption of innocence and the fact that the government

 1    always has the burden in a criminal case.  If the government

 2    proves the defendant guilty beyond a reasonable doubt, would

 3    you hesitate to sign a verdict of guilty?

 4              PROSPECTIVE JUROR:  No.

 5              MR. HALES:  Thank you, your Honor.

 6              THE COURT:  The next peremptory challenge is with the

 7    defense.

 8              MR. WISEMAN:  The defense would like to thank and

 9    excuse Potential Juror Number 2, Mr. Bianchi-Rossi.

10              THE COURT:  All right.  Mr. Bianchi-Rossi, thank you.

11    You're excused.  Nice having you.

12              Call the next juror, please.

13              THE CLERK:  Inge Barsetti, B-A-R-S-E-T-T-I.  Inga

14    Barsetti.

15              THE COURT:  Good morning, Ms. Barsetti.

16              PROSPECTIVE JUROR:  How are you?

17              THE COURT:  I'm fine.  Take the microphone, please.

18    Did you hear my general questions to the other prospective

19    jurors?

20              PROSPECTIVE JUROR:  Yes, I did.

21              THE COURT:  And would your answers to any of those

22    questions be yes?

23              PROSPECTIVE JUROR:  Well, I don't know if this would

24    apply or not, but I have a nephew that works for the state,

25    department of insurance fraud.

```
 1              THE COURT:  All right.

 2              PROSPECTIVE JUROR:  I --

 3              THE COURT:  That's responsive to my question.  I don't

 4    think I need to know any more information about this.

 5              PROSPECTIVE JUROR:  Okay.  That's all.

 6              THE COURT:  Did you answer any of the other questions

 7    yes?

 8              PROSPECTIVE JUROR:  No.

 9              THE COURT:  Then you may answer the individual

10    questions.

11              PROSPECTIVE JUROR:  My name is Inge Barsetti, and I

12    live in San Joaquin County.  And I've been there about 21

13    years.  And I'm semi-retired.  I work at Macy's part-time in

14    Stockton.  And my husband's name is Jeffrey Barsetti, and

15    he's a farmer in Galt.  I have one daughter living in

16    Charlotte, North Carolina.  And she's a nurse.  And I did

17    have prior jury service in Stockton, San Joaquin County, and

18    it was a criminal case.  And there was a verdict.

19              THE COURT:  What was the nature of the charges?

20              PROSPECTIVE JUROR:  It was a murder charge.

21              THE COURT:  What did you do before your

22    semi-retirement?

23              PROSPECTIVE JUROR:  I worked for the Hertz Corporation

24    at the Sacramento International Airport.

25              THE COURT:  Thank you.
```

1          Mr. Wiseman, do you have any questions?

2          MR. WISEMAN:  Ma'am, in your employment with Macy's,

3     do you get any training into having to detect, let's say,

4     credit card fraud or ATM card fraud?  Are you trained in

5     anything like that, how to spot that?

6          PROSPECTIVE JUROR:  Not really.  When they scan the

7     credit card reader, the register will tell you if -- it

8     doesn't tell you that their account isn't any good.  It just

9     says the charge is not accepted, and then we just return it

10    back to them and say you need to please scan another credit

11    card or have a different form of payment.  And that's really

12    it.  So we really don't get into any personal.

13         MR. WISEMAN:  In your experience has that occurred

14    whereby you've accepted a card from a customer and it's been

15    rejected for whatever reason?

16         PROSPECTIVE JUROR:  Yes.

17         MR. WISEMAN:  Okay.  And my question about loans, did

18    you and your husband either refinance a loan or get a

19    mortgage loan between, let's say, 2008, 2006 and '8?

20         PROSPECTIVE JUROR:  Not at all, no.

21         MR. WISEMAN:  Did you ever get a mortgage loan?

22         PROSPECTIVE JUROR:  Years ago.  In 1977, I purchased a

23    house.  That was with my first husband.  And then I

24    remarried, and we purchased property in Galt.  That was back

25    in 1992, '93.

1              MR. WISEMAN:  And since then, you haven't refinanced

2      that property?

3              PROSPECTIVE JUROR:  No.

4              MR. WISEMAN:  You mentioned your husband is a farmer.

5              PROSPECTIVE JUROR:  Yes.

6              MR. WISEMAN:  What kind of crops does he raise?

7              PROSPECTIVE JUROR:  We raise cattle and then like game

8      birds, pheasants, chukars, quail.

9              MR. WISEMAN:  On the property that you own?

10             PROSPECTIVE JUROR:  On the property, yes.

11             MR. WISEMAN:  And do you do any of the bookkeeping or

12     any of the accounting for his business?

13             PROSPECTIVE JUROR:  No.

14             MR. WISEMAN:  Does he hire somebody to do that

15     separately?

16             PROSPECTIVE JUROR:  Absolutely, yes.

17             MR. WISEMAN:  Okay.  And you mentioned that you were

18     on a jury at one point; correct?

19             PROSPECTIVE JUROR:  Yes.

20             MR. WISEMAN:  How long ago was that?

21             PROSPECTIVE JUROR:  Actually, I was the alternate.

22             MR. WISEMAN:  You were an alternate?

23             PROSPECTIVE JUROR:  Yes.

24             MR. WISEMAN:  As an alternate, did you participate in

25     deciding the case?

1          PROSPECTIVE JUROR:  No, I was not allowed to

2     deliberate.  The 12 jurors did that.  And so I was not

3     allowed to be in the deliberation room.  So I was just kind

4     of more or less dismissed, and the 12 jurors came to a

5     verdict.

6          MR. WISEMAN:  I understand.

7          PROSPECTIVE JUROR:  I was not allowed.

8          MR. WISEMAN:  You were not allowed?

9          PROSPECTIVE JUROR:  Correct.

10          MR. WISEMAN:  And in that case, did the person who was

11     accused, did he or she take the stand?

12          PROSPECTIVE JUROR:  Yes, he did.

13          MR. WISEMAN:  And testified; correct?

14          PROSPECTIVE JUROR:  He testified, yes.

15          MR. WISEMAN:  Okay.  But there was a verdict

16     eventually in the case?

17          PROSPECTIVE JUROR:  Yes.

18          MR. WISEMAN:  Okay.  Was there anything about the case

19     that, in your experience with that particular case, that

20     would sway you one way or the other in this particular case

21     if you were chosen as a juror?  In other words, would you

22     have more sympathy for the prosecution or more sympathy for

23     the defense?

24          PROSPECTIVE JUROR:  No.

25          MR. WISEMAN:  Okay.  And you believe that sitting as a

1    juror, you were evaluating the evidence neutrally?

2              PROSPECTIVE JUROR:  Yes, absolutely.

3              MR. WISEMAN:  Okay.  No further questions.  Thank you,

4    your Honor.

5              THE COURT:  Mr. Hales, do you have any questions?

6              MR. HALES:  No, your Honor.

7              THE COURT:  The next peremptory challenge is with the

8    government.

9              MR. HALES:  Pass, your Honor.

10             THE COURT:  The challenge is with the defense.

11             MR. WISEMAN:  Your Honor, the defense would like to

12   thank and excuse Potential Juror Number 10, Mrs. Macias.

13             THE COURT:  Ms. Macias, thank you very much for

14   coming.  You're excused.

15             Call the next juror, please.

16             THE CLERK:  Nadine DeBoard, D-E-B-O-A-R-D.

17   Nadine DeBoard.

18             THE COURT:  Ms. DeBoard, good morning.

19             PROSPECTIVE JUROR:  Good morning.

20             THE COURT:  Do you have the microphone?

21             PROSPECTIVE JUROR:  Now.

22             THE COURT:  You do.  Good.  Did you hear my general

23   questions?

24             PROSPECTIVE JUROR:  Yes, I did.

25             THE COURT:  Would your answers to any of those general

1    questions be yes?

2              PROSPECTIVE JUROR:  Yes.

3              THE COURT:  Which ones?

4              PROSPECTIVE JUROR:  A few of them.

5              THE COURT:  All right.  Let's start at the beginning.

6              PROSPECTIVE JUROR:  I am a current service manager,

7    basically operations manager for Wells Fargo Bank, so I am

8    involved in loans.

9              THE COURT:  Tell me what you do in connection with

10   loans.

11             PROSPECTIVE JUROR:  I can gather all the information,

12   such as statements, checks, the documentation required for a

13   loan to go through.  I can place them on the system, and then

14   it's up to underwriting to finish them.

15             THE COURT:  Where do you get the information that you

16   put into the system?

17             PROSPECTIVE JUROR:  From the customer.

18             THE COURT:  Directly?

19             PROSPECTIVE JUROR:  Directly from the customer.

20             THE COURT:  Do you deal with any mortgage brokers?

21             PROSPECTIVE JUROR:  No, I don't.

22             THE COURT:  And then who makes the decision whether to

23   approve the loan?

24             PROSPECTIVE JUROR:  That would be underwriting.

25             THE COURT:  Do you interact with the people in

1    underwriting at all?

2            PROSPECTIVE JUROR:  I do.  I act as the go-between.

3            THE COURT:  So there may be a question from one of

4    those in underwriting, and then you'll take it back to the

5    borrower?

6            PROSPECTIVE JUROR:  Correct, unless they will deal

7    directly with the borrower.

8            THE COURT:  Do they do that from time to time?

9            PROSPECTIVE JUROR:  They do that, yes.

10           THE COURT:  Now, how long have you been doing this?

11           PROSPECTIVE JUROR:  Ten years.

12           THE COURT:  Ten years.  Okay.  Going back to like

13   2003?

14           PROSPECTIVE JUROR:  July 2nd of 2004.

15           THE COURT:  Have there been any notable changes in the

16   process that Wells Fargo has used in processing home loans

17   during the period of time that you've been involved with it?

18           PROSPECTIVE JUROR:  Oh, yeah.  There's been a lot of

19   changes.

20           THE COURT:  All right.  Essentially, were there

21   differences between the process before that period of time

22   that you heard Mr. Wiseman ask about, 2006, 2008?

23           PROSPECTIVE JUROR:  Yes.

24           THE COURT:  Tell us about those.

25           PROSPECTIVE JUROR:  The difference between stated

1    income and documented income.  The type of documentation that

2    you have to acquire.

3            THE COURT:  Was there such a thing as a stated income

4    loan before that period of time in 2006?

5            PROSPECTIVE JUROR:  They did do stated income loans.

6            THE COURT:  So what were the changes then?

7            PROSPECTIVE JUROR:  You can no longer do stated

8    income.

9            THE COURT:  No.  Now you can no longer do it.

10           PROSPECTIVE JUROR:  Now you can no longer.

11           THE COURT:  I'm talking about the changes between

12   before that period of time that Mr. Wiseman was talking

13   about, 2006, 2008, and that period.

14           PROSPECTIVE JUROR:  That was right at the height of

15   the market.  At that point I was just going into it, that

16   portion of it.

17           THE COURT:  So you're not really familiar with how it

18   was before that period?

19           PROSPECTIVE JUROR:  No, I didn't get into it until

20   afterwards.

21           THE COURT:  All right.  So when you got into it, there

22   were such a thing as stated income loans?

23           PROSPECTIVE JUROR:  Yes.

24           THE COURT:  And full documentation loans?

25           PROSPECTIVE JUROR:  Full documentation loans.

1          THE COURT:  And other types, I imagine.

2          PROSPECTIVE JUROR:  Yes.

3          THE COURT:  Other packages that the bank would sell;

4    right?

5          PROSPECTIVE JUROR:  Correct.

6          THE COURT:  And you, though, dealt directly with the

7    borrowers?

8          PROSPECTIVE JUROR:  Yes.

9          THE COURT:  So you didn't get those people from a

10   mortgage broker.  They walked into the bank and said they

11   wanted a loan?

12         PROSPECTIVE JUROR:  Yes.  We still currently do, but

13   you have to be certified now to be able to do that.

14         THE COURT:  Did you get involved with anything that

15   happened after the loan was made?

16         PROSPECTIVE JUROR:  No.

17         THE COURT:  Do you know what happened with those loans

18   after they were made?

19         PROSPECTIVE JUROR:  Once the documentation was drawn

20   up, it just had to be signed and notarized and processed.

21         THE COURT:  Do you know if the loans were sold to

22   somebody else?

23         PROSPECTIVE JUROR:  No.

24         THE COURT:  You don't know?

25         PROSPECTIVE JUROR:  No.

1          THE COURT:  All right.  That's all I need to know.

2     What's the next question you answered yes?

3          PROSPECTIVE JUROR:  I can't remember if you said the

4     address was on Woodforest or Forestwood.  I think you said it

5     was Forestwood.  That was actually right around the corner

6     from where I used to live.

7          THE COURT:  Okay.  Let's take a look at it here.  5548

8     Woodforest Drive.

9          PROSPECTIVE JUROR:  Yeah, I lived on Eastridge Drive,

10    right around the corner.

11         THE COURT:  Did you ever see that property go up for

12    sale?

13         PROSPECTIVE JUROR:  No.  I had actually moved.  Well,

14    I moved in 2006, and I had my home foreclosed on on Eastridge

15    in 2008.

16         THE COURT:  Okay.  This allegedly occurred between

17    October of 2006 and August 1st, 2008.  Were you living there

18    during that time?

19         PROSPECTIVE JUROR:  I was not living there.  I did own

20    my home there though.

21         THE COURT:  Do you know anything about that property

22    other than the fact that it was there?

23         PROSPECTIVE JUROR:  Yes.

24         THE COURT:  For example, you didn't know the people

25    who lived there?

1                PROSPECTIVE JUROR:  No.

2                THE COURT:  All right.  Okay.  Next question.

3                PROSPECTIVE JUROR:  My husband's entire side of his

4     family is law enforcement, including my husband.

5                THE COURT:  What does he do?

6                PROSPECTIVE JUROR:  He is State of California

7     Department of Corrections.

8                THE COURT:  Now, as a result of your husband's

9     occupation and the other folks on his side of the family

10    being involved in law enforcement, do you think that you

11    could consider the testimony of a law enforcement officer by

12    the same standards that you consider the testimony any other

13    witness or would you give it more weight?

14               PROSPECTIVE JUROR:  No, it would be equal.

15               THE COURT:  You'd treat them just the same as any

16    other witness?

17               PROSPECTIVE JUROR:  Yes.

18               THE COURT:  All right.  Any other questions you

19    answered yes?

20               PROSPECTIVE JUROR:  I had a foreclosure.

21               THE COURT:  You had a foreclosure.

22               PROSPECTIVE JUROR:  Yes, I did have a foreclosure.

23    Mine at the time was done on stated income.  Long situation

24    but --

25               THE COURT:  Well, did it reach a point where you

1    couldn't make the payments anymore or did it just reach a

2    point where you said this property isn't worth it?

3                PROSPECTIVE JUROR:  No.  I actually floated three

4    mortgages, a first, a second, and my current home that I live

5    in.  I live in El Dorado County.  I purchased the home back

6    in 2006, moved because of my husband's job.  It was a

7    situation where the Realtor whose wife worked for another

8    mortgage company, we took out a second on our home, purchased

9    the home we're currently in, and then all three of them just

10   up and disappeared once my home was purchased.

11               THE COURT:  Who disappeared?

12               PROSPECTIVE JUROR:  The Realtors.  The only person I

13   ever heard from was the person that I took my second out on

14   from my home.  The original real estate, the gentleman that

15   put our house up on the market and sold me my current home.

16               THE COURT:  He disappeared after the house was sold?

17               PROSPECTIVE JUROR:  No, he disappeared when I

18   purchased my home.  So he never sold my original home.  I

19   basically kept it as long as I possibly could.

20               THE COURT:  Why didn't you put it up for sale with

21   somebody else?

22               PROSPECTIVE JUROR:  I did, and it was right at the

23   market crash and everything else.  I just couldn't float

24   three mortgages anymore.

25               THE COURT:  Okay.  I understand.  All right.  Did you

1    answer any of the other questions yes?

2          PROSPECTIVE JUROR:  I'm currently on vacation, and I

3    have a camping trip planned for the week of the 14th.

4          THE COURT:  The week of the 14th?

5          PROSPECTIVE JUROR:  Yes.

6          THE COURT:  We're not in session the week of the 14th.

7          PROSPECTIVE JUROR:  That's right.  I apologize.

8          THE COURT:  When do you come back?

9          PROSPECTIVE JUROR:  I will be back on the 21st.

10          THE COURT:  You'll be here on the 21st?

11          PROSPECTIVE JUROR:  I'll be back here on the 21st.

12          THE COURT:  Perfect.  You can just assume that we took

13    the break for you.

14          PROSPECTIVE JUROR:  And that was it.

15          THE COURT:  All right.  The lawyers may have some

16    additional questions about those issues, but I don't.  So you

17    may answer the individual questions.  They're on the screen.

18          PROSPECTIVE JUROR:  Oh, sorry.  I live in El Dorado

19    County.  I have lived in El Dorado County for eight years.

20    My current occupation is a service/operations manager for

21    Wells Fargo Bank.  I've been employed there for ten years.

22    My husband, Daniel DeBoard, works for the California

23    Department of Corrections as a correctional officer.  I have

24    two girls.  One is a supervisor for Ross department store.

25    The other one will be a senior in high school.  I have been

 1    called for jury duty, but I have never served.

 2            THE COURT:  Thank you.

 3            Mr. Wiseman, you may proceed with your questions.

 4            MR. WISEMAN:  Mrs. DeBoard, you've mentioned that you

 5    work in the loan business with Wells Fargo Bank for a number

 6    of years.

 7            PROSPECTIVE JUROR:  I have, yes.

 8            MR. WISEMAN:  And Judge Shubb asked you about the

 9    types of loans, and you mentioned something about a stated

10    income loan; right?

11            PROSPECTIVE JUROR:  (Nods head.)

12            MR. WISEMAN:  And during the time that you worked for

13    Wells Fargo, did Wells Fargo offer stated income loans?

14            PROSPECTIVE JUROR:  No.

15            MR. WISEMAN:  Do you recall when Wells Fargo stopped

16    offering stated income?

17            PROSPECTIVE JUROR:  As long as I've worked there, I

18    have never seen anybody actually do a stated income loan in

19    the branch that I had worked at.

20            MR. WISEMAN:  In the branch.  But did you know whether

21    Wells Fargo, let's say back in 2004, offered those kinds of

22    loans?

23            PROSPECTIVE JUROR:  I wouldn't be able to tell you

24    that information.

25            MR. WISEMAN:  Do you know what a stated income is?

1          PROSPECTIVE JUROR:  Yes, I do.

2          MR. WISEMAN:  And just generally tell us what your

3     understanding of that is.

4          PROSPECTIVE JUROR:  You basically state what your

5     income is.  You can inflate your income without having to

6     show proof of what you actually make.

7          MR. WISEMAN:  And that's the difference between a full

8     doc loan where you've got to document --

9          PROSPECTIVE JUROR:  Correct.  Statements, checks,

10    canceled checks, transfers.

11         MR. WISEMAN:  And do you -- in your profession, has

12    anybody, management or compliance, ever told you why

13    Wells Fargo doesn't offer stated income loans?

14         PROSPECTIVE JUROR:  No.  I'm assuming so they don't

15    get into any trouble, because if you do a stated income loan,

16    you're setting a person up to fail if they can't cover the

17    loan.

18         MR. WISEMAN:  Okay.  And so the idea is, if I

19    understand what you're saying, is that the problem with the

20    stated income loan is that since there's no verification,

21    there's no proof, there's a risk that the borrower may not be

22    able to make the payments?

23         PROSPECTIVE JUROR:  Correct.  Risk their credit, also

24    to the bank that puts out the loan.

25         MR. WISEMAN:  Do you have any colleagues who are

1    familiar with -- let me ask it differently.  Do you have any

2    colleagues who presently do stated income loans?

3              PROSPECTIVE JUROR:  No.

4              MR. WISEMAN:  Have you had any acquaintances,

5    professional acquaintances, that have done those types of

6    loans?

7              PROSPECTIVE JUROR:  No.

8              MR. WISEMAN:  Okay.  And you mentioned about the sort

9    of the change in the real estate market.  When do you recall

10   that occurring?

11             PROSPECTIVE JUROR:  Right after the housing crash.  It

12   was 2007, 2008, and there were a lot of changes that were

13   made.  I know ourselves with the bank, we had to get

14   certified to be able to even do loans.  And certain bankers

15   can't even touch them.  They have to refer them on to people

16   that are certified.

17             MR. WISEMAN:  So is it fair to say then, as a result

18   of the real estate crash, the lending criteria have tightened

19   up?

20             PROSPECTIVE JUROR:  Yes.

21             MR. WISEMAN:  Okay.  So before the crash, it was sort

22   of looser standards that banks, let's say Wells Fargo used?

23             PROSPECTIVE JUROR:  Well, I wouldn't say necessarily

24   that Wells Fargo used.  They've been pretty tight that I know

25   of.  But yes, in general, yes, they were a lot looser.

```
 1              MR. WISEMAN:  A lot looser.  Okay.  Okay.

 2         Thank you, your Honor.

 3              THE COURT:  Mr. Hales, any questions?

 4              MR. HALES:  Just one question, your Honor.

 5              Ms. DeBoard, there may be a witness in this case who

 6    is from the California Department of Corrections, a

 7    corrections officer.  Given your husband's job, would you

 8    give that person's testimony any greater weight or any less

 9    weight in this case or would you look at it like any other

10    witness?

11              PROSPECTIVE JUROR:  No, just like any other person.

12              MR. HALES:  Thank you.

13              THE COURT:  Any challenge for cause?

14              MR. WISEMAN:  No, your Honor.

15              THE COURT:  The next peremptory challenge is with the

16    defense.

17              MR. WISEMAN:  May I have a moment, your Honor?

18              THE COURT:  Yes.

19              MR. WISEMAN:  Your Honor, the defense would like to

20    thank and excuse Mr. Tran.

21              THE COURT:  Mr. Tran, thank you.  You're excused.

22         Call the next juror, please.

23              THE CLERK:  Lloyd Irwin, I-R-W-I-N.  Lloyd Irwin.

24              THE COURT:  Mr. Irwin, good morning.

25              PROSPECTIVE JUROR:  Good morning.
```

1          THE COURT:  Did you hear my general questions?

2          PROSPECTIVE JUROR:  Yes, I did.

3          THE COURT:  Would your answers to any of my general

4    questions be yes?

5          PROSPECTIVE JUROR:  Yes on a couple of them.

6          THE COURT:  All right.  Which ones?

7          PROSPECTIVE JUROR:  The first one is on hardship.  My

8    16-year-old daughter suffers from depression.  She's under

9    psychiatric and psychology care.  She's been hospitalized

10   twice in the past two years under Health and Safety 5150.

11   Today one of my older sons is taking care of her, but he has

12   a trip planned in the middle of the month to go back to visit

13   his mother in New Jersey, and there's really no one else that

14   can watch her.

15         THE COURT:  All right.  I'll excuse you.  Thank you.

16         PROSPECTIVE JUROR:  Thank you.

17         THE COURT:  Call the next juror, please.

18         THE CLERK:  Stacey Bush, B-U-S-H.  Stacey Bush.

19         THE COURT:  Ms. Bush, good afternoon.

20         PROSPECTIVE JUROR:  Good afternoon.

21         THE COURT:  Did you hear my general questions?

22         PROSPECTIVE JUROR:  Yes.

23         THE COURT:  Would your answers to any of my general

24   questions be yes?

25         PROSPECTIVE JUROR:  No.

1           THE COURT:  You answered all of them in the negative?

2           PROSPECTIVE JUROR:  Yes.

3           THE COURT:  Very well then.  You may answer the

4      individual questions.

5           PROSPECTIVE JUROR:  My name is Stacey Bush.  I live in

6      Butte County in the town of Paradise, and I've been there

7      about 27 years.  I'm a self-employed housekeeper, but I've

8      had many jobs in the past.  I've bought oil and gas leases.

9      I've worked on three horse ranches.  I worked for a defense

10     plant.  And I've never been married.  No children.  And I

11     have served on a former jury trial in Santa Barbara County,

12     and I don't think they ever came to a conclusion.

13          THE COURT:  Were you a juror or an alternate?

14          PROSPECTIVE JUROR:  I was a juror.

15          THE COURT:  When you say you don't think they came to

16     a conclusion, do you remember --

17          PROSPECTIVE JUROR:  I think it was a hung jury.

18          THE COURT:  Hung jury.  All right.  Couldn't reach

19     unanimous agreement on a verdict?

20          PROSPECTIVE JUROR:  That's correct.

21          THE COURT:  You've bought oil and gas leases.  Have

22     you ever bought real property as an investment?

23          PROSPECTIVE JUROR:  No, sir.

24          THE COURT:  Thank you.

25          Any questions, Mr. Wiseman?

```
1              MR. WISEMAN:  Thank you, your Honor.

2              Ma'am, you said that you've purchased oil and gas

3      leases?

4              PROSPECTIVE JUROR:  Yes, sir.

5              MR. WISEMAN:  And do these leases pay a royalty on a

6      regular basis?

7              PROSPECTIVE JUROR:  Yes, they do.

8              MR. WISEMAN:  And these leases are -- where are the

9      actual wells?

10             PROSPECTIVE JUROR:  It was in the Eastern Overthrust

11     Belt in Georgia, Tennessee, in that area.

12             MR. WISEMAN:  Do you presently own those leases?

13             PROSPECTIVE JUROR:  No.

14             MR. WISEMAN:  Okay.  And when did you, when did you --

15             PROSPECTIVE JUROR:  About 1981.

16             MR. WISEMAN:  You sold them or transferred them or --

17             PROSPECTIVE JUROR:  I believe the leases were

18     transferred to other oil companies eventually.

19             MR. WISEMAN:  And do you still get revenue from those

20     leases at all?

21             PROSPECTIVE JUROR:  No.

22             MR. WISEMAN:  Okay.  And you said that you're a

23     current housekeeper.  Do you work for other folks then in the

24     community?

25             PROSPECTIVE JUROR:  Yes, individuals.
```

1          MR. WISEMAN:  Is that a full-time position?

2          PROSPECTIVE JUROR:  No, part-time.

3          MR. WISEMAN:  Okay.  And just briefly, the questions I

4     asked from the panel earlier about the idea of a presumption

5     of innocence, do you have any concerns about that if you sat

6     as a juror if you're told that the defendant in any criminal

7     case is presumed to be innocent?  Do you have any issues with

8     that?

9          PROSPECTIVE JUROR:  No, sir.

10          MR. WISEMAN:  And your prior jury experience was on a

11     criminal case?

12          PROSPECTIVE JUROR:  Yes.  Assault with intent to rape.

13          MR. WISEMAN:  And your recollection is that that was a

14     hung jury?

15          PROSPECTIVE JUROR:  I believe it was.

16          MR. WISEMAN:  Okay.  Without going into details, the

17     jury deliberations, were they contentious, did you feel at

18     all?

19          PROSPECTIVE JUROR:  I wouldn't say so.

20          MR. WISEMAN:  It's just that you all couldn't come up

21     with a verdict?

22          PROSPECTIVE JUROR:  Right.  I think one person pretty

23     much held out and just maintained that presumption throughout

24     and would not waver.

25          MR. WISEMAN:  And did you have any concerns or

1    problems with that particular person who was the holdout on

2    the jury?  Did you think this was unfair or do you think they

3    shouldn't have held out?  Do you have any problems with that?

4            PROSPECTIVE JUROR:  Possibly.

5            MR. WISEMAN:  What do you mean by possibly?

6            PROSPECTIVE JUROR:  Well, I wasn't sure that the

7    reason for the holdout was something personal and not

8    actually viewing the facts of the case as should have been

9    done.

10           MR. WISEMAN:  Do you understand that that's the right

11   of a juror sitting on a jury?

12           PROSPECTIVE JUROR:  Absolutely.

13           MR. WISEMAN:  You don't have any problems with the

14   fact that a juror can say I don't want to vote this way or I

15   don't want to vote that way; correct?

16           PROSPECTIVE JUROR:  No.

17           MR. WISEMAN:  No issues with that.  Okay.  Do you have

18   any friends, for example, who are in law enforcement?

19           PROSPECTIVE JUROR:  No, sir.

20           MR. WISEMAN:  Have you had any -- well, you've already

21   answered that question.

22           Okay, your Honor.  Thank you.  I'm satisfied.

23           THE COURT:  Mr. Hales, any questions?

24           MR. HALES:  No, your Honor.  Thank you.

25           THE COURT:  The next peremptory challenge is with the

 1    government.

 2            MR. HALES:  Pass, your Honor.

 3            THE COURT:  The next challenge is with the defense.

 4            MR. WISEMAN:  Your Honor, the defense would like to

 5    thank and excuse Potential Juror Number 10, Ms. DeBoard.

 6            THE COURT:  Ms. DeBoard, thank you.  You're excused.

 7            We may have time to get to one more before I have to

 8    take the noon recess.  Fill that seat, please.

 9            THE CLERK:  Robert Rhoades, R-H-O-A-D-E-S.

10    Robert Rhoades.

11            THE COURT:  Good morning, Mr. Rhoades.

12            PROSPECTIVE JUROR:  Good morning.

13            THE COURT:  Did you hear my general questions?

14            PROSPECTIVE JUROR:  Yes.

15            THE COURT:  Would your answers to any of my general

16    questions be yes?

17            PROSPECTIVE JUROR:  The only one was on a home loan

18    that I had.

19            THE COURT:  You had a home loan?

20            PROSPECTIVE JUROR:  Correct.

21            THE COURT:  I don't think that was one of my

22    questions.  Was it foreclosed on?

23            PROSPECTIVE JUROR:  No.

24            THE COURT:  So you had a home loan.  Still have it?

25            PROSPECTIVE JUROR:  Yes and no.

1          THE COURT:  What happened?

2          PROSPECTIVE JUROR:  Going through a divorce.  That's a

3    property issue.

4          THE COURT:  Okay.  All right.  Then you may answer the

5    individual questions.

6          PROSPECTIVE JUROR:  My name is Robert Rhoades.  I live

7    in Shasta County, in Redding, four years, five years.

8    Occupation, I'm retired with a -- I'm no longer retired.  I

9    went back to teaching.  I have been a teacher for 47 years,

10   45 of which was in Southern California.  And I retired, came

11   up here and retired for two years, went back to Shasta

12   College and am teaching part-time at Shasta College.

13   Significant others, no.  I do have three children, adult

14   children.  One, a daughter that is an insurance salesman.  A

15   son that is a warehouseman for Coors.  And the third one, a

16   son that -- all I can say is a son.  Prior jury service, yes,

17   in San Diego County, federal, and yes, we did reach a

18   verdict.

19         THE COURT:  Was the case in San Diego County a

20   criminal case?

21         PROSPECTIVE JUROR:  Federal criminal, yes.

22         THE COURT:  Federal criminal case.  What were the

23   charges?

24         PROSPECTIVE JUROR:  It was U.S. District Court versus

25   a lawyer, and it was on property issues.

1          THE COURT:  Was it a civil case or a criminal case?

2          PROSPECTIVE JUROR:  Criminal.  I say criminal, but --

3          THE COURT:  But the defendant was a lawyer?

4          PROSPECTIVE JUROR:  Right.

5          THE COURT:  What was the allegation?

6          PROSPECTIVE JUROR:  That he had gone through a divorce

7    and had moved his property, put it into a trust, and part of

8    his property or part of his living trust was buying materials

9    in Europe.

10          THE COURT:  I see.  All right.  How long ago was that?

11          PROSPECTIVE JUROR:  2007, 2008.

12          THE COURT:  I can't tell exactly from your description

13   what the charges were.  You heard the indictment read here,

14   and I explained that the charges are mail and wire fraud and

15   what is referred to as money laundering.  I will instruct the

16   jury at the end of the trial as to the applicable law that

17   pertains to these charges.  If the instructions that I give

18   may sound different than the instructions that you received

19   in that other case, would you be able to set aside your

20   recollection of what you heard in that other case and follow

21   the law as I give it to you in this case?

22          PROSPECTIVE JUROR:  Yes, I can.

23          THE COURT:  All right.  I'm going to stop here because

24   we do need to take a break, and I want to just give a few

25   instructions to those of you in the jury box and the rest of

1    you in the back of the courtroom as to how to conduct

2    yourself during this break because we've gotten into the jury

3    selection process, and I don't want any of you to do anything

4    that would compromise your ability to serve as a fair juror

5    if you are selected.

6          So for those reasons, during this recess, I'm

7    instructing everyone who is a potential juror not to discuss

8    the case or anything that you may think is at issue in the

9    case with any of the other prospective jurors or with anyone

10   else.

11         I'm also instructing you, as we did at the last break,

12   not to talk to any of the lawyers or the parties about any

13   subject.

14         And the third instruction that I'm giving you during

15   this recess is not to seek or receive any information about

16   anything that you might think is an issue in the case.

17         Now, if you're selected as a juror in the case, I will

18   give the jury an admonition in more particular terms as to

19   what that means.  But if you have an iPhone or an iPad or

20   something like that, during the break it's very important

21   that you not use that to go out and obtain information about

22   anything having to do with the case, whether it has to do

23   with who the lawyers are or any of the things that you might

24   think are issues in the case.  Do not seek or receive any

25   information from any source about any of the issues in this

1       case or the parties in the case during this recess.

2              I'm also asking you to look on both sides again, and

3       there are fewer seats occupied, of course, so see who is

4       present.  And then when we come back at 2:00 o'clock, 2:00

5       o'clock, we'll resume with this selection process.

6              Again, take your books with you but keep them.  I

7       don't want to hear anybody tell me they didn't bring their

8       book back to court.  That's important.  So at 2:00 o'clock,

9       you be at this door, and we'll resume with this process.

10             (Lunch recess taken at 11:49 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1                    SACRAMENTO, CALIFORNIA

 2              TUESDAY, JULY 8, 2014, 2:00 P.M.

 3                         ---oOo---

 4         (Jury panel present.)

 5         THE COURT:  The defendant is present with counsel.

 6    Let me take my informal roll call of the jury again.  All of

 7    the jurors appear in the box.  Would you please look around

 8    and see if there's anybody missing, any empty seats that were

 9    filled before you took the last break?  If so, let me know.

10    All right.  It appears that everybody is present.

11              Mr. Wiseman, do you have any questions for

12    Mr. Rhoades?

13              MR. WISEMAN:  Yes.  Thank you, your Honor.

14              Good afternoon, Mr. Rhoades.  You mentioned earlier

15    that you retired up to Northern California from Southern

16    California?

17              PROSPECTIVE JUROR:  Right.

18              MR. WISEMAN:  And you had a long teaching career in

19    Southern California?

20              PROSPECTIVE JUROR:  Right.

21              MR. WISEMAN:  What subjects did you teach?

22              PROSPECTIVE JUROR:  Math, any level you want.

23              MR. WISEMAN:  Now, you taught math.  In like high

24    school, junior high, what?

25              PROSPECTIVE JUROR:  Lowest level was sixth grade all

1    the way to twelfth grade, and then I moonlighted at the

2    junior college in Imperial Valley.

3            MR. WISEMAN:  So you moved up to Redding after you

4    retired down in Southern California.  And did I hear you

5    correctly that you're presently teaching part-time at Shasta?

6            PROSPECTIVE JUROR:  Shasta College, yes.

7            MR. WISEMAN:  Likewise math?

8            PROSPECTIVE JUROR:  Right.

9            MR. WISEMAN:  And you've never had -- you've had that

10   federal, you recall federal jury experience, and that was in

11   San Diego?

12           PROSPECTIVE JUROR:  Right.

13           MR. WISEMAN:  Do you recall that was a criminal case?

14           PROSPECTIVE JUROR:  Well, what it was is the United

15   States versus the lawyer because he was -- they were saying

16   he moved his money to Europe.

17           MR. WISEMAN:  Okay.  And there was a verdict in that

18   case?

19           PROSPECTIVE JUROR:  Yes, there was a verdict.

20           MR. WISEMAN:  Okay.  And you mentioned in response to

21   a question by Judge Shubb, you said something about a

22   mortgage, that you're going through a dissolution and you're

23   dealing with property?

24           PROSPECTIVE JUROR:  Property issues, yes.

25           MR. WISEMAN:  And when did you first get the mortgage

1     for that particular property?

2            PROSPECTIVE JUROR:  1976.

3            MR. WISEMAN:  And had you refinanced it at any time?

4            PROSPECTIVE JUROR:  No.

5            MR. WISEMAN:  Okay.  So it was the original mortgage

6     that you had?

7            PROSPECTIVE JUROR:  (Nods head.)

8            MR. WISEMAN:  And was the mortgage paid off at some

9     point or do you and your wife still owe on it?

10           PROSPECTIVE JUROR:  I can't tell you.  Supposedly it

11    is, but I don't have any information that says it's been paid

12    off.

13           MR. WISEMAN:  Okay.  And during the course of you

14    having the mortgage and making your mortgage payments, did

15    you have any need to talk to the bank or the lending

16    institution, anything about the mortgage?

17           PROSPECTIVE JUROR:  No.  We did refinance one time so

18    we could put in improvements around the house, block fence

19    and so forth.

20           MR. WISEMAN:  And do you remember when you did that

21    refinance?

22           PROSPECTIVE JUROR:  I would say middle '80s.

23           MR. WISEMAN:  Middle '80s.  Okay.  So you've had --

24    well, let me ask this last question.  Have you had any -- let

25    me put it this way.  Let's say in the middle, from 2006 to

1   let's say 2009, had you had any need to borrow money for

2   whatever reason from any institution?

3            PROSPECTIVE JUROR:  No.

4            MR. WISEMAN:  So you haven't had any experience doing

5   that.  Okay.  Thank you, your Honor.

6            THE COURT:  Mr. Hales, any questions?

7            MR. HALES:  No, your Honor.

8            THE COURT:  The next peremptory challenge is with the

9   defense.

10           MR. WISEMAN:  Your Honor, the defense would like to

11  thank and excuse Potential Juror Number 1, Ms. Ringer.

12           THE COURT:  Ms. Ringer, thank you.  You're excused.

13           Call the next juror, please.

14           THE CLERK:  Nadine Murphy, M-U-R-P-H-Y.  Nadine

15  Murphy.

16           THE COURT:  Good afternoon, Ms. Murphy.

17           PROSPECTIVE JUROR:  Good afternoon.

18           THE COURT:  Hope you had a nice lunchtime.  It's a

19  little warm out there.  Did you hear my general questions to

20  the other prospective jurors?

21           PROSPECTIVE JUROR:  Yes, I did.

22           THE COURT:  Would your answers to any of those

23  questions be yes?

24           PROSPECTIVE JUROR:  Yes, they are.

25           THE COURT:  Which ones?

1              PROSPECTIVE JUROR:  Purchasing real estate for

2    investment purposes.

3              THE COURT:  You've done that?

4              PROSPECTIVE JUROR:  Yes.

5              THE COURT:  How many times?

6              PROSPECTIVE JUROR:  Eight.

7              THE COURT:  All right.  Tell us about it.

8              PROSPECTIVE JUROR:  Well, my husband and I decided,

9    since we're both self-employed, that we need to find a way to

10   build our own retirement, and we're doing it through real

11   estate.

12             THE COURT:  How long ago did you start investing in

13   real estate?

14             PROSPECTIVE JUROR:  Early '80s.

15             THE COURT:  All right.  And has it always been

16   profitable or has there been a period or periods of time when

17   it was not?

18             PROSPECTIVE JUROR:  No, profitable.

19             THE COURT:  Profitable.  What type of real estate do

20   you invest in?

21             PROSPECTIVE JUROR:  Single-family residences.

22             THE COURT:  And then you have somebody rent them?

23             PROSPECTIVE JUROR:  We do it ourselves.

24             THE COURT:  You do it yourselves.  And if there's

25   repairs, you have somebody take care of that?

1                PROSPECTIVE JUROR:  My husband's a general contractor,

2      so it falls on him.

3                THE COURT:  All right.  And have you had to take out

4      loans in order to make the purchases?

5                PROSPECTIVE JUROR:  Yes.

6                THE COURT:  Do you do that through a mortgage broker

7      or directly through a bank or how do you do it?

8                PROSPECTIVE JUROR:  I've done it through my bank.

9                THE COURT:  Through you're bank.  And which is your

10     bank?

11               PROSPECTIVE JUROR:  Wells Fargo.

12               THE COURT:  Have you made all of the loans through the

13     Wells Fargo bank?

14               PROSPECTIVE JUROR:  No.  Also Bank of America.

15               THE COURT:  Have you had any bad experiences in

16     dealing with either of those banks in connection with the

17     loans?

18               PROSPECTIVE JUROR:  No.

19               THE COURT:  All right.  You've heard references to

20     different types of loans.  Do you know what type loans they

21     were?

22               PROSPECTIVE JUROR:  We've done both.

23               THE COURT:  Okay.  There's one type where you don't

24     have to produce any papers or show any income.

25               PROSPECTIVE JUROR:  Correct.

1           THE COURT:  How many times have you done that?

2           PROSPECTIVE JUROR:  I don't know for sure.  But I'd

3    say in the late '80s and '90s, it was pretty much no

4    documentation needed because of the relationship we had with

5    our bankers.

6           THE COURT:  All right.  Is there any difference in the

7    experience that you've had with the bank between different

8    types of loans?  Has one been easier, harder?

9           PROSPECTIVE JUROR:  Having to produce the

10   documentation is a lot harder.  Just tedious.

11          THE COURT:  Have you ever borrowed a hundred percent

12   of the purchase price?

13          PROSPECTIVE JUROR:  Yes.

14          THE COURT:  How many times?

15          PROSPECTIVE JUROR:  Four.

16          THE COURT:  And have you ever done that without any

17   documentation?

18          PROSPECTIVE JUROR:  Yes.

19          THE COURT:  You have.  And when was that?

20          PROSPECTIVE JUROR:  In the '90s, late '90s.

21          THE COURT:  So you had a pretty good relationship with

22   the bank to loan you a hundred percent with no documents?

23          PROSPECTIVE JUROR:  You got it.

24          THE COURT:  All right.  Did you answer any of the

25   other questions yes?

```
 1              PROSPECTIVE JUROR:  Yes.  Involved in a lawsuit that
 2    never went to trial.
 3              THE COURT:  It settled?
 4              PROSPECTIVE JUROR:  Yes, out of court.
 5              THE COURT:  Were you the plaintiff or the defendant?
 6              PROSPECTIVE JUROR:  Defendant.
 7              THE COURT:  Did you have a lawyer?
 8              PROSPECTIVE JUROR:  Yes.
 9              THE COURT:  May I ask who the lawyer was?
10              PROSPECTIVE JUROR:  Mike Sexton.
11              THE COURT:  In Sacramento?
12              PROSPECTIVE JUROR:  He was out of Oroville.
13              THE COURT:  I see.  And were you satisfied with the
14    settlement?
15              PROSPECTIVE JUROR:  Yes.
16              THE COURT:  Did you answer any of the other questions
17    yes?
18              PROSPECTIVE JUROR:  Yes.
19              THE COURT:  Which one?
20              PROSPECTIVE JUROR:  Oh, no, that was the general.
21    I've served on a jury.
22              THE COURT:  Any other questions, general questions?
23              PROSPECTIVE JUROR:  No.
24              THE COURT:  All right.  Then you may answer the
25    individual questions.
```

 1            PROSPECTIVE JUROR:  Nadine Murphy.  I reside in Yuba
 2   City, which is in Sutter County, my entire life.  I am
 3   self-employed.  Have been working since the age of 13.  My
 4   husband is named Ralph.  He is also self-employed, a general
 5   contractor.  We have two children.  They're step children for
 6   me, a son and a daughter.  One works for Schools Credit
 7   Union, and the other works for an engineering firm.  Prior
 8   jury service, it was a criminal.  State.  It was a rape case,
 9   and a verdict was reached.
10            THE COURT:  You're self-employed.  What business are
11   you in?
12            PROSPECTIVE JUROR:  I own a beauty and barber supply
13   and salon in Yuba City.
14            THE COURT:  How long have you owned that business?
15            PROSPECTIVE JUROR:  I inherited it from my father.
16   I've been there since I was 13.
17            THE COURT:  And you also work there?
18            PROSPECTIVE JUROR:  Oh, yeah.
19            THE COURT:  You work there?
20            PROSPECTIVE JUROR:  About 70 hours a week.
21            THE COURT:  All right.  Thank you.
22            PROSPECTIVE JUROR:  You're welcome.
23            THE COURT:  Mr. Wiseman, do you have any questions?
24            MR. WISEMAN:  Yes.  Thank you.
25            Mrs. Murphy, you presently have this real estate

 1   investment portfolio.  You and your husband have that now;

 2   correct?

 3            PROSPECTIVE JUROR:  Yes.

 4            MR. WISEMAN:  And presently, how many properties do

 5   you all own?

 6            PROSPECTIVE JUROR:  Eight.

 7            MR. WISEMAN:  And they're single-family homes?

 8            PROSPECTIVE JUROR:  Yes.

 9            MR. WISEMAN:  And since you started this type of

10   investment, have you bought and sold properties over the

11   years?

12            PROSPECTIVE JUROR:  Haven't sold.

13            MR. WISEMAN:  So you've just acquired the properties?

14            PROSPECTIVE JUROR:  Yes.

15            MR. WISEMAN:  Okay.  And do these properties -- have

16   you had occasion, for example, to have any of the properties

17   reappraised, let's say within the last ten years?

18            PROSPECTIVE JUROR:  Yes.

19            MR. WISEMAN:  Okay.  And what were some of the reasons

20   you needed to get appraisals or reappraisals?

21            PROSPECTIVE JUROR:  To get qualified to get a lower

22   interest rate on a loan.

23            MR. WISEMAN:  So you've refinanced some loans over the

24   period of time?

25            PROSPECTIVE JUROR:  Yes.

1          MR. WISEMAN:  And are the properties primarily in

2    Sutter County?

3          PROSPECTIVE JUROR:  All in Sutter but one.  One is in

4    Yuba County.

5          MR. WISEMAN:  And they're all being rented out, as you

6    said?

7          PROSPECTIVE JUROR:  Yes.

8          MR. WISEMAN:  During the refinances, do you recall

9    whether any of those refinances were, as we talked about, as

10   you talked about with the judge a moment ago, stated income

11   loans?

12         PROSPECTIVE JUROR:  Not on the refinances.

13         MR. WISEMAN:  And when was the last time you either

14   got a mortgage or had a refinance?

15         PROSPECTIVE JUROR:  Probably within the last six

16   years, about six years ago.

17         MR. WISEMAN:  And since you and your husband started

18   your investment strategy in the beginning compared to, let's

19   say, the last time you did a refinance or a mortgage, have

20   you noticed the requirements, what you needed to do to get a

21   loan changed over time?

22         PROSPECTIVE JUROR:  Definitely.

23         MR. WISEMAN:  And describe that if you would for us.

24   What do you recall is the changes?

25         PROSPECTIVE JUROR:  Having to produce your federal and

1    state income tax forms and verifying all income, where the

2    money's coming from, what it was for.  They're just basically

3    making sure that the rental income is rental income.

4            MR. WISEMAN:  Would it be fair to say that over time,

5    it got more stringent, the requirements to get a loan became

6    a little more onerous?

7            PROSPECTIVE JUROR:  Yes.  Not onerous, just

8    time-consuming.

9            MR. WISEMAN:  Time-consuming.  Right.  And just a

10   couple more questions about the experience of the stated

11   income loan.  When you got a loan that was a stated income

12   loan, do you recall if you just had to indicate what the

13   income was that you and your husband made to the bank?

14           PROSPECTIVE JUROR:  Yes.

15           MR. WISEMAN:  And then that was essentially it, and

16   they gave you a loan?

17           PROSPECTIVE JUROR:  Yes.

18           MR. WISEMAN:  Okay.  Thank you.  No further questions.

19           THE COURT:  Mr. Hales, any questions?

20           MR. HALES:  Just briefly, your Honor.

21           Ms. Murphy, for the salon where you work, a lot it

22   sounds like, is part of all that work you're doing, are you

23   handling the paperwork for the entire business side and the

24   balance sheets, et cetera?

25           PROSPECTIVE JUROR:  All of it.

1          MR. HALES:  Okay.  And what else do you do?  I mean

2     what's the full scope of your responsibilities there other

3     than that piece?

4          PROSPECTIVE JUROR:  I do all of the paperwork

5     involved, daily receipts, deposits, preparing my taxes,

6     ordering product, meeting with sales reps, everything.

7          MR. HALES:  Everything that has to be done?

8          PROSPECTIVE JUROR:  Yes.

9          MR. HALES:  And for the properties that you and your

10    husband own and manage, are you doing a lot of the paperwork

11    for that yourself too?  It sounds like you're managing those.

12         PROSPECTIVE JUROR:  I do all the paperwork.  He does

13    all the physical work.

14         MR. HALES:  Thank you.

15         PROSPECTIVE JUROR:  Um-hum.

16         THE COURT:  The next peremptory challenge is with the

17    government.

18         MR. HALES:  Pass, your Honor.

19         THE COURT:  The challenge is to the defense.

20         MR. WISEMAN:  The defense would like to thank and

21    excuse, your Honor, Potential Juror Number 11, Mr. Crow.

22         THE COURT:  All right.  Mr. Crow, thank you for

23    coming.  You're excused.

24         PROSPECTIVE JUROR:  Thank you.

25         THE COURT:  Call the next juror, please.

```
 1                THE CLERK:  Dayna Baskerville, B-A-S-K-E-R-V-I-L-L-E.
 2    Dayna Baskerville.
 3                THE COURT:  Good afternoon.
 4                PROSPECTIVE JUROR:  Hi.
 5                THE COURT:  Is your microphone working?
 6                PROSPECTIVE JUROR:  Yes.
 7                THE COURT:  It is.  Did you hear my general questions?
 8                PROSPECTIVE JUROR:  Yes, I did.
 9                THE COURT:  Would your answer to any of those general
10    questions be yes?
11                PROSPECTIVE JUROR:  Yes.  The one about being a
12    witness.
13                THE COURT:  You were a witness in a trial?
14                PROSPECTIVE JUROR:  Yes.  When I was 11 years old,
15    yes.
16                THE COURT:  And was it in state court?
17                PROSPECTIVE JUROR:  It was military court.
18                THE COURT:  Military court.  Well, that's quite
19    different.  What was the nature of the case?
20                PROSPECTIVE JUROR:  Assault.  One man assaulted
21    another one.
22                THE COURT:  And you observed it?
23                PROSPECTIVE JUROR:  Yes.
24                THE COURT:  So you testified?
25                PROSPECTIVE JUROR:  Yes.
```

1          THE COURT:  Well, put that out of your mind because I

2     am really not that familiar with the procedures in military

3     court, but I do know enough to be able to tell you that it's

4     entirely different than the procedure here.

5          Did you answer any of the other questions yes?

6          PROSPECTIVE JUROR:  No.

7          THE COURT:  Then you may answer the individual

8     questions.

9          PROSPECTIVE JUROR:  My name is Dayna Baskerville.  I

10    reside in San Joaquin County, since September 2012.  Before

11    that, I was in Southern California.  Right now, I'm doing

12    administrative work for First 5 San Joaquin.  And I've been

13    there just about seven months now.  I am single.  I don't

14    have any children.  And yes, I have served on a prior jury.

15    It was in L.A. County.  It was a murder case.  And yes, a

16    verdict was reached.

17         THE COURT:  What is First 5 San Joaquin?

18         PROSPECTIVE JUROR:  It's a funding agency.  We fund

19    programs in San Joaquin County that support families that

20    have children zero through 5 with either education or

21    healthcare, nutrition, all different kinds of programs.  We

22    fund those programs.

23         THE COURT:  Is the funding from the county or federal

24    government or some charity?

25         PROSPECTIVE JUROR:  It's from the state.  It's from

1    the smoking tax, Prop 10.

2             THE COURT:  Okay.  Thank you.

3             Mr. Wiseman, any questions?

4             MR. WISEMAN:  Yes.  Thank you, your Honor.

5             Good afternoon, Ms. Baskerville.  When was this trial

6    that you were on a jury; do you recall?

7             PROSPECTIVE JUROR:  It was sometime between '99 and

8    2005.

9             MR. WISEMAN:  And that was in Lake County?

10            PROSPECTIVE JUROR:  Los Angeles.

11            MR. WISEMAN:  Los Angeles County.  And you all reached

12   a verdict in that case?

13            PROSPECTIVE JUROR:  Yes, we did.

14            MR. WISEMAN:  Do you recall if the defendant who was

15   accused, did he or she testify?

16            PROSPECTIVE JUROR:  No.

17            MR. WISEMAN:  Did the fact that that person didn't

18   testify, the defendant didn't testify, did that cause you any

19   problems in terms of how you evaluated the case?

20            PROSPECTIVE JUROR:  No, it did not.

21            MR. WISEMAN:  So you didn't think that he or she had

22   to testify?

23            PROSPECTIVE JUROR:  No.

24            MR. WISEMAN:  You probably heard me earlier.  I was

25   asking some of the other potential jurors about this notion

1    of a presumption of innocence.  That a defendant is presumed

2    innocent when they're accused of a crime in any court.  Do

3    you understand that concept?

4             PROSPECTIVE JUROR:  Yes.

5             MR. WISEMAN:  You probably heard it before since you

6    were a juror once before.  Is there anything about that

7    concept that is at all uncomfortable with you or gives you

8    some pause?

9             PROSPECTIVE JUROR:  No, not at all.

10            MR. WISEMAN:  And sort of the corollary, the flip side

11   of that, is that throughout the case, the prosecution has the

12   burden, the burden to prove their case.  So they've got to do

13   essentially the heavy lifting.  Does that give you any

14   problem at all?

15            PROSPECTIVE JUROR:  No, not at all.

16            MR. WISEMAN:  And when did you relocate up to Northern

17   California?

18            PROSPECTIVE JUROR:  September 2012.

19            MR. WISEMAN:  And when you were a youngster and you

20   were a witness in a military trial, were you at that time

21   residing on a military base?

22            PROSPECTIVE JUROR:  Yes, on Guam.

23            MR. WISEMAN:  With your family, I presume?

24            PROSPECTIVE JUROR:  Yes.

25            MR. WISEMAN:  Is there any reason you don't think you

1     can be fair to both sides in this particular case?

2              PROSPECTIVE JUROR:  No, not at all.

3              MR. WISEMAN:  Thank you, your Honor.

4              THE COURT:  Any questions, Mr. Hales?

5              MR. HALES:  Just one, your Honor.

6              Good afternoon, Ms. Baskerville.  What did you do

7     before you worked at First 5?

8              PROSPECTIVE JUROR:  I was a meeting planner.

9              MR. HALES:  That was when you were in Southern

10    California?

11             PROSPECTIVE JUROR:  Yes.

12             MR. HALES:  What all did that entail?

13             PROSPECTIVE JUROR:  Lots of training classes, meeting

14    classes.  We went to -- it was a users conference basically.

15    It was a software company where the clients came in and

16    trained each other on how they were using the system.  And so

17    I set that all up at the different locations.

18             MR. HALES:  I see.  Thank you.

19             THE COURT:  The challenge is with the defense.

20             MR. WISEMAN:  Your Honor, the defense would like to

21    thank and excuse Juror Number 3, Potential Juror Number 3,

22    Ms. Bush.

23             THE COURT:  Ms. Bush?

24             MR. WISEMAN:  I'm sorry.

25             THE COURT:  Wait, wait, wait.  Ms. Bush is Number 9.

1                    MR. WISEMAN:  I'm sorry.  Number 9.

2                    THE COURT:  You want to excuse Ms. Bush?  That's

3     Ms. Bush down here in the front row.

4                    MR. WISEMAN:  I know.  Thank you, your Honor.  Yeah,

5     Juror Number 9.

6                    THE COURT:  All right.  I just want to make sure we

7     have the right --

8                    PROSPECTIVE JUROR:  Is that me?

9                    THE COURT:  That is you.  You're excused.  Thank you,

10    Ms. Bush.

11                   PROSPECTIVE JUROR:  Thank you.

12                   THE COURT:  Call the next juror, please.

13                   THE CLERK:  Wanda Francisco, F-R-A-N-C-I-S-C-O.

14    Wanda Francisco.

15                   THE COURT:  Ms. Francisco, it will be easier for you

16    to enter on this side over here.

17                   Good afternoon.

18                   PROSPECTIVE JUROR:  Good afternoon.

19                   THE COURT:  Did you hear the general questions I asked

20    the other prospective jurors?

21                   PROSPECTIVE JUROR:  Yes.

22                   THE COURT:  Would your answers to any of my general

23    questions be yes?

24                   PROSPECTIVE JUROR:  Yes.

25                   THE COURT:  Which ones?

1          PROSPECTIVE JUROR:  The first one, hardship, because I

2     have surgery scheduled.  And I have a bunch of tests, medical

3     tests that have to be done this Friday.

4          THE COURT:  This Friday?

5          PROSPECTIVE JUROR:  Yes.

6          THE COURT:  When is the surgery?

7          PROSPECTIVE JUROR:  24th.

8          THE COURT:  Well, that's right in the middle of this.

9          PROSPECTIVE JUROR:  Yes.

10          THE COURT:  You'd probably rather be in trial than in

11     surgery if you had your choice.

12          PROSPECTIVE JUROR:  I definitely would.

13          THE COURT:  But I'm not going to second guess your

14     doctors.  So good luck with the surgery.

15          PROSPECTIVE JUROR:  Thank you.

16          THE COURT:  You're excused.

17          THE CLERK:  Nestor Vera, V-E-R-A.  Nestor Vera.

18          THE COURT:  This end over here.  Good afternoon.

19          PROSPECTIVE JUROR:  Good afternoon.

20          THE COURT:  Did you hear my general questions to the

21     other prospective jurors?

22          PROSPECTIVE JUROR:  Yes.

23          THE COURT:  Would your answers to any of those

24     questions be yes?

25          PROSPECTIVE JUROR:  Yes.

1          THE COURT:  All right.  Tell us which ones.

2          PROSPECTIVE JUROR:  First of all, I have to be very

3     honest.  I don't have enough knowledge of English to be like

4     make a good decision in this case because, you know, I need

5     to know about the case.  I mean to have knowledge of the case

6     to give a decision or give a fair opinion.  That would be

7     wrong because -- I would like to be excused for that reason.

8          THE COURT:  Were you born in the United States?

9          PROSPECTIVE JUROR:  No.

10          THE COURT:  Where are you from?

11          PROSPECTIVE JUROR:  I come from South America.

12          THE COURT:  Where in South America?

13          PROSPECTIVE JUROR:  Peru, South America.

14          THE COURT:  How long have you been in the United

15     States?

16          PROSPECTIVE JUROR:  38 years.

17          THE COURT:  38 years?

18          PROSPECTIVE JUROR:  Yes.

19          THE COURT:  What is your occupation?

20          PROSPECTIVE JUROR:  I work for Safeway.

21          THE COURT:  What do you do?

22          PROSPECTIVE JUROR:  We take -- first we do like

23     production work, shipping and receiving, and different

24     things, yes.

25          THE COURT:  It sounds like you speak pretty good

1    English.

2              PROSPECTIVE JUROR:  I speak English, but I'm afraid I

3    cannot get everything, you know, I need to have to make a

4    decision like to be in the court, you know, to give my fair

5    opinion.

6              THE COURT:  Well, it's one thing to say you don't

7    understand the language, but I think it's another thing to be

8    concerned that you might not understand everything about the

9    case.  I would suspect that just about every one of these

10   other people, after hearing that long indictment read, and

11   coming to court without any knowledge of this case, probably

12   has some doubt about whether they're going to be able to

13   understand everything.

14             PROSPECTIVE JUROR:  Yes.

15             THE COURT:  I can understand that.  But as you heard

16   me tell one of the other jurors, serving on the jury is a

17   privilege, and I don't want to deny you that privilege

18   unnecessarily.

19             PROSPECTIVE JUROR:  It's privilege.  That's why, you

20   know, that's why I come over here because, you know, my

21   responsibility, not responsibility, my, it's one of my

22   obligations, you know.

23             THE COURT:  You bet.

24             PROSPECTIVE JUROR:  That's the reason I come here to

25   show up myself and --

 1            THE COURT:  The reason you came to court or the reason

 2    you came to this country?

 3            PROSPECTIVE JUROR:  To this court.

 4            THE COURT:  To the court?

 5            PROSPECTIVE JUROR:  Yes.

 6            THE COURT:  It's probably the reason you came to the

 7    country was because of our privileges; right?

 8            PROSPECTIVE JUROR:  Of course.

 9            THE COURT:  All right.  Well, I just want to tell you

10    that I think you understand English enough.

11            PROSPECTIVE JUROR:  I understand.  You know, it's the

12    first time I'm shown in the courtroom.

13            THE COURT:  Everybody's a little nervous.

14            PROSPECTIVE JUROR:  This is my first experience.

15            THE COURT:  Right.  Everybody here is probably

16    nervous.  I'm probably the only one that isn't nervous

17    because I come here every day.

18            PROSPECTIVE JUROR:  I like to hear.  It would be very

19    interesting for me.  I was hear, you know, everything.

20            THE COURT:  You heard everything that went on so far?

21            PROSPECTIVE JUROR:  Yeah, I was catching everything.

22            THE COURT:  You understood everything; right?

23            PROSPECTIVE JUROR:  Most of it, yeah.

24            THE COURT:  Let me ask the lawyers.  Do you want me to

25    excuse him or not?

 1              MR. WISEMAN:  I think it would be appropriate, your

 2    Honor, in light of what this individual said.

 3              THE COURT:  Well, and you'd like to be excused or

 4    you'd like to stay?

 5              PROSPECTIVE JUROR:  I would like to be excused because

 6    I have my vacation for the 22nd of July through the 6th of

 7    August.

 8              THE COURT:  That's different.  Where are you going,

 9    back home?

10              PROSPECTIVE JUROR:  I also sent an e-mail asking for

11    my vacation.

12              THE COURT:  Where are you going?

13              PROSPECTIVE JUROR:  I'm going to Connecticut,

14    Stamford, Connecticut.

15              THE COURT:  All right.  I hope the weather is okay.  I

16    told you ahead of time that if you had prearranged vacation

17    plans that that was a sufficient reason to be excused.  So

18    you're excused for that reason.  For that reason.  Because I

19    think you can speak English well enough.

20              PROSPECTIVE JUROR:  Thank you very much.  Maybe next

21    time I will be here.

22              THE COURT:  Right.  Right.

23              PROSPECTIVE JUROR:  Thank you.

24              THE COURT:  Call the next juror, please.

25              THE CLERK:  Dawn Weymouth, W-E-Y-M-O-U-T-H.

1    Dawn Weymouth.

2           THE COURT:  Good afternoon, Ms. Weymouth.

3           PROSPECTIVE JUROR:  Good afternoon.

4           THE COURT:  Did you hear my general questions?

5           PROSPECTIVE JUROR:  Yes.

6           THE COURT:  Would your answers to any of those general

7    questions be yes?

8           PROSPECTIVE JUROR:  Yes.

9           THE COURT:  Which ones?

10          PROSPECTIVE JUROR:  Well, the first one, the hardship,

11   may not be for me but for the students that I work with.

12   Summer school program just started for the special ed, and

13   some of the special needs kids, they get comfortable with

14   certain personnel, so that may cause a hardship for them.

15          THE COURT:  What do you do?

16          PROSPECTIVE JUROR:  I am an assistant in the

17   classroom.

18          THE COURT:  An assistant.  Are you the teacher?

19          PROSPECTIVE JUROR:  No.

20          THE COURT:  What does the assistant do?

21          PROSPECTIVE JUROR:  I set up the computer, get

22   everything going.  We have separate groups that we engage the

23   students with.

24          THE COURT:  Is there somebody that will take your

25   place if you are serving on the jury?

```
 1              PROSPECTIVE JUROR:  No.

 2              THE COURT:  No?

 3              PROSPECTIVE JUROR:  No.

 4              THE COURT:  Where is the school?

 5              PROSPECTIVE JUROR:  It is James Marshall.

 6              THE COURT:  That's a public school?

 7              PROSPECTIVE JUROR:  Yes.

 8              THE COURT:  You mean there's nobody to take your

 9    place?

10              PROSPECTIVE JUROR:  No.

11              THE COURT:  If you're not there?

12              PROSPECTIVE JUROR:  No.  We don't have substitutes

13    during the summer school.  In a regular school setting, yes.

14              THE COURT:  I see.  So what are the classes?

15              PROSPECTIVE JUROR:  Right now, it's just elementary

16    fifth grade right now.

17              THE COURT:  How often are the classes held?

18              PROSPECTIVE JUROR:  Monday through Thursday.

19              THE COURT:  All day?

20              PROSPECTIVE JUROR:  8:00 to 12:30.

21              THE COURT:  All right.  Well, it's a close question

22    because I do customarily excuse teachers during the school

23    year, and you're not the teacher, but you're telling me that

24    you're essential.  So I'm going to excuse you.

25              PROSPECTIVE JUROR:  Okay.
```

1          THE COURT:  All right.  Don't forget to call back

2     Friday after 5:00 though.  You may have to sit on a different

3     jury.

4          PROSPECTIVE JUROR:  Okay.

5          THE COURT:  Call the next juror.

6          THE CLERK:  Kimberly Keogh, K-E-O-G-H.  Kimberly

7     Keogh.  How do you pronounce the name?

8          PROSPECTIVE JUROR:  Keogh.

9          THE CLERK:  Keogh.  Thank you.

10          THE COURT:  Good afternoon, Ms. Keogh.

11          PROSPECTIVE JUROR:  Hello.

12          THE COURT:  Did you hear my general questions?

13          PROSPECTIVE JUROR:  Yes, I did.

14          THE COURT:  Would your answers to any of my general

15     questions be yes?

16          PROSPECTIVE JUROR:  No.

17          THE COURT:  You're sure?

18          PROSPECTIVE JUROR:  Yes.

19          THE COURT:  Please answer the individual questions.

20          PROSPECTIVE JUROR:  My name is Kimberly Keogh.  I am a

21     resident of Grass Valley in Nevada County for four years.  I

22     am a flight attendant with Southwest Airlines.  Before that,

23     I was an elementary teacher for 20 years.  My husband, David

24     Keogh, is a general contractor/site manager, project manager.

25     I have two children, bonus children, stepchildren.  Cody will

1    be in his last year at West Point, and Carly will be starting

2    her first year in college at the Army ROTC at Westminster in

3    the University of Utah.

4           THE COURT:  Good for them.

5           PROSPECTIVE JUROR:  I have been on a jury before for a

6    DUI, and that was in Maricopa County, Arizona.  And yes, a

7    verdict was reached.

8           THE COURT:  A criminal case or civil case?  You said

9    DUI?

10          PROSPECTIVE JUROR:  DUI, yes.

11          THE COURT:  Criminal case.  Thank you.  All right.

12          Any questions, Mr. Wiseman?

13          MR. WISEMAN:  Yes, your Honor.

14          Good afternoon.

15          PROSPECTIVE JUROR:  Hello.

16          MR. WISEMAN:  You heard some of the questions I asked

17   about experiences with mortgages.  In the last ten years,

18   have you had the opportunity to get a mortgage or refinance

19   on any property?

20          PROSPECTIVE JUROR:  Believe it or not, no.  I've only

21   been married two and a half years.

22          MR. WISEMAN:  Do you know if your husband had any

23   experience with mortgages during the last ten years?

24          THE COURT:  You don't have to be married to get a

25   mortgage, you know.

1          PROSPECTIVE JUROR:  I know.  I came in with, shall we

2     say, no assets, would we say?  I guess I call it baggage, but

3     he calls it assets.

4          MR. WISEMAN:  Do you know if he had a mortgage within

5     the last ten years?

6          PROSPECTIVE JUROR:  Previous to ten years.

7          MR. WISEMAN:  Okay.  Now, you mentioned that your son

8     is graduating from West Point.

9          PROSPECTIVE JUROR:  Yes.

10         MR. WISEMAN:  And your daughter is in ROTC?

11         PROSPECTIVE JUROR:  She will be, yes.

12         MR. WISEMAN:  She will be.  Okay.  And you've served

13    on a jury before, and that was a criminal case, and there was

14    a verdict; right?

15         PROSPECTIVE JUROR:  Yes.

16         MR. WISEMAN:  In that particular case, did the

17    defendant testify, if you recall?

18         PROSPECTIVE JUROR:  No, they did not.

19         MR. WISEMAN:  Did you have any problems with that,

20    with the fact that the defendant didn't testify?

21         PROSPECTIVE JUROR:  No.

22         MR. WISEMAN:  Without getting into detail, what was

23    the -- your experience in jury deliberations?  Was it a

24    contentious situation?

25         PROSPECTIVE JUROR:  No, very factual and quick in a

1    way.

2          MR. WISEMAN:  Okay.  Were there any holdouts at any

3    time during that deliberation?

4          PROSPECTIVE JUROR:  No.

5          MR. WISEMAN:  Okay.  So it seemed to be a fairly

6    straightforward case?

7          PROSPECTIVE JUROR:  Yes.

8          MR. WISEMAN:  All right.  And you personally -- I know

9    you mentioned you're recently married, but in the last ten

10   years, have you personally had the opportunity to get a loan

11   for any reason?  Let's say a personal loan or credit card

12   loan or anything?

13         PROSPECTIVE JUROR:  Car loan.

14         MR. WISEMAN:  Car loan.

15         PROSPECTIVE JUROR:  Yes.

16         MR. WISEMAN:  And when did that happen?

17         PROSPECTIVE JUROR:  Two years ago.

18         MR. WISEMAN:  And when you -- did you finance it with

19   the car dealership or through a bank?

20         PROSPECTIVE JUROR:  Through a federal credit union.

21         MR. WISEMAN:  And do you recall that process of

22   getting a loan, having to go down to some office?

23         PROSPECTIVE JUROR:  It was very quick and very easy.

24         MR. WISEMAN:  Tell me about that.  What was so easy

25   about it?  In other words, did you have a relationship with

1    the credit union?

2             PROSPECTIVE JUROR:  No.

3             MR. WISEMAN:  Did you have to fill out some sort of

4    application?

5             PROSPECTIVE JUROR:  Yes.

6             MR. WISEMAN:  Did you have to document, for example,

7    your income or your assets when you took that car loan out?

8             PROSPECTIVE JUROR:  Yes.

9             MR. WISEMAN:  And so you had to provide some sort of

10   receipts or some sort of salary receipt?

11            PROSPECTIVE JUROR:  Correct.

12            MR. WISEMAN:  Okay.  And you're currently paying for

13   that car loan now.  You're paying it off?

14            PROSPECTIVE JUROR:  Yes.

15            MR. WISEMAN:  Okay.  And, lastly, is there anything I

16   said in asking the other potential jurors about this idea

17   that the prosecution throughout a case has the burden, has to

18   do the heavy lifting, has to convince you as a juror beyond a

19   reasonable doubt that a person is guilty, do you have any

20   problems with that responsibility that's on the part of the

21   prosecution?

22            PROSPECTIVE JUROR:  No.

23            MR. WISEMAN:  Do you understand what that means, that

24   the defense doesn't have to do anything if it doesn't want

25   to; right?

1              PROSPECTIVE JUROR:  Absolutely.

2              MR. WISEMAN:  Okay.  And you're comfortable with that?

3              PROSPECTIVE JUROR:  Yes.

4              MR. WISEMAN:  Okay.  Thank you.

5              THE COURT:  Mr. Hales, any questions?

6              MR. HALES:  No questions, your Honor.  Thank you.

7              THE COURT:  The next peremptory challenge is with the

8    government.

9              MR. HALES:  The government passes, your Honor.

10             THE COURT:  The challenge is with the defense.

11             MR. WISEMAN:  I need a moment, if I may, your Honor,

12   so I can get my numbers right.

13             Your Honor, the defense would like to thank and excuse

14   Potential Juror Number 2, Ms. Barsetti.

15             THE COURT:  Ms. Barsetti, thank you.  You're excused.

16             Call the next juror.

17             THE CLERK:  Roger Reed, R-E-E-D.  Roger Reed.

18             THE COURT:  Good afternoon.

19             PROSPECTIVE JUROR:  Good afternoon.

20             THE COURT:  Did you hear my general questions?

21             PROSPECTIVE JUROR:  Yes, I did.

22             THE COURT:  And would your answers to any of my

23   general questions be yes?

24             PROSPECTIVE JUROR:  Yes.

25             THE COURT:  Tell me which ones.

1           PROSPECTIVE JUROR:  Number one would be the hardship.

2    I just had two surgeries in the last two months.  I just came

3    off a two-week disability last week and just started work

4    again on last Friday.  So I really have exhausted all my

5    leave, vacation, sick time.

6           THE COURT:  All right.  What's your job?

7           PROSPECTIVE JUROR:  I work as a help desk analyst for

8    Williams Sonoma.

9           THE COURT:  I'll excuse you.  Thank you.

10          PROSPECTIVE JUROR:  Thank you.

11          THE COURT:  Next juror.

12          THE CLERK:  Donna Baird, B-A-I-R-D.  Donna Baird.

13          THE COURT:  Good afternoon.

14          PROSPECTIVE JUROR:  Good afternoon.

15          THE COURT:  Did you hear my general questions?

16          PROSPECTIVE JUROR:  Yes.

17          THE COURT:  And would your answers to any of those

18   questions be yes?

19          PROSPECTIVE JUROR:  Yes.

20          THE COURT:  Tell us which ones.

21          PROSPECTIVE JUROR:  Bad experience with law

22   enforcement and the court.

23          THE COURT:  And the court?

24          PROSPECTIVE JUROR:  Correct.

25          THE COURT:  Can you tell us about that?

```
1              PROSPECTIVE JUROR:  It's not me personally.  It's a

2    family member who recently went through a whole ordeal.  It's

3    very negative, made me somewhat bitter.

4              THE COURT:  When you say family member, how close is

5    this family member?

6              PROSPECTIVE JUROR:  Not my husband or my kids, but a

7    little further away.

8              THE COURT:  Further away?

9              PROSPECTIVE JUROR:  My brother.

10             THE COURT:  Your brother?

11             PROSPECTIVE JUROR:  Yeah.

12             THE COURT:  And was it a criminal case?

13             PROSPECTIVE JUROR:  Yes.

14             THE COURT:  I gather that it's a little hard for you

15   to discuss; am I right?

16             PROSPECTIVE JUROR:  Impossible.

17             THE COURT:  And is that because of the emotional

18   effect that it still has on you?

19             PROSPECTIVE JUROR:  That and the nature of the whole

20   thing.

21             THE COURT:  So if you were to be selected as a juror

22   in this case, would you be able to be fair to the government?

23             PROSPECTIVE JUROR:  No.

24             THE COURT:  Any objection to excusing Ms. Baird?

25             MR. HALES:  No, your Honor.
```

1          MR. WISEMAN:  No, your Honor.

2          THE COURT:  All right.  Ms. Baird, thank you for your

3   honesty.  You're excused.

4          Call the next juror.

5          THE CLERK:  Michael Henness, H-E-N-N-E-S-S.

6   Michael Henness.

7          THE COURT:  Good afternoon, sir.

8          PROSPECTIVE JUROR:  Hello.

9          THE COURT:  Did you hear my general questions?

10         PROSPECTIVE JUROR:  Yes, I did.

11         THE COURT:  Do you have your notes there?

12         PROSPECTIVE JUROR:  Yes, I have my notes.

13         THE COURT:  Would you answer any of those questions

14   yes?

15         PROSPECTIVE JUROR:  I believe yes.

16         THE COURT:  Which ones?

17         PROSPECTIVE JUROR:  I think you asked a question about

18   was I a party to a real estate lawsuit.

19         THE COURT:  Any lawsuit.  I actually asked if you were

20   a party to a lawsuit.

21         PROSPECTIVE JUROR:  The answer would be yes.

22         THE COURT:  What kind of a case?  You said it involved

23   real estate?

24         PROSPECTIVE JUROR:  Yes.

25         THE COURT:  Tell us about it.

1               PROSPECTIVE JUROR:  In 1999, I purchased a home in San

2       Diego County and subsequently I was the plaintiff in a

3       lawsuit against the sellers, the agent, the broker, and the

4       home inspector.

5               THE COURT:  There was some false representations made

6       in the process of the sale?

7               PROSPECTIVE JUROR:  Correct.

8               THE COURT:  And did you seek to have the sale set

9       aside?

10              PROSPECTIVE JUROR:  No.  We actually had an inspection

11      done on the property and then estimates and then attempted to

12      have the parties pay to correct everything.

13              THE COURT:  And how did that suit end?

14              PROSPECTIVE JUROR:  It ended in mediation.  It was a

15      settlement in mediation.  Court-appointed mediator.

16              THE COURT:  All right.  And with most mediations,

17      neither side gets what they ask for.

18              PROSPECTIVE JUROR:  Right.

19              THE COURT:  It's a compromise.

20              PROSPECTIVE JUROR:  Correct.

21              THE COURT:  Was this a compromise?

22              PROSPECTIVE JUROR:  Yes.

23              THE COURT:  And were you satisfied with the end

24      result?

25              PROSPECTIVE JUROR:  No.

1          THE COURT:  Why no?  Then why did you agree to it?

2          PROSPECTIVE JUROR:  It was the best option at the

3     time.

4          THE COURT:  Is there anything about that experience

5     that would give you any bad feelings about the judicial

6     process?

7          PROSPECTIVE JUROR:  I don't think so.  I don't think

8     it would really relate to court, I mean the judicial process.

9          THE COURT:  All right.  So would it affect your

10     ability to be fair to both sides in this case?

11          PROSPECTIVE JUROR:  I don't think so, no.

12          THE COURT:  Did you answer any of the other general

13     questions yes?

14          PROSPECTIVE JUROR:  No.  And that was -- it was two

15     lawsuits, too, that I was involved in.  There was a second

16     one.  When I moved to Clovis in 2005, I purchased a home

17     there, and I ended up being the plaintiff in a class action

18     lawsuit against the builder in that one.

19          THE COURT:  Were you the named plaintiff or were you

20     just one of the class members?

21          PROSPECTIVE JUROR:  I was one of the class members.

22          THE COURT:  And there were how many in the class?

23          PROSPECTIVE JUROR:  Over a hundred.

24          THE COURT:  Did that case resolve?

25          PROSPECTIVE JUROR:  I'm not sure.  I sold the house,

1    and it was still pending, so I left it in the past.

2              THE COURT:  All right.  Did you answer any of the

3    other questions yes?

4              PROSPECTIVE JUROR:  No.

5              THE COURT:  Please answer the individual questions.

6              PROSPECTIVE JUROR:  Okay.  My name's Michael Henness,

7    and I live in Placer County up in Roseville.  And I work for

8    the State of California.  Do you need to know my exact job or

9    title or whatever?

10             THE COURT:  Not necessarily the exact, but we'd like

11   to know which department or agency you work for.

12             PROSPECTIVE JUROR:  Department of General Services,

13   office of fleet and asset management.  And I've been there a

14   little over 16 years.

15             THE COURT:  All right.

16             PROSPECTIVE JUROR:  I do have a spouse, Susan, and she

17   is a registered dental assistant and works for an oral

18   surgeon in Rocklin.  As far as children, all together I have

19   five kids, and the youngest just turned 25.  She's the only

20   one at home still.  She's a hair stylist and works as a

21   waitress also at night.  Never been on a jury at all.

22             THE COURT:  Thank you.

23             Mr. Wiseman, do you have any questions?

24             MR. WISEMAN:  Yes.  Good afternoon.  Sir, you

25   mentioned the lawsuit in San Diego County.  And you brought

 1    the lawsuit against various individuals?

 2            PROSPECTIVE JUROR:  Correct.

 3            MR. WISEMAN:  Was one of the defendants, in other

 4    words, one of the individuals you sued, the real estate agent

 5    that was involved in the transaction?

 6            PROSPECTIVE JUROR:  The agent and the broker that he

 7    worked for, Century 21.

 8            MR. WISEMAN:  Century 21.  And do you recall what

 9    about their alleged conduct that you claimed was improper?

10    Why did you sue them, in other words?

11            PROSPECTIVE JUROR:  It was -- I'm trying to describe

12    it -- an omission of facts.  They have a section, I guess, in

13    the real estate contract where they're supposed to declare

14    any issues, problems, or whatever.  I forget what they call

15    it.  A transfer disclosure statement.  They basically put

16    hardly anything in there and failed to mention that they took

17    out walls inside the house, removed them, load-bearing walls

18    and remodeled the whole inside of the house without permits,

19    and none of it was up to code.  And it had big electrical

20    problems and structural problems that we didn't discover

21    until after we'd been living in there for a little while.  So

22    we contacted them and they'd moved to Kansas, and they

23    basically told us to jump off a cliff.  There's nothing you

24    can do to us.  We're in Kansas.

25            MR. WISEMAN:  So is it fair to say you felt somewhat

 1    deceived by these folks?

 2          PROSPECTIVE JUROR:  Big time, yeah.  Because it costs

 3    me thousands of dollars to fix everything to get it all up to

 4    code and to work.

 5          MR. WISEMAN:  With that experience, that unfortunate

 6    experience, do you think that that makes you a little jaded

 7    with respect to people in the real estate business, like real

 8    estate agents or brokers?  Do you think you're a little more

 9    cautious now if you were to deal with them?

10          PROSPECTIVE JUROR:  Yeah.  I think I learned a lot.

11    Both of my parents are real estate agents here in Sacramento

12    for over 30 years.  So I already thought I knew a lot, but I

13    did learn a lot.

14          MR. WISEMAN:  Did you ever speak to your parents about

15    this case?

16          PROSPECTIVE JUROR:  Oh, yeah.  Yeah, they knew all

17    about it, yeah.  They weren't involved in the transaction at

18    all.  They were up here and I was down there, and it was just

19    something I did on my own.  And I thought, you know, I had a

20    reputable real estate agent, Century 21, and the whole thing

21    was just kind of screwed up.  I don't know.

22          MR. WISEMAN:  Thank you.  Thank you for your honesty.

23          THE COURT:  Mr. Hales, any questions?

24          MR. HALES:  Yes, your Honor.

25          Mr. Henness, the episode you described, do you think

1    you can set that aside and be a fair juror in this case?

2              PROSPECTIVE JUROR:  I don't think that it has anything

3    to do with this case, honestly.  I mean the judge said it was

4    a case of, what did he call it, money laundering and wire

5    fraud.

6              THE COURT:  You have a good memory.  That's correct.

7              PROSPECTIVE JUROR:  And I don't know how that would

8    really have anything to do with a personal lawsuit that was

9    brought against somebody that sold me a house and didn't

10   disclose everything.

11             MR. HALES:  Okay.

12             PROSPECTIVE JUROR:  As far as the real estate

13   contract, all that was done correctly.  Just they failed to

14   mention, you know, we remodeled the house and none of it

15   meets code.  I got a home inspector and did all my due

16   diligence, and he was not qualified I found out later, and

17   there was just a, I guess, kind of a perfect storm of events

18   that led into the whole thing.

19             MR. HALES:  So it won't affect how you look at this

20   case?

21             PROSPECTIVE JUROR:  No, I don't think so.

22             MR. HALES:  Thank you.

23             THE COURT:  Any challenge for cause?

24             MR. HALES:  No, your Honor.

25             MR. WISEMAN:  No, your Honor.

1            THE COURT:  The next peremptory challenge is with the

2      defense.

3            MR. WISEMAN:  Your Honor, the defense would like to

4      thank and excuse Mr. Henness.

5            THE COURT:  All right.  Mr. Henness, thank you.

6      You're excused.

7            THE CLERK:  Stacey Brown, B-R-O-W-N.  Stacey Brown.

8            THE COURT:  Good afternoon, Mr. Brown.

9            PROSPECTIVE JUROR:  Hi.

10           THE COURT:  Did you hear my general questions?

11           PROSPECTIVE JUROR:  Yes, I did.

12           THE COURT:  I think it was on.

13           PROSPECTIVE JUROR:  It's on.

14           THE COURT:  No.  It was on before you did something to

15      it.

16           PROSPECTIVE JUROR:  I didn't do anything to it.

17           It says low battery.  Is this better?  Okay.

18           THE COURT:  Would your answers to any of my general

19      questions be yes?

20           PROSPECTIVE JUROR:  Yes, two of them.

21           THE COURT:  All right.  Tell us which ones.

22           PROSPECTIVE JUROR:  One of them is I have a vacation

23      starting on August 1st, which is the last day of the trial.

24           THE COURT:  August 1st?

25           PROSPECTIVE JUROR:  Yeah.

1          THE COURT:  You're actually gone August 1st?

2          PROSPECTIVE JUROR:  Yes, I am.

3          THE COURT:  I'm going to excuse you.

4          PROSPECTIVE JUROR:  Yes.

5          THE COURT:  I'm going to excuse you.  We probably will

6    be in session.

7          PROSPECTIVE JUROR:  Okay.

8          THE COURT:  Thank you.

9          Next juror.

10          THE CLERK:  Garnet Callahan, C-A-L-L-A-H-A-N.

11    Garnet Callahan.

12          THE COURT:  Ms. Callahan.

13          PROSPECTIVE JUROR:  Yes, sir.

14          THE COURT:  Did you hear my general questions?

15          PROSPECTIVE JUROR:  Yes, I did.

16          THE COURT:  And would your answers to any of those

17    questions be yes?

18          PROSPECTIVE JUROR:  Yes.

19          THE COURT:  Tell us which ones.

20          PROSPECTIVE JUROR:  Members of my immediate family in

21    law enforcement.  There are several, but my husband and my

22    son are the most immediate.

23          THE COURT:  What are their occupations?

24          PROSPECTIVE JUROR:  My husband is retired from

25    Department of Justice Bureau of Narcotic Enforcement, and my

KELLY O'HALLORAN, OFFICIAL COURT REPORTER, USDC -- (916) 448-2712

1    son is a CHP officer.

2          THE COURT:  Would the fact that you have not only your

3    husband and your son but apparently other relatives employed

4    or formerly employed in law enforcement cause you to be any

5    more favorable to the government in this case than you would

6    be to the defendant?

7          PROSPECTIVE JUROR:  I would certainly like to say no,

8    but my husband was involved in a fraud case, and I know the

9    work that was put in before he could even come to court.  So

10   I am not certain, but I would like to say that I was an

11   honest person and fair.

12         THE COURT:  Well, the fact that the government or

13   anybody else may have put a lot of work into a case doesn't

14   necessarily mean that it has more merit, does it?

15         PROSPECTIVE JUROR:  I guess maybe I couldn't be fair.

16         THE COURT:  You don't award people for putting in a

17   lot of hard work.  You decide the case on the basis of the

18   merits.

19         PROSPECTIVE JUROR:  Absolutely.  And I do trust the

20   law enforcement that I've been in contact with.

21         THE COURT:  So let me ask you the $64 question.  I

22   asked it to one of the others.  If you were in the position

23   of the defendant charged with the crimes set forth in the

24   indictment in this case or in the position of the United

25   States Attorney charged with the responsibility of presenting

1    the case on behalf of the government, would you be satisfied

2    to have your case heard by 12 jurors who are in the frame of

3    mind that you presently have?

4           PROSPECTIVE JUROR:  No.

5           THE COURT:  All right.  I'm going to -- thank you for

6    being honest, but I'm going to excuse you.

7           PROSPECTIVE JUROR:  Thank you, sir.

8           THE CLERK:  Devin Rodriguez, R-O-D-R-I-G-U-E-Z.

9    Devin Rodriguez.

10          THE COURT:  Good afternoon, Ms. Rodriguez.

11          PROSPECTIVE JUROR:  Hi.

12          THE COURT:  You're the ninth person to sit in that

13   chair today.  Did you hear my general questions?

14          PROSPECTIVE JUROR:  Yes, I did.

15          THE COURT:  Would your answers to any of those

16   questions be yes?

17          PROSPECTIVE JUROR:  Yes.

18          THE COURT:  Which ones?

19          PROSPECTIVE JUROR:  The first one, the hardship.  I am

20   scheduled for a vacation starting tomorrow.

21          THE COURT:  All right.  Well, there are going to be at

22   least ten people sitting in that chair.  So have a nice

23   vacation.  You're excused.

24          PROSPECTIVE JUROR:  Thank you.

25          THE COURT:  Call the next juror, please.

1             THE CLERK:  Marleen Merchant, M-E-R-C-H-A-N-T.

2   Marleen Merchant.

3             THE COURT:  Good afternoon, Ms. Merchant.

4             PROSPECTIVE JUROR:  Good afternoon.

5             THE COURT:  Did you hear my general questions to the

6   other prospective jurors?

7             PROSPECTIVE JUROR:  Yes, I did.

8             THE COURT:  And would your answers to any of those

9   questions be yes?

10            PROSPECTIVE JUROR:  In some cases, partial yeses.

11            THE COURT:  All right.  Tell me about it.

12            PROSPECTIVE JUROR:  My husband and I have been in

13   federal court because of our business.  We were plaintiffs.

14            THE COURT:  All right.  And what type of a case?

15            PROSPECTIVE JUROR:  Fair trade.

16            THE COURT:  Was it this court here?

17            PROSPECTIVE JUROR:  No.

18            THE COURT:  Different federal court?

19            PROSPECTIVE JUROR:  Yes.

20            THE COURT:  Where?

21            PROSPECTIVE JUROR:  Texas.

22            THE COURT:  In Texas.  How long ago?

23            PROSPECTIVE JUROR:  Actually, I didn't realize how

24   long it's been.  Ten years at least.

25            THE COURT:  Is there anything about that experience

1    might affect your ability to be a fair, impartial juror in a

2    case such as this?

3              PROSPECTIVE JUROR:  I don't think so.

4              THE COURT:  Did you answer any of the other questions

5    yes?

6              PROSPECTIVE JUROR:  I am in court -- I am in

7    litigation myself.

8              THE COURT:  What type of a case?

9              PROSPECTIVE JUROR:  Probate.

10             THE COURT:  Probate.  Okay.  Who died?

11             PROSPECTIVE JUROR:  My father.

12             THE COURT:  And this is a dispute over his estate?

13             PROSPECTIVE JUROR:  Over a trust, yes.

14             THE COURT:  Over a trust.  It's ongoing.  Do you have

15   a lawyer?

16             PROSPECTIVE JUROR:  Yes, we do.

17             THE COURT:  Is that here in Sacramento?

18             PROSPECTIVE JUROR:  Yes, they are.

19             THE COURT:  May I ask who your lawyer is?

20             PROSPECTIVE JUROR:  Weintraub.

21             THE COURT:  Weintraub firm?

22             PROSPECTIVE JUROR:  Yes.

23             THE COURT:  Not Mr. Weintraub himself?

24             PROSPECTIVE JUROR:  No.

25             THE COURT:  All right.  Who is your lawyer?

1           PROSPECTIVE JUROR:  Kelly Dankbar.

2           THE COURT:  All right.  I was going to say I wouldn't

3    tell her that you didn't remember her name.  Is there

4    anything about the fact that you are in a dispute over a

5    trust that would in any way affect your ability to be a fair

6    juror in a case such as this?

7           PROSPECTIVE JUROR:  No.  Only the duration of this

8    particular case.

9           THE COURT:  Okay.  So tell me about what you think

10   that --

11          PROSPECTIVE JUROR:  I'm due in court on the 23rd of

12   September.

13          THE COURT:  Of September?

14          PROSPECTIVE JUROR:  Yes.

15          THE COURT:  What is it about -- you think you're going

16   to be here in September?

17          PROSPECTIVE JUROR:  I don't know.

18          THE COURT:  No.  You're not.  So don't worry about it.

19   Is there anything else about that lawsuit that you think

20   affects your ability to serve?

21          PROSPECTIVE JUROR:  No.

22          THE COURT:  Okay.  Did you answer any of the other

23   general questions yes?

24          PROSPECTIVE JUROR:  No.

25          THE COURT:  Please answer the individual questions,

1          then.

2                   PROSPECTIVE JUROR:  My name is Marleen Merchant.  I've

3          resided in Sacramento County 28 years.  My occupation is

4          currently retired.  But my former occupation was in science,

5          research, teaching.  My spouse has an independent business,

6          sole proprietor.  My daughter is employed with Pixar

7          Animation Studios.  I have not had prior jury service.

8                   THE COURT:  What is the nature of your husband's

9          business?

10                  PROSPECTIVE JUROR:  Video entertainment.

11                  THE COURT:  Creating videos?

12                  PROSPECTIVE JUROR:  No.

13                  THE COURT:  Selling them?

14                  PROSPECTIVE JUROR:  It was distribution of CBS records

15         and video stores.

16                  THE COURT:  All right.  Thank you.

17                  Mr. Wiseman, do you have any questions?

18                  MR. WISEMAN:  Yes.

19                  Good afternoon.

20                  PROSPECTIVE JUROR:  Good afternoon.

21                  MR. WISEMAN:  You mentioned this federal case in

22         Texas.  I had trouble hearing you, but I thought you said,

23         and correct me if I'm wrong, but it was a trade secret case?

24                  PROSPECTIVE JUROR:  Fair trade.

25                  MR. WISEMAN:  Fair trade case.  What side of the case

1     were you all on?

2             PROSPECTIVE JUROR:  We were the plaintiff.

3             MR. WISEMAN:  So you brought the case?

4             PROSPECTIVE JUROR:  Yes.

5             MR. WISEMAN:  And did that case go to trial?

6             PROSPECTIVE JUROR:  Barely.

7             MR. WISEMAN:  What do you mean by barely?

8             PROSPECTIVE JUROR:  Well, there were several -- yes,

9     it did come to trial, but eventually the judge dismissed.

10            MR. WISEMAN:  Dismissed the case?

11            PROSPECTIVE JUROR:  Yes, because there was also

12    conspiracy charges.

13            MR. WISEMAN:  These are civil charges that you as a

14    plaintiff brought against some other --

15            PROSPECTIVE JUROR:  Yes.

16            MR. WISEMAN:  And the case was eventually dismissed?

17            PROSPECTIVE JUROR:  Well, yeah.  The conspiracy issue

18    in the case was harder to prove than the fair trade issues,

19    and our attorneys at the time -- and this was a class action

20    suit that we brought.

21            MR. WISEMAN:  Now, were you the named class?

22            PROSPECTIVE JUROR:  Yes, we were one of the three

23    named plaintiffs.

24            MR. WISEMAN:  Let me ask you in general, were you

25    satisfied with the outcome of this case?

1            PROSPECTIVE JUROR:  No, not necessarily.

2            MR. WISEMAN:  Okay.  Did you have depositions that you

3    had to take?

4            PROSPECTIVE JUROR:  Yes.

5            MR. WISEMAN:  So you went through that whole civil

6    discovery process?

7            PROSPECTIVE JUROR:  Yes, three years' worth of civil

8    discovery.

9            MR. WISEMAN:  And did your lawyers explain to you what

10   a civil conspiracy charge is in general?

11           PROSPECTIVE JUROR:  It was all explained at the time.

12           MR. WISEMAN:  Okay.  And you said that you're

13   presently involved in some litigation; right?

14           PROSPECTIVE JUROR:  Yes, I did.  Yes, I am.

15           MR. WISEMAN:  And that's here in Sac County?

16           PROSPECTIVE JUROR:  No.  Actually the case will be

17   held in Fresno County.

18           MR. WISEMAN:  Do you know procedurally where that case

19   is?  Is it -- I think you said it's set for trial.

20           PROSPECTIVE JUROR:  We're in discovery.

21           MR. WISEMAN:  You're in discovery.  Now, just a couple

22   more questions about that case.  Can you tell us generally

23   what the assets of the trust are that you all are fighting

24   about?

25           PROSPECTIVE JUROR:  I can, but I don't think that's

1    pertinent.

2            MR. WISEMAN:  Well, let me ask it this way.  Does the

3    trust contain any real estate assets?

4            PROSPECTIVE JUROR:  One of the pieces of the assets is

5    a piece of real estate that is in contention, yes.

6            MR. WISEMAN:  Okay.  And do you have -- did you have

7    any personal experience in acquiring that piece of property

8    for the trust?

9            PROSPECTIVE JUROR:  No.

10           MR. WISEMAN:  But you just know that the trust has

11   this property?

12           PROSPECTIVE JUROR:  It's a portion of my father's

13   trust.  I am a daughter.  It's the family home that is the

14   trust asset that is contentious.

15           MR. WISEMAN:  Okay.  And the other side -- I don't

16   want to presume anything, but is it fair to say without

17   getting into detail the other side of the lawsuit is a family

18   member?

19           PROSPECTIVE JUROR:  Yes.

20           MR. WISEMAN:  It's a family problem.  Okay.  Is there

21   anything about that, what you've gone through in that

22   litigation, that would make it difficult for you to be fair

23   in this particular case?  Anything about that experience?

24           PROSPECTIVE JUROR:  No, they're not related.

25           MR. WISEMAN:  Okay.  And so you can put aside any

1     feelings you may have about what you're going through if you

2     were a juror here?

3              PROSPECTIVE JUROR:  Yes.

4              MR. WISEMAN:  Just a couple other questions.  It

5     sounds to me you've been involved in and now this is your

6     second civil case, and you've had no jury experience; right?

7              PROSPECTIVE JUROR:  No.

8              MR. WISEMAN:  Okay.  I'm sure you heard me ask some of

9     your fellow potential jurors about this burden of proof, that

10    the prosecution has to sort of carry the water in this case,

11    has to convince you and other jurors beyond a reasonable

12    doubt that my client is guilty of anything.  Do you

13    understand that concept?

14             PROSPECTIVE JUROR:  Yes, I do.

15             MR. WISEMAN:  And do you have any problems with that

16    burden that the prosecution has?

17             PROSPECTIVE JUROR:  No.

18             MR. WISEMAN:  Do you have any -- would you have any

19    problems?  well, for example, the person I think who was in

20    the seat right before you testified about, well, her husband

21    was involved in a case that had a lot of work, a lot of

22    evidence.  If you were confronted with this case and the

23    defense did not put on a case and rested on the presumption

24    of innocence, do you have any problems with that?  In other

25    words, if you sat through this trial, and the government put

1    on a case but then the defense did not, would that cause you

2    any problem in terms of having to decide the case?

3              PROSPECTIVE JUROR:  No.

4              MR. WISEMAN:  You seemed to hesitate there for a

5    moment.  Are you confident about that, that you wouldn't hold

6    that against the defense if it did not put on a case, it

7    decided not to put on a case?

8              PROSPECTIVE JUROR:  You're saying that the case

9    depends on the weight of evidence.

10             MR. WISEMAN:  I'm sorry?

11             PROSPECTIVE JUROR:  You're saying the case depends on

12   the weight of the evidence.

13             MR. WISEMAN:  Okay.  So you're convinced, if I

14   understand what you're saying, you're convinced that if the

15   defense decided not to put on a case, you still would make

16   sure before you decided that the government satisfied its

17   burden; is that fair?

18             PROSPECTIVE JUROR:  Correct.

19             MR. WISEMAN:  Okay.

20             Thank you, your Honor.

21             THE COURT:  Any questions, Mr. Hales?

22             MR. HALES:  No, your Honor.  Thank you.

23             THE COURT:  The next peremptory challenge is with the

24   government.

25             MR. HALES:  One moment, your Honor.  The government

1    passes, your Honor.

2            THE COURT:  The challenge is with the defense.  And

3    this is your last challenge.

4            MR. WISEMAN:  I need a moment, your Honor, if I may.

5            Your Honor.  Defense will exercise its last peremptory

6    challenge and thank and excuse Potential Juror Number 2,

7    Ms. Merchant.

8            THE COURT:  Ms. Merchant, thank you.  You're excused.

9            PROSPECTIVE JUROR:  Thank you.

10            THE COURT:  Call the next juror.

11            THE CLERK:  Gerrie Collins, C-O-L-L-I-N-S.

12            THE COURT:  Ms. Collins, do you have your notebook

13    there?

14            PROSPECTIVE JUROR:  Yes, I do.

15            THE COURT:  Did you hear my general questions?

16            PROSPECTIVE JUROR:  Yes, I did.

17            THE COURT:  Would your answer to any of those general

18    questions be yes?

19            PROSPECTIVE JUROR:  Yes.

20            THE COURT:  Tell us which ones.

21            PROSPECTIVE JUROR:  It would be the hardship one.  I

22    have two doctor's appointments this month.  One starts

23    tomorrow, and one's on the 22nd.

24            THE COURT:  Are these appointments that you can change

25    or are they ones that would be difficult to change?

```
 1              PROSPECTIVE JUROR:  It would be difficult to change

 2    because they've been planned out months in advance.

 3              THE COURT:  All right.  I'll excuse you.  Thank you.

 4              PROSPECTIVE JUROR:  Thank you.

 5              THE COURT:  Call the next juror, please.

 6              THE CLERK:  Cynthia Neuman, N-E-U-M-A-N.

 7    Cynthia Neuman.

 8              THE COURT:  Ms. Neuman, good afternoon.

 9              PROSPECTIVE JUROR:  Good afternoon.

10              THE COURT:  Did you hear my general questions?

11              PROSPECTIVE JUROR:  I did.

12              THE COURT:  And would your answers to any of those

13    questions be yes?

14              PROSPECTIVE JUROR:  Yes.

15              THE COURT:  Tell us which ones.

16              PROSPECTIVE JUROR:  I have a vacation scheduled from

17    July 27th through August 3rd.

18              THE COURT:  All right.  I'll excuse you.  Thank you.

19              THE CLERK:  Lydia Escobar, E-S-C-O-B-A-R.

20    Lydia Escobar.

21              THE COURT:  Ms. Escobar, it looks like you're the

22    unlucky 13th person to sit in that seat today.

23              PROSPECTIVE JUROR:  I know.

24              THE COURT:  Did you hear my general questions?

25              PROSPECTIVE JUROR:  Yes, I did.  I have lots and lots
```

1    of yeses.

2              THE COURT:  All right.  We'll hear your answers.

3              PROSPECTIVE JUROR:  Well, I'm in real estate, and I've

4    also worked for a mortgage broker.

5              THE CLERK:  Is the microphone on?  I can't hear you.

6              THE COURT:  All right.  You're in real estate now?

7              PROSPECTIVE JUROR:  Yes.

8              THE COURT:  Hold on.  We'll get you a better

9    microphone.

10             What do you do in real estate now?

11             PROSPECTIVE JUROR:  I'm a Realtor.

12             THE COURT:  You sell residential properties?

13             PROSPECTIVE JUROR:  Yes.  Buy and sell.

14             THE COURT:  How long have you been doing that?

15             PROSPECTIVE JUROR:  Since 2010.

16             THE COURT:  You said you did work for a broker

17   previously?

18             PROSPECTIVE JUROR:  Yes, I did.  I worked for a broker

19   in the Bay Area for about eight years.

20             THE COURT:  And who was that broker?

21             PROSPECTIVE JUROR:  It was Home Service Associates.

22             THE COURT:  What did you do for the broker?

23             PROSPECTIVE JUROR:  I was an account manager, and so I

24   handled accounting, bookkeeping, trust accounting for the

25   broker.

1              THE COURT:  Did you deal personally with the

2    borrowers?

3              PROSPECTIVE JUROR:  No, not personally.

4              THE COURT:  Pretty much worked in the office?

5              PROSPECTIVE JUROR:  Yeah.

6              THE COURT:  Is that what you've done in the real

7    estate business, you worked for a broker, and now you're a

8    Realtor?

9              PROSPECTIVE JUROR:  Yes, exactly.

10             THE COURT:  Did you answer any of the other questions

11   yes?

12             PROSPECTIVE JUROR:  Yes.  I let the clerk know, too,

13   previously so I thought I would be okay for this trial, but

14   I'm going on vacation from the 27th through August 1st.

15             THE COURT:  All right.  Good-bye.  Should have

16   answered that one first.  That's why I ask it first, because

17   that is a sufficient excuse.

18             THE CLERK:  Paul Sanders, S-A-N-D-E-R-S.  Paul

19   Sanders.

20             THE COURT:  Good afternoon, Mr. Sanders.

21             PROSPECTIVE JUROR:  Good afternoon.

22             THE COURT:  Did you hear my general questions?

23             PROSPECTIVE JUROR:  Yes.

24             THE COURT:  Would your answers to any of any general

25   questions be yes?

1              PROSPECTIVE JUROR:  No.

2              THE COURT:  Please answer the individual questions.

3              PROSPECTIVE JUROR:  My name is Paul Sanders.  I go by

4      my middle name, Adrian.  I live in Sacramento County.  I've

5      lived in Sacramento County for 23 years now.  My occupation,

6      I work for Apple with AppleCare doing tech support.  My

7      significant other, his name is Evgeni Ignatov (phonetic).

8      And he's a dispatcher with a trucking company.  I don't have

9      any children.  He does.  He has a daughter, and she's with us

10     every other week.  She's 14 years old.  And I've never done

11     any prior jury service.  I've been called in but never

12     selected.

13             THE COURT:  Are you one of the people that works in

14     the Apple store or do you work behind the scenes?

15             PROSPECTIVE JUROR:  I work in AppleCare, so when you

16     have problems with your phone or iPad.

17             THE COURT:  You talk to us.  All right.

18             Mr. Wiseman, any questions?

19             MR. WISEMAN:  Yes.  Thank you.

20             Mr. Sanders, does the fact that I'm going to use an

21     iPad in this case, is that going to cause you to be a little

22     harder on the government?

23             PROSPECTIVE JUROR:  No.

24             MR. WISEMAN:  And you have no prior jury experience;

25     correct?

1          PROSPECTIVE JUROR:  Correct.

2          MR. WISEMAN:  Let me just ask you sort of generally.

3   I would imagine you've heard the questions I've asked the

4   other potential jurors.

5          PROSPECTIVE JUROR:  Yes.

6          MR. WISEMAN:  Is there any particular question that

7   I've asked previously that you want to comment about?  Do you

8   have any thought about anything I've asked before, like the

9   presumption of innocence or the burden of proof?  Is there

10  anything in those questions that in your mind may make you

11  think that you may not be the perfect juror in this case?

12         PROSPECTIVE JUROR:  No.

13         MR. WISEMAN:  And so let me just follow up.  You

14  understand that this idea that the prosecution has to prove

15  its case beyond a reasonable doubt, are you comfortable with

16  that idea?

17         PROSPECTIVE JUROR:  Yes.

18         MR. WISEMAN:  Okay.  And, likewise, the defense

19  doesn't even have to bring on a case if it elects not to.

20  Are you comfortable with that?

21         PROSPECTIVE JUROR:  Yes.

22         MR. WISEMAN:  Okay.  And is there anything in your

23  background that would lead you to believe that, you know,

24  maybe you shouldn't sit on this particular case?  Anything

25  you may have heard, the reading of the indictment?

1              PROSPECTIVE JUROR:  No.

2              MR. WISEMAN:  Thank you.  No further questions, your

3     Honor.

4              THE COURT:  Mr. Hales, any questions?

5              MR. HALES:  Yes, quickly, your Honor.

6              Good afternoon, Mr. Sanders.

7              PROSPECTIVE JUROR:  Good afternoon.

8              MR. HALES:  Can you just quickly tell us the extent to

9     which you have any experience with real estate purchases,

10    mortgages, similar to the questions that have been asked

11    earlier?

12             PROSPECTIVE JUROR:  I purchased a home back in 2004,

13    so it's prior to the years you were looking for.  But other

14    than that, just that purchase of that home in Elk Grove.

15             MR. HALES:  Did you ever refinance it at a later date

16    or is that it?

17             PROSPECTIVE JUROR:  That was it.

18             MR. HALES:  Any other experience beyond that home

19    purchase?

20             PROSPECTIVE JUROR:  No.

21             MR. HALES:  Thank you.

22             THE COURT:  You're still standing.

23             MR. WISEMAN:  Well, may I follow up with one question,

24    your Honor?

25             THE COURT:  All right.  Go ahead.

```
1              MR. WISEMAN:  Thank you.  Just briefly.

2              Mr. Sanders, I neglected to ask you that question

3    about if you purchased a home or real estate.  With respect

4    to that purchase in 2004, do you recall what kind of a loan

5    that was that you got?

6              PROSPECTIVE JUROR:  Documented loan.

7              MR. WISEMAN:  It was a documented loan?

8              PROSPECTIVE JUROR:  Yes.

9              MR. WISEMAN:  Okay.  Thank you, your Honor.

10             THE COURT:  The government has passed the challenge

11   five times, including your last challenge.  Under

12   Ninth Circuit case law, as I read it, the government has a

13   right to exercise at least one of those challenges now.  Do

14   you wish to exercise that challenge or to pass it?

15             MR. HALES:  May I have one moment to confer, your

16   Honor?

17             THE COURT:  Yes.

18             MR. HALES:  The government passes, your Honor.  Thank

19   you.

20             THE COURT:  All right.  Then that concludes the

21   peremptory challenges.  We're going to select two alternate

22   jurors.  I'll ask the clerk to fill the two alternate seats

23   right now.

24             THE CLERK:  David Schmidt, S-C-H-M-I-D-T.

25   David Schmidt.  And Carolyn Pohlmeyer, P-O-H-L-M-E-Y-E-R.
```

1    Carolyn Pohlmeyer.

2              THE COURT:  Down in the front row.  Yeah, let's do

3    that.  Yes.

4              Mr. Schmidt, good afternoon.

5              PROSPECTIVE JUROR:  Good afternoon.

6              THE COURT:  Did you hear my general questions?

7              PROSPECTIVE JUROR:  Yes, I did.

8              THE COURT:  Would your answers to any of my general

9    questions be yes?

10             PROSPECTIVE JUROR:  That's a hesitant no.

11             THE COURT:  What is hesitant?

12             PROSPECTIVE JUROR:  Well, perhaps the first one,

13   hardship.  I'm a sole provider for the family.

14             THE COURT:  What is your job?

15             PROSPECTIVE JUROR:  I'm a software engineer.

16             THE COURT:  Does your employer provide any time off

17   for jury service?

18             PROSPECTIVE JUROR:  I don't get paid.

19             THE COURT:  You don't get paid?

20             PROSPECTIVE JUROR:  No.

21             THE COURT:  Now, just for the benefit of everyone

22   present, the law does not require employers to pay their

23   employees for time off due to jury service.  What the law

24   requires is that the employer allow you to have the time off

25   for jury service and that they not retaliate against you in

1    any way for taking the time to serve on a jury.

2              That having been said, a lot of employers do provide

3    compensation to their employees for time spent on jury

4    service.  It's often limited to a certain number of days.

5    When they do that, that is either -- I'm serious -- out of

6    the goodness of their heart or else because of some union

7    contract or other obligation they've negotiated with their

8    employees.  There is no law requiring an employer to pay

9    their employees for jury service.

10             That having been said, there are occasions where the

11   court will excuse you if it creates a hardship in the sense

12   that you don't have enough of a cushion to be able to spend

13   the time serving on the jury.

14             Now, back in the old days, no employers ever paid

15   their employees for serving on a jury.  And it wasn't

16   contemplated by the founding fathers that this would be a

17   right.  And so people did take the time off work and served

18   on juries without being paid for it.

19             What I'm telling you is that I'm looking to your

20   situation here, Mr. Sanders.  If it creates a hardship for

21   you because you just don't have enough money set aside or

22   really can't handle it under the circumstance, then I'll let

23   you be off.  But I'm not going to tell you you have to be

24   off.  Some people would say it is a hardship, but I want to

25   stay because I want to get that experience, and this case

1    looks interesting enough and short enough that I can handle

2    it.  So I'm going to leave it to you to tell me why you

3    either think you want to stay or that you should be excused

4    from this one.

5              PROSPECTIVE JUROR:  I'll stay.

6              THE COURT:  You know, I really appreciate that.  I

7    don't just say that.  Because whether you're saying so or

8    not, not getting money for a period of time is a sacrifice.

9    But I'm going to tell the lawyers right now, and they

10   understand this, we're going to move this case along.  We're

11   not going to waste your time.  This isn't going to be a trial

12   where we spend a lot time talking at sidebars with the

13   lawyers or we spend a lot of your time standing out in the

14   hall or back in the jury room.  And I do appreciate your

15   willingness to serve, and I think you will find it a

16   rewarding experience.

17             Did you answer any of my other general questions yes?

18             PROSPECTIVE JUROR:  No, I did not.

19             THE COURT:  Would you answer the individual questions

20   now.

21             PROSPECTIVE JUROR:  My name is David Schmidt.  I have

22   lived in Sacramento for about eight years, just south of

23   downtown.  I'm a software engineer for a local systems

24   integration firm.  And my wife's name is Ann, and she's a

25   stay-at-home wife.  And I have two kids.  Two and four.  And

1    I do not have any prior jury service.

2         THE COURT:  Just to clarify my understanding.  When we

3    are off for a day, you will be able to work that day; right?

4         PROSPECTIVE JUROR:  That's correct.

5         THE COURT:  And what if we're off for a half a day,

6    would you be able to work for a half a day?

7         PROSPECTIVE JUROR:  Yes, I will.

8         THE COURT:  Just one more question.  If you're an

9    alternate juror in this case, are you going to go back at

10   night and work or are you going to take the whole day off?

11        PROSPECTIVE JUROR:  I'll take the whole day off.

12        THE COURT:  All right.  Okay.

13        Ms. Pohlmeyer, would you take the microphone, please.

14        PROSPECTIVE JUROR:  Yes, sir.

15        THE COURT:  Did you hear my general questions?

16        PROSPECTIVE JUROR:  Yes.  It's been a while, but did

17   you ask about involvement with law enforcement?

18        THE COURT:  I did.  It has been a while.  That's why

19   you take notes.

20        PROSPECTIVE JUROR:  I did.  I did.  Yes, my only

21   involvement is I am dating a retired law enforcement person.

22        THE COURT:  All right.  Would the fact that you are

23   dating a retired law enforcement officer cause you to be more

24   favorable to the government in a case such as this?

25        PROSPECTIVE JUROR:  No.

1           THE COURT:  Which agency is he retired from?

2           PROSPECTIVE JUROR:  Los Angeles County Sheriff's

3    Department.  He was a deputy.

4           THE COURT:  They're not involved in this case anyway.

5    Did you answer any of the other general questions yes?

6           PROSPECTIVE JUROR:  No.

7           THE COURT:  Would you answer the individual questions?

8           PROSPECTIVE JUROR:  Yes.  My name is

9    Carolyn Pohlmeyer.  I live in Redding, in Shasta County, for

10   the last 20 years.  I retired last year as a school counselor

11   after 25 years.  I told you about my friend Tom's occupation.

12   I have three grown sons.  The oldest is a financial advisor

13   for Edward Jones.  My middle son is a physician.  And my

14   youngest son works out of Lake Tahoe for an investment

15   company.  I'm not exactly sure.  He hasn't been real

16   forthcoming with everything he does.

17          THE COURT:  Is this by any chance timeshares or

18   something like that?

19          PROSPECTIVE JUROR:  Oh, my son?

20          THE COURT:  Yes.

21          PROSPECTIVE JUROR:  I just remembered the name of his

22   company now.  It's Westwind out of Incline Village, and they

23   go in and help companies who ask them for help if they're

24   struggling and --

25          THE COURT:  Help financing?

 1                 PROSPECTIVE JUROR:  Uh-huh.  With board of directors,

 2      yeah.  They're invited to come in and give advice.

 3                 THE COURT:  Financing or just trying to get themselves

 4      out of financial trouble?

 5                 PROSPECTIVE JUROR:  Just trying to help the business

 6      get out of financial trouble.

 7                 THE COURT:  Counselors.

 8                 PROSPECTIVE JUROR:  Yes.

 9                 THE COURT:  I see.  All right.

10                 PROSPECTIVE JUROR:  And I have had prior jury service.

11      I served on a second degree murder trial in Shasta County,

12      and they did reach a verdict.

13                 THE COURT:  Thank you.

14                 Do you have any questions, Mr. Wiseman, of either

15      Mr. Schmidt or Ms. Pohlmeyer?

16                 MR. WISEMAN:  Yes, just briefly, your Honor.

17                 Mr. Schmidt, do you presently own a home?

18                 THE COURT:  Schmidt.  Schmidt.

19                 MR. WISEMAN:  Schmidt.  Yes.  Do you presently own a

20      home?

21                 PROSPECTIVE JUROR:  Yes, I do.

22                 MR. WISEMAN:  And when did you purchase that home?

23                 PROSPECTIVE JUROR:  Late 2009.

24                 MR. WISEMAN:  And did you finance it with a mortgage?

25                 PROSPECTIVE JUROR:  Yes, I did.

1          MR. WISEMAN:  And do you recall -- you've heard a lot

2     of sort of banter about certain types of mortgages this

3     afternoon.  Do you recall if it was a full doc mortgage where

4     you had to provide documents to the lender?

5          PROSPECTIVE JUROR:  It was a full documentation loan.

6          MR. WISEMAN:  And in sort of your assessment, how did

7     that process go?  Fairly simply or convoluted or what?

8          PROSPECTIVE JUROR:  No.  I mean it was kind of

9     stressful because the bank at the time that we went through,

10    they had -- we put a lot of earnest money down on the house,

11    and it took about 30 days and within about a two-day window

12    before our, I guess some sort of like purchase contract would

13    have been voided out, and we would have lost that earnest

14    money.  But at the end of it after almost no discussion with

15    the company, the bank, within the last few days, it was

16    nothing but phone calls, and then they sealed it up and we

17    got the house.

18         MR. WISEMAN:  So as I understand it, the bank didn't

19    make a decision until way toward the end?

20         PROSPECTIVE JUROR:  As I understand, they had a

21    backlog.

22         MR. WISEMAN:  Okay.

23         PROSPECTIVE JUROR:  Yeah.

24         MR. WISEMAN:  I would imagine that process was

25    somewhat stressful, not knowing what's going to happen.

```
 1              PROSPECTIVE JUROR:  Well, I mean that's home buying.

 2              MR. WISEMAN:  And, ma'am, Ms. Pohlmeyer, likewise, do

 3    you presently own a home?

 4              PROSPECTIVE JUROR:  Yes, I do.

 5              MR. WISEMAN:  And when did you purchase that home?

 6              PROSPECTIVE JUROR:  In 1994.

 7              MR. WISEMAN:  And do you still have a mortgage on that

 8    home or is it paid off?

 9              PROSPECTIVE JUROR:  I do have a mortgage, and I

10    refinanced two years ago.

11              MR. WISEMAN:  Two years ago.  And that refinancing,

12    was that the kind of loan where you had to provide all the

13    documentation?

14              PROSPECTIVE JUROR:  Yes, sir.

15              MR. WISEMAN:  What about when you first purchased the

16    home in the '90s?  What kind of loan, if you remember, what

17    was that all about?

18              PROSPECTIVE JUROR:  I don't remember too well.  I know

19    that there wasn't -- it didn't seem nearly as much of a, you

20    know, the one two years ago, everything had to be produced.

21              MR. WISEMAN:  Everything was produced, the one two

22    years ago.  Okay.

23              PROSPECTIVE JUROR:  Yeah.

24              MR. WISEMAN:  And how would you describe that

25    experience?
```

1          PROSPECTIVE JUROR:  It was more work, but it all went

2     well.

3          MR. WISEMAN:  Okay.

4          PROSPECTIVE JUROR:  It didn't have any problems.  It

5     was just, yeah, you had to produce many more documents and

6     things.

7          MR. WISEMAN:  And did anybody explain to you at the

8     bank or the finance company why you had to produce all these

9     documents?

10          PROSPECTIVE JUROR:  No.

11          MR. WISEMAN:  Okay.  Couple other questions.  Have you

12     had any occasion to chat with your son, the son that works

13     for this Westwind?

14          PROSPECTIVE JUROR:  I think it's Westwind.

15          MR. WISEMAN:  What he does to sort of help companies

16     out when they're in trouble.

17          PROSPECTIVE JUROR:  It's hard for me to explain

18     because he's kind of -- he's a man of few words, but I find

19     things out from my daughter-in-law.  I think it's something

20     that -- he used to work for Goldman Sachs, and this is part

21     of that kind of work.  I don't -- I'm sorry.  It's not my

22     area at all.

23          MR. WISEMAN:  That's fine.  Let me just ask this

24     question.  Have you had conversations with him, your son,

25     this man of few words, about any particular company that he

 1    had to help out?  Or he doesn't really talk about this, it

 2    sounds like.

 3              PROSPECTIVE JUROR:  No.  The only thing I know is he's

 4    been in North Carolina the last month.  I'm sorry.

 5              MR. WISEMAN:  No problem.  That's fine.  Thank you

 6    very much.

 7              Thank you, your Honor.  I have no further questions.

 8              THE COURT:  Ms. Pohlmeyer, if you are selected as an

 9    alternate juror in this case, one of my instructions is that

10    you are not going to be permitted to have any conversations

11    with your son about anything that would be in issue in this

12    case.  And you would be able to follow that instruction?

13              PROSPECTIVE JUROR:  Absolutely.

14              THE COURT:  All right.  Mr. Hales, any questions?

15              MR. HALES:  No, your Honor.  Thank you.

16              THE COURT:  Each side has one challenge of the

17    alternates.  One peremptory challenge.  Do you wish to

18    exercise that challenge, Mr. Wiseman?

19              MR. WISEMAN:  The defense would pass, your Honor.

20              THE COURT:  Pass the challenge.  Does the government

21    wish to exercise that challenge?

22              MR. HALES:  No, it doesn't, your Honor.  We pass.

23              THE COURT:  All right.  Both sides are satisfied with

24    the alternate jurors.  I'll bet, ladies and gentlemen, when

25    you came in this room this morning and you saw how many

 1    people I summoned here as prospective jurors, you thought I

 2    would never get to you.

 3               PROSPECTIVE JUROR:  Judge.

 4               THE COURT:  Yes.

 5               PROSPECTIVE JUROR:  Did you say the trial would be

 6    over on the 1st?  Would that mean we would be deliberating

 7    later?

 8               THE COURT:  What do you think, Counsel?  Does that

 9    estimate include reasonable time for deliberation or not?

10               MR. HALES:  I think so.

11               THE COURT:  We never know how long a jury is going to

12    deliberate.  Somebody said they had an appointment in

13    September.  Theoretically, you can deliberate as long as the

14    jury says that they want to continue to deliberate and that

15    it would be fruitful.  Do you have a problem?

16               PROSPECTIVE JUROR:  I have a problem on August 5th.

17               THE COURT:  August the 5th.

18               PROSPECTIVE JUROR:  Right.  When you mentioned the

19    1st, I thought I would be fine.

20               THE COURT:  Counsel, do you think that presents a

21    problem?  Again, we never know how long it's going to take

22    for the jury to deliberate.  What's the problem on August

23    5th?

24               PROSPECTIVE JUROR:  I have a vacation on August 5th.

25               THE COURT:  What do you want to do?

 1              MR. HALES:  I would think, your Honor, that we would

 2    be done by then, but, of course, it's hard to predict.  I

 3    think we would be done by then.

 4              THE COURT:  Well, if we're going to excuse

 5    Ms. Donahue, I would have a procedural question of you as to

 6    how to proceed with the peremptory challenges.

 7              MR. WISEMAN:  Your Honor, I think in light of the

 8    uncertainty and since we are dark all the following week, I

 9    don't know how to precisely answer that.  I think there could

10    be a problem.

11              THE COURT:  All right.  So we're going to have to take

12    a recess, and you'll tell me what you want me to do with the

13    peremptory challenges.  I thought we were almost finished,

14    but we're not.  So let's take a recess.  Everybody take your

15    books with you, go out and take a break, and we'll come back

16    in 15 minutes.  And those of you in the back of the

17    courtroom, be sure to show up and come back and sit in the

18    seats when the clerk comes out to get you.

19              (Recess taken.)

20              (Jury panel not present.)

21              THE COURT:  All of the prospective jurors are outside

22    the courtroom.  I have something like this come up in just

23    about every case, and I am tired of it.  I do my best to

24    select a jury in such a way that I do not commit reversible

25    error before this trial ever begins.  And now you get

1    somebody.  I don't know what to do.  Do you want a mistrial?

2    I'll just start all over again.  Or if you have some other

3    suggestion, I'll just do that.  But I'm not going to do

4    anything unless both of you agree to it and ask me to do it.

5    So why don't you confer and you find out what you'll agree to

6    do and what you will ask me to do.  And if there's nothing

7    that you will agree to do and ask me to do, then we'll just

8    proceed with this jury.  And if it starts to deliberate into

9    August the 5th, I will declare a mistrial.  All right.  You

10   tell me.

11           MR. WISEMAN:  That's fair.  Thank you.

12           THE COURT:  You tell me.

13           (Recess taken.)

14           (Jury panel not present.)

15           THE COURT:  All right.  Tell me what you want the

16   Court to do.

17           MR. WISEMAN:  Your Honor, I don't think the Court

18   needs to do anything at this point because I think the

19   parties, and Mr. Hales will correct me if I'm wrong, the

20   parties' sort of mutual understanding, not stipulating to

21   anything, but mutual understanding that if in the very

22   unlikely event this case goes beyond August 5th, that that

23   juror would be excused and an alternate juror, in that case

24   Mr. Schmidt, would sit on the jury and begin deliberations

25   anew.  That's our understanding.

1            THE COURT:  The problem, and it's not necessarily a

2     problem, with that, is that even though Ninth Circuit case

3     law does now suggest that you can send an alternate juror in

4     during the middle of deliberations, in order to do that

5     safely, it is such a delicate situation to tell the jurors to

6     begin their deliberations anew.

7            The old rule used to be that you couldn't expect

8     jurors to do that.  Now, they say that you can, but you have

9     to be very careful about it, and you have to give very

10    careful instructions and so forth.

11           So the problem as I see it would be not if we don't

12    finish the trial by August the 5th.  But the problem would be

13    if the jury is in the middle of deliberations on August

14    the 5th.  That would be the most problematical.

15           Now, one thing I could do if we get to that point is

16    definitely give you Monday, August the 4th.  Because even if

17    we didn't have this problem, the reason I can't meet on

18    Mondays has to do with my calendar.  It doesn't mean the jury

19    can't be in here deliberating and I can't interrupt my

20    calendar if they have a question or verdict.

21           So as I understand what you're saying, you'd like me

22    to just to leave it as it is.  And then you're going to do

23    your best to see that we finish in enough time so that

24    they're not even in deliberations on August 5th.  But if they

25    are, I'll have them deliberate on August the 4th.

1           MR. WISEMAN:  That would be fair, and I think that's a

2    prudent thing to do.

3           MR. HALES:  That's correct, your Honor.

4           THE COURT:  All right.  Let's just do it that way

5    then.

6           MR. WISEMAN:  Okay.

7           THE COURT:  Bring the jurors in.

8           (Jury panel present.)

9           THE COURT:  The jurors are all present, and the

10   defendant is present with counsel.  Don't worry about August

11   the 5th, Ms. Donahue.  The lawyers are going to move this

12   trial along.

13          What I was about to say is that when you all came in

14   this morning, you probably thought that I brought in way too

15   many jurors for this case and that you were all going to sit

16   out there, and I was never going to get to you.  But I'm

17   pretty proud of the fact that I gauged it about right.  As I

18   count it, there's only four left over.  Raise your hand if

19   you're a prospective juror.  Right.  We have four left over.

20          So I want to thank the four of you for being here and

21   making yourselves available.  I don't know what your answers

22   to the questions were going to be.  But other than leaving

23   your books on the table on the way out and making sure that

24   you call that number after 5:00 on Friday, you're excused.

25          So at this time I'm going to ask that the clerk

1    administer the oath to the jurors and the alternates.

2              THE CLERK:  Please stand and raise your right hands.

3              (Jury sworn.)

4              THE CLERK:  Thank you.  You may be seated.

5              THE COURT:  Ladies and gentlemen of the jury, you are

6    now the jury in this case.  And from here on, I will address

7    you as ladies and gentlemen of the jury.

8              I want to take a few minutes before the trial begins

9    to tell you something about your duties as jurors and how the

10   trial will proceed.  At the end of the trial, I'll give you

11   detailed instructions on the law, and those instructions will

12   control your deliberations.

13             It will be your duty as the jury to decide from the

14   evidence what the facts are.  You and you alone are the

15   judges of the facts.  You'll hear the evidence, decide what

16   the facts are, and then apply those facts as you find them to

17   the law as I will give it to you.  That is how you will reach

18   your verdict.  In doing that, you must follow the law whether

19   you agree with it or not.

20             The evidence will consist of the sworn testimony of

21   witnesses, any exhibits that are received in evidence, and

22   any facts to which the lawyers on both sides may agree or

23   stipulate and which I tell you to accept.

24             You should not take anything I may say or do during

25   the course of a trial as any indication of what I think of

1     the evidence or what your verdict should be.  That will be a

2     matter entirely for you to decide.

3          Now, there are rules of evidence that control what can

4     be received into evidence.  When a lawyer on one side asks a

5     question and the other on the other side thinks it is not

6     permissible under the rules of evidence, that lawyer may

7     object.  When I say an objection is overruled, that means the

8     witness may answer the question.  When I say an objection is

9     sustained, that means the witness may not answer the

10    question, and you may not infer from the question what the

11    answer might have been.

12         Also, sometimes a witness may start to answer or may

13    even complete a short answer before I have a chance to rule

14    on an objection.  In those circumstances, I'll instruct you

15    to disregard the answer, and you must not consider that

16    answer in deliberating on your verdict.

17         In deciding the case, you may not consider anything

18    that has been stricken or anything that I instruct you to

19    disregard.

20         Some evidence may be received for a limited purpose

21    only.  When I instruct you that testimony or an exhibit may

22    be received and considered only for a limited purpose, that

23    means you may consider it for that purpose and for no other

24    purpose.

25         Now, the court reporter here is taking down what we

 1    say in shorthand.  She can review her notes on the screen,

 2    and I have a screen down here where I can see her notes as

 3    well.  That does not mean that there is going to be a

 4    transcript of the testimony that you can review at the end of

 5    the trial or at any time during the trial.  There's not going

 6    to be a written transcript of the testimony.  She can read

 7    those notes, but they're not in a form that we can just give

 8    to you and that you would be able to understand and read.  So

 9    for that reason, I urge you to pay careful attention to the

10    testimony as it is given.

11            Each of you has a notebook.  If you wish to do so, you

12    may take notes when the witnesses testify to help you

13    remember what they say.  If you do take notes, keep them to

14    yourself during the trial and don't let the taking of notes

15    distract you from listening to the witnesses.  It's more

16    important that you listen to and understand the testimony

17    than it is that you write it down.  Also, don't let the

18    taking of notes distract you from observing the demeanor of

19    the witnesses as they testify.  That's important too.

20            Whenever you leave the courtroom for a short break or

21    a long recess, leave your notebooks on your seat.  Leave your

22    notebooks on the seat.  They will be there when you come back

23    to the courtroom, and nobody will read them when you're gone.

24    If we have a long break, like a week, we'll make sure

25    nobody -- I can't guarantee you we're going to leave them on

1   the seat, but I think we will.  I will tell you that nobody

2   reads your notes and that they'll be back on your seat when

3   you return after the break.

4        Whether or not you take notes, you should rely on your

5   memory of what was said.  Your notes are only to assist your

6   memory.

7        We're going to start taking testimony tomorrow

8   morning.  At that time the trial will begin with the opening

9   statements of the lawyers.  Now, an opening statement is not

10  evidence in the case.  It is a statement by the lawyer as to

11  what that lawyer thinks the evidence will show.  Some lawyers

12  have compared it to a road map.  They say it shows you where

13  the case is going.  Other lawyers have compared it to the

14  picture on the outside of the box of a jigsaw puzzle.  And

15  they point out that evidence comes in one piece at a time,

16  and you have to put that evidence together like you put

17  together the pieces of a jigsaw puzzle.  And they point out

18  that it's easier to see how the pieces fit if you know the

19  big picture ahead of time.  So they'll tell you that their

20  opening statement is like the big picture, but it's not

21  evidence.  It's not the pieces of the jigsaw puzzle.

22       Nothing that the lawyers say at any time during the

23  trial is evidence in the case unless it's a stipulation that

24  I tell you to accept.

25       So the trial begins with an opening statement on

1    behalf of the government by one of the assistant United

2    States Attorneys.  Mr. Wiseman or Ms. Noble may or may not

3    wish to make an opening statement after the government's

4    opening statement.  But if they do, it's not evidence either.

5    It's simply what they think the evidence will show.

6          Then after the opening statements, the government will

7    call witnesses.  We'll place the witness on the stand.  The

8    witness will be placed under oath.  The government attorney

9    will ask that witness questions.  The witness will answer the

10   questions.  And during the process of questioning witnesses,

11   the lawyers may offer exhibits into evidence.  It may be a

12   piece of paper.  It may be a record.  It may be a photograph.

13   It's something tangible.  Those are exhibits.

14         When I say an exhibit is received in evidence, that

15   means it's evidence in the case.  It means that at the end of

16   the trial when you're deliberating on a verdict, anything

17   that I have received in evidence is going to be in the jury

18   room with you for you to look at, feel, touch, talk about

19   during your deliberations.

20         Now, sometimes when I receive an exhibit, it's going

21   to be shown to you immediately.  Maybe on the screen.  Maybe

22   on a chart.  Other times, it may not be shown to you

23   immediately.  But if it is received in evidence, it's

24   evidence in the case, and it will be in the jury room at the

25   end of the trial for you to look at.

 1           After the government questions a witness on direct

 2     examination, the defense may cross-examine the witness.  And

 3     then after the cross-examination, the government may ask some

 4     more questions on redirect examination, and there may be some

 5     recross or further redirect until that witness's testimony is

 6     complete and the next witness is called.  And that's how the

 7     trial proceeds.  One witness after the other offering

 8     testimony, cross-examination, and offering exhibits.

 9           After the government presents all of its evidence, the

10     defense may or may not call witnesses.  The defense may or

11     may not produce exhibits.  If the defense chooses to call

12     witnesses, they'll be questioned by Mr. Wiseman on direct

13     examination in the same way that the government witnesses are

14     questioned by the United States Attorney.  And they'll be

15     cross-examined by the United States Attorney in the same way

16     that the defense counsel may cross-examine witnesses called

17     by the government.  And then when the defense, if it does

18     elect to call witnesses, completes the testimony of all of

19     its witnesses, the government may call rebuttal witnesses.

20     That will be short, but there may be some more testimony in

21     rebuttal.

22           And then after all the testimony is in, the lawyers

23     will present their final summations or arguments.  We call

24     them arguments.  They're not arguing with anybody.  They're

25     summarizing the evidence as they want you to interpret it.

 1    They're suggesting to you how you should interpret the

 2    evidence that you have heard and seen in light of the

 3    instructions that I'm going to give you.  But again, nothing

 4    that the lawyers say in their final arguments is evidence in

 5    the case.  If the facts that the lawyers state in their

 6    arguments differ from the way you recall them in the

 7    testimony, your memory of them will control.

 8         Arguments will begin with an argument on behalf of the

 9    government by one of the assistant United States Attorneys.

10    There will then be an argument on behalf of the defendant by

11    Mr. Wiseman or Ms. Noble.  And then a closing or rebuttal

12    argument by the government.

13         Then after all of the arguments, I'll instruct you on

14    the applicable law.  I will deliver my instructions to you

15    orally here in court and then there will be a copy, written

16    copy, of my oral instructions sent into the jury room with

17    you at the end of the trial during your deliberations, and

18    you'll have those instructions along with the exhibits to

19    look over and discuss during your deliberations.

20         Now, that is how the trial will proceed.  During the

21    trial, whenever court is not in session, there are rules that

22    govern your conduct as jurors.  You're now judges in the

23    case.  You're the judges of the facts, just as I'm a judge in

24    this case.  I'm a judge of the law.

25         There are rules of conduct that relate to judges.

1    Things I can do and things I can't do.  There are rules that

2    govern your conduct now as judges too.  What I'm about to

3    tell you are those rules that govern your conduct during the

4    course of the trial at all times when court is not in

5    session.  What I'm about to tell you is often referred to as

6    the judge's admonition to the jury.  I'm not going to repeat

7    this admonition every time we take a recess, but I am going

8    to remind you to remember the admonition whenever we take a

9    recess.  And what I'm telling you is to remember what I'm

10   about to tell you.

11        Whenever court is not in session during this trial,

12   you must not discuss this case or any issues in the case with

13   each other or with any other person.

14        That part of the admonition used to be a little easier

15   to explain and a little easier to comply with before we got

16   all of these tools of technology, cell phones, smart phones,

17   the Internet, Facebook, et cetera.  But the same thing

18   applies.  You can't talk to your husband, wife, significant

19   other, spouse, friend, anybody about the case or any issues

20   in the case.  Beyond that, you can't post something on

21   Facebook or you can't go out on Twitter or you can't have a

22   blog discussion about anything that's going on in this

23   courtroom or anything relating to the issues in this trial.

24        And you're going to have to remember that because I'm

25   not going to be there to tap you on the shoulder and say hey,

 1    you can't do that.  So you're going to have to remember that.

 2    That's a little bit harder now to get across and to make sure

 3    that you remember than it was before we got all these tools

 4    of technology.  But that is part of the admonition.

 5         If anyone should attempt to talk to you about the

 6    case, inform them that you're a juror, and you're not

 7    permitted to discuss the case.  If they should persist in

 8    attempting to discuss the case with you after you've told

 9    them you're a juror, then you have to report it to the clerk.

10         Second, you must not talk to any of the attorneys, the

11    parties, or the witnesses in the case about any subject.

12    Now, that may seem a little harsh.  You may see one of them

13    in the hall or even out in front of the building and be

14    inclined to say nice weather, bad weather, good day, bad day,

15    how are you, something like that.  Well, you can't do that.

16    And the reason for that is that as judges, we must not only

17    avoid impropriety, we must also avoid the appearance of

18    impropriety.  And if someone should see you talking to one of

19    the witnesses or one of the lawyers and not hear what you're

20    saying, they may think you're discussing the case.  They may

21    think you're doing something improper.  And so we have this

22    rule.  You can't talk to them about anything.  And they

23    understand.  They'll be happy.  Don't worry.  If you just

24    don't say anything when you pass them and think that they may

25    believe that you're snubbing them or you're being impolite,

 1     they know the rules, and they're just as happy that they

 2     don't have to remind you that they can't talk to you.

 3          Third, do not form or express any opinion upon any

 4     issue in this case until the entire case is finally submitted

 5     to you for deliberation.  In many ways, that is the hardest

 6     part of the admonition to get across because we are used to

 7     forming opinions as we go along.  You'll hear somebody say

 8     something, and you'll say that doesn't sound right or yeah,

 9     that sounds pretty good or, you know, I don't trust that

10     person or I like that person.  All kinds of opinions that you

11     may form as you're listening to people talk and hearing what

12     they have to say and considering arguments.

13          But we've found over the course of many years of

14     experience with trials that sometimes opinions change.  A

15     witness may say something one morning.  It may sound pretty

16     good, and then that witness may be cross-examined that

17     afternoon or maybe the next day and something may happen on

18     cross-examination that causes you to have a little bit

19     different opinion about what you heard that morning.

20          The same is true with different witnesses.  You may be

21     inclined to form an opinion about one witness and then the

22     next day or two or three days later or the next week, another

23     witness may testify.  That witness may contradict something

24     you heard the first witness say, and it may change your whole

25     opinion about that testimony that you heard earlier.

1          And we've also found that when you express an opinion

2     about something, it is much harder to change that opinion.

3     So we have this rule.  You must not form or express any

4     opinion on any issue in the case until the entire case is

5     finally submitted to you for your deliberation.

6          Don't read any newspaper accounts or watch or listen

7     to any television or radio accounts or access any Internet

8     accounts relating to this case or the trial of it.  Don't

9     visit the scene or the place where any material fact or event

10    involved in the case allegedly occurred.

11         And, finally, you must not seek or receive any

12    information relating to any of the facts or issues involved

13    in this case from any source outside of the evidence that you

14    see and hear in this courtroom.  This is another part of the

15    admonition that used to be easier to explain, get across, and

16    understand before we had all these tools of technology.

17         You as jurors have to decide the case based solely on

18    the evidence presented here within the four walls of this

19    courtroom.

20         This means that during the trial, you must not conduct

21    any independent research about the case, the matters in the

22    case, or the individuals involved in the case.  In other

23    words, you can't consult any dictionaries, reference

24    materials, search the Internet, websites, blogs, or use any

25    other electronic tools to obtain information about this case

1        or help you decide the case.

2                We have good lawyers on both sides of this case.  If

3        there is anything you need to know and that is permissible

4        under the rules of evidence for you to hear, those lawyers

5        will present it to you.  That's their job.  I have the job of

6        making sure you understand the law.  If there is anything you

7        need to know about the law, that is my responsibility to give

8        you instructions that make it clear to you what the law is.

9        It would be a violation of your oath as jurors for you to go

10       out and search the Internet or seek or receive any

11       information about any issues in this case from any other

12       source outside of what you see and hear in this courtroom.

13               Now, I've spent a fair amount of time going over this

14       admonition with you, and I do that because I have discussions

15       with other judges.  And they tell me that they have real

16       problems, now that we have all these Internet tools,

17       enforcing the Court's admonition.  Some of them are so

18       cynical that they tell me that no matter what they tell the

19       jury, the jury is not going to follow the admonition.  And I

20       simply cannot understand that cynicism.  I cannot believe

21       that people such as you would respond to the Court's summons

22       to come here, take time away from your life in order to

23       decide somebody else's dispute, and then violate the law.

24       You did not come here to do that.

25               I firmly believe in those cases where we've heard war

1   stories of jurors not doing something that the admonition

2   required them to do or doing something that the admonition

3   prohibited them from doing, those were cases where the judge

4   didn't adequately explain the admonition to the jury.  So

5   that's why I go out of my way to make this admonition just a

6   little bit longer than I might otherwise because I want to

7   help you do your job.

8          Do any of you have any questions now about how the

9   trial will proceed as I've explained it or the admonition?

10         Before we break today, the clerk is going to give you

11  some key cards that will allow you to come into the jury

12  deliberation room.  That's the room where you're ultimately

13  going to deliberate.  But before we reach that point in the

14  trial, that's the room where you will gather in the morning.

15  You don't have to go down to the fourth floor anymore.  You

16  will gather in this room in the morning, and when we're ready

17  for you, we'll just have you have come through this door.

18  You go in it from the outside and come in through the door

19  that's next to the jury box.  And she'll give you a key card

20  that gets you in and out of that room.  She'll explain to you

21  what the amenities are.  There are restrooms and a sink and

22  refrigerator and so forth in that room.

23         So again, unless any of you have any questions about

24  the procedure or how we're going to proceed, I'm going to

25  turn you over to the clerk this afternoon and have you come

1    back at 9:00 o'clock in the morning to hear the opening

2    statements.

3            Leave your books on your seat.  Once more, in case I

4    passed you by, any questions?  All right.  You will all meet

5    in the jury room at 9:00 o'clock tomorrow morning, and we'll

6    see you then.

7            (Jury not present.)

8            THE COURT:  The jurors are all outside the courtroom

9    beyond the hearing of these proceedings.  You said at some

10   point you wanted to address some motions in limine.  I

11   suggested that you may want to take another look at the

12   motions in limine to see if you really think they have to be

13   addressed before trial.  But if you think they do, now would

14   be the time.

15           MR. WISEMAN:  Your Honor, I think the only one --

16   well, no, never mind.  I think we're fine.  I don't think

17   that there's anything that I would say in my opening that is

18   yet to be resolved in a motion in limine.  So I think we can

19   wait.  Although what would the Court contemplate in terms of

20   when we would raise those?

21           THE COURT:  My preference always is that where

22   possible to do so, you put your arguments in your trial

23   briefs, which you have, and then we wait until a question is

24   asked that you think is objectionable and you make your

25   objection at that time, and I would rule on the objection

1     then.

2              MR. WISEMAN:  I understand the Court's position.

3     There's one thing that, if I may, just bring up.  My

4     understanding, and I'm not holding the government to this, is

5     that some of their first witnesses will be bank witnesses.  I

6     have a motion in limine to request that the Levin Senate

7     Report be admitted, although I've reconsidered that, and I

8     think that as long as the Court would permit me to

9     cross-examine a witness, if the government didn't object and

10    the Court didn't sustain the objection, as to that witness's

11    understanding about the contents of the report.

12             THE COURT:  Mr. Williams, you can sit down.

13             I read your motion.  I don't know under what theory

14    you can with a straight face argue that the Senate Report is

15    admissible.  It's just a big piece of hearsay.

16             MR. WISEMAN:  Well, I take a different view of that.

17    My view -- I've updated my view.  I certainly don't need to,

18    if the Court were to allow the document admitted, I certainly

19    don't want the entire thing admitted.  I think we can get

20    around the potential problem if I'm permitted to cross the

21    witness as to his or her knowledge of it.

22             THE COURT:  Well, see, I don't know what your question

23    is going to be.  That's why I much prefer to wait until the

24    question is asked.  I'm not going to tell you now that you

25    can or cannot ask a specific question or questions on

1    cross-examination.  I'm going to have to hear the questions

2    and make a determination at that time.

3              MR. WISEMAN:  That's fine.  That's not a problem.

4    Okay.

5              THE COURT:  Anything else?

6              MS. HEMESATH:  No, thank you.

7              THE COURT:  See how easy it was?

8              MR. HALES:  Thank you, your Honor.

9              MR. WISEMAN:  Lots easier than I thought.  Thank you.

10             (Proceedings concluded at 4:16 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1         I certify that the foregoing is a correct transcript

2     from the record of proceedings in the above-entitled matter.

3

4

5                               /s/ Kelly O'Halloran

6                          KELLY O'HALLORAN, CSR #6660

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25