IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

---oOo---

BEFORE THE HONORABLE WILLIAM B. SHUBB, JUDGE

---oOo---

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                  No. 2:08-cr-376 WBS

LEONARD WILLIAMS,

        Defendant.

_____/

---oOo---

<u>REPORTER'S TRANSCRIPT</u>

JURY TRIAL

VOLUME 2

WEDNESDAY, JULY 9, 2014

---oOo---

Reported by:      KELLY O'HALLORAN, CSR #6660

```
                            APPEARANCES




  For the Plaintiff:


        UNITED STATES ATTORNEY'S OFFICE
        501 I Street, Suite 10-100
        Sacramento, CA  95814
        BY:  CHRISTOPHER HALES
             AUDREY B. HEMESATH
             Assistant U.S. Attorneys

  For the Defendant:

        WISEMAN LAW GROUP, P.C.
        1477 Drew Avenue, Suite 106
        Davis, CA  95616
        BY:  JOSEPH J. WISEMAN, Attorney at Law
             JENNIFER NOBLE, Attorney at Law
```

INDEX

|                                                            | PAGE |
|------------------------------------------------------------|------|
| Government opening statement                               | 203  |
| Defense opening statement                                  | 219  |

GOVERNMENT WITNESSES:

KEVIN WALSH
| DIRECT EXAMINATION BY MS. HEMESATH                         | 228  |
| DIRECT EXAMINATION, (Cont'd.) BY MS. HEMESATH              | 253  |
| CROSS-EXAMINATION BY MR. WISEMAN                           | 280  |
| CROSS-EXAMINATION, (Cont'd.) BY MR. WISEMAN                | 291  |
| REDIRECT EXAMINATION BY MS. HEMESATH                       | 317  |
| RECROSS-EXAMINATION BY MR. WISEMAN                         | 318  |

JEFFREY JACKSON
| DIRECT EXAMINATION BY MS. HEMESATH                         | 319  |

ARTHUR WATSON
| DIRECT EXAMINATION BY MS. HEMESATH                         | 330  |
| DIRECT EXAMINATION, (Cont'd.) BY MS. HEMESATH              | 349  |
| CROSS-EXAMINATION BY MR. WISEMAN                           | 386  |

GOVERNMENT EXHIBITS RECEIVED IN EVIDENCE

| NO.: | DESCRIPTION: | PAGE: |
|------|--------------|-------|
| 201 | Purchase Agreement | 234 |
| 202 | Loan Application | 237 |
| 206 | Database printout of verification of employment | 243 |
| 203 | Letter from Leonard Williams verifying employment | 249 |
| 204 | request for Verification of Employment filled out by hand | 250 |
| 207 | Verification of Rental Income | 251 |
| 208 | Summary of bank account deposits | 254 |
| 209-A | Bank statements from Bank of America | 255 |
| 213 | Uniform Underwriting and Transmittal Summary | 263 |
| 214 | HUD-1 Final | 269 |
| 215 | Wiring instructions and wire receipt for $37,001.42 dated 6/15/07 | 275 |
| 216 | Deed of Trust | 276 |
| 220 | Congratulations letter from CIT | 278 |
| 230 | Bank of America monthly statements for Arthur Watson, 4/26/06 through 5/25/07 from Bank of America | 320 |
| 311 | Arthur Watson Bank of America Monthly Statement for June 27, 2007 - July 26, 2007 | 326 |
| 102 | Loan application | 345 |
| 101 | Purchase agreement | 356 |
| 105 | Occupancy statement | 358 |
| 112 | Cashier's Check to Arthur Watson from Leonard Williams, $14,993 on 9/5/06 | 361 |
| 229 | Kickback check from DHF to Arthur Watson for $2,000 dated 7/24/07 | 371 |
| 226 | Check to Arthur Watson 6/21/07 for $1,700, memo Consultant | 372 |
| 228 | Check from DHF to Arthur Watson for $1,300 dated 6/27/07, memo Ceanothus | 373 |
| 301 | Loan Application | 378 |
| 302 | Purchase Agreement | 381 |
| 305 | Occupancy Statement | 382 |
| 308 | Check from DHF to Arthur Watson for $8,000 dated 6/29/07, memo Chico Property | 384 |
| 309 | Check from Arthur Watson to DHF for $8,000 dated 6/29/07 | 384 |

DEFENSE EXHIBITS RECEIVED IN EVIDENCE

| NO.: | DESCRIPTION: | PAGE: |
|------|-------------|-------|
| A | IRS 4506-T form | 293 |

1                    SACRAMENTO, CALIFORNIA

2                WEDNESDAY, JULY 9, 2014, 9:00 A.M.

3                          ---oOo---

4          (Jury not present.)

5          THE COURT:  Ready for the jury?

6          MR. HALES:  Yes, your Honor.

7          THE COURT:  All right.  Bring them in.

8          (Jury present.)

9          THE COURT:  Good morning, ladies and gentlemen.  All

10   of the jurors are present.  The defendant is present with

11   counsel.

12         Mr. Hales, are you going to make the opening statement

13   on behalf of the government?

14         MR. HALES:  I am, your Honor.

15         THE COURT:  You may proceed.

16         MR. HALES:  Thank you.

17         Leonard Williams defrauded lenders into giving out

18   more than a million dollars in home loans based on phony loan

19   applications filled with lies.  And he didn't do it alone.

20   This is a mortgage fraud conspiracy case.  And from late 2006

21   into 2008, the defendant, Leonard Williams, conspired with

22   others to carry out a mortgage fraud scheme.

23         The government expects the evidence at trial to show

24   the following five things:

25         First, with the defendant's knowledge, loan

1    applications containing false information were submitted to

2    lenders and multiple loans were given out based on the false

3    information in those loan applications.

4            Second, the defendant was a real estate professional

5    who was in the middle of this conspiracy.

6            Third, he not only knew about the false information in

7    those loan applications, he suggested it, he encouraged it,

8    and he backed it up.

9            Fourth, the defendant and his partner profited tens of

10   thousands of dollars from these transactions.

11           And fifth, multiple borrowers defaulted on their home

12   loans and the lenders lost hundreds of thousands of dollars

13   as a result.

14           So what forms did the fraud take in this case?  First,

15   the lies told to the lenders included the following:

16           First, false employment information.  False income

17   information.  False asset information.  Large falsified cash

18   gifts from family members that were supposed to go towards

19   down payments but didn't exist.  Falsified down payments that

20   never changed hands but inflated the sales price of homes.

21   False statements of the intent to occupy homes as the

22   primary, as a primary residence, which is important to

23   lenders because you're more likely to fight for your own home

24   than an investment property.  And cash kickbacks to the

25   borrowers outside of escrow that the lenders didn't know

1    about which has the effect of inflating the sales price of

2    the homes.

3              Each transaction, each deal in this case was

4    different, but all of them included at least two of those

5    lies to the lenders.  And as a result, the lenders were

6    deceived.  They were deceived as to the true sales price of

7    the homes, what the borrower, the buyer of the house was

8    actually paying for the home, and they were deceived as to

9    the true financial condition of the borrower.  How much money

10   they had, how much money they were putting into the

11   residence, into the home, and how much money they were likely

12   to have going forward in order to repay the loan.  These were

13   important pieces of information for the lenders to know.

14   They could affect whether or not the loans were extended.

15             Now, I want to talk for a minute about the defendant's

16   role in this case and give a little bit of background.  The

17   defendant, Leonard Williams, met his partner, a young man

18   named Joshua Clymer, while they were working for a mortgage

19   broker.  And by late 2006, they decided to pair up and do

20   their own deals, their own transactions.  They had an office

21   on Watt Avenue in Sacramento and at times they worked with a

22   loan processor named Jan Vawter who had an office space in

23   the same building.  And you'll hear about Jan Vawter from

24   time to time.

25             The defendant and his partner recruited home buyers

1    with a sales pitch.  You can get cash back if you buy a

2    house.  Little or no money down.  And sometimes imaginary

3    equity in the home that would result from a faked down

4    payment.

5         Practically speaking, they would act as the agents for

6    home buyers because they would help those buyers apply for

7    the loans and get them.  This is where the lies would be

8    discussed when the loan applications were being contemplated

9    and they were getting ready to prepare them.

10        The defendant used two businesses in connection with

11   these real estate deals, Diamond Hill Financial and Bay Area

12   Real Estate Holdings, LLC.  So, first, Diamond Hill

13   Financial.  You'll hear a lot about Diamond Hill Financial

14   during this trial.  That was the defendant Leonard Williams'

15   business.  It was basically just him.  He was the president.

16   He controlled the bank account.

17        In the earlier stages, the defendant and his partner

18   used the Diamond Hill bank account to receive the proceeds of

19   their scheme and divide them up.  In October 2006, the

20   defendant made his partner, Joshua Clymer, treasurer of

21   Diamond Hill on paper so that they could complete one of

22   their real estate transactions.  No one else truly worked for

23   Diamond Hill or had a title there.  That was it.

24        Why is that important?  Because the loan applications

25   for multiple buyers in this scheme falsely stated that they

1   had worked at Diamond Hill Financial for years and made good

2   money there.  And as the defendant and the buyers knew, that

3   was completely false.

4         You'll hear testimony from buyers that

5   Leonard Williams suggested listing Diamond Hill as their

6   employer on the loan applications, and they went along with

7   it.

8         The evidence will also show that when lenders tried to

9   verify that employment for the borrowers, the defendant

10  verified it.

11        Next, Bay Area Real Estate.  In April 2007, the

12  defendant and his partner agreed to create another business

13  called Bay Area Real Estate Holdings, LLC.  During the trial,

14  we'll refer to it as Bay Area Real Estate or BARE.

15        The defendant and his partner were the only owners of

16  Bay Area Real Estate, and they shared it 50/50.  They were

17  the only ones with signature authority on Bay Area Real

18  Estate's bank account, and they used the Bay Area Real Estate

19  bank account to receive the proceeds of their scheme and to

20  divide it up.

21        The defendant and his partner also used Bay Area Real

22  Estate to buy and sell properties in a technique called a

23  double escrow that I will explain in a few minutes.

24        So six properties.  The evidence at trial will focus

25  on six properties.  You'll hear about other properties from

1    time to time, but these are the six that will be focused on.

2    So two properties in Chico at the top and four properties in

3    the Sacramento area at the bottom.  These are all in

4    Sacramento except for Linday Way which is actually in

5    Gold River nearby.

6         First, I'll discuss the Chico properties.  The buyer

7    for the Chico properties was the defendant's longtime Air

8    Force friend, Arthur Watson.  And in 2006, Mr. Watson was

9    coming out of a difficult period in his life.  The defendant

10   helped Mr. Watson rebuild his credit score and then

11   encouraged him to buy several homes by making promises that

12   Mr. Watson would receive cash back if he bought homes.

13   Mr. Watson bought two Chico properties about a month apart in

14   2007, one on Ceanothus Avenue and the other one on Rockin M

15   Drive.

16        The defendant and Mr. Watson met and they discussed

17   putting false information on Mr. Watson's loan applications,

18   and they agreed to do it.  Mr. Watson knew about the false

19   information in his loan applications, but he went along

20   anyway to get the cash back that they had discussed.

21        And the lies on the loan applications for Mr. Watson

22   for Ceanothus and Rockin M included the following:  The false

23   statement that Mr. Watson had been an employee of Diamond

24   Hill Financial for years and that, next, inflated income

25   multiple times what Mr. Watson actually made at the time.

1    Inflated assets that were supported in part by false bank

2    statements and money that was not Mr. Watson's.  The false

3    statement of Mr. Watson's intent to occupy these homes as his

4    primary residence.

5          Mr. Watson at that point had never been to Chico, had

6    no intent of living in those homes as his primary residence.

7    And, finally, as I'll explain further in a few minutes, a

8    false purchase price because of the kickbacks that were

9    received from the seller.

10         Why did Mr. Watson do it anyway?  One might ask even

11   with the promise of cash back, why would he take on the kind

12   of debt associated with these homes in Chico if he had never

13   been there and didn't intend to live in the homes?  The

14   defendant and Mr. Watson agreed that the defendant would pay

15   the mortgage on those properties and that he would rent them

16   out so Mr. Watson didn't have to worry about it.  In the end,

17   it didn't work out that way.  The mortgage wasn't paid,

18   Mr. Watson defaulted on the loans, and the homes were sold at

19   foreclosure.

20         So how did the defendant get the money out of these

21   Chico deals?  That is where the falsified purchase price and

22   the kickbacks that I mentioned before come into play.  The

23   seller for these two homes was a Chico home developer named

24   Tony Symmes.  I'll hold it up so everyone can see.  And in

25   2006 and 2007, Mr. Symmes had too many homes.  He couldn't

1    sell them quickly enough.  So what he started to do was to

2    pay buyers kickbacks, cash back if they would buy his homes.

3    And he relied on a man also listed here, he often relied on a

4    man named Garret Gililland to recruit buyers like that for

5    him, people that would buy the homes if they got cash back.

6    Mr. Gililland is the one who connected the defendant and

7    Tony Symmes.

8            Mr. Symmes' kickback scheme worked like this.  A lot

9    of his houses were similar.  So around that time, he was

10   typically willing to sell one of his houses for around

11   $300,000, maybe a little under.  But if somebody like

12   Mr. Gililland brought him a buyer who was willing to buy the

13   home if they could get cash back, both sides would pretend

14   that the true purchase price was much higher.  And that is

15   what they would tell the lender, that is what they would tell

16   escrow.

17           Why?  So that the buyer could apply for a loan pegged

18   that higher purchase price, that inflated amount.  When the

19   loan came in and the inflated amount went to Mr. Symmes, he

20   would then kick back some or all of the difference to the

21   buyer or the recruiter who brought the buyer to him so they

22   bought the home.  But the lender didn't know about it.  What

23   that means is that the true amount that the buyer actually

24   paid for the house was much lower.  That's essentially what

25   happened here.

1           For the Chico properties in this case, the defendant

2    was the primary recruiter who brought Mr. Watson in as the

3    buyer, and he received the kickback checks from Mr. Symmes

4    made out to Diamond Hill Financial.  One of them for $46,000,

5    the other one for $30,000.  The defendant shared some of that

6    money with his partner, Joshua Clymer.  He also shared some

7    of it with Mr. Watson on the first Ceanothus deal.  And

8    you'll see the kickback checks, and you'll hear testimony

9    from Mr. Symmes about these deals.

10          Now, when Mr. Symmes testifies, you will likely learn

11   that he cooperated with the government in this case, that he

12   pled guilty and accepted responsibility, and that he received

13   a reduced sentence for his cooperation.  So you should expect

14   to see his testimony corroborated by documents and by other

15   witnesses.

16          Arthur Watson will also testify about these Chico

17   properties.  You will hear about his discussions with the

18   defendant and see his fraudulent loan applications.  You will

19   hear some about another property he bought with the defendant

20   in Yuba City in 2006 called Gidda Loop.  That's one of the

21   other properties that you'll hear about at times.

22          You will hear that Mr. Watson never worked a day for

23   Diamond Hill Financial, and he did not make the money that

24   was listed on his loan application.  You will hear how he

25   trusted the defendant, his longtime Air Force friend, so much

1    that he gave him online access to his bank account statements

2    and pretty much signed whatever the defendant asked him to in

3    connection with these transactions.

4         Finally, with respect to these Chico deals, you will

5    hear that IRS and FBI agents interviewed the defendant about

6    these transactions, and you'll hear what he told them.

7         So next, the four Sacramento area properties.  These

8    four properties involved similar types of fraud and loan

9    applications just within a more complicated structure for the

10   real estate transaction.  That is the double escrow that I

11   referred to earlier.

12        Here's a basic overview of the double escrows.  The

13   defendant and his partner would look for a property they

14   thought they could buy at a low price but that they could get

15   appraised for a higher price.  But because they didn't have

16   the money to actually buy the property at the low price they

17   could get it for, they would also be looking for buyers,

18   buyers who would agree to purchase the house at the inflated

19   amount on a purchase contract.  And this is where the

20   recruitment pitch came in.  Cash back, little or no money

21   down, and at times the imaginary equity from the faked down

22   payment.  That's what they used to pull the buyers in.

23        Once they recruited the buyer, the defendant and his

24   partner would help the buyer get a loan with a fraudulent

25   loan application.  The plan was that Bay Area Real Estate

1    would buy the house and then resell it to that buyer all on

2    the same day.  It's like an instant flip, and it's made

3    possible by fraud, because the only money, the primary source

4    of funds in this transaction is the loan proceeds from the

5    fraudulent loan application.  That money would come into the

6    deal, a portion of it would be used to pay off the initial

7    contract where Bay Area Real Estate purchased it for the low

8    price, and the rest of it, minus a few transaction costs,

9    would go to Bay Area Real Estate as the proceeds of the

10   fraud, and the defendant would then write the checks to

11   divide up those proceeds.

12        That's the double escrow.  It's an instant flip.  Two

13   transactions instead of one.  But it's all made possible by

14   the funds from that fraudulent loan application.

15        Fictional down payments.  Each of these double escrows

16   involved fictional down payments.  In the loan applications

17   and purchase agreements, lenders were led to believe that the

18   buyers were making substantial down payments in connection

19   with the purchase of these properties to Bay Area Real

20   Estate.  The defendant and his partner simply told the buyers

21   they didn't have to make that down payment.  Remember that

22   was part of the pitch, little or no money down.  But the

23   lenders weren't told.  And this meant that the true purchase

24   price of the home, because there was no down payment, was

25   actually much lower than what was stated on the purchase

1    contract and what was stated in the loan application.

2          As witnesses from lenders will explain to you during

3    the trial, the existence of the down payment and the true

4    purchase price of the home are key pieces of information for

5    the lenders.  They can affect whether or not they will extend

6    the loan or how much money they will decide to lend.

7          So the first recruited buyer for a double escrow was

8    Joshua Frye who bought a property on Baker Avenue in

9    Sacramento in February 2008.  At the time Mr. Frye was 21

10   years old.  He had no steady income, no steady job.  He met

11   with the defendant and his partner at their office, and they

12   offered Mr. Frye cash back if he would buy a house.  The

13   defendant suggested that in order to get him a loan, they

14   could list Diamond Hill Financial as his employer.  Mr. Frye

15   agreed and they did it.

16         When the loan application was ready, the defendant's

17   partner sent it to Mr. Frye by email and he signed it.  That

18   loan application said that Mr. Frye made over $7,000 a month

19   working at Diamond Hill Financial and that he had over

20   $60,000 in assets.  All false.  Right before funding, the

21   lender called to verify that Mr. Frye worked at Diamond Hill

22   Financial and the defendant verified it.  The loan then

23   funded for $315,000.

24         And after paying off the first part of the double

25   escrow and various expenses were paid, the defendant had

1    enough to cut himself checks, cut a check to himself and his

2    partner for over $15,000 each.  And they still had enough to

3    kick back over $17,000 to Joshua Frye.  The defendant himself

4    personally handed Mr. Frye his kickback check.  The lender

5    didn't know about it.

6          Mr. Frye later defaulted on the Baker property.  He

7    tried to do a short sale, it didn't work, and there had to be

8    a foreclosure.  Mr. Frye will testify about that transaction.

9          The second double escrow buyer was Juan Reynaga who

10   bought a home on Trap Rock Way in Sacramento in March 2008.

11   Unlike the other buyers, his loan application did not say

12   that he worked at Diamond Hill Financial.  Mr. Reynaga was a

13   correctional officer, and he made decent money.  What he did

14   not have was money for a down payment.  The primary fraud in

15   his loan application was a faked $84,000 down payment.

16         The defendant flat out told Mr. Reynaga we will put

17   $420,000 as the purchase price for this house on the purchase

18   agreement and on the loan application, but really Bay Area

19   Real Estate will accept only $336,000 from you.  You just

20   don't have to make the down payment.

21         To make this work, the defendant told Mr. Reynaga to

22   fill out an affidavit saying that Mr. Reynaga's brother had

23   gifted him $84,000.  It was false, but he did it.

24         The defendant also asked Mr. Reynaga to write out a

25   check, an actual check for $84,000 that looked like a down

1    payment for Trap Rock, but the defendant promised he would

2    never cash it.  That check was provided to the lender, but it

3    was never cashed, nor could it have been because Mr. Reynaga

4    did not have the money.

5            Mr. Reynaga's loan funded at $336,000.  He did not get

6    any cash back.  After paying off the first part of the double

7    escrow, the defendant and his partner had enough left over to

8    each get over $16,000 out of that deal.  Mr. Reynaga will

9    testify about that transaction.

10            The next double escrow buyer was Lacie Clymer,

11   Joshua Clymer's sister.  She bought a property on Linday Way

12   in Gold River in March 2008.  At the time she bought it, she

13   made less than a thousand dollars a month working retail

14   jobs.  She's fairly young.  Her loan application falsely

15   stated that she worked at Diamond Hill Financial and made

16   over $8,000 a month.  It also falsely stated her assets and

17   that she would make a hundred thousand dollar down payment.

18   Just before funding the loan, the lender called to verify

19   that Lacie worked at Diamond Hill Financial, and the

20   defendant verified it.  The loan funded for over $382,000.

21            The defendant wrote his partner, Joshua Clymer, a

22   check out of the proceeds for $36,000 and another check to

23   Lacie Clymer for $9,500.  Lacie Clymer later defaulted on her

24   loan, and the property was sold at foreclosure.

25            The final double escrow buyer focused on in this trial

1   is Anthony Petri.  He bought a property at 5548 Woodforest

2   Drive in Sacramento in August 2008.  At the time, Mr. Petri

3   was 19 years old or had just turned 20, and he was a used car

4   salesman.  He met with the defendant and his partner several

5   times.  Mr. Petri told them his true employment information

6   and how much money he made, and they told him he couldn't get

7   the loan he wanted with his true employment and income

8   information but that there was still a way to do it, if they

9   lied about his employment and income.

10          Mr. Petri's loan application falsely stated that he

11   made over $11,000 per month working at Diamond Hill

12   Financial, and it falsely stated that he had $60,000 in

13   assets from a gift from his mother.  That $60,000 was

14   supposed to go towards Mr. Petri's down payment on

15   Woodforest, but neither the gift nor the down payment ever

16   existed.

17          Mr. Petri's loan application also contained falsified

18   W-2s and pay stubs from Diamond Hill Financial to

19   substantiate this money he supposedly made working there.

20          Before signing this loan application, Mr. Petri

21   expressed concerns about the legality of this to the

22   defendant and his partner.  The defendant told him not to

23   worry about it.  Mr. Petri signed and the lender funded a

24   loan of $240,000 on the Woodforest property.  The defendant

25   and his partner had previously offered Mr. Petri cash back,

1    but in the end, they didn't give it to him, and the defendant

2    and his partner each profited over $16,000 from that

3    transaction.  Mr. Petri later defaulted on his loan, and he

4    had to have his loan terms modified.  He will testify about

5    that transaction.

6         So that's it.  Those are all of the main real estate

7    transactions that will be focused on during the trial.

8         In addition to the witnesses I've already mentioned,

9    you will hear testimony from lenders, representatives from

10   the lenders who gave out these loans, and some lenders who

11   later acquired these loans.  Testimony from the banks and

12   credit unions, representatives from the banks and credit

13   unions where the money related to these deals flowed.  County

14   recorders, representatives from the Butte County and

15   Sacramento County Recorder's Offices, the counties where

16   these transactions took place, who will tell you about

17   certain documents that were recorded in connection with the

18   transactions and then mailed out.  And various other

19   individuals who are connected to these transactions or came

20   into contact with the defendant's scheme.

21        One example would be Jessica Sawyer listed here.  She

22   worked for Garret Gililland.  And during the Chico deals, she

23   communicated with both the defendant and with Arthur Watson.

24        Finally, you'll hear testimony from a summary witness,

25   IRS Special Agent Andrew Harrison, who has reviewed the loan

1    files, the escrow files, and the bank records in this case in

2    order so that he can summarize the transactions and the flow

3    of money for you.

4         And so what will you be called upon to decide?  In the

5    end, you'll be asked to render a verdict on three counts.

6    First, conspiracy to commit mail fraud and wire fraud which

7    encompasses the entire scheme I just described.  And then the

8    next two counts, money laundering, which are the defendant's

9    writing of checks giving profits from the Petri Woodforest

10   deal out of the Bay Area Real Estate account into the Diamond

11   Hill account for himself and into Joshua Clymer's account for

12   his partner Joshua Clymer.

13        And based on the evidence presented and the

14   instructions on the law as given to you by the Court, at the

15   end we will ask you to render a verdict of guilty on all

16   three counts as charged.

17        THE COURT:  Thank you.

18        Mr. Wiseman, do you wish to make an opening statement

19   at this time or would you rather reserve it?

20        MR. WISEMAN:  I'm going to make one now, your Honor.

21        THE COURT:  All right.  Why don't you take your

22   materials down there, Mr. Hales.

23        If you want to set the stage a little differently,

24   Mr. Wiseman, you may do so.

25        MR. WISEMAN:  Thank you, your Honor.

1             And good morning, ladies and gentlemen.

2             THE COURT:  Did you want a microphone?

3             THE CLERK:  Pull your mike up a little bit.

4             THE COURT:  Put it on your necktie.  Can you do that?

5             MR. WISEMAN:  Good thing I didn't wear a bow tie

6    today.

7             THE COURT:  Yeah, that's right.

8             MR. WISEMAN:  Again, let me start.  Is that better?

9             THE COURT:  A little better.  Is there volume on it?

10   It's not quite as loud as Mr. Hales had it.

11            MR. WISEMAN:  How is that?  A little better?

12            THE CLERK:  Keep talking.  I'll adjust it.  Keep

13   talking.  I'll adjust it.

14            MR. WISEMAN:  Testing 1-2-3, testing.

15            THE COURT:  Why don't you face it more up.  Now try

16   it.

17            MR. WISEMAN:  Okay.  How is that?  All right.  Very

18   well.

19            Again, good morning, ladies and gentlemen.  As you

20   already know, I'm Joseph Wiseman.  I represent Mr. Williams

21   in this case.  And let me start by saying this.  We probably

22   have all heard the phrase that every picture tells a story.

23   And like every picture that tells a story, every case that is

24   tried in court really has an underlying story about it, and

25   that's what I want to spend just a few minutes talking to you

1    about in this case.  I'm going to tell you the defense's

2    position or the defense's view of the story of this case.

3         And as you probably gathered from the questions that I

4    asked you during the jury selection, this case, the story of

5    this case takes place during 2006 to around 2008.  And if

6    anybody were alive and could listen to the radio or read a

7    paper or watch television, you would know that that was a

8    period of time where it was the beginning of the tail end of

9    the largest run up of real estate prices in the United States

10   and some people suggest the world.  And it was also a time

11   where it was the beginning of a major financial crash that we

12   probably are all familiar with that started around the tail

13   end of 2008.

14        So this story, the story of this case takes place

15   during the time.  And you might recall that there were all

16   sorts of media accounts, for example, cabbies in New York

17   City buying condos in the south Florida sight unseen.  There

18   were stories where people in California would get multiple

19   offers on their homes way in excess of asking prices.  Again,

20   this is this period of time during this major run up of

21   prices of homes.

22        It was also a time where people would stand in line

23   and in lottery situations at developer's sites to bid on

24   empty lots that were promised to be built.  It was really a

25   heady time, and I think we probably all can remember.  And

1        that is the setting of the story of this case.

2                Now, how does Mr. Williams, my client, fit into this

3        story?  Well, you'll discover that Mr. Williams had a long

4        career in the United States Air Force.  And after that career

5        in the Air Force, he became a real estate agent.  He got his

6        real estate license, and he began working in the real estate

7        field.  He eventually went into business with a partner whose

8        name has been mentioned, Josh Clymer.  And their idea was to

9        invest in real estate and real estate transactions.  And one

10       of the ways, the way in which you will hear in this

11       particular case that they did this is that they set up what

12       Mr. Hales described as double escrows, but it's also

13       described as a concurrent transaction, a simultaneous

14       transaction.  And here's how it worked.

15               The idea that Mr. Williams and Mr. Clymer had was to

16       find undervalued properties in the Sacramento area primarily

17       or the central valley area.  And to do that, one has to scour

18       the multiple listings.  And I think you'll hear testimony

19       about what the multiple listing is.  It's a rather tedious

20       thing to do to find these undervalued houses.  And that job

21       was left to Mr. Clymer.  He appeared to be quite good at

22       scouring the MLSs, locating undervalued properties.

23               And the moment that one of these undervalued

24       properties was located, the partnership or the business model

25       that Mr. Clymer and Mr. Williams had was to make an offer on

1    that undervalued property, tie the property up in a contract,

2    make an offer to the seller for what the list price was.  At

3    the same time, Mr. Clymer and Mr. Williams would find a buyer

4    who was willing to buy that property but at a higher price.

5    Because the only way that a concurrent transaction works, the

6    only economic benefit to people who are trying to put a

7    concurrent transaction together is if there is a spread; if

8    they buy low and sell high.  That's the American way of

9    making a buck.  You buy low and you sell high.  That was the

10   idea that Clymer and Williams had.

11        When they located a buyer who was willing to buy the

12   property, it was a buyer's responsibility to go get a loan

13   and to secure the loan proceeds to buy the property.  So

14   essentially the concurrent transaction is a seamless

15   transaction between Williams and Clymer buying an undervalued

16   property and simultaneously selling it at a higher price to a

17   buyer.

18        Now, there is nothing inherently wrong with a

19   concurrent transaction or also described as a double escrow.

20   And I suspect you'll hear testimony from an escrow agent as

21   to how that works and the fact that, inherently, there's

22   nothing wrong with that concept.

23        Now, you'll find, you'll discover that, as I mentioned

24   before, it was Mr. Clymer's job to find these transactions --

25   excuse me, find these undervalued transactions or undervalued

1      properties.  What was Mr. Williams' job?  Well, Mr. Williams'

2      job, because he was a licensed real estate broker,

3      represented the Williams Clymer entity in the purchase as the

4      purchasing agent in these transactions, and you'll discover

5      that.  And that's essentially how the business model that

6      Mr. Clymer and Mr. Williams created operated.

7              Now, things get a little difficult in this case

8      because what you're going to have to do in this case is,

9      after you hear the evidence, is to decide who had what role

10     and who is responsible for what the government is alleging

11     that occurred.

12             One of the things that you're going to have to decide

13     is, when you get instructed by Judge Shubb, is, A, was there

14     a conspiracy, and a conspiracy, you'll learn, is an agreement

15     among two or more people to do something, and a criminal

16     conspiracy, it's an agreement to do something that is

17     illegal.

18             So, one, you'll have to decide, in fact, was there a

19     conspiracy in this case.  And, secondly, with this conspiracy

20     question is what was the object of the conspiracy, what did

21     the alleged conspirators decide to do?  So that's the

22     conspiracy count that you're going to have to deal with.

23             One of the other key points that you're going to have

24     to analyze and decide is the issue of materiality.  Because

25     what the government is going to attempt to prove is that many

1    of the loan transactions, many of the loan applications, were

2    fraudulent.  That they contained false employment

3    information, they contained false salaries, et cetera.  The

4    question that you're going to have to decide is did that make

5    a difference to the lenders?  Because, again, we're talking

6    about 2008.

7         And I suspect you're going to have and I anticipate

8    that you're going to have testimony from banking folks that

9    will describe the milieu, what the conditions, the business

10   climate of the lenders was in 2008.  And so the question is

11   if you find that there were false statements, the question

12   you'll have to decide is did it make a difference to the

13   lenders?  Because that is the issue of materiality, which I

14   suggest is going to be a key question in this case.

15        Now, like all stories, this case has a long cast of

16   characters, and you heard Mr. Hales describe some of the

17   people that you are going to hear who will testify.  And I

18   suspect that the government will call Joshua Clymer,

19   Mr. Williams' partner, who will testify about his involvement

20   with Mr. Williams.  And you will hear from a Symmes, a

21   Tony Symmes, who Mr. Hales has already described has pled

22   guilty and has agreed to cooperate.  And you will be

23   instructed by Judge Shubb as to how you evaluate that kind of

24   testimony.  That is somebody who has pled guilty and is

25   cooperating with the government.  You're going to hear from a

1    Lacie Clymer.  You're going to hear, I suspect, as I said,

2    you're going to have Joshua Clymer on the stand, and you'll

3    hear the motivations that Joshua Clymer has to testify in

4    this court.

5          Now, I think this case is going to be a relatively

6    straightforward and a relatively quick case.  And one thing

7    that you will discover is the defense is going to agree on a

8    lot of this.  I mean, there's going to be document after

9    document that is going to be introduced, and a lot of these

10   documents the defense is not going to object to because the

11   document is what the document is.  The question is, however,

12   what the document represents and what the document proves.

13   So you're not going to see me standing up every two seconds

14   objecting to this or objecting to that.

15         And, lastly, what I want to say is, and I think it's

16   something that Judge Shubb already alluded to, but if not,

17   you'll be instructed, you have to suspend judgment.  You have

18   to suspend one's natural tendency to make a quick judgment

19   after hearing something until you go into the jury room.  So

20   you have to keep your minds open throughout the whole trial.

21   So you have to listen to the evidence and only until you're

22   instructed and asked to deliberate do you then go through the

23   process of making a decision on this case.  So I'm asking

24   you, and I have no reason to believe you won't do this, but

25   keep your mind open, wait until all of the evidence is in

1     before you come to some conclusion even though your natural

2     tendency may be to come to an early conclusion about an event

3     or a transaction or believing somebody or not believing.

4          So keep an open mind until the end of the case.  And

5     then at the end of the case, I'm going to ask you, based upon

6     the evidence, that the government -- I'm going to suggest to

7     you and ask you to find that the government has not proved

8     the essential element of each and every charge beyond a

9     reasonable doubt.

10         Thank you.

11         THE COURT:  Thank you.

12         Mr. Hales, would you remove that easel, please.

13         MR. HALES:  Yes, your Honor.

14         THE COURT:  And the government may call its first

15    witness.

16         MS. HEMESATH:  The United States calls Kevin Walsh.

17         THE CLERK:  Sir, please step forward, stand right

18    here, please, in front of the court reporter and face me.

19    Raise your right hand.

20                        KEVIN WALSH,

21    a witness called by the Government, having been first duly

22    sworn by the Clerk to tell the truth, the whole truth, and

23    nothing but the truth, testified as follows:

24         THE WITNESS:  I do.

25         THE CLERK:  Thank you.  You may be seated.  Please

1    state your full name, spell your last name for the record.

2              THE WITNESS:  Kevin Walsh, W-A-L-S-H.

3                         DIRECT EXAMINATION

4    BY MS. HEMESATH:

5    Q.

6    Q.       Mr. Walsh, we're going to be using the binder behind

7    you.  If you turn around, the middle binder on the top row.

8    You can just leave it in front of you on the desk for now.

9    Thank you.

10             Mr. Walsh, where do you work?

11   A.       I work for Caliber Home Loans, and I work out of my

12   home in Yonkers, New York.

13   Q.       How long have you worked there?

14   A.       I've worked out of my home the last two years.  I've

15   worked for Caliber or its predecessor companies, including

16   CIT, for almost 34 years.

17   Q.       And in what capacity?

18   A.       I started out as a procedures analyst, writing the

19   operating procedures and policies for our lending operation,

20   and I also worked with our systems people setting up the

21   parameters in the system, the control rates, late charges,

22   refunds on precomputed accounts, interest calculations,

23   adjustable rate changes, all matters of servicing loan

24   accounts.

25             I have done licensing for our in-house insurance

```
 1   operation, regulatory compliance, state exams, residential

 2   complaints that came in to CIT's Livingston office.  And

 3   currently I am involved mostly with data mapping of loans we

 4   acquire from other servicers.

 5   Q.     What's your current job title?

 6   A.     Vice president of acquisitions.

 7   Q.     And you said 34 years.  Is it fair to say you were

 8   working at CIT in 2007?

 9   A.     Yes, I was.

10   Q.     In that time period, 2007, what was your job?

11   A.     In 2007, my job title was vice president of strategic

12   business systems implementation, and I was involved with

13   setting up and maintaining our consumer loan servicing system

14   which at the time was called ALS.

15   Q.     Would you please describe for us what kind of a lender

16   is CIT.

17   A.     CIT was a consumer lender engaged primarily in

18   mortgage loans, some sales finance business at the time, and

19   also some unsecured consumer business.

20   Q.     In the mortgage loans, is that to purchasers of

21   residential homes?  Would you offer that type of a loan?

22   A.     Among others, yes.

23   Q.     And for those residential home loans, would you

24   typically keep the loan from beginning to end?

25   A.     We might or we might not.
```

KELLY O'HALLORAN, OFFICIAL COURT REPORTER, USDC -- (916) 448-2712

1    Q.       You did both?

2    A.       We did both.

3    Q.       The ones that you didn't keep, what would happen to

4    them?

5    A.       Some were originated with the intention of selling

6    them off shortly after origination.  And then some other

7    loans that were originated to be held in the portfolio might

8    at some time down the road be sold if there was the

9    opportunity of locking in some kind of gain.

10   Q.       When a potential borrower would come to you to apply

11   for a home loan, what are some of the most important

12   qualifications that you would be looking for in 2007?

13   A.       You would be looking for the borrower's income, you'd

14   want to make sure that he could afford to make the payments

15   on the loan, his debts, his credit history, does he have a

16   pattern of paying his debts or not paying them.  You'd

17   certainly be looking for information on the property.  You

18   know, you could have a borrower with A-1 credit who wants to

19   buy a property for 500,000 and the property is worth a

20   hundred thousand, and that's a deal you're going to turn down

21   no matter how good the credit is.

22   Q.       What's A-1 credit?

23   A.       A-1, I'm using that in a generic sense.  Perfect

24   credit.

25   Q.       Is there a number that you associate with that?

KELLY O'HALLORAN, OFFICIAL COURT REPORTER, USDC -- (916) 448-2712

1   A.      No.  That's just layman's terms.  Somebody with the

2   best credit imaginable.  If the collateral is not good, then

3   we don't want to do the loan.

4   Q.      What do you mean by collateral?

5   A.      The real estate being purchased.

6   Q.      How could the real estate not be good?

7   A.      Well, it may not be worth what the borrower is paying

8   for it.  We don't want to loan $200,000 on a property that's

9   worth $100,000.

10  Q.      Why not?

11  A.      If there's a foreclosure and we have to sell the

12  property, we're only going to be able to sell it for ballpark

13  a hundred thousand, and there will be some expenses, so we'd

14  be looking at a loss probably in excess of a hundred thousand

15  if that loan went bad quickly.

16  Q.      These factors that you just mentioned to us, income,

17  credit history, debts, did you have qualifications on each of

18  those or did you look at them all in conjunction with each

19  other?

20  A.      There was a bit of both with the company.

21  Q.      All right.  What is a stated income loan?

22  A.      A stated income loan is a loan where you rely on what

23  the borrower states his or her income to be.

24  Q.      Did CIT have a type of borrower in mind -- well, first

25  I should ask did CIT offer stated income loans?

1    A.       We did.

2    Q.       Was there a type of borrower that the company had in

3    mind when it offered stated income loans?

4    A.       Typically it would appeal to a borrower for whom

5    verifying the income would be more difficult.  Someone who

6    did perhaps did not receive all his income on regular W-2

7    work.

8    Q.       Can you give us an example of what type of worker that

9    might be?

10   A.       It could be someone who was self-employed, it could be

11   someone who regularly sold stocks and had capital gains

12   coming in every month.

13   Q.       What's a full documentation loan?

14   A.       A full documentation loan would be a loan where

15   everything is supported.  You'd probably have the borrower's

16   tax returns.  You'll verify his employment with the employer.

17   Q.       CIT offered both types of loans in 2007?

18   A.       Yes.

19   Q.       Who made the choice which type of loan to apply for?

20   A.       The borrower sometimes in consultation with the broker

21   through whom he was submitting the application, but it was

22   the borrower's choice.

23   Q.       Would you, CIT, ever go back to the borrower and say

24   you applied for stated income, but we really think that you

25   should be applying for full documentation?

1    A.      Yes, that's possible.

2    Q.      Under what circumstances?

3    A.      A stated income loan, because you have less

4    documentation to rely on, is riskier and so the credit

5    standards would generally be tighter.  And if the borrower

6    did not meet those particularly tight standards but might

7    meet the standards for a full documentation loan, we might

8    suggest to the borrower that while we can't offer the stated

9    income, we could consider an application with full

10   documentation.

11   Q.      If an application did on its face appear to meet, say,

12   the credit standards that you just mentioned, would you then

13   still go back to the borrower and say we think you'd be

14   better off with full documentation loan?

15   A.      I doubt that very much.

16   Q.      All right.  Have you had an opportunity to familiarize

17   yourself with the loan file from 2640 Ceanothus Drive in

18   Chico, California?

19   A.      I have.

20   Q.      Who was the lender on this file?

21   A.      The CIT Group/Consumer Finance, Inc.

22   Q.      How long did CIT Group hold this loan?

23   A.      We made the loan in 2007 and --

24   Q.      Was it ever resold?

25   A.      No, it was not.  We held it until it was charged off,

```
 1    and I suppose some would argue we perhaps still hold the

 2    title.

 3    Q.      All right.  If you would turn in the binder in front

 4    of you to what's been marked as Government's Exhibit 201.

 5    A.      Okay.

 6    Q.      Do you recognize this?

 7    A.      I do.

 8    Q.      How do you recognize it?

 9    A.      From reviewing the customer file.

10    Q.      And what is it?

11    A.      This is a real property purchase agreement.

12            MS. HEMESATH:  Move to admit Government's Exhibit 201

13    and permission to publish.

14            THE COURT:  Any objection?

15            MR. WISEMAN:  No objection, your Honor.

16            THE COURT:  I will assume from now here on, unless I

17    hear an objection to the offer of an exhibit, that there is

18    no objection.  Fair enough?

19            MR. WISEMAN:  That's fair.

20            THE COURT:  Exhibit 201 is received in evidence.

21                         (GOVERNMENT'S EXHIBIT 201, Purchase

22                          Agreement, ADMITTED INTO EVIDENCE.)

23    Q.      BY MS. HEMESATH:  Tell us again what this document is,

24    please.

25    A.      It is a real property purchase agreement.
```

1   Q.      All right.  Who is -- which property is it, first of

2   all?

3   A.      2640 Ceanothus Avenue.

4   Q.      And who is the seller?

5   A.      Ceanothus Traditions.

6   Q.      And the buyer?

7   A.      Arthur Watson.

8   Q.      What is the price?

9   A.      The purchase price was 375,000.

10  Q.      What's a purchase agreement in general terms?

11  A.      It's a contract to buy the real estate.

12  Q.      Does the lender see the purchase agreement?

13  A.      On a loan to purchase the real estate, absolutely.

14  Q.      What's the purpose of including the purchase agreement

15  in the loan file?

16  A.      To establish how much the borrower is paying for the

17  property.

18  Q.      Did CIT rely on this purchase agreement in its

19  decision to fund this loan?

20  A.      Yes.

21  Q.      What's an appraisal?

22  A.      An appraisal is an expert opinion by an appraiser of

23  what the real estate is worth, what it would sell for at a

24  particular time.

25  Q.      And does CIT generally rely on appraisals in the

1   decision whether or not to fund a particular loan?

2   A.      Yes.

3   Q.      And in your review of this loan file, was there an

4   appraisal done on this piece of property?

5   A.      There was.

6   Q.      And what price did this piece of property appraise

7   for?  It's on what's been marked as Government's Exhibit 211.

8   A.      Okay.

9           THE COURT:  Are you offering that in evidence?

10          MS. HEMESATH:  Not at this time, your Honor.

11          THE COURT:  Don't just read from the exhibit because

12  it's not in evidence.  If it refreshes your recollection, you

13  may testify, but don't just read from the exhibit.

14          THE WITNESS:  This does refresh my recollection, and

15  it was $379,800.

16  Q.      BY MS. HEMESATH:  And how did that appraisal price

17  compare to the purchase price stated in the purchase

18  agreement?

19  A.      It was slightly more than the purchase price.

20  Q.      If an appraisal and a purchase price don't match up,

21  what does CIT do at that junction?

22  A.      Generally, we would use the lower of the two.

23  Q.      And why is that?

24  A.      To be more conservative, to protect ourselves.

25  Q.      Explain that for us, please.  How is it more

 1    conservative to use the lower of the two prices?

 2    A.      If we were to loan 375,000 against a property that the

 3    borrower is buying for 375, we could be on the hook for the

 4    entire value of the property.  If we loan 379,000 and change,

 5    but the buyer is only spending 375,000, we're on the hook for

 6    an additional 4,000.

 7    Q.      Is it fair to say that even if a property appraises

 8    for a certain amount, it's still relevant to you what the

 9    buyer is paying for that property?

10    A.      Yes.

11    Q.      Go ahead and look at what's been marked as

12    Government's Exhibit 202.

13    A.      Okay.

14    Q.      Do you recognize this?

15    A.      I do.

16    Q.      How do you recognize it?

17    A.      From reviewing the customer file.

18    Q.      And what is it?

19    A.      This is the customer's application.

20            MS. HEMESATH:  Move Government's Exhibit 202 into

21    evidence and permission to publish.

22            MR. WISEMAN:  No objection.

23            THE COURT:  Exhibit 202 is received in evidence.

24                        (GOVERNMENT'S EXHIBIT 202, Loan

25                        Application, ADMITTED INTO EVIDENCE.)

1   Q.      BY MS. HEMESATH:  What's a loan application?

2   A.      It's a document where the potential borrower provides

3   information to the creditor so that the creditor can make an

4   informed decision on whether or not to make the loan.

5   Q.      When you say creditor, are you the creditor?

6   A.      In this case, yes.

7   Q.      Is creditor a word that you use interchangeably with

8   lender?

9   A.      Yes.

10  Q.      Who's the borrower on this loan?

11  A.      Arthur Watson.

12  Q.      And how much does he want to borrow?

13  A.      375,000.

14  Q.      As you compare that to the purchase price of the

15  house, what type of loan is this?

16  A.      This might be called a hundred percent LTV or loan to

17  value.

18  Q.      Explain loan to value for us, please.

19  A.      It's a ratio of the amount borrowed to the value of

20  the property.

21  Q.      And you said here this is a hundred percent?

22  A.      Yes.

23  Q.      Are hundred percent loans treated differently than

24  other loans by CIT?

25  A.      Yes.

1    Q.      In what sense?

2    A.      Because there is no down payment and the borrower has

3    no equity in the property, there were generally higher

4    interest rates and tighter underwriting standards.

5    Q.      What do you mean by tighter underwriting standards?

6    What's an underwriting standard?

7    A.      Underwriting is the process of reviewing the

8    application.  In this case you might require a higher credit

9    score.  You might require a lower debt ratio, that the

10   monthly payment be a lower percentage of the customer income

11   because you want to be certain that the payments are going to

12   be paid.

13   Q.      So when you say higher underwriting standards, does

14   that mean that you are looking more carefully at the loan

15   application or does it mean you are looking for different

16   things on the loan application to satisfy you?

17   A.      I wouldn't want to say you're looking more carefully

18   because you should be looking carefully at every one, but you

19   are looking for some different criteria.

20   Q.      All right.  Is one of those criteria whether the

21   borrower will be living in the house?

22   A.      Absolutely.

23   Q.      Why is that important to you?

24   A.      If a borrower is living in the house, there is a much

25   higher incentive for the borrower to make payments.  If the

1    borrower is not living in the house and the borrower does not

2    pay and there's a foreclosure, the borrower loses his

3    investment.  If it's your primary residence and you don't

4    pay, you could be living in a refrigerator box under the

5    interstate, and that, for most people, is a much stronger

6    incentive to make payments.

7    Q.      If this borrower did not intend to live in this house,

8    which box would you expect to see checked over here?

9    A.      I would expect to see the box that says investment.

10   Q.      Did CIT have a policy with regard to hundred percent

11   financing of investment loans in 2007?

12   A.      We did.

13   Q.      What was that policy?

14   A.      We did not make such loans.

15   Q.      Loan applications in 2007, typically how would they be

16   received by CIT?

17   A.      Most commonly, they would be received over the

18   Internet.  Most of our applicants went through brokers, and

19   the broker would enter the information on a website that we

20   had called brokerage.com.  And that information would be

21   transmitted directly to our loan origination, loan

22   application system.

23   Q.      So on the broker end, would they have access to that

24   software to be able to submit this to you?  I guess it's not

25   software if it's online.

1    A.      They did not need the software.  They would go to the

2    website and they would key it in, and then they would click

3    submit, and that would be enough to submit it to us.

4    Q.      All right.  Down here at the bottom, where does this

5    loan application tell you that Mr. Watson works?

6    A.      It tells us in a box that's labeled name and address

7    of employer.

8    Q.      And which company?

9    A.      He works for Diamond Hill Financial.

10   Q.      And how many years on the job?

11   A.      Eight.

12   Q.      Why is it significant to you how long someone has been

13   on the job?

14   A.      It establishes whether the borrower has stable

15   employment, whether he's likely to continue to be working.

16   And in the case of a borrower who has a very short time on

17   the job, if you are verifying income, it then tells you that

18   you need to go and verify from a prior employer as well.

19   Q.      If a borrower had previously within this eight-year

20   period submitted loan application to a different lender that

21   had a different employer listed there, is that a fact that

22   would be significant to you in reviewing this loan

23   application?

24   A.      If the borrower had submitted an application to

25   someone else?

1    Q.      Right.

2    A.      If we were aware of that, that would be a fact,

3    something of interest.

4    Q.      What's the purpose of putting a phone number here with

5    the employer?

6    A.      This can be used to confirm that the borrower really

7    works there.  If you call the number and somebody answers

8    with a company name other than Diamond Hill Financial and

9    they don't know who Arthur Watson is, that's a tip-off that

10   there is a major problem.

11   Q.      All right.  And, finally, the title, what's the reason

12   for listing that there?

13   A.      It gives you some clue as to perhaps what salary the

14   borrower might actually be making or help you evaluate

15   whether the claim number is reasonable.  And in the case of a

16   larger company, if you're calling to verify that John Smith

17   works there and there's more than one John Smith, it might

18   help you pin down which person we're talking about.

19   Q.      All right.  I'm going to have you jump in your binder

20   to what's been marked as Government's Exhibit 206.  Do you

21   recognize it?

22   A.      I do.

23   Q.      How do you recognize it?

24   A.      From reviewing the customer file.

25   Q.      What is it?

1   A.      This is a printout from our application system of the

2   verification of employment on Arthur Watson.

3           MS. HEMESATH:  Move to admit Government's Exhibit 206

4   and permission to publish.

5           THE COURT:  Exhibit 206 is received in evidence.

6                           (GOVERNMENT'S EXHIBIT 206, Database

7                           printout of verification of

8                           employment, ADMITTED INTO EVIDENCE.)

9   Q.      BY MS. HEMESATH:  You were just describing to us a

10  verbal verification system for employment.  What is this that

11  we're looking at?

12  A.      This is a printout of a screen in that application or

13  origination system that documents that someone called to

14  verify the employment.

15  Q.      When you say someone, do you mean someone at CIT?

16  A.      Yes.

17  Q.      Do you know who that person is by looking at this

18  form?

19  A.      I do not see a name on this.  Oh, yes, I take it back,

20  it's down on the bottom where it says person.

21  Q.      You can go ahead and touch on the screen there in

22  front of you.

23  A.      Okay.  Oh, that's cool.  It's someone named A. Lopez.

24  Q.      Was it CIT's policy in 2007 to verbally verify

25  employment on loan applications?

KELLY O'HALLORAN, OFFICIAL COURT REPORTER, USDC -- (916) 448-2712

1    A.      Yes.

2    Q.      And in reviewing this loan file, did you find a

3    verification of the employment?

4    A.      Well, this is it.  This is the documentation of that.

5    Q.      In the remark section, who does this form tell you

6    verified the employment at Diamond Hill Financial?

7    A.      Leonard Williams who is the CEO and president.

8    Q.      What does this verification tell you about how long

9    Mr. Watson worked at Diamond Hill?

10   A.      It says he worked there at the time of the

11   verification for eight years and three months.

12   Q.      And what was his title at Diamond Hill according to

13   this form?

14   A.      Marketing director.

15   Q.      Did CIT rely on these verbal verifications of

16   employment in its decision to fund loans?

17   A.      Yes.

18   Q.      Let's go back to 202, please.  And let's look at page

19   2, please.  The top box.  What does this loan application

20   tell you that Mr. Watson's monthly base income is?

21   A.      $11,552.

22   Q.      Why is monthly income a significant factor to you in

23   evaluating loan applications?

24   A.      It's an important piece in determining whether or not

25   the borrower can afford to make the monthly payment.

1    Q.      What do you compare the monthly income to when trying

2    to determine if he can make the monthly payment?

3    A.      You will look at it first just in comparison to the

4    loan that we are considering, and then you'll look at it in

5    comparison to his total monthly obligations, the proposed

6    loan, and anything else that will continue after this loan is

7    made.

8    Q.      And so if we go back out, do you expect to see those

9    total monthly obligations on this application as well?

10   A.      We do.

11   Q.      Just go ahead and tap the screen where you expect to

12   see that if it is on this page.

13   A.      Down in this section here.

14   Q.      All right.  And so is it as simple as you add up

15   what's listed there in the liability section and compare it

16   to the income coming in?

17   A.      Basically, yes.

18   Q.      All right.  Let's go back to the top box.  We see a

19   rent line filled in there.  What is that asking for?

20   A.      That is asking for the borrower's current rent.

21   Q.      Why is it significant to you what the borrower is

22   currently paying in rent?

23   A.      If the borrower is comfortable with a $3,200 monthly

24   rental bill, then the borrower should be comfortable with a

25   mortgage payment of at least that amount and probably a

1    little more since mortgage interest is tax deductible and

2    rental income is not.

3    Q.      Let's go back to page 1 for a moment.  Is that why

4    you're asking for the borrower's current address?

5    A.      Yes.  Well, it's one of the reasons why.

6    Q.      What are the other reasons?

7    A.      Well, another one is if you have to send the borrower

8    disclosures, and there are disclosures that have to be sent

9    within three days of applications, you need the current

10   address to mail them to and not the address of the property

11   he's hoping to buy.

12   Q.      So if the borrower moves, is that something that you

13   would like to know?

14   A.      Absolutely.

15   Q.      And here why is it significant how long the borrower

16   has rented a particular home?

17   A.      It can demonstrate stability.  If someone is staying

18   in one place three years, he is more likely to be comfortable

19   living in a place for a while.  The landlord is more likely

20   to be comfortable with this person than somebody who's moving

21   every three months.

22   Q.      All right.  Let's go to page 3, please.  What's the

23   relevance to you of the assets portion of the loan

24   application?

25   A.      This is something that will tell us does the borrower

 1   have cash for a down payment, if there's one involved, does

 2   the borrower have some kind of cushion for unexpected

 3   expenses.  You move in and 30 days later you have to replace

 4   the water heater.  You know, does the borrower have any kind

 5   of savings.

 6   Q.     If there's no down payment, is this asset information

 7   still relevant to you?

 8   A.     Perhaps more so.

 9   Q.     Why is that?

10   A.     Because if the borrower does run into some unexpected

11   surprises, the water heater, for example, maybe the roof

12   starts to leak, all the things that homeowners hate, if the

13   borrower does not have the resources to put some money into

14   the property to make those repairs, the borrower may be a bit

15   more inclined to walk away from the property than someone who

16   has put 20 percent down.

17   Q.     All right.  Take it down.  Oh, I'm sorry.  Actually

18   one more on page 4.

19          What is the interview portion of the loan application

20   here?

21   A.     This is where we document who took the application,

22   and we document some information that the government requires

23   us to collect for monitoring purposes.

24   Q.     What's the purpose of having the borrower sign the

25   loan application?

1   A.      The purpose in having the borrower sign it is for the

2   borrower to say that yes, he has read this application and

3   that the information that is on it is correct and that he's

4   standing behind it.  That's his word.

5   Q.      All right.  Now we can take it down.

6           In 2007, did CIT offer a kind of loan where a borrower

7   would be able to buy a house without money down and also get

8   cash back from you as part of the deal?

9   A.      No.

10  Q.      Has CIT ever offered that kind of loan?

11  A.      No.

12  Q.      Why not?

13  A.      If you're giving the borrower cash back, in effect,

14  the purchase price is overstated, the borrower is paying

15  350,000 and you give him $5,000 back --

16          THE COURT:  One of the problems with the question, I

17  think, is -- and he hesitated in answering.  Cash back.  In a

18  loan, the lender is always giving the borrower money.  And so

19  when you say cash back, I think you probably need to redefine

20  what you're asking about.

21          MS. HEMESATH:  Fair enough.

22  Q.      BY MS. HEMESATH:  Would CIT ever make loans in excess

23  of the purchase price on homes?

24  A.      Not knowingly.

25  Q.      Go ahead and look in your binder at Exhibit 203.  Do

1    you recognize it?

2    A.      I do.

3    Q.      How do you recognize it?

4    A.      From reviewing the customer file.

5    Q.      And what is it?

6    A.      This is a letter from Diamond Hill Financial that

7    states that the applicant, Arthur Watson, can do his work

8    anyplace.

9           MS. HEMESATH:  Move to admit 203 and permission to

10   publish.

11          THE COURT:  Exhibit 203 is received in evidence.

12                         (GOVERNMENT'S EXHIBIT 203, Letter from

13                         Leonard Williams verifying employment,

14                         ADMITTED INTO EVIDENCE.)

15   Q.      BY MS. HEMESATH:  Why is it relevant to you that

16   Arthur Watson could do this job from anyplace?

17   A.      It would be relevant if the home being purchased is a

18   long drive from the borrower's place of employment, and a

19   lender might be concerned that the borrower is not planning

20   on staying in that job very long.

21   Q.      And what is Mr. Williams representing to you in this

22   letter?

23   A.      He's representing that his work could be done from any

24   location, and he doesn't have to live in Sacramento.

25   Q.      To what extent is he also representing here that

1   Mr. Watson is his marketing director?

2   A.     He's signed, "I'm writing regarding my marketing

3   director, Arthur Watson."

4   Q.     Go ahead and turn to 206, please, in the binder.

5   Sorry.  204.  Do you recognize it?

6   A.     I do.

7   Q.     How do you recognize it?

8   A.     From reviewing the customer file.

9   Q.     And what is it?

10  A.     This is a written verification of employment form.

11         MS. HEMESATH:  Move to admit 204 and permission to

12  publish.

13         THE COURT:  Exhibit 204 is received in evidence.

14                          (GOVERNMENT'S EXHIBIT 204, request for

15                          Verification of Employment filled out

16                          by hand, ADMITTED INTO EVIDENCE.)

17         THE COURT:  When an exhibit is received in evidence,

18  you do not need to ask permission to publish.  You may

19  publish it.

20         MS. HEMESATH:  Thank you, your Honor.

21  Q.     BY MS. HEMESATH:  Why is there an additional document

22  in the loan file about employment verification?

23  A.     It's preferable to get written verification as opposed

24  to verbal.  Verbal verification, if you get bad news, that

25  might tell you everything you need to know.  But if you're

1    relying on it, it's much better to have something where

2    Leonard Williams is signing off saying yes, this is something

3    you can rely on as opposed to somebody making a note that

4    said well, I spoke with Leonard Williams and he said.

5    Q.    And who made the written verification of employment in

6    this case?

7    A.    Leonard Williams.

8    Q.    Go ahead and look in your binder, please, at 207.  Do

9    you recognize it?

10   A.    I do.

11   Q.    How do you recognize it?

12   A.    From reviewing the file.

13   Q.    And what is this?

14   A.    This is a rental agreement.

15         MS. HEMESATH:  Move to admit 207.

16         THE COURT:  Exhibit 207 is received in evidence.

17                         (GOVERNMENT'S EXHIBIT 207,

18                          Verification of Rental Income,

19                          ADMITTED INTO EVIDENCE.)

20   Q.    BY MS. HEMESATH:  What's the purpose of a rental

21   agreement being in a loan file?

22   A.    This is an agreement that supports Arthur Watson

23   receiving monthly income of, if I'm reading it correctly,

24   $3,800.

25   Q.    So this agreement is telling you that Mr. Watson is

1    receiving rent on which property?

2    A.      5507, it looks like.

3    Q.      Well, let's make this a little bigger here.

4            Okay.  So let's start at the top.  Does this document

5    tell you who owns the piece of property being rented?

6    A.      Arthur Watson.

7    Q.      And that the tenants are who?

8    A.      Monica and Todd Stevens.

9    Q.      So this here is -- what's the owner's address?

10   A.      Well, it's 5507, and I'm not sure I can pronounce the

11   name of the street.  It looks something like Towhee Way.

12   Q.      Sorry.  In what city?

13   A.      Sacramento.

14   Q.      And then the property being rented is?

15   A.      That looks like 8 something 4 Gidda Loop in Yuba City.

16           THE COURT:  Yuba City.

17           THE WITNESS:  Yuba City.  Thank you, your Honor.

18   Q.      BY MS. HEMESATH:  To what extent did CIT rely on this

19   rental agreement being in the loan application and the

20   decision to fund the loan?

21   A.      This would be an important factor in documenting that

22   the borrower is receiving or should be receiving this rental

23   income every month.

24           THE COURT:  All right.  Let's take a ten-minute recess

25   now, ladies and gentlemen.  Remember the admonition.  We'll

```
 1    resume in ten minutes.

 2              (Recess taken.)

 3              (Jury not present.)

 4              THE COURT:  Mr. Wiseman, before we bring the jury back

 5    in, one of the jurors, Juror Number 5, reported to the clerk

 6    that he inadvertently said good morning to your client this

 7    morning.  And it's harmless because he didn't recognize that

 8    it was your client.  But I would say that if it was your

 9    client who initiated the greeting to have him make sure that

10    he doesn't address jurors again in the future.

11              MR. WISEMAN:  I will admonish him that way, your

12    Honor.

13              THE COURT:  All right.  So let's bring the jury in.

14              (Jury present.)

15              THE COURT:  Everyone is present.

16              Ms. Hemesath, you may continue.

17              MS. HEMESATH:  Thank you, your Honor.

18                   DIRECT EXAMINATION, (Cont'd.)

19    BY MS. HEMESATH:

20    Q.    We were speaking earlier about verifications of

21    employment.  In your experience, if CIT had not been able to

22    verify employment as listed on the loan application, what

23    would happen next?

24    A.    Most likely, the loan would not be approved.

25    Q.    And why is that?
```

1    A.      Because we don't know if the borrower is actually

2    working.

3    Q.      I'm going to have you look in your binder at what's

4    marked as 208.  Do you recognize it?

5    A.      I do.

6    Q.      How do you recognize it?

7    A.      From reviewing the customer file.

8    Q.      What is it?

9    A.      This is a summary of deposits to the customer's bank

10   account.

11           MS. HEMESATH:  Move to admit 208.

12           THE COURT:  Exhibit 208 is received in evidence.

13                       (GOVERNMENT'S EXHIBIT 208, Summary of

14                        bank account deposits, ADMITTED INTO

15                        EVIDENCE.)

16   Q.      BY MS. HEMESATH:  So if you look up here, which bank

17   is this?

18   A.      Bank of America.

19   Q.      And this is whose monthly bank account?

20   A.      This is --

21   Q.      I'm not sure if it actually says on this form.

22   A.      I was going to say I'm looking for Arthur Watson's

23   name, but I don't see it.

24   Q.      What account number is this?

25           MR. WISEMAN:  I'm going to object.  Calls for

1   speculation.  There's no foundation.

2          MS. HEMESATH:  I'm just asking what account number is

3   this.

4          THE COURT:  The account number is on it, so that

5   objection is overruled.

6          THE WITNESS:  06952-09603.

7   Q.     BY MS. HEMESATH:  All right.  And go ahead and look at

8   what's marked as Government's Exhibit 209-A.  Do you

9   recognize this?

10  A.     I do.

11  Q.     How do you recognize it?

12  A.     From reviewing the customer file.

13  Q.     And what is it?

14  A.     These are copies of actual bank statements from Bank

15  of America.

16         MS. HEMESATH:  Move to admit 209-A.

17         THE COURT:  Exhibit 209-A is received in evidence.

18                         (GOVERNMENT'S EXHIBIT 209-A, Bank

19                          statements from Bank of America,

20                          ADMITTED INTO EVIDENCE.)

21  Q.     BY MS. HEMESATH:  And if we could put that up side by

22  side with 208.  This may be a challenge.  Are you able to

23  read those account numbers?

24         THE COURT:  If you zoom in on the account number, it

25  will make it bigger.

 1           THE WITNESS:  I can read that from the binder if you

 2   want.

 3           MS. HEMESATH:  We're going to make them bigger right

 4   here.

 5           THE WITNESS:  Okay.

 6   Q.      BY MS. HEMESATH:  First of all, do those account

 7   numbers match?

 8   A.      I don't -- well --

 9   Q.      Go ahead and try to read the account number on the

10   left.

11   A.      That looks like 06952-09, and to me that looks like an

12   803.

13   Q.      Okay.  And on the right?

14   A.      06952-09603.

15           THE COURT:  Let me help you here.  See the telephone

16   number on the one on the left?

17           THE WITNESS:  Yes, your Honor.

18           THE COURT:  Read that and tell me what it looks like.

19           THE WITNESS:  I'm not sure if that's 916 or 918.

20   Q.      BY MS. HEMESATH:  Okay.  Thank you.  Let's go back out

21   on 209-A.  And we can take 208 away for a second.  Okay.  By

22   this document, whose bank account is this?

23   A.      Arthur W. Watson.

24   Q.      And where does he live?

25   A.      5507 Towhee Way in Sacramento.

```
1    Q.      For which month is this bank account statement?

2    A.      This is for the period March 28th through April, looks

3    like 25th of 2007.

4    Q.      And if we go back out, what does this account

5    statement tell you that the balance is in his account at the

6    beginning of the month?

7    A.      At the beginning of the month, it's 10,093.20.

8    Q.      And the total deposits?

9    A.      $11,747.18.

10   Q.      And the end balance?

11   A.      $13,056.87.

12   Q.      All right.  Now, if we can go back side by side with

13   208.  I should ask you, first of all, what is 208?

14   A.      208 is a report that is a summary of what was entered

15   in as the balances at the end of the 12-month period.

16   Q.      And why is CIT interested in that information?

17   A.      If you are verifying bank information for the -- and I

18   believe I just misspoke.  It's the deposits that were made

19   each month, not the balances at the end of the month.

20   Q.      Okay.

21   A.      But this tells you over the course of a year what the

22   income flow is.  You might have a borrower who, at least

23   where I live, is a teacher and they don't get paid in July

24   and August, they get paid over the ten-month year.  Their

25   July and August bank statements are going to look much poorer
```

1    than the other ten months.  Other people may get a bonus once

2    a year.  So this lets you see the flow, the ebb and flow over

3    the course of a year.

4    Q.      And as far as CIT is concerned, ought these deposit

5    amounts correlate with the amount of income that the borrower

6    is claiming?

7    A.      They should.

8    Q.      All right.  And so if we compare -- show us where

9    these match up, please.

10   A.      Okay.  The total deposits here which I just blocked

11   out, $11,747.18, match exactly -- well, close enough, I think

12   you can see.

13   Q.      All right.  Is it fair to describe the printout in 208

14   is supposed to be a summary of the deposits?

15   A.      Yes, that's fair.

16   Q.      And why is the 12-month period significant to CIT?

17   A.      It lets you see the pattern for the whole year.

18   Q.      Okay.  And if we can, please, on the left-hand side

19   pull up 209-7.  And so this is for the second month.  Would

20   you please show us how the deposits match up.

21   A.      $12,580.90.  $12,580.90.

22   Q.      And can we just have 208 now, please.  208.

23           And so down here, what are these summary totals,

24   please?

25   A.      You have a 12-month total that is the sum of the

1    deposits for the first 12 months on the statement.  You have

2    a 24-month total which is really useless in this particular

3    case because you only have values for the first 12 months.

4    So it's the same as the 12-month total.  And then you have a

5    net monthly income which would be the 12-month total divided

6    by 12.

7    Q.      Were there loans for which you would require

8    24 months' worth of deposit information?

9    A.      There were.

10   Q.      Okay.  Was this not one?

11   A.      I don't believe it was, no.

12   Q.      Okay.  To what extent did CIT rely on this summary of

13   deposit information into the bank account in determining

14   whether to fund this loan?

15           MR. WISEMAN:  Objection.  I think it calls for

16   speculation.  There's no foundation that this gentleman

17   decided the loan.

18           THE COURT:  Sustained.

19   Q.      BY MS. HEMESATH:  Did CIT rely on this document in

20   evaluating this loan?

21           MR. WISEMAN:  Objection again.  Calls for speculation

22   with respect to this loan.

23           THE COURT:  He's been asked general questions about

24   what CIT relies upon, but I think this may be the first

25   question that has been addressed to a particular loan.

1              MS. HEMESATH:  Okay.  Fair enough.

2     Q.      BY MS. HEMESATH:  Generally speaking, did CIT rely on

3     12-month summaries of deposit information into bank accounts

4     in determining to fund loans in 2007?

5     A.      On those loans where bank account statements were

6     required, yes.

7     Q.      Was this a loan where a bank account statement was

8     required?

9     A.      I believe it was.

10    Q.      Okay.  Why do you believe that?

11    A.      The hassle of getting bank account statements, you

12    don't get them unless they're required.

13    Q.      In a hundred percent financed loans, were bank

14    statements more important or less important in your

15    determination to fund the loan than in other types of loans?

16    A.      It would depend on what other documentation was

17    available for the borrower's income.

18    Q.      Okay.  And so in a stated income hundred percent

19    financing loan, would the bank account documents be more

20    important or less important?

21    A.      More important.

22    Q.      If CIT came to learn that a bank account statement was

23    not accurate, could that have the ability to affect CIT's

24    decision to fund a loan?

25    A.      Absolutely.

1    Q.      Why?

2    A.      It would depend on why the bank account statement was

3    inaccurate.  If the bank had made a mistake, which can

4    happen, we would want a corrected statement so that we can

5    know what the real numbers are and make our decision based on

6    the real numbers and not the incorrect numbers.  If we were

7    to learn that a bank account statement had been forged or

8    altered in some way to change the cash flows, the deposits,

9    to make it look more favorable to the borrower, at that point

10   the application would be turned down.

11   Q.      In your review of this loan file, were you able to

12   determine if this was a stated income loan?

13   A.      I always get nervous using that term because it

14   doesn't have as a precise a definition as we might like, but

15   I think the answer is yes, we relied on what the borrower

16   stated.

17   Q.      Okay.  Well, let's go ahead and explore that a little

18   bit.  So would there be a term that you would use other than

19   stated income to describe this loan?

20   A.      They're sometimes referred to as no income

21   verification loans, and then sometimes you'll see the phrase

22   light documentation.

23          THE COURT:  When you say no income, is that limited to

24   income or does it mean no income or assets or other

25   information?

 1              THE WITNESS:  No income verification would be limited

 2    to no income.

 3              THE COURT:  Just income.  All right.

 4    Q.      BY MS. HEMESATH:  If this had been a full

 5    documentation loan, are there other documents that you would

 6    expect to see here in the loan file?

 7    A.      Probably pay stubs, a W-2.  In this case with rental

 8    property involved, probably the full tax return or at least

 9    the schedule that shows the rental property income and

10    expenses.

11    Q.      All right.  We spoke a little bit about underwriting

12    before.  When in the process does the underwriting take

13    place?

14    A.      The underwriting takes place really in a couple of

15    stages.  It will take place when we receive all the

16    application information from the borrower, whether it's

17    directly or through the broker, and then there would be a

18    further review when the appraisal and the title reports come

19    in.

20    Q.      And what's the purpose of underwriting?

21    A.      It's to review all the documentation, all the facts,

22    and make a determination as to whether this is a loan that

23    should be made or whether the application should be turned

24    down or perhaps some kind of counteroffer made.

25    Q.      Please go ahead and look in your binder at what's

```
 1   tabbed 213.  Do you recognize it?

 2   A.      I do.

 3   Q.      How do you recognize it?

 4   A.      This is something I reviewed in the customer file.

 5   Q.      And what is it?

 6   A.      It is a uniform underwriting and transmittal summary.

 7           MS. HEMESATH:  Move to admit 213.

 8           THE COURT:  Exhibit 213 is received in evidence.

 9                           (GOVERNMENT'S EXHIBIT 213, Uniform

10                           Underwriting and Transmittal Summary,

11                           ADMITTED INTO EVIDENCE.)

12   Q.      BY MS. HEMESATH:  Is this CIT's underwriting form?

13   A.      Yes.  It's -- I think it's actually a Fannie

14   Mac/Freddie -- Fannie Mae/Freddie Mac form, but it's one we

15   use.

16   Q.      And did CIT use these in 2007?

17   A.      We did.

18   Q.      And what is the purpose of this form in the loan file?

19   A.      It's to summarize some of the key facts in the

20   underwriting.

21   Q.      What are some of those key facts that you see here on

22   this document?

23   A.      The property type, what kind of loan it is.  Is it an

24   ARM, is it fixed rate, is it FHA, is it VA, is it a purchase

25   money loan.
```

1    Q.      So what's an ARM?  When you say ARM, is that where I'm

2    pointing on the screen?

3    A.      Yes.

4    Q.      What does that mean?

5    A.      ARM stands for adjustable rate mortgage.

6    Q.      And what does that mean?

7    A.      That means that the borrower's interest rate can

8    change periodically over the life of the loan.

9    Q.      Okay.  And the loan type conventional, what does that

10   mean?

11   A.      Basically it means it's not an FHA or VA loan.  It's

12   the typical loan that most of us would get.

13   Q.      Property type, why is that significant to you?

14   A.      It's significant simply in determining the value and

15   in determining what other documentation might be required.

16   You know, for example, in a condominium, you'll need a

17   condominium rider.  Just, you know, it's an additional

18   document.  And of course, these can all affect the value of

19   the property.

20   Q.      Was whether a house was to be a primary residence, a

21   second home, or investment property part of your underwriting

22   standards in 2007?

23   A.      Yes.

24   Q.      Was the sales price part of your underwriting

25   standards in 2007?

```
 1    A.      Not by itself.

 2    Q.      In conjunction with what?

 3    A.      In conjunction with the appraised value.  Those two

 4    went together.

 5    Q.      All right.  Let's see, can we go back out, please.

 6            Why is the -- what does this mean, initial P&I

 7    payment?

 8    A.      P&I stands for principal and interest.  And that is

 9    the initial payment on the loan excluding any monthly amounts

10    being sent to the lender that are being escrowed for taxes

11    and insurance.

12    Q.      Okay.  So if I'm buying a house and I see this there,

13    that's the amount that I owe you in the first month; is that

14    a fair summary?

15    A.      Yes.

16    Q.      Okay.  Why is that significant in your underwriting

17    standards?

18    A.      That's a number we use to determine if it's likely you

19    can afford to make the payments on the loan.

20    Q.      And do we see that math being done over here?

21    A.      We do.

22    Q.      And what is this box telling you?

23    A.      This box is telling us not only what the payment is on

24    this mortgage, the 2,990, but the other expenditures that

25    were carried over from the other documentation, and it gives
```

1    us the total of his monthly payments, 4,461, if I'm reading

2    it correctly.

3    Q.       If this borrower had other mortgage obligations

4    different from this property, would you expect to see that

5    here in this box?

6    A.       I would.

7    Q.       All right.  And then how do you compare this total

8    monthly payments to the income section over here?

9    A.       Well, he has $4,461 monthly payments.  The income is

10   11,552.  And that's giving you the total obligations to his

11   income of 38.617 percent.

12   Q.       According to this box, can Mr. Watson afford this

13   property?

14           MR. WISEMAN:  Objection.  Calls for speculation.

15           THE COURT:  That's a good question.  If that's a

16   question that they generally ask or reach an opinion upon, I

17   suppose he can answer it.  Is part of your analysis to

18   determine whether you think the buyer can afford the house?

19           THE WITNESS:  Yes, your Honor.

20           THE COURT:  All right.  I'll overrule the objection.

21   Q.       BY MS. HEMESATH:  According to this box, can

22   Mr. Watson afford this piece of property?

23   A.       According to this box, there would be an excellent

24   reason to believe that he could.

25   Q.       And why is that?

1    A.       His total obligations there are 38.6 percent.

2    Depending on how he's spending the rest of his income, if he

3    wants to do a cruise every month or if he's spending too much

4    money at the casinos, there could still be a problem, but

5    based on this, it's very reasonable to assume that he should

6    be able to afford the house.

7    Q.       And that calculation was part of your underwriting

8    standards in 2007?

9    A.       Yes.

10   Q.       What's escrow?

11   A.       Escrow is a term that has two meanings.  And one I

12   touched on a couple minutes ago where the borrower is sending

13   an additional sum to the lender every month and out of those

14   additional sums the lender periodically pays taxes and the

15   insurance on the property.  The other term, and it's

16   primarily used in California, is that you have an escrow

17   company that will handle the closing of the loan and the

18   transfer of the property, the title from the buyer (sic) to

19   the seller (sic).

20   Q.       Okay.  I meant the California version, so I'm glad

21   that you clarified that for us.  Who participates in that

22   California version of escrow?

23   A.       You'll have the buyer, the seller, and in most cases,

24   there's a lender involved.

25   Q.       Okay.  And in this loan, was that you?

1    A.      Yes.

2    Q.      Are you familiar with a document called a HUD-1?

3    A.      I am.

4    Q.      What is it?

5    A.      It's a settlement statement that lists in two

6    different columns the buyer's side of the transaction and the

7    seller's side of the transaction.  How much money they

8    brought, paid ahead of time, how much they have to pay at

9    closing, how much the lender's kicking in, and where all the

10   funds that come into this big pot will be disbursed.

11   Q.      Is it fair to say that you expect to see all

12   transactions associated with this home purchase on the HUD-1?

13   A.      Yes.

14   Q.      Did CIT rely on HUD-1 statements in 2007?

15   A.      We received them.  We reviewed them before the loan

16   closed.  At that point, yeah, the underwriting decisions had

17   been made, but if the HUD-1 did not reflect what had been

18   approved, then there was a possibility the loan might not go

19   through.

20   Q.      Okay.  Go ahead and look at 214.  Do you recognize it?

21   A.      I do.

22   Q.      How do you recognize it?

23   A.      From reviewing the customer file.

24   Q.      And what is this?

25   A.      This is a HUD-1 settlement statement for the Watson

```
 1   loan.

 2             MS. HEMESATH:  Move to admit 214.

 3             THE COURT:  Exhibit 214 is received in evidence.

 4                            (GOVERNMENT'S EXHIBIT 214, HUD-1

 5                            Final, ADMITTED INTO EVIDENCE.)

 6   Q.    BY MS. HEMESATH:  All right.  So starting up here,

 7   name and address of borrower, is this the HUD-1 for the

 8   Ceanothus property sale?

 9   A.    It is.

10   Q.    And you are the lender over here?

11   A.    We are.

12   Q.    All right.  And up here, is this the final version of

13   the HUD-1?

14   A.    It is.

15   Q.    Are there previous versions that you, the lender, see

16   before this is finalized?

17   A.    There can be, but sometimes there's only one version.

18   Q.    Okay.  Let's go back out, please.

19         You described two columns.  Let's take a chunk of

20   them.  So on the left side of the screen, what is that

21   column?

22   A.    Column J is the summary of the borrower's

23   transactions.

24   Q.    And generally speaking, what is that?

25   A.    This tells us the borrower's paying 375,000.  We have
```

1    some settlement charges to the borrower.

2    Q.      What are settlement charges?

3    A.      They're costs incurred in connection with the closing

4    of the loan.  It could be title insurance, title exam, the

5    appraisal, other out-of-pocket expenses.

6    Q.      Okay.  And so they're added up and entered there?

7    A.      Yes.  They actually appear on the reverse of the form

8    in detail, and then the total is carried to the front.

9    Q.      Okay.  And then down here, what's this figure?

10   A.      That is the total amount that the borrower is

11   responsible for paying, the buyer is responsible for paying.

12   Q.      So on a hundred percent financed loan, how does that

13   number match up to the hundred percent financing?

14   A.      This is a greater number than the purchase price

15   because there are additional expenses that the purchaser will

16   have to pay.

17   Q.      Okay.  And so if we can go back out again.  Looking at

18   the bottom half of the left-hand column, so starting at 200,

19   what is this section of the form?

20   A.      Amounts paid by or on behalf of the borrower.

21   Q.      And so the first entry there that we see, where is

22   that 375,000 coming from?

23   A.      That is the loan proceeds from us.

24   Q.      And then the $2,000, what's that?

25   A.      The $2,000 is a deposit that the borrower had put down

1    to bind the contract.

2    Q.      Okay.  And so that says deposit from Arthur Watson?

3    A.      Yes.  In New York, we usually refer to it as a binder.

4    I think in some parts of the country, they might call it

5    earnest money.

6    Q.      All right.  And then down here at 213, seller credit

7    for closing costs, what's that?

8    A.      The seller is crediting the borrower $13,591.28

9    towards the closing costs.

10   Q.      And can you please explain for us how a credit like

11   that works?

12   A.      Basically it reduces the amount the borrower is going

13   to have to pay, and it comes out of the seller's pocket.

14   Q.      And is this something that's negotiated between the

15   buyer and the seller?

16   A.      Yes.

17   Q.      Okay.  Down here at the bottom, the 300 section, what

18   is this about?

19   A.      The 300 section is a summary.  And in this case, the

20   amount that is due to the borrower or due from the borrower,

21   rather, is 390,591.28.  And then we show that we're paying

22   that exact same amount out between the loan and between the

23   other funds the escrow company has.  So the borrower is going

24   to get cash from this transaction of zero.

25   Q.      Okay.  And if the borrower were to be getting cash

1    from the transaction, where would you expect to see that

2    annotated?  You can touch on your screen.

3    A.      I would expect to see a number right here in the cash

4    to borrower box.

5    Q.      Okay.  Let's go back out, please.

6            What's the right-hand column of the HUD-1?

7    A.      The right-hand column is the seller's half of the

8    transaction.

9    Q.      All right.  And so on line 420, what is that amount?

10   A.      420 is the gross amount that the escrow company should

11   be paying the seller.

12   Q.      All right.  Let's go to the bottom half of the page.

13   If the seller is receiving less money, where on this form do

14   we see that?

15   A.      We see the seller is paying the borrower 13 -- or

16   crediting the borrower with 13,591.28 for closing costs.

17   That's on line 513.

18   Q.      Is that a reduction in the price the property is being

19   sold for?

20   A.      No.  It's simply an adjustment as to who is paying the

21   various expenses that go with the sale.

22   Q.      And so down here, how is this math done?

23   A.      Okay.  We have the gross amount due to seller which

24   was $375,049.19.  And then we subtract the reductions and the

25   amounts, the credit for the closing costs and the settlement

 1    charges that the seller is paying, and the difference is

 2    $358,450.01.  And that is the check that the escrow company

 3    is going to be giving to the seller.

 4    Q.     All right.  Let's go ahead and look at the second

 5    page, please.  Is this what you had previously described as

 6    the back of the HUD-1 form?

 7    A.     Yes, it is.

 8    Q.     And what is this page?

 9    A.     On this page is detailed information for items that

10    are summarized on the front.

11    Q.     Okay.  So, for example, the first entry that we see

12    here is at 803.  What's that?

13    A.     That is the appraisal fee.

14    Q.     Okay.  And then down here, 809, what is that?

15    A.     809 is an origination fee.  Points or, in this case,

16    I'd say a broker fee.

17    Q.     Okay.  And so, say, down here, 904?

18    A.     904 is a fee to the -- well, it's more than one fee to

19    the notary.

20    Q.     Okay.  So let's go over to the side there.  So who is

21    paying that first amount, the $350?

22    A.     $350 is coming out of the borrower's pocket.

23    Q.     Okay.  And on the right-hand side?

24    A.     A hundred dollars is coming out of the seller's

25    pocket.

1    Q.     Okay.  Let's go further down on the form.  And another

2    example, 1108.

3    A.     1108 is title insurance.

4    Q.     Is it fair to say that this second page is a summary

5    of everyone who is receiving payments, be they fees,

6    insurance commissions out of this real estate transaction?

7    A.     I'd probably say it's the detail and not the summary,

8    but yes.

9    Q.     Okay.  All right.  So the detail is on the second

10   page?

11   A.     Yes.

12   Q.     And then the summary is on the first page?

13   A.     Yes.

14   Q.     Okay.  Let's go to the third page, please.  What's

15   this final page?

16   A.     These are fees that simply didn't fit in neatly with

17   the predefined entries on the back of -- on page 2.

18   Q.     Is this like a catchall section?

19   A.     Yes.

20   Q.     All right.  You can take it down.

21          After escrow, or I guess I should say when the time

22   for escrow comes, how do you transmit the actual funds from

23   your company to the closing agent?

24   A.     They would generally be wired to the escrow company's

25   bank account the day before the loan was scheduled to close.

```
 1   Q.      And take a look at 215, please.  Do you recognize it?

 2   A.      I do.

 3   Q.      How do you recognize it?

 4   A.      From reviewing the customer file.

 5   Q.      And what is it?

 6   A.      These are the instructions from the title company as

 7   to how the money should be wired to them.

 8           MS. HEMESATH:  Move to admit 215.

 9           THE COURT:  Exhibit 215 is received in evidence.

10                           (GOVERNMENT'S EXHIBIT 215, Wiring

11                            instructions and wire receipt for

12                            $37,001.42 dated 6/15/07, ADMITTED

13                            INTO EVIDENCE.)

14   Q.      BY MS. HEMESATH:  So who is giving the instructions

15   here?

16   A.      The title company, Mid Valley Title & Escrow Company.

17   Q.      And who are these instructions to?

18   A.      They are to us, to CIT.

19   Q.      And what are they asking you to do?

20   A.      They're asking us to wire the money to a bank account,

21   and the number appears to be redacted.  But their routing

22   number is also there, and those are two numbers that are

23   absolutely essential for us to be able to wire money.  And

24   then it tells us how to identify the transaction so that they

25   know which customer the funds should be credited to.
```

1    Q.     And in your experience and practice, once CIT received

2    wiring instructions like this, what would happen next?

3    A.     The funds would be wired at the appropriate time.

4    Q.     Okay.  If we look at page 2, please.  What is this?

5    A.     This is a screen from our application processing

6    center or printout of the screen from the application

7    processing system that shows that we issued the wire to the

8    title company, the escrow company.

9    Q.     Please go ahead and look in your binder at 216.  Do

10   you recognize this?

11   A.     I do.

12   Q.     How do you recognize it?

13   A.     From reviewing the file.

14   Q.     What is it?

15   A.     This is the deed of trust.

16          MS. HEMESATH:  Move to admit 216.

17          THE COURT:  Exhibit 216 is received in evidence.

18                              (GOVERNMENT'S EXHIBIT 216, Deed of

19                              Trust, ADMITTED INTO EVIDENCE.)

20   Q.     BY MS. HEMESATH:  What's a deed of trust?

21   A.     A deed of trust is an instrument that is very similar

22   to a mortgage, and the terms are often used interchangeably.

23   There is a technical difference in that a deed of trust is

24   much easier to foreclose on in most states, but for all

25   practical purposes, this is the instrument that gives us the

1   right to foreclose on the property if the borrower does not

2   pay.

3            THE COURT:  There's another difference in California.

4   There are three parties to a deed of trust.  And in other

5   states, there may just be two; right?

6            THE WITNESS:  Yes.  You have the trustee.

7            THE COURT:  Right.  So that's the difference.  There

8   are three parties to a deed of trust?

9            THE WITNESS:  In California, yes.

10           THE COURT:  Right.

11  Q.       BY MS. HEMESATH:  Part of this document that I would

12  like you to look at is the top left, please.  What does this

13  part mean?

14  A.       Okay.  These are instructions to the recording

15  officer, the county clerk or whoever the official is in the

16  county, that after they have recorded the deed of trust in

17  their real estate records, who they are to return the

18  instrument to.

19  Q.       How are the instruments typically returned?

20  A.       They are often returned to the title company because

21  the title company or the escrow agent is responsible for

22  making sure that the deed of trust is recorded.

23  Q.       Okay.  And what does this part right here mean?

24  A.       When recorded, mail to.

25  Q.       And what are you asking them to do?

1    A.      We are asking in this case the county recording office

2    to mail the recorded deed of trust back to Nationwide Title

3    Clearing, Inc., in Palm Harbor, Florida.

4    Q.      Okay.  And then eventually, how does this deed of

5    trust make it into your loan file?

6    A.      We will get the copy from Nationwide Title Clearing.

7    They'll send it on to us.

8    Q.      All right.  Go ahead and look in your binder at 220.

9    Do you recognize it?

10   A.      I do.

11   Q.      How do you recognize it?

12   A.      From reviewing the customer file.

13   Q.      And what is it?

14   A.      This is a letter that was sent from CIT to the

15   borrower after the loan closed telling him that we're happy

16   that he's a customer and that he should be getting a

17   statement prior to the due date of his first payment, but

18   just in case there's a problem, please contact us.

19          MS. HEMESATH:  Move to admit 220.

20          THE COURT:  Exhibit 220 is received in evidence.

21                       (GOVERNMENT'S EXHIBIT 220,

22                       Congratulations letter from CIT,

23                       ADMITTED INTO EVIDENCE.)

24   Q.      BY MS. HEMESATH:  All right.  So you may have just

25   said it, but why are you congratulating him?

1    A.       It's a little bit of sales.  You want the customer to

2    start out feeling welcome, feeling that he's doing business

3    with a good company, that we are interested in a

4    relationship.

5    Q.       Okay.  And you are also communicating to him what?

6    A.       We're communicating that he should receive his

7    statements, you know, in this case in a letter dated

8    June 6th, his statement isn't due until August 1st.  We want

9    him to know that he will be getting a statement, and if for

10   any reason he doesn't, to please call us, and we'll do what

11   we have to do.

12   Q.       And how much did you expect him to pay you in the

13   first month?

14   A.       We expected him to pay us $2,990.39.

15   Q.       If you learned that a borrower had an agreement with a

16   friend that the friend would instead make the first and all

17   subsequent mortgage payments, is that something that could

18   affect your decision to fund a loan?

19   A.       Yes.

20   Q.       Why?

21   A.       We don't know anything about the friend's credit.  We

22   don't know anything about his income, his capacity to repay,

23   and we don't know what interest the friend has in seeing that

24   payments are made.

25   Q.       Were the monthly mortgage payments made on 2640

 1   Ceanothus Avenue?

 2   A.      One payment was made.

 3   Q.      What happened next after the one payment was made?

 4   A.      Eventually there was a foreclosure.  We acquired the

 5   loan in foreclosure.

 6   Q.      How much, if any, money did CIT lose on this loan?

 7           MR. WISEMAN:  I'm going to object.  Lacks foundation

 8   as what happened with the loan.

 9           THE COURT:  I don't see the relevance.  What

10   difference does it make?  It doesn't, does it?

11           You can think about it, but I'm going to sustain the

12   objection.

13           MS. HEMESATH:  Thank you, your Honor.  Nothing

14   further.  Thank you.

15           THE COURT:  Mr. Wiseman, you may cross-examine.

16           MR. WISEMAN:  Thank you, your Honor.  Your Honor, may

17   I have a moment just to get this set up here?

18                           CROSS-EXAMINATION

19   BY MR. WISEMAN:

20   Q.      Good morning, Mr. Walsh.

21   A.      Good morning.

22   Q.      Now, I want to start by sort of getting a foundational

23   fact out of the way.  You did not have any personal

24   involvement in reviewing this loan application regarding

25   Mr. Watson; correct?

1    A.      That is correct.

2    Q.      And likewise, you didn't have any personal involvement

3    in making the underwriting decision to fund this particular

4    loan; correct?

5    A.      Correct.

6    Q.      Okay.  And so you were tasked with, I think you

7    already testified to this, of reviewing this particular

8    customer's file and answering questions about how CIT

9    essentially operates; right?

10   A.      That's right.

11   Q.      And is it fair to say that you didn't converse with

12   anybody at CIT that was involved in the actual underwriting

13   decision; correct?

14   A.      Correct.

15   Q.      Okay.  So let me go back to something that you said

16   earlier.  You were talking generally about CIT's business

17   model, and I believe you said that the business model for

18   CIT, going back in the time frame of 2006-2007, acquired

19   loans from other lenders and also maintained its -- or

20   actually loaned as well; is that correct?  Is that the basic

21   business model of CIT in 2007?  Let me rephrase that.  You

22   all would make loans to folks; right?

23   A.      We did, yes.

24   Q.      And you would also buy loans from other lenders; is

25   that correct?

1    A.        Yes.

2    Q.        Okay.  And what would be the reason CIT would buy

3    loans from other lenders?

4    A.        We would buy for the servicing income, if we had the

5    opportunity to buy a portfolio at a profitable rate.

6    Q.        Right.  So this would be, let's say lender A made a

7    number of loans that you folks at CIT would consider to be a

8    profitable investment if you purchased those loans and then

9    you would acquire those loans; correct?

10   A.        Correct.

11   Q.        And then you would service the loans and bill or send

12   out the mortgage payments to the borrower; correct?

13   A.        Correct.

14   Q.        Okay.  I think you also said that CIT was in the

15   business in 2007 of actually making a loan, and this is an

16   example of one of those loans that CIT made, correct, to

17   Mr. Watson?

18   A.        Correct.

19   Q.        Okay.  Now, with respect to the loans that CIT made,

20   did CIT hold on to all of the loans it made back in 2007?

21   A.        No.

22   Q.        Okay.  And so a certain percentage of the loans were

23   sold; right?

24   A.        Correct.

25   Q.        And can you tell the jury just in general to whom some

1    of the borrowers -- excuse me, who were some of the

2    purchasers of those loans that CIT would sell?  Were these

3    institutional investors, private people?  Who are they that

4    bought these?

5    A.       They were generally other lenders, Deutsche, Deutsche

6    Bank, Accredited Home Lenders, I think Chase would have been

7    on the list.  And some of the companies we also bought from.

8    Q.       So back and forth, you all were buying and selling to

9    one another back then?

10   A.       Yes.

11   Q.       Okay.  Now, was there a particular criteria that CIT

12   relied upon back in 2007 to decide whether to hold onto the

13   loan as opposed to selling it?

14   A.       Some loans were originated with the intent of selling

15   them.

16   Q.       And what was the criteria used to make that kind of

17   loan, i.e., those loans that you simply intended to sell?

18   A.       They were products that we did not want on our books,

19   perhaps because we didn't like the product or it was

20   cumbersome to service manually, our service didn't handle it

21   terribly well.  So we could originate it, and we would then

22   try and sell it.

23   Q.       And just one or two questions about that to make sure

24   the jury understands.  When you refer to the idea of the

25   concept of originating the loans, that means that you folks

1    would at CIT fund the loan; right?

2    A.      We would fund it, yes.

3    Q.      And then immediately turn around and sell it if it was

4    one of those loans that you didn't intend to keep; right?

5    A.      We didn't sell it immediately, but it was typically 30

6    to 60 days.

7    Q.      Okay.  And those loans that CIT decided to keep in

8    house, can you describe what the criteria CIT used to make

9    that decision with that particular loan?

10   A.      Most commonly, it would be almost all the fixed-rate

11   loans were intended to be kept in house.

12   Q.      Okay.  And were the ARM loans, the adjustable rate

13   mortgage loans, typically sold?

14   A.      Most of them were.

15   Q.      Okay.  And the ones that -- was there a reason why a

16   particular ARM loan would not be sold?

17   A.      It could be because a particular loan fell into a

18   product that we intended to keep or it could be because after

19   the loan was funded, we discovered some problem that meant

20   that the people who might otherwise buy the loan would not be

21   interested in buying it.

22   Q.      Okay.  Now, some problem with that particular loan or

23   some problem with the product that was being offered?

24   A.      Well, generally it would be with a particular loan up

25   until, you know, the whole mortgage industry imploded later

1    on in 2007.

2    Q.      Okay.  Maybe I'll get to that in a moment.  Back in

3    2007 before the implosion of your industry, did CIT offer

4    something called a subprime loan?

5    A.      We made subprime loans, yes.

6    Q.      And just briefly, what is a subprime loan?

7    A.      A subprime loan is a loan made to a customer who is --

8    does not meet the standards for, typically for Fannie Mae,

9    Freddie Mac, the GSEs, to buy the loan.

10   Q.      All right.  And with the subprime loan, that product

11   that you offered, was that a product that you kept in house

12   or sold on the market back in 2007?

13   A.      I don't think I would call subprime a product by

14   itself.  I think I would say that the borrowers fell into the

15   subprime category.

16   Q.      A better description would be a category then of

17   loans?

18   A.      Yeah.

19   Q.      All right.  Okay.  And back in 2007, I think we've

20   already explored this, but you all discovered something

21   called a stated income loan; correct?

22   A.      Correct.

23   Q.      Now, in this particular loan that you've been asked

24   about, were you able to discern whether it was a stated

25   income loan or a full doc loan?

1    A.      I did not find a particular code that told me one way

2    or the other.

3    Q.      Were you able to come to a -- render an opinion based

4    upon what you saw in Mr. Watson's loan file whether it was a

5    stated income or a full doc?

6    A.      Yes.

7    Q.      Did it appear to be a stated income loan?

8    A.      It did.

9    Q.      Okay.  And did stated income loans as opposed to a --

10   well, strike that.

11           In your experience with CIT, is a stated income loan a

12   type of a subprime loan?  Does it fit that category of being

13   a subprime loan?

14   A.      Yes.

15   Q.      Okay.  So you have a stated income loan, in general

16   we're speaking back in 2007.  If one were to borrow from CIT

17   and it was a stated income loan, that would be grouped into

18   the category of a subprime loan; correct?

19   A.      Yes.

20   Q.      And a subprime loan is a category of loans for people

21   who would ordinarily not meet your sort of high standards,

22   typical standards for making a loan; right?

23   A.      Yes.

24   Q.      And just talking about the implosion, is it fair --

25   strike that.  I won't get into that.

1          Now, you talked about this ALS.  What is the ALS?

2     A.     ALS stands for Advanced Lending System.  It's a

3     software system provided by Fidelity National Information

4     Systems that we used at the time to service our loans, to

5     post the payments, process rate changes, process escrow,

6     generate the monthly bills.

7     Q.     So this is a software system that one would input

8     information and then at the end of the software run.  There

9     would be some sort of result; right?  Does that make sense?

10          Let me start that again.  So is this a software system

11    that is designed to evaluate the, for example, the

12    creditworthiness of the borrower?

13    A.     No.

14    Q.     Okay.  So this is not related to the underwriting

15    process?

16    A.     No.  This is a system that receives the loan after it

17    has been made.

18    Q.     Okay.

19    A.     It has been funded.

20    Q.     Would it be fair to say that this ALS system is

21    basically a software program that is designed to service the

22    loan after it has been funded?

23    A.     Yes.

24    Q.     Okay.  And let me go back to a question I asked, or a

25    topic I asked a moment ago, with respect to the stated income

1    loans, back in 2007, what percent of the loans that CIT made

2    were, in fact, stated income loans?

3    A.      I don't know.

4    Q.      Okay.  Do you know -- well, were stated income loans

5    typically the interest rate for the loan higher or lower than

6    a conventional loan?

7    A.      They would be higher.

8    Q.      Okay.  Because to account for the added risk; correct?

9    A.      Yes.

10   Q.      Okay.  And in reviewing the loan file in question here

11   regarding Mr. Watson's loan, did you come across in the file

12   an IRS Form 4506-T?

13   A.      I don't recall.

14   Q.      Do you know what that particular form is?  Are you

15   familiar with it?

16   A.      I believe that's the form where you can get a copy of

17   the borrower's tax return.

18   Q.      And in making an underwriting decision, based upon

19   your experience with CIT, would getting that information be

20   important to the underwriting decision?

21   A.      Unfortunately in most cases, it would not.

22   Q.      Okay.  The IRS -- the information from the IRS would

23   not be a consideration; correct?

24   A.      You would be very unlikely to receive it on time to do

25   anything.

1    Q.      Okay.  Because of the slowness of the IRS, I presume?

2    A.      Yes.

3    Q.      But with a stated income loan, it's fair to say that

4    the bank is simply relying upon the income that the borrower,

5    the applicant, the borrowing applicant states on the

6    application; correct?

7    A.      Correct.

8    Q.      And with a stated income loan, CIT back in 2007, it

9    was routine not to verify the amount that was stated;

10   correct?  You're relying upon the borrower telling you this

11   is the amount he or she is making?

12   A.      Oftentimes, yes.

13   Q.      Okay.  Now, let me pull up 201.  I'll have you do that

14   if you don't mind.  Okay.  Now, 201 is the -- one moment,

15   your Honor.

16           MR. WISEMAN:  Excuse me, Karen.

17   Q.      BY MR. WISEMAN:  While we're trying to work out the

18   technical problems, sir, 201 is the purchase agreement;

19   correct?

20   A.      Yes.

21   Q.      Okay.  And 201 is the document that was in the

22   particular loan file; correct?

23   A.      Yes, correct.

24   Q.      And 201, however, does not provide the bank, in this

25   case CIT, with information about the borrower; correct?

1    A.        Correct.

2    Q.        Okay.  And the information about the borrower is

3    contained in the loan application which is Government's

4    Exhibit 202; correct?

5              THE COURT:  If we're having a technical problem,

6    Mr. Wiseman, do you want to take the noon recess and work it

7    out?

8              MR. WISEMAN:  That would be terrific, your Honor.

9              THE COURT:  All right.  We'll take the noon recess at

10   this time.  It's a quarter to 12:00 now, so we'll resume at

11   1:15 today.  1:15, ladies and gentlemen.  Remember the

12   admonition.

13             MR. WISEMAN:  Thank you.

14             (Lunch recess taken at 11:47 a.m.)

15

16

17

18

19

20

21

22

23

24

25

 1                    SACRAMENTO, CALIFORNIA

 2             WEDNESDAY, JULY 9, 2014, 1:15 P.M.

 3                        ---oOo---

 4         (Jury present.)

 5         THE COURT:  Everyone is present.  I think we have all

 6    the equipment working.

 7             Mr. Wiseman, you may continue.

 8             MR. WISEMAN:  Thank you, your Honor.

 9                  CROSS-EXAMINATION, (Cont'd.)

10    BY MR. WISEMAN:

11    Q.    Good afternoon, Mr. Walsh.

12    A.    Good afternoon.

13    Q.    Before we -- before I had the technical glitch, I was

14    going to ask you some questions about the purchase agreement

15    with respect to Mr. Watson, but I want to go back briefly to

16    another topic that we discussed before the break.  And let me

17    ask you this.  In reference to CIT back in 2007 deciding to

18    hold on to certain loans and keep them in house versus

19    selling them, did each category of loans have a different

20    underwriting criteria?  In other words, did the loans that

21    came under the rubric of stated income or subprime loans as

22    you described it, did they have a different underwriting

23    criteria than, let's say, a conventional loan, full doc loan?

24    A.    A stated income and a conventional 80 percent loan to

25    value, 20 percent, could both be subprime.

1   Q.      They can both be subprime?

2   A.      Yes.

3   Q.      So the nature or the notion that they're subprime,

4   whether it's an ARM or a conventional loan, that is -- and it

5   is determined by the value, if you will, of the borrower,

6   right, the creditworthiness of the borrower?

7   A.      Yes.

8   Q.      Okay.  And so if a potential borrower had less

9   creditworthiness, whether it was conventional or, let's say,

10  an ARM loan or a hundred percent loan to value, that would be

11  sort of put into the subprime category, so to speak; is that

12  a fair assessment?

13  A.      I think that's a fair statement.

14  Q.      Okay.  All right.  Now, I asked you earlier about this

15  Form 4506-T which, if I recall correctly, you said you're

16  generally familiar with it; right?

17  A.      That was the form to get the copy of the tax returns.

18  Q.      Exactly.  And in reviewing the file for Mr. Watson,

19  did you come across any such 4506 form?

20  A.      I don't recall.

21  Q.      Okay.  Let me, if I may, your Honor, if I may approach

22  the witness, I'm going to show you, Mr. Walsh, a document

23  that has been at this point merely marked as Defendant's A.

24          THE COURT:  Have you shown a copy to Ms. Hemesath?

25          MR. WISEMAN:  I have, your Honor.

```
1              THE COURT:  All right.  Go ahead.

2              MR. WISEMAN:  Okay.

3    Q.     BY MR. WISEMAN:  And, Mr. Walsh, in reviewing that

4    document, let me ask you the first question, does that

5    refresh your recollection as to whether or not you remember

6    that document being in Mr. Watson's loan file?

7    A.     It does.

8    Q.     Okay.  And so having refreshed your recollection, does

9    it appear that you recall this being in the loan file?

10   A.     Yes.

11             MR. WISEMAN:  Okay.  And, your Honor, pursuant to the

12   stipulation, the defense would move Defendant's A into

13   evidence.

14             THE COURT:  Exhibit A is received in evidence.

15                        (DEFENDANT'S EXHIBIT A, IRS 4506-T

16                        form,

17                        ADMITTED INTO EVIDENCE.)

18             MR. WISEMAN:  And, your Honor, I want to present it to

19   the jury.  However, the document that I'm going to present

20   electronically is the exact same document, but it just simply

21   doesn't have the exhibit sticker on the bottom.

22             THE COURT:  All right.

23   Q.     BY MR. WISEMAN:  Okay.  Now, Mr. Walsh, I'm going to

24   pull this up.  You can see it on the screen there?

25   A.     Yes.
```

1    Q.      Okay.  Now, this document up in the upper left is

2    denoted as 4506-T; correct?

3    A.      Correct.

4    Q.      And it is a request for transcript of tax return;

5    correct?

6    A.      Correct.

7    Q.      Now, you notice in the bottom portion of this

8    document, there is a signature box; correct?

9    A.      Correct.

10   Q.      And based upon your review of the file, does that

11   appear to be a signature -- well, have you seen a signature

12   like that in any other document?

13   A.      I have seen Arthur Watson's signatures, but I don't

14   recall if that matches.

15   Q.      Okay.  But that appears to say Arthur Watson; correct?

16   A.      Yes.

17   Q.      And there's a date of 6/10/07; correct?

18   A.      Correct.

19   Q.      Now, the purpose of this document is, if I understand

20   it, to allow CIT to verify the borrower's or the potential

21   borrower's income; correct?

22   A.      Correct.

23   Q.      Okay.  And that would be something that would be

24   significant to the lender, in this case CIT, in terms of

25   making the loan; correct?

1    A.      I don't believe so.  This is dated June 10th, 2007.  I

2    don't believe we would have had copies of the tax returns

3    anywhere near on time.

4    Q.      Okay.  And so it's been your experience that in spite

5    of requiring the borrower to sign this form to give CIT the

6    opportunity to get the return, it was not used to obtain the

7    return?

8    A.      Typically, no.

9    Q.      Okay.

10         THE COURT:  What's wrong with just asking the borrower

11   for a copy of their tax return?

12         THE WITNESS:  Especially in this day of TurboTax and

13   similar software, the copy the borrower provides may not be

14   the copy that actually went to the IRS.

15         THE COURT:  I guess I'm not in the age of TurboTax.

16   Q.      BY MR. WISEMAN:  And in the loan file for Mr. Watson

17   with respect to this property, did you recall seeing a tax

18   return of his?

19   A.      I do not recall seeing a tax return.

20   Q.      Okay.  And you indicated that the problem, or at least

21   from CIT's point of view, with using this form is that you

22   simply don't get the -- you simply don't get the tax returns

23   in time; is that essentially what you're saying?

24   A.      Yes.

25   Q.      Okay.  I just want to pull something up.  So and

1     that's been your experience in spite of the fact that line 6

2     on this form says most requests will be processed within ten

3     business days; right?  So the IRS is basically not fulfilling

4     what they're saying they're going to do, in your experience?

5     A.        Oftentimes.

6     Q.        Okay.  All right.  Now, you talked about the hundred

7     percent loan to value ratio that was in the loan for the

8     Ceanothus property.  Now, if I understand your testimony,

9     that means that CIT was lending a hundred percent of the

10    purchase price to Mr. Watson; correct?

11    A.        Correct.

12    Q.        As opposed to requiring some sort of down payment;

13    correct?

14    A.        Correct.

15    Q.        And is it fair to say that the reason for that, for,

16    in other words, being willing to loan the full amount of the

17    purchase price, is that the bank felt that it was secured in

18    the event there was a default on the loan?  Would that be a

19    fair statement with a hundred percent LTV loan?

20    A.        No, I don't think it would be, if I understand you

21    correctly.

22    Q.        Okay.  And so what in your experience back in 2007

23    would be the reason why CIT would be willing to make a

24    hundred percent LTV loan?

25    A.        Because the borrower had the capacity to make the

 1   payments and the character, the credit history that indicated

 2   that he would, indeed, make the repayments.

 3   Q.      So would it be fair to say that based upon your

 4   understanding of what happened in 2007 with CIT that somebody

 5   -- well, strike that.  Based upon your experience back in

 6   2007, would it be fair to say that you would expect somebody

 7   in underwriting to have checked Mr. Watson's credit history?

 8   A.      Absolutely.

 9   Q.      Okay.  And with respect to the significance of the

10   appraisal, the appraisal is something that in this case CIT

11   would rely upon in making a loan; correct?

12   A.      Correct.

13   Q.      Because the appraisal gives you folks as the lender an

14   understanding of the value of this property based upon an

15   independent appraiser's opinion; correct?

16   A.      Correct.

17   Q.      And likewise, the sale price is something that you

18   would consider as well?

19   A.      Correct.

20   Q.      Okay.  Now, does the bank, in this case CIT, does your

21   bank, your lending institution -- and let me go back to the

22   year in question, 2007.  Back then, in part of the

23   underwriting process, the decision whether to make the loan,

24   did the bank do their independent -- rather, did the bank do

25   an independent valuation of the property, in other words, to

1       determine that the value is stated as is stated in the

2       appraisal?

3       A.       Our appraisals, the appraisals that we received from

4       these outside appraisers, were reviewed by our credit

5       personnel, and some of them would be reviewed by our in-house

6       appraisers to make sure they were reasonable.

7       Q.       To make sure that the independent appraisal was

8       reasonable relative to what your in-house folks would look

9       at.

10      A.       Yes.

11      Q.       Do you have an understanding of how an in-house

12      appraiser would, he or she, would go through the process of

13      verifying or comparing the outside appraiser's work?

14      A.       I have a high level of knowledge.

15      Q.       And just briefly, what would an independent in-house

16      appraiser do to confirm that that which has been reflected in

17      the outside appraiser's report is accurate?

18      A.       The appraiser would verify, the in-house appraiser

19      would verify the prices on the, what we call the comps, the

20      comparable properties that the original appraiser had listed.

21      If it was a recent sale and the outside appraiser said it

22      sold for $300,000, we would want to verify that it sold for

23      300,000.  If there were adjustments to the values of the

24      comparables, the house had a finished basement but the other

25      one didn't, were the adjustments reasonable.  Did the

1    pictures seem to match the description of the house.

2    Q.      Do you know in this particular loan whether or not,

3    based upon your review of the file, whether or not there was

4    an independent in-house appraisal done of the Ceanothus

5    property?

6    A.      I do not.

7    Q.      Okay.  Now, I want to ask you about the actual loan

8    application, which is Government's Exhibit 202, and have you

9    take a look at this.  As you indicated earlier, essentially

10   the first section of this document indicates the property

11   that the borrower wishes to purchase; correct?

12   A.      Correct.

13   Q.      Okay.  And so you see the amount of 375,000 bucks

14   there?

15   A.      Yes.

16   Q.      That's the amount that you folks were going to loan,

17   right, or is that the purchase price?

18   A.      That's the amount he's applying for.

19   Q.      Now, to the right of that, there is a number under the

20   interest rate box of 8.9 percent; right?

21   A.      Yes.

22   Q.      So that reflects how much the loan was going to cost,

23   in this case, Mr. Watson; correct?

24   A.      Correct.

25   Q.      And was that a loan rate reflective of a stated income

1  loan?  In other words, 8.9 percent, was that what, back in

2  2007, you would expect to charge, CIT would charge for a

3  stated income loan?

4  A.     I don't recall our exact pricing, but it certainly

5  strikes me as believable for a stated income.

6  Q.     Okay.  And then this document goes on.  On the next

7  page, you were asked about -- the next page goes into

8  providing information about the borrower; correct?

9  A.     Correct.

10 Q.     Okay.  And this information about the borrower is

11 provided to the bank on this form, for example, let me pull

12 something up, by the borrower; correct?  Is that correct?

13 It's the borrower's responsibility to provide you folks with

14 this information?

15 A.     Yes.

16 Q.     Okay.  Now, you mentioned, sir, that most of the loans

17 that came into CIT came via CIT -- excuse me, most of the

18 loans that came into CIT were via brokers; correct?

19 A.     Correct.

20 Q.     Now, were these brokers independent of CIT or were

21 they employees of CIT?

22 A.     Very much independent.

23 Q.     So these were independent folks out there who were in

24 the mortgage business; right?

25 A.     Yes.

1    Q.      And then they would -- they would have a client, for

2    example, that was looking for a loan or shopping for a loan;

3    correct?

4    A.      Correct.

5    Q.      And that broker would -- well, that broker would

6    provide, in the case of CIT, the completed application;

7    correct?

8    A.      Correct.

9    Q.      Okay.  And then you folks would make the decision

10   whether you would loan; correct?

11   A.      Correct.

12   Q.      Okay.  And so at the time of 2007, CIT was not --

13   didn't have a cadre of employees who went out and got loans

14   for the company; right?  They were all through independent

15   brokers.

16   A.      We had some employees, and we had some people approach

17   us directly, but the vast majority would be brokers, yes.

18   Q.      Okay.  And in this particular case, can you tell

19   anywhere in the document who the broker was that brokered

20   this loan?  Is there a way to do that?

21   A.      On this particular document, I don't recall.  I did

22   see the broker's name on the HUD-1 settlement statement.

23   Q.      Okay.  Let me pull something up and see if this helps.

24   On the bottom of this document, in the last part of this

25   document, there is this completed by interviewer, Lee Tate.

1    Would that be where the broker's information is provided or

2    is that somebody from in house at CIT?

3    A.      I believe that was somebody in house at CIT.  The

4    named address of the interview's employer is CIT.

5    Q.      So based upon that fact, does it appear that this loan

6    was brought to CIT through one of CIT's own employees?

7    A.      Not necessarily.

8    Q.      Okay.  And do you know what this represents, this

9    highlighted portion of the loan application?  In other words,

10   the signature of Lee Tate, what's the purpose of the

11   signature?  What is Mr. or Mrs. Tate indicating they did by

12   signing this document?

13   A.      Mr. or Ms. Tate is actually not signing it.  The name

14   is printed and the caption is "interviewer's name," and I

15   believe it says "print or type" in parentheses.

16          THE COURT:  Are you reading the same thing I am?

17   Mr. or Mrs. Tate signed it.  It says "signature" on the next

18   line.  Are you reading the same thing?

19          THE WITNESS:  I'm sorry.  I was looking at the line

20   above.

21   Q.      BY MR. WISEMAN:  No problem.  I'm sorry.  So let's go

22   back to that.  So what is highlighted -- and I presume you

23   have the same visual as I do.  There is an interviewer's

24   name, and it's printed out.  It appears to be Lee Tate.  Do

25   you see that?

1    A.      Yes.

2    Q.      And under that, there's an interviewer's signature,

3    and it appears to be a signature of a Lee Tate.  Do you see

4    that?

5    A.      Yes.

6    Q.      With the date of June 10, 2007.  So if you know, what

7    does this indicate that Mr. or Mrs. Tate did with respect to

8    this loan application?

9    A.      It indicates to me, this is Section 10, information

10   for government monitoring purposes, that this person

11   completed the information on the borrower's racial and ethnic

12   demographics.

13   Q.      So that was it, that appears to be that's the reason

14   for the signature here?

15   A.      Yes.

16   Q.      Okay.  And on the actual document, I may have asked

17   this already, but is there a place to determine who the --

18   assuming it was a mortgage broker who completed the

19   application or assisted Mr. Watson in completing the

20   application, is there a space to indicate who that person is?

21   A.      I don't believe there is.

22   Q.      Okay.  So I want to show you another document that's

23   previously been introduced, and that's Government's

24   Exhibit 206.  Okay.  And this is the document that you

25   described as the employment verification; correct?

1    A.      Correct.

2    Q.      And you indicated this is created -- it's basically

3    computer generated; right?

4    A.      Yes.

5    Q.      Okay.  And this purports to represent that somebody,

6    an A. Lopez, confirmed Mr. Watson's or the applicant's

7    employer, correct, or the employment status?

8    A.      Correct.

9    Q.      To your knowledge, is there any other document that is

10   generated through CIT to confirm that, in fact, the

11   employment was verified?

12   A.      There was a separate written document that the

13   government introduced this morning that was a signed

14   verification signed by the president of the company that he

15   works for.  This document is simply a note in the system that

16   whoever made the phone call typed in.

17   Q.      Okay.  But other than my question -- and maybe I

18   didn't make myself clear -- my question is other than this

19   document before you, is there anything, any other document

20   that CIT generates to confirm, in fact, that the employment

21   has been verified, or is this the only document?

22   A.      There was that signed verification request for

23   verification of employment.

24   Q.      Okay.  And your understanding is that that document

25   you just described was generated by CIT and forwarded on to

1      the employer?

2      A.      Yes.

3      Q.      Was that your experience back in 2007?

4      A.      Yes.

5      Q.      Okay.  And with respect to -- do you know who this

6      A. Lopez is by any chance?

7      A.      No.  I'm sorry, I don't.

8      Q.      You've never spoken to him or her; correct?

9      A.      No.

10     Q.      Okay.  And generally speaking, where is this in the

11     loan file?  In the loan file rather.  Where is this document

12     kept?

13     A.      This document that we're looking at right now?

14     Q.      Yes.

15     A.      It normally would be online on the computer, and it

16     might be printed out and placed in the file along with the

17     signed verification of employment.

18     Q.      Okay.  Now, in the underwriting process when the

19     decision was being made to fund the loan or not, back in

20     2007, did CIT utilize any computer algorithm or computer

21     system to analyze the information on the loan application

22     before underwriting was made?

23     A.      Yes.

24     Q.      And describe briefly what that system was, if you

25     know.

1    A.    The system credit review, which this is a screen print

2    from, had certain rules built into it.  If a particular

3    product had a minimum FICO credit score and the borrower's

4    score was below that, it would reject it.  If the loan to

5    value was greater than that that was allowed, it would reject

6    it or tell you you could not approve it.  And you would

7    either turn it down, or if you really thought it made sense

8    to make the loan, you could send it up to somebody with a

9    higher credit authority.

10   Q.    If one as the underwriter believed that the loan can

11   be made, that can be sent up for higher review; correct?  Is

12   that what you're describing?

13   A.    Yes.

14   Q.    But on the flip side, was there an opportunity at CIT

15   in 2007 for this computer algorithm that you described to

16   make the underwriting decision automatically depending on the

17   criteria that's encoded in the loan application?  In other

18   words, could the approval, the underwriting approval process

19   back in 2006, could that have been made entirely by a

20   computer analyzing that information, the data that was

21   encoded in the system?

22   A.    No.

23   Q.    So there had to be some real person to actually review

24   the application?

25   A.    Yes.

1    Q.      And do you know in this particular case who that

2    person was?

3    A.      I do not.

4    Q.      Is there any way, based upon your view of the loan

5    file, to determine who that individual at CIT was?

6    A.      I don't know.

7    Q.      Okay.  Now, you were also asked about another document

8    which was Government's Exhibit 203.  And this is what you

9    described earlier as another -- purports to be another

10   verification of income; is that correct?

11   A.      No.  I don't see any income on it.

12   Q.      Excuse me.  Of employment.  Well, let's read it

13   together.

14   A.      Okay.

15   Q.      That might be easier.

16   A.      "To whom it may concern:  I am writing this letter

17   regarding my marketing director, Arthur Watson.  Due to the

18   fact that Arthur Watson's job is an Internet-based position,

19   his work can be done from any location and therefore is not

20   dependent on him living in Sacramento.  If you have any

21   questions, please do not hesitate to call me directly.

22   Regards."  And it's signed by Leonard Williams,

23   CEO/president.

24   Q.      Okay.  So if you look at this -- as you testified to

25   earlier, this is something that was important to CIT or could

1    be important because of the fact that it indicates that

2    Mr. Watson is not going to a remote location to work and to

3    get back home; correct?

4    A.      Correct.

5    Q.      Okay.  Now, and you saw -- you looked at that

6    signature line; correct?

7    A.      Correct.

8    Q.      Okay.  Now, I want to bring up another document which

9    is Government's Exhibit 204.  Now, this says a request for

10   verification of employment; right?

11   A.      Yes.

12   Q.      And is this the form that you were referring to

13   earlier that was the type of form that would be generated by

14   CIT?

15   A.      Yes.

16   Q.      Okay.  And in the bottom section of this document,

17   there is, likewise, a signature line.  Do you see that?

18   A.      Yes.

19   Q.      On the left, it says Leonard Williams.  All right.

20   Does that signature appear to be similar or different to the

21   signature I showed you in 203?  In other words, if you

22   compare the two signatures.

23   A.      They're different.

24   Q.      Okay.  And do you know if anybody at CIT, when these

25   two conflicting signatures were presumably presented in order

1    to determine whether the loan should be funded, do you know

2    if anybody questioned the fact that they're two different

3    signatures?

4    A.       I do not.

5    Q.       Okay.  Now, with respect to the HUD-1, the HUD-1, as

6    you described earlier, is the closing summary.  Would that be

7    a fair description of a HUD-1?

8    A.       I think so, yes.

9    Q.       It summarizes the transaction that is about to take

10   place; right?

11   A.       Yes.

12   Q.       And the HUD-1 is generated, if I understand correctly,

13   generated typically after funding; right?  After you folks in

14   this particular case funded the loan or approved the funding,

15   the HUD-1 is prepared?

16   A.       It might be generated after we fund the money to the

17   escrow company, but it must be generated and available to the

18   borrower on request 24 hours before the loan closes.

19   Q.       So the borrower has an indication of where the money

20   is going, what the breakdown of costs is and that sort of

21   thing; correct?

22   A.       And how much money each has to bring to the closing

23   table.

24   Q.       Right.  And the HUD-1 is a document that's required by

25   the feds; right?

1    A.       Yes.

2    Q.       Okay.  And it's correct to say -- well, strike that.

3    My recollection of your testimony is that CIT back in 2007

4    did not rely upon the HUD-1 to make the decision whether to

5    fund a particular loan; correct?

6    A.       We might review the HUD-1, but at that point, the

7    decision that we're going to make the loan has been approved.

8    Q.       Right.  So the loan's been approved, then you get

9    the -- the HUD 1 is generated, and if you choose to review

10   it, you review it.

11   A.       Yes.  And if it matches what we expect, everything

12   goes ahead.  If it does not match, then the escrow company

13   might be told to hold off on the closing until we can resolve

14   the issues.

15   Q.       Right.  But back in 2007, the HUD-1, this closing

16   summary, was not something that was routinely, if I

17   understand your testimony, was not routinely reviewed in

18   every case.  If you all thought for a particular reason you

19   needed to review it, you would.

20   A.       I'm not positive on that.

21   Q.       Okay.  So it's possible back in 2007, HUD-1s were not

22   routinely reviewed by CIT; correct?

23   A.       In at least some cases, yes.

24   Q.       Okay.  Now, going back for a moment to the topic we

25   discussed earlier, back in 2007, was the policy and practices

1    of CIT to decide to sell a loan before it was underwritten or

2    did the decision to sell a particular loan occur after

3    underwriting?  Does my question make sense?

4    A.      The question makes sense.

5    Q.      Okay.

6    A.      If the loan was being originated in a product that we

7    intended to sell, then that decision would be made as part of

8    the underwriting.  And we would be underwriting it to the

9    criteria of the investors, the institutions that might be

10   purchasing the loan.

11   Q.      Okay.  So if a loan, if a particular loan in question

12   was one of those loans that you folks at CIT intended to

13   sell, then that particular loan would be underwritten, the

14   criteria used would be based upon what the potential

15   investors require; correct?

16   A.      Correct.

17   Q.      Okay.  And the idea was simply, if I understand your

18   testimony, sir, the idea in those types of loan products that

19   you folks intended to sell, the idea was simply to fund the

20   loan and then within a short period of time just sell it in

21   the open market or to investors; right?

22   A.      Yes.

23           THE COURT:  Mr. Wiseman uses the term investor.  Do

24   you understand that to mean another lending institution or

25   somebody like Wall Street that's going to sell it as

1    securities?

2         MR. WISEMAN:  Well, your Honor, I didn't make myself

3    clear, so I appreciate that.  Let me see if I can make myself

4    clear on that topic.

5    Q.    BY MR. WISEMAN:  Back in 2007 when CIT had a product

6    that it intended to sell, you described earlier some of the

7    purchases of the -- purchasers of those loans would be other

8    lenders; right?

9    A.    Yes.

10   Q.    And back in 2007, were some of the loans that CIT

11   intended to sell, were they sold to entities other than

12   lenders, like, for example, Wall Street firms?

13   A.    The loans we intended to sell were sold to other

14   lending institutions that would take over the servicing.

15   Loans that we kept in our own portfolio and serviced might at

16   some point be securitized to Wall Street, but we would

17   continue to service them.

18   Q.    Okay.  So in that situation, the loans that you

19   intended to keep in house, some of those loans were sold to

20   Wall Street, but CIT continued to service them; right?

21   A.    Yes.

22   Q.    And what you mean by service, you mean simply -- well,

23   not simply because I'm sure it was fairly complicated, but

24   the notion of servicing a loan was communicating with a

25   borrower, having the borrower pay to CIT the monthly mortgage

1    payments, that sort of thing; correct?

2    A.       Correct.

3    Q.       Yet in that situation where the loan was sold to Wall

4    Street under a securitization scheme -- well, without using

5    the word scheme, process.

6    A.       I know what you mean, I think, yes.

7    Q.       Wall Street owns the loan; right?

8    A.       Yes.

9    Q.       And if something goes south on the loan, the Wall

10   Street folks are basically holding the bag; right?

11   A.       Typically, there were reps and warranties that any

12   lender selling or securitizing had to make.  So we might be

13   obliged to repurchase depending on why it went bad.

14   Q.       Right.  And depending on what the terms of the

15   warranties and representations were; right?

16   A.       Yes.

17   Q.       And with respect to this loan here that you've been

18   asked about, can you tell whether this loan was one of those

19   loans that was securitized and sold to Wall Street?

20   A.       I do not believe it was.

21   Q.       And is your belief based upon something that you've

22   seen in the loan file?

23   A.       It was based on a payment history I saw.

24   Q.       What about the payment history would lead you to

25   believe that, in fact, this was not a loan that was sold or

1    securitized and sold to Wall Street?

2    A.      If the loan had been sold to Wall Street, I would

3    expect to see a transaction where the loan was moved from

4    being owned by CIT to being owned by another corporation.

5    It's a transaction that would have no impact on the borrower,

6    but it would have a lot of impact on our general ledger, how

7    we record the income, what we have to pay out to whoever

8    securitized the loan.  I did not see any such transaction.

9    Q.      To suggest that it had been securitized and sold?

10   A.      Correct.

11   Q.      Okay.  Now, you mentioned earlier in response to one

12   of my questions about this sort of the mortgage implosion.

13   And I want to get to that just briefly.  But let me go back

14   to the topic about selling.  I just want to make it clear or

15   at least get it clear in my mind.  When a loan is sold, let's

16   say to another lender or, as you described it, packaged, a

17   securitization package, and sold to Wall Street, CIT is paid

18   essentially the face value of that loan; right?

19          MS. HEMESATH:  Objection; relevance.

20          THE COURT:  Overruled.  You may answer.

21          THE WITNESS:  Not necessarily.

22   Q.      BY MR. WISEMAN:  All right.  Is there a percentage, a

23   transactional cost that is part of that transaction?

24   A.      We could be paid par, which means we are paid face

25   value, or we could sell at a discount, or we could sell at a

 1    premium.

 2    Q.      Okay.  And if you sell at a premium, that means you're

 3    basically making something off the transaction, you're making

 4    a profit off the sale of a particular loan?

 5    A.      Yes.

 6    Q.      All right.  And if you sell it at par value, it's the

 7    face value of the loan; right?

 8    A.      Yes.

 9    Q.      Okay.  Now, you mentioned the implosion.  In your

10    view, when did that happen?  When did the mortgage -- I call

11    it meltdown, if that's an appropriate description.  When did

12    that happen, that implosion or meltdown?

13    A.      2007.

14    Q.      Okay.  And as a result of this implosion, has the

15    underwriting criteria changed with CIT, for example?

16    A.      Well, with CIT, we basically stopped originating

17    mortgages in September 2007.

18    Q.      So you basically stopped writing loans?

19    A.      We stopped writing loans, yes.

20    Q.      And did you continue to service those loans that you

21    were contracted to service?

22    A.      We continued to service the loans that were in the

23    portfolio, and the following year, June 30th, 2008, CIT sold

24    all the assets of the mortgage business to Lone Star Funds,

25    and it was a two-part deal.  They took ownership of the

1    loans, the assets, as it were, immediately, and then on

2    March 1, 2009, they actually acquired one of the CIT

3    corporations after all the legal approvals had been obtained.

4    And because CIT kept the CIT name, we became known as

5    Vericrest Financial, and we continued to service those loans,

6    and Lone Star began buying other loans, which we serviced.

7    Lone Star also owned Accredited Home Lending.  They merged

8    them into us.  We acquired their loans.  And then they merged

9    us in with Caliber Funding.  Technically, we acquired Caliber

10   Funding, but we were both owned by Lone Star, and we became

11   Caliber Home Loans, and Caliber Home Loans does originate

12   loans today.

13   Q.     But as you described it, after the implosion, the CIT

14   you knew before the implosion is quite a bit different than

15   the CIT today; right?

16   A.     Oh, absolutely.

17   Q.     And one of the reasons, would it be fair to say based

18   upon your vast experience, one of the reasons for the

19   implosion is that the underwriting criteria were just not --

20   in many cases not followed; right?

21   A.     Industrywide, I'd say that's a fair statement.

22   Q.     And that industrywide would be a fair statement to say

23   that part of the implosion was that folks in the lending

24   business, the lending industry, were simply not paying

25   attention to certain criteria that they probably should have;

```
 1    correct?

 2    A.      Yeah, I think that's a fair statement.

 3    Q.      And just, lastly, would it be a fair statement to say

 4    that the reason, one of the potential reasons why lenders

 5    were simply not paying as great attention is that they were

 6    going to off-load these loans relatively soon after they were

 7    funded; right?

 8    A.      I think that was true for many lenders, yes.

 9            MR. WISEMAN:  Very well.  Thank you, your Honor.  No

10    further questions.

11            THE COURT:  Redirect.

12                         REDIRECT EXAMINATION

13    BY MS. HEMESATH:

14    Q.      In your view of this loan file, to the best of your

15    knowledge, were any of the underwriting criteria on this loan

16    ignored?

17    A.      To the best of my knowledge, no.

18            MS. HEMESATH:  Thank you.

19            THE COURT:  All right.  Any further questions before

20    we excuse the --

21            MR. WISEMAN:  One question, if I may, your Honor,

22    briefly.

23            THE COURT:  Raised by the one question that was asked

24    on redirect, you may recross.

25            ///
```

```
 1                         RECROSS-EXAMINATION

 2   BY MR. WISEMAN:

 3   Q.     Mr. Walsh, you were just asked, based upon your review

 4   of the file, in your opinion, were any of the underwriting

 5   criteria, I think, ignored.  I don't remember exactly what

 6   the question was.  Right?

 7            THE COURT:  That was the question.

 8   Q.     BY MR. WISEMAN:  That was the question.  And your

 9   answer was yes?

10            THE COURT:  No, his answer was no.

11            MR. WISEMAN:  His answer was no, there was nothing

12   that was ignored.

13   Q.     BY MR. WISEMAN:  However, you testified earlier, and I

14   want to make sure that we all know that you're basing that

15   simply on the file; correct?

16   A.     Correct.

17   Q.     You did not speak to any of the underwriters

18   personally; correct?

19   A.     Correct.

20   Q.     You don't know if they ignored the requirements to

21   review this loan that they should have ignored; correct?

22   A.     Correct.

23            MR. WISEMAN:  Okay.  No further questions.

24            THE COURT:  Any reason why Mr. Walsh should not be

25   excused?
```

1          MS. HEMESATH:  No, your Honor.

2          THE COURT:  All right.  Thank you, Mr. Walsh, for

3    coming.  You're excused.

4          THE WITNESS:  Thank you, your Honor.

5          THE COURT:  You may call your next witness.

6          MS. HEMESATH:  The United States calls

7    Jeffrey Jackson.

8          THE CLERK:  Sir, please step forward.  Please stand

9    next to the court reporter and face me, please.

10                          JEFFREY JACKSON,

11   a witness called by the Government, having been first duly

12   sworn by the Clerk to tell the truth, the whole truth, and

13   nothing but the truth, testified as follows:

14         THE WITNESS:  I do.

15         THE CLERK:  Thank you.  You may be seated.

16         Please state your full name, spell your last name for

17   the record.

18         THE WITNESS:  Jeffrey Jackson, J-E-F-F-R-E-Y, Jackson,

19   J-A-C-K-S-O-N.

20                        DIRECT EXAMINATION

21   BY MS. HEMESATH:

22   Q.    Mr. Jackson, where do you work?

23   A.    Bank of America.

24   Q.    What's your job title?

25   A.    An operation analyst.

1    Q.      Did Bank of America have occasion to pull the monthly

2    bank statements for Bank of America Account Number

3    06952-09603?

4    A.      Yes.

5    Q.      Who is the accountholder on that account?

6    A.      I'd have to look at the statements.  I don't know by

7    hand.

8    Q.      Would it refresh your memory to look at what's tabbed

9    Government's Exhibit 230?  If you look at the tabs on the top

10   of the binder.  The very top, the part that's facing me.  It

11   should be toward the back.  230.

12   A.      It's Arthur Watson.

13           MS. HEMESATH:  Your Honor, move to admit Government's

14   Exhibit 230 as a certified business record.

15           MR. WISEMAN:  No objection.

16           THE COURT:  Exhibit 230 is received in evidence.

17                          (GOVERNMENT'S EXHIBIT 230, Bank of

18                          America monthly statements for Arthur

19                          Watson, 4/26/06 through 5/25/07 from

20                          Bank of America, ADMITTED INTO

21                          EVIDENCE.)

22   Q.      BY MS. HEMESATH:  Are these the monthly bank account

23   statements for Arthur Watson, Account Number 06952-09630 --

24   excuse me -- 603?

25   A.      Yes.

```
 1   Q.      Which month is this statement for?

 2   A.      April 26th through May 25th of 2006.

 3   Q.      What's the beginning balance in that month?

 4   A.      $628.32.

 5   Q.      And the total deposits?

 6   A.      3,268.02.

 7   Q.      And ending balance?

 8   A.      $3.34.

 9   Q.      If you can please go to 230, page 4.  I'm sorry.

10   Actually, take us back to 230 again.  What is the address of

11   the account holder?

12   A.      It's 5507 Towhee Way in Sacramento, California.

13   Q.      Okay.  Now to 230-4.  And the address now?  You can

14   look on the screen in front of you if that's easier.

15   A.      It's not.

16   Q.      It's not easier.

17   A.      2428 Camino Park Court, Carmichael, California.

18   Q.      And this is for which month?

19   A.      May 26th through June 28th -- sorry, June 27th of

20   2006.

21   Q.      And the beginning balance in that month?

22   A.      $3.34.

23   Q.      The total deposits?

24   A.      $3,770.81.

25   Q.      And the ending balance?
```

 1    A.      $50.70.

 2    Q.      Let's go, please, to 230-10.  Same thing, please.

 3    Beginning balance, total deposits, and end balance.

 4    A.      Beginning, 245.28.  Total deposits, 3,504.93.  Ending

 5    balance, $291.41.

 6    Q.      All right.  And next, please, 230-13.

 7            THE COURT:  How many of these do you have?

 8            MS. HEMESATH:  I'm going to do two more.

 9            THE COURT:  You don't need to have him read them.

10    They're in evidence.

11            MS. HEMESATH:  I understand, your Honor.

12    Q.      BY MS. HEMESATH:  On this one, please, beginning

13    balance?

14    A.      I'm sorry.  Which page are you on?

15    Q.      Sorry.  On 230-13.

16    A.      And what's your question?

17    Q.      The beginning balance?

18    A.      $291.41.

19    Q.      And total deposits?

20    A.      $17,221.02.

21    Q.      Do you see on this page a deposit that constitutes the

22    bulk of those total deposits?

23    A.      Yes.

24    Q.      And what amount is that?  And if you wouldn't mind

25    pointing to it on the screen in front of you.

1    A.      On September 6th, deposit for $14,993.

2    Q.      Have you reviewed these bank account statements which

3    are Exhibit 230, April 26, 2006, through May 25, 2007, in

4    their totality?

5    A.      Yes.

6    Q.      And other than this deposit for $14,993, are there any

7    dollar amounts that you recall over $5,000?

8            MR. WISEMAN:  Objection.  Relevance, your Honor.

9            THE COURT:  Well, whether it's relevant or not, the

10   exhibit is in evidence, and it speaks for itself.  All he can

11   do would be to read the exhibit, and the jury can do that

12   themselves.  So I'm going to sustain the objection.

13   Q.      BY MS. HEMESATH:  All right.  If we could please go

14   back to 230 and put it side by side with Exhibit 209-A-39,

15   which is already in evidence.  Which of these is the bank

16   account as certified by Bank of America?

17   A.      I can't view it from your screen here.  It's too small

18   for me.

19   Q.      Do you have a paper copy of 230 still in front of you?

20   A.      Yes.

21   Q.      Go back to the beginning page of 230.

22   A.      Yes.

23   Q.      All right.  Is what's marked as Government's

24   Exhibit 230, is that the certified copy of Mr. Watson's bank

25   account statement as provided by Bank of America?

 1    A.      Yes.

 2    Q.      All right.  What's the total deposits in the bank

 3    account on the left?

 4    A.      Three thousand --

 5            THE COURT:  I'm not sure.  Is the point that one of

 6    these is a forgery?  What is the point here?

 7            MS. HEMESATH:  Your Honor, Exhibit 209-A is the one

 8    that was in the loan file that Mr. Walsh just testified to

 9    reflecting the balances in that loan file.

10            THE COURT:  So is that the point, that that's not

11    legitimate?  Because they refer to two different things.  One

12    is summary of your Nuevo Future checking account.  The other

13    one is summary of your Prima Interest checking account.  I

14    can't tell whether it's the same checking account, a

15    different checking account, but I think if it's confusing to

16    me, it's going to be confusing to the jury.  So the point is

17    one of them is not legitimate.  Is that the point you're

18    trying to make?

19            MS. HEMESATH:  Yes.  Maybe if I could bring up two

20    different pages to make the point.

21            THE COURT:  All right.

22    Q.      BY MS. HEMESATH:  Let's see 230-4 next to 209-A-36.

23    Okay.  The bank account number of the one on the left and the

24    right side by side, please.  Do these look to you like the

25    same bank account number?

1    A.      They appear to be.

2    Q.      And the statement period dates?

3    A.      May 26th through June 27th of 2006.

4    Q.      And if we could compare the boxes with the deposits

5    again on these same pages.

6            All right.  If we compare the beginning balance on the

7    left versus the beginning balance on the right, what

8    difference do you see?

9    A.      The dollar amount.

10   Q.      Which has the smaller dollar amount?

11   A.      The one on the left.

12   Q.      And the total deposits, which has the smaller dollar

13   amount?

14   A.      Also the one on the left.

15   Q.      And the ending balance, which one has the smaller

16   dollar amount?

17   A.      The one on the left.

18   Q.      And which one is the certified Bank of America bank

19   account statement?  If you want us to make it big again, we

20   can.

21   A.      I believe it is the one on the left.

22   Q.      All right.  How many months of statements, if you

23   recall, did you provide to us in Exhibit 230?

24   A.      I don't recall.

25           MS. HEMESATH:  Okay.  I won't take the time to go

1    through each month now, your Honor, but the full exhibits can

2    be compared.

3              THE COURT:  The full exhibits are in evidence.

4              MS. HEMESATH:  Yes, your Honor.

5              THE COURT:  Very well.

6              MS. HEMESATH:  All right.  Please go ahead and turn to

7    -- actually, I'm going to move to admit Exhibit 311 which is

8    a certified business record, the same bank account.

9              THE COURT:  Exhibit 311 is received in evidence.

10                             (GOVERNMENT'S EXHIBIT 311, Arthur

11                             Watson Bank of America Monthly

12                             Statement for June 27, 2007 - July 26,

13                             2007, ADMITTED INTO EVIDENCE.)

14   Q.     BY MS. HEMESATH:  And, Mr. Jackson, can you confirm

15   that this is also a certified copy of a different month for

16   Mr. Watson's Bank of America bank account?

17   A.     I'm sorry.  Is there a tab here somewhere?

18   Q.     Sorry.  It's the 300 binder series right behind you.

19   A.     Which one are we looking at?

20   Q.     311.  So again, the tab's on the top.

21   A.     And your question?

22   Q.     My question is can you confirm that this is from the

23   same bank account of Mr. Watson maintained at Bank of

24   America?

25   A.     Yes.

1    Q.      All right.  Do you see a deposit into this account for

2    $8,000?  It may be on the next page, if you need to turn the

3    page.

4    A.      Yes.

5    Q.      Can you go to page 2.  Oops, sorry.  Can you show us

6    where on the screen that is?

7            Does a lender have the ability to call or otherwise

8    reach out to Bank of America to verify how much money an

9    account holder has at Bank of America?

10           MR. WISEMAN:  I'm going to object.  Calls for

11   speculation and lack of foundation as to this witness's

12   knowledge.

13           THE COURT:  It hasn't been established really what his

14   independent knowledge is.  He's said he's operations analyst

15   which suggests he may be able to answer the question, but we

16   really haven't established his expertise.

17   Q.      BY MS. HEMESATH:  Do you have familiarity with Bank of

18   America's policies regarding interactions with other banks or

19   lenders?

20   A.      To some degree.

21   Q.      Are you familiar with verifications from other

22   entities to Bank of America?

23   A.      Yes.

24   Q.      All right.  Do other lenders have the ability to

25   verify bank account amounts with Bank of America?

1    A.       They do, but it's limited information that's provided.

2    It's not a full balance figure.  They will generally state,

3    you know, this account has an average balance of this or this

4    account has maintained a five-figure or six-figure account,

5    but they won't specifically say the full amount.

6    Q.       Okay.  And so if a lender here had reached out to Bank

7    of America to verify how much was in this account, that is

8    something that could, under some circumstances, be provided

9    by Bank of America?

10   A.       Depending on the lending situation, it could be

11   something provided by Bank of America.

12   Q.       Okay.  If we can go back to page 1, please.  Down

13   here, do you see $8,000 leaving this bank account?

14   A.       Yes.

15   Q.       And on what date?

16   A.       July 13th.

17   Q.       Okay.  And then back out, please.  What is the end

18   balance that month in this bank account?

19            MR. WISEMAN:  Your Honor, I'm going to object.  The

20   records are admitted, and they speak for themselves.  I don't

21   think this witness is providing any more information than

22   simply reciting what's in the record.

23            THE COURT:  Not on this question he's not, so I'm

24   going to sustain this objection.

25            MS. HEMESATH:  Okay.

1    Q.      BY MS. HEMESATH:  Have we asked you to review what has

2    been marked but not yet admitted as Government's Exhibit 306?

3    It's there in the binder in front of you.

4    A.      Yes.

5    Q.      What is your conclusion as to whether Exhibit 306 is

6    an authentic reproduction of Mr. Watson's bank account?

7           MR. WISEMAN:  I'm going to object.  It calls for an

8    expert witness testimony.

9           THE COURT:  Well, his opinion that one is authentic is

10   based upon the fact that it's included in his records.  Now,

11   if that's what you're asking him, fine.  But if you're asking

12   him what his opinion is of one of the others, that's a

13   different question.  He can form an opinion as to whether the

14   records that he brought here are authentic.

15          MS. HEMESATH:  Yes.

16   Q.      BY MS. HEMESATH:  Does Exhibit 306 match what you

17   brought here?

18   A.      No.

19          MS. HEMESATH:  Thank you.  No further questions.

20          THE COURT:  You may cross-examine.

21          MR. WISEMAN:  I have no questions, your Honor.

22          THE COURT:  All right.

23          Thank you, Mr. Jackson.  You're excused.

24          THE WITNESS:  Thank you.

25          THE COURT:  You may call your next witness.

 1            MS. HEMESATH:  The United States calls Arthur Watson.

 2            May I approach and rearrange the binders, your Honor?

 3            THE COURT:  Yes.

 4            MS. HEMESATH:  Thank you.

 5            THE CLERK:  Sir, please step forward.  Please stand

 6   here next to the court reporter and face me.

 7            THE WITNESS:  Okay.

 8            THE CLERK:  Please raise your right hand.

 9                       ARTHUR WATSON,

10   a witness called by the Government, having been first duly

11   sworn by the Clerk to tell the truth, the whole truth, and

12   nothing but the truth, testified as follows:

13            THE WITNESS:  I do.

14            THE CLERK:  Thank you.  You may be seated.  Please

15   state your full name and spell your last name for the record.

16            THE WITNESS:  Arthur Watson.

17            THE CLERK:  Spell your last name.

18            THE WITNESS:  What's that?

19            THE CLERK:  Spell your last name, please.

20            THE WITNESS:  W-A-T-S-O-N.

21                       DIRECT EXAMINATION

22   BY MS. HEMESATH:

23   Q.    Good afternoon, Mr. Watson.

24   A.    Good afternoon.

25   Q.    Mr. Watson, how old are you?

```
 1    A.      67.

 2    Q.      And have you retired or are you still working?

 3    A.      Retired.

 4    Q.      Before you retired, what did you do?

 5    A.      I was active duty, then I worked for federal, and I

 6    did some handyman work.

 7    Q.      Active duty, which branch, sir?

 8    A.      Air Force.  Active duty.  12 years.  And then federal

 9    time, about 14, and some handyman work.

10    Q.      What type of handyman work?

11    A.      Home repair.

12    Q.      And where did you do the handyman work?

13    A.      Where?

14    Q.      Uh-huh.

15    A.      In Carmichael, for Camino Park, basically, but I moved

16    around a little bit.

17    Q.      When you were Air Force, you were active duty, I think

18    you said 12 years?

19    A.      12 years active duty.

20    Q.      Were you also in the reserves?

21    A.      Yeah.  After I -- when I finished active duty, I took

22    about a year break, and then I joined the reserves, air

23    technician.  In other words, yeah, reserves, say reserves.

24    Q.      What is an air technician?

25    A.      They call it ARTs, Air Reserves Technician.  When you,
```

1    like, part-time Air Force and then you work for the federal

2    government, so like you're doing work at half and half.

3    Q.      What did you do for the federal government?

4    A.      Same thing, work on aircraft.  Same thing.  I did the

5    same job, but I did it in a different capacity.

6    Q.      I see.

7    A.      When I put the uniform on, I worked for the Air Force.

8    And then after that was done, I put my civilian clothes on,

9    and I worked as a federal employee, just straight civil

10   service.

11   Q.      But the actual work itself was what?

12   A.      Was same work, aircraft mechanic.

13   Q.      Were you actually the one with the tools?

14   A.      What's that?

15   Q.      Were you actually the one with the tools?

16   A.      With the tools?

17   Q.      Working on planes?

18   A.      Yes.  Yes.

19   Q.      What types of things would you do?

20   A.      Oh, various things.  My job was like a crew chief, and

21   we did a little bit of everything.  We worked on the plane,

22   we managed the plane, inspections, preflights, postflights,

23   launched the plane, did repairs.  Just a host of refuel,

24   defuel service, just a host of things pretty much.  But we

25   had specialists to do certain things that we couldn't do as a

 1   crew chief.  We had specialists to do it.  So what I couldn't

 2   do, I could call somebody to do it.

 3   Q.      What about school.  How far did you go in school?

 4   A.      Basically high school.

 5   Q.      Any college after that?

 6   A.      A little bit.  Nothing much to brag about.  City

 7   college.  When I got out of the Air Force, I went, took a

 8   couple courses that really didn't amount to very much, but I

 9   did go to city college.

10   Q.      Is it fair to say that the bulk of your career was in

11   the Air Force?

12   A.      Yes.

13   Q.      And then besides that, you said handyman.  Have you

14   done anything else?

15   A.      No.  Air Force, federal, and then handyman work.

16   Q.      What about UPS, did you ever drive a truck for UPS?

17   A.      No.  I applied for UPS, I remember doing that.  And

18   they told me I failed the driver's test, so I let that go.

19   But I never worked -- wait, wait, wait, wait.  I take that

20   back.  Wow.  I just thought about it.  I wanted to be a

21   driver, but they put me down in the loading dock unloading

22   the trucks.  I remember now.  I forgot about that.  I didn't

23   drive much.  I did that for about three months, I didn't like

24   it, and I quit.  So it was about three, four months I did

25   that.

```
 1    Q.      Okay.

 2    A.      I just remembered that.

 3    Q.      What about real estate?  Ever work in real estate?

 4    A.      Never worked, no, never worked in real estate, no.

 5    Q.      Mr. Watson, do you know Leonard Williams?

 6    A.      Yes, I do.

 7    Q.      Do you see him here in the courtroom today?

 8    A.      Yes.

 9    Q.      Please point him out and describe something he's

10    wearing.

11    A.      He's sitting over there, like a black sweater,

12    something, red tie.

13            THE COURT:  The record will reflect he's identified

14    the defendant.

15            THE WITNESS:  I'm sorry.

16            THE COURT:  You got him.

17            THE WITNESS:  Oh, okay.

18            THE COURT:  I just said the record will reflect you've

19    identified the right person.

20            THE WITNESS:  Okay.  Yeah, that's him.

21    Q.      BY MS. HEMESATH:  How long have you known

22    Mr. Williams?

23    A.      Me and Mr. Williams, we met in the reserves when I

24    joined the reserves.  We met there, and we became good

25    friends.  And when we met, I would say maybe in the '80s.
```

```
 1    Yeah, something like that.  My memory, I'm trying to
 2    remember.  My memory's not that great, but I'm saying around
 3    late '80s.
 4    Q.      Is it fair to say that you can remember decades of
 5    friendship?
 6    A.      Huh?
 7    Q.      Is it fair to say that you can remember decades of
 8    friendship?
 9    A.      Say?
10    Q.      Have you been friends with him for several decades?
11    A.      Yeah.
12    Q.      And you said you met in the reserves?
13    A.      We met in the reserves.
14    Q.      Was Mr. Williams in the reserves with you?
15    A.      Yes, he was.
16    Q.      Did you become friends immediately?
17    A.      Yeah.  Yeah, we worked together, and we became
18    friends.
19    Q.      And did you stay friends over the years?
20    A.      Yes, we did.
21    Q.      About how often would you see each other over the
22    years?
23    A.      Oh, wow.  It varied.  I wouldn't say every day, but
24    quite frequently.  And then at the time on the job, you know,
25    we saw each other, you know, on the job, you know, every
```

```
 1    time, all the time.  And him and I would get together and do

 2    certain things, and so we were pretty friendly.

 3    Q.      How close of a friend did you consider him?

 4    A.      Very close.

 5    Q.      You don't have to give me the street address, but

 6    where do you live now, Mr. Watson?

 7    A.      In Carmichael.

 8    Q.      And what type of housing situation is it?

 9    A.      It's a duplex.

10    Q.      Do you own or do you rent?

11    A.      I rent.

12    Q.      About how long have you lived there?

13    A.      About eight years.

14    Q.      And before that, where did you live?

15    A.      Towhee Way.

16    Q.      There, were you renting or owning?

17    A.      Renting.

18    Q.      In Towhee, about how much rent were you paying per

19    month?

20    A.      About 900 a month.

21    Q.      In Carmichael, about how much rent are you paying a

22    month?

23    A.      950.

24    Q.      Have you ever paid upwards of $3,000 a month in rent?

25    A.      No.
```

1    Q.      Could you afford to pay upwards of $3,000 a month in

2    rent?

3    A.      No.

4    Q.      What caused you to move to Carmichael?

5            MR. WISEMAN:  Objection.  Relevance.

6            THE COURT:  What's the relevance?

7            MS. HEMESATH:  Your Honor, the move the Carmichael is

8    right in the time period that we're discussing in this case,

9    eight years ago.

10           THE COURT:  Well, the fact that he moved at a

11   particular time is relevant.  What's the relevance of the

12   reason that he moved?

13           MS. HEMESATH:  The relevance is that it explains

14   Mr. Watson's state of mind at the time that he began the

15   transaction with Mr. Williams.

16           THE COURT:  All right.  The objection is overruled.

17   Q.      BY MS. HEMESATH:  What caused you to move to

18   Carmichael?

19   A.      I was evicted.  I had an eviction from Towhee Way.

20   Q.      And during that time, were you friends with

21   Mr. Williams still?

22   A.      Yes.

23   Q.      Were you close in your friendship at that time?

24   A.      Were we what?

25   Q.      Were you close in your friendship at that time?

1    A.       Yes.

2    Q.       How were you doing financially?

3    A.       Right now?

4    Q.       At the time you moved to Carmichael.

5    A.       Oh, not too good.  Yeah, I was kind of struggling.

6    Q.       Did you have a job?

7    A.       Yeah, I was doing handyman work, but I went into that

8    debt consolidation to pay off some bills, you know, to reduce

9    my interest rate and to pay them off like in five years to

10   save myself some money from the interest rates.

11   Q.       How did you come to enroll in debt consolidation?

12   A.       In what?

13   Q.       In the debt consolidation.

14   A.       I heard about it through some friends, and I called

15   them up and I enrolled.  I got enrolled.  I heard it was a

16   good program.

17   Q.       Did you have a conversation with Mr. Williams about

18   the debt consolidation?

19   A.       No, not the debt consolidation.

20   Q.       Did you have a conversation with Mr. Williams about

21   your credit?

22   A.       Yes.  Mr. Williams helped me to do credit repair.  He

23   turned me on to credit repair.  And so I got my credit, you

24   know, scores, you know, straightened out, and Mr. Williams

25   was instrumental in doing that.

1    Q.     So before your credit went up, about what was your

2    credit score, if you remember?

3    A.     I think I was at about three or four, something like

4    that.

5    Q.     And after the credit repair, about what was your

6    credit?

7    A.     I think I was up to about seven.  I got up to seven,

8    as far as I recollect.

9    Q.     Did you have a conversation with Mr. Williams about

10   the repaired credit score?

11   A.     Did I have a conversation?  Well, I remember I was at

12   his office one time, one day, and we were talking about it,

13   and we talked about my credit score, and I told him I don't

14   know what it is.  I didn't know what my credit score was.  So

15   he went in and pulled up a credit report, and it was like a

16   seven something, and then that's what he told me, because

17   other than that, I didn't know exactly what it was.  So he

18   said, man, you got a seven, you got a pretty good score.

19   Q.     And you mentioned his office.  Which office was this?

20   A.     On Watt Avenue.

21   Q.     About how many times do you think you've been to that

22   office?

23   A.     15, 20 times.  You know, I would stop by, holler at

24   him or whatever.  Like I say, he's a friend and so whatever,

25   but like 15, 20, maybe more.

1    Q.     Can you give us a brief description of how the office

2    looked?

3           MR. WISEMAN:  Objection.  Relevance.

4           THE WITNESS:  It was a nice office.

5           THE COURT:  The objection is overruled.  Go ahead.

6    Answer the question.

7           THE WITNESS:  It was a nice office.  Well kept,

8    organized.

9    Q.     BY MS. HEMESATH:  Who else worked there besides

10   Mr. Williams?

11   A.     Josh.  I just know him as Josh.

12   Q.     Anybody else besides the two of them?

13   A.     No.

14   Q.     Who was Josh?

15   A.     He was Mr. Williams' -- they worked together.  They

16   were partners together.

17   Q.     Was Josh a friend of yours?

18   A.     So-called.  More of an acquaintance.  I never -- I

19   didn't know Josh that well.  I met him through Leonard and

20   going into the office, and so we never hung out, anything

21   like that.  I just knew him from Leonard.

22   Q.     Okay.  At some point did -- actually, let me ask one

23   more question before that.

24          During this time period, I believe you said about

25   eight years ago, so 2006, did you have a computer?

1    A.        No.

2    Q.        Did you have any other way to access the Internet?

3    A.        No.

4    Q.        During this time frame, did Mr. Williams approach you

5    about doing a real estate deal with him?

6    A.        Yes.

7    Q.        What did he propose to you?

8    A.        Well, he proposed he had a deal to work out with me on

9    Gidda Loop, to purchase a house on Gidda Loop, and if we did

10   that, he would -- we would kinda do it together, but I would

11   pay the first three months' notes on the house, and then he

12   would make sure that it was paid, everything was paid after

13   that.

14   Q.        What were you going to get out of the deal?

15   A.        Well, he gave me some money up front.

16   Q.        You said Gidda Loop.  Do you remember where the house

17   was?

18   A.        I can't remember.  It was in Yuba City.

19   Q.        What was he going to get out of the deal?

20   A.        I don't know what he was going to get.  He didn't talk

21   to me about that.

22   Q.        Okay.

23   A.        He just told me what he would give me.

24           THE COURT:  The last part of the answer is stricken,

25   after "I don't know."

1    Q.      BY MS. HEMESATH:  Were you actually going to live in

2    this house on Gidda Loop?

3    A.      At the time I hadn't planned on it.

4    Q.      Did you have any plans to move to Yuba City?

5    A.      Not at the time.

6    Q.      If you didn't plan to move to Yuba City, why did you

7    think Mr. Williams was trying to help you buy a house in

8    Yuba City?

9            MR. WISEMAN:  Objection.  Relevance.

10           THE COURT:  Overruled.

11           THE WITNESS:  Well, it was some money to be -- from

12   what I understand, he could get some money up front for

13   purchasing the home and give me, you know, give me some, then

14   he would make some on it for the purchase of the house, and

15   we didn't have to put a down payment on it or nothing like

16   that.

17   Q.      BY MS. HEMESATH:  What was your reaction to this deal

18   when he proposed it?

19   A.      My reaction was I was broke, and I told him, I said

20   well, hey, this is all well and good as long as we can, you

21   know, keep it up, you know, make those notes.  You know, I

22   could do the first three months, but after that, you know,

23   you know, can you handle it, make sure that you can handle

24   it.  And he told me he could.

25   Q.      Did you get that agreement with him about you would

```
 1   pay the first three months of the mortgage and he would pay

 2   the remaining months?

 3   A.      Right.

 4   Q.      Did you get that agreement in writing?

 5   A.      No, I didn't.  We were friends, so it was just like a

 6   verbal agreement.

 7   Q.      Okay.  To what extent were you relying on your trust

 8   of him that he would pay the remaining months?

 9   A.      What?

10   Q.      Were you trusting him that he would pay?

11   A.      Yeah, I trusted him, yes.  Uh-huh.

12   Q.      Did you go visit this house that you were going to

13   buy?

14   A.      No.

15   Q.      Did you accept the deal that he was proposing to you?

16   A.      Yes, I did.

17   Q.      Was it immediate or did you have to sleep on it?

18   A.      I can't remember.  I think it was immediate.  I can't

19   remember.

20   Q.      About how much money was he promising you that you

21   would get out of the deal?

22   A.      14 grand.

23   Q.      Did you and Mr. Williams have a conversation about how

24   you would pay for this house?

25   A.      Well, he said that he could handle it after, if I paid
```

1    the first three months.  And what he was saying is that -- he

2    said that, you know, he could sell it, but until then, we may

3    have to rent it out until such time as he could sell it.  And

4    that was the agreement.  But he would make good on the notes,

5    on the payments, and because we were such good friends, I,

6    you know, I trusted him.

7    Q.    Did you have enough of your own money to pay for the

8    first three months' rent?

9    A.    No.

10   Q.    Where were you going to get the money for the first

11   three months' rent?

12   A.    Oh, out of the money he gave me.

13   Q.    Out of the 14,000?

14   A.    Yes.

15         THE COURT:  How much was the first three months going

16   to be?

17         THE WITNESS:  It was roughly $2,800.  It was a first

18   and a second on that house.

19         THE COURT:  2,800 a month?

20         THE WITNESS:  Yeah, it was a first and a second, if

21   I'm not mistaken.

22   Q.    BY MS. HEMESATH:  Were you going to pay that money

23   directly to the lender or were you going to pay it a

24   different way?

25   A.    I gave it to Leonard and let him make the payments.

```
 1    Leonard was more or less handling the business.

 2    Q.     If you can look at that binder in front of you at

 3    what's been tabbed 102, the very first tab.

 4    A.     Which one?

 5    Q.     102.

 6    A.     102.  Okay.  All right.

 7    Q.     Do you recognize that?

 8    A.     Well, I see my signature at the top.

 9    Q.     What is that document?

10    A.     What's that?

11    Q.     What is that document?

12    A.     I can't read.  I don't have my glasses.  I'm sorry.  I

13    can't read it.  Loan application, residential.

14           THE COURT:  Would these help?  They're just regular

15    reading glasses.

16           THE WITNESS:  I don't want to stretch them out.

17           THE COURT:  That's okay.

18           THE WITNESS:  Uniform residential loan application.

19           MS. HEMESATH:  I'm going to move to admit 102.

20           THE COURT:  Exhibit 102 is received in evidence.

21                        (GOVERNMENT'S EXHIBIT 102, Loan

22                         application, ADMITTED INTO EVIDENCE.)

23           MR. WISEMAN:  Your Honor, at this point I'm going to

24    raise a --

25           THE WITNESS:  What's that?
```

1           THE COURT:  Just a minute.  He's speaking to me.

2           MR. WISEMAN:  With respect to this evidence, I would

3     ask for a 403 limiting instruction because this is outside

4     the scope of what the charges are, particularly the Gidda

5     Loop property.  I think we raised that pretrial.

6           THE COURT:  403 and a limiting instruction are two

7     different things.

8           MR. WISEMAN:  404(b).  I'm going to object to the

9     introduction of this evidence unless the government qualifies

10    this as 404(b).

11          THE COURT:  Well, maybe this is a good time.  I was

12    going to take a recess at a quarter to 3:00.  Maybe this is a

13    good time to do that.  We'll take a 15-minute recess now,

14    ladies and gentlemen.  Remember the admonition.  Make it 20

15    minutes.  It will be a 20-minute recess.  It will give me a

16    chance to talk to Mr. Wiseman.  Resume at five minutes after

17    3:00.

18          THE WITNESS:  Here you go, Judge.  Thank you.

19          MS. HEMESATH:  Can we keep those there?

20          THE WITNESS:  Keep them here?  Okay.

21          MS. HEMESATH:  If you don't mind.

22          THE WITNESS:  Okay.

23          (Jury not present.)

24          MS. HEMESATH:  Can we excuse Mr. Watson?

25          THE COURT:  He can be excused.  He may have a little

 1   harder time getting down.  Do you want to stay there?  Do you

 2   want to step down and take a break?  Mr. Watson, you can take

 3   a break.

 4           THE WITNESS:  I've been breaking all day.

 5           THE COURT:  That's that I thought.  Okay.  You can

 6   stay there.

 7           THE WITNESS:  I will stay here for now.

 8           THE COURT:  Just let me talk to the lawyers here

 9   though.

10           THE WITNESS:  Okay.

11           MS. HEMESATH:  So, your Honor, this property is in the

12   indictment.

13           THE COURT:  That's my point.  I read the trial briefs

14   and the motions in limine.  Mr. Wiseman tends to refer to

15   these transactions as 404(b) materials as if they are offered

16   as other overt or other criminal acts.  They are not offered

17   to prove other crimes, nor are they offered as character

18   evidence, as I understand it.  The government contends they

19   are part of the same scheme that constitutes the charge in

20   Count 1.

21           MR. WISEMAN:  The Count 1 charge, as the Court knows,

22   is the conspiracy with Josh Clymer.  And if I recall the

23   state of the discovery and the indictment, the Gidda Loop

24   transaction predates the involvement of Mr. Clymer in the

25   alleged conspiracy.

1              THE COURT:  But it's right in the indictment on page

2     4.  Is this 864 Gidda Loop?

3              MS. HEMESATH:  It is.

4              MR. WISEMAN:  And the government is claiming that that

5     is part of the transaction that encompassed the conspiracy in

6     spite of the fact that Mr. Clymer has nothing to do with this

7     transaction.

8              THE COURT:  Look at the indictment.  Refresh your

9     recollection.

10             MR. WISEMAN:  I will.

11             THE COURT:  Do it right now.  Because I may be missing

12    something that you can straighten me out on.

13             MR. WISEMAN:  So having reviewed the pertinent part of

14    the indictment, it appears the government is trying to claim

15    that this is part and parcel of the underlying conspiracy.

16             THE COURT:  Yes.  And I think that applies to the

17    other transactions that you seek to characterize as 404(b)

18    materials.  In each one of those cases, the government claims

19    it's part of the scheme.

20             MR. WISEMAN:  Right.  But there's no indication, at

21    least with Gidda Loop -- that was my whole point -- that

22    Mr. Clymer was involved.  I understand the government's

23    position.  That clears it up that the government is saying

24    this is part and parcel of the conspiracy.

25             THE COURT:  Right.  And Mr. Clymer doesn't have to be

```
 1    involved.  The conspiracy is alleged to have involved

 2    Mr. Williams, Mr. Clymer, and others known and unknown to the

 3    grand jury.  It could be anybody.

 4              MR. WISEMAN:  Very well.

 5              (Recess taken.)

 6              (Jury present.)

 7              THE COURT:  All right.  Everyone is present.  You may

 8    continue.

 9              MS. HEMESATH:  Thank you, your Honor.

10                   DIRECT EXAMINATION, (Cont'd.)

11    BY MS. HEMESATH:

12    Q.    Can we have 102 back up.

13          Do you see your signature on this document?

14    A.    On this one, yes.

15    Q.    All right.  Can you tap where it is?

16              THE COURT:  Well, I think we have a problem with using

17    that feature.

18              MS. HEMESATH:  Just this screen.

19              THE COURT:  Just that screen.  All right.

20              MS. HEMESATH:  There we go.

21    Q.    BY MS. HEMESATH:  Who did you work with in preparing

22    this loan application?

23    A.    Mr. Williams.

24    Q.    Did you work with anyone else in preparing this loan

25    application?
```

```
1    A.      No.

2    Q.      Did you fill in the information on this loan

3    application?

4    A.      No.

5            MS. HEMESATH:  Can we make the bottom third big,

6    please.  Sorry, I tried to clear it.

7            THE CLERK:  Do you want me to clear it?

8            MS. HEMESATH:  Yes, please.

9    Q.      BY MS. HEMESATH:  This is 2006.  Where were you

10   working at the time?

11   A.      Oh, wow.  I think I was in the reserves, as far as I

12   can remember.

13   Q.      Okay.  If we look at the bottom of this application --

14   and if you need the glasses to see, if that will make it

15   easier.  There we go.  Can you read that?

16   A.      Yeah.  D and W.  I was doing handyman work then.

17   Q.      Was this your employer?

18   A.      Yeah.  I was working for -- on his property.

19   Q.      Okay.  About how much money were you making a month?

20   A.      It varies.  I would make anywhere from maybe 500 to a

21   thousand a month depending.  I got paid by the job.

22   Q.      Okay.  So not a regular salary?

23   A.      No.

24   Q.      Okay.  And it says here:  Years on this job, three.

25   Is that accurate?
```

1    A.      What's that?

2    Q.      It says up here:  Years on this job, three.  Do you

3    see that box?

4    A.      Probably so, yeah.

5    Q.      Okay.  Down here, it says owner.  Were you the owner

6    of D & W Handyman Services?

7    A.      Was I the owner of what now?

8    Q.      Of the handyman services?

9    A.      No.

10   Q.      Who was the owner?

11   A.      Well, I was like independent.  I worked -- okay, this

12   guy, there's a property manager, and I worked for the

13   property manager.  She managed the property.  The owner, he

14   owned the property.  So I don't know how you -- you know, how

15   to put it, but I basically worked for the property manager.

16   She gave me -- issued out the workload, the jobs for me to

17   do, and made out my, for my pay, you know, how much I would

18   get paid for what I did.  The guy, D.W. Waggaman, he wasn't

19   involved.  He owned the property.

20   Q.      Okay.  And is that the property there, 2428 Camino

21   Park?

22   A.      Yeah.  That's where I lived, and it was apartments and

23   duplexes in a cul-de-sac.  He owned all of it, everything.

24   So 2428 is where I lived, which is in that property.

25   Q.      Okay.  So you were the handyman at the same apartment

```
 1    complex where you worked?

 2    A.      Yeah, in the same complexes, yes.

 3    Q.      Okay.

 4    A.      Yeah, I lived there.

 5    Q.      Can we go back up to the top of the page again, the

 6    box with the residence.  On this loan application, there are

 7    three boxes where property will be primary residence,

 8    secondary residence, investment.  Did you and Mr. Williams

 9    have a conversation about which box would be checked?

10    A.      I don't recall.

11    Q.      Okay.  Did you understand the significance of checking

12    one of these boxes?

13    A.      I'm pretty sure.  If I think back, I think I did.

14    Q.      Okay.

15    A.      Yeah.

16    Q.      What did it mean to you that you were checking primary

17    residence?

18    A.      That I would live there.

19    Q.      Okay.  Was that true?

20    A.      At the time I hadn't planned on it, no.

21    Q.      Okay.  Did Mr. Williams have an understanding of

22    whether you would be residing in this house in Yuba City?

23            MR. WISEMAN:  Objection.  Calls for speculation.

24            THE COURT:  Sustained.

25    Q.      BY MS. HEMESATH:  Did you have a conversation with
```

1   Mr. Williams about whether you would reside in this house in

2   Yuba City?

3   A.      I don't recall.

4   Q.      Did you have a conversation with Mr. Williams about

5   whether you would move to Yuba City?

6   A.      I think I did.

7   Q.      Okay.  And what was that conversation?

8   A.      That at the time I wasn't planning on moving to Yuba

9   City.

10   Q.      Okay.  Next page, please.  The income.  Base

11   employment income, $6,150.  As a handyman, were there months

12   where you made $6,150?

13   A.      No.

14   Q.      Did you have any other income that would bring you up

15   to $6,150?

16   A.      No.  No other income that would do that, no.  No more

17   than my retirement.  And it wouldn't bring me up to that much

18   anyway.

19   Q.      About how much were you making a month in retirement?

20   A.      About 4,000, something like that.

21   Q.      Okay.

22   A.      Somewhere in that neighborhood.

23   Q.      Okay.  Where did this number come from then, $6,150?

24   A.      I don't remember.

25   Q.      Did you have a conversation with Mr. Williams about

1    how you would qualify for this loan?

2    A.      I don't recall.

3    Q.      Okay.  Did you have a conversation with Mr. Williams

4    about what is a stated income loan?

5    A.      What's a what?

6    Q.      Stated income loan.

7    A.      Stated income loan?

8    Q.      Uh-huh.

9    A.      Yeah.  Stated income loan?  You said stated income,

10   period.  Stated income was you're saying how much you made.

11   You didn't have to basically prove it.

12   Q.      Okay.  Did you have a conversation with Mr. Williams

13   about whether this would be a stated income loan?

14   A.      I don't recall.

15   Q.      Okay.  Did you have an understanding of whether you

16   would have to prove that you made $6,150 a month?

17   A.      No.

18   Q.      Was it your belief you would not have to prove it?

19   A.      Yeah.  I don't remember that I had to prove it.

20   Q.      Okay.  Do you know how much the house cost that you

21   were buying on Gidda Loop?

22   A.      I don't remember.  No, I didn't know.

23   Q.      Was the price important to you?

24   A.      Not at the time, no.

25   Q.      Why not?

```
1    A.    Well, because of the agreement me and Mr. Williams

2    had, he said that, like I said, going back to what I was

3    saying, if I covered the first three months, he would make

4    sure that the rest of it was taken care of, and I just left

5    it there.  Okay.  I asked him can you handle that, he said

6    yes, I can, so I just left it right there.

7    Q.    Go ahead and turn in your binder to what's tabbed as

8    101.

9    A.    Back to 101?  I'm on 102 now.

10   Q.    I might have put it afterwards.

11   A.    Go to 101?

12   Q.    Yes, please.

13   A.    Oh.

14   Q.    I think it's the next tab in the binder.

15   A.    Glasses.  Okay.  I'm sorry.  Okay.  I got 101 now.

16   Q.    Okay.  Do you recognize that, Mr. Watson?

17   A.    What's that?

18   Q.    Do you recognize that?

19   A.    No.

20   Q.    Okay.  Do you want to look through it and see if you

21   see your signature on that?  There should be several pages.

22   A.    I don't see a signature.

23   Q.    Go ahead and flip through the next few pages all the

24   way through to the end.

25   A.    I see initials.
```

```
 1    Q.     Are those your initials?

 2    A.     101.  I just see initials on 101.

 3    Q.     Mr. Watson, are those your initials?

 4    A.     Yeah.

 5    Q.     Okay.

 6    A.     I see a signature up here at the top left.  I see a

 7    signature at the top left.

 8    Q.     Is that your signature?

 9    A.     Yeah, it looks like my signature.

10           MS. HEMESATH:  I'm going to move to admit 101, the

11    purchase agreement.

12           THE COURT:  Exhibit 101 is received in evidence.

13                      (GOVERNMENT'S EXHIBIT 101, Purchase

14                       agreement, ADMITTED INTO EVIDENCE.)

15    Q.     BY MS. HEMESATH:  Did you ever meet the seller on this

16    property, Mr. Watson?

17    A.     What's that?

18    Q.     Did you ever meet the seller on this house?

19    A.     No.

20    Q.     Did you and Mr. Williams have a conversation about the

21    purchase price?

22    A.     About the purchase price?

23    Q.     Right.

24    A.     No.

25    Q.     Okay.  How worried were you that you could afford to
```

1    buy a house at this time?

2    A.      Well, I was kind of leaving it up to Mr. Williams

3    because he at the time, you know, he was doing good, and he

4    promised that he would, you know, that he could make the

5    payments for me until such time as until he could sell it.

6    So --

7              MR. WISEMAN:  Your Honor, I'm going to object as

8    nonresponsive to the question.  The question was how worried

9    was he.

10             THE COURT:  The question was how worried were you as

11   to whether you could afford to buy the house.

12             THE WITNESS:  I wasn't that worried.

13   Q.      BY MS. HEMESATH:  Okay.  How was Mr. Williams doing

14   financially at this time?

15   A.      Oh, he was doing pretty good.

16             MR. WISEMAN:  Objection.  Relevance and lack of

17   foundation.

18             THE COURT:  It is relevant what his impression was of

19   whether Mr. Williams was able to meet the obligations of the

20   agreement between the two of them.  So you tell us what you

21   understood, and I'll instruct the jury to consider this only

22   as it relates to Mr. Watson's state of mind and not for the

23   truth of the matters asserted.

24   Q.      BY MS. HEMESATH:  How did you perceive Mr. Williams to

25   be doing financially at the time?

1    A.      Good, real good.

2    Q.      How did you know?

3    A.      Well, from the things that he did, the things that he

4    bought, his lifestyle reflected that he was doing good.  You

5    know, and him and I talked, you know, as friends, and he said

6    hey, don't worry about it, trust me, I got it handled.  I

7    said you sure you gonna be able to handle this because I

8    don't want any problems on this, you know, and he said I got

9    it.  I said okay.

10   Q.      Go ahead and look, please, at Exhibit 105.  Do you see

11   your signature on that?

12   A.      Okay.  I have 105 here.

13   Q.      Do you see your signature on it?

14   A.      Yes, I do.

15           MS. HEMESATH:  I'm going to move to admit 105.

16           THE WITNESS:  What's that?

17           THE COURT:  She's offering the exhibit.  Exhibit 105

18   is received in evidence.

19                          (GOVERNMENT'S EXHIBIT 105, Occupancy

20                           statement, ADMITTED INTO EVIDENCE.)

21   Q.      BY MS. HEMESATH:  Mr. Watson, when you made this

22   purchase, did you read all the documents that you were asked

23   to sign?

24   A.      Did I what now?

25   Q.      Did you read all the documents you were asked to sign?

1    A.      No, I didn't.

2    Q.      Did you read any of the documents you were asked to

3    sign?

4    A.      Not in depth, no.

5    Q.      Okay.  Is it fair to say that you understood that you

6    would be representing to the lender that you would occupy

7    this house, that you would live there?

8    A.      Which one was that?

9    Q.      Did you understand that you would occupy this house,

10   that you were representing you would occupy the house?

11   A.      Yeah.

12   Q.      Okay.  Did you have a conversation with Mr. Williams

13   about the risks involved with representing to the lender that

14   you were going to occupy the house when you knew that wasn't

15   true?

16   A.      No.

17   Q.      Did you have a conversation with Mr. Williams about

18   the fact that you could be subject to prosecution if, in

19   fact, that wasn't true?

20   A.      No.

21   Q.      Did you have a conversation with Mr. Williams about

22   the fact that the lender could inspect the property to verify

23   whether or not you're living in the house?

24   A.      Did I have a conversation?

25   Q.      Right.

```
1    A.      No, I didn't.

2    Q.      Okay.  Did you have any conversations with

3    Mr. Williams about the legality of what you were doing?

4    A.      Not really.  We just pressed on with, you know, I was

5    just kind of following his lead.  You know, I just thought he

6    knew what he was doing, and I was following the lead, and he

7    told me that he could handle it.

8            MR. WISEMAN:  Your Honor, I'm going to object and ask

9    for the answer be stricken, everything after no.  It's not

10   responsive.

11           THE COURT:  I think that's true.  I'm going to strike

12   everything after the words "not really."

13   Q.      BY MS. HEMESATH:  Aside from the financial risk, how

14   worried were you about what you were doing with this

15   Gidda Loop loan application?

16   A.      I didn't -- I wasn't worried.

17   Q.      Why not?

18   A.      I didn't think about it.

19   Q.      And why didn't you think about it?

20   A.      Because Leonard was handling it, and I trusted him.

21   Q.      Go ahead and turn to Exhibit 112.

22   A.      Okay.

23   Q.      Do you recognize this?

24   A.      Yes.

25           MS. HEMESATH:  I'm going to move to admit this as a
```

```
1    certified business record.
2            THE COURT:  Exhibit 112 is received in evidence.
3                         (GOVERNMENT'S EXHIBIT 112, Cashier's
4                         Check to Arthur Watson from Leonard
5                         Williams, $14,993 on 9/5/06, ADMITTED
6                         INTO EVIDENCE.)
7    Q.    BY MS. HEMESATH:  Do you recognize this?
8    A.    Yes.
9    Q.    What is this?
10   A.    It's a check that Leonard gave me for the money that
11   he said he would for purchasing the house.
12   Q.    Did you go on to move to Gidda Loop?
13   A.    Did I do what?
14   Q.    Did you move into the Gidda Loop?
15   A.    No.
16   Q.    You did become the owner of the Gidda Loop house?
17   A.    Yes.
18   Q.    Did anybody move into the Gidda Loop house?
19   A.    I think we rented it out for a while until he could
20   sell it.
21   Q.    When you say we rented it out, who is we?
22   A.    Well, Leonard handled that.
23   Q.    Who found the renters?
24   A.    Leonard.
25   Q.    And when they paid rent, who did they pay it to?
```

1    A.      Leonard.

2    Q.      Did you ever meet the renters?

3    A.      No.

4    Q.      Did you ever go to the house after you became the

5    owner?

6    A.      No.  Leonard handled that.

7    Q.      Okay.  And was that your agreement with him?

8    A.      Yes.

9    Q.      Did there come a time when Mr. Williams again

10   approached you about doing another real estate deal?

11   A.      Yeah.

12   Q.      About how long after?

13   A.      Oh, wow.  Oh, I don't recall how long afterwards.

14   Q.      Okay.  Let me back up one moment.  I just remembered

15   one thing.  That $15,000, the $14,000 check we just saw, what

16   did you do with that money?

17   A.      Oh, I paid bills.  I had dental work done.  Fixed my

18   car.  Just took care of a lot of business.  I used it to pay

19   off some bills and take care of some problems I had,

20   financial problems.  And it didn't take long to go through

21   it.

22   Q.      Okay.  What did Mr. Williams propose to you in the

23   second real estate deal?

24   A.      If we did the second one, he would give me 2,000 for

25   the second one.

1    Q.      And what did you say to that?

2    A.      Here again, I asked him if we could do this, you know,

3    can he afford it, because, you know, I couldn't afford it.

4    And he said yes, not a problem.  I said well, okay, well if

5    you can handle it, let's do it.

6    Q.      Were you nervous about holding a second piece of

7    property in your name?

8    A.      No, I wasn't.  I probably should have been, but I

9    wasn't.

10           THE COURT:  Do we have an address on this one?

11   Q.      BY MS. HEMESATH:  Do you recall the address?

12   A.      No, I don't recall.

13   Q.      Do you recall where it was?

14   A.      No.

15   Q.      Do you recall where generally in the state of

16   California -- was it in the state of California?

17   A.      It was in California, yeah.

18   Q.      Which part of California?

19   A.      I think one was in Chico.

20   Q.      Okay.  What agreement, if any, did you and

21   Mr. Williams reach about paying the mortgage on the second

22   piece of property?

23   A.      He would handle it.

24   Q.      All of it?

25   A.      Yes.

```
 1   Q.      Okay.  Were you going to put any of your own money

 2   into this house?

 3   A.      No.

 4   Q.      Did you have any money to put into it?

 5   A.      Not really.

 6   Q.      So the agreement was $2,000 for you?

 7   A.      Yeah.  And he would make sure that the notes were

 8   paid, the -- yeah, the notes were paid.

 9   Q.      Were you planning on moving to Chico?

10   A.      No.

11   Q.      Where were you living at this time?

12   A.      Camino Park, Carmichael.

13   Q.      Carmichael.  Did you have a conversation with

14   Mr. Williams about how much this second house would cost?

15   A.      No.

16   Q.      Who did you work with on this second deal?

17   A.      Mr. Williams.

18   Q.      Anybody else?

19   A.      No.

20   Q.      Did you agree to do the second deal?

21   A.      Yeah.

22   Q.      Why?

23   A.      Well, he said he would give me the 2,000, and that's

24   why I agreed.

25   Q.      Can we pull up 202 which is already in evidence.
```

1          Do you recognize your signature on this loan

2     application?

3     A.      Yes, top right.

4     Q.      Okay.  And this is for 2640 Ceanothus in Chico.  Did

5     you ever go to 2640 Ceanothus in Chico?

6     A.      No.

7          THE COURT:  So this is the second deal, the Ceanothus

8     that we heard about earlier?

9          MS. HEMESATH:  Yes, your Honor.

10         THE COURT:  All right.

11    Q.      BY MS. HEMESATH:  And if we can go down to the bottom

12    portion, the employer.  Have you ever worked for Diamond Hill

13    Financial?

14    A.      No, I didn't.

15    Q.      Have you ever been a marketing director?

16    A.      No.

17    Q.      Do you know the name Diamond Hill Financial?

18    A.      Do I know the name?

19    Q.      Do you recognize the name?

20    A.      That's Leonard's firm.

21    Q.      Okay.

22    A.      Mr. Williams.

23    Q.      Did you and Mr. Williams have a conversation about

24    using Diamond Hill Financial as your employer on this loan

25    application?

```
1    A.       Yeah, I think so.

2    Q.       What was that conversation?

3    A.       That I worked for him.  That I worked for him.

4    Q.       Was the conversation that you would actually go to

5    work for him or that you would --

6    A.       No, he would just put it down that I worked for him.

7    Q.       Okay.  Let's go to the next page, please.  At the time

8    was your salary $11,552 a month?

9    A.       You mean at Diamond Hill?

10   Q.       In real life, how much were you making a month in

11   2007?

12   A.       My retirement?  It looks like 11,552.

13   Q.       Uh-huh.

14   A.       No, I didn't make that much.

15   Q.       Did you make more or less than that?

16   A.       Less.

17   Q.       Did you have a conversation with Mr. Williams about

18   putting an inaccurate number for your income?

19   A.       No, I didn't.  I kind of let him just put down what he

20   thought was right.

21           MR. WISEMAN:  I'm going to object.

22           THE COURT:  Everything after "no" is stricken.

23   Q.       BY MS. HEMESATH:  Did you fill in this number $11,552?

24   A.       No.

25   Q.       Next page, please.  Asset section, up at the top.
```

1    Where do you have a bank account?

2    A.      My banking account?

3    Q.      Which bank?

4    A.      B of A.

5    Q.      Was that also true in 2007?

6    A.      For 10,000?

7    Q.      How long have you had your bank account?

8    A.      Oh, wow.  Since about -- I got it at Mather.  I can't

9    remember.  I can't remember when I got it, to be honest with

10   you.

11   Q.      Okay.

12   A.      But it's been 15, 20 years.

13   Q.      Okay.  Just one bank account at Bank of America?

14   A.      Yeah.

15   Q.      Checking account?

16   A.      Yeah.

17   Q.      In 2007, would you typically keep $10,000 in cash in

18   your bank account?

19   A.      No.

20   Q.      Would you have more or less?

21   A.      Less.

22   Q.      Do you recall an average balance for you around that

23   time?

24   A.      It was pretty low, maybe a couple hundred.

25   Q.      Did you and Mr. Williams have a conversation about

1    this number, $10,000?

2    A.       I don't recall.

3    Q.       Okay.  Did you put down this number, $10,000?

4    A.       No.

5    Q.       Did you and Mr. Williams have a conversation generally

6    about your Bank of America bank account?

7    A.       No.

8    Q.       Did you and Mr. Williams have a conversation about

9    needing to provide to the lender monthly statements?

10   A.       Statements?

11   Q.       Monthly statements.

12   A.       Yeah.  He told me he needed statements, and I checked

13   with the bank.  And so what I did, I got whatever information

14   he needed so he could go on the computer and pull them up,

15   and he was able to pull them up, whatever he needed.

16   Q.       What information did you give him?

17   A.       All my personal information to pull them up.  Whatever

18   he needed.

19   Q.       Were you worried giving him access information to your

20   bank account?

21   A.       No, no, I wasn't.  Because like I said, he was a very

22   good friend, and I trusted him.

23   Q.       After you gave him that information and this deal is

24   done, did you change your access information?

25   A.       No.

1    Q.    Did you submit falsified monthly bank statements in

2    connection with this loan application to the lender?

3    A.    No.

4    Q.    Did you ask anybody to submit falsified bank

5    statements on your behalf to this lender?

6    A.    No.

7    Q.    Let's go to the last page, please.  Is this your

8    signature on the last page of the loan application?

9    A.    Yeah, that's my signature there.

10   Q.    Okay.  Let's look at 201, please, already in evidence.

11   A.    201?  Okay.

12   Q.    You can see it on your screen if you want.  Did you

13   know who you were buying the second house from?

14   A.    No.

15   Q.    Did you ask Leonard how he found this property?

16   A.    No.

17   Q.    Did you know the purchase price on this property?

18   A.    No.

19   Q.    Okay.  Let's go to 204, please, already in evidence.

20   A.    2 what?

21   Q.    204.

22   A.    Okay.

23   Q.    Do you see your signature on this page?

24   A.    Yes.

25   Q.    Go ahead and point it out for us.

1   A.      Right there.

2   Q.      Is any of the rest of the writing on this page yours?

3   A.      No.  Just my signature.

4   Q.      Okay.  You understood that you were representing to

5   the lender that you worked at Diamond Hill Financial?

6   A.      Yeah.  Yeah.

7   Q.      And you understood that was not true?

8   A.      Well, Leonard -- yeah, I would say yeah.

9   Q.      Okay.  Did you have an understanding that the lender

10  might want to verify whether you worked at Diamond Hill

11  Financial?

12  A.      No.

13  Q.      Okay.  Did you have a conversation with Mr. Williams

14  about assuring the lender that you did work at Diamond Hill

15  Financial?

16  A.      No.

17  Q.      Did anybody from the lender ever call you to confirm?

18  A.      No.

19  Q.      Okay.  Let's look at 207, please.  Is this the rental

20  agreement for Gidda Loop?

21  A.      Hold on.

22  Q.      Sorry.

23  A.      207.

24  Q.      207.

25  A.      Okay.  I have it.

1   Q.      Is any of this your writing?

2   A.      No.  At the top?

3   Q.      Anywhere on this page.

4   A.      No.

5   Q.      Were you the owner of 864 Gidda Loop in Yuba City?

6   A.      I think it was that one we purchased, right?  Gidda

7   Loop?

8   Q.      Were you receiving rental income?

9   A.      No, I didn't receive any income.  Leonard handled

10  that.  Mr. Williams handled that.  Whatever he told me, he

11  rented it, so I just told him take the money and put it on

12  the property.

13          MR. WISEMAN:  Objection.

14          THE COURT:  I'm going to allow the part of the answer

15  where he said that Mr. Williams handled that, and then

16  everything after that is stricken.  So the answer is:  No, I

17  didn't receive any income.  Mr. Williams handled that.

18          THE WITNESS:  No, I didn't receive any income.

19  Q.      BY MS. HEMESATH:  Okay.  I'm going to move to admit

20  229, certified business record.

21          THE COURT:  Exhibit 229 is received in evidence.

22                          (GOVERNMENT'S EXHIBIT 229, Kickback

23                          check from DHF to Arthur Watson for

24                          $2,000 dated 7/24/07, ADMITTED INTO

25                          EVIDENCE.)

1    Q.      BY MS. HEMESATH:  Do you recognize this check,

2    Mr. Watson?

3    A.      No, but that's my signature on the side.

4    Q.      Okay.  How much money did you receive from

5    Mr. Williams, in your memory, for the Ceanothus deal?

6    A.      For what property?

7    Q.      Ceanothus, the second one.

8    A.      I think it's 2,000 for the second one, yeah.

9    Q.      Okay.  And I'm going to go ahead and admit 226,

10   another check.

11          THE COURT:  Exhibit 226 is received in evidence.

12                      (GOVERNMENT'S EXHIBIT 226, Check to

13                      Arthur Watson 6/21/07 for $1,700, memo

14                      Consultant, ADMITTED INTO EVIDENCE.)

15   Q.      BY MS. HEMESATH:  Do you recall receiving this check,

16   Mr. Watson?

17   A.      What's that?

18   Q.      Do you recall receiving this check?

19   A.      No.

20   Q.      Have you ever worked as a consultant for the Diamond

21   Hill Financial?

22   A.      No.

23   Q.      Have you ever worked as a consultant, down there in

24   the memo line, for Mr. Williams?

25   A.      No.

```
 1    Q.     Have you ever worked as a consultant at all?

 2    A.     No.

 3           THE COURT:  Is that your signature on the endorsement?

 4           THE WITNESS:  On the side right here?

 5           THE COURT:  Right.

 6           THE WITNESS:  Yeah, that's my signature.

 7           MS. HEMESATH:  Okay.  And last check, 228.  Move to

 8    admit 228.

 9           THE COURT:  Exhibit 228 is received in evidence.

10                        (GOVERNMENT'S EXHIBIT 228, Check from

11                         DHF to Arthur Watson for $1,300 dated

12                         6/27/07, memo Ceanothus, ADMITTED INTO

13                         EVIDENCE.)

14           THE WITNESS:  Go to 228?

15    Q.     BY MS. HEMESATH:  Yes, please.  Or you can look on the

16    screen, whichever is easier.

17    A.     Okay.  I have it.

18    Q.     Okay.  Do you recognize your signature on this one?

19    A.     Yeah, right here, yeah.

20    Q.     Do you recall receiving this check?

21    A.     No, I don't.

22    Q.     To the best of your recollection, did you receive an

23    additional $3,000 for the Ceanothus deal?

24    A.     For what?

25    Q.     For the Ceanothus deal, the second deal.
```

1    A.        No.

2    Q.        Okay.  Did the deal close, and you became the owner of

3    Ceanothus?

4    A.        Yeah.  I'm pretty sure it closed, yeah.

5    Q.        Did you move into the house?

6    A.        No.

7    Q.        Did you pay the mortgage?

8    A.        Leonard handled that.  I left it up to him.

9    Q.        Did you ask him if he paid the mortgage?

10   A.        Yeah.  I would always check with him to see if he had

11   done it.

12   Q.        And what was his response?

13   A.        Yes.

14   Q.        When you say you would always check with him, how

15   often would you check?

16   A.        Towards the end of the month when it was due.

17   Q.        Would you call?

18   A.        Yeah.

19   Q.        Okay.  And for how long did you follow up asking him?

20   A.        Well, up until it came a time to where everything kind

21   of dried up, you know, the sales and stuff, and he started

22   running low on money.  And I think at that point, I just

23   stopped asking him.

24   Q.        How did you know he was running low on money?

25   A.        He told me because he had deals that was supposed --

1    he told me that he had deals that is supposed to close, and

2    he said man, all of these are gone because I guess they --

3    they changed the system, how they did business, the real

4    estate companies, the banks and stuff, they changed.  They

5    did it kind of the old-fashioned way, not stated income, you

6    know, you had to prove everything.

7    Q.      Did you have an understanding of whether you would

8    qualify for a mortgage the old-fashioned way?

9    A.      If I what?

10   Q.      If you would qualify for a mortgage the old-fashioned

11   way?

12   A.      Oh, no, I wouldn't have.

13   Q.      Did there come a time when Mr. Williams again

14   approached you about doing a third house?

15   A.      Yes.

16   Q.      What did he ask you?

17   A.      He wanted to do -- he said we can do another one.  And

18   here, again, you know, he said I can give you 2,000 on it,

19   and I asked him --

20          MR. WISEMAN:  Objection, your Honor.  Nonresponsive,

21   the last part.

22          THE COURT:  The question is:  What did he ask you?

23          THE WITNESS:  He asked me if we wanted to do a third

24   one.

25          THE COURT:  All right.

1              THE WITNESS:  Yes.  I said yeah, if we can.

2    Q.    BY MS. HEMESATH:  Your answer to that was?

3    A.    If we can, yeah.

4    Q.    What did he offer you?

5    A.    2,000.

6    Q.    Did you agree to do it?

7    A.    Yeah.

8    Q.    Why?

9    A.    The money.

10   Q.    About how far apart were the second and third deals?

11   A.    I can't remember.

12   Q.    Could it have been a year, two years?

13   A.    Maybe less than that.  Maybe six months or something

14   like that.

15   Q.    Okay.  How enthusiastic were you about doing a third

16   deal?

17   A.    I wasn't really enthused about doing it.

18   Q.    Why not?

19   A.    I just wasn't.

20   Q.    You got the money for the first deal.

21   A.    I thought we had done enough.

22   Q.    What do you mean by that?

23   A.    Huh?

24   Q.    Why did you think you had done enough?

25   A.    Because I had done two already.

```
1    Q.      Did doing these deals make you nervous?

2    A.      Yeah.

3    Q.      Why?

4    A.      Because I know that I couldn't afford to pay for it,

5    and I was relying on Leonard.

6    Q.      What were you risking by doing these deals?

7    A.      Basically my credit because I didn't put any down

8    payments on it.

9    Q.      Did you have conversations with Mr. Williams about the

10   risks of holding three pieces of property in your name?

11   A.      No.

12   Q.      Why not?

13   A.      I don't know.

14   Q.      What was the agreement you reached on the third

15   property in terms of paying the mortgage?

16   A.      The agreement was he was going to give me $2,000 to do

17   that third one.  It would be the last one we would do.  And I

18   never -- he ran out of money by then, so I didn't get

19   anything on that one.

20   Q.      Where was the third house?

21   A.      I don't remember.

22   Q.      Do you remember what part of the state?

23   A.      No.

24   Q.      Okay.  Why was it not important to you where the house

25   was?
```

1   A.      Because it was just a real estate deal that we were

2   kind of making an investment on and, you know, in the house,

3   buying it for investment.

4   Q.      Who did you work with on this third deal?

5   A.      Mr. Williams.

6   Q.      Anybody else?

7   A.      No.

8   Q.      Okay.  Go ahead and turn to 301.

9   A.      301?

10  Q.      Yes, please.

11  A.      Okay.

12  Q.      Do you recognize your signature on that?

13  A.      Yes, top left.

14          MS. HEMESATH:  I'm going to move to admit 301, the

15  loan application.

16          THE COURT:  Exhibit 301 is received in evidence.

17                      (GOVERNMENT'S EXHIBIT 301, Loan

18                       Application, ADMITTED INTO EVIDENCE.)

19          THE WITNESS:  Move to what now?

20          THE COURT:  301.

21          MS. HEMESATH:  Can you make it a little bigger on the

22  top.

23  Q.      BY MS. HEMESATH:  This is 3294 Rockin M Drive.  Do you

24  recognize that address in Chico, California?

25  A.      No.

```
1    Q.      But that is your signature?

2    A.      Yes.

3    Q.      Did you know how big of a loan you were applying for?

4    A.      No.

5    Q.      Did you know how much you were paying for this house?

6    A.      No.

7    Q.      Is it fair to say that you did not fill in the

8    information on this loan application?

9    A.      What?

10   Q.      Did you fill in the information on this loan

11   application?

12   A.      No, I didn't.

13   Q.      But you signed it?

14   A.      Yeah.

15   Q.      Did you and Mr. Williams have a conversation -- can we

16   go down to the bottom, to the employer.

17           Did you have a conversation about using Diamond Hill

18   Financial as the employer again?

19   A.      Yes.

20   Q.      What was that conversation?

21   A.      Well, I think he -- I think if I needed it, he would

22   say that I worked for him.

23   Q.      Okay.  By this point, were you working for him?

24   A.      No, I never did.

25   Q.      Next page, please.  Did you have a conversation about
```

1    the income on this loan application?

2    A.     No, I don't recall.

3    Q.     Did you put down that you were making $10,743.26 per

4    month?

5    A.     No, I don't recall that either.

6    Q.     Were you making 10,000?

7    A.     No.

8    Q.     Were you making less than that?

9    A.     Yes.

10   Q.     Bottom of the page, the assets, please.

11          You still had the same Bank of America bank account?

12   A.     Yes.

13   Q.     Did you have $18,950 in cash in it?

14   A.     I don't think so, no.  No.  I don't recall.

15   Q.     Do you know where that number came from?

16   A.     No.

17   Q.     Did you put it there?

18   A.     No.

19   Q.     For this third loan application, did you have a

20   conversation with Mr. Williams about monthly bank statements?

21   A.     No, not this time.  That one time he pulled those

22   statements up, and that was the last thing that I recall.

23   Q.     Okay.  You did not submit your monthly statements in

24   connection with this third loan application?

25   A.     No, I don't recall that one, no.  Just the other one.

1    Q.      In the previous one, did you submit the monthly

2    statements?

3    A.      No.  No, I gave -- Leonard pulled them up.  I gave him

4    the information he needed, and he went online and pulled them

5    up, pulled them up.

6    Q.      Okay.  Let's go to 302, please, in your binder.

7    A.      Okay.

8    Q.      Go ahead and look for your signature on that, on 302.

9    A.      Okay.  I see my signature right here.

10           MS. HEMESATH:  I move to admit 302, the purchase

11   agreement.

12           THE COURT:  Exhibit 302 is received in evidence.

13                          (GOVERNMENT'S EXHIBIT 302, Purchase

14                          Agreement, ADMITTED INTO EVIDENCE.)

15           THE WITNESS:  No, not on that page.

16   Q.      BY MS. HEMESATH:  That's the beginning of 302, the

17   first page.

18   A.      The beginning of 302?

19   Q.      Yes, sir.

20   A.      I didn't see it.  Hold on.  Go back.

21   Q.      That's all right.  Do you remember signing this

22   document?

23   A.      No.

24   Q.      Okay.  But that is your signature?

25   A.      Yeah, back here in the back.

```
 1    Q.      Right.

 2    A.      Yeah.

 3    Q.      And you knew you were entering into a contract to buy

 4    this house?

 5    A.      Yeah.

 6    Q.      Let's have you turn to 314.

 7    A.      Okay.

 8    Q.      Do you recognize your writing anywhere on that

 9    document?

10    A.      No.  The first page of 314?

11    Q.      Yes.

12    A.      No, that's not me.

13    Q.      Okay.  What about the second page?

14    A.      No.

15    Q.      Okay.  We'll skip it then.  305.  Please turn to 305.

16    A.      305.  Okay.

17    Q.      Do you see your signature on that page?

18    A.      Yeah.

19            MS. HEMESATH:  Move to admit 305, the occupancy

20    statement.

21            THE WITNESS:  What's that?

22            THE COURT:  Exhibit 305 is received in evidence.

23                        (GOVERNMENT'S EXHIBIT 305, Occupancy

24                        Statement, ADMITTED INTO EVIDENCE.)

25            THE WITNESS:  Yeah, I see it.
```

1    Q.     BY MS. HEMESATH:  Did you understand that you were

2    representing to the lender that you would live in this house?

3    A.     Yes.  Yes.

4    Q.     Okay.  Did you understand it was not possible to have

5    more than one house be your primary residence?

6    A.     Yeah.

7    Q.     Okay.  Did you have a conversation with Mr. Williams

8    about that impossibility?

9    A.     No, I didn't.  We didn't talk about it.

10   Q.     Okay.  How worried were you signing this document?

11   A.     Didn't think about it.

12   Q.     Did you receive any money on this third deal?

13   A.     No, I didn't.

14   Q.     Did you confront Mr. Williams?

15   A.     Yeah, but he didn't have anything.

16   Q.     How angry were you that you didn't get your money?

17   A.     I just let it go.

18          MR. WISEMAN:  Object.

19          THE COURT:  Overruled.

20          MS. HEMESATH:  I want to move to admit 308, a

21   certified business record, a check.

22          THE COURT:  Check?

23          MS. HEMESATH:  A check.

24          THE COURT:  Exhibit 308 is received in evidence.

25          ///

```
 1                              (GOVERNMENT'S EXHIBIT 308, Check from

 2                              DHF to Arthur Watson for $8,000 dated

 3                              6/29/07, memo Chico Property, ADMITTED

 4                              INTO EVIDENCE.)

 5   Q.     BY MS. HEMESATH:  Do you see your signature on this

 6   one, Mr. Watson?

 7   A.     Yeah, that's my signature.

 8   Q.     Do you recall this check?

 9   A.     No, I don't.  8,000, no.

10   Q.     To the best of your recollection, you did not make

11   $8,000 off of --

12   A.     No, I didn't.

13          THE COURT:  Wait for her to finish the question before

14   you answer it.

15          THE WITNESS:  Okay.

16          MS. HEMESATH:  All right.  And I'm also going to move

17   to admit 309, another check.

18          THE COURT:  Exhibit 309 is received in evidence.

19                              (GOVERNMENT'S EXHIBIT 309, Check from

20                              Arthur Watson to DHF for $8,000 dated

21                              6/29/07, ADMITTED INTO EVIDENCE.)

22          THE WITNESS:  Okay.

23   Q.     BY MS. HEMESATH:  Do you recognize your signature on

24   this one?

25   A.     That's my signature.  That's my signature, yes.
```

```
1    Q.      Do you recall writing this check?

2    A.      No.

3    Q.      Did you owe Mr. Williams any money?

4    A.      No.

5    Q.      Can you recall why you would have written Diamond Hill

6    Financial an $8,000 check?

7    A.      No.

8    Q.      The deal closed and you became the owner of the third

9    piece of property?

10   A.      What was that again?

11   Q.      Do you recall if the deal closed and you became the

12   owner?

13   A.      Yeah.

14   Q.      Did you move into the house?

15   A.      No.

16   Q.      Did you pay the mortgage?

17   A.      Leonard took care of the payments.

18   Q.      Did you have a conversation with Mr. Williams about --

19   A.      Yeah, about doing it, yes.

20   Q.      Was it your understanding that he was paying by this

21   time the mortgage on all three houses?

22   A.      Yes.

23   Q.      Just one more subject.  You mentioned at the beginning

24   of your testimony that you knew Mr. Williams from your time

25   in the Air Force.
```

1    A.      Yes.

2    Q.      Did you also have a friend named Terrance Murrell?

3    A.      Yes.

4    Q.      Was Mr. Murrell also a friend of Mr. Williams?

5    A.      Yes.

6    Q.      Did Mr. Murrell have any real estate background that

7    you knew of?

8    A.      No.

9            MS. HEMESATH:  Thank you.  Nothing further.

10           THE COURT:  Mr. Wiseman, we have a half hour.  You may

11   cross-examine.

12           All right.  Mr. Watson wants to take a short break.

13   So let's take a five-minute recess.  Five-minute recess,

14   ladies and gentlemen.  Remember the admonition.  And then

15   we'll have the cross-examination.

16           (Recess taken.)

17           (Jury present.)

18           THE COURT:  Everyone has returned.  You may

19   cross-examine now, Mr. Wiseman.

20                        CROSS-EXAMINATION

21   BY MR. WISEMAN:

22   Q.      Good afternoon, Mr. Watson.

23   A.      Good afternoon.

24   Q.      Earlier in your testimony on direct examination, you

25   mentioned that there are certain things that you just don't

1   remember; right?

2   A.      Yes.

3   Q.      Because that was a fair amount of time ago; correct?

4   A.      Yeah.

5   Q.      Your memory is --

6   A.      Ain't that great right now.

7   Q.      Not that the good right now.  And back in 2006 and

8   2007, were you still in the reserves, in the Air Force

9   Reserves?

10  A.      I think so.

11  Q.      And when Mr. Watson -- excuse me, when Mr. Williams

12  approached you about trying to help you out with your credit,

13  that's because at that time you had pretty bad credit; right?

14  A.      Right, exactly.

15  Q.      You were sort of down on your luck; right?

16  A.      Yeah.

17  Q.      And back then, we're talking about 2006 or so; right?

18  A.      I think so.

19  Q.      Yeah.  And you also were suffering from an abuse

20  problem, right, a substance abuse problem?

21  A.      Yes.

22  Q.      And what was this substance that you were

23  unfortunately abusing?

24  A.      Crack.

25  Q.      Crack cocaine.  Were you smoking it?

1    A.      Yeah.

2    Q.      You were smoking crack cocaine.  How long during that

3    time back in 2006 had you been smoking crack cocaine?

4    A.      I'd been smoking for about five, five -- I started

5    kind of early, way before then.  On and off.  Not constantly.

6    On and off.  Recreational, yeah.

7    Q.      Recreational smoking crack.

8    A.      Yeah.

9    Q.      Did it come to a time where you were smoking it more

10   regularly than recreationally?

11   A.      Well, not really.  The problem, one of the problems I

12   had, I lived in a neighborhood that was infested with

13   addiction.  And when I tried to stop, it was hard to stop

14   because people would come over.  So when I moved from North

15   Highlands to where I'm at, I stopped it because I got away

16   from that crowd.

17   Q.      Right.  But while you were down in that crowd, with

18   that crowd, you were using crack cocaine regularly; correct?

19   A.      Yeah.

20   Q.      Would you say, looking back, that you were addicted to

21   crack cocaine during that time?

22   A.      Yes, semi-addiction, yeah.

23   Q.      Semi?

24   A.      It's an addiction, yeah.

25   Q.      It's an addiction.  And that addiction to crack

```
1    cocaine sort of affected your ability to recall things;

2    right?

3    A.      No, I don't think it affected my ability, my memory.

4    Q.      You don't think the crack affected --

5    A.      It could have.  Here again, I don't remember.

6    Q.      Yeah.  So you don't remember what --

7    A.      I don't remember, yeah.

8    Q.      And so when Mr. Williams approached you to help you

9    out with your financial problems, was he aware that you were

10   having a substance abuse problem as well?

11   A.      I don't know.

12   Q.      You don't know?

13   A.      If he was aware, no, because I didn't do it with him

14   or around him.

15   Q.      Okay.  And you sort of kept this addiction to

16   yourself.

17   A.      Yeah.

18   Q.      And while you were in active duty military, did you

19   use when you were in active duty as well?

20   A.      On and off, which was bad.

21   Q.      And against service regulations; right?

22   A.      Yeah, but I didn't do it that often so -- and I got

23   tested, we had random testing, so I wasn't doing it all the

24   time.  So I was lucky in that respect.

25   Q.      That you didn't get caught?
```

1   A.      Didn't get caught.

2   Q.      And then when you were in the reserves, were you

3   likewise using crack?

4   A.      On and off.

5   Q.      Okay.  And when Mr. Williams approached you about

6   helping out with sort of getting your credit back up, what

7   was the reason why your credit was bad in the first place?

8   A.      I think the crack caused me to, you know, spend a lot

9   of money.  That was one of the main reasons, I think.

10  Q.      Okay.  What you had to spend to feed the addiction?

11  A.      Yeah.

12  Q.      Okay.  And then so his approach, when Mr. Williams

13  approached you, he said look, I think I want to help you out

14  to try to get your credit score back up; right?

15  A.      Yeah.

16  Q.      And that was just because it sounded to you like a

17  friendly offer to help you out; right?  You were down on your

18  luck.

19  A.      Yeah.

20  Q.      And, in fact, he was able to help you with that;

21  right?

22  A.      Yeah.  We went to a credit repair.  He turned me on to

23  it, and I completed the course and got it cleaned up.

24  Q.      Okay.  Good.  And you were asked a question about what

25  you did to earn a living back then, and you mentioned that

1   you had been a handyman; correct?

2   A.      Yeah.  After I left the Air Force and civil service, I

3   was retired, and I did that to make some extra money.

4   Q.      And to make extra money, you also deejayed; is that

5   right?

6   A.      Yeah, deejayed a little bit.

7   Q.      You deejayed a little bit.  And you would go to

8   parties and deejay for parties; correct?

9   A.      Yeah.

10  Q.      And you'd make money that way; correct?

11  A.      Yeah, a little bit, yeah.

12  Q.      Was that money that was like paid under the table or

13  did you report it?

14  A.      At one time I had to report it, for a time when I was

15  playing at the club, the NCO clubs, because they gave me a

16  W-2 or whatever.  Then after we closed down, I was doing

17  private gigs making a little bit, and I didn't have to report

18  it then.

19  Q.      Okay.

20  A.      Because I didn't, yeah, I didn't report nothing then.

21  Q.      Now, when Mr. Williams approached you about doing the

22  first deal -- do you remember you testified about that

23  earlier?

24  A.      Yes.

25  Q.      And you were asked about this property on Gidda Loop;

1    right?

2    A.      Yeah.

3    Q.      And you recall that's the first transaction you got

4    involved with Mr. Williams; correct?

5    A.      Yes.

6    Q.      Now, when Mr. Williams approached you with that, it

7    was your understanding that you all were just going to make

8    an investment in that property; right?

9    A.      Yes.

10   Q.      That you would make an investment and hopefully gain

11   something as the property increased in value; right?

12   A.      Right.  Yeah, we said that -- we talked about it, and

13   I told him that I really didn't want it.  He said well, you

14   know, I can sell it.  He said but if we get it, I can give

15   you X amount of dollars.  Excuse me.

16   Q.      That's okay.

17   A.      And you make the first three months' payment, rent,

18   you know, house note, and I'll make sure it's taken care of

19   from there.

20   Q.      Right.  So Mr. Williams said look, I can get you some

21   money, I will eventually sell it; correct?

22   A.      Yeah.

23   Q.      And this is -- did you know at the time when you got

24   involved in the Gidda Loop purchase what the real estate

25   market was doing?  In other words, was it prices were going

1    up or prices were going down, or do you even know?

2    A.      The only thing I can remember is that I recall that I

3    think they called that subprime and -- I can't remember if it

4    was going up or down, but I know that I remember Leonard was

5    telling me it was stated income, and I never heard of that

6    before.

7    Q.      Did Mr. Williams explain to you what stated income

8    meant?

9    A.      Yeah.

10   Q.      And did he tell you that stated income meant that you

11   would indicate an amount that you made on your application

12   and that's all that was needed?

13   A.      Yeah.

14           MR. WISEMAN:  Your Honor, do you want me to continue

15   or shall we -- until 4:30?

16           THE COURT:  Yes.

17           MR. WISEMAN:  Okay.

18   Q.      BY MR. WISEMAN:  All right.  And then you said that

19   you worked as a handyman; correct?

20   A.      Yes.

21   Q.      And on one of the applications, it indicates that the

22   property manager -- you worked for a property manager; is

23   that correct?

24   A.      Right.

25   Q.      Right.  And is it correct that that property manager

1    you worked for was at the time your girlfriend?

2    A.      Yeah, one time, yeah.  We dated at one time.

3    Q.      Okay.  Let me pull up a document.  Okay.  Mr. Watson,

4    I pulled up and you can see it on the screen.  Tell me if you

5    can't.  All right.  Do you see that document up on the

6    screen?

7    A.      Yes.

8    Q.      Do you see at the upper left, it's a signature, and

9    you've already identified that as your signature?

10   A.      That's my signature, yes.

11   Q.      And as you sit here now, do you have any recollection

12   of signing this particular document?

13   A.      That's my signature, but I don't recall signing it.

14   But it is my signature.

15   Q.      Okay.  Can you read that right before your signature,

16   the box that is highlighted?

17   A.      Read the whole box?

18   Q.      Yeah.  Well, let me just ask you this question first.

19   Can you read that?  Do you have the ability to read that?

20   A.      It's not too clear.

21   Q.      It's not too clear so you can't read it.  All right.

22   Let me ask you this way.  Do you have an understanding that

23   when you signed this document, this residential loan

24   application, you were signing under penalty of perjury that

25   what you put in there was correct?  Did you understand that

1    you were signing under penalty of perjury?

2    A.      Well, yeah.  Well, I signed it, but I don't remember

3    filling out the document.

4    Q.      But when you signed it, did you bother to read the

5    document?

6    A.      No, I didn't.

7    Q.      So you don't recall reading anything that was

8    contained in the document before you signed it?

9    A.      No.  A lot of that I didn't read.  I just signed, you

10   know, if I had to sign, I just signed it.

11   Q.      Okay.

12   A.      I know it sounds a little crazy, but I signed it.

13   Q.      And then you testified that you weren't worried about

14   whether you can afford these properties because your

15   understanding was that they were going to be a short-term

16   investment and they would be sold?

17   A.      Yeah.

18   Q.      Right.  And so you all would make some money after the

19   property was sold; right?

20   A.      Yeah.

21   Q.      And so you had no belief that this was going to be a

22   long-term investment for yourself; right?

23   A.      Right.

24   Q.      And I asked you about this particular loan document

25   and asked about whether or not you read it.  Let me ask you

1    this question.  Of the three loan applications that you were

2    shown, do you remember reading any of them before you signed

3    them?

4    A.      Vaguely.  I didn't read -- I didn't read a lot of the

5    applications.  I just -- where do I sign, where do I sign.

6    And I was kinda -- Leonard was kind of coaching me on, you

7    know, so sign here, okay, I signed here.  So I didn't, you

8    know, read word for word, no.

9    Q.      Now, when you signed these documents -- let's talk

10   about the first one that's in front of you.  When you signed

11   these documents, did you think at the time that you were

12   doing anything wrong?

13   A.      No.

14   Q.      And when you signed the second document, the second

15   loan document, did you think in your mind that you were doing

16   anything wrong?

17   A.      Wasn't thinking.

18   Q.      What about the third loan application, document.  When

19   you signed that, did you think you were doing anything wrong?

20   A.      Well, it felt a little funny.

21   Q.      But you didn't think it was illegal?

22   A.      No, nothing wrong, no, because we, you know, our

23   intentions were to pay, pay the notes.

24   Q.      Your understanding was that you and Mr. Leonard's

25   (sic) intention was to pay these notes off?

1    A.      Right, yeah.

2    Q.      And make some money when these properties were sold?

3    A.      Yeah.

4    Q.      Okay.  And at no point did Mr. Leonard (sic) say to

5    you, you know, Arthur, we're going to rip off these banks;

6    right?

7    A.      No.

8    Q.      He never said anything like that?

9    A.      No.

10   Q.      He never said anything like I got this scheme that

11   we're going to burn these banks and take off to Tahiti with

12   the money or anything like that; correct?

13   A.      No.

14   Q.      As far as you understood, is it fair to say,

15   Mr. Watson, that as far as you understood, these were

16   legitimate transactions where you and Mr. Williams were going

17   to maybe get some gain when these properties were eventually

18   sold?

19   A.      Yes.

20   Q.      Okay.  Now, did you -- strike that.  Did you ever get

21   a call from any of the lenders who made these loans and

22   say -- and did anybody say, Mr. Watson, I'm going to confirm

23   some information on this loan application?

24   A.      No, I don't recall.

25   Q.      Do you recall, Mr. Watson, the closing of these

1    transactions?  In other words, do you remember ever going to

2    an office and having to sign closing papers for these

3    transactions?

4    A.      Yeah, vaguely.  It was a long time ago, you know.

5    Q.      And let me ask you this question.  Maybe I can prompt

6    your memory.  What do you recall about the location where you

7    went, for example, on the Gidda Loop transaction?  Do you

8    remember going to some office to sign closing papers?

9    A.      Yeah, I did it at Leonard's office.

10   Q.      Okay.  Now, do you recall signing any closing papers

11   at an escrow office?

12   A.      I think I did one, vaguely.

13   Q.      And when you signed the document that you seem to

14   recall at the escrow office, do you remember anybody asking

15   you anything about the information that was in the documents,

16   on your loan application, or anything else?

17   A.      No.

18   Q.      Okay.  So if I understand your testimony, you don't

19   recall anybody from the bank questioning the application;

20   correct?

21   A.      Say again, please.

22   Q.      As I understand what you're saying, you don't remember

23   anybody from any bank calling you up and saying, Mr. Watson,

24   I want to confirm this information.

25   A.      No.

1    Q.      Okay.  And you were asked, Mr. Watson, about your bank

2    records.  Do you remember that conversation?

3    A.      Yeah.

4    Q.      Okay.  And you said that you banked with Bank of

5    America for a number of years; correct?

6    A.      Yeah.

7    Q.      And you indicated that Mr. -- that you gave

8    Mr. Williams access to your account.

9    A.      Yeah, right, to pull up the bank statements.

10   Q.      The bank statements.  And your understanding is that

11   he needed to pull up those bank statements to provide

12   information to the lender?

13   A.      He said he needed them.

14   Q.      And he didn't say that he was going to alter those

15   bank statements or anything like that; right?

16   A.      No.

17   Q.      And you had no reason to believe that he was going to

18   do anything like alter these statements when you gave him

19   your information; correct?

20   A.      No.  Right.

21   Q.      Because you had this friendship with Mr. Williams and

22   you trusted his word; right?

23   A.      Right.

24   Q.      And throughout the time that you dealt with him on

25   these transactions, is it fair to say there was nothing that

1   he said to you to make you believe that anybody was

2   committing a crime?

3   A.      No.

4   Q.      I want to pull up another document, number 202, and

5   have you take a look at this.  Mr. Watson, I'm going to try

6   to get it bigger for you.  Can you see this document here up

7   on the screen?

8   A.      Yes.  I see my signature.

9   Q.      Yeah.  You see that signature?  Do you see the name

10  Lee Tate on the bottom there?  Does that look like Lee Tate?

11  A.      Yeah.

12  Q.      Is that your signature under that name?  It's not

13  yours; right?

14  A.      No.

15  Q.      Do you have any idea who Lee Tate is?

16  A.      No.

17  Q.      Do you have any recollection of having a conversation

18  with Lee Tate?

19  A.      No.

20  Q.      Do you have any recollection of somebody from the bank

21  calling you up to ask you about your ethnicity?

22  A.      No.

23  Q.      And the signature right above that -- well, strike

24  that.  You see on this page, you can see your signature

25  there; correct?

1    A.      Yeah, I see my signature.

2    Q.      That is your signature?

3    A.      Yes.

4    Q.      Okay.  And you were asked about some checks that you

5    don't recall receiving; right?  You identified your signature

6    on the back of the checks; correct?

7    A.      Yeah, we talked about that, yes.

8    Q.      But you don't recall receiving those monies; right?

9    A.      Right.

10   Q.      Is there any reason why you wouldn't have gotten that

11   money?

12   A.      I don't remember.

13   Q.      You don't remember anything about it.  You just know

14   your signature was on the bottom?

15   A.      I just know I verified my signature.

16   Q.      Okay.  Now, based upon your habit and custom back in

17   2006 and 2007, if you received a check, the back of which you

18   signed, what did you ordinarily do with the checks that you

19   received?

20   A.      Cashed it.

21   Q.      Okay.  I'm going to ask you another question,

22   Mr. Watson, about another document.  I'm going to call up

23   207.

24           Your Honor, it's getting late in the day.  I think

25   we're having more technical problems.

1          THE COURT:  You can't call it up on your iPad on the

2     screen.

3          MR. WISEMAN:  Yeah.  I'm just having some issues on

4     this technical stuff.  Do you have the binder in front of you

5     with Exhibit 207?

6          THE COURT:  Is it part of the topic you wanted to

7     cover before we break?

8          MR. WISEMAN:  I'd rather break, your Honor.

9          THE COURT:  All right.  We'll do that.  We're going to

10    take the evening recess at this time, ladies and gentlemen.

11    You will recall that we are not going to be in session

12    tomorrow.  So leave your books on your seats and be very

13    careful to heed the Court's admonition.  We will resume with

14    the trial at 9:00 clock on Friday morning.

15         MR. WISEMAN:  Thank you.

16         (Proceedings concluded at 4:30 p.m.)

17

18

19

20

21

22

23

24

25

1            I certify that the foregoing is a correct transcript

2      from the record of proceedings in the above-entitled matter.

3

4

5                              /s/ Kelly O'Halloran

6                         KELLY O'HALLORAN, CSR #6660

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25