IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

---oOo---

BEFORE THE HONORABLE WILLIAM B. SHUBB, JUDGE

---oOo---

UNITED STATES OF AMERICA,

　　　　　　Plaintiff,

vs.                              No. 2:08-cr-376 WBS

LEONARD WILLIAMS,

　　　　　　Defendant.

_____/

---oOo---

REPORTER'S TRANSCRIPT

JURY TRIAL

VOLUME 3

THURSDAY, JULY 11, 2014

---oOo---

Reported by:      KELLY O'HALLORAN, CSR #6660

APPEARANCES


For the Plaintiff:


     UNITED STATES ATTORNEY'S OFFICE
     501 I Street, Suite 10-100
     Sacramento, CA  95814
     BY:  CHRISTOPHER HALES
         AUDREY B. HEMESATH
         Assistant U.S. Attorneys

For the Defendant:


     WISEMAN LAW GROUP, P.C.
     1477 Drew Avenue, Suite 106
     Davis, CA  95616
     BY:  JOSEPH J. WISEMAN, Attorney at Law
         JENNIFER NOBLE, Attorney at Law

INDEX

GOVERNMENT WITNESSES:                                    PAGE:


ANTHONY SYMMES
DIRECT EXAMINATION BY MS. HEMESATH                        404
CROSS-EXAMINATION BY MR. WISEMAN                          431

JESSICA MARIE SAWYER
DIRECT EXAMINATION BY MS. HEMESATH                        438
CROSS-EXAMINATION BY MR. WISEMAN                          450
REDIRECT EXAMINATION BY MS. HEMESATH                      456

TERRANCE MURRELL
DIRECT EXAMINATION BY MS. HEMESATH                        462
CROSS-EXAMINATION BY MR. WISEMAN                          477

JOSHUA FRYE
DIRECT EXAMINATION BY MR. HALES                           481
CROSS-EXAMINATION BY MR. WISEMAN                          513
REDIRECT EXAMINATION BY MR. HALES                         534

KELI UPDEGRAFF
DIRECT EXAMINATION BY MR. HALES                           536
CROSS-EXAMINATION BY MR. WISEMAN                          586

LACIE CLYMER
DIRECT EXAMINATION BY MS. HEMESATH                        607

GOVERNMENT EXHIBITS RECEIVED IN EVIDENCE

| NO.: | DESCRIPTION: | PAGE: |
|---|---|---|
| 200 | Photo of house | 410 |
| 223 | Cashier's check to DHF for $46,250 dated 6/21/07 | 417 |
| 300 | Photo of house | 421 |
| 317 | Amended Additional Escrow Instructions | 423 |
| 319 | Seller's Final Settlement Statement | 425 |
| 326-A | Check from Mariposa Traditions to DHF | 428 |
| 210-A | Jessica Sawyer email re Arthur Watson | 447 |
| 307 | Jessica Sawyer email re: $8,000 | 448 |
| 61 | Photo | 469 |
| 6 | DHF Chief Financial Officer appointment documents | 474 |
| 8-A | Signature page only from DHF Cash Flow Manager Line of Credit | 475 |
| 434 | Yahoo Email re: Funding Status | 491 |
| 401 | Purchase agreement (second escrow) | 494 |
| 402 | Loan application | 495 |
| 435 | Email re: Third Party Deposit | 499 |
| 403 | Occupancy and financial status affidavit, signed by Frye | 501 |
| 437 | Borrower's Certification and Authorization form for Joshua Frye | 503 |
| 413 | HUD-1 for second escrow (loan file version) | 505 |
| 417 | Notice of assignment, sale, or transfer of servicing rights | 507 |
| 427 | Kickback check from BARE to Joshua Frye $17,859 dated 2/21/08, memo escrow 60603635 | 509 |
| 428 | Escrow File copy of check to Joshua Frye for $3,141.26 dated 2/21/08 | 510 |
| 404 | Verification of employment | 549 |
| 433 | Online salary checker | 551 |
| 407 | DU underwriting findings | 553 |
| 408 | Uniform Underwriting and transmittal summary | 562 |
| 409 | Loan approval worksheet | 563 |
| 415 | Deed of trust (loan file version) | 567 |
| 436 | NL, Inc. Letter to Joshua Frye dated 2/19/08 | 570 |
| 601 | Purchase Agreement | 573 |
| 611 | Addendum lowering purchase price after appraisal review | 574 |
| 602 | Loan Application | 574 |
| 613 | HUD-1 (from loan file) | 578 |
| 603 | Verification of Employment | 579 |

GOVERNMENT EXHIBITS RECEIVED IN EVIDENCE

| NO.: | DESCRIPTION: | PAGE: |
|------|-------------|-------|
| 606 | Affidavit of Occupancy | 581 |
| 608 | Credit Report | 582 |
| 612 | Conventional Loan Approval underwriting document | 583 |
| 615 | Deed of Trust (from loan file) | 584 |
| 604 | Yellowpages.com printout for DHF | 585 |
| 607 | SAFE Credit Union bank statements | 610 |
| 620 | Check from BARE to Lacie Clymer for $9,500 on 3/31/08, memo 11516 Linday | 617 |

1                      SACRAMENTO, CALIFORNIA

2                  FRIDAY, JULY 11, 2014, 9:00 A.M.

3                          ---oOo---

4          (Jury not present.)

5          THE COURT:  Good morning.  Are all the jurors present?

6          THE CLERK:  Yes.

7          THE COURT:  You may bring them in.

8          (Jury present.)

9          THE WITNESS:  Judge, did you get your glasses?

10         THE COURT:  I got them, but if you need them again,

11    just pick them up.

12         THE WITNESS:  Okay.

13         THE COURT:  Good morning, ladies and gentlemen.  The

14    jurors are all present.  Mr. Williams is present with

15    counsel.  Mr. Wiseman was in the process of cross-examining

16    Mr. Watson.

17         You may continue.

18         MR. WISEMAN:  Your Honor, we have no further questions

19    at this time.

20         THE COURT:  Oh, no more questions.  Any redirect?

21         MS. HEMESATH:  No, your Honor.

22         THE COURT:  Oh, well, Mr. Watson, thank you for coming

23    back today.  There are no more questions for you unless you'd

24    like me to ask you some questions.

25         THE WITNESS:  I'm outta here.

1               THE COURT:  Thank you for coming.

2               You may call your next witness.

3               MS. HEMESATH:  The United States calls Anthony Symmes.

4               Your Honor, permission to approach to change the

5     binder?

6               THE COURT:  Yes.

7               MS. HEMESATH:  Thank you.

8               THE CLERK:  Sir, please step forward.  Stand over here

9     next to the court reporter and face me.  Please raise your

10    right hand.

11                         ANTHONY SYMMES,

12    a witness called by the Government, having been first duly

13    sworn by the Clerk to tell the truth, the whole truth, and

14    nothing but the truth, testified as follows:

15              THE WITNESS:  I will.

16              THE CLERK:  Thank you.  You may be seated.  Please

17    state your full name and spell your last name for the record.

18              THE WITNESS:  Anthony G. Symmes S-Y-M-M-E-S.

19                         DIRECT EXAMINATION

20    BY MS. HEMESATH:

21    Q.    Good morning, Mr. Symmes.

22    A.    Good morning.

23    Q.    Mr. Symmes, what's been your career?

24    A.    I went to college.  I started out as a CPA.  Went to

25    work for one of my clients, Orchard Machinery, as a

1    controller in 1981.  I was hired with a developer in Chico,

2    California.  Worked there for 13 years.  And in 1994, late

3    '94, first of '95, I went off on my own and have been

4    building single-family affordable housing, entry level, in

5    Chico primarily for the last 15, 16, 17 years.

6    Q.     In the building of the family housing, what was your

7    sales model?

8    A.     I was fortunate enough to have the entry-level market

9    to myself in Chico.  All the other builders, friends of mine,

10   basically they started -- their house pricing was where I

11   quit.  So I had the whole entry-level market to myself.  I

12   did several projects at a time as the market allowed.  I

13   generally sold 10 percent under market in order to help

14   first-time home buyers get into a home.  They used FHA loans,

15   they used city mortgage subsidy programs, they used FHA

16   loans, and they used conventional loans.  So that was my

17   niche in the Chico market.

18   Q.     When you say entry level, what sales price did you

19   typically have?

20   A.     Well, when I started in 1994 and '5, it was basically

21   a hundred thousand to 130,000.  Over time as the market

22   improved into the 2005, '6, it was up mostly in the 250, 60

23   to 300, $325,000 range.  A few slightly lower, a few higher.

24   Q.     When you're building the homes, was it one house here,

25   one house there, or were they larger?

1    A.       It was larger tracts.  Anywhere from a five-lot

2    subdivision to a 200-lot subdivision.  And when the market

3    was good, we would do phases of 12, 14, 20 at a time.  In the

4    2005, '6 range, we did probably 80 to 90 houses a year for

5    two to three years in a row.  That was the best group of

6    houses and best time that I experienced.

7    Q.       What was the name of your company?

8    A.       My name was, the DBA was Aspire Homes.  My company

9    name is Agasy, Inc., for my initials A.G. Symmes.  That's the

10   corporation.  The DBA was Aspire Homes, the marketing name.

11   Q.       Now, did you have any other companies underneath that?

12   A.       Yes.  Each subdivision had its own Sub S corporation.

13   So the Mariposa Vista subdivision, the company that ran that

14   was Mariposa Traditions, Inc.  The Jensen Parks project was

15   Ceanothus Traditions.  The McKinney Ranch project was Rockin

16   M, Inc.  And there were other companies and other

17   subdivisions over time that came and went.  As each

18   subdivision went through its cycle, the Sub S corporation

19   dissolved and went away.

20   Q.       Were you the hundred percent owner of each of these

21   companies?

22   A.       Yes.

23   Q.       What's your educational background?

24   A.       I graduated.  I went to Davis for a couple years,

25   graduated from UC Berkeley in 1973 in a bachelor of science

 1    in business, and then I went to McGeorge Law School at night

 2    between '76 and '81.  I passed the Bar.  I have a CPA degree.

 3    I have a -- had.  These are all in the past tense.  Had a

 4    real estate license and had a general contractor's license.

 5    Q.     Would you in the 2000, the early 2000s through 2006

 6    era, would you sell directly to buyers?

 7    A.     Yes.  I very rarely used real estate agents.  I dealt

 8    almost exclusively with the home purchaser.

 9    Q.     In 2006, did you begin to do business with a man named

10    Garret Gililland?

11    A.     Yes.  He came on the scene in June of 2006.

12    Q.     Who was he?

13    A.     He was a fellow who approached one of my assistants

14    and said he had numerous investors who would buy as many

15    houses as could be made available to him to purchase.

16           MR. WISEMAN:  Your Honor, I'll object.  It calls for

17    hearsay.

18           THE COURT:  Sustained.  The question simply was what?

19           MS. HEMESATH:  Who was he.

20           THE COURT:  Who was he?  That's good enough.

21           THE WITNESS:  He was a person who came to buy houses.

22           THE COURT:  Good enough.

23    Q.     BY MS. HEMESATH:  Was he buying the houses with the

24    intention of living in them himself?

25    A.     No.  And he never bought a house from me.

1    Q.      Okay.  What service did he provide to you?

2    A.      I'll have to tell you how the deals came about.  He

3    would approach me, and as I had houses under construction or

4    finished, sitting, which weren't that many, but he would

5    say --

6            MR. WISEMAN:  Objection.  He would say.

7            THE COURT:  He can say what he said.  Go ahead.

8            THE WITNESS:  He would say that I would like to buy

9    those houses from you.  And I said okay.  And he would ask me

10   what price I would accept for that purchase for that house

11   would be.  I would give him a number.  He would then go away

12   and in a week or two, at some time in the future, I would get

13   some escrow instructions at a price higher than what I

14   quoted, and then I would sign the escrow instructions and the

15   grant deed, send them back to the title company, and the

16   transaction would close.

17   Q.      BY MS. HEMESATH:  Was it your understanding that

18   Mr. Gililland would then find buyers for these homes?

19   A.      He would find buyers for the homes and arrange for

20   loans for those buyers.

21   Q.      Did Mr. Gililland find all the buyers himself or did

22   he work with others to do that?

23   A.      He had a network.  I don't know how that worked, but

24   he did not find all the buyers himself.  He found some, but

25   then he had other associates that would find other buyers for

1    him apparently.

2    Q.      Do you know Leonard Williams?

3    A.      No, I do not, other than I was shown him on Wednesday

4    and I knew his name on a couple of transactions, but I do not

5    know him.

6    Q.      Do you know Diamond Hill Financial?

7    A.      Again, on a couple of transactions, they were

8    involved, and I did write a couple of checks to Diamond Hill

9    Financial.

10   Q.      Did you have an understanding that Diamond Hill

11   Financial was an entity known to Garret Gililland?

12   A.      Yes, that was my understanding.

13   Q.      Did you have an understanding that Mr. Williams was an

14   associate of Garret Gililland?

15   A.      Not directly, no.  Diamond Hill Financial was the name

16   that I was mostly familiar with.

17   Q.      I'm going to have you look in the binder in front of

18   you at what's been marked as Government's Exhibit 200.

19   A.      Right in front, yes.

20   Q.      Do you recognize it?

21   A.      It is a house that I built on the east side of

22   Ceanothus Avenue in Chico, California.  It looks like it's

23   2640 Ceanothus Avenue.

24          MS. HEMESATH:  Move to admit Government's Exhibit 200.

25          THE COURT:  Exhibit 200 is received in evidence.

```
1                        (GOVERNMENT'S EXHIBIT 200, Photo of

2                        house, ADMITTED INTO EVIDENCE.)

3    Q.      BY MS. HEMESATH:  This is one of your homes?

4    A.      Yes, it is.

5    Q.      Approximately what year did you build this home?

6    A.      Late 2006 or early 2007.

7    Q.      Is this a house that you worked with Mr. Gililland to

8    sell?

9    A.      Yes.

10   Q.      And how did that transaction go?

11   A.      Just like all the others.  This was not sold as it was

12   approaching completion or at completion.  I gave him a price

13   that I would accept for that house.  He went away for a

14   period of time and subsequently escrow instructions appeared

15   with a grant deed, and I executed those and returned them to

16   the title company.

17   Q.      What price did you tell Mr. Gililland you wanted for

18   this house?

19   A.      Approximately 325,000.

20   Q.      Were you aware if a different sales price was

21   represented to the lender on this house?

22   A.      Only upon receiving the settlement statement from the

23   title company.

24   Q.      Okay.  Let's show, please, Government's Exhibit 201

25   already in evidence.  This is the purchase agreement for that
```

1    home.  And if we can look at the last page, please, page 6.

2    A.      Yes.

3    Q.      You were the seller on this home?

4    A.      Yes.  Ceanothus Traditions, one of my Sub S

5    corporations, was the seller on this transaction.

6    Q.      Is this your signature?

7    A.      No, it is not.

8    Q.      Do you know who signed this document?

9    A.      No, I do not.

10   Q.      Was it generally part of your practice with

11   Mr. Gililland that your signature would be entered for you?

12   A.      That was never agreed upon at any time, no.

13   Q.      Were you aware that purchase agreements would be given

14   to the lender for these loans?

15   A.      Absolutely.  That's the normal course of business.

16   But again, I never entered into a transaction with

17   Mr. Gililland or the ultimate seller, other than the closing

18   documents, escrow instructions, closing statement, and grant

19   deed.

20   Q.      On a typical direct sale where you're selling direct

21   to a buyer, would you sign the purchase agreement?

22   A.      Absolutely.  I had my own contract form.  The seller

23   and the buyer, we would execute all the disclosures and the

24   contracts, yes.

25   Q.      Okay.  On the purchase agreement for this house, you

1    were not involved?

2    A.      No, because there was an agreement -- there was an

3    arrangement with Mr. Gililland.  But sometimes when he went

4    away for a week or two and he would come back and say I've

5    got the transaction ready to go on this house, I would inform

6    him that's no longer available.  I would have sold it to

7    somebody in the normal course of business.  So I never

8    entered into an agreement because I was never sure that

9    Mr. Gililland would complete the transaction, and I didn't

10   want to be in the case where I had two contracts on the same

11   property.  I always wanted a real deal, and his were not

12   often in that vein.

13   Q.      What agreement did you reach with Mr. Gililland about

14   the purchase price for this house?

15   A.      I believe I told him I would accept approximately

16   325,000 for that house.

17   Q.      All right.  And if we go back to the first page of

18   this exhibit, please.

19   A.      Yes.

20   Q.      Were you aware of an inflated purchase price?

21   A.      I was aware that there would be an inflated purchase

22   price on his transactions, yes.

23   Q.      Were you aware of the amount?

24   A.      No.

25   Q.      Why was that not important to you?

```
1    A.      Because I was willing to accept 325,000.  And often

2    the purchase price was pretty much determined by what he

3    could obtain for an appraisal on the property.

4    Q.      Were you involved in the appraisal process at all?

5    A.      No, I was not.

6    Q.      Were you involved in securing a loan for the buyer?

7    A.      No, I was not.

8    Q.      Do you know who the buyer was on this house?

9    A.      Again, during the time when Mr. Gililland was working

10   on that, he may say I have a fellow named Mr. Watson who

11   would be on the --

12           MR. WISEMAN:  Your Honor, I'll object.  It's

13   nonresponsive.  I think the question called for a yes or no

14   answer.

15           THE COURT:  It does, but I'm going to overrule the

16   objection.  This is responsive.

17           Go ahead.  Finish your answer.

18           THE WITNESS:  He would inform me that Mr. Watson would

19   be placed on that property, and then when the escrow

20   instructions would come and the grant deed, that name was on

21   those documents.

22   Q.      BY MS. HEMESATH:  Did you meet Mr. Watson?

23   A.      No, I've never met Mr. Watson.

24   Q.      Do you know if Mr. Watson had an intention of moving

25   into your house?
```

1    A.        I did not know his intention.

2    Q.        By this point, so this -- let's see if we can go to

3    the date up here.  April 20th, 2006.  Approximately how many

4    deals had you done with Mr. Gililland by this point?

5    A.        Probably 20.  This is about halfway through our time

6    together.

7    Q.        Had the buyers in those previous homes moved into the

8    houses?

9    A.        Some had.  Most hadn't.

10   Q.        All right.  Did you care whether Mr. Watson would move

11   into the house?

12             MR. WISEMAN:  Objection.  Relevancy.

13             THE COURT:  Sustained.

14   Q.        BY MS. HEMESATH:  Are you familiar with HUD-1s?

15   A.        Yes, I am.

16   Q.        What's a HUD-1?

17   A.        A HUD-1 is the final settlement statement that the

18   escrow officer prepares, and it has both the buyer's

19   information, sales price, commissions paid, demand from the

20   construction lender as to what's to be paid to them in the

21   escrow.  It would have the buyer's information, sales price,

22   their loan amount, their deposits, their other monies to go

23   into escrow.  The HUD-1 has both the buyer's and seller's

24   side.  It is usually, I think almost always, given to the

25   lender prior to their final funding so they can see all

1   information, financial information, regarding the

2   transactions on both sides to make sure that they want to

3   make the final funding of the loan which is their final

4   commitment on the loan.

5   Q.     Can we please pull up 214 already in evidence.  This

6   is the HUD-1 for 2640 Ceanothus?

7   A.     That looks like a portion of a --

8   Q.     Yeah, I just blew it up so you could read the address

9   there.

10   A.     Yes.

11   Q.     Okay.  We can go back out now to the full document.

12   A.     I'm at 214, and that is a HUD-1, 2640 Ceanothus

13   Avenue.

14   Q.     As the seller on this property, did you understand

15   that all the money associated with this transaction needed to

16   be disclosed on the HUD-1?

17   A.     Yes.  All monies in the transaction should be

18   disclosed on HUD-1s.

19   Q.     Did you have an understanding as to whether all the

20   monies associated with this transaction were disclosed on

21   this HUD-1?

22   A.     No.  All monies were not disclosed on this

23   transaction.

24   Q.     Why not?

25   A.     To finalize how the operation with Mr. Gililland went,

 1    was after the close of escrow, he would come with a HUD-1, he

 2    would say look, you netted X number of dollars.

 3           MR. WISEMAN:  Objection.  Calls for hearsay as to what

 4    Mr. Gililland said.

 5           THE WITNESS:  He said that to me.

 6           THE COURT:  Overruled.  But when you say he would come

 7    to me and he would say, we need to know whether he did come

 8    to you and did say.

 9           THE WITNESS:  After the transactions with

10    Mr. Gililland, after they closed and I had received a HUD-1

11    or a settlement statement and the check, he would come to me.

12           THE COURT:  Okay.  That's the point.

13           THE WITNESS:  He came to me.

14           THE COURT:  Good.

15           THE WITNESS:  He came to me and he said you agreed to

16    take X number of dollars on this transaction.  You got Y.

17    I'm due the difference between X and Y.  And then he would

18    direct me as to who I should pay that money to on that

19    transaction.

20           MR. WISEMAN:  Your Honor, I'm going to object again.

21    It's hearsay as to what Mr. Gililland said.

22           THE COURT:  It's not hearsay.  Mr. Gililland is not

23    telling him any facts that are being offered to prove the

24    truth of the matters asserted.

25           Go ahead.

1    Q.    BY MS. HEMESATH:  Please turn to Exhibit 223-2.  I'm

2    sorry, page 2 of what's marked as Exhibit 223.

3    A.    That is a cashier's check.

4    Q.    Do you recognize it?

5    A.    It's a cashier's check that I arranged from

6    Tri Counties Bank payable to Diamond Hill Financial.

7          MS. HEMESATH:  Move to admit 223.

8          THE COURT:  Exhibit 223 is received in evidence.

9                         (GOVERNMENT'S EXHIBIT 223, Cashier's

10                         check to DHF for $46,250 dated

11                         6/21/07, ADMITTED INTO EVIDENCE.)

12   Q.    BY MS. HEMESATH:  And if we could see page 2 of that,

13   please.

14          Is this the money that was not disclosed on the HUD-1

15   on the Ceanothus transaction?

16   A.    Yes.

17   Q.    What does this $46,250 represent?

18   A.    It represents primarily the difference between the

19   $375,000 amount that the transaction showed was the purchase

20   price by Mr. Watson, less a few credits, less $325,000, would

21   net approximately this amount.

22   Q.    Was this check disclosed to the lender?

23   A.    No.

24   Q.    Was it disclosed to the escrow officer?

25   A.    No.

1    Q.      Was it disclosed to the appraiser?

2    A.      No.

3    Q.      Who directed you to pay this to the order of Diamond

4    Hill Financial?

5    A.      Mr. Gililland.

6    Q.      Were you involved in what happened to the $46,250

7    after you paid it to Diamond Hill Financial?

8    A.      No.

9    Q.      Did you know how much, if any of it, was going to the

10   buyer of the house?

11   A.      No.

12   Q.      Did you have any financial obligations to this

13   company, Diamond Hill Financial?

14   A.      No.

15   Q.      Did you have any debt that you owed to

16   Leonard Williams?

17   A.      No.

18   Q.      Did you ever make a loan to Diamond Hill Financial?

19   A.      No.

20   Q.      What were the benefits that you got out of this

21   transaction, Mr. Symmes?

22   A.      I was able to pay down my construction loan to -- on

23   this case, it would have been to Umpqua Bank.

24   Q.      Could you have sold this house directly to a buyer

25   like with your other houses?

1  A.      Yes, at a price approximately 325.

2  Q.      Why didn't you do that?

3  A.      This wasn't the best floor plan.  It wasn't the most

4  popular plan.  It was sitting for a few months.  I could have

5  sold it, probably dropped the price or got an agent and done

6  a better job marketing it.  Yes, I could have sold it in the

7  direct market probably at a lower price.

8  Q.      What was the appeal then to you of selling this house

9  through Mr. Gililland?

10  A.      Getting close to my asking price and then, in a

11  relatively short period of time, paying off my construction

12  loan.

13  Q.      Mr. Symmes, have you pleaded guilty to the crimes

14  associated with the conduct in this case?

15  A.      Yes.

16  Q.      What crimes?

17  A.      Conspiracy and mail fraud.

18  Q.      Were those felonies or misdemeanors?

19  A.      Those are felonies.

20  Q.      Did you sign a plea agreement?

21  A.      Yes, I did.

22  Q.      Are you currently serving your sentence?

23  A.      Yes, I am.

24  Q.      Were you furloughed here today for the purpose of

25  testifying at this trial?

```
 1    A.        Yes.

 2    Q.        Had you been in trouble with the law before this case?

 3    A.        Never.

 4    Q.        Do you know whether this home went into foreclosure?

 5    A.        I believe it did.

 6    Q.        Do you know whether the other homes that you sold

 7    through Mr. Gililland went into foreclosure?

 8    A.        Most of them did.

 9    Q.        Did you pay back money in association with your guilty

10    plea?

11    A.        Yes.

12    Q.        How were you able to pay it back?

13    A.        Sold a lot of my assets.

14    Q.        You did a second deal with Mr. Gililland and Diamond

15    Hill Financial?

16    A.        Yes.

17    Q.        Which property was that?

18    A.        It was at Rockin M.  It was a duplex at the corner of

19    Rockin M and Desiree Lane in the McKinney Ranch subdivision.

20    Q.        I'm going to have you change binders.  So the binder

21    that's to your left.  And you're going to look at tab 300.

22    A.        Yes.

23    Q.        Do you recognize it?

24    A.        That is the duplex at the corner of Desiree Lane and

25    Rockin M Drive, and I think it's 3294 Rockin M Drive.
```

```
 1              MS. HEMESATH:  Move to admit Government's Exhibit 300.

 2              THE COURT:  Exhibit 300 is received in evidence.

 3                           (GOVERNMENT'S EXHIBIT 300, Photo of

 4                           house, ADMITTED INTO EVIDENCE.)

 5    Q.     BY MS. HEMESATH:  Were you the builder on this house?

 6    A.     Yes, I was.  It's a duplex.

 7    Q.     Duplex?

 8    A.     Yes.

 9    Q.     You sold this duplex?

10    A.     Yes.

11    Q.     To whom did you sell it?

12    A.     The buyer on the transaction was Arthur Watson.

13    Q.     And how did you sell this house?

14    A.     Same arrangement, through Mr. Gililland.

15    Q.     What price did you tell Mr. Gililland you wanted for

16    this house?

17    A.     I believe it was 375,000.

18    Q.     Do you know what price the lender was told was the

19    purchase price on this house?

20    A.     Not until the escrow instructions came to me in

21    preparation for close.

22    Q.     Can we please pull up what is I believe already in

23    evidence, Government's Exhibit 302.

24              This is the purchase agreement on Rockin M?

25    A.     Yes.
```

1    Q.      And if we can go to the last page again.

2    A.      Yes.

3    Q.      Is that the seller, Rockin M, Inc.?

4    A.      It doesn't have Rockin M, Inc., at the seller

5    signature line, but the seller would have been Rockin M, Inc.

6    Q.      If we look right here in what I'm showing you on the

7    touch screen?

8    A.      Yes.  That is Rockin M, Inc., yes.

9    Q.      And that's you the seller?

10   A.      That would be the selling entity.  Again, that's not

11   my signature.

12   Q.      That's not your signature?

13   A.      No.

14   Q.      Is that similar to the way in which you sign your

15   name?

16   A.      Similar.

17   Q.      You use a lower case Y?

18   A.      Yes.  It's a, believe it or not, it's an A-S-Y.

19   Q.      How did something in that signature box come to be on

20   this purchase agreement?

21   A.      I don't know.

22   Q.      Were you aware -- if we go back to page 1.  Bring up

23   the purchase price.

24           Were you aware that a purchase price of 450,000 was

25   being entered on the purchase agreement?

```
 1    A.      No.

 2    Q.      And I'm going to have you look at what's in your

 3    binder at 317.

 4    A.      Yes.

 5    Q.      Do you recognize this?

 6    A.      Yes.

 7    Q.      Is this your signature?

 8    A.      Yes.

 9            MS. HEMESATH:  All right.  I'm going to move to admit

10    Government's Exhibit 317, which is the amended escrow

11    instructions.

12            THE COURT:  Exhibit 317 is received in evidence.

13                            (GOVERNMENT'S EXHIBIT 317, Amended

14                            Additional Escrow Instructions,

15                            ADMITTED INTO EVIDENCE.)

16    Q.      BY MS. HEMESATH:  Can you tell us what this document

17    is?

18    A.      It was an amendment of the purchase price from 450 to

19    440.

20    Q.      Do you know why that purchase price was amended?

21    A.      No.

22    Q.      What was the purchase price of the house, in your

23    mind, that you told Mr. Gililland?

24    A.      I was selling those for 375 to 400,000, but my price

25    to Mr. Gililland was 375.
```

1    Q.      You did not expect to get $440,000 on this sale?

2    A.      I was willing to sell that house for 375, and under

3    his transactions, I would accept 375 as my proceeds for that

4    property.

5    Q.      Were you aware if it was being represented to the

6    lender that you were to receive a down payment on this

7    property?

8    A.      No.

9    Q.      Were you expecting a down payment from Mr. Watson on

10   this property?

11   A.      The transactions with Mr. Gililland, I was never

12   involved in the down payments or anything of that nature.  If

13   money was required into escrow, I didn't have anything to do

14   with that or I had no knowledge of it.

15   Q.      Did you receive a down payment on this property?

16   A.      No, I did not.

17   Q.      Okay.  When you didn't, did you complain?

18   A.      No.  It was normal I didn't get them on these because

19   I didn't want to tie up those properties in case a bona fide

20   seller would come along.

21   Q.      Did the lender have an understanding that you were

22   willing to forego the down payment?

23   A.      I don't know.

24   Q.      I'm going to have you look at 319 in your binder,

25   please.  Do you recognize it?

1   A.      It is a settlement statement for 3294 Rockin M Drive.

2   Seller's side.

3           MS. HEMESATH:  Move to admit Government's Exhibit 319.

4           THE COURT:  Exhibit 319 is the received in evidence.

5                           (GOVERNMENT'S EXHIBIT 319, Seller's

6                           Final Settlement Statement, ADMITTED

7                           INTO EVIDENCE.)

8   Q.      BY MS. HEMESATH:  What's a seller's final settlement

9   statement?

10  A.      It indicates -- well, in this case it didn't represent

11  the 440, but it represents -- the bottom line is what I am

12  paying out of the escrow and the net proceeds to me after

13  those payments are made.  So it shows payments to the

14  construction lender and then it shows a final settlement

15  check to Rockin M, Inc.

16  Q.      How does a seller's final settlement statement compare

17  to a HUD-1?

18  A.      It only shows one side of the transaction.  My side.

19  Q.      This one shows your side?

20  A.      Yes.  I really am not privy to the buyer's side.  It's

21  really none of the seller's business.

22  Q.      So in the seller credit column, what does that tell

23  us?

24  A.      It again tells the full amount of the purchase price.

25  Q.      Let me clarify that.  I think you said just one answer

1   before that 440 was the purchase price represented to the

2   lender.  And this shows 414.  Do you know what this 414 is?

3   A.      Nope.

4   Q.      Okay.

5   A.      It looks -- receipt from the mortgage company, it

6   looks like the loan proceeds.

7   Q.      Okay.  The loan proceeds.  And then in the seller

8   charge, talk us through these monies.  Where are they going?

9   A.      Not to burden the Court, but a developer buys land, he

10  develops the land, and then he builds houses on the land.

11  Often the lender will give you some money for the land, some

12  money for the development, the streets and the sewers and the

13  utilities, and some money for the construction loan.  The

14  145, I believe, represented money for land and land

15  development.  The 125 was construction.  It might be the

16  other way around.  It probably was because the land and land

17  development is generally less than the construction costs.

18  But those two numbers represent the loans that I got that

19  were attributable to that lot in that subdivision that Umpqua

20  Bank gave me.  When the escrow closes, they put in their

21  demand.  They don't want me to have the full check and not

22  pay them back.  They want to make sure they get their money

23  through escrow.  So those are payments back to the bank for

24  land, land development loans, and construction loans.

25  Q.      Okay.  So in the seller charge column, this is the

 1    money from the lender that you have received going back out

 2    from escrow to wherever you directed it to go.  Is that --

 3    A.      Well, over time -- and banks don't just give you

 4    money.  What happens is you hire subcontractors.  They do the

 5    work.  They give you a bill.  You present the bill to the

 6    bank.  The bank will either pay them directly on a voucher

 7    system or give the money to me, and I pay the subcontractor.

 8    When I pay the subcontractor, he gives me a form that I got

 9    my money so I can give it to the bank so they know that I'm

10    using the money they're giving me to do the project.  So

11    that's what all that $270,000 was.  It was money that they

12    lent me to build that specific house, 3294 Rockin M Drive.

13    Q.      Okay.  Per your agreement with Mr. Gililland, did you

14    also owe him money on this transaction?

15    A.      That was the arrangement with Mr. Gililland.

16    Q.      Is that debt reflected on this final settlement

17    statement?

18    A.      No.

19    Q.      Was that debt disclosed to the lender?

20    A.      No.

21    Q.      To the escrow officer?

22    A.      No.

23    Q.      To the appraiser?

24    A.      No.

25    Q.      All right.  And let's have you look at Exhibit 326.

1    Do you recognize it?

2    A.     There's a check to Diamond Hill Financial, second line

3    down.

4           MS. HEMESATH:  Move to admit Government's Exhibit 326.

5           THE COURT:  326 is received in evidence.

6           MS. HEMESATH:  Sorry.  326-A.  I apologize.

7           THE COURT:  So you want 326-A instead of 326 in

8    evidence?

9           MS. HEMESATH:  Yes.  I apologize.

10          THE COURT:  All right.  That's the order.

11                         (GOVERNMENT'S EXHIBIT 326-A, Check

12                          from Mariposa Traditions to DHF,

13                          ADMITTED INTO EVIDENCE.)

14   Q.     BY MS. HEMESATH:  If we can make that bigger, please.

15          Who wrote this check?

16   A.     I wrote that check.

17   Q.     To whom did you write it?

18   A.     Diamond Hill Financial.

19   Q.     You are Mariposa Traditions, Inc.?

20   A.     That is one of my Sub S corporations, yes.

21   Q.     This is your signature?

22   A.     Yes.

23   Q.     And for what amount is this check?

24   A.     $30,000.

25   Q.     What was this $30,000 paid to Diamond Hill Financial

1    for?

2    A.      Mr. Gililland directed me to write that check to

3    Diamond Hill Financial subsequent to the close of 3294

4    Rockin M Drive.

5    Q.      Mr. Symmes, are you familiar with something called an

6    Uncle Tony deal?

7              MR. WISEMAN:  Objection.

8              THE COURT:  What?

9              MR. WISEMAN:  Uncle.  I'm sorry.  I didn't hear the

10   question.

11             THE COURT:  She said are you familiar with something

12   called the Uncle Tony deal.

13             MR. WISEMAN:  I would object as to relevance.

14             THE COURT:  Well, we don't know what a Tony deal is

15   yet, so I don't know whether it's relevant or not.  We'll

16   find out.

17             MR. WISEMAN:  I'm curious myself.

18             THE COURT:  Well, then maybe it's very relevant.

19             THE WITNESS:  At times I was the George Bailey of

20   Chico, but we'll see.  I met with most of the homeowners over

21   time, and there were some that were in need of certain help,

22   that they couldn't quite put together a down payment.  I

23   would facilitate that for them and take a silent second for

24   that.  There probably were 25 or 30 of those over a number of

25   years.

1    Q.      BY MS. HEMESATH:  When you say silent second, what is

2    that?

3    A.      That was just a private note between them that they

4    would pay me back.

5    Q.      You made them a loan?

6    A.      I made them a loan.

7    Q.      To afford to buy your house?

8    A.      That is correct.

9    Q.      This is different from the kickback deals that you

10   just walked us through?

11   A.      That is correct.  Those were all sold at market or

12   below.  Very few, if any, went into foreclosure.  They were

13   normal transactions, other than the fact that I facilitated

14   usually a relatively small amount of monies to them for a

15   down payment.

16   Q.      Was there an aspect of fraud to the Uncle Tony deals?

17   A.      I'd have to say that was not disclosed to the lender.

18   The purchase prices were below market value.  The credits

19   were generally good.  But yes, that should have been

20   disclosed to the lender, yeah.

21   Q.      Are there any Uncle Tony deals you associate with

22   Diamond Hill Financial?

23   A.      No.

24   Q.      With Mr. Williams?

25   A.      No.

1    Q.      Okay.  Between the kickback deals with Mr. Gililland

2    and the Uncle Tony deals, approximately how many properties

3    did you sell that had some aspect to them that wasn't

4    disclosed to the lender?

5    A.      80, 90, somewhere in that range.

6    Q.      Out of how many total houses that you have sold in the

7    Chico area over your career?

8    A.      Twenty-two or three hundred.

9    Q.      Did you know that these deals you worked out with

10   Mr. Gililland were wrong from the beginning?

11   A.      It became obvious after the first couple of deals.

12   The first couple of deals were relatively straightforward, a

13   hundred percent financing, then they morphed into something

14   more.  And yes, I knew they were wrong, pretty much after the

15   first couple of transactions, yes.

16           MS. HEMESATH:  Thank you.  Nothing further.

17           THE COURT:  You may cross-examine.

18           MR. WISEMAN:  Thank you.

19                        CROSS-EXAMINATION

20   BY MR. WISEMAN:

21   Q.      Good morning, Mr. Symmes.

22   A.      Good morning.

23   Q.      I just want to recap a couple things that you said.

24   So throughout your testimony, you were asked about

25   Mr. Garret Gililland; is that correct?

1    A.      That is correct.

2    Q.      And I just want to emphasize you never met anybody by

3    the name of Leonard Williams; correct?

4    A.      Never met Mr. Williams.

5    Q.      You never knew anything about Diamond Hill Financial;

6    correct?

7    A.      That is correct.

8    Q.      And your understanding is that it was Mr. Gililland,

9    if I recall your testimony, he would, A, find buyers for you

10   to purchase your homes; correct?

11   A.      Correct.

12   Q.      And B, he would arrange loans for those buyers;

13   correct?

14   A.      Correct.

15   Q.      It was your understanding it was Mr. Gililland that

16   was going to do that; correct?

17   A.      Him or his associates, yes.

18   Q.      Okay.  And he was -- at some point you became aware of

19   the fact that the prices were inflated.  In other words, the

20   homes, the transactions that you got involved in, the prices

21   were inflated; correct?

22   A.      The market was red hot at that time.  They were

23   inflated from the prices that I was selling to other general

24   people in the open market, yes.

25   Q.      But during that time, you just mentioned this is a

1    time when housing prices were going up in California;

2    correct?

3    A.      Yes.

4    Q.      So it was not uncommon to see a particular house,

5    within a short period of time, the market price go up;

6    correct?

7    A.      Not uncommon.

8    Q.      Okay.  So is it fair to say that you didn't find there

9    was anything unusual, at least in the beginning, when you

10   learned that the houses that you sold were being sold at a

11   higher price than what you were asking for; correct?

12   A.      It was reasonable in the current economic environment.

13   Q.      Okay.  And your goal, if I understand you, your goal

14   was simply to get what you needed out of the transaction?

15   A.      Yes.  And to be honest, I made a little profit on

16   those as well after I paid my construction lender, yes.

17   Q.      And the advantage, if I understand it, the advantage

18   of the transactions with Mr. Gililland is that you were

19   guaranteed what you needed to pay off your creditors for that

20   particular home, make a little profit, and move on?

21   A.      If Mr. Gililland completed the transaction, if he

22   could find a buyer and get a loan for that property, yes.

23   Q.      Because as a developer, you needed to kind of move the

24   inventory to pay your banks back; right?

25   A.      Absolutely.

1    Q.       Okay.  And you were asked about certain items that

2    were not disclosed to certain, let's say, professionals in a

3    real estate transaction.  You were asked about whether or not

4    these inflated prices or maybe the disbursements were

5    disclosed to the appraiser.  Do you remember that question

6    you were asked?

7    A.       Yes.

8    Q.       In your professional experience as being a developer,

9    does the appraiser get involved in how the disbursements at

10   the end of the transaction are made?

11   A.       No.  But generally he gets a copy of the contract

12   which usually specifies all the details of the transaction.

13   Q.       Right.  And your understanding is that these, based

14   upon you being the seller, that each of the transactions that

15   you were involved in, there was some sort of appraisal done;

16   correct?

17   A.       That was arranged by Mr. Gililland or the bank who was

18   making the loan.

19   Q.       Or the bank.  So the bank would, in your experience,

20   banks themselves would go out and get a particular property

21   appraised to ensure that they have some security on the

22   amount that they're lending to the buyer; right?

23   A.       That is what the bank does.  The seller does not do

24   that.

25   Q.       Right.  But your understanding is banks do that

1   routinely?

2   A.      Yes.

3   Q.      And they did that when you were a developer in the

4   Chico area; right?

5   A.      They did it on every transaction that had a loan that

6   I did over 30 years.

7   Q.      And it's correct to say, based upon your testimony,

8   that it was Mr. Gililland who instructed you to write a

9   check, as you testified, to Diamond Hill Financial; correct?

10  A.      After the close of the escrow, yes.

11  Q.      On the two properties that you were asked about?

12  A.      That is correct.

13  Q.      And no communication with Mr. Williams regarding that

14  transaction, i.e., you providing a check to Diamond Hill

15  Financial?

16  A.      No communication with Mr. Williams.

17  Q.      Okay.  And you were asked about an Uncle Tony deal.

18  And although you may have hedged a bit, the Uncle Tony deal

19  is the same sort of thing that should have been disclosed to

20  a lender as well; correct?

21  A.      Yes.

22  Q.      Okay.

23          MR. WISEMAN:  May I have a moment, your Honor?

24          THE COURT:  Yes.

25  Q.      BY MR. WISEMAN:  Now, Mr. Symmes, you've already

1   admitted that you pled guilty as a result of your involvement

2   with Mr. Gililland; correct?

3   A.      Yes.

4   Q.      And in part of the process of getting your case

5   resolved, you at some point wore a wire; is that right?

6   A.      Yes.

7   Q.      And you recorded conversations with certain

8   individuals; correct?

9   A.      Yes.

10  Q.      And those individuals were primarily involving

11  Mr. Gililland's business; correct?

12  A.      Primarily, yes.

13  Q.      Primarily.  And let me ask you this question.  You

14  were charged.  You pled guilty.  As you sit here today, do

15  you think that you were manipulated by Mr. Gililland?

16  A.      No.  I went in with my eyes open.  Looking back on

17  this, I should have been the adult in the room.  If you,

18  Mr. Gililland, want to learn the real estate business, you

19  should do it the proper way.

20  Q.      In the beginning, he wasn't being truthful with you in

21  terms of what his intentions were; right?  You thought, if I

22  understand your testimony, that in the beginning, these were

23  up-and-up deals.

24  A.      I'm a trusting soul.  Yes, I thought the first few

25  were up-and-up.  And then as the requests for larger and

1    larger checks came, it became obvious what was going on to

2    me.

3    Q.     And in spite of that becoming obvious, you continued

4    with this?

5    A.     Yes, I did.

6    Q.     And you continued with this because you needed to kind

7    of keep your business going?

8    A.     Yes, I did.

9    Q.     And throughout all the involvement with Mr. Gililland,

10   you never came across in person a Leonard Williams.  You

11   never spoke to a Leonard Williams; correct?

12   A.     No, I did not.

13          MR. WISEMAN:  Thank you.

14          No further questions, your Honor.

15          THE COURT:  Any redirect?

16          MS. HEMESATH:  No, your Honor.

17          THE COURT:  Thank you, Mr. Symmes.  You're excused.

18          THE WITNESS:  Thank you.

19          THE COURT:  Call your next witness.

20          MS. HEMESATH:  The United States calls Jessica Sawyer.

21          THE CLERK:  Please step forward.  Stand here in front

22   of the court reporter and face me, please.  Raise your right

23   hand.

24          ///

25          ///

1                       JESSICA MARIE SAWYER,

2      a witness called by the Government, having been first duly

3      sworn by the Clerk to tell the truth, the whole truth, and

4      nothing but the truth, testified as follows:

5                  THE WITNESS:  Yes, I do.

6                  THE CLERK:  Thank you.  You may be seated.  Please

7      state your full name and spell your last name for the record.

8                  THE WITNESS:  My name is Jessica Marie Sawyer.  My

9      last name is spelled S-A-W-Y-E-R.

10                         DIRECT EXAMINATION

11     BY MS. HEMESATH:

12     Q.    Good morning, Ms. Sawyer.

13     A.    Good morning.

14     Q.    In the year 2007, where were you working?

15     A.    I worked for Garret Gililland.

16                 THE COURT:  Could you pull the microphone a little

17     closer?

18                 THE WITNESS:  Is that better?

19                 THE COURT:  Yes.

20                 THE WITNESS:  Okay.

21     Q.    BY MS. HEMESATH:  What was your job?

22     A.    I was his secretary/personal assistant.

23     Q.    What kind of business was it?

24     A.    He sold homes or did loans, that type of thing.

25     Q.    And where was this?  Which part of California?

```
1   A.      Northern.  Chico, California.

2   Q.      And about when did you start working for him?

3   A.      I started working for Garret in December of 2006.

4   Q.      And how long did you work there?

5   A.      I worked there until August of 2007.

6   Q.      So about three quarters of a year?

7   A.      Uh-huh.

8   Q.      How did you find the job?

9   A.      My friend Danielle had worked for Garret, and they

10  needed another employee, so I was interviewed and hired.

11  Q.      What had you been doing before that?

12  A.      Cutting hair at Supercuts.

13  Q.      Was this job a step up for you in terms of pay?

14  A.      Yes, it was.

15  Q.      I think you said real estate before.  What was

16  Mr. Gililland's role in the real estate transactions?

17  A.      He would find buyers for Tony Symmes' homes and bring

18  them in, was mainly his part in that.  At first he would,

19  when I first started working for him, he would do some of the

20  loan applications.  After a while, they were all sent down to

21  LA, to Third Sky Mortgage, so he was just kind of the person

22  that would bring in the people to buy the homes.

23  Q.      And Mr. Gililland was the person?

24  A.      Yes.

25  Q.      Okay.  Were you involved in bringing people in to buy
```

```
 1   the homes?

 2   A.      No.

 3   Q.      Were you involved in the transactions that

 4   Mr. Gililland had worked out with Mr. Symmes?

 5   A.      No.

 6   Q.      Okay.  In terms of day-to-day, what was your actual

 7   job?

 8   A.      Day-to-day, I would answer his phones, send emails out

 9   that he asked me to, contact people that he asked me to, run

10   errands.  I paid all of his bills.  Just whatever tasks he

11   had that day for me.

12   Q.      Did you receive any type of commission on the

13   properties that were sold?

14   A.      No, I never did.

15   Q.      Were you paid a regular salary?

16   A.      Yes.  I was paid a regular salary every month.

17   Q.      Any kind of bonuses?

18   A.      No.

19   Q.      How did Mr. Gililland find the buyers for the houses?

20   A.      Um, I honestly, I don't know.  He had different

21   friends that at first would go out and bring friends in.  I

22   don't know truly how.  I mean, I would just hear about them

23   after the fact, so I don't know.  Friends of friends.

24   Just -- I honestly don't know exactly how.

25   Q.      Did Mr. Gililland work with other people to find
```

1    buyers for these houses?

2    A.      Yes, he did.

3    Q.      Was one of those people Leonard Williams?

4    A.      Yes, he was.

5    Q.      How do you know that?

6    A.      Because I had communicated with Mr. Williams via email

7    and a couple times on the phone regarding two homes that were

8    sold to Arthur Watson.

9    Q.      Did you ever meet Mr. Williams?

10   A.      No, I did not.

11   Q.      Do you know where Mr. Williams was working out of?

12   A.      Yes, I did.

13   Q.      Where was that?

14   A.      Diamond Hill Financial.

15   Q.      And in which part of California was that?

16   A.      I believe Sacramento, Folsom area.

17   Q.      All right.  When you worked for Mr. Gililland, were

18   you at all involved in the preparation of loan applications?

19   A.      I did not prepare the loan applications.  I would

20   gather the information or talk to the people that he needed

21   to get information from and get that sent off or sent to him

22   or whatever was needed to be done.  But no, I did not fill

23   out any loan applications.

24   Q.      You said you did not meet Mr. Williams in person?

25   A.      No, I did not.

1   Q.      Did you speak with him by phone?

2   A.      A couple times, yes.

3   Q.      All right.  And what was the purpose of speaking to

4   him by phone?

5   A.      Arthur Watson was purchasing houses, so I would

6   contact him to let him know what was needed by Third Sky

7   Mortgage or whoever was dealing with that loan as far as bank

8   statements or if they needed Mr. Watson's driver's license, I

9   would call to get that.  Just things that they needed, I

10  would contact him for.

11  Q.      When you say him, you would contact Mr. Watson or

12  Mr. Williams?

13  A.      I talked to Mr. Watson and Leonard Williams both, but

14  mainly Leonard Williams via email.

15  Q.      Did you talk to Mr. Williams on any other transactions

16  or just the ones involving --

17  A.      Just Arthur Watson.

18          THE COURT:  Just a minute.  There's a difference

19  between email and talking to him.

20          THE WITNESS:  It was mainly email.  I spoke with him

21  maybe a couple times on the phone, but most of our contact

22  was through email.

23  Q.      BY MS. HEMESATH:  That's through Mr. Williams?

24  A.      Yes.

25  Q.      Would you ever email with Mr. Watson?

1    A.      No, I did not.  I spoke with him maybe once or twice

2    on the phone.

3    Q.      Did you ever meet him in person?

4    A.      No, I did not.

5    Q.      Did you ever speak with Mr. Williams about an

6    employment verification?

7    A.      Yes, I did.

8    Q.      What's an employment verification?

9    A.      An employment verification is when someone is buying a

10   home, they want to verify their employment to know how much

11   income they're making, how long they've worked there, that

12   type of thing.

13   Q.      What was the conversation you had with Mr. Williams

14   about employment verification?

15   A.      He was supposed to verify that Mr. Watson worked for

16   UPS.

17   Q.      Did you have an understanding of whether Mr. Watson

18   actually worked for UPS?

19   A.      I believed that he did not work for UPS, no.  That was

20   my impression.

21   Q.      Okay.  What were your conversations with Mr. Watson?

22   A.      I spoke with Mr. Watson once because I needed his

23   driver's license faxed, and I believe I spoke with him again

24   because they needed him to get bank statements.  That was the

25   only two times that I spoke with him.

1    Q.      Okay.  Did you have an understanding of whether

2    Mr. Watson intended to live in these houses?

3    A.      I don't know if he intended to.  Every time I spoke

4    with him, he just seemed pretty irritated and like he didn't

5    know what was going on.

6            MR. WISEMAN:  Objection.  Nonresponsive.

7            THE COURT:  Well, I thought that was probably the most

8    responsive.  I'll overrule the objection.

9    Q.      BY MS. HEMESATH:  How enthusiastic did Mr. Watson seem

10   about these transactions?

11   A.      Not enthusiastic at all.

12   Q.      Did you have an understanding of why Mr. Williams

13   would proceed with these transactions if Mr. Watson was not

14   enthusiastic about buying the houses?

15   A.      I would assume because if --

16           THE COURT:  No.  These questions that ask her whether

17   she had an understanding are difficult to deal with if

18   Mr. Wiseman wants to make an objection because you don't know

19   how she acquired that understanding.  So I think you have to

20   approach it a different way.

21           MS. HEMESATH:  Okay.

22   Q.      BY MS. HEMESATH:  Did you know if Mr. Williams was

23   profiting off of these transactions?

24   A.      Yes, I believe that he was, yeah.

25   Q.      Okay.  Did you know if Mr. Gililland was profiting off

1    of these transactions?

2    A.    Yes, he was.

3    Q.    Okay.  And if they couldn't find a buyer for these

4    houses, would they make money off of this transaction?

5    A.    No, they will not.

6    Q.    Did you have an email account when you worked for

7    Mr. Gililland?

8    A.    Yes, I did.

9    Q.    What was it?

10   A.    I believe it was Jessica Sawyer something at gmail.  I

11   honestly don't know if there was numbers behind it or not.  I

12   haven't used that email in seven years.  But yes, it was a

13   gmail account.

14   Q.    It was a gmail account, but this was your work-related

15   email?

16   A.    Yes.  Garret set it up for me at his home, so he had

17   the password and everything to that.

18   Q.    Besides you and Mr. Gililland, who else had access to

19   this email account?

20   A.    No one.  Just us.

21   Q.    Okay.  I'm going to have you look in -- sorry.  The

22   binder is behind you, and I think it's open on the shelf

23   behind you.

24   A.    Okay.

25   Q.    And we're going to look for Tab 210.  Do you recognize

1    this?

2    A.      Yes, I do.

3    Q.      Sorry.  Let me have you flip to 210-A.  It should be

4    right behind it.  Do you recognize it?

5    A.      Yes, I do.

6    Q.      How do you recognize it?

7    A.      It was an email that either I or Garret wrote that I

8    have seen before.

9    Q.      Do you recognize the email address?

10   A.      Yes, I do.

11   Q.      Okay.  And is that the email address that

12   Mr. Gililland set up for you?

13   A.      Yes, it is.

14   Q.      Okay.  Did you --

15   A.      Well, this one's actually SBCglobal.  So I had this

16   one also, but I did have the gmail account as well.  So yeah,

17   I do recognize this one.  Sorry.

18   Q.      Did you use the SBCglobal email address for your work

19   with Mr. Gililland as well?

20   A.      Once we moved to the house, he switched it over to the

21   gmail account, and I never used the SBCglobal.  This was

22   dated in May.  We were still working at his office, and those

23   were the accounts we used there.  So at one time, yes, I did.

24          MS. HEMESATH:  Move to admit Government's

25   Exhibit 210-A.

```
 1              THE COURT:  Exhibit 210-A is received in evidence.
 2                          (GOVERNMENT'S EXHIBIT 210-A, Jessica
 3                          Sawyer email re Arthur
 4                          Watson, ADMITTED INTO EVIDENCE.)
 5   Q.     BY MS. HEMESATH:  Who is being emailed here?
 6   A.     Leonard Williams.
 7   Q.     Do you recognize the email address in the to line?
 8   A.     Yes.
 9   Q.     Whose email address is that?
10   A.     Leonard Williams'.
11   Q.     And what is he being told in this email?
12   A.     He is being told when the lender calls for
13   Mr. Watson's employment verification that he is to say that
14   he's a marketing director, that he's worked at Diamond Hill
15   from 2/99 to present and that he makes $9,400 a month.
16   Q.     Based on this email, did you expect Mr. Williams
17   would, in fact, verify that Mr. Watson worked at Diamond
18   Hill?
19   A.     Yes.
20   Q.     What was your understanding as to whether Mr. Watson
21   actually worked at Diamond Hill?
22   A.     No, I didn't believe he did, no.
23   Q.     What was your understanding of whether Mr. Watson
24   actually made 9,400 a month?
25   A.     I didn't believe that that was true.
```

1   Q.      I'm going to have you look at the binder that's

2   towards your elbow there.  You can push that first binder

3   away.  Thank you.  I'm going to have you look at 307, please.

4           MR. WISEMAN:  307?

5           MS. HEMESATH:  Yes.

6   Q.      BY MS. HEMESATH:  Do you recognize it?

7   A.      Uh-huh.

8   Q.      How do you recognize it?

9   A.      This is -- Garret would type these types of things up

10  every day letting me know what I needed to find out for him

11  or whatever, and then I would respond back to him by the end

12  of the day.

13          MS. HEMESATH:  Move to admit Government's Exhibit 307.

14          THE COURT:  Exhibit 307 is received in evidence.

15                          (GOVERNMENT'S EXHIBIT 307, Jessica

16                          Sawyer email re: $8,000, ADMITTED INTO

17                          EVIDENCE.)

18  Q.      BY MS. HEMESATH:  Explain to us again how you and

19  Mr. Gililland would communicate on this type of a list.

20  A.      Usually he would come in in the morning, type it up,

21  send it out to whoever, me, anyone else that he wanted to

22  read it, the people down at Third Sky usually.  And then by

23  the end of the day after I had read through it and did what

24  he told me, I would go in and answer, you know, let him know

25  if things were closing, what docs needed, if docs got sent,

1    that type of thing.

2    Q.      So portions of what we're looking at here on the

3    screen are what he wrote?

4    A.      Some of these probably, yeah, because down here he had

5    wrote:  "Get Jessica, Jessica to verify."  These, yeah, these

6    are all -- I might have typed some of the answers in, but I

7    don't honestly remember.  Usually these were typed by him.

8    Q.      Okay.  If we go up to the section here, just the one

9    with the Watson, just those two lines.  Okay.  On the line

10   that begins Watson, would you please read that to us as you

11   understand it.

12   A.      Watson:  They need a check for 22,000 and 8,000 in the

13   Bank of America account as soon as possible.  Leonard said

14   that he was faxing a copy of the check to Sandra.

15           So they needed money put into Arthur Watson's account

16   to show that he had enough in there for the loan.

17   Q.      And the Leonard here is Mr. Williams?  Where it says

18   Leonard?

19   A.      Oh, yes.  Yes, yes.

20   Q.      That's Leonard Williams?

21   A.      Yes.

22   Q.      What was your understanding of whether Mr. Watson was

23   going to be keeping this $8,000 or giving it back?

24   A.      That I don't know.  I assume he would have given it

25   back after the loan, but I don't know that.

1          MR. WISEMAN:  In terms of her assumption.

2          THE COURT:  Overruled.

3    Q.    BY MS. HEMESATH:  When you -- tell us again when you

4    stopped working for Mr. Gililland.

5    A.    It was either the end of July, beginning of August.

6    Q.    Why did you leave?

7    A.    I just realized that it was not a good environment and

8    things weren't right, and I wanted to get out of there.

9          MS. HEMESATH:  Thank you.  Nothing further.

10         THE COURT:  Mr. Wiseman, you may cross-examine.

11                         CROSS-EXAMINATION

12   BY MR. WISEMAN:

13   Q.    Good morning, Ms. Sawyer.  And so you worked for

14   Mr. Gililland for essentially nine months during the time

15   that you testified; right?

16   A.    Yes.

17   Q.    And prior to working for him, you were --

18   A.    I was a hairdresser.

19   Q.    You were a hairdresser.  Okay.  And you also

20   testified, and it's correct, that it was Mr. Gililland that

21   was doing all the loans for the buyers of these properties;

22   correct?

23   A.    The loans were sent to Third Sky Mortgage.

24   Q.    The loans were sent to Third Sky?

25   A.    That's who did the loans, yes.

1    Q.      And Mr. Gililland was the one that used Third Sky

2    Mortgage to process the loans?

3    A.      For all the buyers that came?

4    Q.      Yes.

5    A.      Arthur Watson's loans were being processed there as

6    well, yes.

7    Q.      So your answer is that all of the loans that

8    Mr. Gililland did were done through the Sky Mortgage?

9    A.      Yes.

10   Q.      Okay.  Did you personally have any involvement with

11   the folks at the First Sky Mortgage (sic)?

12   A.      Yes, I talked to them.  They would call me and let me

13   know what information they needed and called to talk to

14   Garret on a daily basis.

15   Q.      And when you spoke to these people at First Sky

16   Mortgage (sic), were they instructing you as to the kind of

17   information they needed to process a particular loan?

18   A.      Yes.

19   Q.      And would they tell you, would they call you and let

20   you know if there was a particular problem with a loan file?

21   A.      Yes.

22   Q.      And would they tell you that they needed, for example,

23   additional information; correct?

24   A.      Correct.

25   Q.      And they would tell you if, for example, the numbers

1    on the application loan were not adequate; right?

2    A.      Correct.

3    Q.      Right.  So you've had occasion where people from the

4    mortgage company would call you up and inform you that hey,

5    on this particular loan application, I need better numbers

6    for the borrower; right?

7    A.      Correct.

8    Q.      Right.  And then you would tell Mr. Gililland that

9    this particular loan application needed to be, for lack of a

10   better description, beefed up; right?

11   A.      Well, normally they would call and talk to Garret and

12   then Garret would pass on information to me of what I needed

13   to call and get from these people.

14   Q.      And you knew when Mr. Gililland did that that

15   Mr. Gililland was asking you to get information for these

16   loan applications that was not accurate; right?

17   A.      Yes, I did.

18   Q.      Right.  So with respect to the email to Mr. Williams,

19   you did that because Garret Gililland told you that we needed

20   better information for Mr. Watson; isn't that right?

21   A.      Yes.  But I'm not sure that I even wrote that email,

22   because Garret would get into my email box and write emails

23   to people all the time.

24   Q.      So you have no idea whether or not you wrote that

25   email?

1    A.      I could have or he could have.  It's been seven years.

2    I honestly don't remember if I did or he did.  But I do

3    recognize the email, yes.

4    Q.      You do recognize the email?

5    A.      Yes.

6    Q.      But you have no idea whether or not you wrote the

7    email.

8    A.      Correct.

9    Q.      Okay.  And you said that Mr. Gililland had access to

10   your email.  Was that his habit to access your email account?

11   A.      Oh, yes.  He was in my email every day.  He would send

12   these reports out to people every day from me.

13   Q.      Let me ask you a question.  Let me go back for a

14   moment.  Ms. Sawyer, prior to coming here to testify, within

15   let's say the last five days, have you reviewed any documents

16   to prepare yourself for your testimony?

17   A.      Yes, I have.

18   Q.      Okay.  And did you speak to anybody, say in the last

19   five days, to prepare yourself for your testimony?

20   A.      Speak to?

21   Q.      Anybody to prepare yourself.

22   A.      I spoke to my attorney.

23   Q.      Okay.  You spoke to your attorney.  So you have an

24   attorney; correct?

25   A.      Yes, I do.

1    Q.      Okay.  And you're testifying here with the

2    understanding that you have been given immunity from

3    prosecution; is that right?

4    A.      No.  I have immunity that no matter what I say -- what

5    I say cannot be used against me to prosecute me.

6    Q.      Okay.  So your understanding is that you have an

7    agreement where anything you say this morning cannot be used

8    against you; correct?

9    A.      Correct.

10   Q.      Okay.  Now, let's go back to Mr. Gililland.  So it's

11   your understanding that it was Mr. Gililland that was

12   gathering the information that was needed to process these

13   loans; correct?

14   A.      Yes.

15   Q.      Right.  And he would instruct you when a particular

16   loan file needed to have additional or altered information;

17   correct?

18   A.      Yes.

19   Q.      And the email that you were shown which was I believe

20   Government's Exhibit 10-A is an example of you doing what

21   Mr. Gililland was telling you to do; correct?

22   A.      Like I said, it could have been me that did that, yes.

23   Q.      Okay.  And that was routine in terms of the way that

24   Mr. Gililland ran his business insofar as doing whatever it

25   took to get a loan approved; correct?

```
 1   A.      Yes.

 2   Q.      Okay.  And you have no -- did you ever meet in person

 3   Mr. Williams?

 4   A.      No, I did not.

 5   Q.      And you don't know whether or not it was Mr. Williams

 6   who responded to that email; correct?  You don't have any

 7   personal knowledge of that; correct?

 8   A.      No, but I spoke with him on the phone.

 9   Q.      But you have no personal knowledge that it was he,

10   Mr. Williams, who responded to the email that's in question

11   here, 210-A; correct or not?

12   A.      I guess no, I can't say that he is.  I don't know.

13   Q.      So you have no idea whether or not someone at Mr. --

14   that somebody was using Mr. Williams' own email account to

15   respond just like Mr. Gililland was doing to yours; correct?

16   You have no knowledge of that.  It could have happened;

17   correct?

18   A.      Well, I mean yes, it could have happened.

19   Q.      Okay.  Thank you.

20           MR. WISEMAN:  Can we have a moment, please.

21           THE COURT:  Are you through?

22           MR. WISEMAN:  No.  May I have a moment?

23           THE COURT:  Okay.  Yes, just be careful how you use

24   that.  It sometimes spills.

25           MR. WISEMAN:  No further questions, your Honor.
```

```
 1              THE COURT:  Oh, he didn't have any more questions.

 2              MR. WISEMAN:  I had to make sure.

 3              THE COURT:  All right.  Any redirect?

 4              MS. HEMESATH:  One.

 5                           REDIRECT EXAMINATION

 6   BY MS. HEMESATH:

 7   Q.     Were your phone conversations with Mr. Williams

 8   consistent with him having read these emails?

 9   A.     Yes, they were.

10              MS. HEMESATH:  Thank you.

11              THE COURT:  Any more questions?

12              MR. WISEMAN:  No, your Honor.

13              MS. HEMESATH:  No.

14              THE COURT:  Thank you, Ms. Sawyer.  You're excused.

15              Call your next witness.

16              MS. HEMESATH:  Your Honor, may we take our morning

17   recess?

18              THE COURT:  We could.  I was just thinking about doing

19   that.

20              MS. HEMESATH:  Thank you.

21              THE COURT:  We'll take a recess until 10:30, ladies

22   and gentlemen.  Remember the admonition.

23              (Recess taken.)

24              (Jury not present.)

25              MR. WISEMAN:  Your Honor, if I may, there's a matter
```

1    that I think it would be prudent to take up, or at least I'm

2    requesting that the Court take it up now.  My understanding

3    is the next witness that the government wants to present is

4    Terrance Murrell.  And his testimony is subject to one of our

5    motion in limines.

6              THE COURT:  Who is Mr. Murrell?

7              MS. HEMESATH:  Mr. Murrell is listed on the Diamond

8    Hill corporate documents during the charged period as the CFO

9    of Diamond Hill Financial.  He's also a longtime friend of

10   Mr. Williams.  He's going to testify that at one point

11   Mr. Williams approached him about doing a deal on a home with

12   a double escrow also during the period.  And the third piece

13   of the testimony is that Mr. Murrell was asked to sign bank

14   documents in his capacity as CFO and, in fact, what he signed

15   turned out to be a $35,000 line of credit that he was not

16   aware he was signing.

17             THE COURT:  Does any of the testimony relate to the

18   specific pieces of property in the indictment?

19             MS. HEMESATH:  Yes.  He will identify a photograph --

20   I believe he will identify a photograph of a house that is

21   one of the pieces of property in the indictment that

22   Mr. Williams proposed that he buy.

23             THE COURT:  All right.  So what's your objection?

24             MR. WISEMAN:  Well, my objection is that it is not

25   direct evidence of any conspiracy that Mr. Williams may have

1    had with Josh Clymer.  Number one, it's tangential.  Number

2    two, I think it's 404(b).  If I'm not mistaken, I think the

3    government indicated it would be 404(b) evidence.

4         MS. HEMESATH:  Just the third piece, that we did

5    concede in our briefing that the $35,000 line of credit is

6    404(b) evidence.

7         THE COURT:  I don't know what you understand by

8    404(b), but 404(b) relates to evidence of a crime, wrong, or

9    other act.

10        MR. WISEMAN:  Right.

11        THE COURT:  For purposes of proving motive,

12   opportunity, intent, preparation, plan, knowledge, identity,

13   or absence of mistake or lack of accident.  And when you have

14   a charge like this one, of a conspiracy over a period of

15   time, and you're offering evidence of some act or transaction

16   that you claim to be part of the conspiracy, then it's not

17   404(b).

18        Are you offering this testimony of the double escrows

19   and the other testimony from Mr. Murrell as part of the

20   conspiracy or not?

21        MS. HEMESATH:  The first two pieces, the fact that he

22   was not, in fact, the CFO of Diamond Hill Financial and the

23   fact that he was shown a house, those are direct evidence of

24   the conspiracy.

25        THE COURT:  So what is it that you say or think is

1    404(b) evidence about his testimony?

2              MS. HEMESATH:  I think the $35,000 line of credit.

3              THE COURT:  Tell me what the testimony is there then.

4              MS. HEMESATH:  The testimony is that when he was

5    brought to the bank, he was told by Mr. Williams that he was

6    signing a signature exemplar.  He signed.  And then a few

7    days later, he had regrets about becoming the CFO of Diamond

8    Hill Financial.  He communicated these regrets to

9    Mr. Williams and asked him to take him off of the company

10   papers.

11             THE COURT:  Okay.  All of that is --

12             MS. HEMESATH:  That's all direct evidence.

13             THE COURT:  That's still part of the conspiracy.

14             MS. HEMESATH:  Yes, your Honor.

15             THE COURT:  So what is it you think is 404(b)?

16             MS. HEMESATH:  Some period of time later, he received

17   a call from the bank inquiring about the $35,000 line of

18   credit.  And at that moment he came to learn that what he

19   had, in fact, signed was a line of credit with U.S. Bank that

20   he was now personally responsible for as CFO of Diamond Hill.

21             THE COURT:  And how is that relevant?

22             MS. HEMESATH:  That is relevant to show plan.

23             THE COURT:  What plan?

24             MS. HEMESATH:  Mr. Williams' plan to use his friends

25   with good credit to give the profits to his business, Diamond

KELLY O'HALLORAN, OFFICIAL COURT REPORTER, USDC -- (916) 448-2712

1    Hill Financial.

2            THE COURT:  I think we can leave that out and just

3    have the rest of it.  If that's all this shows, it's

4    confusing.  It's probably as much 403 as anything else

5    because it's going to confuse things if the only thing it

6    shows, in your mind, is that the defendant was using his

7    friends to his advantage.

8            MS. HEMESATH:  The other argument that we made in our

9    brief is that it shows motivation because Diamond Hill

10   Financial now had this $35,000 debt and that it was necessary

11   to keep bringing in profits on these houses to make the

12   company solvent again.

13           THE COURT:  No, I don't think that's enough.  It

14   diverts the jury's attention from the issues in this case.

15   So I'll let you use everything else that you want to ask

16   Mr. Murrell except the $35,000 line of credit.

17           MR. WISEMAN:  So as I understand from the Court's

18   ruling, the government intends to ask Mr. Murrell about an

19   alleged offer that Mr. Williams made for a double escrow on

20   one particular house, and the second point is that they're

21   friends?

22           THE COURT:  I don't know what the other points are.

23   You can't expect me to rule on questions that haven't been

24   asked yet.

25           MR. WISEMAN:  I understand.  I understand.  I'm just

```
 1      trying to get a clarification of the Court's ruling.
 2           THE COURT:  The only thing I've said is that I will
 3      exclude testimony about the $35,000 line of credit.
 4      Everything else I'm going to wait until I hear the question,
 5      and then I'll rule on any objections that are made to the
 6      questions.
 7           MR. WISEMAN:  All right.  Very well.
 8           THE COURT:  Let's bring the jury in.
 9           (Jury present.)
10           THE COURT:  Everyone is present.
11           Who is your next witness?
12           MS. HEMESATH:  The United States calls Terrance
13      Murrell.
14           THE CLERK:  Sir, step forward.  Step forward.  Stand
15      here in front of the court reporter.  Sir, stand here in
16      front of the court reporter and face me, please.  Raise your
17      right hand.
18                          TERRANCE MURRELL,
19      a witness called by the Government, having been first duly
20      sworn by the Clerk to tell the truth, the whole truth, and
21      nothing but the truth, testified as follows:
22           THE WITNESS:  I do.
23           THE CLERK:  Thank you.  You may be seated.  Please
24      state your full name and spell your last name for the record.
25           THE WITNESS:  Terrance Raphael Murrell, M-U-R-R-E-L-L.
```

```
 1              THE CLERK:  Can you spell your middle name, please.

 2              THE WITNESS:  R-A-P-H-E-A-L.  I'm sorry.  A-E-L.

 3                          DIRECT EXAMINATION

 4   BY MS. HEMESATH:

 5   Q.      Good morning, Mr. Murrell.

 6   A.      Good morning.

 7   Q.      Mr. Murrell, how old are you?

 8   A.      62, 63, somewhere around there.

 9   Q.      Are you still working, Mr. Murrell?

10   A.      No, I'm retired.

11   Q.      Before you retired, what was your career?

12   A.      I worked -- I was in the Air Force for eight years,

13   and then I joined civil service as an air reserve technician.

14   Q.      Straight out of school, did you join the Air Force?

15   A.      Yes.  Got out of high school, got drafted into the

16   Army, and before I checked into the Army, I went down and

17   joined the Air Force.

18   Q.      Did you work anywhere else during your career?

19   A.      When I was in high school, I worked the A and P.

20   That's about it.

21   Q.      Any kind of accounting background?

22   A.      No.

23   Q.      Any kind of real estate background?

24   A.      No.

25   Q.      Do you know Leonard Williams?
```

1    A.        Yes, I do.

2    Q.        Do you see him in the courtroom here today?

3    A.        Yes, I do.

4    Q.        Please point him out and describe an article of

5    clothing he's wearing.

6    A.        Sitting right over there, black and white tie, white

7    shirt, brown suit, glasses.

8              THE COURT:  The record will reflect he's identified

9    the defendant.

10   Q.        BY MS. HEMESATH:  How do you know Mr. Williams?

11   A.        Through the military.  We met somewhere around the

12   first, the early part of I'd say the '80s, the early '80s at

13   Mather Air Force Base.

14   Q.        What were you doing at Mather?

15   A.        I was an aircraft mechanic.

16   Q.        And what was Mr. Williams' job?

17   A.        He was an Air Force -- he was an aircraft mechanic.

18   He also -- he was working in the docks at the time.

19   Q.        In the --

20   A.        In the dock, in the hangar.

21   Q.        Did there come a time when he actually came to work

22   for you?

23   A.        After we got to Beale Air Force Base, which was

24   sometime later, yes, he was on my crew.

25   Q.        What did he do for you?

1    A.      Assistant.  He was my assistant on the aircraft.  One

2    of the assistants on my aircraft.

3    Q.      Okay.  Did you have him do any IT work?

4    A.      Not me.  I think the squadron gave him a job to do

5    some IT work.

6    Q.      Okay.  Was your experience that he was pretty good

7    with computers?

8    A.      Yeah.  Yeah.  I mean when I got my first computer, he

9    helped me out with it.

10   Q.      Were you friends?

11   A.      Yeah, very good friends.

12   Q.      For approximately how long was your friendship?

13   A.      We were like brothers from Mather, McClellan, Beale,

14   maybe until 2008 when things went a little sour.

15   Q.      Do you know Arthur Watson?

16   A.      Yes, I do.

17   Q.      Is he also a friend of yours?

18   A.      Yes.

19   Q.      Did you also know him to be a friend of Mr. Williams?

20   A.      Yes.  We were all friends in the military at Mather

21   and McClellan.

22   Q.      Did there come a time when Mr. Williams left the Air

23   Force and went into real estate?

24   A.      Yes.

25   Q.      What was the name of his company?

1    A.      I think it was -- at that time I think it was Diamond

2    Hill Financial.  I knew later on it was Diamond Hill

3    Financial.  I'm not sure what it was when he left the

4    military, but that was the name of the company that I knew

5    of.

6    Q.      Did he discuss his real estate business with you?

7    A.      We talked.  We didn't get into depth with the

8    business.  We talked.  He was doing pretty good at the time,

9    and we were all happy for him, yeah.

10   Q.      How do you know he was doing pretty good?

11   A.      He told us.  You know, he told us he was president and

12   CEO.  That's what he was.

13   Q.      Did he tell you what kind of real estate business he

14   was in?

15   A.      I knew he was doing loans.  He was helping people

16   refinance their homes.  And that he was selling houses, I

17   guess.  Trying to get people to buy houses.

18   Q.      Did you ever have a conversation with Mr. Williams

19   about double escrows?

20   A.      Yeah.  Yeah.

21   Q.      What was that conversation?

22   A.      Well, he was explaining to me that he was doing double

23   escrows.  I didn't fully understand it, but then he always

24   talks a little bit above my head anyway, but I still

25   listened.  He was talking about doing double escrows where

1    somehow they purchase a house and resell it at closing.  And

2    I didn't fully understand.  I just got the gist of the

3    conversation.

4    Q.     Did there come a time when Mr. Williams approached you

5    about doing a real estate deal with him?

6    A.     He came to us.  He wanted us to refinance our home,

7    and he said he could beat the bank rate.  So my wife was

8    totally against it at first and then she said well, just let

9    me see what you have.  And I think he sent us some numbers or

10   something like that.

11   Q.     And did you refinance with him?

12   A.     No.

13   Q.     Why not?

14          MR. WISEMAN:  Relevance.  Objection.  Relevance, your

15   Honor.

16          THE COURT:  What's the relevance?

17          MS. HEMESATH:  The relevance goes to the next

18   transaction.

19          THE COURT:  All right.  Overruled.

20   Q.     BY MS. HEMESATH:  Okay.  Did Mr. Williams approach you

21   about buying a house from him?

22          THE COURT:  Overruled means you can answer the

23   question.

24          MS. HEMESATH:  Sorry.

25   Q.     BY MS. HEMESATH:  Why didn't you refinance with

1    Mr. Williams?

2    A.     My wife wasn't feeling good about doing business with

3    Leonard.  We've always done business with our credit union,

4    and it was always simple and safe, and we thought we got

5    better rates and a better deal at the credit union, so that's

6    what we went to.

7    Q.     Let me back up a minute.  You were refinancing, so you

8    owned a house?

9    A.     Yeah, we owned two houses, yes.

10   Q.     You owned two houses?

11   A.     Yes.

12   Q.     How did you buy those houses?

13   A.     One, the first one was with the VA, through my VA loan

14   and through the credit union, and the second one was through

15   the credit union also.

16   Q.     Okay.  Did there come a time when Mr. Williams

17   approached you about buying a house through him?

18   A.     Yeah.  He, you know, he came to us and told us that,

19   you know, we could get some investment property, and he gave

20   us a list of two houses to look at.

21   Q.     So you were not looking to move?

22   A.     No.  No.  We're pretty set where we are.

23   Q.     So the idea is that you would buy the house as an

24   investment and then do what with it?

25   A.     I don't know, rent it out and build some equity in it

1   and sell it later on.

2   Q.      Did you have a conversation with Mr. Williams about

3   the building equity?

4   A.      Yeah.  I don't fully remember the conversation, but I

5   know that if you buy the house, the way housing prices were

6   going, the property will just keep appreciating, and then you

7   can turn around and sell it and make some money on it.

8   Q.      Was a double escrow a part of the purchase that he

9   proposed to you?

10  A.      Yes.  On the two houses, which was, one was in Oak

11  Park and the other one was up off of Florin, it was supposed

12  to be a double escrow, which again, I didn't fully understand

13  the whole thing.  All I know was we'd get some money back at

14  closing and we'd own the house.

15  Q.      How much of your own money did he tell you you were

16  going to be putting into these houses?

17  A.      I didn't think we had to put any money down.

18  Q.      So he proposed to you that you buy an investment

19  property with a hundred percent financing?

20  A.      Yeah.  It had something to do with investors being

21  involved.  And again, I didn't fully understand.

22  Q.      Who did he tell you you would be buying the house

23  from?

24  A.      I don't know.  I just know that he was handling the

25  deal.

```
1   Q.      Go ahead and look in -- I'm sorry.  I gave you the

2   wrong binder.  The binder that's to your elbow right behind

3   you.  The very last exhibit in there.

4           MS. HEMESATH:  May I approach, your Honor?

5           THE COURT:  Yes.

6           THE WITNESS:  The last page?

7   Q.      BY MS. HEMESATH:  Is it Tab 61, the very back?

8   A.      Yeah.  Yes.

9   Q.      Do you recognize that?

10  A.      Yeah.  This is one of the houses that we looked at, I

11  think it was.  I think we went all the way up Florin Road and

12  made a right and went somewhere back there.

13  Q.      And this is in Sacramento?

14  A.      Yeah.

15          MS. HEMESATH:  Move to admit Government's Exhibit 61.

16          THE COURT:  Exhibit 61 is received in evidence.

17                      (GOVERNMENT'S EXHIBIT 61, Photo,

18                      ADMITTED INTO EVIDENCE.)

19  Q.      BY MS. HEMESATH:  How much did Mr. Williams tell you

20  this house was worth?

21  A.      The two houses we looked at was somewhere between I

22  think 4 and $500,000.

23  Q.      And this was about which year?

24  A.      I think it had to have been before 2008, I guess.  I'm

25  retired.  I don't -- I can't remember years and dates very
```

KELLY O'HALLORAN, OFFICIAL COURT REPORTER, USDC -- (916) 448-2712

1  much.

2  Q.      What was your impression when you went to see this

3  house?

4  A.      Well, not so much my impression.  My wife was like no

5  way, no way in hell that we gonna put money into something

6  like this.

7  Q.      What about the second house that you saw?

8  A.      No.

9  Q.      Did you go visit that house?

10  A.      Yes, we did.  And the second one was in Oak Park, and

11  it had like, I don't know, 30, 40 coats of paint on it, and

12  no.

13  Q.      What did Mr. Williams tell you about getting the cash

14  back that you mentioned out of these transactions?

15  A.      All I can remember is that at closing, we'd get some

16  cash back.  You'd get the property.  He'll help us put

17  tenants in it, and we'll get some cash back.

18  Q.      Had you heard of buying a house without any of your

19  own money and getting cash back after the purchase before

20  this?  Had you heard of that concept before this?

21  A.      No, not getting cash back.

22  Q.      And what did you tell Mr. Williams as to whether you

23  would do these deals with him or not?

24  A.      I told him no way.  I told him that Sharon, there's no

25  way Sharon will go along with this.  Sharon don't agree with

1    it and she says no.

2    Q.      Did there come a time when you and Mr. Williams

3    discussed your working at Diamond Hill Financial?

4    A.      Yes.

5    Q.      Were you looking for a job at the time?

6    A.      Yeah.  After I retired, I was looking for a job.

7    Because my wife and I, we wanted to build a retirement home

8    actually in Mexico, and we had a 401(k), and I guess we

9    didn't do the full research on it.  We found that if you take

10   all the money out, you'd have to pay a lot of taxes.  So we

11   decided to get a loan.  And in order to qualify for the loan,

12   we needed to have enough income to qualify for the loan from

13   the bank.

14   Q.      So the primary purpose of you looking for a job was to

15   boost your qualifications for the loan?

16   A.      Yes.

17   Q.      And did you have a conversation with Mr. Williams

18   about the reason you were looking for the job?

19   A.      Yeah.  You know, normally we, all the guys, we'd get

20   together and do lunch a couple times a month, and, you know,

21   I'd say hey, you know, we need to boost our income, need to

22   get a W-2 so we can show income in order to get the loan from

23   the bank, and I need to get a job.  I tried getting a job

24   back up at Beale, I tried getting a job down in Southern

25   California, a number of bases down there.  But at that time

1   everything started slowing down.  A lot of people was out of

2   employment so a lot of bases were cutting back.  So I was not

3   able to get anything from the military.

4   Q.    So your intention when you wanted to get a job was you

5   actually wanted to go to work somewhere?

6   A.    Yes.

7   Q.    Did you discuss needing a W-2 with Mr. Williams?

8   A.    I don't know if we discussed it so much as mention it

9   to him, you know, mention that that's why I'm looking for a

10  job.

11  Q.    And what did he say?

12  A.    At first he didn't say anything, and then he said, you

13  know, a couple times, I don't know if it was over lunch or us

14  just talking, he said well, you know, if you come work for

15  me, I'll give you a W-2.

16  Q.    And what was your reaction?

17  A.    I says what will I have to do?  He says well, you

18  could be my CFO.  He says I can put anything on the W-2 you

19  want.

20  Q.    Did you discuss a salary with Mr. Williams?

21  A.    No.

22  Q.    Did you discuss working hours?

23  A.    No.  I told him I would need -- I need about 20,000 on

24  a W-2 to qualify for the loan, but I didn't discuss what my

25  salary would be or anything.

1    Q.      What did he say when you told him you needed 20,000 on

2    the W-2?

3    A.      He says oh, that's nothing.

4    Q.      Did you have an impression of whether you would

5    actually go to work for him?

6    A.      Yeah.

7    Q.      And he would actually pay you 20,000?

8    A.      Yeah, that was my understanding, yes.

9    Q.      Where was his office?

10   A.      I found out that he had an office on Watt Avenue.  I

11   don't remember the address, but it was on Watt Avenue.

12   Q.      When he proposed that you be that CFO, did that give

13   you pause because you said you didn't have an accounting

14   background?

15   A.      Well, he said, the way he put it is he was gonna give

16   me a job.  I would, you know, be paying the bills for the

17   company, and, you know -- but then he says I'll put a title

18   on it and you'll be CFO.  You'll be my CFO, you know.  I said

19   wow.  I don't know anything about being a CFO.

20   Q.      But you agreed?

21   A.      Yeah, I did.

22           MS. HEMESATH:  May I approach to switch binders, your

23   Honor?

24           THE COURT:  Yes.

25   Q.      BY MS. HEMESATH:  I'm going to have you look at tab 6,

1    please.  It should be near the top.  Do you recognize it?

2    A.      Yes.

3    Q.      How do you recognize it?

4    A.      This is what Leonard presented to me the morning that

5    I went down to his office when he told me to come down and

6    start the job, I guess.

7              MS. HEMESATH:  Move to admit Government's Exhibit 6.

8              THE COURT:  Exhibit 6 is received in evidence.

9                            (GOVERNMENT'S EXHIBIT 6, DHF Chief

10                            Financial Officer appointment

11                            documents, ADMITTED INTO EVIDENCE.)

12   Q.      BY MS. HEMESATH:  Do you recognize your signature on

13   this?

14   A.      Yes, I do.

15   Q.      Do you recognize Mr. Williams' signature on this?

16   A.      Yes.

17   Q.      Did you both sign this document together?

18   A.      Yes, we did.

19   Q.      Where were you when you signed this?

20   A.      I think we were at his office on Watt Avenue.

21   Q.      Okay.  Now, up at the top it says Diamond Hill

22   Financial, Parkshore Drive in Folsom, California.

23   A.      Uh-huh.

24   Q.      Is that different from the Watt Avenue office?

25   A.      Yes, it is.

1    Q.      So his physical office was on Watt Avenue?

2    A.      That I knew of, yes.

3    Q.      Okay.  And so this is as of the 26th of March 2007,

4    you became the chief financial officer of Diamond Hill

5    Financial?

6    A.      Yeah, I guess.  Never got a call.  Yeah, I signed this

7    on this day, yeah.

8    Q.      Where is the next place that you went with

9    Mr. Williams after you signed this?

10   A.      We went over to the bank.

11   Q.      And I'm going to have you look at what's tabbed

12   Exhibit 8-A.

13   A.      Okay.

14   Q.      Do you recognize this?

15   A.      Yes.

16   Q.      And how do you recognize it?

17   A.      This is what I got from the bank later on.

18           MS. HEMESATH:  Move to admit 8-A.

19           THE COURT:  Exhibit 8 A is received in evidence.

20                         (GOVERNMENT'S EXHIBIT 8-A, Signature

21                          page only from DHF Cash Flow Manager

22                          Line of Credit, ADMITTED INTO

23                          EVIDENCE.)

24   Q.      BY MS. HEMESATH:  Do you recognize your signature on

25   this page?

1      A.      Yes, it looks like my signature, yes.

2      Q.      It says right above your signature:  Percent of

3      ownership, 82 percent.  Were you the 82 percent owner of

4      Diamond Hill Financial?

5      A.      No.

6      Q.      Did you become the 82 percent owner of Diamond Hill

7      Financial?

8      A.      No.

9      Q.      Did you ever own any part of Diamond Hill Financial?

10     A.      No.

11     Q.      What did Mr. Williams tell you about assigning you

12     82 percent ownership of Diamond Hill Financial?

13     A.      I was told that I was going to the bank to sign, to

14     give a signature.  I was never told that I would be any

15     partner or anything with Diamond Hill.

16     Q.      Did you go on to work at Diamond Hill?

17     A.      No.

18     Q.      Why not?

19     A.      Well, after talking to my wife about this and getting

20     a full-blown beat down, she says no.  I called Leonard and I

21     told him, I said Leonard, take me off of it.  I don't want to

22     work for your company.  I don't want to be a member of your

23     company.

24     Q.      About how much time passed in between when you signed

25     on to be CFO and when you called in your regrets?

1    A.      Maybe about a month, somewhere around there.

2    Q.      Okay.

3    A.      Never heard from him during that time also.

4    Q.      What did he say when you said you don't want to do the

5    CFO thing anymore?

6    A.      He said okay, I'll take your name off of it.

7    Q.      Did you ever conduct any real estate transactions on

8    behalf of Diamond Hill Financial?

9    A.      No.

10   Q.      Did you ever write any checks out of the Diamond Hill

11   Financial bank account?

12   A.      No, did not even know about it.

13   Q.      Did you conduct any other financial transactions as

14   CFO of Diamond Hill Financial?

15   A.      No.

16   Q.      Did you ever buy a house from Mr. Williams?

17   A.      No.

18           MS. HEMESATH:  Thank you.  Nothing further.

19           THE COURT:  Mr. Wiseman.

20                        CROSS-EXAMINATION

21   BY MR. WISEMAN:

22   Q.      Good morning, Mr. Murrell.

23   A.      Good morning.

24   Q.      I have a few questions.  So as I understand your

25   testimony, you at a certain point after you retired, you were

1    looking for work; right?

2    A.      Yes.

3    Q.      And you needed to acquire some sort of employment so

4    you can show some income on a W-2; right?

5    A.      So we can, when we apply to the bank so we can boost

6    our income and be able to qualify for the loan, yes.

7    Q.      And so you needed to qualify for a loan.  In order to

8    do that, you had to boost your income; correct?

9    A.      Yes.

10   Q.      And this was a loan to build a property in Mexico;

11   right?

12   A.      Yes.

13   Q.      To retire to Mexico?

14   A.      Yes.  It was a loan to go through the bank to get

15   money to build a house in Mexico.

16   Q.      Okay.  And so you approached Mr. Williams and asked

17   him if he had a job for you?

18   A.      No.

19   Q.      No.  But you had some conversation with Mr. Williams

20   about your need for a job; right?

21   A.      We normally all meet for lunch and we sit around and

22   talk about things we doing and stuff, and that was mentioned,

23   yeah.  Yes.

24   Q.      Is it fair to say that when Mr. Williams offered you a

25   position that you intended to work for him; correct?

1    A.      Not at first, no.  I said no, no, no.  And he kept

2    asking me, and finally he came over to my house one day and

3    he was pitching the job, and I was hesitant, and then we went

4    out to the street when he was leaving, my neighbor was out

5    there, and he says hey, come be my CFO.

6    Q.      Because he knew you needed to have some employment so

7    you can get this loan; right?

8    A.      I believe so.

9    Q.      Yeah.

10   A.      That's what I was saying, so I believe that's what he

11   knew, yeah.

12   Q.      And so when you signed the document that you were

13   shown a moment ago, it was your intention to go to work for

14   Mr. Williams; right?

15   A.      Yeah.  He said I'll give you a call, yeah.

16   Q.      And then you would do the tasks that he mentioned that

17   you would be doing; right?

18   A.      Yes.

19   Q.      And then at some point, as you testified, you changed

20   your mind; right?

21   A.      I never got a call back from him for, you know, days

22   went by, weeks went by, and I says no.  And then my wife kept

23   telling me don't do anything with Leonard.

24   Q.      So you decided not to go through with the job; right?

25   A.      Yes.

```
1            MR. WISEMAN:  Okay.  No further questions, your Honor.

2            THE COURT:  Any redirect?

3            MS. HEMESATH:  No, your Honor.

4            THE COURT:  Thank you, Mr. Murrell.  You're excused.

5       You may call your next witness.

6            MR. HALES:  The United States calls Joshua Frye.

7            MS. HEMESATH:  May I approach with the binders again,

8   your Honor?

9            THE COURT:  Yes.

10           THE CLERK:  Sir, please step forward.  Stand this way,

11  please, in front of the court reporter and face me.  Raise

12  your right hand.

13                        JOSHUA FRYE,

14  a witness called by the Government, having been first duly

15  sworn by the Clerk to tell the truth, the whole truth, and

16  nothing but the truth, testified as follows:

17           THE WITNESS:  I do.

18           THE CLERK:  Thank you.  You may be seated.

19           MR. HALES:  Good morning, Mr. Frye.

20           THE COURT:  Just a minute.

21           THE CLERK:  Please state your full name and spell your

22  last name for the record.

23           THE WITNESS:  Joshua August Frye, F-R-Y-E.

24       ///

25       ///
```

```
 1                         DIRECT EXAMINATION

 2    BY MR. HALES:

 3    Q.      Good morning, Mr. Frye.

 4    A.      Good morning.

 5    Q.      How old were you in late 2007?

 6    A.      21.

 7    Q.      21 years old?

 8    A.      (Nods head.)

 9    Q.      And so you're how old now?

10    A.      27, about to turn 28.

11    Q.      What are you doing for work now?

12    A.      I'm in real estate.

13    Q.      What were you doing in late 2007 for work?

14    A.      I had just gotten my real estate license and was sort

15    of interning in a sense.

16    Q.      Would you say that you had a steady job, a steady

17    income?

18    A.      No.

19    Q.      Did you end up buying a property at 4824 Baker Avenue

20    in February 2008?

21    A.      Yes.

22    Q.      Who did you work with to buy that property?

23    A.      Leonard Williams and Joshua Clymer.

24    Q.      How did you first meet Mr. Williams and Mr. Clymer?

25    A.      I met them at a real estate seminar in Sacramento.
```

1    Q.      Do you remember approximately when that was?

2    A.      December of '06.

3    Q.      And when you first met them, what did you discuss?

4    A.      We discussed the possibility of purchasing a property,

5    real estate property for investment.

6    Q.      And was this -- what was the nature -- this was during

7    the seminar but to the side.  How many of you were standing

8    there when you were talking to Mr. Williams and Mr. Clymer?

9    A.      As I recall, I was just speaking to the two of them.

10   I don't recall any other people standing around, but it was

11   during a break at a seminar.

12   Q.      Had you gone to the seminar with a friend?

13   A.      Yes.

14   Q.      Who was that friend?

15   A.      That friend was Jonathon Torrente.

16   Q.      Was he standing there when you were talking to

17   Mr. Williams and Mr. Clymer?

18   A.      He may have been.  We were sitting near each other.

19   Q.      And so you said the idea of investing in real estate

20   came up during that discussion.  What specifically was said

21   by Mr. Williams and Mr. Clymer to you?

22   A.      I don't recall specific terminology, but the ideas of

23   purchasing property, they had property, they were investors,

24   and they also did loans, so they could help me.

25   Q.      What was your impression of Mr. Williams and

1    Mr. Clymer during that first meeting?

2    A.      They seemed very knowledgeable, successful people.

3    They knew what they were talking about.

4    Q.      Do you recognize Mr. Williams sitting in the courtroom

5    here today?

6    A.      Yes, I do.

7    Q.      Can you point him out, please, and just identify

8    something he's wearing?

9    A.      He's wearing glasses and a suit jacket and tie.

10           THE COURT:  What color suit?

11           THE WITNESS:  Like a gray brown, I guess.

12           THE COURT:  The record will reflect he's identified

13   the defendant.

14   Q.      BY MR. HALES:  After that first discussion, did you

15   stay in touch with Mr. Williams and Mr. Clymer?

16   A.      Yes.

17   Q.      How so?  By what media?  Telephone, email?

18   A.      By phone.

19   Q.      Did you come to have an in-person meeting with them at

20   some point?

21   A.      Yes, I did.

22   Q.      How did that meeting come about?

23   A.      It was set up by a phone conversation.

24   Q.      Who did you speak to to set up that meeting?

25   A.      I believe Williams.

1    Q.      Leonard Williams?

2    A.      Yes.

3    Q.      This was sometime after you'd met in late 2006 and

4    sometime before you bought the house in February of '08?

5    A.      Yes.

6    Q.      Do you remember specifically when this first meeting

7    was?

8    A.      I don't remember specifically, but I believe earlier

9    in '07.

10   Q.      Where did you go for this meeting?

11   A.      To their office on Watt Avenue.

12   Q.      Can you describe the office a little bit for us?

13   A.      Two-story building.  There was a lobby, stairs up to

14   their office.

15   Q.      Based on what you observed while you were there, how

16   many people worked in the office or the room where you met

17   with Mr. Williams and Mr. Clymer?

18   A.      In their room, just the two of them.  I don't know if

19   the other offices were part of them or not.

20   Q.      How many desks were in there that you saw?

21   A.      In the room, two, I believe.

22   Q.      So at this first meeting when you went to that office,

23   who all was there?  Was it just the three of you?

24   A.      And also my friend Jonathan Torrente.

25   Q.      He came with you?

1    A.       Yeah.  Yes, he came with me.

2    Q.       What did you discuss during this first meeting at that

3    office on Watt Avenue?

4    A.       We discussed potential properties.  That was the one

5    on Baker that they proposed for me to purchase.  Talked about

6    qualifying for a loan.

7    Q.       Did you see a list of properties or anything of that

8    nature in the office?

9    A.       Yes.  There was a white board, I believe, of

10   properties.

11   Q.       Do you remember what kind of information was listed on

12   that white board?

13   A.       Property addresses, you know, purchase prices, and I

14   don't recall what other information.

15   Q.       Okay.  And did the subject of getting cash back in

16   connection with a home purchase come up during the

17   conversation?

18   A.       I believe it did, yes.

19   Q.       Who brought up that topic?

20   A.       I believe Leonard Williams brought it up.

21   Q.       During this meeting, who was talking?  Were all three

22   of you talking at times during this meeting?

23   A.       Possibly, but mostly it was between Leonard Williams

24   and myself.

25   Q.       And a few moments ago, you mentioned discussing

1   qualifying for a loan.  What during this first meeting at

2   Watt Avenue was discussed regarding qualifying for a loan?

3   A.      At that meeting, I believe it was filling out a loan

4   application and gathering financial documentation.

5   Q.      Okay.  That day when you came to that first meeting,

6   had you brought financial documentation with you?

7   A.      No.

8   Q.      Okay.  Do you recall if the Baker property came up

9   during that very first meeting or did it come up at a later

10  date?

11  A.      I believe it came up in the very first meeting.

12  Q.      Okay.  What happened?  Did you agree to buy a property

13  right there at that first meeting that day?

14  A.      I believe so.  I intended to purchase the property,

15  yes.

16  Q.      And that was the Baker property?

17  A.      Yes.

18  Q.      Okay.  What happened after that meeting?

19  A.      I collected the documentation that had been requested

20  and emailed it to a Jan Vawter, I believe.

21  Q.      And what types of documentation are you talking about?

22  A.      Like bank statements, other account statements.  Maybe

23  taxes.

24  Q.      What was your understanding of who Jan Vawter was in

25  relation to Mr. Williams and Mr. Clymer?

1     A.      Like an assistant or a coordinator.

2     Q.      How did you come to send your information to her?  How

3   did you get the email information, if you recall?

4     A.      I don't recall.

5     Q.      Was it in the course of that first meeting or at some

6   later point, if you recall?

7     A.      I don't recall.  I don't know if it was at the meeting

8   or not.

9     Q.      The information that you sent Ms. Vawter, was that

10  your true employment and income information, the documents

11  you described?

12    A.      Yes.

13    Q.      Prior to this time, had you ever applied for a home

14  loan yourself?

15    A.      I did from a new home development.

16    Q.      You formed a new home development?

17    A.      Oh, no.  Excuse me.  I did apply for, you know, to

18  purchase a home from a new home development.

19    Q.      Oh, I see.  Okay.  And so you actually applied for a

20  loan at that time?

21    A.      Yes.

22    Q.      And what happened with that loan application?

23    A.      It was rejected.

24    Q.      After submitting your information to Ms. Vawter, did

25  you come to have a second meeting at the Watt Avenue office?

```
 1   A.       Yes.

 2   Q.       Who was there for that second meeting?

 3   A.       I believe both Leonard Williams and Joshua Clymer were

 4   present.

 5   Q.       Who did you speak to primarily during that second

 6   meeting?

 7   A.       Leonard Williams.

 8   Q.       Was there any discussion about whether you would

 9   qualify for a loan based on the information you'd submitted?

10   A.       Yes.  I did not qualify based on the information that

11   I had submitted.

12   Q.       Who told you that?

13   A.       I believe it was Leonard Williams who told me.

14   Q.       Did you discuss any solutions to that problem with

15   Mr. Williams?

16   A.       Yes.

17   Q.       What was discussed?

18   A.       He brought up the proposal of creating a position for

19   me in his company and supplying the position and salary and

20   whatnot.

21   Q.       And when you say creating, was it your understanding

22   that you would actually work at that company or that the

23   position would just be for purposes of the loan application?

24   A.       I would not be working there.  It was for the loan

25   application.
```

1    Q.      And do you recall the name of that company?

2    A.      Diamond Hill Financial.

3    Q.      Did you eventually agree to do this?

4    A.      I did.

5    Q.      And what did you expect would be put down for your

6    income on the loan application?

7    A.      I didn't know what amount would be put down, but it

8    would be significantly more than what I'd been making in the

9    previous years.

10   Q.      What would you say that you were making a month at

11   that time?  You said that you had no steady job or income.

12   Did you have any income?

13   A.      No income.  I maybe, you know, I did draw from my

14   savings.  I think total for the year, under $10,000.

15   Q.      Under $10,000?

16   A.      (Nods head.)

17   Q.      Did you express any concerns about doing this during

18   the second meeting at the office?

19   A.      Yes.  I wasn't sure of it, but they told me that it

20   would be fine.

21   Q.      When you say they told you, do you recall who told you

22   specifically?

23   A.      Leonard Williams.

24   Q.      And during the second meeting, did Mr. Clymer have as

25   much of a speaking role in the conversation as he had the

1    first time you met, or was he not as involved?

2    A.    He was generally not involved in the second meeting.

3    Q.    Was he present in the office?

4    A.    Yes.

5    Q.    From your perspective, within earshot as far as you

6    could tell?

7    A.    Yes.

8    Q.    There's a binder in front of you.  The tabs for the

9    exhibits are on the very top, so I'll be referring to those

10   numbers, and we'll start going through.  So I'll ask if you

11   could look at Exhibit 434 first.  It's a little ways in.

12   Just let me know when you've had a chance to look at that.

13   A.    Yes.  It's behind the tab?

14   Q.    It should be behind the tab, correct.

15   A.    Okay.  I found it.

16   Q.    Mr. Frye, do you recognize that document?

17   A.    Yes, I do.

18   Q.    What is it?

19   A.    It's an email from Joshua Clymer to me.

20   Q.    Did you receive that in connection with your loan

21   application for the Baker Avenue property?

22   A.    Yes.

23        MR. HALES:  Move to admit Government's Exhibit 434,

24   your Honor.

25        MR. WISEMAN:  Your Honor, in total?

1          MR. HALES:  Yes.

2          THE COURT:  Exhibit 434 is received in evidence.

3                         (GOVERNMENT'S EXHIBIT 434, Yahoo Email

4                          re: Funding Status, ADMITTED INTO

5                          EVIDENCE.)

6          MR. HALES:  Can we publish the first page, please.

7    Q.     BY MR. HALES:  So was it your understanding that this

8    email address at the top was Joshua Clymer's?

9    A.     Yes.

10   Q.     During the course of preparing to apply for this loan,

11   had you communicated back and forth some with Mr. Clymer by

12   email?

13   A.     I believe so.

14   Q.     And was this your email address at the time,

15   Jayfrye20@yahoo.com?

16   A.     Yes.

17   Q.     You mentioned that you now work in real estate.  Do

18   you know from that work, down here where it says just sign

19   the 1003, what is 1003 referring to?

20   A.     It's a residential loan application.

21   Q.     So it's the standardized form number for a residential

22   loan application?

23   A.     Yes.

24   Q.     And if we could go to page 3 of this exhibit, please.

25   I'm going to get into a few pieces of this, but first, is

1    this the loan application?  Do you recall signing this loan

2    application that came to you by email from Joshua Clymer?

3    Not this physical one in front of you, but after receiving

4    it, did you, in fact, sign it?

5    A.      Yes, I did.

6    Q.      Okay.  But this is the copy you received attached to

7    the email?

8    A.      Yes.

9    Q.      Okay.  And actually if we can go to the next page,

10   page 4.  At the time that you received this email from

11   Mr. Clymer, did you see that on the loan application, Diamond

12   Hill Financial was listed as your employer?

13   A.      Yes.

14   Q.      Was that true?

15   A.      No.

16   Q.      If we can go back out and go to the information at the

17   bottom.

18          Did you also see that your monthly income was listed

19   as $7,292.36 on this loan application?

20   A.      Yes.

21   Q.      Was that true?

22   A.      No.

23   Q.      And if we can go to the following page, please, 5.

24          Do you see where it says total assets, $61,488?

25   A.      Yes.

1            THE COURT:  Wait.  We don't see that.  Oh, I see.

2    Okay.  I didn't see the 6.  I thought it was something else.

3    Q.      BY MR. HALES:  Okay.  So do you see that it says

4    61,488?

5    A.      Yes.

6    Q.      And was that a true amount of assets that you had at

7    this time?

8    A.      No.

9    Q.      What approximately do you recall having in terms of

10   assets at this time you were applying for the loan?

11   A.      Maybe $7,000.

12   Q.      If we can go to the next page, please, page 6.

13           Do you see down at the bottom here where it says cash

14   from/to borrower and there's an amount $34,772 listed?

15   A.      Yes.

16   Q.      Did you have that amount of money at that time to make

17   a down payment?

18   A.      No.

19   Q.      During your meetings with Mr. Williams and Mr. Clymer,

20   what was discussed about a down payment with them, if

21   anything?

22   A.      I do not recall.

23   Q.      Okay.  We can take that exhibit down.

24           If you could turn in your binder, please, to

25   Exhibit 401.  So now it's back to the front.  Please take a

1    moment to look at that and tell us if those are your initials

2    and then your signature at the back of that document.

3    A.      Yes.

4    Q.      Is this the purchase agreement you signed to buy

5    4824 Baker Avenue in Sacramento?

6    A.      Yes.

7            MR. HALES:  Move to admit Government's Exhibit 401,

8    your Honor.

9            THE COURT:  Exhibit 401 is received in evidence.

10                         (GOVERNMENT'S EXHIBIT 401, Purchase

11                         agreement (second escrow), ADMITTED

12                         INTO EVIDENCE.)

13   Q.      BY MR. HALES:  If we could show that first page and

14   blow up just the top part.

15           So you were the buyer listed here.  Do you see that?

16   A.      Yes.

17   Q.      And then the purchase price, do you see what's listed

18   there for the purchase price?

19   A.      $350,000.

20   Q.      How was that agreed upon?  Was that discussed during

21   your meetings with Mr. Williams and Mr. Clymer?

22   A.      Yes.  I was told that would be the purchase price.

23   Q.      Was there any negotiation or was that it?

24   A.      I don't recall any negotiation.

25   Q.      Okay.  And if we could zoom back out.

1              What was your understanding of from whom you were

2      buying this property at that time?

3      A.      I believed I was buying it from Williams and Clymer.

4      Q.      And do you recall if there was a name, if they had a

5      business entity?

6      A.      It was Bay View Loans, or no, excuse me, Bay Area

7      Holdings.

8      Q.      If you can flip to the last page of the exhibit, page

9      8, and look a few lines down below your signature.  Does that

10     refresh your recollection?

11     A.      Yes, it does.

12     Q.      And what was the name of the entity?

13     A.      Bay Area Real Estate Holdings.

14     Q.      If you could turn next to 402 in your binder,

15     Mr. Frye.  Take a moment and tell us if you recognize that

16     and if that's your signature at the top.

17     A.      Yes.

18     Q.      Is this the signed version of your loan application?

19     A.      Yes.

20             MR. HALES:  Move to admit Government's Exhibit 402,

21     your Honor.

22             THE COURT:  Exhibit 402 is received in evidence.

23                             (GOVERNMENT'S EXHIBIT 402, Loan

24                             application, ADMITTED INTO EVIDENCE.)

25     Q.      BY MR. HALES:  That's your signature that you just

1    identified at the top?

2    A.       Yes, it is.

3    Q.       And if we can pull up this section here.

4             What was the amount of the loan that you were applying

5    for, Mr. Frye?

6    A.       316,000 -- or 315.  Excuse me.

7    Q.       Does it appear like it could be a 5 or a 6, the 5

8    might bleed there.  Is that why you say that?

9    A.       Yes.

10   Q.       How does that, if you recall, relate to the sales

11   price that we just saw on the purchase agreement?

12   A.       It's less than.

13   Q.       Okay.  And if we can go to page 2 of this exhibit.  So

14   we looked at the version that you received from Mr. Clymer.

15   This version that you signed, does it still list Diamond Hill

16   Financial as your employer?

17   A.       Yes, it does.

18   Q.       And did you know that when you signed it?

19   A.       Yes, I did.

20   Q.       If we can zoom back out and go to the income portion

21   at the bottom.

22            This version that you signed, does it still list

23   $7,292.38 as your monthly income?

24   A.       Yes.

25   Q.       When you signed the loan application, did you know

1    that it listed that as your income?

2    A.    Yes, I did.

3    Q.    Page 3, please.  Can you zoom back out and try to grab

4    the whole assets column.  Thanks.

5          So again, it's kind of small to read, but I want the

6    whole column here.  Do you see the assets that are listed on

7    that page?

8    A.    Yes.

9    Q.    And were you aware that the version that you signed of

10   this loan application had $61,488 listed as your total

11   assets?

12   A.    Yes.

13   Q.    And if you look above, there's an account listed here

14   at Wells Fargo Bank.  Do you see that?

15   A.    Yes.

16   Q.    Did you have an account at Wells Fargo Bank containing

17   $25,897 at the time you signed this loan application?

18   A.    I had an account at Wells Fargo but not in that

19   amount.

20   Q.    Did any of the information that you had provided by

21   email to Ms. Vawter indicate that you had a bank account with

22   that balance?

23   A.    No.

24   Q.    And below that, do you see another account number

25   listed but without a bank name?

```
 1     A.      Yes.

 2     Q.      Did you have another bank account at that time that

 3     contained 35,000, approximately $35,000?

 4     A.      No.

 5     Q.      Did you provide any information to Ms. Vawter,

 6     Mr. Williams, or Mr. Clymer indicating that you had an

 7     account with $35,000 in it?

 8     A.      No.

 9     Q.      If we could go to the next page, please.

10             Do you recall knowing when you signed this loan

11     application that it listed the cash from borrower $34,772.44?

12     A.      Yes.

13     Q.      But you didn't have that amount of money to put down?

14     A.      No.

15     Q.      If we could zoom out and get the signature at the

16     bottom.

17             And this is your signature on the loan application?

18     A.      Yes.

19     Q.      And the date you signed it was what, if you can see

20     it?

21     A.      February 14, 2008.

22     Q.      Was that just a week or two before you closed on the

23     property, if you recall?

24     A.      Yes.  It was very near the closing.

25     Q.      Do you see where it says interviewer's name and below
```

1    that Arji Rashidi?

2    A.      Yes.

3    Q.      Do you remember who that person is?

4    A.      No.

5    Q.      Okay.  Now, I'm going to make you go a little ways in

6    the binder again.  If you could turn to 435, please.

7    A.      Okay.

8    Q.      Take a moment and tell me if you recognize that.

9    A.      Yes.

10   Q.      What is it?

11   A.      It's an email from Leonard Williams to me.

12   Q.      Is this an email you received in connection with the

13   Baker Avenue purchase?

14   A.      Yes.

15           MR. HALES:  Move to admit Government's Exhibit 435,

16   your Honor.

17           THE COURT:  Exhibit 435 is received in evidence.

18                           (GOVERNMENT'S EXHIBIT 435, Email re:

19                           Third Party Deposit, ADMITTED INTO

20                           EVIDENCE.)

21   Q.      BY MR. HALES:  Who did you understand

22   president@diamondhillfinancial.com to be?

23   A.      Leonard Williams.

24   Q.      And what was that based on?  Did you have other email

25   communications?

1    A.      Not that I can recall.

2    Q.      If you flip to the third page of this exhibit, do you

3    see down below here where it says the name Chahal Hardip?

4    A.      Yes.

5    Q.      Do you know who that person is?

6    A.      No.

7    Q.      It's not a family member of yours or a friend?

8    A.      No.

9    Q.      Okay.  Do you recall understanding what this document

10   was for when you received it?

11   A.      Not really.

12   Q.      All right.  Let's go back to Government's Exhibit 403.

13   And tell me when you've had a chance to look at that.

14   A.      Okay.

15   Q.      Actually first, before discussing this exhibit, do you

16   recall where you went to sign the closing documents for the

17   Baker Avenue property?

18   A.      Yes.  It was a Chicago Title Company in Sacramento.

19   Q.      And who was there when you signed those documents?

20   A.      I believe it was just myself and the closing officer.

21   Q.      Okay.  As for Government's Exhibit 403, is that your

22   signature on the second page of the document?

23   A.      Yes.

24           MR. HALES:  Move to admit Government's Exhibit 403,

25   your Honor.

1          THE COURT:  Exhibit 403 is received in evidence.

2                         (GOVERNMENT'S EXHIBIT 403, Occupancy

3                         and financial status affidavit, signed

4                         by Frye, ADMITTED INTO EVIDENCE.)

5     Q.     BY MR. HALES:  Do you see at the top it says occupancy

6     and financial status affidavit?

7     A.     Yes.

8     Q.     Did you ever discuss this document with Mr. Williams

9     at all?

10    A.     I don't recall discussing the contents of it.

11    Q.     Did you ever discuss it with Mr. Clymer at all?

12    A.     I don't recall.

13    Q.     If we could blow up paragraph 3.

14           Do you see the second sentence of this paragraph where

15    it says, "Borrower hereby certifies that the information

16    provided by borrower contained in, or made in connection

17    with, the loan application related to borrower's financial

18    status, such as borrower's employment, income, available

19    cash, debts, expenses, credit obligations, and the like has

20    not changed significantly and that such information

21    accurately reflects borrower's current financial status."  Do

22    you see that sentence?

23    A.     Yes.

24    Q.     Did you ever discuss that particular sentence or that

25    concept with Mr. Williams while you were applying for this

```
1    loan?

2    A.      I don't recall discussing that.

3    Q.      Did you ever discuss that sentence or that idea with

4    Mr. Clymer during this process?

5    A.      No.

6    Q.      What about Ms. Vawter?

7    A.      No.

8    Q.      If we can zoom back out, please, and blow up paragraph

9    4.

10           Mr. Frye, please take a moment and read that

11   paragraph, then I'll ask you a question about it.  Let me

12   know when you're done.

13   A.      Okay.

14   Q.      Do you remember ever discussing that paragraph with

15   Mr. Williams or any of the ideas contained within it?

16   A.      I don't recall discussing.

17   Q.      What about with Mr. Clymer?

18   A.      No.

19   Q.      What about with Ms. Vawter?

20   A.      No.

21   Q.      We can take that down.  I know I'm making you flip

22   back and forth, and I apologize.  The next one is 437, again

23   back towards the back of the binder.

24   A.      Okay.

25   Q.      Is that your signature on Exhibit 437?
```

```
 1    A.      Yes.

 2    Q.      Did you submit this in connection with your loan

 3    application for the Baker Avenue property?

 4    A.      Yes.

 5            MR. HALES:  Move to admit Government's Exhibit 437,

 6    your Honor.

 7            THE COURT:  Exhibit 437 is received in evidence.

 8                        (GOVERNMENT'S EXHIBIT 437, Borrower's

 9                         Certification and Authorization form

10                         for Joshua Frye, ADMITTED INTO

11                         EVIDENCE.)

12    Q.      BY MR. HALES:  Can we blow up the top portion here.

13            Look through paragraphs -- well, first of all, do you

14    recall ever discussing this particular document with

15    Mr. Williams while you were applying for your loan

16    application?

17    A.      No.

18    Q.      Applying for your loan?

19    A.      No.

20    Q.      With Mr. Clymer?

21    A.      No.

22    Q.      With Ms. Vawter?

23    A.      No.

24    Q.      And in particular, paragraph 1, the portion that is

25    sort of offset here because of the typeface where it says,
```

1    "I/we certify that all of the information is true and

2    complete.  I/we made no misrepresentations in the loan

3    application or other documents, nor did I/we omit any

4    pertinent information."  As to that particular statement did

5    you discuss with Mr. Williams that you were signing a

6    document saying there were no misstatements in your loan

7    application?

8    A.      I don't recall discussing this, no.

9    Q.      What about with Mr. Clymer or Ms. Vawter?

10   A.      Neither.

11   Q.      Mr. Frye, the discussion about cash back, how did that

12   end up prior to -- what did you expect to receive prior to

13   the time that you closed on this transaction?

14   A.      It was discussed, I believe, at the first meeting, and

15   I understood it to be maybe 30,000 or more.

16   Q.      Is that what you ultimately received?

17   A.      No.

18   Q.      Was it more or less?

19   A.      That amount disclosed or told was more than what I

20   actually received.

21   Q.      Did you ultimately receive cash?

22   A.      I did.

23   Q.      Or checks, I should say.

24   A.      Yes.

25   Q.      Was the amount that you received more or less than

```
1    30,000?

2    A.      Less.

3    Q.      Can you please look at Exhibit 413 in your binder.

4    A.      Okay.

5    Q.      From working in real estate now, do you know what a

6    HUD-1 is?

7    A.      Yes, I do.

8    Q.      What's your basic understanding of a HUD-1?

9    A.      It's a settlement sheet that shows amounts going to

10   and from the buyers and sellers.

11   Q.      Is this the final HUD-1 from your purchase of the

12   Baker Avenue property?

13   A.      Yes.

14           MR. HALES:  Move to admit Government's Exhibit 413,

15   your Honor.

16           THE COURT:  Exhibit 413 is received in evidence.

17                       (GOVERNMENT'S EXHIBIT 413, HUD-1 for

18                        second escrow (loan file version),

19                        ADMITTED INTO EVIDENCE.)

20   Q.      BY MR. HALES:  Do you see on this line 303 where it

21   says cash from/to borrower and then the amount is listed

22   $3,141.26?

23   A.      Yes.

24   Q.      Did you receive a check for that amount?

25   A.      I believe so, yes.
```

1    Q.       From whom did you receive it?

2    A.       From Leonard Williams.

3    Q.       And how did you receive it from him, in person, in the

4    mail?

5    A.       Yes, he handed it to me in person.

6    Q.       Where was it that he handed that to you?

7    A.       His office on Watt.

8    Q.       On Watt Avenue?

9    A.       (Nods head.)

10   Q.       After the close of the transaction?

11   A.       Yes.

12   Q.       Is that the only check that you received from

13   Mr. Williams that day?

14   A.       No.

15   Q.       What else did you receive from Mr. Williams that day?

16   A.       A second check for roughly 20 to $21,000 -- or excuse

17   me, 17.  The total was about 21, and the other check was 17.

18   Q.       Between the two checks, it was 20, is your

19   recollection, is that what you're saying, and the second one

20   was roughly $17,000?

21   A.       Yes.

22   Q.       The second $17,000 check that you received, have you

23   looked at this HUD-1?  Were you able to find it anywhere on

24   there?

25   A.       I don't see that amount.

1    Q.     If you could turn to Exhibit 417, please.

2    A.     Okay.

3    Q.     Is that your signature at the bottom of this document?

4    A.     Yes.

5           MR. HALES:  Move to admit Government's Exhibit 417,

6    your Honor.

7           THE COURT:  Exhibit 417 is received in evidence.

8                       (GOVERNMENT'S EXHIBIT 417, Notice of

9                        assignment, sale, or transfer of

10                       servicing rights, ADMITTED INTO

11                       EVIDENCE.)

12   Q.     BY MR. HALES:  Do you recall being aware that -- well,

13   what happened to your loan?  Did the original lender keep it

14   or was it sold to someone else?

15   A.     As far as I recall, it was with the original lender.

16   Q.     Take a minute and look at this document and let me

17   know if it refreshes your memory at all.

18   A.     Yes.

19   Q.     Oh, actually let me ask you for a moment.  Did you

20   after closing on the house, did you make payments on it?

21   A.     Yes.

22   Q.     For approximately how long?

23   A.     Approximately six to eight months.

24   Q.     What money did you use to make the payments on the

25   house?

```
 1    A.      The cash back that I received.

 2    Q.      Okay.  What happened after the six to eight months?

 3    A.      I could no longer afford the mortgage.

 4    Q.      Is that because the cash you'd received ran out?

 5    A.      Yes.

 6    Q.      Do you recall your later payments going to GMAC rather

 7    than the original lender, if you look on this document?

 8    A.      Repeat that.  I'm sorry.

 9    Q.      Do you recall to whom you sent your payments?  If you

10    don't, that's fine.  I'm just asking if you recall to whom

11    you sent them.

12    A.      I believe it was GMAC.

13    Q.      Okay.  If you could turn to Exhibit 427 in your

14    binder, please.

15    A.      Okay.

16    Q.      Do you recognize this document?

17    A.      Yes.

18    Q.      What is it?

19    A.      It's a check to me from Bay Area Real Estate Holdings.

20    Q.      Is that your signature on the back?

21    A.      Yes.

22            MR. HALES:  Move to admit Government's Exhibit 427,

23    your Honor.

24            THE COURT:  Exhibit 427 is received in evidence.

25            ///
```

```
 1                         (GOVERNMENT'S EXHIBIT 427, Kickback
 2                         check from BARE to Joshua Frye $17,859
 3                         dated 2/21/08, memo escrow 60603635,
 4                         ADMITTED INTO EVIDENCE.)
 5    Q.     BY MR. HALES:  Mr. Frye, is this the additional --
 6    before I believe you said approximately $17,000 check that
 7    you received from Mr. Williams?
 8    A.     Yes.
 9    Q.     And did you deposit it into your account?
10    A.     Yes.
11    Q.     And these are the funds that you used to pay the
12    mortgage for six to eight months?
13    A.     Yes.
14    Q.     If you could turn, please, to Government's
15    Exhibit 428.  Do you see the amount that's listed on that
16    document?
17    A.     Yes.
18    Q.     Is that consistent with the amount that was shown on
19    the HUD-1?
20    A.     Yes.  Yes, it is.
21    Q.     Whose name appears in the pay to the order of box?
22    A.     My name.
23    Q.     Does this appear to be a copy of the check that you
24    received for the lower $3,000 amount at the close of this
25    transaction?
```

1   A.      A copy or a receipt.

2   Q.      Okay.  Move to admit Government's Exhibit 428, your

3   Honor.

4           THE COURT:  Exhibit 428 is received in evidence.

5                       (GOVERNMENT'S EXHIBIT 428, Escrow File

6                       copy of check to Joshua Frye for

7                       $3,141.26 dated 2/21/08, ADMITTED INTO

8                       EVIDENCE.)

9   Q.      BY MR. HALES:  So this isn't the exact copy, but this

10  is the amount of the check that you recall receiving from

11  Mr. Williams on the same day as the $17,000 check?

12  A.      Yes.

13  Q.      After you stopped making the payments -- well,

14  actually, let me back up.  Did you end up living in this

15  house?

16  A.      I did not.

17  Q.      At the time that you were applying for the loan, had

18  you intended to live in it?

19  A.      I intended to live in it and rent out rooms.

20  Q.      And why did you end up not living in it?

21  A.      Well, it was not an area that I wanted to live in.

22  Q.      Had you gone to look at the house in person before you

23  purchased it?

24  A.      I believe I drove by it, but I was never able to

25  access it.

```
 1    Q.      And how did you go about getting renters for the

 2    house?

 3    A.      There was at least one renter already there, and I was

 4    able to find someone to manage the property and find other

 5    tenants.

 6    Q.      After you ran out of money and stopped making the

 7    payments, what did you do with respect to your mortgage?

 8    A.      Well, I couldn't pay it, and I defaulted on the

 9    mortgage.

10    Q.      Okay.  Did you do a short sale of the house?

11    A.      Yes.

12    Q.      If you could look at Government's Exhibit 429 for a

13    moment.  Do you recognize that?

14    A.      Yes.

15    Q.      What is it?

16    A.      It's a hardship letter from me to GMAC Mortgage.

17            THE COURT:  Not relevant.  Not relevant.  We've heard

18    enough about this house.

19            MR. HALES:  I'll move on, your Honor.

20    Q.      BY MR. HALES:  I'm not going to ask to admit, but I'll

21    ask you to look at for a moment Exhibit 431, Mr. Frye.

22    A.      Okay.

23    Q.      I'll just ask you is 5 or $6,000 ballpark the true

24    amount of income that you had in 2008 as best you can recall?

25    A.      Yes.
```

1    Q.     One other question, Mr. Frye.  Was it your plan from

2    the beginning to use income from renters to help meet the

3    mortgage on the Baker Avenue property?

4          MR. WISEMAN:  Objection.  Relevance.

5          THE COURT:  Sustained.

6          MR. HALES:  No further questions.

7          THE COURT:  All right.  We'll take the noon recess at

8    this time, and we'll resume at 1:30, ladies and gentlemen.

9    Remember the admonition.

10          (Jury not present.)

11          THE COURT:  The jury's outside the courtroom.

12          I just want to clarify my ruling with regard to

13    Mr. Murrell's testimony.  I excluded the testimony with

14    regard to the $35,000 line of credit because I didn't want

15    you to get into the point that Mr. Williams defrauded him or

16    obtained his signature under false pretenses, but I did not

17    intend to exclude you from presenting other evidence if you

18    think it's relevant to show that there was a line of credit.

19    Okay.  So that is still an open question.

20          MS. HEMESATH:  I appreciate that.  I think we got

21    everything we need out of him.

22          THE COURT:  All right.  Then we'll see you at 1:30.

23          MR. HALES:  Thank you.

24          MR. WISEMAN:  Thank you.

25          (Lunch recess taken at 11:55 a.m.)

KELLY O'HALLORAN, OFFICIAL COURT REPORTER, USDC -- (916) 448-2712

1                    SACRAMENTO, CALIFORNIA

2                FRIDAY, JULY 11, 2014, 1:30 P.M.

3                         ---oOo---

4          (Jury not present.)

5          THE COURT:  I understand before the jury comes in, you

6     wanted to address a scheduling issue.

7          MR. HALES:  We do, your Honor.  Just briefly, we

8     wanted to tell the Court that we're moving a lot more quickly

9     than we expected today.  We have called in all the witnesses

10    that we had on standby, and so I think we'll be able to fill

11    the full day.  There's a chance that we may finish with the

12    witnesses we have coming in by about 4:00 o'clock or so, a

13    little bit early.

14         THE COURT:  Whether you're ahead of schedule or not,

15    that's not the question.  You need to fill every day.  So

16    we'll see.

17         Okay.  Let's bring the jury in.

18         MR. HALES:  Thank you, your Honor.

19         (Jury present.)

20         THE COURT:  Everyone is present.

21         Mr. Wiseman, do you wish to cross-examine?

22         MR. WISEMAN:  Yes, thank you, your Honor.

23                      CROSS-EXAMINATION

24    BY MR. WISEMAN:

25    Q.    Good afternoon, Mr. Frye.

KELLY O'HALLORAN, OFFICIAL COURT REPORTER, USDC -- (916) 448-2712

1    A.      Hello.

2    Q.      You might want to make sure the microphone is close by

3    so we can all hear you.

4    A.      Hello.

5    Q.      Okay.  Mr. Frye, you testified that you met

6    Mr. Williams and Mr. Clymer at a real estate seminar;

7    correct?

8    A.      Yes.

9    Q.      And that real estate seminar, it was being held where?

10   A.      In Sacramento at a hotel in Arden.

11   Q.      And do you recall the year and month that was?

12   A.      I believe it was December of '06.

13   Q.      December of '06.  And in December of '06, you had

14   already acquired your real estate license; correct?

15   A.      Yes.

16   Q.      And you were working at that time in December of '06

17   in the real estate profession; right?

18   A.      Yes.

19   Q.      And you were working as an agent at that time or as an

20   intern?

21   A.      I was an agent, but I was learning still.

22   Q.      So in other words, you had passed the real estate

23   exam, you were a licensed agent, but you were still learning

24   the business; right?

25   A.      Yes.

1    Q.       And to acquire, for one to acquire a real estate

2    license, one has to take an examination; correct?

3    A.       Yes.

4    Q.       And that examination describes and covers real estate

5    practices; correct?

6    A.       Yes.

7    Q.       Real estate transactions; correct?

8    A.       Yes.

9    Q.       Real estate law; correct?

10   A.       Yes.

11   Q.       The type of available real estate financing that

12   exists in California; correct?

13   A.       Yes.

14   Q.       And I presume your license was in California; right?

15   A.       Yes.

16   Q.       Okay.  And when you were working and learning the

17   trade, if you will, what were you actually doing back in

18   December of '06?

19   A.       Well, making phone calls to prospective buyers,

20   clients, really getting used to even talking on the phone.

21   Q.       Okay.  Something I still have trouble with.  So you

22   were learning the business of being a real estate agent;

23   right?

24   A.       Yes.

25   Q.       And that included cold calling prospective customers?

1    A.      Right.

2    Q.      Now, back then in December of '06, I presume you were

3    working for somebody; right?

4    A.      Yes.

5    Q.      Okay.  Did the company that you worked for back then

6    primarily represent buyers or sellers?

7    A.      Mostly buyers at that time.

8    Q.      Mostly buyers.  So the idea is that you folks would be

9    the agent for the buyers assuming that particular prospect

10   came through the door; right?

11   A.      Yes.

12   Q.      Okay.  And did you, let's say in late December of '06

13   before you met Mr. Clymer and Mr. Williams, had you closed

14   any transactions for buyers?

15   A.      No.

16   Q.      Had you assisted any of the other licensed

17   professionals at the office in closing any transactions?

18   A.      Possibly.  I don't recall any closings.

19   Q.      You don't recall that.

20   A.      No.

21   Q.      So the best of your recollection is you were basically

22   doing a lot of cold calling and trying to get customers to

23   come in the door?

24   A.      Right.

25   Q.      And the purpose of you going to this real estate

1    seminar was what?

2    A.      To possibly buy real estate for myself and meet other

3    people in the business.

4    Q.      Okay.  So the idea was that you wanted to meet other

5    people in the profession?

6    A.      Uh-huh.

7    Q.      Right?

8    A.      Yes.

9    Q.      And also to possibly buy real estate for yourself;

10   correct?

11   A.      Yes.

12   Q.      Now, what was it about the seminar that you thought

13   you would be able to parlay that into maybe some real estate

14   that you could buy yourself?  Was it advertised as a

15   particular kind of seminar or what?

16   A.      It was a company that coaches you on buying and

17   locating property, buying property, that kind of thing.

18   Q.      Okay.  So it was like a training seminar of some sort?

19   A.      Not really training.  It's something that you would

20   join and then they would work with you in that aspect.

21   Q.      Okay.  So if I understand your testimony, it was a

22   company that would assist you as a professional in acquiring

23   real estate?

24   A.      Yes.

25   Q.      Okay.  And so when you met with Mr. Williams and

1    Mr. Clymer, did you come to learn that they were at the

2    seminar for the same reason?

3    A.       I don't recall.  I assume maybe.

4    Q.       Okay.  And after you had this initial meeting at this

5    seminar, how much time transpired before you actually decided

6    to do a transaction with Mr. Clymer?

7    A.       I believe it was about two months.

8    Q.       Two months later?

9    A.       Yes.

10   Q.       Now, did you contact Mr. Clymer to initiate -- strike

11   that.  Two months later when you did the deal, did you

12   contact Mr. Clymer or did he reach out to you?

13   A.       I don't recall who contacted whom.

14   Q.       Okay.  What do you recall, if anything, about the

15   substance of that contact two months later?

16   A.       Not much.  I can't recall.

17   Q.       But as a result of the conversation with Mr. Clymer,

18   then you went to an office on Watt Avenue?

19   A.       Yes.

20   Q.       Okay.  And was it at that Watt Avenue address that

21   Mr. Clymer indicated that there was a piece of property that

22   you might be interested in?

23   A.       Clymer and Williams, yes.

24   Q.       They indicated they were -- they advised you or told

25   you about a particular property; right?

1    A.       Yes.

2    Q.       And it was this Baker Avenue property; right?

3    A.       Yes.

4    Q.       And at the time you had -- this is two months after

5    the seminar that you went to to try to find some real estate

6    for you to buy; right?

7    A.       Yes.

8    Q.       And so your intent, if I understand, your intent was

9    to buy what, investment property?

10   A.       Yes.

11   Q.       Okay.  So from a real estate professional's point of

12   view, what is an investment property?

13   A.       Well, at the time I would buy a property that I would

14   live in for a while and rent out rooms and then later down

15   the road buy more and then, you know, build property that

16   would be income, produce income.

17   Q.       Right.  So you'd sort of build a property portfolio;

18   right?

19   A.       Yes.

20   Q.       And so the idea of an investment property, in your

21   mind, one can invest in real estate and either live in it or

22   rent it out; right?

23   A.       Yes.

24   Q.       And as long as that person's intent is to benefit from

25   the increase of the value, that would be considered an

1    investment property; right?

2    A.      Yes.

3    Q.      In December of 2006, what was the climate, the real

4    estate climate in Northern California?  Let me even be more

5    specific and talk about Sacramento.  Was it an up market or

6    was it a down market?

7    A.      I don't recall exactly what it was.  I know that at

8    least in the preceding years, it was going down.

9    Q.      In the preceding years, it was going down?

10   A.      After, you know, like I think around '09 was when it

11   was the worst.

12   Q.      It was the worst.  But if you were interested in

13   buying real estate in December of '06, you wouldn't buy real

14   estate on a declining market; right?

15   A.      I didn't know what the climate of the market was at

16   that point.

17   Q.      You didn't know the climate of the market, but you

18   just simply wanted to buy some property?

19   A.      Yes.

20   Q.      Okay.  And so Mr. Clymer approached you with this

21   Baker Avenue deal.  And let me -- you've been asked about

22   this document.  I'm going to show you what has been marked

23   and introduced as Government's Exhibit 401.  And you've

24   already recognized this document; right?  This is the

25   purchase agreement for the Baker Avenue property; right?

1    A.      Yes.

2    Q.      Okay.  And if you go down the page here, I want to

3    show you something here.  Okay.  You see that portion that

4    I've highlighted there?

5    A.      Yes.

6    Q.      It says the agent, Josh Clymer; correct?

7    A.      Yes.

8    Q.      And the broker, Great American Mortgage Realty;

9    correct?

10   A.      Yes.

11   Q.      So if I understand your testimony, you thought the --

12   your understanding at the time that you entered into this

13   deal was that the seller was Bay Area Real Estate?

14   A.      Yes.

15   Q.      At the time did you understand that that company, Bay

16   Area Real Estate, was Mr. Clymer's company?

17   A.      I believe so.

18   Q.      Okay.  You believe so.  Were you at all concerned or

19   did you have any thought about the fact that Mr. Clymer, who

20   was selling you the property, was also acting as the agent?

21   A.      I guess I didn't notice that.

22   Q.      You didn't notice that.  Okay.  And this document goes

23   on, and it has your signature or your initials, correct, for

24   example on the next page.  Let me bring that up.  Those are

25   your initials or no?  Where it says buyer's initials.

1    A.        Yes.

2    Q.        Those are your initials?

3    A.        Yes.

4    Q.        And the seller's initials, do you know who initialed

5    that?

6    A.        I can't tell.  I don't know.

7    Q.        You don't know?

8    A.        No.

9    Q.        At the time that you executed this, did Mr. Clymer

10   also initial this document, if you recall?

11   A.        I don't recall.

12   Q.        Okay.  You don't recall.  And then after you executed

13   this document which was the purchase agreement, what's your

14   recollection of the next thing that happened in this

15   transaction?

16   A.        I don't really recall.

17   Q.        You don't recall the next sequence of events?

18   A.        No.

19   Q.        Okay.  And I'm going to show you something here that's

20   been called up on the screen here.  Do you see it says

21   seller?  Do you see that signature there?

22   A.        Yes.

23   Q.        Do you recognize that signature?

24   A.        No.

25   Q.        Okay.  And underneath, it's typed in Bay Area Real

1    Estate Holdings; correct?

2    A.      Yes.

3    Q.      And you understood that that was, as you testified to,

4    was the seller of this particular property?

5    A.      Yes.

6    Q.      And you knew that seller was Josh Clymer, the --

7    strike that.  You knew that this company was Mr. Clymer's

8    company and Mr. Williams' company; correct?

9    A.      Or I inferred that it was their property.  I was under

10   the assumption that it was their property.

11   Q.      You were under the assumption that it was their

12   property; right?

13   A.      Yes.

14   Q.      So in doing this transaction, it was your

15   understanding that this was just a property that Bay Area

16   owned and was then selling to you; correct?

17   A.      Yes.

18   Q.      In the conversation that you had with Mr. Clymer, was

19   there any discussion of a concurrent transaction?

20   A.      I don't recall.

21   Q.      Was there any discussion of a double escrow?

22   A.      I don't recall.

23   Q.      Now, I want to show you something you've already

24   testified to, which is Government's Exhibit 402.  And this is

25   Government's Exhibit 402, and you testified to this as being

1    a uniform residential loan application that you had signed;

2    correct?

3    A.      Yes.

4    Q.      Okay.  And if you look at the top here, just to make

5    sure, it says borrower.  That is your signature; correct?

6    A.      Yes.

7    Q.      Okay.  No doubt about it?

8    A.      That's my signature.

9    Q.      And you're indicating that you're applying for a

10   conventional loan; correct?

11   A.      Yes.

12   Q.      Okay.  And you testified about some of the information

13   that was inputted into this document; correct?

14   A.      Yes.

15   Q.      And you, for example, were asked about this section

16   here.  And this section here is the section concerning your

17   purported assets; correct?

18   A.      Yes.

19   Q.      Okay.  And, for example, it's your testimony that the

20   25,000, I think that is, or 26,000 in change is not an

21   accurate number; correct?

22   A.      That is correct.

23   Q.      And likewise, the number right below that is likewise

24   not accurate; correct?

25   A.      Yes.  Not accurate.

1     Q.     So essentially the assets that you put down on this

2     loan application were not accurate; correct?

3     A.     I did not put any information for the assets on this.

4     Q.     You did not put any information for the assets.  Did

5     you provide this information to Mr. Clymer?

6     A.     No.

7     Q.     No, you didn't.

8     A.     No.

9     Q.     Okay.  When you signed the document, you were aware

10    that this information -- well, strike that.  When you signed

11    the document, were you aware that this information was on

12    here?

13    A.     Yes.

14    Q.     Okay.  Because you looked at the document before you

15    signed it?

16    A.     Yes.

17    Q.     Okay.  And you looked at the document and signed it

18    knowing that it was inaccurate; correct?

19    A.     Correct.

20    Q.     Okay.  And you submitted it nevertheless because it

21    was your understanding that it really didn't make a

22    difference to the lender; right?

23    A.     I was assured that it would be okay.

24    Q.     You were assured that it would be okay.  So you

25    therefore didn't think it was going to have an effect on the

1    lender because you were told it was going to be okay;

2    correct?

3    A.     Yes.

4    Q.     Okay.  Now, when you signed the document -- I'm going

5    to call up a lengthy paragraph here and see if we can read

6    it.  Okay.  This acknowledgment and agreement, right, again,

7    that is your signature on the lower left with that date;

8    correct?

9    A.     Yes.

10   Q.     And if you can, read the small text and tell me if

11   that text indicates that you were signing this under penalty

12   of perjury.  And I'll refer you to the first long paragraph

13   there.

14          THE COURT:  Why don't you point out where it is.

15          MR. WISEMAN:  I will do that, your Honor.  Thank you.

16   Q.     BY MR. WISEMAN:  Now, see right here, it says

17   beginning where the little red thing is:  Any person who may

18   suffer a loss due to reliance upon any misrepresentation that

19   I may have made on this application, and/or in criminal

20   penalties including, but not limited, to imprisonment.  Do

21   you see that?

22   A.     Yes.

23   Q.     Do you understand that to mean that if you made a

24   misstatement on this application, you were subject to

25   criminal prosecution?

1    A.      Yes.

2    Q.      Okay.  And nevertheless, you signed this document;

3    correct?

4    A.      I did.

5    Q.      And you signed this document even though you were a

6    licensed real estate professional; correct?

7    A.      Yes.

8    Q.      And you signed this document knowing that it was going

9    to be submitted somewhere, I presume; right?

10   A.      Yes.

11   Q.      But you believed that it was going to be okay, that it

12   wouldn't make a difference, that everything would be okay?

13   A.      Yes.

14   Q.      Okay.  Now, likewise on some of the other documents

15   that you were asked about, you likewise signed those

16   documents knowing that not all the information contained

17   therein was accurate; correct?

18   A.      Yes.

19   Q.      And you did that as well because you thought that

20   everything was going to be okay; right?

21   A.      Yes.

22   Q.      And what you mean that everything was going to be

23   okay, it was your understanding it wasn't going to make a

24   difference because you were going to get this loan?

25   A.      Yes.

1    Q.      Okay.  Now, sir, in your career as -- let me ask you,

2    are you still in the real estate business?

3    A.      Yes.

4    Q.      Are you still representing buyers and sellers in

5    residential real estate?

6    A.      I'm doing transaction coordination and short sale

7    negotiation.

8    Q.      You're doing transaction coordination and short

9    selling; right?

10   A.      Uh-huh.

11   Q.      And short selling is a process where a person attempts

12   to sell an underwater property to get out of the loan; right?

13   A.      Yes.

14   Q.      And it requires the lender and other people to agree

15   to it; right?

16   A.      Yes.

17   Q.      Okay.  And in your short selling, in doing this short

18   selling negotiations and consulting, you confer with lenders,

19   I presume; correct?

20   A.      Yeah, with the mortgage holders.

21   Q.      With the mortgage holders, right, the folks who are

22   owed the money?

23   A.      Yeah.

24   Q.      Right.  And when you applied for the loan in question

25   on Baker Avenue, did anybody from the lender call you up and

1    chat with you about your application?

2    A.      I don't recall.

3    Q.      You don't recall.  Now, are you familiar with the term

4    of seller incentive in your professional career?  Have you

5    heard that term before?

6    A.      Maybe.

7    Q.      If you've maybe heard about it, what's your

8    understanding of what that term means?

9    A.      I don't know what -- can you provide an example?

10   Q.      Well, let me rephrase this.  Have you been in any

11   transaction since you've been -- have you been involved in

12   any transaction, either as the agent or as an intern for an

13   agent, in which a seller in the transaction provided

14   incentives to the buyer?

15   A.      I don't think so.

16   Q.      You don't think so.  Okay.  And you are familiar with

17   a HUD-1; correct?

18   A.      Yes.

19   Q.      And you were asked about a HUD-1 in this particular

20   case; correct?

21   A.      Yes.

22   Q.      And the HUD-1 is a document that details the

23   disbursements to the various parties to a real estate

24   transaction; correct?

25   A.      Yes.

1    Q.      And there are occasions in a transaction when the

2    seller will, for example, credit to the buyer certain amounts

3    for certain things; correct?

4    A.      Yes.

5    Q.      So, for example, if the seller, if a seller credits

6    back to a buyer $10,000 to repair a roof, would as a

7    professional, a real estate professional, would you construe

8    that as being a seller incentive?

9    A.      Yes.

10   Q.      Okay.  And it's your understanding that you were

11   getting, out of this Baker Avenue deal, that you were going

12   to be getting cash back; correct?

13   A.      Yes.

14   Q.      And what was -- when you were told by Mr. Clymer that

15   you were going to get cash back, what was your intent for

16   which you were going to use the money?  What were you going

17   to do with the money?

18   A.      Save it.  Maybe invest later.

19   Q.      So you were going to take that cash back and save it

20   and maybe parlay it into another transaction?

21   A.      At some future date, sure.

22   Q.      Right.  And the Baker Avenue property was merely, as

23   you said, an investment property; correct?

24   A.      Yes.

25   Q.      And you had no need to see it before you purchased it,

1   right, because you thought it was an investment property?

2   A.      Yeah.

3   Q.      And that's not unusual for an investor to purchase

4   property or make an offer on property without even seeing it

5   if he or she just wants to do it as an investment; correct?

6   A.      Yes.

7   Q.      Okay.  And the check that you were shown, let me just

8   pull that up.  Okay.  This is Government's Exhibit 427.  You

9   were asked about this; right?

10  A.      Yes.

11  Q.      Do you recall this?

12  A.      Yes.

13  Q.      This is the check that you received from Bay Area Real

14  Estate; right?  Do you see where I'm pointing, the red?

15  A.      Yes.

16  Q.      Okay.  And that's made out to you, Josh Frye?

17  A.      Yes.

18  Q.      And this amount is $17,859.  That represented the cash

19  back to you; correct?

20  A.      Yes.

21  Q.      And that was your understanding of how this deal was

22  going to go down, right, that you were going to get cash

23  back?

24  A.      Yes.

25  Q.      And at the time you did it, you didn't think there was

1   anything improper about this cash-back transaction; right?

2   A.      No.

3   Q.      Okay.  And, Mr. Frye, you've testified about what you

4   say was Mr. Williams' conduct and what he did.  And you

5   testified to something to the extent that he said that he

6   would put you on as an employee of Diamond Hill Financial;

7   correct?  That's what you testified to?

8   A.      Yes.

9   Q.      And you testified to some other things about what he

10  allegedly did to make this transaction go forward; correct?

11  A.      Yes.

12  Q.      But isn't it fair to say that the primary person that

13  you dealt with in this Baker Avenue transaction is

14  Josh Clymer?

15  A.      In terms of emails?  Yes.

16  Q.      In terms of emails.  But the emails made up the bulk

17  of the communication on this particular transaction; correct?

18  A.      Yes.

19  Q.      Okay.  And so it was Mr. Clymer with whom you were

20  dealing with; correct?

21  A.      Yes.

22  Q.      And so is it possible that it was Mr. Clymer and not

23  Mr. Williams who suggested that you be put on as an employee

24  of Diamond Hill Financial?

25  A.      I seem to recall it being Williams.

1    Q.     But it could have been Mr. Clymer.  As you sit here

2    right now in that chair, you are not convinced to a certainty

3    that it was Mr. Williams who suggested that.  It could have

4    been Mr. Clymer; correct?

5    A.     I was told by Mr. Williams.

6    Q.     You were told.  It's your recollection that you were

7    told by Mr. Williams, yet it was Mr. Clymer with whom you

8    were interacting with via email; correct?

9    A.     Yes.

10   Q.     And it was Mr. Clymer who you looked to as the person

11   who was going to make this deal happen and close this deal;

12   correct?

13   A.     Yes.

14          MR. WISEMAN:  May I have a moment, your Honor?

15          THE COURT:  Yes.

16   Q.     BY MR. WISEMAN:  Mr. Frye, you've admitted that you

17   signed documents knowing that they were not accurate back in

18   2006 to make this Baker Avenue deal go through; right?

19   A.     Yes.

20   Q.     As a result of that, was your real estate license ever

21   placed in jeopardy?

22   A.     No.

23   Q.     And you were approached by the FBI in this case;

24   correct?

25   A.     Correct.

1    Q.     And you were asked about your participation in this

2    Baker Avenue transaction; correct?

3    A.     Yes.

4    Q.     And you told the FBI that you had made these

5    statements that were not accurate; correct?

6    A.     Yes.

7    Q.     Did anybody tell you, the FBI, were you ever under any

8    impression that you were subject to criminal prosecution?

9    A.     Repeat.

10   Q.     Has anybody told you from the FBI that based upon your

11   involvement in this Baker Avenue transaction, that you would

12   be charged with a crime?

13   A.     No.

14          MR. WISEMAN:  No further questions.

15          THE COURT:  Any redirect?

16          MR. HALES:  Yes, your Honor.

17                          REDIRECT EXAMINATION

18   BY MR. HALES:

19   Q.     Mr. Frye, do you recall being asked on

20   cross-examination about knowing you were signing documents

21   with false statements?

22   A.     Yes.

23   Q.     Do you recall saying that you were assured it would be

24   okay?

25   A.     Yes.

1    Q.      Who assured you that it would be okay?

2    A.      I believe it was Mr. Williams.

3    Q.      Do you also recall being asked on cross-examination

4    about seller credits?

5    A.      Yes.

6    Q.      In your experience in the real estate industry, are

7    seller credits of the type Mr. Wiseman asked you about

8    supposed to be reflected on the HUD-1 in a real estate

9    transaction?

10   A.      Yes.

11   Q.      On another topic, in your cross-examination, you were

12   asked whether this was an investment property.  Do you

13   remember that?

14   A.      Yes.

15   Q.      And you said that by and large, that's how you thought

16   of it, it was an investment property for you?

17   A.      Yes.

18   Q.      Do you remember what box was checked on your loan

19   application?  Was the box checked for investment property or

20   primary residence?

21   A.      I believe it was checked for primary residence.

22           MR. HALES:  No further questions, your Honor.  Thank

23   you.

24           THE COURT:  Any recross?

25           MR. WISEMAN:  No, your Honor.

```
 1              THE COURT:  Thank you, Mr. Frye.  You're excused.
 2              THE WITNESS:  Thank you.
 3              MR. HALES:  The United States calls Keli Updegraff.
 4              THE CLERK:  Please step forward.  Stand next to the
 5      court reporter.  Thank you.  Face me.  Please raise your
 6      right hand.
 7                            KELI UPDEGRAFF,
 8      a witness called by the Government, having been first duly
 9      sworn by the Clerk to tell the truth, the whole truth, and
10      nothing but the truth, testified as follows:
11              THE WITNESS:  I do.
12              THE CLERK:  Thank you.  You may be seated.
13              MR. HALES:  Your Honor, may I approach to move
14      binders?
15              THE COURT:  Yes.
16              MR. HALES:  Thank you.
17              THE CLERK:  Please state your full name, spell your
18      last name for the record.
19              THE WITNESS:  Keli Updegraff, U-P-D-E-G-R-A-F-F.
20              THE CLERK:  Thank you.
21                          DIRECT EXAMINATION
22      BY MR. HALES:
23      Q.    Good afternoon, Ms. Updegraff.  Please tell us where
24      you work.
25      A.    I work at Residential Pacific Mortgage in Alamo.
```

1    Q.      And how long have you worked there or with companies

2    related to Residential Pacific Mortgage?

3    A.      Since January of 1991.

4    Q.      What are some of the other names of the company as

5    you've worked for it over those years?

6    A.      Nigerian Loans and NL, Incorporated.

7    Q.      What is your current job description at Residential

8    Pacific Mortgage?

9    A.      Credit risk analyst.

10    Q.      What does that involve?

11    A.      It involves looking at loans and analyzing risk not

12    only of individual loans but company policy regarding the

13    types of loans that we'll be doing.

14    Q.      Back in 2008, what was the company named at that time?

15    A.      NL, Inc.

16    Q.      And what were you doing at that time at NL, Inc?

17    A.      I was an underwriter, a loan underwriter.

18    Q.      And what did that involve just basically?

19    A.      It involved getting a loan package and then evaluating

20    the information in the package and comparing it to the

21    investor guidelines that we had to underwrite loans to to

22    make sure it adhered to whatever they wanted.

23    Q.      And when you say investor guidelines, did NL, Inc.,

24    typically sell the loans that it did?

25    A.      We sold 100 percent of our loans, yes.

1    Q.      And so an investor who would -- give us an example of

2    an investor who might buy one of your loans.

3    A.      Oh, Wells Fargo, Citi Corps, Chase.

4    Q.      So people would come directly to you to get a home

5    loan, but then at some point you would resell it after that?

6    A.      Yes.

7    Q.      So as an underwriter, are you familiar with the NL,

8    Inc., underwriting practices that were in effect in 2008?

9    A.      Yes.

10   Q.      What are, speaking generally now, some of the key

11   pieces of information that NL, Inc., would look at and

12   consider in a borrower in deciding whether to fund a loan at

13   that time?

14   A.      We would look at their credit, which is typically the

15   credit report, to see how they've paid their obligations.  We

16   would look at what's called the collateral, which is the

17   appraisal, the property, and the value of the property.  And

18   then we look at assets, like what the borrower has as far as

19   money on deposit and money for the transaction, and we look

20   at income.

21   Q.      Did you also look at the purchase price when doing the

22   underwriting?

23   A.      Yes.  If it was a purchase, we would look at the

24   purchase contract and the price of the home compared to the

25   appraisal, and then we would look at what they call the

1    preliminary title report which shows kind of a chain of

2    ownership of the property.

3    Q.      And what about a down payment in the transaction, is

4    that something that you would look at?

5    A.      Yes.

6    Q.      And why?

7    A.      Because depending on the loan program, there had to be

8    varying amounts of a down payment.  Different programs and

9    investors wanted different amounts, and so we had to make

10   sure that it, you know, fit into those guidelines.

11   Q.      You mentioned income before.  In connection with

12   income, would you also look at where the person was employed

13   and their job title?

14   A.      Yes.  Not only income but what generated that income,

15   which includes where they work and what their job title was.

16   Q.      In the underwriting process, what was the significance

17   of assets and income to NL, Inc., when you're looking at the

18   borrower?

19   A.      Well, the significance of assets is does the borrower

20   have enough money to put for a down payment and for closing

21   costs on the loan.  And also do they have enough money maybe

22   in reserves in the bank afterwards so that they have a few

23   months of payments, you know, sitting aside waiting.  And as

24   far as income goes, it's because it's evaluated if they have

25   the ability to be able to repay the loan.

1    Q.     During the underwriting process, can you tell -- well,

2    still talking about NL, Inc., in 2008, what are some of the

3    key documents that NL, Inc., would look at during the

4    underwriting process to gather the information and assess the

5    loan package?

6    A.     The loan application was one document that we really

7    looked at because that was sort of the document that tied it

8    all together.  In other words, the borrower would state what

9    their income was or their assets, that kind of thing.  And so

10   we would be comparing documentation to that to see, you know,

11   how accurate it was.  The appraisal's always a key piece of

12   documentation.  And then when you're matching to the loan

13   application, it's those things that are on there.  It's the

14   income documentation and the asset documentation.  And, once

15   again, in the case of a purchase, you're looking at the

16   purchase contract.

17   Q.     Have you had a chance to review loans, two different

18   loan files -- I'll ask you about one at a time.  First,

19   related to Joshua Frye's purchase of 4824 Baker Avenue in

20   February 2008, have you looked at that loan file?

21   A.     Yes.

22   Q.     Have you also looked at the loan file related to

23   Lacie Clymer's purchase of 11516 Linday Way in Gold River?

24   A.     Yes.

25   Q.     In your review of those loan files, did you recognize

1    those as loans originated by NL, Inc.?

2    A.      Yes.

3    Q.      Are they both correspondent loans?

4    A.      Yes.  They're what we call correspondent loans, which

5    means the loans close in our name and then we immediately

6    sell them to the end investor.

7    Q.      And by closing in your name, you mean that --

8    A.      Mean what's done at the title company where the loan

9    is funded and the deed of trust is recorded.

10   Q.      And in a correspondent loan, whose underwriting

11   standards are typically used?  I'm talking again about NL,

12   Inc., in 2008.

13   A.      We underwrite to the standards of the investor that

14   we're selling the loan to.  Since we sell 100 percent of our

15   loans and don't retain any, we always underwrite to that

16   particular investor's guidelines and standards.

17   Q.      Did NL, Inc., also have its own internal underwriting

18   procedures or guidelines that might be in addition or done

19   simultaneously with that?

20   A.      I wouldn't say that we added guidelines, but we had

21   processes and procedures that were in place that were

22   specific to us, yes.

23   Q.      How did you get the guidelines from the investors who

24   were buying the correspondent loans?

25   A.      They're published on the investor website.  And then

1    once you're a correspondent, you get a login and password to

2    access them.

3    Q.      And in that process, does NL, Inc., get paid when it

4    sells the correspondent loan?

5    A.      Yes.

6    Q.      Now, in 2008, based on your experience working there,

7    did NL, Inc., care if borrowers on correspondent loans could

8    continue to repay them?

9    A.      Yes.

10   Q.      Why?

11   A.      Well, because there's -- in the contracts we have with

12   these investors, and obviously every one is slightly

13   different, but there's things called reps and warrants that

14   they have on contracts where normally if a borrower goes

15   delinquent on the loan for any reason whatsoever, even say

16   somebody loses their job, we're liable to buy that loan back

17   within normally a year period.  And then in the case of any

18   kind of misrepresentation, there's no time period at all.  We

19   might have to buy that loan back 20 years from then.

20   Q.      So even if you're selling the loan, you care if these

21   were truthful loan applications?

22   A.      Yeah.

23   Q.      Let's discuss the loan file for the 4824 Baker Avenue.

24   And that should be the binder that's in front of you.  You

25   may need to flip all the way to the front.  We'll look at

1    Exhibit 401 first.  And there are tabs on the top of the

2    binder to tell you the exhibit numbers.  Do you need help?

3    A.      I think I have it.  Yes.  Okay.

4    Q.      All right.  Is Exhibit 401 the purchase agreement

5    related to 4824 Baker Avenue?

6    A.      Yes.

7    Q.      Why does the lender get to see the purchase agreement,

8    in your view as an underwriter?

9    A.      Well, first of all, you want to see what the purchase

10   price is because you're going to compare that to the

11   appraisal that you get to see, you know, that the value is

12   the same.  We look to see who the seller is to make sure that

13   that matches who's listed as the legal owner of the property

14   at the time.  We look to see if there are any inspections

15   that are called for that we might need to get and to make

16   sure that it's properly executed by all parties to the

17   transaction.

18   Q.      To what extent then does NL, Inc., rely on the

19   purchase agreement when it's going through the process of

20   deciding whether to fund the loan?

21   A.      We rely on an accurate purchase contract, purchase

22   agreement, as part of the loan due diligence that we do.

23   Q.      And as an underwriter, if buyer and seller had agreed

24   to a deal where the buyer would get cash back after the deal

25   closed but it wasn't on this document, would that affect your

 1   view of the true purchase price of the property as an

 2   underwriter?

 3   A.      Yes.

 4   Q.      Why?

 5   A.      Because it's some kind of an undisclosed payment to

 6   the seller.  And normally that's called a seller concession,

 7   and it's up-front and there are legitimate seller concessions

 8   that can be in contracts.  But what it does is it lowers the

 9   value of the home in terms of how much you can lend on it.

10   Q.      So if it's happening, as an underwriter at NL, Inc.,

11   you wanted that to be disclosed to you?

12   A.      Correct.

13   Q.      And you mentioned an appraisal before.  Who performs

14   the appraisal?

15   A.      Independent appraisers.

16   Q.      And in what way did you at NL, Inc., in 2008 rely on

17   appraisals in funding loans?

18   A.      Well, we relied on appraisals to be able to show an

19   accurate valuation of the collateral.

20   Q.      In your review of this loan file, did you learn what

21   4824 Baker Avenue appraised for?

22   A.      Yes.

23   Q.      Do you recall what it is?

24   A.      No, I'd have to look at it.

25   Q.      If you can look at Government's Exhibit 410 in the

1    binder and tell me if that refreshes your recollection.

2    A.      $350,000.

3    Q.      All right.  And if you can turn back to Exhibit 402 in

4    your binder.

5    A.      Okay.

6    Q.      And what is that?

7    A.      This is a loan application.

8    Q.      And who does it show is the borrower on this loan, if

9    you can see on the document?

10   A.      Joshua Frye.

11   Q.      How much is it that he's asking to borrow?

12   A.      315,000.

13   Q.      And is that the same or less than the purchase price

14   that we saw in the purchase contract?

15   A.      Less.

16   Q.      From an underwriter's perspective, what's the

17   importance of a down payment?  At NL, Inc., underwriting

18   perspective in 2008.  Let me clarify that.

19   A.      A down payment is important to the overall risk of the

20   file.  Because if you have somebody that isn't putting any

21   money down on a property, then they really maybe don't have

22   as much invested.  So something goes wrong or value

23   decreases, it's a lot easier to walk away.  It would be

24   deemed a very risky loan.

25   Q.      Is there a term you use in the industry when there is

```
 1    no down payment to refer to the loan?  How do you describe

 2    it?

 3    A.      When there's no down payment at all, oh, 100 percent

 4    financing.

 5    Q.      And is that viewed as more or less risky than a

 6    transaction involving a down payment?

 7    A.      Much more risky.

 8    Q.      Okay.  And if we go to page 2 of this loan

 9    application, and if we look in the top left corner of that

10    page, where does this loan application tell you Joshua Frye

11    works?

12    A.      Diamond Hill Financial.

13    Q.      For how long?

14    A.      Two years, six months.

15    Q.      Why is there -- well, from the underwriter's

16    perspective, does the duration matter and, if so, why?

17    A.      Yes, the duration matters.  Generally speaking, if

18    somebody's been on the same job or in the same line of work

19    for at least two years, it's considered much more stable than

20    if it hadn't been that long.

21    Q.      And if this loan applicant's duration on the job had

22    been significantly less or this job didn't exist at all,

23    could that have affected the decision to fund this loan?

24    A.      Yes.

25    Q.      If we can go back out to the full page.
```

1           How much does it say that the loan applicant here is

2    making monthly?

3    A.      7,292.36.

4    Q.      And if this loan applicant's true income had been far

5    below that, is that something that could have affected NL,

6    Inc.'s, decision whether to extend this loan?

7    A.      Yes.

8    Q.      Let's go to page 3.  And before I talk about it -- I

9    mean you've already said this, I think, but can you explain a

10   little further why is knowing the extent of the borrower's

11   assets important to NL, Inc.?

12   A.      Because we have -- we, first of all, have to see that

13   the borrower has sufficient money for a down payment and for

14   any of the closing costs associated with the loan.  And,

15   honestly, the ability to save is also just sort of one of

16   those things an underwriter looks at in evaluating a loan.

17   Q.      And if we pull up the total assets here.

18           Now, if this loan applicant, Mr. Frye, did not have

19   total assets of $61,488 at the time of this application and,

20   in fact, had far less than that, could that have affected NL,

21   Inc.'s, decision to fund this loan?

22   A.      Yes.

23   Q.      Why?

24   A.      I don't know how much, first of all, that the borrower

25   even needed to close, but if it cut into that, it obviously

1    would because then he'd have insufficient funds to close.

2    Over and above that, it also would mean that he probably

3    didn't have the amount in reserves that we assumed he had

4    when we were underwriting the loan.

5    Q.     From your review of this loan file, is this a stated

6    income/stated asset loan application?

7    A.     I believe this one was, yes.

8    Q.     Can you please turn to Exhibit 404 in your binder.

9    A.     Okay.

10   Q.     Do you recognize that?

11   A.     Yes.

12   Q.     What is it?

13   A.     It's called a verification of employment form.  And

14   it's a form that we at NL, Inc., completed on every single

15   loan that we did just prior to the loan funding where we

16   would call the employer and verbally verify that the borrower

17   still worked there, how long they've been there, and what

18   their position was.

19   Q.     What would happen if you couldn't verify the

20   employment?

21   A.     Everything stops until we can find out do they have a

22   new job and then go through and verify that or see what's

23   happening.

24   Q.     And did you know Melissa Maclay?

25   A.     Yes.

1    Q.      Did she work at NL, Inc.?

2    A.      Yes.

3            MR. HALES:  Move to admit Government's Exhibit 404,

4    your Honor.

5            THE COURT:  Exhibit 404 is received in evidence.

6                            (GOVERNMENT'S EXHIBIT 404,

7                            Verification of employment, ADMITTED

8                            INTO EVIDENCE.)

9    Q.      BY MR. HALES:  Based on your review of this loan file,

10   did NL, Inc., rely on its verification of employment document

11   in its decision to fund the loan?

12   A.      Yes.

13   Q.      If you can move in your binder to Government's

14   Exhibit 405.

15           As far as deciding who to call to verify the

16   employment, did NL, Inc., have rules or, you know, a common

17   practice in 2008 that you are familiar with?

18   A.      Yes.  We had to independently verify the telephone

19   number of the company.  We couldn't take a number from the

20   borrower or anyone else involved in the transaction.  We had

21   to discover it on our own.

22   Q.      Is this the type of document you would put in the loan

23   file to reflect that that had been done to find the phone

24   number?

25   A.      Yes.

1           MR. HALES:  Move to admit Government's Exhibit 405.

2           MR. WISEMAN:  Your Honor, I'll object.  I'm not sure

3     she has sufficient personal knowledge of this.

4           THE COURT:  She hasn't had personal knowledge of most

5     of this.  It's all business records.

6           MR. WISEMAN:  Right.  But there's a relevancy if she

7     can't describe it any more than she did, the significance of

8     it.

9           THE COURT:  The objection is overruled.

10    Q.     BY MR. HALES:  Do you see the phone number that's

11    listed here?

12    A.     Yes.

13    Q.     (916) 932-2083?

14    A.     Uh-huh.

15    Q.     And if we can zoom out.

16           And that appears to have been acquired from

17    411.yellowpages.com?

18    A.     Correct.

19    Q.     And this will require a little page turning, so I

20    apologize.  But if you can turn to Exhibit 433 in your

21    binder.

22    A.     Okay.

23    Q.     Did you see that in the loan file related to

24    Joshua Frye's purchase of the Baker Avenue property?

25    A.     Yes.

1    Q.      Do you recognize what that document is?

2    A.      Yes.

3    Q.      What is Salary Wizard?

4    A.      Well, Salary Wizard is just a tool on this website

5    salary.com.  And what it does is you can plug in a job title

6    as well as a metropolitan area or an exact city where a

7    borrower will work, and it will give you a range of what

8    income would be for that job.

9    Q.      And so is that a tool you're familiar with from 2008

10   working at NL, Inc., that you would use?

11   A.      Yes.

12           MR. HALES:  Move to admit Government's Exhibit 433,

13   your Honor.

14           THE COURT:  Exhibit 433 is received in evidence.

15                           (GOVERNMENT'S EXHIBIT 433, Online

16                           salary checker, ADMITTED INTO

17                           EVIDENCE.)

18   Q.      BY MR. HALES:  And is this one of the pieces of

19   underwriting that you would rely on in deciding whether to

20   fund the loan?

21   A.      Yes.

22   Q.      All right.

23           THE COURT:  That's from this loan file; right?

24           MR. HALES:  Yes, your Honor.

25           THE COURT:  Okay.

```
 1              MR. HALES:  It's probably better if I asked the
 2    witness.
 3    Q.      BY MR. HALES:  That document that we just viewed, the
 4    Salary Wizard document, is that a document that you saw in
 5    the loan file for Joshua Frye's purchase of the Baker Avenue
 6    property?
 7    A.      Yes.
 8    Q.      Thank you.  And if you can flip back to Government's
 9    Exhibit 407 in your binder.
10    A.      Okay.
11    Q.      Do you recognize this document?
12    A.      Yes.
13    Q.      What is it?
14    A.      This is something, it's called underwriting findings.
15    And when we have loan information and we input it into
16    Fannie Mae's underwriting engine, which is called Desktop
17    Underwriter (DU), this is what prints out when it evaluates
18    the loan.
19    Q.      And what is the source of the information that is used
20    to put into that process to generate this analysis?
21    A.      The actual loan file that we have.  In good part, the
22    loan application.
23              MR. HALES:  Move to admit Government's Exhibit 407,
24    your Honor.
25              THE COURT:  Exhibit 407 is received in evidence.
```

```
1                              (GOVERNMENT'S EXHIBIT 407, DU

2                              underwriting findings, ADMITTED INTO

3                              EVIDENCE.)

4    Q.      BY MR. HALES:  I'm going to ask a few questions about

5    the top portion of this.  First, LTV and CLTV, can you

6    explain to us what those acronyms mean?

7    A.      Oh, LTV is loan to value.  CLTV is combined loan to

8    value.  And what that is is the loan amount and then divided

9    into what the appraised value or the purchase price of the

10   house is.  And it gives you, it shows you how much, what

11   percentage of it is expressed as a loan, in this case

12   90 percent.

13   Q.      And you said it's against the value of the home, but

14   either the appraised value or the purchase price.  How do you

15   choose?

16   A.      The lower of.

17   Q.      The lower of the two?

18   A.      Uh-huh.

19   Q.      So if the actual purchase price is lower than the

20   appraised value, that's what you would use to calculate the

21   loan-to-value ratio?

22   A.      Yes.

23   Q.      And how is the loan-to-value ratio significant, and

24   again talking about NL, Inc., in 2008, in terms of deciding

25   whether to fund the loan?
```

1    A.      Oh, significant that all of the investors that we sold

2    to had published matrices which showed what loan to values

3    they would lend in for particular products, and so we had to

4    adhere to that.

5    Q.      So if the true purchase price of this home had been

6    lower, could that have changed the loan-to-value ratio here?

7    A.      Yes.

8    Q.      Could that have affected NL, Inc.'s, decision to fund

9    this loan?

10   A.      Yes.

11   Q.      And next, the housing expense ratio, can you explain

12   that to us, please?

13   A.      Oh, housing expenses, all of the expenses associated

14   with the payment on the house, which is the principal and

15   interest payment, the taxes, any insurance, and homeowners

16   dues, if any, and that's divided into the borrower's gross

17   monthly income.

18   Q.      So then the sort of bottom of the fraction is the

19   borrower's monthly income?  I hope I didn't misstate it.  Why

20   don't you describe it for us.

21   A.      All it means is what percentage of the borrower's

22   gross income is being paid toward their housing expense every

23   month.

24   Q.      And if their actual income is much lower than what was

25   stated on the loan application, can that affect this

```
1    calculation, the housing expense ratio?

2    A.    Yes.

3    Q.    And if that ratio is actually quite a bit different,

4    can that affect NL, Inc.'s, decision whether to fund this

5    loan?

6    A.    Yes.

7    Q.    What's the difference between the housing expense

8    ratio and the total expense ratio?

9    A.    Total expense also includes all other debt that the

10   borrower may have; credit cards, car payments, if they owned

11   any other real estate.

12   Q.    Can that ratio also be affected if the borrower's true

13   income is different than what's stated on the loan

14   application?

15   A.    Yes.

16   Q.    And that can have the same effect, it can affect

17   whether you decide to extend this loan?

18   A.    Correct.

19   Q.    Okay.  And if we look down here at item number 9.

20   Actually, do you see that the section in which Number 9

21   appears has at the top approval conditions?

22   A.    Yes.

23   Q.    What does that mean?

24   A.    That means that all of these conditions would need to

25   be met in order for the loan to be approved.
```

1    Q.      And looking at item number 9 in particular, why would

2    it be important to NL, Inc., to verify that the borrower is

3    contributing at least 5 percent towards the down payment?

4    A.      Well, it would be important to us because that was the

5    industry standard at the time.  And if the borrower wasn't

6    contributing 5 percent of their own funds, the loan would not

7    be sellable to any of our end investors.

8    Q.      If the loan wasn't sellable, then, in turn, would you

9    extend the loan at NL, Inc., in 2008?

10   A.      No.

11           THE COURT:  So there weren't hundred percent loans at

12   that time.  You said any of your investors.  I assumed when I

13   saw that that it was the particular investor you were

14   underwriting that loan for.  But you just said any of your

15   investors.  So they all required at least a down payment of

16   5 percent.  Is that what you're saying?

17           THE WITNESS:  To my recollection, all of our investors

18   required the 5 percent.

19           THE COURT:  So there were no hundred percent loans?

20           THE WITNESS:  I think that there were in the industry.

21   I don't believe we were participating in them.

22           THE COURT:  All right.

23   Q.      BY MR. HALES:  And if you can flip to page 3 in that

24   exhibit, please.  I'm sorry.  Page 2.  In the upper portion

25   of page 2, do you see where it appears to say SISA?

1    A.      Correct.

2    Q.      What does that stand for?

3    A.      Stated income/stated asset.

4    Q.      And based on your experience, why would that be noted

5    here on this loan application?

6    A.      It would be noted here because at the time when stated

7    income/stated asset loans were being done, that was one of

8    the criteria from the investors.  We still had to run all of

9    the loans through this Fannie Mae engine, and it would spit

10   out income and asset information, and those were the only two

11   items on there that we didn't have to get documentation for.

12   And so we would note on there that it was a SISA loan, and

13   that's why -- that it was a stated income/stated asset loan,

14   and that's why it wasn't in the file.

15   Q.      And even if your investor didn't require you to -- we

16   saw the verification employment form before.  Even if your

17   investor didn't require you to verify the employment, was

18   that a separate requirement at NL, Inc., in 2008 to do that,

19   or was that also done to satisfy your investors?

20   A.      At some point investors started asking for it, and I

21   don't recall at what time we introduced it, if it was prior

22   to that or at that time.

23   Q.      If we could zoom back out on that page, please, and go

24   to page 3.  Are you on page 3, or you can see it on the

25   screen, either way.

1          And if you look at item number 21 on this exhibit,

2    what was the income amount relied on for this DU underwriting

3    analysis?

4    A.      7,292.36.

5    Q.      And do you recall how that compares to the income that

6    was listed on the loan application?  Take your time.  It's at

7    402, I believe.

8    A.      It's the same.

9    Q.      If we could zoom back out, please, and enlarge item

10   22.

11         What was the asset information that was relied upon

12   for the DU underwriting analysis?

13   A.      Two accounts at Wells Fargo.

14   Q.      Totalling approximately a little over $60,000?

15   A.      Yes.  Actually on the fourth page, those two

16   accounts -- any accounts that are in section 22 on the fourth

17   page, the system itself, the program, totals it.

18   Q.      Okay.  Let's go there and have you show us then.

19   A.      So down near the bottom on the left where it says

20   funds, it shows how much in funds is required for the

21   transaction.  And then what's available would be what's

22   reflected on the earlier page in the different accounts.

23   Q.      And is that your arrow that just appeared there?

24   A.      Oh, did I do that?

25   Q.      You can touch the screen and arrows appear.

1    A.        Okay.

2    Q.        But if you could show us, and then maybe we could blow

3    up the part that you're talking about.

4    A.        Right here, yes.

5    Q.        Great.  So this is where it's totaled up?

6    A.        Correct.

7    Q.        How does that asset total compare to what was on the

8    loan application for Mr. Frye?

9    A.        It's the same.

10   Q.        And if we could zoom back out and enlarge the portion

11   that says qualifying ratios.

12            So I believe we saw the same ratios before, but here

13   they have a different title above them, qualifying ratios.

14   What does that mean in your experience as an underwriter?

15   A.        It means that all this information going into these

16   ratios, these are the ratios that are qualifying the borrower

17   for the loan.

18   Q.        And then sort of backing out, you know, getting up a

19   few thousand feet maybe.

20            What is the role of this document in the overall

21   transaction as you do the underwriting and then you sell the

22   loan?

23   A.        I think it's twofold.  First of all, you do rely on,

24   if you look at the first page at the very top, it shows that

25   the recommendation for the loan is approved and eligible, and

1    so it means that it's gone through Fannie Mae's underwriting

2    engine and it's evaluated the credit risk and has deemed that

3    it's an approvable and acceptable risk.  That's one thing.

4    The other thing that it's used for is it's just a really good

5    overview or synopsis of the entire loan.  It breaks

6    everything out as far as the income and the assets and the

7    liabilities and also gives us a list of conditions that we

8    need to make sure are in the final loan file.

9    Q.      In your experience, would you have been able to resell

10   this loan to an investor if it did not pass the DU

11   underwriting analysis?

12   A.      No.

13   Q.      In your experience as an underwriter at NL, Inc., in

14   2008 or any other time, have you seen a loan pass the DU

15   underwriting analysis where the borrower's true income is

16   lower than the monthly expenses expected from the mortgage

17   that's resulting from the loan?

18   A.      No.

19   Q.      And if we can look at the proposed monthly payment

20   portion of this.  And so what is this section telling us just

21   generally?

22   A.      This is just showing what the breakout of the entire

23   monthly payment is.  The first portion is principal and

24   interest, and then it has a line for taxes and insurance or

25   homeowners dues, mortgage insurance, just any of the costs

 1    associated with it.

 2    Q.      Okay.  And so is the total, the total at the bottom is

 3    the anticipated total cost to the borrower of owning this

 4    residence month to month?

 5    A.      Correct.

 6    Q.      Similar to the question that I asked before, but if

 7    that borrower's income that's put on the loan application is

 8    less than this $2,488.96 amount on this form, would in your

 9    experience that application have passed the DU underwriting

10    analysis?

11    A.      No.

12    Q.      Could you please move to Exhibit 408 in your binder.

13    A.      Okay.

14    Q.      Do you recognize that document?

15    A.      Yes.

16    Q.      What is that?

17    A.      It's called a uniform underwriting and transmittal

18    summary.  This is a form that's required in every single one

19    of the loans that we do.  It's a Fannie Mae and Freddie Mac

20    form.  And what it does is it pulls information from the loan

21    application and sort of sets it in a different format on one

22    page where it shows the terms of the loan and the income and

23    what the ratios are in the loan to value.

24    Q.      Is this intended to be a useful snapshot for your

25    investor when you're putting the loan for sale?

1    A.       Yes.

2    Q.       Was this document generated by NL, Inc.?

3    A.       Yes.

4             MR. HALES:  Move to admit Government's Exhibit 408,

5    your Honor.

6             THE COURT:  Exhibit 408 is received in evidence.

7                            (GOVERNMENT'S EXHIBIT 408, Uniform

8                            Underwriting and transmittal summary,

9                            ADMITTED INTO EVIDENCE.)

10   Q.       BY MR. HALES:  I'll try not to belabor it, but if we

11   can blow that portion up.

12            Do we see again here on the uniform underwriting and

13   transmittal summary the same income numbers and qualifying

14   ratios that we saw on the prior DU underwriting analysis?

15   A.       Yes.

16   Q.       And again -- strike that.  I'll skip that question.

17            Does NL, Inc., or did NL, Inc., in 2008 when putting

18   together documents like this, did you intend for your

19   investor, the buyer of the loan, to rely on this document in

20   purchasing it?

21   A.       Yes.

22   Q.       And in your experience, if the income on this form had

23   said zero dollars or $500, anything under a thousand, would

24   GMAC -- I'm sorry, would anybody, any of the investors NL,

25   Inc., worked with have purchased this loan?

```
 1   A.      No.

 2   Q.      Please turn to Exhibit 409 in your binder, please.

 3   A.      Okay.

 4   Q.      Do you recognize this document?

 5   A.      Yes.

 6   Q.      Is this also an NL, Inc., document related to

 7   underwriting?

 8   A.      Yes.

 9   Q.      What is it, if you can describe for us?

10   A.      This is the document that we generate after we've

11   underwritten each loan.  And it's basically the loan approval

12   that lists out all of the conditions that need to be met in

13   order to close the loan.

14           MR. HALES:  Move to admit Government's Exhibit 409,

15   your Honor.

16           THE COURT:  Exhibit 409 is received in evidence.

17                       (GOVERNMENT'S EXHIBIT 409, Loan

18                        approval worksheet, ADMITTED INTO

19                        EVIDENCE.)

20   Q.      BY MR. HALES:  Well, just looking at the document

21   right now, do you see that there are initials in the far

22   right-hand column and some dates?

23   A.      Yes.

24   Q.      And the dates column says signed off.  How are these

25   fields populated, if you will?  At NL, Inc., in 2008, how is
```

1    this document completed?

2    A.    Oh, well, it's in the computer system, and each person

3    in the company has their own login, password and ID and

4    login, to be able to get into the system.  And so if we were

5    to sign off one of these conditions, it automatically

6    populates their initials.

7    Q.    Okay.  So it's computer based?

8    A.    Correct.

9    Q.    Can you look at page 2 of this exhibit, please.  Item

10   number 26 at the bottom, if we could blow that up.

11         Was one of the prior to funding conditions on this

12   loan a verbal -- what does VOE stand for here?

13   A.    Verbal verification of employment.

14   Q.    So is one of the prior to funding conditions that the

15   verbal verification of employment covering two years of

16   employment history be satisfied?

17   A.    Yes.

18   Q.    Does it appear that an employee of NL, Inc., did sign

19   off, if you will, on that requirement?

20   A.    Yes.

21   Q.    Okay.  And the initials MM, do you recognize those?

22   A.    Melissa Maclay.

23   Q.    Did you know anyone else with those initials at NL,

24   Inc., at the time, as best you can recall?

25   A.    No.

1   Q.      And if you could look back at page 1 just quickly on

2   this document.  And if you'll look at item number 17.

3   A.      Oh, on this document.

4   Q.      Yes.  We're still within the exhibit we were on.

5           Do you see where it says, "Please fax a certified copy

6   of the final HUD-1 within 24 hours of funding to your

7   funder"?

8   A.      Uh-huh.

9   Q.      What's a HUD-1 from your perspective as an

10  underwriter?

11          THE COURT:  We've heard this at least three times

12  before.  So you don't have to have every witness repeat it.

13          MR. HALES:  I'll move on, your Honor.

14          THE COURT:  Unless she thinks it's something different

15  than the other ones.

16          MR. HALES:  I'll move on.

17  Q.      BY MR. HALES:  What is this condition asking for?

18  That's condition 17.

19  A.      Just that the title company fax a copy of the HUD-1 to

20  the NL, Inc., employee that funded the loan within 24 hours

21  of the loan funding.

22  Q.      Did you find a HUD-1 in this loan file?

23  A.      Yes.

24  Q.      Can you please look at Government's Exhibit 413 and

25  tell me if that's the HUD-1.

1    A.       Yes.

2    Q.       Right.  And if we could put up the first page there.

3             And if we look in the left-hand column at the bottom,

4    do you see at line 303 where it says "cash from (xx to)

5    borrower"?

6    A.       Yes.

7    Q.       If the borrower was receiving approximately 17 or

8    $18,000 cash -- sorry, if the buyer was receiving

9    approximately that amount of cash back from the seller on

10   this transaction, would you expect to see that reflected in

11   this box on the HUD-1?

12   A.       Yes.

13   Q.       But the amount that's reflected here is just the

14   $3,141.26?

15   A.       Yes.

16   Q.       Move to page 3 of this document, please.

17            Do you see the section where it says deposits to

18   escrow?

19   A.       Yes.

20   Q.       And there's another name there, Chahal Hardip, across

21   from $38,000.  Do you see that?

22   A.       Yes.

23   Q.       Does that have any significance to you or strike you

24   as odd in any way in connection with this overall loan file?

25   A.       It strikes me as odd as I don't see that name anywhere

1    else in the file.

2    Q.      All right.  Let's move to the second page of this

3    exhibit at the lines 800 through 809, if we could.  How much

4    did NL, Inc., get for its underwriting fee according to this

5    HUD-1, if you can read that?

6    A.      $720.

7    Q.      And further up at 801, that loan origination fee,

8    Residential Pacific Mortgage is also affiliated with NL,

9    Inc.; is that right?

10   A.      Correct.

11   Q.      Could you please turn to Exhibit 415 in your binder.

12   A.      Okay.

13   Q.      Do you recognize this document?

14   A.      Yes.

15   Q.      What is it?

16   A.      It's a deed of trust.

17          MR. HALES:  Move to admit Government's Exhibit 415,

18   your Honor.

19          THE COURT:  Exhibit 415 is received in evidence.

20                            (GOVERNMENT'S EXHIBIT 415, Deed of

21                            trust (loan file version), ADMITTED

22                            INTO EVIDENCE.)

23   Q.      BY MR. HALES:  Did you see this document in the loan

24   file, Ms. Updegraff?

25   A.      Yes.

1    Q.      And if we look in the upper right-hand corner, what

2    does that section indicate to you about whether this document

3    was recorded?

4    A.      Yes.  This is the recording information that's put on

5    by whatever county records it.  And it shows the date that

6    they did it and the book and page number of the recording.

7    Q.      And from NL, Inc.'s, perspective in this transaction,

8    what's the importance of the deed of trust?

9    A.      The deed of trust is the document -- when somebody

10   signs a note on a loan, that's kind of a promissory note, but

11   the deed of trust is the actual document that's securing that

12   note because it's recorded against the property.

13   Q.      And this section here, is this indicating that

14   Joshua Frye is the borrower and NL, Inc., is the lender?

15   A.      Yes.

16   Q.      And you'd mentioned earlier with the correspondent

17   loans, it means it closes in NL, Inc.'s, name.  Is this how

18   you see it on the deed of trust, that it's your name and not

19   the investor?

20   A.      Correct.

21   Q.      If we go back out, what's the total amount of the loan

22   that's reflected, if you look down at the bottom of the

23   document?

24   A.      315,000.

25   Q.      And then if we can zoom back out.

1          How did NL, Inc., in 2008 typically receive back the

2    deed of trust after the transaction had closed, the recorded

3    copy like this one?

4    A.     Most counties in California send it through U.S. mail.

5    Q.     Is that typically how NL, Inc., received them then?

6    A.     Yes.

7    Q.     Can you please move to Government's Exhibit 436 in

8    your binder.  You'll have to jump a little bit.

9    A.     Okay.

10   Q.     Actually, before I ask you about that document, when

11   the loan closes, how does NL, Inc., typically transmit the

12   loan amount to where it needs to go, escrow?

13   A.     Oh, the funds to close the loan, we wire them, wire

14   transfer.

15   Q.     And does it come directly from NL, Inc., or does it

16   sometimes come from an entity related to NL, Inc.?

17   A.     I don't do the wires.  I can't tell you of my own

18   individual knowledge.

19   Q.     But you do know that the funds are wired.

20   A.     Yes.

21   Q.     All right.  Let's talk about Government's Exhibit 436.

22   Do you recognize this type of document?

23   A.     Yes.

24   Q.     This document.  What is it?

25   A.     As soon as the loan funds, this is something that --

KELLY O'HALLORAN, OFFICIAL COURT REPORTER, USDC -- (916) 448-2712

1   well, the borrower receives a copy.  It shows where they're

2   to send their first mortgage payment.

3              MR. HALES:  Move Government's Exhibit 436 into

4   evidence, your Honor.

5              THE COURT:  Exhibit 436 is received in evidence.

6                          (GOVERNMENT'S EXHIBIT 436, NL, Inc.

7                          Letter to Joshua Frye dated 2/19/08,

8                          ADMITTED INTO EVIDENCE.)

9   Q.      BY MR. HALES:  And quickly, what is the first monthly

10  payment?  Is that the first monthly payment this document is

11  saying Mr. Frye will owe?

12  A.      Yes.

13  Q.      And then if you could please go back to Exhibit 417 in

14  your binder.

15  A.      Okay.

16  Q.      Do you recognize this document?

17  A.      Yes.

18  Q.      What is this document saying?

19  A.      This document's informing the borrower that we're

20  transferring, assigning the loan to whoever the end investor

21  is.  In this case, it's GMAC Mortgage.

22  Q.      Based on your review of the loan file, did GMAC

23  Mortgage ultimately purchase this loan?

24  A.      Yes.

25  Q.      Let's now talk about the file related to

1    Lacie Clymer's purchase of the Linday Way property.  And if

2    you will, there's a binder behind you that's labeled the 600

3    series.  We will be using that one.

4          MR. WISEMAN:  Your Honor, may I ask if we can take a

5    quick break?

6          THE COURT:  We can take the recess now.  We'll take a

7    15-minute recess, ladies and gentlemen.  Remember the

8    admonition.

9          MR. WISEMAN:  Thank you.

10          (Recess taken.)

11          THE COURT:  Anything to discuss before we bring the

12    jury in?

13          MR. WISEMAN:  No.  I think -- we had a brief

14    conversation, but I don't think it's an issue.

15          THE COURT:  All right.

16          MR. WISEMAN:  Wait a minute.  You know what?  I'm

17    sorry, your Honor.  Maybe we should just put it on the record

18    so nothing later can be a problem.  Go ahead.

19          MR. HALES:  Your Honor, I was advised that prior to

20    Ms. Updegraff's testimony that one of our agents on the case

21    who had not met her before came upstairs to look for her, saw

22    a woman fitting her description, and asked are you Keli?  The

23    individual said no.  It was not Ms. Updegraff.  It was one of

24    the jurors that the agent did not recognize.

25          THE COURT:  Which one of the jurors looks like

 1    Ms. Updegraff?

 2          MR. HALES:  I don't know that she looks that much like

 3    her but fit the rudimentary description the agent had at the

 4    time.  That was the extent of the conversation.  I've advised

 5    Mr. Wiseman, and I don't believe he has any issue with it.

 6          THE COURT:  All right.  No issue?

 7          MR. WISEMAN:  I have no issues with that.

 8          THE COURT:  Very well.

 9          MR. WISEMAN:  Let's just hope the juror looks like

10    her.

11          THE COURT:  I don't know.  I can't think of anyone who

12    looks like her, but things are all subjective.

13          (Jury present.)

14          THE COURT:  The jurors are all present.  The defendant

15    is present with counsel.  You may continue.

16          MR. HALES:  I apologize, your Honor.

17    Q.    BY MR. HALES:  Before we broke, we were about to talk

18    about the loan file for Lacie Clymer's purchase of Linday

19    Way.

20    A.    Yes.

21    Q.    And you've reviewed that file?

22    A.    Yes.

23    Q.    Please look at Government's Exhibit 601 in your

24    binder.

25    A.    Okay.

1    Q.      Is that the purchase agreement from the loan file for

2    the Linday Way?

3    A.      Yes.

4            MR. HALES:  Okay.  Your Honor, move to admit

5    Government's Exhibit 601.

6            THE COURT:  Exhibit 601 is received in evidence.

7                            (GOVERNMENT'S EXHIBIT 601, Purchase

8                            Agreement, ADMITTED INTO EVIDENCE.)

9    Q.      BY MR. HALES:  Did NL, Inc., receive this document in

10   conjunction with the loan application?

11   A.      Yes.

12   Q.      And what is the stated purchase price?

13   A.      500,000.

14   Q.      And if you could also look back at Government's

15   Exhibit 611 in your binder.

16   A.      Okay.

17   Q.      Do you recall seeing in the loan file that the

18   purchase price was subsequently reduced somewhat?

19   A.      Yes.

20   Q.      Is this the addendum reflecting that, Government's

21   Exhibit 611?

22   A.      Yes.

23           MR. HALES:  Move to admit Government's Exhibit 611,

24   your Honor.

25           THE COURT:  Exhibit 611 is received in evidence.

```
 1                          (GOVERNMENT'S EXHIBIT 611, Addendum

 2                          lowering purchase price after

 3                          appraisal review, ADMITTED INTO

 4                          EVIDENCE.)

 5     Q.     BY MR. HALES:  And to what amount was the purchase

 6     price ultimately -- was the purchase price amended as

 7     reflected in this document?

 8     A.     478,000.

 9     Q.     And if you can go back then to -- well, before I move

10     on, similarly as we discussed with the other loan file, did

11     NL, Inc., rely on the purchase price that was reflected in

12     that purchase agreement and addendum in doing its

13     underwriting on this loan file?

14     A.     Yes.

15     Q.     Can you please look at what's been marked as

16     Government's Exhibit 602 in your binder.

17     A.     Okay.

18     Q.     And what is that?

19     A.     The loan application.

20            MR. HALES:  Move to admit Government's Exhibit 602,

21     your Honor.

22            THE COURT:  Exhibit 602 is received in evidence.

23                          (GOVERNMENT'S EXHIBIT 602, Loan

24                          Application, ADMITTED INTO EVIDENCE.)

25     Q.     BY MR. HALES:  And the address related to this loan
```

1    application is what?

2    A.      11516 Lindsay Way, Gold River, California.

3    Q.      Is it Lindsay or Linday?

4    A.      Excuse me.  Linday Way.

5    Q.      And the borrower is Lacie Clymer?

6    A.      Yes.

7    Q.      If you can just see on the paper in front of you

8    what's the total amount of the loan being applied for?  We

9    can blow it up if you can't see it.

10   A.      382,400.

11   Q.      Can we please go to page 2 of this document.

12           Maybe to try and make things a little more quick with

13   the review of these documents, is there anything different

14   between the two loan files that you reviewed where you would

15   not have relied on the employment information in this loan

16   application, or did the same descriptions that you provided

17   before apply as far as how NL, Inc., would have relied upon

18   this loan application?

19   A.      Yes, the same descriptions apply.

20   Q.      Who does it say employs Lacie Clymer on this

21   application?

22   A.      Diamond Hill Financial.

23   Q.      For how long?

24   A.      Three years, six months.

25   Q.      And if both of those pieces of information were false,

1    could that have affected NL, Inc.'s, decision to extend this

2    loan in 2008?

3    A.      Yes.

4    Q.      If we can zoom back out and go to the income

5    information at the bottom.

6            How much monthly income does this loan application

7    state Lacie Clymer receives?

8    A.      8,893.

9    Q.      If her true income was substantially below that, is

10   that something that could have affected NL, Inc.'s, decision

11   to fund this loan in 2008?

12   A.      Yes.

13   Q.      For the same reasons that you stated earlier?

14   A.      Correct.

15   Q.      Go to page 3, please.  Similar question.

16           Do you see the total amount of assets that's listed in

17   the assets column?

18   A.      Yes.

19   Q.      What is that amount?

20   A.      147,664.

21   Q.      And if this borrower Lacie Clymer's true amount of

22   assets were far below that, would that have affected NL,

23   Inc.'s, decision whether to fund this loan?

24   A.      Yes.

25   Q.      And then if you can go to page 4, please.

1                   And the summary of transaction column in the upper

2       left.  What is this -- I guess it's details of transaction.

3       Do you see that?

4       A.      Yes.

5       Q.      What does this indicate about the down payment to be

6       made in connection with this transaction?

7       A.      Well, the total funds to close, which includes not

8       only the down payment but all closing costs, is 96,977.

9       Q.      Thank you for clarifying that.  So that's not just a

10      down payment.  That includes some other costs?

11      A.      Correct.

12      Q.      Okay.  If NL, Inc., in 2008 knew that the buyer,

13      Lacie Clymer, was not, in fact, going to make that down

14      payment in connection with the purchase of this house, is

15      that something that could have affected your decision to

16      extend this loan?

17      A.      Yes.

18      Q.      For the same reasons that you explained earlier with

19      respect to down payments?

20      A.      That's correct.

21      Q.      What would NL, Inc., consider to be the purchase price

22      of this house for underwriting purposes if no down payment

23      had been made if you were underwriting this?

24      A.      If wouldn't affect the purchase price of the house,

25      but it would affect the loan to value.  If no down payment

 1   were made, it would be 100 percent loan to value, and it

 2   wouldn't have been able to be done, the loan.

 3   Q.      Because you couldn't sell it to one of your investors?

 4   A.      Correct.

 5   Q.      Please turn to Government's Exhibit 613 in your

 6   binder.

 7   A.      Okay.

 8   Q.      Do you recognize that document?

 9   A.      Yes.  It's the settlement statement.

10   Q.      Also sometimes known as the HUD-1?

11   A.      Yes.

12          MR. HALES:  Move to admit Government's Exhibit 613,

13   your Honor.

14          THE COURT:  Exhibit 613 is received in evidence.

15                      (GOVERNMENT'S EXHIBIT 613, HUD-1 (from

16                       loan file), ADMITTED INTO EVIDENCE.)

17   Q.      BY MR. HALES:  And if we can blow up this portion.

18          Do you also see the funds to close amount reflected on

19   this HUD-1 as well?

20   A.      Yes.

21   Q.      And can you tap on the screen and show us where that

22   is or tell us the line number perhaps?

23   A.      It's line 214.

24   Q.      And is that close to the amount that we saw on the

25   loan application?

```
 1    A.      Yes.

 2    Q.      Just off by maybe a thousand dollars or so?

 3    A.      Correct.

 4    Q.      If you'd turn back then to Government's Exhibit 603.

 5    A.      Okay.

 6    Q.      Do you recognize that document?

 7    A.      Yes.

 8    Q.      Is it similar -- the same type of verification of

 9    employment form that we saw in the previous loan file?

10    A.      Yes.

11            MR. HALES:  Move to admit Government's Exhibit 603.

12            THE COURT:  Exhibit 603 is received in evidence.

13                         (GOVERNMENT'S EXHIBIT 603,

14                         Verification of Employment, ADMITTED

15                         INTO EVIDENCE.)

16    Q.      BY MR. HALES:  Is this a document that NL, Inc.,

17    relied upon in its underwriting of this loan?

18    A.      Yes.

19    Q.      Who does it indicate the employment was verified by?

20    A.      Melissa Maclay.

21    Q.      The NL, Inc., employee that did the verification is

22    Melissa Maclay?

23    A.      Yes.

24    Q.      And if we see here, employment verified by, what's the

25    name there?
```

1    A.      Leonard Williams.

2    Q.      What's your understanding of the purpose of putting a

3    name on this form from NL, Inc.'s, underwriting perspective?

4    A.      Because we have to document who we spoke to.

5    Q.      And again, as you said before, if this employment

6    hadn't been verified, what would it have done to the loan

7    process at NL, Inc.?

8    A.      It would have stopped it until it was resolved.

9    Q.      Okay.  And if we can go back to the -- no, we already

10   did that.  Let me move on.  Can we go to Government's Exhibit

11   606, please.

12   A.      Okay.

13   Q.      Do you recognize that document?

14   A.      Yes.

15   Q.      Did you see that in the Lacie Clymer/Linday Way loan

16   file?

17   A.      Yes.

18   Q.      What is that document?

19   A.      It's an affidavit of occupancy.  It's a form that is

20   in all loan documents, and then the borrower, you know, it's

21   checked whether it's going to be a primary residence or a

22   vacation or second home or a nonowner occupied property.

23          MR. HALES:  Move to admit Government's Exhibit 606,

24   your Honor.

25          THE COURT:  Exhibit 606 is received in evidence.

KELLY O'HALLORAN, OFFICIAL COURT REPORTER, USDC -- (916) 448-2712

```
 1                          (GOVERNMENT'S EXHIBIT 606, Affidavit

 2                          of Occupancy, ADMITTED INTO EVIDENCE.)

 3    Q.      BY MR. HALES:  We can take that down.  I'll move on.

 4            Can you move to Government's Exhibit 608 in the

 5    binder, please.  What's the importance of a credit score in

 6    the underwriting analysis?  I think we've covered this, so

 7    just briefly if you could.

 8    A.      Different investors in different loan programs require

 9    certain credit scores in order to, you know, be able to plug

10    the loan into that particular product.

11    Q.      Okay.  And do you recognize this to be a credit report

12    that was in the loan file for the Linday Way?

13    A.      Yes.

14    Q.      Does it reflect that the buyer had good or bad credit?

15    If you can take a moment to look.

16    A.      I think good or bad credit is kind of subjective.  She

17    doesn't have any derogatory credit.  Her credit scores are

18    not as high as we might see for somebody without derogatory

19    credit, but it clearly states that the reason is that most of

20    her accounts have not been open a very long amount of time.

21            MR. HALES:  Move to admit Government's Exhibit 608,

22    your Honor.

23            THE COURT:  This is the credit report, 608?

24            MR. HALES:  Yes, your Honor.

25            THE COURT:  Exhibit 608 is received in evidence.
```

1              (GOVERNMENT'S EXHIBIT 608, Credit

2              Report, ADMITTED INTO EVIDENCE.)

3    Q.     BY MR. HALES:  What's the credit score that's circled

4    there, if you can read it?

5    A.     681.

6    Q.     In your experience, would you get -- well, from where

7    would you get credit information when you're analyzing a

8    borrower in the underwriting process?  Would you get it from

9    the borrower or somewhere else?

10   A.     Oh, no.  This is an independent credit company that we

11   receive these from.

12   Q.     Would you get multiple scores?

13   A.     Yes.

14   Q.     And so how did you decide which one to, you know, use

15   as what you thought was that person's score?

16   A.     Most of the lenders take the middle score.

17   Q.     Move, if you would, to Government's Exhibit 612 in

18   your binder.

19   A.     Okay.

20   Q.     Is this similar to the underwriting check sheet more

21   or less that we saw in the Baker Avenue loan file earlier?

22   A.     Yes.

23          MR. HALES:  Move to admit Government's Exhibit 612,

24   your Honor.

25          THE COURT:  Exhibit 612 is received in evidence.

```
 1                           (GOVERNMENT'S EXHIBIT 612,

 2                           Conventional Loan Approval

 3                           underwriting document, ADMITTED INTO

 4                           EVIDENCE.)

 5   Q.      BY MR. HALES:  Is this one similar to before, but this

 6   one is for the Linday Way property?

 7   A.      Correct.

 8   Q.      And why is Residential Pacific Mortgage listed as the

 9   broker at the top?  Do you have an understanding as to why

10   that is?

11   A.      It was right around that time period that we were

12   going through a name change, our company.  We were the same

13   principal, same company.  They changed the name from, I

14   believe it was from NL, Inc., to Residential Pacific

15   Mortgage.  And so it looks to me like -- well, I shouldn't

16   say that.  Obviously not everything was updated at the same

17   time.

18   Q.      Can you please look at page 2 of this document and

19   tell me if, like the other, it has at item 21 a requirement

20   of the verbal verification of employment?

21   A.      Yes.

22   Q.      And it indicates that that was checked off on

23   March 28, 2008, by one with the initials MM?

24   A.      Correct.

25           MR. HALES:  One moment, your Honor.
```

1    Q.      BY MR. HALES:  Can you turn to Government's

2    Exhibit 615, please.  Do you recognize that?

3    A.      Yes.

4    Q.      And did you see this in the Linday Way loan file?

5    A.      Yes.

6    Q.      What is it?

7    A.      It's a deed of trust.

8            MR. HALES:  Move to admit Government's Exhibit 615,

9    your Honor.

10           THE COURT:  Exhibit 615 is received in evidence.

11                          (GOVERNMENT'S EXHIBIT 615, Deed of

12                          Trust (from loan file), ADMITTED INTO

13                          EVIDENCE.)

14   Q.      BY MR. HALES:  And does this deed of trust likewise

15   have the stamp on it indicating it was recorded?

16   A.      Yes.

17   Q.      And then if we could zoom out.

18           Similar to the other one, is this indicating that the

19   county recorder should mail this to NL, Inc., once it's

20   recorded?

21   A.      Yes.

22   Q.      Okay.  We don't need to look at it, but does this deed

23   of trust reflect that Lacie Clymer is the borrower?

24   A.      Yes.

25   Q.      And that NL, Inc., is the lender?

1    A.      Yes.

2    Q.      Based on your review of this loan file, was this loan

3    subsequently sold to one of your investors?

4    A.      Yes, it was.

5    Q.      Which investor was that?

6    A.      Citi Mortgage.

7    Q.      And in connection with this loan, if the borrower's

8    true income had been lower than the anticipated monthly

9    payments for the mortgage, in your experience as an

10   underwriter at NL, Inc., in 2008, would the loan have been

11   approved?

12   A.      No.

13           MR. HALES:  One moment, your Honor.

14           THE COURT:  Yes.

15   Q.      BY MR. HALES:  One more.  If you could go back to

16   Government's Exhibit 604 in your binder.  Did you see that

17   document in the Linday Way loan file?

18   A.      Yes.

19   Q.      Is that a similar 411.yellowpages.com printout for

20   Diamond Hill Financial, Inc.?

21   A.      Yes, it is.

22           MR. HALES:  Move to admit Government's Exhibit 604.

23           THE COURT:  Exhibit 604 is received in evidence.

24                         (GOVERNMENT'S EXHIBIT 604,

25                          Yellowpages.com printout for DHF,

1                     ADMITTED INTO EVIDENCE.)

2    Q.     BY MR. HALES:  And again, this is put in the loan file

3    to show that the phone number for Diamond Hill was obtained

4    somewhere other than just the loan application?

5    A.     Yes.

6           MR. HALES:  No further questions, your Honor.

7           THE COURT:  Cross-examination.

8                          CROSS-EXAMINATION

9    BY MR. WISEMAN:

10   Q.     Good afternoon.

11   A.     Good afternoon.

12   Q.     Ma'am, you have been asked a long series of questions

13   concerning the standards and practices of NL, right, that's

14   your employer?

15   A.     NL, Inc., in 2008.

16   Q.     In 2008 it was NL, Inc.  And presently it's now

17   called?

18   A.     RPM Mortgage.

19   Q.     RPM Mortgage?

20   A.     Uh-huh.

21   Q.     And you had been with NL, Inc., since the late 1990s;

22   correct?

23   A.     With them as soon as they were formed.

24   Q.     And when do you recall they were formed?

25   A.     I've worked for the same company since January

1    of 1991.  They've changed names a few times over the years.

2    And I believe NL, Inc., came into that -- that name came into

3    existence probably somewhere in the late '90s.

4    Q.      Okay.  And then since the late '90s, would it be fair

5    to say that the -- well, if you compare what the mortgage

6    lending business was in the late '90s compared to what it is

7    today, there has been -- would it be fair to say there's been

8    a sea change, the standards in underwriting criteria?

9    A.      Yes.

10   Q.      You mentioned that back in 2008, NL, Inc., was in

11   business of doing, if I understood you correctly,

12   correspondent loans; correct?

13   A.      That's what they're called, yes.

14   Q.      And a correspondent loan is a loan that the, in this

15   case NL, Inc., would basically very close to funding or

16   immediately after funding would sell the loan to investors;

17   correct?

18   A.      Correct.

19   Q.      Okay.  So is it fair to say that in 2008, with NL,

20   Inc., that when NL, Inc., was approving a loan, and let's say

21   did approve a loan, the proceeds to fund the loan came from

22   the investor; is that correct?

23   A.      No.

24   Q.      Okay.

25   A.      Not correct.

1    Q.      It's not correct.  So when a loan in 2008 was funded,

2    what was the source of the funds to fund that loan?

3    A.      There are specialized lines of credit called warehouse

4    lines that correspondent banks use to fund the loans, and

5    then when the investor purchases the loan, the warehouse,

6    they purchase it off the warehouse bank and it's paid back.

7    Q.      Okay.  So the loan is funded through a warehouse line

8    of credit; correct?

9    A.      Correct.

10   Q.      So in 2008, is it fair to say NL, Inc., had a line of

11   credit in which it can draw from to fund a particular loan?

12   A.      That's right.

13   Q.      That is correct.  So when the borrower got approved

14   for a loan in which NL, Inc., was funding, the proceeds or

15   the funds that went to the escrow company, is it your

16   testimony came from NL, Inc., or was NL, Inc., merely the

17   conduit for the funds?

18   A.      We would order the funds to be wired from our line of

19   credit.

20   Q.      From your line of credit.  And then immediately upon

21   the loan being sold, that line of credit was paid off?

22   A.      Well, for that particular loan, yes.

23   Q.      For that particular loan.  Okay.  Now, when you

24   testified earlier, if I understand your testimony, you say

25   that you wrote loans back in 2008 based upon investor

1   guidelines; correct?

2   A.      We underwrote loans based on investor guidelines.

3   Correct.

4   Q.      Okay.  So the criteria as to whether in a particular

5   loan application NL, Inc., would fund, that was based upon

6   the guidelines that the particular investor had?

7   A.      That's correct.

8   Q.      Okay.  So before NL, Inc., funded a particular loan,

9   did NL, Inc., already know what investor it was going to be

10  sold to?

11  A.      Yes.

12  Q.      How did that come about?  In other words, what was the

13  relationship between NL, Inc., and an investor that would

14  create a situation where NL, Inc., knew that it was going to

15  be that particular investor that would buy the loan?

16  A.      What happens in the correspondent industry is that the

17  investors publish rates to their correspondents every day.

18  We, in turn, would publish an internal rate sheet to our loan

19  agents.  And different investors have different programs,

20  different products, different interest rates.  And at the

21  time they're taking a loan application from somebody, they

22  choose which product best fits the needs and they lock the

23  interest rate in normally ahead of time.  And so by the time

24  we receive the loan for underwriting, we already know where

25  it's targeted for so we can underwrite to those guidelines.

1    Q.      Okay.  As I understand what you're saying is that

2    there is some rate sheet so an independent mortgage broker,

3    if he or she had a client that was looking for a loan and

4    wanted a loan at a certain rate, the mortgage broker would be

5    able to look at what was being offered, depending on what the

6    client's need was, be able to fund, to basically have that

7    particular loan that you folks were providing available.

8    Does that make sense?

9    A.      Sure, yes.

10   Q.      Okay.  Good.  And each investor, if I understand what

11   you are saying, is each investor had their own particular

12   guidelines as to what would be required for the investor to

13   purchase that loan?

14   A.      Yes.

15   Q.      So you all, NL, Inc., were underwriting loans based

16   upon various investors' guidelines.

17   A.      Correct.

18   Q.      Now, I want to make sure because it may have been

19   slightly confusing.  You did not personally work on the

20   decision to underwrite these particular two loans that you've

21   been asked about; correct?

22   A.      No, I did not.

23   Q.      Okay.  And what you've done is you have, as I

24   understand your testimony, basically reviewed the file that

25   was available to you through NL, Inc.; correct?

1    A.       Correct.

2    Q.       Okay.  And in 2008, how many loans, if you know, did

3    NL, Inc., sell to investors?

4    A.       I don't know.

5    Q.       Okay.  Do you know, for example, in 2008 what the

6    revenue, the gross revenue of NL, Inc., was?

7    A.       No.

8    Q.       Okay.  Do you know how many loans, if any, that were

9    generated by NL, Inc., in 2008 NL, Inc., was forced to buy

10   back from investors?

11   A.       I do not.

12   Q.       Okay.  And you talked about the idea of or the concept

13   of warranties, and there was another term you used.

14   A.       They called it reps and warrants, representations and

15   warranties.

16   Q.       And is it fair to say that each investor -- by the

17   way, we're not talking about individual folks who invest in

18   the stock market.  We're talking about institutional

19   investors when you talk about investors; right?

20   A.       Correct.

21   Q.       So the folks -- well, bad word.  The entities that buy

22   these loans from NL, Inc., are big institutional investors

23   generally in 2008?

24   A.       I would say so.

25   Q.       So is it fair to say that each of the investor

1    entities has its own representations and warranties that it

2    essentially writes into the contracts?

3    A.      That's my understanding.

4    Q.      Okay.  And have you had any experience with reading

5    the various representations and warranties?

6    A.      No.

7    Q.      Okay.  Now, what you testified to is based upon your

8    review of the file with respect to these two loans in

9    question, that they would not have passed muster had the true

10   facts been revealed.  Is that what you're saying?

11   A.      I don't really know what the true facts are, so I

12   can't tell you that.  I mean I answered a question if the

13   income were lower, then it would make a difference.

14   Q.      Understood.

15   A.      Okay.

16   Q.      So if the income were lower, it would have made a

17   difference to -- now, here's my question.  It would have made

18   a difference to whom?  To NL, Inc., in its decision to

19   underwrite the loan or to the investor who purchased the

20   loan?

21   A.      I think you're talking two things.  First of all, if

22   we have a loan application that's represented as a certain

23   way and the income turns out not to be that, even if it's at

24   a level that would be sufficient to make the loan, it's still

25   a concern that we received a loan application that's

 1    inaccurate.  But as far as being able to make the loan or

 2    not, it would be us representing the investor in that manner.

 3    I mean whatever their guidelines are.

 4    Q.      Right.  But the reliance on the loan application is

 5    the reliance by the investor; correct?  The investor is

 6    relying upon the representations there.

 7    A.      They're relying on those representations as are we.

 8    Q.      Okay.  And if you did not, for example, with a

 9    particular loan make sure, not you particularly, but if an

10    individual at NL, Inc., who is an underwriter on a particular

11    loan, if he or she does not make sure that all of the

12    criteria that, for example, the document which I'll call up

13    that Fannie Mae produces are met and yet that loan gets sold,

14    then that loan is not conforming to the investor's

15    requirements; right?

16    A.      Correct.

17    Q.      Okay.  I'm going to call up a document which has been

18    marked as Government's Exhibit 407.  Okay.  And do you recall

19    this document here, Government's Exhibit 407?

20    A.      Yes.

21    Q.      Okay.  And you mentioned and you've testified, if I'm

22    not mistaken, this is the underwriting findings.  What does

23    DU stand for?

24    A.      Desktop Underwriter.

25    Q.      So this is a computer-generated form; right?

1    A.       Yes.

2    Q.       By the way, back in 2008, was the underwriting review

3    a computer-generated event?  In other words, was all of the

4    underwriting done through a computer algorithm, data would be

5    produced, put into the computer, and the results spit out?

6    A.       Aside from this one particular form, no.

7    Q.       And your understanding is that back in 2008, the

8    underwriting was done by a human being, somebody who looked

9    at the file and went through the process of deciding whether

10   that loan met the investor's criteria?

11   A.       Correct.  This form is generic to Fannie Mae.  It

12   doesn't have individual investor guidelines built in, so the

13   underwriter would need to compare the loan to the individual

14   investor guidelines.

15   Q.       So the underwriter would have to compare the loan to

16   the individual investor's guidelines.  Okay.  So in other

17   words, if I understand what you're saying, is these are

18   generic guidelines that Fannie Mae requires on a loan?

19   A.       Uh-huh.

20   Q.       Yet they may be different than what the ultimate

21   investor requires; correct?

22   A.       Correct.

23   Q.       So the investor may require things that are more

24   stringent than what Fannie Mae requires in its generic form;

25   right?

1   A.      Or less.

2   Q.      Or less.  So there would be a situation where an

3   investor would say we'll take less standards than what

4   Fannie Mae requires or recommends?

5   A.      Less.  Different.  Yes.

6   Q.      Okay.  And in your experience in being in this

7   profession for as long as you have, in your experience in

8   2008, were there investors who would accept loans on the

9   standards that were less stringent than Fannie Mae?

10  A.      There were stated income loans at the time, and I

11  don't believe Fannie Mae, strictly speaking, had a stated

12  income product.

13  Q.      So the stated income loans in your experience had a

14  lower standard that the investors required; right?

15  A.      Lower standard only in that there was not income

16  documentation in the file.  There was not lower standard, as

17  I recall, of credit scores or that sort of thing.

18  Q.      Okay.  Understood.  And let's go through this document

19  for a moment.  And this document says here, number 5:

20  "Verification messages/approval conditions.  This loan is

21  also subject to all other lender-specified conditions and

22  must comply with all applicable federal, state, and local

23  laws and regs."  Do you see that?

24  A.      Yes.

25  Q.      Basically, this restates what you said, that the loan

1    itself has to comply with the lender's requirement as well?

2    A.      Correct.

3    Q.      And those requirements can be either more stringent or

4    less stringent than Fannie Mae.  Okay.  And then it goes on

5    to say that based upon the -- let me pull this up for you.

6    "Based upon the credit report obtained through Desktop

7    Underwriter."  So that implies that the credit report was

8    filtered through this computer form.

9    A.      Yes.  We hook it up to this.

10   Q.      You hook it up to this system here?

11   A.      Yes.

12   Q.      The loan must close on or before this particular date;

13   correct?

14   A.      Correct.

15   Q.      And all verification documents must be dated within

16   120 days of closing; correct?

17   A.      Correct.

18   Q.      Okay.  Now, you mentioned that this loan, and let's go

19   to the second page, this loan here was a -- you believe this

20   was a stated income/stated asset loan?

21   A.      Correct.

22   Q.      Is that the SISA on the side?

23   A.      Just an acronym, yes.

24   Q.      That's not your handwriting; right?

25   A.      No.

 1   Q.       Because you didn't do this loan?

 2   A.       Correct.

 3   Q.       Now, if I understand what you said is that this meant,

 4   because it was a stated income/stated asset loan, that these

 5   criteria that Fannie Mae had required were not --

 6   A.       Required by the investor.

 7   Q.       They were not required by the investor?

 8   A.       Correct.

 9   Q.       Okay.  And let's see what those things were.  Now, by

10   the way, which of these items were not required by the

11   investor?  Why don't you just tell me the numbers and then we

12   can read them.

13   A.       10, 11, and 12.

14   Q.       Okay.  So let's look at that.  So 10 is Joshua Frye's

15   income must be supported by a pay stub and a telephone

16   confirmation of employment.

17            So if I understand, your testimony is that since the

18   investor did not require a pay stub, for example, for

19   Mr. Frye's loan.

20   A.       Uh-huh.

21   Q.       And then, moreover, the assets totaling 56,000 must be

22   verified.  So, likewise, that was something that was not

23   required by the investor.  Okay?

24   A.       Correct.

25   Q.       Now, how do you know that when the person is making

1    that acronym that this particular investor that's buying this

2    loan doesn't require these things to be fulfilled?

3    A.      Because the underwriter looks up the guidelines to

4    see.  Moreover, when a loan is locked, it shows the

5    documentation type.  I mean they choose whether they're

6    locking it as a stated income or stated asset or full

7    documentation loan.  So it's the loan program from the

8    investor as well as the guidelines.

9    Q.      Okay.  Now, ma'am, I thought I heard you say that you

10   weren't sure, but some of the investors in 2008, even with a

11   stated income/stated asset loan, required certain

12   verifications as well.  Did I misunderstand your testimony?

13   A.      Perhaps I was speaking about the verbal verification

14   of employment that we do where we verify a borrower still

15   works there.

16   Q.      Okay.  And back in 2008, if I -- strike that.  Back in

17   2008, if you recall, did some investors not even require

18   verbal verifications?

19   A.      I don't remember the date that they started requiring

20   them.

21   Q.      But at some point they did not require them?

22   A.      Correct.

23   Q.      Okay.  And so if we go through the rest of this, a few

24   more of these requirements, if you continue here, number 15

25   is one of those requirements that had to be met, right, even

1    though this was a stated income/stated asset loan; correct?

2    A.    Yes, because this has to do with collateral.

3    Q.    Okay.  And meaning the collateral, it's the --

4    A.    It's the property.

5    Q.    -- it's the appraisal that has to be done; correct?

6    A.    Correct.

7    Q.    So 15 says, "The subject property has been identified

8    as being located in either an area of declining home prices

9    or in an area where it may be difficult to assess home

10   values.  The lender should carefully review the appraisal to

11   ensure that the appraiser has appropriately analyzed property

12   value, trends, and overall market conditions."  Correct?

13   A.    Correct.

14   Q.    Now, is that something that NL, Inc., back in 2008

15   would do, in other words, review the appraisal?

16   A.    Yes.  We underwrite the appraisal.  And oftentimes

17   when there are what they call these red flag warnings that

18   are issued from Fannie Mae, we would order a second

19   independent review appraisal.

20   Q.    But the initial appraisal is typically, in your

21   experience, is produced by whom, or who orders the initial

22   appraisal?

23   A.    Well, the initial appraisal is ordered by the loan

24   officer.

25   Q.    Okay.  So is the initial appraisal then -- I think you

1    used the word underwritten by NL, Inc.?

2    A.      Correct.

3    Q.      So you folks go out and request the initial appraisal

4    to be done?

5    A.      The underwriter doesn't, but the company does.

6    Q.      The company does.  And then if you have some concerns

7    about that initial appraisal, you folks will do a follow-up

8    or independent appraisal; correct?

9    A.      Well, the first appraisal's independent.  The second

10   one we would do from a completely different company and

11   appraiser where we would also obtain a review appraisal.

12   Q.      And do you know in this particular case, based upon

13   your review of the file, whether or not there was a second

14   independent appraisal done on the property?

15   A.      Can I look?

16   Q.      Sure.

17           THE COURT:  What's she looking for?

18   A.      THE WITNESS:  It's the loan approval.  It would have

19   it on there as a condition.

20   Q.      BY MR. WISEMAN:  Okay.  So your testimony is that on

21   the loan approval, if a second independent appraisal was

22   done, it would be reflected there?

23   A.      Correct.  The underwriter would condition, and then it

24   would show signed off.

25   Q.      Okay.  Now, would it be fair to say that if in a

 1   particular case that one of these required conditions was not

 2   met or not fulfilled, then the loan is not conforming to the

 3   investor's standards?

 4   A.     Well, you can see right now that the employment and

 5   asset information wasn't completed because the investor

 6   didn't require it on stated income loans.  And so that wasn't

 7   fulfilled, but it still conformed to the investor standards.

 8   Q.     Let me ask it another way then.  If the investor

 9   standards that the investor required were not fulfilled by

10   you folks at NL, Inc., by this underwriter on a particular

11   file, yet that loan was sold to the investor, then the loan

12   does not conform to the investor's requirement; correct?

13   A.     Correct.

14   Q.     And based upon your experience, has that occurred, had

15   that ever occurred in 2008?

16   A.     I can't think of an individual loan, but I'm quite

17   certain that it had.

18   Q.     Okay.  And if the -- strike that.  What document or

19   documents does the particular individual underwriter rely

20   upon to determine what the investor's criteria are?

21   A.     Their own published guidelines.

22   Q.     Okay.  So there's guidelines that the investor

23   publishes that says if I buy this loan, I want the following

24   things to be met; correct?

25   A.     Correct.

1    Q.      Kind of a layman's way of describing it?

2    A.      Yes.

3    Q.      And if the loan is purchased by the investor and the

4    loan goes south, that would prompt the warranties and

5    representations to kick in; correct?

6    A.      Correct.

7    Q.      And that would require NL, Inc., to buy the loan back;

8    correct?

9    A.      That could be the ultimate end to it.  There's a

10   process it goes through where we can rebut and, you know,

11   back and forth.  Those things take a while.  But that could

12   be the ultimate outcome, yes.

13   Q.      Okay.  And with these particular two loans that you

14   have been asked about, do you know whether NL, Inc., was

15   required to buy them back from the investor?

16   A.      I could find nothing in the files that showed that

17   they had to buy them back from the investor.

18   Q.      I'm sorry.  What was your answer?

19   A.      I could not find anything in the files that showed

20   that we purchased those back from the investor.

21   Q.      Okay.  And that was based upon your review of the

22   file.  Now, let me ask you with respect to the HUD-1, I think

23   you were asked about a HUD-1; correct?

24   A.      Uh-huh.

25   Q.      Is a HUD-1 a document that is typically maintained in

1    the NL, Inc., files for a particular loan?

2    A.      Yes.

3    Q.      Okay.  And what is your understanding of what a HUD-1

4    is designed to do?

5            THE COURT:  I thought we decided you didn't have to go

6    over this again.

7            MR. WISEMAN:  All right.  Then I won't.  Let me just

8    move on quickly.  I'm just trying to set up so I can ask the

9    question.

10   Q.      BY MR. WISEMAN:  In your view, being in this industry,

11   what would NL, Inc., expect, I mean what would -- strike

12   that.  Let me start this another way.

13           If, in fact, on a particular transaction that NL,

14   Inc., was going to fund, if there was a concession that was

15   being made by the seller to the buyer, for example, who would

16   be expected to disclose that to the lender:  The buyer or the

17   seller?

18   A.      Well, first of all, it should be on the purchase

19   contract which is executed by both parties.  That's actually

20   where it would be.  That's the document that we would see it

21   on because escrow also gets the purchase contract because any

22   concession should additionally be reflected on the HUD-1.

23   Q.      But if a concession were agreed to by the buyer and

24   seller after the purchase agreement was signed --

25   A.      Then they would do an addendum to the purchase.

1    Q.      Then they would do an addendum.  So it would be

2    reflected somewhere in the transaction if there was a

3    concession of some sort?

4    A.      Correct.

5            MR. WISEMAN:  May I have a moment, your Honor?

6            THE COURT:  Yes.

7    Q.      BY MR. WISEMAN:  Okay.  And then with respect to the

8    particular loans in question, you don't know who actually did

9    the underwriting; correct?

10   A.      Oh, I know.  The underwriter signed the loan approvals

11   that are in the files.

12   Q.      So you know who that person was that actually --

13   A.      Two different people.  I know who they are, yes.

14   Q.      Two different people.  Now, other than the checklist,

15   if one wanted to describe it as a checklist, which you

16   testified about, internally what is the way in which NL,

17   Inc., knows that all of the conditions that the investor

18   requires to purchase the loan are met?

19   A.      First of all, by checklist, you mean our loan approval

20   where we list out all of the conditions?  Is that the

21   checklist?

22   Q.      Yes.

23   A.      So that checklist signed off goes to the investor with

24   the entire loan package.  Most investors review loans before

25   they purchase them from us.  That's why they're not purchased

605

1    in 24 hours.  They take time and review the file.  And if

2    there are any deficiencies, they will come back to us and say

3    oh, whoops, this wasn't in the file, and then we have to

4    provide it.

5    Q.      And then you have to provide it?

6    A.      Correct.

7    Q.      And so it's the responsibility of NL, Inc., as the

8    underwriter to fulfill the conditions of the criteria that

9    the investor requires?

10   A.      The underwriter's responsible for correctly

11   identifying all the conditions that are made and putting them

12   on the sheets, but the underwriter herself doesn't go get the

13   conditions necessarily.  She doesn't provide them to herself.

14   Whatever sort of condition it is, if it's a review appraisal,

15   an appraisal is going to come to her.

16   Q.      But the only way to determine if those conditions were

17   fulfilled, if I understand your testimony, is the document

18   you just described which I described as a checklist; right?

19   A.      Correct.

20   Q.      And then that document you're saying goes to the

21   investor and the investor reviews it?

22   A.      Along with the entire package, yes.

23   Q.      And typically back in 2008, how long did it take --

24   let me ask it this way.  How much time typically transpired

25   between the time that you folks funded a loan and the time it

1   was sold on the market?

2   A.      I don't know.  Those turn times actually change daily

3   all the time.

4            MR. WISEMAN:  I have no further questions, your Honor.

5   Thank you.

6            THE COURT:  Any redirect?

7            MR. HALES:  No, your Honor.

8            THE COURT:  All right.  Thank you, Ms. Updegraff.

9   You're excused.

10           Any more witnesses?

11           MS. HEMESATH:  The United States calls Lacie Clymer.

12           THE CLERK:  Please step forward.  Please stand here

13   next to the court reporter and face me.  Please raise your

14   right hand.

15                          LACIE CLYMER,

16   a witness called by the Government, having been first duly

17   sworn by the Clerk to tell the truth, the whole truth, and

18   nothing but the truth, testified as follows:

19           THE WITNESS:  Yes.

20           THE CLERK:  Thank you.  You may be seated.

21           Please state your full name, spell your last name for

22   the record.

23           THE WITNESS:  Lacie Blue Clymer C-L-Y-M-E-R.

24   ///

25   ///

1                              DIRECT EXAMINATION

2      BY MS. HEMESATH:

3      Q.      Good afternoon, Ms. Clymer.  What's your relationship

4      to Joshua Clymer?

5      A.      He's my brother.

6      Q.      When did your brother get into the real estate

7      business?

8      A.      I'm not that close to him, but I'm going to say 2006

9      or something like that maybe.

10     Q.      What was the name of his company?

11     A.      I don't know.

12     Q.      Did he have an office?

13     A.      Yeah.

14     Q.      Did you ever go visit him at the office?

15     A.      Once to help him decorate it.

16     Q.      Where was that?

17     A.      The office that he went to was on Truxel Avenue or,

18     yeah, Truxel.

19     Q.      Was there another office?

20     A.      There was on Watt Avenue.

21     Q.      But you didn't go to that one?

22     A.      Huh-uh.

23     Q.      Did you ever met Leonard Williams?

24     A.      Yes.

25     Q.      What was Josh's relationship to Mr. Williams?

1    A.       They were business partners.

2    Q.       And what type of business?

3    A.       Real estate.

4    Q.       Did there come a time when Mr. Clymer suggested you

5    buy a house from him?

6    A.       Yes.

7    Q.       Where were you living at the time?

8    A.       With my parents.

9    Q.       Around when was this?

10   A.       2000 -- probably the end of 2007.

11   Q.       Were you looking to move out from your parents' house?

12   A.       Not really at that time.

13   Q.       So why did he approach you about buying a house then?

14   A.       For investment purposes.

15   Q.       Where were you working at that time?

16   A.       I was working at Aaron Brothers.  It's an art and

17   framing store.

18   Q.       Were you working full-time?

19   A.       No, part-time.

20   Q.       About how many hours a week?

21   A.       Maybe 20 hours.

22   Q.       Were you working anywhere else?

23   A.       I did work at Pottery Barn for a while.

24   Q.       At the same time as Aaron Brothers?

25   A.       For part of the time, yes.

```
1    Q.      Okay.  So total between the two.  About how many

2    hours?

3    A.      Maybe 30, maybe.

4    Q.      Were you also in school at the time?

5    A.      I started school at the beginning of 2008.

6    Q.      Okay.  Between Aaron Brothers and Pottery Barn, about

7    how much money were you making each month?

8    A.      Approximately around 2 or $300.

9    Q.      Was that enough for you to live on?

10   A.      No.

11   Q.      How did you meet your monthly expenses then?

12   A.      I lived with my parents.

13   Q.      Did you have any money that you were able to save?

14   A.      No.

15   Q.      Okay.  You did have a bank account?

16   A.      Yes.

17   Q.      Okay.  I think that's the 600 -- the tabs at the top

18   of that binder in front of you, is there 607 there?

19   A.      I'm at 609.  Hold on.  Okay.  607.

20   Q.      Do you recognize this?

21   A.      Yes.

22           MS. HEMESATH:  Move to admit -- oh, sorry.

23   Q.      BY MS. HEMESATH:  What is it?

24   A.      It's my bank statement.

25           MS. HEMESATH:  Move to admit Government's Exhibit 607.
```

```
 1              THE COURT:  Exhibit 607 is received in evidence.
 2                              (GOVERNMENT'S EXHIBIT 607, SAFE Credit
 3                              Union bank statements, ADMITTED INTO
 4                              EVIDENCE.)
 5   Q.     BY MS. HEMESATH:  Was that a pretty typical monthly
 6   bank balance for you?
 7   A.     Probably.
 8   Q.     Okay.  Sometimes a little more?
 9   A.     Sometimes a little more.  You know, it depends on what
10   bills I had to pay.
11   Q.     Okay.  How was your credit during this time?
12   A.     Excellent.  I paid everything on time, and I didn't
13   have a lot of bills.
14   Q.     Did Josh find a house for you to buy?
15   A.     Yes.
16   Q.     Where was it?
17   A.     In Rancho Cordova.
18   Q.     Did Josh discuss a price for this house?
19   A.     No.
20   Q.     Why not?
21   A.     Because he was my brother.  I trusted him with finding
22   a house for me for an investment, and he said he found one,
23   and I just trusted him and said yes.
24   Q.     But you didn't discuss a budget that you had to buy
25   the house?
```

```
1    A.       No.

2    Q.       How were you going to pay for the house?

3    A.       Through loans.

4    Q.       Okay.  Did you discuss the process of getting a loan

5    with Josh?

6    A.       No.

7    Q.       Okay.  Who did you understand to be responsible for

8    getting the loan?

9    A.       Well, I knew that they worked with loan companies that

10   were going to help out, so I just put it all in his hands to

11   take care of it.

12   Q.       When you say they, who do you mean?

13   A.       Josh's company.  Him and Leonard.

14   Q.       Can we pull up 601, please.  And it's in the binder in

15   front of you as well.

16            Can you please identify your initials and signature on

17   there for us.

18   A.       Yes.

19   Q.       So this is the purchase agreement for the house on

20   Linday Way?

21   A.       It looks like it, yes.

22   Q.       Okay.  Did you pay attention to this when you signed

23   it?

24   A.       I didn't.

25   Q.       Were you aware of the purchase price when you signed
```

1     it?

2     A.      No.

3     Q.      How concerned were you about buying a house that you

4     didn't know the purchase price for?

5     A.      I was a little naive and a little ignorant about the

6     whole process, but I trusted that I was going to find renters

7     and that everything would be taken care of with that, so I

8     was not concerned.

9     Q.      Where did the idea of finding renters come from?

10    A.      My brother.  He lived in a house with other people and

11    rented his rooms out and so on.  And so I figured living

12    close to a college that that wouldn't be too difficult.

13    Q.      Okay.  So is it fair to say that your plan to pay for

14    the house was you were going to fill it with renters, and

15    they would pay the mortgage?

16    A.      Correct.

17    Q.      Okay.  Let's go to the last page of this, please.

18            Who did you think you were buying this house from?

19    A.      I had no clue who I was buying it from.  Like I said,

20    I was a little naive about the whole process of buying a

21    home, and I did not even look or even ask twice because it's

22    my brother I trusted.

23    Q.      What did you understand Josh's role to be in buying

24    this house?

25    A.      I don't really know what a real estate agent does, but

 1   I'm guessing to find the house and to help me go through all

 2   the paperwork and show me what to do next.

 3   Q.      Did you have any understanding that you were actually

 4   buying the house from Josh?

 5   A.      No, not at the time.

 6   Q.      Okay.  Let's go ahead and pull up 602.

 7           Do you recognize this loan application?

 8   A.      No, I don't really, but my initials are on it.

 9   Q.      Did you fill out the information on this loan

10   application?

11   A.      No.

12   Q.      Who did you work with to fill it out?

13   A.      I don't remember.  I remember talking to somebody over

14   the phone, but I really don't remember who I worked with to

15   do that.

16   Q.      When you talked to that person over the phone, what

17   information did you give them?

18   A.      Where I worked, the addresses I worked at, phone

19   numbers, and how much I made.

20   Q.      So let's go to the next page, please.  So where you

21   worked, did you give them the information that you worked at

22   Diamond Hill Financial?

23   A.      No.

24   Q.      Did you work at Diamond Hill Financial?

25   A.      No.

1    Q.      Have you ever worked at Diamond Hill Financial?

2    A.      No.

3    Q.      What's Diamond Hill Financial?

4    A.      I'm not sure.

5    Q.      Okay.  Did you see this on here when you signed this

6    loan application?

7    A.      Well, like I -- well, I haven't said it yet, but when

8    I was signing all the paperwork, I didn't really look closely

9    at what I was signing because it was my brother and I trusted

10   him.  It was sign here, sign here, sign here, and that's what

11   I did.

12   Q.      Okay.  And down at the bottom, the income.  Did you

13   have a conversation with your brother about the fact that

14   your income would be inflated on this loan application?

15   A.      No.

16   Q.      Did you think you would qualify for a loan on your

17   actual income?

18   A.      I thought my credit was really good, but I had no

19   clue.  I thought it wouldn't hurt to try.

20   Q.      Okay.  Let's go to the assets section, please.

21           This shows $147,000 in assets.  Did you have $147,000

22   in assets?

23   A.      No, I did not.

24   Q.      What was your role in putting this information on this

25   loan application?

1    A.       I did not have a role in it.  I left it up to my

2    brother.

3    Q.       Did you know it would be falsified?

4    A.       No.

5    Q.       All right.  And the last page, please.

6             Did you and Josh discuss a down payment on this house?

7    A.       No.

8    Q.       How much of your own money were you going to put into

9    this house?

10   A.       None.

11   Q.       So at any point were you asked for $96,000 to close

12   the deal on this house?

13   A.       No.  And I wouldn't have been able to give it,

14   obviously.

15   Q.       All right.  And let's -- can we bring up 606.

16            Did you and Josh discuss the requirement that you move

17   into the house immediately after closing?

18   A.       No.

19   Q.       Did you understand that you needed to move into the

20   house after closing when you signed this?

21   A.       No, I had no clue.  I did end up moving into it, but I

22   didn't know I had to.

23   Q.       Do you recall signing this document?

24   A.       I signed so many documents, I don't recall, but

25   obviously I did because my signature's here.

1    Q.      Okay.  It may jog your memory a bit.  This one is

2    notarized.  So does that help you recall where you were when

3    you signed this?

4    A.      No.  I'm sorry.

5    Q.      Okay.  You attended the closing for this house?

6    A.      Uh-huh.

7    Q.      Who else attended the closing?

8    A.      My brother.

9    Q.      Anybody else?

10   A.      A lady that worked at the closing office.

11   Q.      Why was Josh with you at the closing?

12   A.      Because he was my real estate agent and my brother.

13   Q.      How did you feel at the closing?

14   A.      A little nervous but okay.

15   Q.      Why were you nervous?

16   A.      Just because it was a big responsibility, and I'm a

17   pretty responsible person.

18   Q.      Did you have an understanding of whether Josh was also

19   making money off of this deal?

20   A.      I had no clue, but I'm guessing he would have because

21   he's a real estate agent and they make money off of the deals

22   that they sell.

23   Q.      So you thought that the money that he was making off

24   of this deal was his real estate agent fees or commission?

25   A.      Yeah.  But I had no idea what that amount was at the

1    time.

2    Q.    Okay.  At the closing, were you told if any money was

3    left over from this deal?

4    A.    Yes.

5    Q.    What were you told?

6    A.    I was told that I would receive $10,000 back left over

7    from the loan.

8    Q.    Who told you that?

9    A.    My brother.

10   Q.    And did you get that money?

11   A.    Yes.

12   Q.    All right.  And go ahead and look at 620.

13         MS. HEMESATH:  Move to admit 620, a certified business

14   record, the check.

15         THE COURT:  Exhibit 620 is received in evidence.

16                         (GOVERNMENT'S EXHIBIT 620, Check from

17                         BARE to Lacie Clymer for $9,500 on

18                         3/31/08, memo 11516 Linday, ADMITTED

19                         INTO EVIDENCE.)

20   Q.    BY MS. HEMESATH:  Is this the money you got after the

21   closing?

22   A.    Yes.

23   Q.    And how did you receive this check?

24   A.    It was a check.  Are you saying through who?  My

25   brother called me and --

KELLY O'HALLORAN, OFFICIAL COURT REPORTER, USDC -- (916) 448-2712

1   Q.      Did you get it through the mail?

2   A.      My brother called me and told me that the check was

3   in.  I don't remember exactly who I picked it up from or --

4   Q.      Okay.  Did you move into the house right away after

5   closing?

6   A.      No.

7   Q.      Why not?

8   A.      Well, I didn't know that I needed to, but I moved in

9   three months after the closing.

10  Q.      Okay.  And who paid for the mortgage on the house?

11  A.      For the first couple months, my brother did,

12  Joshua Clymer.

13  Q.      All right.  And after those first few months?

14  A.      Nobody.  It went into foreclosure.

15  Q.      Did you make any of the mortgage payments on it?

16  A.      No, I couldn't afford that.

17  Q.      How long did you live there?

18  A.      One year.

19          MS. HEMESATH:  Nothing further.

20          THE COURT:  You may cross-examine.

21          MR. WISEMAN:  No questions, your Honor.

22          THE COURT:  All right.  Thank you, Ms. Clymer.  You're

23  excused.

24          THE WITNESS:  Thank you.

25          THE COURT:  Any other witnesses?

1          MR. HALES:  No, your Honor.  We don't for today.

2          THE COURT:  All right.  We'll recess for the day.

3    Ladies and gentlemen, you'll recall that we're not going to

4    be in session next week.  You may have been wondering why

5    we're taking a week off in the middle of trial.  Every other

6    year, it used to be every year, the federal judges of all the

7    western states get together for a conference.  We hear talks

8    from professors and participate in panel discussions on

9    various subjects of common interest among the judges.  We

10   also have the opportunity to see each other and to exchange

11   our experiences.  So it is a valuable experience for the

12   judges.  We have to schedule those conferences a long time

13   ahead of time, and so we're not always able to see that they

14   come between trials or that they don't interrupt a trial.

15   Unfortunately, very often they do.  And that is what I'm

16   going to be doing for the first four days of next week.

17          On Friday, one of the lawyers had an appearance in

18   another court and asked if we could accommodate him, and so

19   we're going to do that since we would only have one day that

20   week anyway.  And then the following Monday, I have motions

21   and other pretrial proceedings in a number of other cases.

22   Each one of the judges carries a substantial number of cases

23   on our docket and things have to happen in those cases.  Some

24   of them are civil cases involving various types of disputes,

25   and some of them are criminal cases, but there are still a

1    number of things that have to go on before trial, motions and

2    other pretrial proceedings, and I have to cover a number of

3    those.  When I do that, it is on a Monday.  So I have to do

4    that the following Monday.

5            All of that having been said, it means that we will be

6    out of session for a whole week and then Monday of the

7    following week.  You may be concerned that you will forget

8    something during that period of time.  I will tell you from

9    experience that you will forget something.  I will also tell

10   you from experience that when we resume with the trial and

11   you start to hear more testimony and eventually hear the

12   arguments of counsel, what you may have forgotten will come

13   back.  That is my experience.

14           You may also be wondering well, what should I do to

15   make sure that I don't forget.  Well, don't worry about that.

16   What you should be thinking about, however, is what you need

17   to do to make sure that you continue to follow the Court's

18   admonition.  That's what you can't forget.

19           So my advice to you is put this case on the back

20   burner.  Don't worry about the evidence.  It will all come

21   back to you when you get here a week from Tuesday.  But

22   always remember that you are a juror, you are a judge, and

23   you must not seek or receive any information about any of the

24   issues in this case from any source during that period of

25   time.  And you must not discuss the case or any issues in the

1    case with any other person during that period of time.  You

2    must never forget that.

3          So with that in mind, have a nice time while the rest

4    of us arguably are working, and we will see all of you back

5    here at 9:00 o'clock on Tuesday, July the 22nd.

6          (Jury not present.)

7          THE COURT:  The jurors are outside the courtroom.

8    Counsel, is there anything that we need to discuss before we

9    resume on the 22nd?  So that if we have anything to take up,

10   we take it up now and not at 9:00 o'clock on the 22nd.

11         MR. HALES:  I'm not aware of anything, your Honor.  I

12   don't think so.

13         MR. WISEMAN:  Nor am I.

14         THE COURT:  All right.  Then we'll see you then.

15         MR. HALES:  Thank you.

16         (Proceedings concluded at 4:20 p.m.)

17

18

19

20

21

22

23

24

25

1                    I certify that the foregoing is a correct transcript

2          from the record of proceedings in the above-entitled matter.

3

4

5                                      /s/ Kelly O'Halloran

6                                      KELLY O'HALLORAN, CSR #6660

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25