IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

---oOo---

BEFORE THE HONORABLE WILLIAM B. SHUBB, JUDGE

---oOo---

UNITED STATES OF AMERICA,

          Plaintiff,

vs.                  No. 2:08-cr-376 WBS

LEONARD WILLIAMS,

          Defendant.

_____/

---oOo---

<u>REPORTER'S TRANSCRIPT</u>

JURY TRIAL

VOLUME 4

TUESDAY, JULY 22, 2014

---oOo---

Reported by:      KELLY O'HALLORAN, CSR #6660

APPEARANCES


For the Plaintiff:


       UNITED STATES ATTORNEY'S OFFICE
       501 I Street, Suite 10-100
       Sacramento, CA  95814
       BY:  CHRISTOPHER HALES
            AUDREY B. HEMESATH
            Assistant U.S. Attorneys

For the Defendant:


       WISEMAN LAW GROUP, P.C.
       1477 Drew Avenue, Suite 106
       Davis, CA  95616
       BY:  JOSEPH J. WISEMAN, Attorney at Law
            JENNIFER NOBLE, Attorney at Law

INDEX

GOVERNMENT WITNESSES:                                      PAGE:


JUAN REYNAGA
DIRECT EXAMINATION BY MR. HALES                           623
CROSS-EXAMINATION BY MR. WISEMAN                          645
REDIRECT EXAMINATION BY MR. HALES                         662
CROSS-EXAMINATION, (Cont'd.) BY MR. WISEMAN               666

BRETT HELLSTROM
DIRECT EXAMINATION BY MR. HALES                           669
DIRECT EXAMINATION, (Cont'd.) BY MR. HALES                684
CROSS-EXAMINATION BY MR. WISEMAN                          727
REDIRECT EXAMINATION BY MR. HALES                         752
RECROSS-EXAMINATION BY MR. WISEMAN                        753

ANTHONY PETRI
DIRECT EXAMINATION BY MR. HALES:                          755
CROSS-EXAMINATION BY MR. WISEMAN                          783
CROSS-EXAMINATION, (Cont'd.) BY MR. WISEMAN               790
REDIRECT EXAMINATION BY MR. HALES                         794
RECROSS-EXAMINATION BY MR. WISEMAN                        796

STACY FRIERSON
DIRECT EXAMINATION BY MS. HEMESATH                        797

COLLEEN BROWN
DIRECT EXAMINATION BY MS. HEMESATH                        809

MARK ZARATE
DIRECT EXAMINATION BY MR. HALES                           813
CROSS-EXAMINATION BY MR. WISEMAN                          826

DONNA ALLRED
DIRECT EXAMINATION BY MR. HALES                           831

ANDREW JAMES HARRISON
DIRECT EXAMINATION BY MS. HEMESATH                        845
CROSS-EXAMINATION BY MR. WISEMAN                          880

GOVERNMENT EXHIBITS RECEIVED IN EVIDENCE

| NO.: | DESCRIPTION: | PAGE: |
|---|---|---|
| 50-A | Grant Deed to Reynaga | 839 |
| 52 | Grant Deed Linday to BARE | 839 |
| 52-A | Grant Deed to Lacie Clymer | 839 |
| 58 | Grant Deed Woodforest to BARE | 840 |
| 58-A | Grant Deed to Anthony Petri | 840 |
| 1 | DHF, Inc. Corporate Documents | 847 |
| 4 | DHF Resolution for Blanket Authority to Sell Assets | 848 |
| 5 | DHF Resolution to Appoint a Treasurer | 850 |
| 12 | Bay Area Real Estate Holdings LLC Corporate Documents | 851 |
| 553 | Fax from Leonard Williams to escrow officer dated 2/14/08 with attachments | 852 |
| 26 | Certified CA Bureau of Real Estate History Certification for Leonard Williams | 854 |
| 107 | Letter to Arthur Watson | 856 |
| 802 | Summary Chart - Ceanothus | 859 |
| 803 | Summary Chart - Rockin M | 859 |
| 804 | Summary Chart - Baker Ave. | 859 |
| 805 | Summary Chart - Trap Rock | 859 |
| 806 | Summary Chart - Linday Way | 859 |
| 807 | Summary Chart - Woodforest | 859 |

DEFENSE EXHIBITS RECEIVED IN EVIDENCE

| NO.: | DESCRIPTION: | PAGE: |
|---|---|---|
| R | Freddie Mac Letter | 747 |
| S | Chase letter 1/19/11 | 749 |

1                    SACRAMENTO, CALIFORNIA

2              TUESDAY, JULY 22, 2014, 9:00 A.M.

3                         ---oOo---

4         (Jury not present.)

5         THE COURT:  Good morning.

6         MR. HALES:  Good morning.

7         MS. HEMESATH:  Good morning.

8         THE COURT:  I just wanted to refresh my recollection

9    as to where we were when we broke off the week before last.

10        Had we finished Lacie Clymer's testimony?

11        MS. HEMESATH:  Yes, your Honor.

12        THE COURT:  All right.  So the government is going to

13   call another witness?

14        MS. HEMESATH:  Yes.

15        MR. HALES:  Yes.

16        THE COURT:  All right.  Bring in the jury.

17        (Jury present.)

18        THE COURT:  Good morning, ladies and gentlemen.  All

19   of the jurors are present in their proper seats.  Do you all

20   have your notebooks back?  Then we're ready to continue with

21   the trial.  As you may recall, we had finished with the

22   testimony of Lacie Clymer, who was Joshua Clymer's sister.

23   And the government is going to call its next witness.

24        MR. HALES:  Yes, your Honor.  The United States calls

25   Juan Reynaga.

KELLY O'HALLORAN, OFFICIAL COURT REPORTER, USDC -- (916) 448-2712

```
 1              THE CLERK:  Sir, please step forward.  Please stand
 2     here next to the court reporter and face me.  Raise your
 3     right hand.
 4                            JUAN REYNAGA,
 5     a witness called by the Government, having been first duly
 6     sworn by the Clerk to tell the truth, the whole truth, and
 7     nothing but the truth, testified as follows:
 8              THE WITNESS:  I do.
 9              THE CLERK:  Thank you.  You may be seated.  Sir,
10     please state your full name, spell your last name for the
11     record.
12              THE WITNESS:  Juan Reynaga, R-E-Y-N-A-G-A.
13                         DIRECT EXAMINATION
14     BY MR. HALES:
15     Q.     Good morning, Mr. Reynaga.
16     A.     Good morning.
17     Q.     How old are you, sir?
18     A.     44.
19     Q.     And where do you work?
20     A.     I work for the Department of Corrections.
21     Q.     Is that where you also worked in 2008?
22     A.     Yes.
23     Q.     Did you buy a property at 2976 Trap Rock Way in
24     Sacramento in March 2008?
25     A.     Yes, I did.
```

1   Q.     Who did you work with to buy that property?

2   A.     For the Department of Corrections.

3   Q.     I'm sorry.  Who did you work with in buying that

4   property?

5   A.     You mean real estate agent or --

6   Q.     Uh-huh.

7   A.     Leonard and Josh.

8   Q.     Do you remember their last names?

9   A.     Leonard Williams and Joshua Clymer, I think.

10          MR. WISEMAN:  Pardon me, your Honor.  Would the

11   witness put the microphone a little closer?

12          THE WITNESS:  Sorry.

13          MR. WISEMAN:  Thank you.

14   Q.     BY MR. HALES:  Why were you looking to buy a house at

15   that time in March 2008?

16   A.     Because the house I was renting from, they were not

17   paying -- they were getting evicted from their own home, so

18   they gave me a month's notice.  So I had about a month to

19   move out of that house.

20   Q.     So you were on a tight time frame?

21   A.     Yes.

22   Q.     What areas were you looking in for a house at that

23   time?

24   A.     At the time I was looking in the Sacramento area,

25   Woodland area, and my last option was Stockton.

1   Q.      Were Leonard Williams and Joshua Clymer the only

2   people that you were working with to look for a house?

3   A.      Not at the time.  I was working with another real

4   estate agent at the same time.  I forgot her name.  I don't

5   know.

6   Q.      How did you come to meet Leonard Williams and

7   Joshua Clymer?

8   A.      At first I was going through a rent to own, but I

9   didn't like it, so she referred me to Josh and Leonard.

10  Q.      And did you end up meeting with them in person?

11  A.      Yes.

12  Q.      How did that first meeting come about, if you recall?

13  How was it set up?

14  A.      First time I met Leonard was in his office.  I don't

15  recall where.  Somewhere in the Sacramento area.

16  Q.      Okay.  Do you recognize Mr. Williams in the courtroom

17  here today?

18  A.      Yes, I do.

19  Q.      Can you point him out and describe an article of

20  clothing that he's wearing?

21  A.      Black sweatshirt, red tie, glasses.

22          THE COURT:  I don't know if that's a sweatshirt, but

23  he does have a red tie and glasses.

24          THE WITNESS:  A blue shirt.

25          THE COURT:  The record will reflect he's identified

1    the defendant.

2    Q.      BY MR. HALES:  So you don't remember the very specific

3    location, but was it an office-type space or a home; do you

4    recall?

5    A.      It was an office.

6    Q.      And the first meeting that you had, who was there?

7    A.      Leonard Williams.

8    Q.      Was Joshua Clymer also there?

9    A.      I don't recall.  But I did meet him before in the

10   office.

11   Q.      What did you discuss at that first meeting with

12   Mr. Williams?

13   A.      To purchase a home.  When I went in there, I saw a

14   board of all of the people he sold houses to, and he asked me

15   if I would like to buy a home with a thousand dollars down

16   only, and I said that would be great.

17   Q.      He said a thousand dollars down only?

18   A.      Yeah.

19   Q.      After that, did you look at multiple properties with

20   Leonard Williams and Joshua Clymer?

21   A.      With him, I recall three.

22   Q.      Three.  Okay.  Let's go through them each.

23           THE COURT:  You asked him about Leonard Williams and

24   Joshua Clymer, and he said with him.  So I want to make sure

25   that whenever we talk about a transaction or a conversation,

```
1    you make it clear which of the individuals he's talking

2    about.

3              MR. HALES:  Thank you, your Honor.

4    Q.      BY MR. HALES:  How about I start it this way.  How

5    many properties did you look at with either Leonard Williams

6    or Joshua Clymer during the course of working with them?  Was

7    it three?

8    A.      Three properties with Leonard and Josh.

9    Q.      Let's walk through each of them, and I'll try to be

10   clear about who you interacted with each time.  So for the

11   first property, tell me what you recall about that property.

12   A.      The first property, I specifically told them I wanted

13   property in the Natomas area.  The first property that I

14   recall was in the Natomas area.  I told them I wanted --

15             THE COURT:  See, we're already --

16             MR. HALES:  Understood.

17   Q.      BY MR. HALES:  Did you discuss this first property

18   with Mr. Williams?

19   A.      When I was in the office, I don't recall what day, I

20   discussed with both Josh and Leonard Williams that I wanted a

21   turnkey home in the Natomas area.

22   Q.      And then this first property that you started speaking

23   about --

24   A.      That I recall with --

25   Q.      Sorry.  Let me finish my question.  I apologize.
```

```
1    A.        Sorry.

2    Q.        My fault.  With whom did you discuss that first

3    property?  Only Leonard Williams, only Joshua Clymer, or both

4    of them at different times?

5    A.        That I recall, I met them both at that property.

6    Q.        At that first property?

7    A.        First property.

8    Q.        Did you end up buying that first property?

9    A.        No.

10   Q.        Why not?

11   A.        It didn't go through.  That's what -- I don't recall

12   who, Josh or Leonard told me, but they said the property fell

13   through.  So I said okay.

14   Q.        Had you made a thousand-dollar down payment as had

15   been discussed in the first meeting?

16   A.        They told me to write down -- I don't recall who, but

17   that I'm aware of, both Leonard and Josh knew about the

18   thousand-dollar check that I wrote them.

19   Q.        What do you recall about the second property?

20   Actually, let me ask first, for the second property, do you

21   recall whether you spoke about it only with Leonard Williams,

22   only with Joshua Clymer, or with both of them at different

23   times?

24   A.        With both of them at different times.

25   Q.        Okay.  Tell us what you recall about that second
```

 1   property.

 2   A.      The second property I went to, I do recall that both

 3   Leonard and Josh were there.  And somehow the door, you know

 4   how real estate people have the keys to open the doors to buy

 5   a house, the door couldn't open.  So to me, I was wondering

 6   what's going on.  So we started looking around the perimeter

 7   of the house, went in the backyard, and we looked inside the

 8   window, and I asked Josh or Leonard, as I recall, I said why

 9   is there furniture inside the house?  I don't understand

10   that.  And then --

11   Q.      How did they respond?  Well, who responded to you when

12   you said that?

13           MR. WISEMAN:  Objection.  Relevancy.

14           THE COURT:  Overruled.

15           THE WITNESS:  Leonard Williams was angry and said why

16   the banks pull this over on us.  And I don't understand it,

17   so I said okay, I stood back and listened to both of them,

18   but I don't recall specifically what they were saying.

19   Q.      BY MR. HALES:  Did you end up buying that second

20   house?

21   A.      No.

22   Q.      Was the third property that you looked at the

23   Trap Rock Way property?

24   A.      Yes.

25   Q.      Let's talk about that one for a minute.  Did you go to

 1    see that Trap Rock Way property before you purchased it?

 2    A.      Yes, I did.

 3    Q.      With whom did you go to that property to look at it?

 4    A.      I do recall this.  Both Leonard and Josh Clymer were

 5    at the property, and I told them my situation, that I was in

 6    a bind, and I told them that I also had another real estate

 7    agent looking for a house for me, but because I was in a

 8    bind, whoever got me the house first, I would buy the house

 9    from them.

10    Q.      Did you apply for a loan to -- did you decide to buy

11    the Trap Rock house?

12    A.      Yes.

13    Q.      Did you apply for a loan in order to be able to buy

14    the Trap Rock house?

15    A.      Yes, I did.

16    Q.      Who helped you apply for the loan?

17    A.      Both Josh and Leonard helped me apply for the loan.

18    Q.      Is there anyone else that you remember meeting in or

19    near their office space while you were working with --

20    A.      There was a female, but I don't recall her face or her

21    name.  I probably interacted with her one time over the phone

22    and maybe one time at their office, but I don't recall.  I do

23    recall I think it was a black female.

24    Q.      Mr. Reynaga, there's a binder in front of you, and

25    there are tabs on the top with the numbers of the exhibits if

 1    you look.  And so I'll be asking you to turn to different

 2    documents in that binder.  If you could turn first to what's

 3    been marked Government's Exhibit 501.  Do you recognize that

 4    document?

 5    A.      I recognize my signature and yeah, I do recall the

 6    document now.

 7    Q.      Is that your purchase agreement for Trap Rock Way?

 8    A.      Yes.

 9            MR. HALES:  Your Honor, move to admit Government's

10    Exhibit 501.

11            THE COURT:  Exhibit 501 is received in evidence.

12                          (GOVERNMENT'S EXHIBIT 501, Purchase

13                          agreement (second escrow), ADMITTED

14                          INTO EVIDENCE.)

15    Q.      BY MR. HALES:  Do you recall seeing a purchase price

16    of $420,000 on the purchase agreement when you were getting

17    ready to buy the Trap Rock Way property?

18    A.      Yes.

19    Q.      Did you expect to pay $420,000 for that property?

20    A.      No.

21    Q.      Why not?

22    A.      In my opinion, that house was not worth 420.  And to

23    me, it was worth around 330, in my opinion.

24    Q.      Did you discuss that issue with Mr. Williams?

25    A.      Yes.  I told him I'm not going to buy no house at that

1    time.  To me, it's not worth 420.

2    Q.     What did he say in response?

3    A.     He says you're not buying the house at 420.  I'm

4    speaking about Leonard or Josh.  They told me you're not

5    buying the house at 420.  We're going to get you the loan for

6    333.

7    Q.     And when you say they told you, at the time this was

8    discussed, were both Mr. Williams and Mr. Clymer present?

9    A.     Yes.

10   Q.     You don't recall specifically --

11   A.     I don't recall the specific.  But I do recall both

12   knowing about it, that I was not going to pay for a home at

13   420.

14   Q.     Can you please turn in your binder to what's marked

15   Government's Exhibit 502.  Is that your signature at the top

16   of that document?

17   A.     Yes.

18   Q.     And what is that document?

19   A.     The loan application.

20          MR. HALES:  Move to admit Government's 502, your

21   Honor.

22          THE COURT:  Exhibit 502 is received in evidence.

23                         (GOVERNMENT'S EXHIBIT 502, Loan

24                         Application dated 3/1/08 (loan file),

25                         ADMITTED INTO EVIDENCE.)

1    Q.      BY MR. HALES:  What was the amount of the loan for

2    which you were applying, Mr. Reynaga?

3    A.      The loan that I recall was, I think, 333, but it says

4    338 on there.

5    Q.      You recall 333, you said?

6    A.      Yeah.

7    Q.      Okay.  So you weren't applying for a loan for the full

8    $420,000 purchase price that was on the purchase contract?

9    A.      No.

10   Q.      If we could zoom out on that page.  And if we can go

11   to page 3, please.  Can you turn to page 3 in the document,

12   Mr. Reynaga.  It will be on the screen as well.

13           Do you see in this "details of transaction" down at

14   the bottom where it says "cash from/to borrower," and then it

15   lists $79,792?  It might be easier to read on the screen.

16   A.      I see 79,000, but I don't know what does that mean.

17   Q.      Let me ask you this.  At the time you were looking at

18   this house, did you have around $80,000 available to make a

19   down payment?

20   A.      No.

21   Q.      Did you discuss that issue with Mr. Williams?

22   A.      Yes, I did.

23   Q.      What did you tell him?

24   A.      I told him the most I have is $15,000 to put down on

25   the house.

1   Q.      What did he say to you in response, as best you

2   recall?

3   A.      From what I recall, Leonard Williams told me write

4   down a check for $84,000, but we'll take care of it.  Don't

5   worry about it.

6   Q.      What did you understand him to mean by "we'll take

7   care of it"?

8   A.      I don't know what he meant by that.  I just know that

9   he would take care of it.

10  Q.      Did you end up writing such a check?

11  A.      Yes, I did.

12  Q.      Did you expect it to be cashed?

13  A.      No.

14  Q.      Why not?

15  A.      Because he told me he would not cash it.

16  Q.      Zoom back out, please.

17          Can you please, Mr. Reynaga, move to Government's

18  Exhibit 505 in your binder.  Do you recognize that document?

19  A.      Yes, I do.

20  Q.      Who filled it out?

21  A.      I first asked Josh Clymer how do I do a gift letter.

22  I did one at first, but he told me that's too much detail,

23  just write a simple one.  And I told him I don't know how to

24  write a simple one.  Can you do one for me, and I'll just put

25  the things in there, fill in the blanks.

1    Q.     So in the end, did you fill this document out?

2    A.     Yes, I did.

3    Q.     Did you submit it in connection with your loan

4    application?

5    A.     Yes.

6           MR. HALES:  Move to admit Government's Exhibit 505,

7    your Honor.

8           THE COURT:  Exhibit 505 is received in evidence.

9                          (GOVERNMENT'S EXHIBIT 505, Gift Letter

10                         Affidavit for $84,000, ADMITTED INTO

11                         EVIDENCE.)

12   Q.     BY MR. HALES:  Now, Mr. Reynaga, who is Ruben Reynaga?

13   A.     That is my brother.

14   Q.     And here where it says "amount of gift, $84,000,"

15   around this time did your brother, Ruben Reynaga, actually

16   give you a gift of $84,000?

17   A.     No, he didn't.

18   Q.     Did he have $84,000 to give you, as far as you know?

19   A.     No.

20   Q.     Did you discuss this document with Mr. Williams?

21   A.     Yes.

22   Q.     What did you discuss about it with Mr. Williams?

23   A.     I told him my brother doesn't have $84,000.  He told

24   me just say that he won it in Las Vegas, and he gave me the

25   money.

1    Q.      Who signed your brother's name on this document here?

2    A.      I think my brother did, that I recall.

3    Q.      Who signed your name at the bottom?

4    A.      That's me.

5    Q.      Can you please next look at Government's Exhibits 506

6    and 507 in your binder.  Do you recognize those?

7    A.      Yes.  That's my check.

8    Q.      That's the $84,000 check you wrote?

9    A.      Yes.

10           MR. HALES:  Move to admit Government Exhibits 506 and

11   507, your Honor.

12           THE COURT:  What's the difference between 506 and 507?

13           MR. HALES:  I can ask a question to clarify that.

14   Q.      BY MR. HALES:  Mr. Reynaga, is Government's

15   Exhibit 507 a copy of the check that's slightly easier to

16   read?

17   A.      Yes, it is.

18           THE COURT:  All right.  Exhibits 506 and 507 are

19   received in evidence.

20                          (GOVERNMENT'S EXHIBIT 506, Copy of

21                          $84,000 check from Reynaga, ADMITTED

22                          INTO EVIDENCE.)

23                          (GOVERNMENT'S EXHIBIT 507, Copy of

24                          $84,000 check from Reynaga, ADMITTED

25                          INTO EVIDENCE.)

1          MR. HALES:  Can we put up 507, please.

2     Q.     BY MR. HALES:  Mr. Reynaga, whose signature is that on

3     the bottom right?

4     A.     That is my signature.

5     Q.     And did you put the memo down here in the bottom left?

6     A.     No.

7     Q.     Can you read what it says?

8     A.     Down payment.

9     Q.     When you wrote this check, did you understand that

10    this check was supposed to look like your down payment check

11    for the Trap Rock Way property?

12    A.     Yes.

13    Q.     At the time that you wrote it, did you have $84,000 in

14    funds in the account from which this check was written?

15    A.     No.

16    Q.     And if we could just briefly put up 506, please.  Does

17    that appear to be a copy of the same document, just more

18    difficult to read?

19    A.     Yes.

20    Q.     Can you please turn to Government's Exhibit 508 in

21    your binder and take a moment and look at the initials and

22    the signature at the back and tell us if that's your

23    signature.

24    A.     That's my initial.  Those are my initials.  Well, also

25    my signature.

1   Q.      Did you sign this document in connection with your

2   purchase of the Trap Rock Way property?

3   A.      Yes.

4           MR. HALES:  Move to admit Government's Exhibit 508,

5   your Honor.

6           THE COURT:  Exhibit 508 is received in evidence.

7                       (GOVERNMENT'S EXHIBIT 508, Occupancy,

8                       Misrepresentation and Nondisclosure

9                       Affidavit and Agreement, ADMITTED INTO

10                      EVIDENCE.)

11  Q.      BY MR. HALES:  Do you see the first two paragraphs

12  where it indicates that you're saying certain things in this

13  document under oath?

14  A.      Yes.

15  Q.      Did you ever discuss those paragraphs with

16  Mr. Williams?  Did you ever discuss this document, I should

17  ask, with Mr. Williams at all?

18  A.      All I just remember is signing the document, not

19  specifically what I was really signing.  I just know that I

20  was signing it to buy a house.

21  Q.      Can we zoom back out, please.

22          Do you see at the bottom of the first page, one of the

23  things being said in here is that the true and correct sales

24  price of the property is $420,000, and we have paid in cash

25  the down payment specified in the contract?  Do you see that

 1    part?

 2    A.      Yes, I do.  I see 420,000.  Paid in cash, the 420?

 3    Q.      Well, let me ask you two questions.  Had you, in fact,

 4    paid a down payment at the time you signed this document?

 5    A.      I supposedly put $84,000 down with a check, but I

 6    didn't put $420,000 down on a house.

 7    Q.      So you were not paying $420,000; correct?

 8    A.      Correct.

 9    Q.      And you had not made a down payment?

10    A.      No.

11    Q.      Can you zoom back out, please.

12            If we can go to page 3 of this exhibit.  Can you take

13    a moment to read that paragraph at the bottom of the exhibit,

14    Mr. Reynaga, and then I'll ask you a question about it.

15    A.      Okay.  I read it, but to me, it's --

16    Q.      It's a simple question.  Did you ever discuss that

17    paragraph or what follows on the next page with Mr. Williams?

18    A.      I do remember doing the initial, and that is my

19    initial on that, but I don't remember specifically what -- I

20    just remember going through the contract.  Okay, sign this,

21    okay, sign this, sign this.  That's what I was doing.

22    Q.      Okay.  Do you recall when you signed the documents to

23    close on the Trap Rock Way property?

24    A.      Yes.

25    Q.      Where did you go to sign the documents to close on the

1    house?

2    A.      I remember two parts.  I'm confused.  One part was a

3    final part where a notary came to the house on Friday when

4    Josh Clymer was right there with me, and I signed the papers

5    right there.  And another part was a different building away

6    from the house.  I don't know what I signed that for.  That

7    was like the deed of the house.  I don't know what it was.

8    Q.      At the time that you spoke of -- so when you say at

9    the house, you mean you were at the Trap Rock Way property

10   when you signed some of the documents?

11   A.      Yes.

12   Q.      Mr. Clymer was there with you when you did that?

13   A.      Yes.  Joshua Clymer was there with me.

14   Q.      Who else was there?

15   A.      A notary.

16   Q.      A notary.  Okay.  At the time you were signing

17   documents and Mr. Clymer was there, did anything come up

18   about the $84,000 down payment as you were signing documents?

19   A.      Yes.  He looked at me and said this is the $84,000

20   that you put down, and I went yes.

21   Q.      How did you interpret his look to you at that point as

22   you were signing the documents?

23   A.      To me, it's like you and I both know that you did not

24   put $84,000 down.  To me, that's how I interpreted it.  I

25   knew it and he knew it.

1    Q.      Following that, did you go ahead and sign the

2    documents?

3    A.      Yes, I did.

4    Q.      Can you please look at Government's Exhibit 518 in

5    your binder.  Are you there?

6    A.      Yes.

7    Q.      Can you look through the document and tell us if those

8    are your initials at the bottom?

9    A.      Those are my initials at the bottom.

10   Q.      Then if you can look at page 14 of that exhibit and

11   tell us if that's your signature.

12   A.      Where are the pages on here?

13   Q.      I'm sorry.  If you look at the sticker in the bottom

14   right, there will be page numbers written next to the exhibit

15   number.

16   A.      It says 518, page -- okay, I see it now.  That's my

17   initial.

18   Q.      Okay.  Is that your signature at the top right above

19   your printed name?

20   A.      You mean where it says initials?

21          MR. HALES:  Your Honor, may I approach to make sure

22   we're literally on the same page?

23          THE COURT:  Yes.

24          MR. HALES:  Thank you.

25          THE COURT:  Go ahead.  You can approach.  But in the

 1   future, you can just show it on the screen and have him

 2   identify it.

 3            THE WITNESS:  That is my signature.

 4            MR. HALES:  Move to admit Government's 518, your

 5   Honor.

 6            THE COURT:  Exhibit 518 is received in evidence.

 7                      (GOVERNMENT'S EXHIBIT 518, Deed of

 8                       Trust (from loan file), ADMITTED INTO

 9                       EVIDENCE.)

10   Q.    BY MR. HALES:  Let me show page 14 first, please.

11   Mr. Reynaga, is that your signature there?

12   A.    That is my signature.

13   Q.    Thank you.  Can we go back to page 1 of the document.

14   And you see that this document is entitled deed of trust.  Do

15   you see that at the top?

16   A.    Yes, deed of trust.

17   Q.    Who is listed as the borrower below?

18   A.    Me.

19   Q.    And if we can zoom back out and go to page 2.

20         And on page 2 of the exhibit, Mr. Reynaga, do you see

21   the loan amount that's stated on the deed of trust?

22   A.    Yes.  336.

23   Q.    Mr. Reynaga, did you get any cash back from

24   Leonard Williams or Joshua Clymer in connection with this

25   transaction?

1    A.      No, I didn't.

2    Q.      You didn't?

3    A.      No.

4    Q.      Do you have any knowledge about how much money they

5    made on the transaction, if any?

6    A.      As a referral, if I referred someone, it would be

7    $500, I recalled.

8    Q.      For a referral?

9    A.      For a referral.

10   Q.      Talking about your transaction, the purchase of

11   Trap Rock Way, do you know how much money, if any, they --

12   A.      No, I don't recall.

13           THE COURT REPORTER:  I couldn't hear the last part of

14   your question.

15   Q.      I'll have to remember what it was.  The question was

16   do you know how much money, if any, they made on the Trap

17   Rock Way transaction?

18   A.      Oh, off this house that they sold to me?

19   Q.      Yeah.

20   A.      I don't know for sure, but I was wondering and so I

21   saw it on ziprealty.com, and at one point I saw it for 270

22   and then it changed over to 420, the sale.

23           MR. WISEMAN:  I'm going to object, your Honor.  Calls

24   for speculation, the answer.  He said he didn't know.

25   Q.      BY MR. HALES:  You don't have firsthand knowledge of

1    how much?

2    A.      No, I don't.

3           THE COURT:  He said he saw something.  That's why I'm

4    hesitating.  You can ask him what he saw.

5           THE WITNESS:  I looked on ziprealty.com.

6           THE COURT:  Okay.  The objection's sustained.

7    Q.      BY MR. HALES:  Mr. Reynaga, from interacting with

8    Mr. Williams and Mr. Clymer, what did you perceive as their

9    roles in connection with this transaction?  How did you view

10   them in relation to you, as, you know, your agent, your

11   broker?

12   A.      Josh as my real estate agent and Leonard Williams as

13   my broker.

14   Q.      Who did you understand to own the Trap Rock Way

15   property?  Who did you think you were buying it from?

16   A.      From Leonard Williams.

17   Q.      How did you come to that understanding?

18   A.      To me, is they would buy houses, bank-owned homes, and

19   they would flip them.

20   Q.      Did you express any concerns to Mr. Williams about

21   what was done with the down payment and the check?

22   A.      Yes, I did.  I was worried that that $84,000, because

23   I don't have $84,000 in my bank account, so how are you going

24   to do it, but then we didn't go into detail after that.  All

25   I cared was getting a house.

1    Q.      When you expressed concerns to Mr. Williams, what, if

2    anything, did he say to you in response?

3    A.      He said don't worry, we will take care of it, or I

4    will take care of it.

5            MR. HALES:  A moment, your Honor?

6            THE COURT:  Yes.

7            MR. HALES:  No further questions.

8            THE COURT:  Mr. Wiseman, you may cross-examine.

9            MR. WISEMAN:  Thank you, your Honor.  I need a moment,

10   your Honor, just to set up.

11                          CROSS-EXAMINATION

12   BY MR. WISEMAN:

13   Q.      Good morning, Mr. Reynaga.

14   A.      Good morning.

15   Q.      Now, you testified that you're currently employed with

16   the Department of Corrections; correct?

17   A.      Yes.

18   Q.      And at the time that you purchased this house that you

19   were asked about, the Trap Rock Way house, you likewise were

20   working for the Department of Corrections; correct?

21   A.      Yes.

22   Q.      At the time that you purchased the Trap Rock property,

23   were you a correctional officer?

24   A.      I still am a correctional officer.

25   Q.      And at what facility are you assigned to presently?

1    A.      San Quentin.

2    Q.      Where were you assigned back when you bought the

3    Trap Rock property?

4    A.      San Quentin.

5    Q.      When did you first become employed with the Department

6    of Corrections?

7    A.      July 3rd of 2006.

8    Q.      And on July 3rd of 2006 when you became employed, did

9    you have to take an oath?

10   A.      Yes.

11   Q.      And do you recall what that oath required you to

12   attest to?

13   A.      It's been since 2006.  I don't recall.  It was when I

14   was in the academy.

15   Q.      It was the academy.  And is it fair to say that the

16   oath that you took was that you were to be honest and fair?

17   A.      Yes.

18   Q.      And when you took the oath, the understanding that you

19   had in taking this oath is that you had to tell the truth

20   when you were required to do so; correct?

21   A.      Yes.

22   Q.      Because as a correctional officer, if an incident came

23   up with, for example, an inmate --

24   A.      Oh, yes.

25   Q.      -- you'd want to be truthful; correct?

1   A.      Yes.

2   Q.      You want to be truthful with your dealings with your

3   supervisors, with inmates, and other folks where you work;

4   correct?

5   A.      Yes.

6   Q.      Okay.  And is it fair to say that the oath you took to

7   take your position as a correctional officer, that

8   requirement to tell the truth applies to other aspects of

9   your life?

10  A.      I would say so.

11  Q.      Okay.  So you said that you wanted to buy a turnkey

12  home; correct?

13  A.      Yes.

14  Q.      A turnkey home, meaning that you didn't have to do

15  anything to the home, you just had to walk in and move in;

16  right?

17  A.      Correct.

18  Q.      Something that didn't require a lot of improvements or

19  unnecessary upkeep; right?

20  A.      Yes.

21  Q.      Okay.  And you testified that you eventually were

22  shown the Trap Rock Way property by both Mr. Williams and

23  Mr. Clymer; correct?

24  A.      Yes.

25  Q.      And it was Mr. Clymer who was the one who encouraged

1   you to buy the house; correct?

2   A.      It was both of them.

3   Q.      Did you have more dealings -- is it fair to say that

4   in the process of purchasing Trap Rock Way, you had more

5   dealings with Mr. Clymer?  Correct?

6   A.      It was 50-50.

7   Q.      Is it fair to say that it was Mr. Clymer who was

8   involved in filling out the loan applications for the

9   purchase?

10  A.      I'm still going to say it was 50-50.

11  Q.      You think it was 50-50 at the time?

12  A.      Yeah.

13  Q.      Okay.  And then you testified that when you first saw

14  the Trap Rock Way -- strike that.  When you first saw the

15  Trap Rock Way property, did you have any opinion as to what

16  it was worth?

17  A.      Yeah, I told them.  I'm not an appraisal (sic), but I

18  don't think it was worth 420.

19  Q.      Had you done any comps to check the value of what

20  Trap Rock Way was versus other houses in the area?

21  A.      That's why you hire an appraisal.

22  Q.      Okay.  Did you hire an appraiser to determine that you

23  didn't think it was worth 420?

24  A.      They told me they will get the appraisal.

25  Q.      Okay.  You just didn't think the property was worth

1    420?

2    A.      No.

3    Q.      You had no appraiser to back that up?

4    A.      No.

5    Q.      You had no comps that you had that looked up to back

6    up your concern?

7    A.      No.

8    Q.      And you relied upon what Mr. Williams and Mr. Clymer

9    told you; correct?

10   A.      Yes.

11   Q.      And you were aware, correct, that in the transaction,

12   there, in fact, was an appraisal; right?

13   A.      There had to be an appraisal.

14   Q.      Right.  And the appraisal came out at the price that

15   you paid for the property; correct?

16   A.      Yes.

17   Q.      It came out at 420?

18   A.      Yes.  In 2005, that would be 420.  Sorry.

19   Q.      Yeah.  But at the time that you bought that house, the

20   appraiser -- I just want to make sure that we're all on the

21   same page here.  Your understanding is the appraisal, this

22   independent appraisal, was for 420; correct?

23   A.      Yes, it said 420.

24   Q.      Now I want to show you an exhibit which has been

25   introduced as Exhibit 502.  And that was a loan application.

1    Do you remember that?  You were asked about that a moment

2    ago?

3    A.      It's not on the screen.

4    Q.      All right.  Do you see this document here, 502?

5    Correct?

6    A.      Yes.

7    Q.      And you testified, correct, that the signature, the

8    signature at the top here, and I'll highlight it for you, is

9    your signature; correct?

10   A.      Yes, it is.

11   Q.      What was your understanding of what you were doing

12   when you put your signature down on this uniform residential

13   loan application?  Did you understand what you were doing was

14   applying for a loan?

15   A.      Yes.  That's all I knew.  I was applying for a loan.

16   Q.      Did you understand that when you signed this, you were

17   signing this document under penalty of perjury that what was

18   contained in the document was true to the best of your

19   knowledge?

20   A.      The truth to the best of my knowledge, yes.

21   Q.      And, in fact, this loan application which you signed

22   contained falsities; correct?

23   A.      What falsities are those?

24   Q.      Well, do you know -- let me ask the question.  Do you

25   know if this residential loan application which is 502,

1    everything contained therein is accurate?

2    A.       Can I see the --

3    Q.       Sure.  Do you have it in front of you?  You can look

4    at the one that's before you, the hard copy of it, if that

5    would be helpful.

6    A.       What page is that?

7    Q.       Okay.

8             THE COURT:  The pages correspond with the exhibit

9    number, so it's 502.

10   Q.       BY MR. WISEMAN:  Look at 502 and look at page 3 of

11   502.  Okay?  And again, let me just call up page 3 of 502.

12   Do you have it in front of you, sir?

13   A.       Not yet.

14   Q.       Okay.  I'll pull it up on the screen here.  Before we

15   get to page 3, let's go to the next page.  Go to page 4 and

16   let's just confirm something.  Let me show you something on

17   page 4 of 502.  Do you see what is highlighted right there on

18   the screen?

19   A.       Yeah.  That's my initial.

20   Q.       That is your initial.  So again, that's your

21   signature.  And do you see the date next to it?

22   A.       Yes.

23   Q.       Okay.  And if you go to page 2 of that document.  Do

24   you have it in front of you?

25   A.       Yes.

1    Q.      And if you look on the bottom right, that likewise is

2    your signature -- is your initial; correct?

3    A.      Yes.

4    Q.      Now, if you look at the monthly income and combined

5    housing expense, do you see that little box right there?

6    A.      Base employee income?

7    Q.      Yes.

8    A.      Yes.

9    Q.      $10,297.  That amount was correct; correct?

10   A.      Yes.

11   Q.      That's how much you were making as a CO at the time;

12   correct?

13   A.      At that month, yes.

14   Q.      And there was nothing wrong with that; correct?

15   A.      No.

16   Q.      And if you go to the top of that page, do you see

17   where it says Pepsi Bottling Group?

18   A.      Yes.

19   Q.      Warehouse supervisor.  You were also working a second

20   job; is that correct?

21   A.      No.

22   Q.      Do you know the reason why that was included there?

23   Is that your former employer?

24   A.      That's my former employer.

25   Q.      So that information on that page is correct; correct?

1   A.      Yes.

2   Q.      Okay.  If you go to page 4, and I'll bring it up, of

3   that document, you were asked about this entry right here;

4   correct?  The cash from/to borrower, $79,792; correct?

5   A.      Yes.

6   Q.      And so you never received $79,000 in this transaction;

7   correct?

8   A.      No.

9   Q.      And you never gave $79,000 in this transaction;

10  correct?

11  A.      No.

12  Q.      So that's a misstatement on this application; correct?

13  A.      Yes.

14  Q.      And that you already confirmed is your signature right

15  below that; right?

16  A.      Yes.

17  Q.      Okay.  And you understood that when you signed this

18  document, you were signing that in order to obtain a loan to

19  purchase this property; correct?

20  A.      Yes.

21  Q.      And you signed it notwithstanding that there was

22  information that was not accurate, that was false on it;

23  correct?

24  A.      To me, it's just numbers.  I just signed the paper to

25  get the house.

 1    Q.      To you, it was just numbers?

 2    A.      Yeah.

 3    Q.      So is it fair to say that you didn't care what was on

 4    the loan application because you just wanted to get the

 5    house?

 6    A.      To me, I don't know what -- to me, is to sign a house,

 7    and that's all.  All this numbers, I'm not educated on this.

 8    Q.      But did you review this document before you signed it?

 9    A.      I can review it and sign it, but I don't know what I'm

10    signing.

11    Q.      So if I understand, your testimony is that you

12    reviewed a document, didn't understand what was contained

13    therein, and signed it in any event?

14    A.      Yeah.

15    Q.      When you applied for this loan, isn't it true that

16    Mr. Clymer told you that it didn't matter what was put on the

17    loan application?

18    A.      I don't recall him saying that.

19    Q.      Was it your understanding that it didn't matter what

20    was placed on the loan application?

21    A.      To me, what do you mean it didn't matter?

22    Q.      Well, you just said that you just signed it.  You

23    didn't know what the numbers meant; right?

24    A.      To me, I don't know how to interpret these numbers.

25    Q.      But yet you signed a document that you didn't know how

1    to interpret?

2    A.      Then to me, the job is for the broker or the real

3    estate person to be responsible to see what I'm signing.  All

4    I know is I got a $333,000 loan.  That's all I know.

5    Q.      That's all you know?

6    A.      Yes.

7    Q.      Okay.  Now, let me ask you -- well, you testified

8    already it's correct that you only had about $15,000 for a

9    down payment; correct?

10   A.      Yes.

11   Q.      Okay.  Let me ask you about another document which is

12   document, exhibit rather, 505.  And that was the gift letter;

13   correct?  Do you remember that?  You can actually look at it

14   on the hard copy until I pull it up.

15   A.      Yes.

16   Q.      Do you have 505 in front of you?

17   A.      Yes, I do.

18   Q.      And 505 is this gift letter that you were asked about;

19   correct?  And you confirmed that the signature on the bottom

20   is -- whose signature is that?

21   A.      That's my signature.

22   Q.      That's your signature right there.  So this signature

23   right here which I'm highlighting is your signature?

24   A.      Uh-huh.

25   Q.      And right above that signature, it says -- can you

1    read that?  "It is herewith affirmed that I, the donee of the

2    above-captioned gift, will neither be obligated to repay the

3    principal nor pay interest on that gift at any time."  Do you

4    see that?

5    A.      Yes.

6    Q.      And that was not true; correct?

7    A.      No, it wasn't.

8    Q.      And so when you signed this on 2/13/2008, you signed

9    something knowing that it was false; correct?

10   A.      Correct.

11   Q.      And, sir, this document is simply a one-page document.

12   It's not eight or nine pages; correct?

13   A.      Correct.

14   Q.      So when you signed this, you knew and you had read

15   what was contained therein; correct?

16   A.      Yes.

17   Q.      And what you were misrepresenting is that you received

18   a gift from your brother of $84,000; correct?

19   A.      Correct.

20   Q.      And your brother, if I understand your testimony,

21   likewise signed a false document; correct?  Let me just --

22   A.      Correct.

23   Q.      So this highlighted portion right here, this portion

24   right here that contains -- I'll show this to you for a

25   second.  This portion right here, that portion right there,

1   donor relationship to donee, Ruben Reynaga, signed by your

2   brother; correct?

3   A.      Correct.

4   Q.      So you had your brother sign a document that you knew

5   was false; correct?

6   A.      Correct.

7   Q.      And your brother at the time that he signed this knew

8   that this document was false; correct?

9   A.      Correct.

10  Q.      And if you look at the top of this document, this

11  document is noted as a gift letter affidavit; correct?

12  A.      Correct.

13  Q.      You understand what an affidavit is?

14  A.      Like a truth thing.

15  Q.      Like a truth thing.  Right.  And this document was

16  going to Washington Mutual Bank of some sort; correct?

17  A.      Correct.

18  Q.      And you did this because it was Joshua Clymer that

19  told you to do this; correct?

20  A.      Correct.

21  Q.      And it was Josh Clymer that told you that this was

22  going to be able to get you the house; correct?

23  A.      Yes.

24  Q.      And let me pull up 507.  You can turn to that in hard

25  copy, if you want, while I pull it up for the jury.

1              507.  This has been admitted.  This is the check that

2     -- a better rendition of the check that you wrote for

3     $84,000; correct?

4     A.      Correct.

5     Q.      So this is a check.  To whom did you make this check

6     out to?  Can you read that?

7     A.      Land America.  I can't read it.

8     Q.      Do you have any idea who Land America is when you

9     wrote this check?

10    A.      No.

11    Q.      No idea.  And you knew when you wrote this check that

12    this check was, in fact, fraudulent.  Nobody was going to use

13    this check; right?

14    A.      Correct.

15    Q.      And that was consistent with the fraudulent gift

16    statement that you just testified about; correct?

17    A.      Correct.

18    Q.      And you did this all because you just wanted to get a

19    house?  That was your motivation for doing this?

20    A.      Yeah.  I wanted to find a place to live.

21    Q.      Sir, go to 508, would you.  Do you see 508 there?

22    A.      Yes, I do.

23    Q.      And 508 is the occupancy statement; correct?

24    A.      Correct.

25    Q.      And again, 508 is a document that you signed that was

1    not truthful; correct?

2    A.      Correct.

3    Q.      Let me pull that up.  It's the occupancy statement;

4    correct?

5    A.      Correct.

6    Q.      And if you look at the top of this document, again --

7    let me just call something out for you here.  Let's go to the

8    title of the document.  Do you see that?

9    A.      I do.

10   Q.      And can you read what's bolded there?  What does it

11   say?

12   A.      Misrepresentation and nondisclosure affidavit and

13   agreement.

14   Q.      Occupancy, misrepresentation and nondisclosure

15   affidavit and agreement.  When you signed this document, did

16   you understand that you were representing in this document

17   facts that were supposed to be true?

18   A.      Yes.

19   Q.      And when you signed it, you knew, did you not, that

20   you were, in fact, misrepresenting what was in the document;

21   correct?

22   A.      Yes.

23   Q.      And at the time that you signed this document, you

24   were still -- you were working as a correctional officer for

25   the State of California; correct?

1    A.       Yes.

2    Q.       All designed so you can acquire a house; correct?

3    A.       A house to live in, yes.

4    Q.       A house to live in.  Let me go to page 3 of this

5    document just to make sure of one thing.  That paragraph, you

6    were asked to read it to yourself, but let me just read it to

7    you:  That I and/or my agent have made certain

8    representations and disclosures in order to induce lender to

9    make the loan.

10            Do you see that, the first sentence?

11   A.       Yes, I do.

12   Q.       And that my execution of this document, including my

13   agreements and representations in it, is a material

14   inducement to the lender to make the loan; correct?

15   A.       So far you read it, yes.

16   Q.       And it goes on to say, the last sentence:  If I have

17   made any material misrepresentations or failed to disclose

18   any material fact, either in this document or in my loan

19   application, I basically breach the agreement.

20   A.       I didn't understand the last part, but the first

21   three-quarters of it, I did understand.

22   Q.       Yeah, but you did know at the time that you were

23   signing this document, sir, that it was false; correct?

24   A.       Correct.

25   Q.       Now, you signed these documents at the closing of this

KELLY O'HALLORAN, OFFICIAL COURT REPORTER, USDC -- (916) 448-2712

 1   transaction?

 2   A.      On Friday, yes.

 3   Q.      I'm sorry?

 4   A.      It was on a Friday.

 5   Q.      It was on a Friday.  And it was at a closing of the

 6   transaction?

 7   A.      Yes, at the house.

 8   Q.      At the house.  And it was Joshua Clymer who was there

 9   with you; correct?

10   A.      Correct.

11   Q.      And in spite of the fact that you knew that you were

12   signing false documents, you went along and did it; correct?

13   A.      Correct.

14   Q.      And you signed these things knowing that they were, in

15   fact, incorrect?

16   A.      And if I didn't, I'd be homeless, so yes.

17   Q.      Okay.  So you did it so you could avoid being

18   homeless; correct?

19   A.      Correct.

20   Q.      You had the option, though, didn't you, to rent a

21   place?  Didn't you?

22   A.      Rent $1,800 or rent mortgage $1,800.

23   Q.      So it didn't matter.  You just wanted to get a place

24   to live.  And if you were going to spend $1,800, you'd rather

25   spend it on a mortgage; correct?

1    A.      Correct.

2    Q.      And so in order to get the mortgage, you would have

3    done anything to get into that house; correct?

4    A.      And for my family too.

5    Q.      Including signing false documents; correct?

6    A.      Correct.

7    Q.      Mr. Reynaga, you're a correctional officer, then and

8    now.  You signed -- you took an oath for your job.  You've

9    admitted that you signed false documents, misleading

10   documents, fraudulent documents; correct?

11   A.      Correct.

12   Q.      And you did that then; correct?

13   A.      For my family, yes.

14   Q.      And is there -- so why should we believe you now?

15   A.      You don't have to.

16           MR. WISEMAN:  No further questions.

17           THE COURT:  Redirect?

18           THE DEFENDANT:  Your Honor, may I be allowed to ask

19   the witness questions?

20           THE COURT:  No.

21           Redirect?

22           MR. HALES:  One question, your Honor.

23                        REDIRECT EXAMINATION

24   BY MR. HALES:

25   Q.      Mr. Reynaga, did you ever pay anything more than the

1    $336,000 loan amount for the purchase of Trap Rock Way?

2    A.       No.

3              MR. HALES:  No further questions, your Honor.

4              THE COURT:  Let's take a short ten-minute recess now.

5    Remember the admonition, ladies and gentlemen.

6              MR. WISEMAN:  Your Honor, can I reopen cross?

7              THE COURT:  After the recess.

8              MR. WISEMAN:  Okay.  Very well.  Thank you.

9              THE COURT:  Ten-minute recess, ladies and gentlemen.

10             (Jury not present.)

11             THE COURT:  Mr. Reynaga, would you step outside for a

12   recess.

13             THE WITNESS:  Outside?

14             THE COURT:  Out in the hall.

15             (Witness Reynaga left the courtroom.)

16             THE COURT:  I'm not sure what to do about this

17   disruption here.  If I tell Mr. Williams not to do it again,

18   he'll say that I'm interfering with something that he has a

19   right to do.  If I just let it go, it not only disrupts the

20   proceedings, but it hurts him.  He doesn't look good to the

21   jury popping up and interfering with the trial.  So I want to

22   know what to do about this.

23             MR. WISEMAN:  Your Honor, if I may, I'll admonish

24   Mr. Williams during the break, and let's hope it doesn't

25   happen again.

1          THE COURT:  He's just trying to set a record here so

2     that he can claim that you're not doing your job and I'm not

3     doing my job.  And I'm here to make sure that the record

4     accurately reflects what's going on in this courtroom.

5          MR. WISEMAN:  I understand, your Honor.

6          THE COURT:  So let's hear it.  Let's hear it,

7     Mr. Williams.  Let me have it all.

8          THE DEFENDANT:  Here or there?

9          THE COURT:  Wherever you want.

10          THE DEFENDANT:  I'm just trying to be proactive in my

11     defense, your Honor.  That's it.  That's all.

12          THE COURT:  Tell me the whole story.

13          THE DEFENDANT:  I'm not trying to be disruptive.  I'm

14     not trying to upset the proceedings.  I'm just trying to be

15     proactive in my defense.

16          THE COURT:  What does proactive mean?  That you get to

17     ask questions?  Is that the way you understand your role in

18     this case?

19          THE DEFENDANT:  No, I was asking.  I didn't know.

20          THE COURT:  Well, I'm telling you.  What do you want

21     me to tell him, counsel for the government?  I want to have

22     the best record here, and I don't want to be criticized later

23     on for what I'm doing.

24          MS. HEMESATH:  Your Honor, I would like to add for the

25     record that I was able to observe, while Mr. Hales was doing

1    his direct examination of the witness, that I was able to

2    observe Mr. Williams consulting with Mr. Wiseman in the

3    formation of questions that Mr. Wiseman ought to pose on his

4    cross-examination.

5            THE COURT:  All right.

6            MR. HALES:  And I think that segues into what the

7    Court might say, the best thing the Court might say, which is

8    that if there are questions that Mr. Williams wants to ask of

9    the witness, he can use that mechanism to put them to the

10   witness through counsel.

11           THE COURT:  All right.  The observation is valid.

12           THE DEFENDANT:  Judge.

13           THE COURT:  The communications between you and

14   Mr. Wiseman have not broken down.  You are regularly

15   communicating with him during this trial.

16           THE DEFENDANT:  We are now.

17           THE COURT:  Good.  Anything else you think I ought to

18   do?

19           MS. HEMESATH:  I don't think so, no.

20           MR. HALES:  Not top of mind, your Honor, although we

21   would appreciate, I think, a couple minutes to think about

22   it.

23           THE COURT:  All right.  Take a couple minutes, and

24   then we'll bring the jury back.

25           MR. HALES:  Thank you, your Honor.

 1              (Recess taken.)

 2              THE COURT:  All right.  Let's bring the jury back.

 3    It's been ten minutes.  That's not the morning break.  The

 4    morning break is coming a little later.

 5              MR. WISEMAN:  Your Honor, let me ask Mr. Williams to

 6    come back in.

 7              THE COURT:  Just a minute.  Before we bring the jury

 8    back, was there is anything you wanted to add?

 9              MR. HALES:  There may be, your Honor.  May I have a

10    moment to confer with Mr. Tice-Raskin?

11              THE COURT:  All right.

12              MR. HALES:  Nothing additional, your Honor.

13              THE COURT:  All right.  Let's bring the jury back.

14              MR. HALES:  Thank you.

15              (Jury present.)

16              THE COURT:  The jurors are all present.  The defendant

17    is still present with counsel.

18              Mr. Wiseman, did you want to reopen the

19    cross-examination?

20              MR. WISEMAN:  Yes, just briefly, your Honor.

21                   CROSS-EXAMINATION, (Cont'd.)

22    BY MR. WISEMAN:

23    Q.    Mr. Reynaga, you were interviewed by the FBI, correct,

24    in this investigation of this case; correct?

25    A.    Correct.

KELLY O'HALLORAN, OFFICIAL COURT REPORTER, USDC -- (916) 448-2712

1   Q.      And at the time that you had an interview, you told

2   the FBI that you had filed these false statements; correct?

3   A.      Correct.

4   Q.      All right.  And when you -- did you have some

5   understanding that you were subject to being prosecuted for

6   making false statements on loan applications?

7   A.      What do you mean?

8   Q.      Did you have an understanding -- well, let me ask it

9   this way.  At any point did you ever think that you could be

10  prosecuted for filing, for signing a document?

11  A.      Yes.

12  Q.      So you were concerned about being prosecuted; correct?

13  A.      Of course.

14  Q.      And you were concerned about that as a law

15  enforcement, I mean you are law enforcement; right?

16  A.      Baby-sitter.

17  Q.      Baby-sitter.  But you still --

18          THE COURT:  $120,000 a year baby-sitter?  You're more

19  than that.

20  Q.      BY MR. WISEMAN:  All right.  And so at the time that

21  you signed these documents or any time thereafter, you were

22  concerned about being prosecuted; right?  You knew that that

23  was a possibility?

24  A.      For false documentation, yes.

25  Q.      Yeah.  And so at the time that you made your statement

1    to the FBI and spoke to them, you likewise knew that you

2    could have been prosecuted; correct?

3    A.       It concerned me, yes.

4    Q.       So you don't want to be prosecuted; correct?

5    A.       Who does?

6    Q.       So you have an incentive to say whatever the

7    prosecution wants you to say or any law enforcement officer

8    wants you to say; correct?

9    A.       I'm in a court, so I have to tell the truth.

10   Q.       And you've told the truth by admitting that you lied

11   on these applications; correct?  And you have an incentive to

12   say whatever it is the prosecution wants you to say about

13   this case?

14   A.       What is the incentive?

15   Q.       Well, the incentive, is it fair to say the incentive

16   is not to be prosecuted?

17   A.       The incentive is that I lied on the application.  To

18   me, I lied on the application.

19   Q.       And you knew that that could cause you to be

20   prosecuted?

21   A.       It could.

22   Q.       And you have an incentive to make sure you don't get

23   prosecuted; correct?

24   A.       I will deal with it if it does come to that.  But

25   right now, I'm dealing with this.

```
 1              MR. WISEMAN:  No further questions, your Honor.  Thank
 2     you.
 3              THE COURT:  Any redirect?
 4              MR. HALES:  No, your Honor.
 5              THE COURT:  All right.  Thank you, Mr. Reynaga.
 6     You're excused.
 7              THE WITNESS:  Thank you.
 8              THE COURT:  You may call your next witness.
 9              MR. HALES:  The United States calls Brett Hellstrom,
10     your Honor.  May I approach for binders?
11              THE COURT:  Yes.  Let's get the witness sworn.
12              THE CLERK:  Sir, please stand in front of the court
13     reporter.  Please raise your right hand.
14                          BRETT HELLSTROM,
15     a witness called by the Government, having been first duly
16     sworn by the Clerk to tell the truth, the whole truth, and
17     nothing but the truth, testified as follows:
18              THE WITNESS:  I do.
19              THE CLERK:  Thank you.  You may be seated.  Please
20     state your full name, spell your last name for the record.
21              THE WITNESS:  Brett Hellstrom, H-E-L-L-S-T-R-O-M, as
22     in Mary.
23                         DIRECT EXAMINATION
24     BY MR. HALES:
25     Q.     Good morning, Mr. Hellstrom.
```

1    A.      Good morning.

2    Q.      Where do you work?

3    A.      JPMorgan Chase.

4    Q.      How long have you worked there?

5    A.      Nine and a half years through the acquisition of

6    Washington Mutual.

7    Q.      So prior to JPMorgan Chase, you worked at Washington

8    Mutual?

9    A.      That is correct.

10   Q.      And when you say acquisition, can you describe just

11   quickly how that happened and when?

12   A.      In September of 2008, Washington Mutual was shut down

13   and sold to JPMorgan Chase.

14   Q.      What's your current job description at JPMorgan Chase?

15   A.      Loan quality review analyst.

16   Q.      What does that mean on a day-to-day basis?  What do

17   you do?

18   A.      I audit mortgage underwriters.

19   Q.      So you're, in essence, a step above ordinary

20   underwriters, reviewing their work?

21   A.      Correct.

22   Q.      Prior to having that job role, were you yourself an

23   underwriter?

24   A.      Yes.

25   Q.      For how long?

1    A.      For about five years prior to my current job.

2    Q.      And was underwriter your job in 2007 and 2008?

3    A.      Correct.

4    Q.      Have you testified in other trials on behalf of

5    Washington Mutual and JPMorgan Chase?

6    A.      Yes, I have.

7    Q.      Is that both as an underwriter and a custodian of loan

8    files?

9    A.      Correct.

10   Q.      Have you become familiar with how JPMorgan Chase

11   creates and maintains its loan files?

12   A.      Yes.

13   Q.      Based on what you've learned, are those file

14   generating and maintaining methods generally the same now as

15   they were in 2007 and 2008?

16   A.      Correct.

17   Q.      Were you also familiar with how Washington Mutual

18   created and maintained its loan files?

19   A.      Yes.

20   Q.      I'm going to ask about if you've reviewed a few loan

21   files and do them one at a time.  First, have you reviewed

22   the loan file for Arthur Watson's purchase of 3294 Rockin M

23   Drive in Chico, California, in 2007?

24   A.      Yes.

25   Q.      Have you also reviewed the loan file for

1    Juan Reynaga's purchase of 2976 Trap Rock Way in Sacramento

2    in March 2008?

3    A.      Yes.

4    Q.      And have you also reviewed the loan file for

5    Anthony Petri's purchase of 5548 Woodforest Drive in

6    Sacramento, California, in August 2008?

7    A.      Yes.

8    Q.      And were each of those files produced from JPMorgan

9    Chase's files in connection with this case?

10   A.      Yes.

11   Q.      Were those files kept in the course of JPMorgan

12   Chase's regularly conducted lending business?

13   A.      Yes.

14   Q.      Is the making and keeping of those loan files a

15   regular practice at JPMorgan Chase?

16   A.      Yes.

17   Q.      Let's talk for a moment about the Trap Rock loan file

18   related to borrower Juan Reynaga.  Did that loan originate

19   with Washington Mutual?

20   A.      Yes.

21   Q.      And how did it end up at JPMorgan Chase?

22   A.      Through the acquisition of Washington Mutual.

23   Q.      The loan file records at Washington Mutual, you said

24   you were familiar with how those are generated.  Are those

25   records made at or near the time of the events or acts

 1   recorded in them by someone with knowledge?

 2   A.      Yes.

 3   Q.      And let's talk briefly about the Woodforest loan file

 4   related to borrower Anthony Petri.  Did that particular loan

 5   originate with JPMorgan Chase?

 6   A.      Yes.

 7   Q.      And you're similarly -- you said you're familiar with

 8   how loan files are generated at JPMorgan Chase.  Were the

 9   records in that loan file made at or near the time of the

10   events or acts recorded in them by someone with knowledge?

11   A.      Yes.

12   Q.      And then, lastly, the loan file for the Rockin M

13   property related to Arthur Watson, do you recall with whom

14   that loan originated?

15   A.      A company called Novelle.

16   Q.      And did Washington Mutual eventually purchase that

17   loan?

18   A.      Correct.

19   Q.      Now, when that would happen at Washington Mutual --

20   what is your understanding of what Novelle was, first of all,

21   from reviewing of the loan file?

22   A.      Novelle was a finance company.

23   Q.      Okay.  And when WaMu would purchase a loan like that,

24   would it take the loan file from the originator and

25   incorporate it into its own business records?

1    A.      Correct.

2    Q.      And would Washington Mutual then rely upon that loan

3    file for purposes of holding that loan going forward?

4    A.      Correct.

5    Q.      Let's talk about some of your work as an underwriter.

6    First I want to ask, from your perspective as an underwriter

7    who's worked at Washington Mutual and JPMorgan Chase, what

8    are some of the key pieces of information that you look at in

9    a borrower when you're deciding whether to approve a loan?

10   A.      You make a loan decision based on income, assets,

11   credit, and collateral.

12   Q.      Okay.  Why is income important in the underwriting

13   process?

14   A.      Income helps us determine if they can qualify for a

15   loan and if they can pay the loan back.

16   Q.      If lies are told about income in a loan application,

17   can that affect the decision whether to approve the loan?

18   A.      Yes, it can.

19   Q.      Why are assets important?

20   A.      Well, assets show does the borrower have the ability

21   to save money, and it also completes a transaction depending

22   on what type of transaction it is.

23   Q.      And if lies are told about assets in a loan

24   application, does that have the capacity to affect the

25   lending decision?

1    A.       Yes, it does.

2    Q.       Why is credit important?

3    A.       Credit shows us what liabilities they might have, and

4    it also shows us how they paid their past creditors.

5    Q.       And then when you said collateral is another thing you

6    look at, what did you mean by that?

7    A.       It means the property for a mortgage, meaning we look

8    at the value of the property to sustain the loan amount.

9    Q.       When you're looking at the value of the property, are

10   you familiar with something called loan-to-value ratio?

11   A.       Yes.

12   Q.       And in the calculation of loan-to-value ratio, what is

13   the value that is used?

14   A.       For underwriting purposes, the value that is used is

15   the purchase price or the appraised value, whichever is

16   lower.

17   Q.       Whichever is lower?

18   A.       Yes.

19   Q.       Was that true both at Washington Mutual and JPMorgan

20   Chase?

21   A.       Correct.

22   Q.       What are some of the key documents as an underwriter

23   that you look at in order to analyze the things that you

24   listed and decide whether to approve a loan?

25            MR. WISEMAN:  Your Honor, I'm going to object as to

 1   vagueness.  Is counsel speaking about now or back --

 2        THE COURT:  And are you talking about this loan or

 3   some other loan or loans in general?

 4        MR. HALES:  Right now, just generally, your Honor.

 5        THE COURT:  Well, I think you have to put it into

 6   context.  Are you talking about the present or are you

 7   talking about the time in question?  And are you talking

 8   about the same kind of loans that were involved in the Petri

 9   and Watson loans?  So I'm going to sustain the objection.

10   Q.   BY MR. HALES:  The things that you listed, income,

11   assets, credit, and collateral, were those important to

12   underwriting in 2007 and 2008?

13   A.   Yes.

14   Q.   And in order to assess those -- the documents you used

15   to assess those things, have they changed between 2007, 2008,

16   and now or are they the same documents?

17   A.   Same type documents.

18   Q.   And what are those documents that you will typically

19   look at to assess those things?

20   A.   You're looking at pay stubs, W-2s, tax returns, bank

21   statements, verification of deposits, credit reports,

22   purchase contracts, appraisals.

23   Q.   And in the case of something like a stated

24   income/stated asset loan, can the documents you look at

25   change?

1    A.       Correct.

2    Q.       And how might it change in that situation?

3    A.       Well, a stated loan, you are stating your income on an

4    application.  So we rely on the application as the source of

5    where the income is coming from to determine if they will

6    qualify for a loan.

7    Q.       You should have in front of you a binder with

8    documents in the 500s, and so I'll be pointing you to

9    particular documents.  The tabs are at the top of the binder.

10   So first can you look at Government's Exhibit 501 in that

11   binder?  Are you at 501?

12   A.       Yes, sir.

13   Q.       Did you find this document in the loan file for the

14   Trap Rock Way property with borrower Juan Reynaga?

15   A.       Yes.

16   Q.       And what is this document?

17   A.       This is a purchase contract.

18   Q.       Okay.  What is the importance, if any, of the purchase

19   price that's on a purchase contract when you're underwriting?

20   A.       It tells us the agreed purchase price of the property.

21            MR. WISEMAN:  Your Honor, I'm going to object as to

22   vagueness in terms of what time reference are we concerned

23   about.

24            THE COURT:  Well, I don't think it's vague because

25   he's now pointing to a particular exhibit which has a date on

KELLY O'HALLORAN, OFFICIAL COURT REPORTER, USDC -- (916) 448-2712

 1   it.  But just to avoid any misunderstanding, why don't you

 2   make sure that your questions take into account the time

 3   frame.

 4   Q.     BY MR. HALES:  Sir, who underwrote this loan from your

 5   review of the loan file?

 6   A.     I don't recall who underwrote the file.

 7   Q.     I'm sorry.  Not the individual, but the institution.

 8   Was it underwritten by Washington Mutual?

 9   A.     Correct.

10   Q.     Okay.  For Washington Mutual, at the time -- you

11   worked for Washington Mutual at the time that this loan file

12   was underwritten?

13   A.     Yes, I did.

14   Q.     Okay.  For Washington Mutual at that time, what was

15   the significance of the purchase price stated on a purchase

16   agreement?

17   A.     Well, it was the agreed-upon purchase price of the

18   subject, so we would base part of our analysis on this

19   document.

20   Q.     And if the purchase price as stated in that agreement

21   was false, could that have affected the decision to approve

22   this loan?

23   A.     Yes, it could have.

24   Q.     Can you please turn to Government's Exhibit 502.  Did

25   you see this document in the loan file for Trap Rock Way?

1    A.        Yes, I did.

2    Q.        What is it?

3    A.        It's a loan application or what we refer to as a 1003.

4    Q.        Do you see a box that says source of down payment

5    there?

6    A.        Yes.

7    Q.        What does it list as the source of the down payment?

8    A.        Gift funds.

9    Q.        Can we go to page 3 of that exhibit, please.

10        Do you see in the details of transaction section a

11   line entry for cash from/to borrower of $79,792?

12   A.        Yes.

13   Q.        Okay.  If the borrower did not have assets to cover a

14   down payment in the area of $80,000 on this loan application,

15   is that something that could have affected the decision to

16   lend?

17   A.        Yes, it could have.

18   Q.        Why?

19   A.        Well, if they don't have the assets to complete the

20   transaction, we don't have a transaction.

21   Q.        Can you please turn next to Government's Exhibit 504.

22   Did you see that document in the loan file for Mr. Reynaga's

23   purchase of Trap Rock Way?

24   A.        Yes.

25   Q.        What is that?

```
 1    A.      It's a receipt.

 2    Q.      A receipt for what?

 3    A.      For $84,000.

 4            MR. HALES:  Move to admit Government's Exhibit 504,

 5    your Honor.

 6            THE COURT:  Exhibit 504 is received in evidence.

 7                          (GOVERNMENT'S EXHIBIT 504, Receipt for

 8                          $84,000 down payment, ADMITTED INTO

 9                          EVIDENCE.)

10    Q.      BY MR. HALES:  And if funds of that amount had not

11    actually been received, is that something that would have

12    been significant to a Washington Mutual underwriter at this

13    time?

14    A.      Correct.

15    Q.      Why?

16    A.      Again, if this was not received, we have not completed

17    the transaction.

18    Q.      Can you please turn to Government's Exhibit 505.

19            THE COURT:  Did anybody explain what that land

20    company, Land America Commonwealth is?

21            MR. HALES:  No.  I can ask the question, your Honor.

22            THE COURT:  All right.

23    Q.      BY MR. HALES:  If we could go back to 504 for a

24    moment.  Are you familiar with Land America Commonwealth?

25    A.      I've seen it before.
```

1    Q.      Do you have, from working in the industry, an

2    understanding of what type of business they are?

3    A.      It's a title company.

4    Q.      What is the title company's role in a loan

5    transaction?

6    A.      They will complete the transaction and complete the

7    closing of the loan.

8    Q.      So this document in the loan file, your understanding

9    is it came from the title company?

10   A.      Correct.

11   Q.      Can you please now flip over to Government's

12   Exhibit 505.  Are you familiar with this type of document

13   from Washington Mutual?

14   A.      Yes, I am.

15   Q.      Okay.  And what is the purpose of this document in the

16   underwriting process?

17   A.      This is considered the gift letter, which is the asset

18   that is being used for the down payment of the subject

19   property.

20   Q.      And you're familiar with how these were used at

21   Washington Mutual in the 2007, 2008 time frame?

22   A.      Yes.

23   Q.      In underwriting the loan, does Washington Mutual rely

24   on the information in a document like this to be true?

25   A.      Yes.

1    Q.     If it's not true and the funds don't exist, does that

2    have the capacity to affect the decision whether this loan is

3    approved?

4    A.     Yes, it does.

5    Q.     Can you look next at Exhibits 506 and 507 in your

6    binder.  Actually, just 506, please.  Mr. Hellstrom, did you

7    see this document in the loan file for the Trap Rock Way

8    property?

9    A.     Yes, I did.

10   Q.     And what would be the purpose of maintaining a

11   document like this in the loan file?

12   A.     It's the down payment of the $84,000.

13   Q.     So based on your review of this loan file, is

14   Washington Mutual relying on that in part to show that the

15   down payment was, in fact, made?

16   A.     Correct.

17   Q.     If this check was never cashed and you found out about

18   it, is that something that could affect the decision whether

19   to approve this loan?

20   A.     Yes.

21   Q.     Why?

22   A.     Again, the transaction wouldn't be complete without

23   it.

24   Q.     When you say the transaction wouldn't be complete,

25   what sort of thoughts or consequences flow with that as an

KELLY O'HALLORAN, OFFICIAL COURT REPORTER, USDC -- (916) 448-2712

1    underwriter?  Can you give us more of a description of what

2    you're meaning by that?

3    A.      Well, if you're buying a property for $400,000 and

4    you're putting a hundred thousand dollars down and you're

5    borrowing $300,000 from the bank to complete that

6    transaction, that means all pieces need to be in place to

7    actually complete the purchase price of $400,000.  It would

8    be the $300,000 that we're loaning and the hundred thousand

9    dollars that they're putting down, so that would complete

10   your $400,000, which completes the purchase price.

11   Q.      So if the down payment is not made, the value that you

12   would use in the loan-to-value ratio, would that be different

13   if you knew it hadn't been made?

14   A.      Well, if no down payment was actually made, then the

15   purchase price would not be the $400,000.  It would only be

16   what actually changed hands for the transaction.

17   Q.      Okay.

18          THE COURT:  I think we should take the scheduled

19   morning break at this time.  I have some lawyers in another

20   case that need to address the Court briefly on another

21   matter.  So let's make it a 20-minute recess instead of 15

22   minutes.  Remember the admonition, ladies and gentlemen.

23          (Recess taken.)

24          (Jury not present.)

25          THE COURT:  The jurors are outside the courtroom.

1    Counsel, the other case that I'm going to hear in a moment is

2    the case that's going to trail yours.  So one of the things

3    they're asking me about is when I might expect this case to

4    end.  And I'm just going to tell them what I know.  But they

5    might want to talk to you afterwards and get a better feel

6    for the timing.

7              MR. HALES:  I can advise the Court our view of it

8    currently, taking into account it could change depending on

9    cross-examinations, Mr. Hellstrom is the second of eight

10   witnesses we have on deck for today, some of whom we expect

11   to be fairly short.  So we expect to finish our case in chief

12   around the end of today or possibly tomorrow morning, into

13   the morning somewhat.  It just depends.

14             THE COURT:  All right.  So why don't you remain

15   available to these other lawyers if they want to talk to you.

16             MR. HALES:  Yes, your Honor.

17             (Whereupon, another matter was heard unrelated to this

18   case.)

19             (Recess taken.)

20             (Jury present.)

21             THE COURT:  Everyone is present.  You may continue.

22             MR. HALES:  Thank you, your Honor.

23                    DIRECT EXAMINATION, (Cont'd.)

24   BY MR. HALES:

25   Q.    Mr. Hellstrom, can you next look in the binder at

1    Government's Exhibit 508.  Did you see that document in the

2    loan file for Juan Reynaga's loan related to Trap Rock Way?

3    A.       Yes, I did.

4    Q.       What is the document?

5    A.       It's an occupancy certification.

6    Q.       Down here at the bottom, in that portion, subparagraph

7    B, what is the borrower, I guess, swearing to in this

8    document, representing to Washington Mutual in this document?

9    A.       That the correct sales price is $420,000.

10   Q.       Anything else?

11   A.       And that they've paid in cash the down payment

12   specified in the contract.

13   Q.       Can you please look next at Government's Exhibit 509.

14   Do you recognize that document?

15   A.       Yes.

16   Q.       Was it in the loan file for Juan Reynaga and Trap Rock

17   Way?

18   A.       Yes, it was.

19   Q.       What is that document?

20   A.       It's an internal document that's basically conditions

21   to the loan or stipulations to the loan that need to be met.

22   Q.       Need to be met before what?

23   A.       Before funding the loan.

24            MR. HALES:  Move to admit Government's Exhibit 509,

25   your Honor.

1          THE COURT:  Who does this go to?  Does it go to the

2     borrower or is it just internal?

3     Q.     BY MR. HALES:  Is it an internal document,

4     Mr. Hellstrom?

5     A.     It's an internal document, but depending on what type

6     of loan you have, if it was a wholesale loan, which we had a

7     broker involved, it would go to the broker.  Kind of a dual

8     thing.  They have to meet some of these conditions.  We have

9     to meet some of the conditions as well.

10         MR. WISEMAN:  Your Honor, I would object as to lack of

11    foundation.  The witness has no personal knowledge about the

12    underwriting here.  He didn't underwrite the loan.

13         THE COURT:  Well, beyond that, I don't know whether

14    he's saying this is one of those where the exhibit would be

15    communicated to the broker or not.

16    Q.     BY MR. HALES:  From reviewing this loan file, can you

17    tell whether this document was communicated to a broker or

18    not?

19    A.     It would be, yes.

20    Q.     And then when it's complete, why is it maintained in

21    the loan file?

22    A.     To show that these were actually met in the file.

23         THE COURT:  All right.  Exhibit 509 is received in

24    evidence.

25         ///

1                          (GOVERNMENT'S EXHIBIT 509, Commitment

2                          Addendum, ADMITTED INTO EVIDENCE.)

3    Q.      BY MR. HALES:  If you look at the bottom half of the

4    page, the part that's about to be blown up here, do you see

5    an item related to the gift that we discussed earlier?

6    A.      Yes.

7    Q.      And can you explain your understanding from your

8    familiarity with this type of form as to what that's saying?

9              MR. WISEMAN:  I'm going to object.  It speaks for

10   itself.

11             THE COURT:  I don't think it does.  Overruled.

12             THE WITNESS:  It's a prior-to-docs condition, meaning

13   they need to provide a gift letter executed by who the donor

14   is, stating the amount of the gift and the donor's name,

15   things of that nature.

16   Q.      BY MR. HALES:  And in your experience, if an item like

17   that is on this checklist and it's not completed, will the

18   loan be approved?  Will the underwriting approval be given or

19   does that have to be completed first?

20   A.      Well, this is a stipulation of the underwriter, so the

21   loan has either been approved, declined, or suspended at this

22   point.  So it needs to be met to proceed further.

23   Q.      And proceed further means what in particular?

24   Funding?

25   A.      It means set the closing and then funded.

 1   Q.      Can you please turn next to Government's Exhibit --

 2           THE COURT:  What does PTD mean?

 3           MR. HALES:  Oh, I think he said it, but I should

 4   clarify, your Honor.

 5   Q.      BY MR. HALES:  I think you said the phrase but we

 6   didn't clarify when you referred to that acronym.  What does

 7   PTD stand for?

 8   A.      Prior to documents.

 9   Q.      Prior to documents.  And what documents is that

10   referring to, the prior to documents phrase?

11   A.      Meaning when the loan has been underwritten and all

12   the conditions have been met, they will print up the final

13   documentation for the loan.

14   Q.      Can you please turn to Government's Exhibit 510 in

15   your binder, Mr. Hellstrom.  Is that another document you

16   found in the Juan Reynaga loan file?

17   A.      Yes, it is.

18   Q.      What is that document?

19   A.      It's a loan approval summary.

20   Q.      What is the purpose of keeping this document in the

21   loan file?

22   A.      It's a document generated by the underwriter.  It's

23   just a summary of the loan.

24           MR. HALES:  Move to admit Government's Exhibit 510,

25   your Honor.

```
 1              THE COURT:  Exhibit 510 is received in evidence.
 2                          (GOVERNMENT'S EXHIBIT 510, Loan
 3                          Approval Summary, ADMITTED INTO
 4                          EVIDENCE.)
 5   Q.      BY MR. HALES:  On this loan approval summary, what is
 6   the sales price that was entered?
 7   A.      $420,000.
 8   Q.      And the loan amount below that?
 9   A.      $336,000.
10   Q.      Is it fair to say then that this loan approval summary
11   is presuming that a down payment will be made in connection
12   with this transaction?
13   A.      Correct.
14   Q.      Can you zoom back out, please.
15           And we talked a little bit earlier about loan-to-value
16   ratio.  Here where it says LTV, is that referring to
17   loan-to-value ratio?
18   A.      Yes, it is.
19   Q.      And the 80 percent, what does that mean?  How is that
20   arrived upon?
21   A.      It means we are lending 80 percent of the value in
22   relationship -- 80 percent loan size in relationship to the
23   value of the home.
24   Q.      And does that change if the down payment isn't made?
25   A.      Does it change?  Yeah, it can change.  Correct.
```

1    Q.      Okay.  If the down payment wasn't made on this

2    transaction and the only funds used to buy the house were the

3    loan proceeds, what is the loan-to-value ratio?

4    A.      It would be a hundred percent.

5    Q.      If it's a hundred percent loan-to-value ratio, does

6    that -- for Washington Mutual at this time, is that viewed as

7    having more or less risk than a loan with an 80 percent

8    loan-to-value ratio?

9    A.      Much higher risk.

10          THE COURT:  Are you talking about loan to purchase

11   price or loan to value?  Aren't they two different things?

12          MR. HALES:  Well, may I ask a question?  I think I

13   asked this question earlier, but I'll ask it again to

14   clarify.

15   Q.      BY MR. HALES:  At this time when Washington Mutual

16   calculated loan-to-value ratio, what value would you use if

17   there was a difference between the purchase price and the

18   contract price -- or appraisal price?  Sorry.

19   A.      We would use the lower of the two, whichever it might

20   be.  So if the purchase price was $300,000 and the appraisal

21   came in at $320,000, we would still use the $300,000 to base

22   our loan upon.

23   Q.      If the appraisal was at 420, but the actual amount

24   paid for the property was 336, what value would you use to

25   calculate loan-to-value ratio?

1    A.       If the purchase price was $336,000, that's where we

2    would start at.

3    Q.       And if that's the value you use and the loan is

4    $336,000, then what is the loan-to-value ratio?

5    A.       If the purchase price was 336,000?

6    Q.       Yes.  And the loan itself was 336,000.

7    A.       That would be a hundred percent loan to value.

8    Q.       And then I started to ask this.  I'm not sure how far

9    we got.  But is that viewed as more or less risky than a loan

10   that is at an 80 percent loan-to-value ratio?

11   A.       It's a higher risk.

12   Q.       Why is that?

13   A.       Well, the individual does not have anything vested in

14   the property.  At 80 percent, they have 20 percent interest

15   in the actual property, so the likelihood that they pay it

16   back is greater.

17   Q.       If you could turn next to Exhibit 514-A in your

18   binder.  It's added right behind 514.  Do you see that?

19   A.       Yes.

20   Q.       Did you find that document in the loan file for

21   borrower Juan Reynaga?

22   A.       Yes.

23   Q.       What is that document?

24   A.       It's a HUD-1 or a settlement statement.

25   Q.       What's the purpose of maintaining the HUD-1 in the

1    loan file?

2    A.      It's a summary of the transaction.

3            MR. HALES:  Your Honor, I move to admit Government's

4    Exhibit 514-A.

5            THE COURT:  Exhibit 514-A is received in evidence.

6                          (GOVERNMENT'S EXHIBIT 514-A, HUD-1,

7                          ADMITTED INTO EVIDENCE.)

8    Q.      BY MR. HALES:  Do you see the $84,000 amount reflected

9    on this HUD-1?

10   A.      Yes.

11   Q.      Can you tap the screen where you see it.  In that

12   area?  Okay.

13           Can you turn next to Government's Exhibit 518 in your

14   binder, please.  Did you see that document in the loan file

15   for Juan Reynaga's loan related to Trap Rock Way?

16   A.      Yes.

17   Q.      Is that a deed of trust?

18   A.      Yes, it is.

19   Q.      What's the importance of the deed of trust to the

20   lender?

21   A.      Well, this is the document that secures, what's

22   securing the loan.  So the property is securing the loan.

23   Q.      And are you familiar with these documents?  Generally

24   speaking, you've seen them before?

25   A.      I've seen them, yes.

1   Q.      Is there an indication on this document that it's been

2   recorded?

3   A.      Yes, there is.

4   Q.      Can you point out to us where that is?

5   A.      (Indicating)

6   Q.      And in what county does it appear to have been

7   recorded?

8   A.      Sacramento County.

9   Q.      If we can zoom back out.  Do you see the address block

10  in the upper left?

11  A.      Yes.

12  Q.      How did at this time Washington Mutual receive the

13  deeds of trusts back after recording with respect to loans?

14  A.      Through mail.

15  Q.      Did you ever know representatives from Washington

16  Mutual to go in person to recorder's offices to pick up deeds

17  of trusts?

18  A.      Not that I was aware of, no.

19          MR. HALES:  A moment, your Honor?

20          THE COURT:  Is 518 in evidence?

21          MR. HALES:  It already was, your Honor.

22          THE COURT:  All right.

23          MR. HALES:  Yes.

24  Q.      BY MR. HALES:  Mr. Hellstrom, we're done with that

25  binder.  If you look behind you, there are two more sizable

1    binders.  One of them should say 700 series.  And if you can

2    grab that one.

3          You said earlier that you had also looked at the loan

4    file for Anthony Petri's loan related to 5548 Woodforest

5    Drive in Sacramento.

6    A.    That is correct.

7    Q.    Let's talk about that one.  Can you look at 702 in

8    your binder, please.  Do you recognize that document?

9    A.    Yes, I do.

10   Q.    Was that in the loan file for Anthony Petri's loan?

11   A.    Yes, it was.

12   Q.    What is this document?

13   A.    It's a loan application or 1003.

14         MR. HALES:  Move to admit Government's Exhibit 702.

15         THE COURT:  Exhibit 702 is received in evidence.

16                       (GOVERNMENT'S EXHIBIT 702, Loan

17                        Application, ADMITTED INTO EVIDENCE.)

18   Q.    BY MR. HALES:  What is the amount of the loan for

19   which Mr. Petri is applying?

20   A.    $240,000.

21   Q.    And in the box about source of down payment, what is

22   indicated as the source of down payment funds?

23   A.    Gift funds.

24   Q.    From whom?

25   A.    Janice Petri.

1    Q.      What is indicated as the purpose of the purchase where

2    it says "property will be"?

3            MR. WISEMAN:  Your Honor, I'm going to object.  The

4    documents speaks for itself.  It's on the document.

5            THE COURT:  What's your question?

6            MR. HALES:  I was first going to ask what's indicated

7    there, and then I'm going to ask some follow-up questions

8    about it.

9            THE COURT:  All right.  Overruled.  It's preliminary.

10   Q.      BY MR. HALES:  What's indicated as the purpose of

11   purchase?

12   A.      A primary residence.

13   Q.      If that's false, does that have the capacity to affect

14   the approval decision on a loan?

15   A.      Yes, it does.

16   Q.      Can we zoom back out.

17           Let me ask why is that?

18   A.      Different levels of risk.

19   Q.      If it's not going to be a primary residence, what

20   happens to the risk?  Does it go up or down?

21   A.      It goes up.

22   Q.      Because?

23   A.      Well, again, people have a tendency to pay for

24   something they live in as opposed to something they do not

25   live in.

1    Q.      Can you turn to page 2 in this exhibit, please.  Do

2    you see the employment information that's listed at the top

3    of this page?

4    A.      Yes.

5    Q.      What importance, if any, does the years on the job

6    have to JPMorgan Chase -- let me back up.  Was this file

7    underwritten by JPMorgan Chase?

8    A.      Yes, it was.

9    Q.      What significance does the years on the job listed

10   here have to JPMorgan Chase and its underwriting?

11   A.      It shows job stability.

12   Q.      If the employer and the years on the job listed here

13   are false, does that have the capacity to affect the loan

14   decision?

15   A.      Yes, it can.

16   Q.      Zoom back out, please.

17           If you look at the bottom of this page, do you see

18   where it lists $11,200 is the monthly income of the borrower?

19   A.      Yes.

20   Q.      If that information is false, does that have the

21   capacity to affect the lending decision for JPMorgan Chase?

22   A.      Yes, it does.

23   Q.      If the true income of the borrower is, in fact, much

24   lower, what can that do to this loan application and to the

25   ultimate decision?

1    A.      Well, it could ultimately lead to a decline if they

2    can't afford to pay for the loan.

3    Q.      Let's turn to page 3 of this exhibit.  Do you see the

4    asset column on the left-hand side of page 3?

5    A.      Yes, I do.

6    Q.      What's the importance of the listing of assets in a

7    loan application to JPMorgan Chase?

8    A.      Again, it's something they would use in the loan

9    qualification, and it's something that's used to complete the

10   transaction.

11   Q.      And do you see the gift from Janice Petri listed here?

12   A.      Yes, I do.

13   Q.      Now, if that gift did not, in fact, exist, could that

14   have affected the decision to extend this loan?

15   A.      Yes, it could have.

16   Q.      Why is that?

17   A.      Again, if there's no assets to complete the

18   transaction, the transaction would never get completed.

19   Q.      Can we go to page 4, please.  Do you see the details

20   of transaction portion in the upper left-hand portion of that

21   page?

22   A.      Yes.

23   Q.      What is the -- and you see the purchase price is

24   listed as 300,000?

25   A.      Correct.

1    Q.      Is that $60,000 greater than the loan amount being

2    applied for?

3    A.      I'm sorry?

4    Q.      Is that $60,000 greater than the loan amount that's

5    being applied for?

6    A.      Well, the loan amount was $240,000, so 60,000 would be

7    less.

8    Q.      I'm sorry.  It's a poorly asked question.  What's the

9    difference between the purchase price listed and the loan

10   amount being applied for?  That's a better question.

11   A.      $60,000.

12   Q.      And the cash from/to borrower line down below that, do

13   you see where it lists $58,617?

14   A.      Yes.

15   Q.      If the borrower does not, in fact, have sufficient

16   liquid assets to make a down payment on the order of that,

17   does that have the capacity to affect whether this loan is

18   approved?

19   A.      Yes, it could.

20   Q.      Same reason as stated before?

21   A.      Yes.

22   Q.      Can you turn next, please, to Government's

23   Exhibit 703.  Did you see that document in the loan file for

24   Anthony Petri's loan?

25   A.      Yes, I did.

1    Q.      And what is that document?

2    A.      It's a gift letter.

3    Q.      What is the purpose of maintaining a gift letter in a

4    JPMorgan Chase loan file?

5    A.      It's a form of an asset.

6            MR. HALES:  Move to admit Government's Exhibit 703,

7    your Honor.

8            THE COURT:  Exhibit 703 is received in evidence.

9                           (GOVERNMENT'S EXHIBIT 703, Gift

10                          letter, $60,000, ADMITTED INTO

11                          EVIDENCE.)

12   Q.      BY MR. HALES:  What is the amount of the gift that's

13   being indicated on this document?

14   A.      $60,000.

15   Q.      Now, if that's, in fact, false and the gift hadn't

16   been given, could that affect whether or not this loan would

17   have been extended?

18   A.      It could.

19   Q.      Turn next, please, if you will, to Government's

20   Exhibit 704 in the binder.  Did you see that document in the

21   loan file for Anthony Petri?

22   A.      Yes.

23   Q.      What is it?

24   A.      It's a verification of employment.

25   Q.      What's the purpose of keeping that document in a

1    JPMorgan Chase loan file?

2    A.      It's an income documentation to verify income.

3    Q.      And this particular form, is it intended to be filled

4    out at JPMorgan Chase or is it typically sent out to someone

5    to be filled out?

6    A.      It would be sent out to the employer.

7            MR. HALES:  Move to admit Government's Exhibit 704,

8    your Honor.

9            THE COURT:  Exhibit 704 is received in evidence.

10                          (GOVERNMENT'S EXHIBIT 704,

11                          Verification of employment, ADMITTED

12                          INTO EVIDENCE.)

13   Q.      BY MR. HALES:  Can you see -- are you able to read

14   that?  Who does it say this is being sent to at the employer?

15   A.      It's Leonard at Diamond Hill Financial.

16   Q.      And if we go down a little further in the document to

17   this portion, what does this document say about

18   Anthony Petri's employment?

19   A.      It shows that he's been employed since December 1st of

20   2005 as a sales manager and that his probability of continued

21   employment is positive.

22   Q.      If we can go to the bottom of the document.  Does this

23   document appear to have been signed?

24   A.      Yes, it does.

25   Q.      Can you please move next to 705 in your binder.  Did

1    you see that document in the Anthony Petri loan file?

2    A.      Yes, I did.

3    Q.      What is it?

4    A.      Pay stubs.

5    Q.      Based on your review of this loan file, is this a full

6    document or a stated income loan?

7    A.      It's a full document loan.

8    Q.      What's the purpose of having pay stubs in a full

9    document loan for JPMorgan Chase?

10   A.      To verify and calculate income.

11           MR. HALES:  Move to admit Government's Exhibit 705,

12   your Honor.

13           THE COURT:  Exhibit 705 is received in evidence.

14                        (GOVERNMENT'S EXHIBIT 705, Earning

15                        statements from DHF, ADMITTED INTO

16                        EVIDENCE.)

17   Q.      BY MR. HALES:  For whom does this purport to be a pay

18   stub?

19   A.      Anthony Petri.

20   Q.      At what company?

21   A.      Diamond Hill Financial.

22   Q.      Can we look at the bottom half of the page as well.

23   Again, Mr. Petri at Diamond Hill Financial?

24   A.      Correct.

25   Q.      In a full document loan, does JPMorgan Chase rely on

1    the pay stubs to verify the person's income and determine

2    whether the loan should be extended?

3             MR. WISEMAN:  Objection.  Vague as to time.  Are we

4    going back to the time this loan was applied for or

5    presently?

6             MR. HALES:  At the time this loan was applied for.

7             THE COURT:  Go ahead.  Answer the question.

8             THE WITNESS:  Yes.

9    Q.    BY MR. HALES:  If this document was, in fact, a

10   fabrication, could that have affected JPMorgan Chase's

11   decision to extend this loan?

12   A.    Yes, it could.

13   Q.    Will you please look next to the Government's

14   Exhibits 706 and 707.  Did you see those two documents in the

15   Anthony Petri loan file?

16   A.    Yes, I did.

17   Q.    And what are they?

18   A.    They're W-2s.

19   Q.    What's the purpose of keeping W-2s in the loan file?

20   A.    Again, it's an income documentation to verify income

21   and calculate income.

22            MR. HALES:  Move to admit Government's Exhibits 706

23   and 707, your Honor.

24            THE COURT:  Exhibits 706 and 707 are received in

25   evidence.

```
 1                              (GOVERNMENT'S EXHIBIT 706, Purported

 2                              W2 from DHF, 2006, ADMITTED INTO

 3                              EVIDENCE.)

 4                              (GOVERNMENT'S EXHIBIT 707, Purported

 5                              W2 from DHF, 2007, ADMITTED INTO

 6                              EVIDENCE.)

 7   Q.      BY MR. HALES:  And for whom does this document purport

 8   to be a W-2?

 9   A.      For an Anthony Petri.

10   Q.      At what company?

11   A.      Diamond Hill Financial.

12   Q.      And what does it list as his annual income for 2006?

13   A.      $70,489.23.

14   Q.      Can we look at Government's Exhibit 707, please.  And

15   again, does this purport to be a W-2 for Anthony Petri at

16   Diamond Hill Financial?

17   A.      Yes, it does.

18   Q.      This time, what are the yearly wages listed?

19   A.      $137,562.52.

20   Q.      If Washington Mutual had learned that these documents

21   were -- if it became known to Washington Mutual that these

22   documents were not true, could that have affected the

23   decision to extend this loan?

24   A.      This was a Chase loan.

25   Q.      I'm sorry.  JPMorgan Chase.  Thank you for correcting
```

1    me.

2    A.      It could, yes.

3    Q.      And why is that?

4    A.      Again, we use the documentation to calculate income,

5    and you would base your loan upon income documentation in the

6    file.

7    Q.      Can you please look next at Government's Exhibit 708

8    in that binder.

9    A.      Yes.

10   Q.      Did you also see this document in Anthony Petri's loan

11   file?

12   A.      Yes, I did.

13   Q.      What is this document?

14   A.      This is a verbal verification of employment.

15   Q.      Was the purpose -- is it a verification or

16   re-verification?

17   A.      Well, it's a verification of employment or

18   re-verification.  It's done normally ten days prior to

19   closing to verify that they actually still work at the said

20   company on the application.

21   Q.      What's the purpose of maintaining this in the loan

22   file?

23   A.      To show that they were working at the time of the

24   loan.

25           MR. HALES:  Move to admit Government's Exhibit 708,

1      your Honor.

2              THE COURT:  Exhibit 708 is received in evidence.

3                              (GOVERNMENT'S EXHIBIT 708, Telephonic

4                              verification of employment, verified

5                              with Leonard Williams, ADMITTED INTO

6                              EVIDENCE.)

7      Q.      BY MR. HALES:  Who does this indicate was contacted to

8      verify the employment?

9      A.      Leonard.

10     Q.      And for Anthony Petri?

11     A.      Correct.

12     Q.      Same company we saw before, Diamond Hill Financial?

13     A.      Yes.

14     Q.      What happens at this stage in JPMorgan Chase's process

15     of funding a loan if the employment is not verified?  In

16     other words, if a phone call is made but the person doesn't

17     work there.

18     A.      Well, if the borrower does not work there, at that

19     time the file would be returned to the underwriter to

20     determine if they still qualify for a loan.

21     Q.      So is it fair to say it would put things at least on

22     hold?

23     A.      Correct.

24     Q.      And if it was determined the person had never worked

25     there at all, could that affect the decision whether to

 1   extend this loan?

 2   A.      Yes, it could.

 3   Q.      Please turn next -- you have to flip a little bit --

 4   back to Government's Exhibit 728.  Do you recognize this

 5   document?

 6   A.      Yes, I do.

 7   Q.      Was it in Anthony Petri's loan file for the Woodforest

 8   Drive property?

 9   A.      Yes, it was.

10   Q.      What is this document?

11   A.      This is produced from the underwriter.  Again, it's

12   the approval summary of the loan.

13   Q.      And the purpose of keeping it in the loan file to

14   memorialize the conclusions of the underwriter?

15   A.      Again, it shows the -- actually a summary of the file,

16   meaning the transaction, and then any conditions that were

17   set on the file.

18           MR. HALES:  Move to admit Government's Exhibit 728,

19   your Honor.

20           THE COURT:  Exhibit 728 is received in evidence.

21                        (GOVERNMENT'S EXHIBIT 728, Chase Loan

22                        Memorandum - Approval, ADMITTED INTO

23                        EVIDENCE.)

24   Q.      BY MR. HALES:  What is the -- the purchase price

25   that's listed here is 300,000?

1    A.      That is correct.

2    Q.      Is it fair to say this loan memorandum is presuming

3    that a $60,000 down payment is going to be made or was made?

4    A.      Correct.

5    Q.      If we can zoom back out.

6            And here again, we have -- do you see where LTV is

7    listed?

8    A.      Yes.

9    Q.      Is that the same, in JPMorgan Chase, is that same

10   acronym used to refer to loan-to-value ratio?

11   A.      Yes.

12   Q.      At JPMorgan Chase, is it calculated in the same manner

13   as you described at Washington Mutual?

14   A.      Correct.

15   Q.      And that was you used the lower of the appraisal

16   amount or the purchase price?

17   A.      Correct.

18   Q.      Okay.  In this case, the loan-to-value ratio was

19   calculated as what?

20   A.      80 percent.

21   Q.      Now, if the true purchase price for this property was

22   $240,000, what would the loan-to-value ratio be?

23   A.      That would be a hundred percent.

24   Q.      And again, at JPMorgan Chase, does that change the

25   risk profile of this loan?

```
 1    A.       Yes, it would.

 2    Q.       In turn, could that affect the decision whether to

 3    extend this loan?

 4    A.       Yes, it could.

 5    Q.       Do you see the total income amount?

 6    A.       Yes, I do.

 7    Q.       Are you familiar with how JPMorgan Chase underwriters

 8    will determine the total income amount to put on this loan

 9    memorandum?

10    A.       I can figure it out, correct, yes.

11             MR. WISEMAN:  I'm going to object as to vagueness as

12    to terms in time.

13    Q.       BY MR. HALES:  At the time this loan was underwritten?

14    A.       Yes.

15    Q.       And how is a JPMorgan Chase underwriter to determine

16    that amount?

17    A.       Well, they would look at the income docs supplied and

18    then from those determine what income they're using for the

19    loan.

20    Q.       Do you use the most recent W-2 and divide the total

21    amount by 12 to get to that?

22    A.       That can be one of the calculations, correct, yes.

23    Q.       Can you look back at -- if I can have a moment -- at

24    Government's Exhibit 707 for a moment.

25    A.       Yes.
```

1    Q.      Have you divided that number by 12?

2    A.      Yes, I have.

3    Q.      What is it?  If we go back to Government's

4    Exhibit 728.

5    A.      It's $11,464.

6    Q.      From your review of this loan file, did you conclude

7    that the W-2 that was submitted was used as the basis for

8    this income amount on the loan memorandum?

9    A.      Yes.

10          MR. WISEMAN:  Objection.  Calls for speculation.  He

11   didn't underwrite this loan.

12          THE COURT:  All right.  I'll sustain the objection.

13   The document speaks for itself.

14          MR. HALES:  I'll move on, your Honor.

15   Q.      BY MR. HALES:  Can you please turn next to Exhibit 710

16   in your binder.  Did you see that document in Anthony Petri's

17   loan file?

18   A.      Yes.

19   Q.      What is this document?

20   A.      It's the closing instructions.

21   Q.      What's the purpose of maintaining this document in the

22   loan file?

23   A.      Again, it's an internal document that is submitted

24   when we close a loan, and it gives instructions to the title

25   company.

1            MR. HALES:  Move to admit Government's Exhibit 710,

2     your Honor.

3            THE COURT:  Exhibit 710 is received in evidence.

4                              (GOVERNMENT'S EXHIBIT 710, Chase's

5                              closing instructions, ADMITTED INTO

6                              EVIDENCE.)

7     Q.    BY MR. HALES:  First, do you see where it says wire

8     amount and then approximately $242,000?

9     A.    Yes.

10    Q.    How were the loan amounts typically transmitted from

11    JPMorgan Chase at this time, if you know?

12    A.    Again, that was outside my job capacity, so I don't

13    know.

14    Q.    Let's go down to the bottom half of this page.  Do you

15    see where it says recorded documents and title policies must

16    be forwarded to and then there's an address?

17    A.    Yes.

18    Q.    Okay.  What's in Monroe, Louisiana?

19    A.    It's where JPMorgan keeps their documentation.

20    Q.    So after a JPMorgan Chase loan closes, is it typical

21    for the recorded documents to be mailed to that address?

22    A.    That is correct.

23    Q.    And a similar question to what I asked earlier.  In

24    working at JPMorgan Chase, have you ever known the company to

25    send representatives to personally pick up recorded documents

```
 1    after a loan has closed?

 2    A.      No.

 3    Q.      And they're typically received by mail?

 4    A.      Correct.

 5    Q.      Please move next to Government's Exhibit 712 in your

 6    binder.  Did you see that document in Anthony Petri's loan

 7    file?

 8    A.      Yes, I did.

 9    Q.      What is it?

10    A.      It's a settlement statement.

11    Q.      What's the purpose of keeping this document in the

12    loan file?

13    A.      That's a summary of the transaction.

14            MR. HALES:  Move to admit Government's Exhibit 712,

15    your Honor.

16            THE COURT:  Exhibit 712 is received in evidence.

17                        (GOVERNMENT'S EXHIBIT 712, HUD-1,

18                         ADMITTED INTO EVIDENCE.)

19    Q.      BY MR. HALES:  This one's hard to read, but do you see

20    the $60,000 amount we discussed earlier reflected anywhere

21    else on this document?

22    A.      Yes, I do.

23    Q.      Can you point for us where it is?

24    A.      (Witness indicating.)

25    Q.      That's at line 214?
```

```
1    A.      214.

2    Q.      And then if you can please look at Government's

3    Exhibit 714 in your binder.  Did you see that document in

4    Anthony Petri's loan file?

5    A.      Yes, I did.

6    Q.      What is it?

7    A.      Deed of trust.

8            MR. HALES:  Move to admit Government's Exhibit 714,

9    your Honor.

10           THE COURT:  Exhibit 714 is received in evidence.

11                        (GOVERNMENT'S EXHIBIT 714, Deed of

12                         Trust, ADMITTED INTO EVIDENCE.)

13   Q.      BY MR. HALES:  And again, as with the other deeds of

14   trusts we looked at, does this have an indication that the

15   document was recorded?

16   A.      Yes, it does.

17   Q.      Where do you see that?

18   A.      (Witness indicating.)

19   Q.      In the upper right?

20   A.      Yes.

21   Q.      And then over to the left of that, is that the same

22   address that we saw before on the previous document, Monroe,

23   Louisiana?

24   A.      Yes, it is.

25   Q.      Mr. Hellstrom, we're done with that binder.  And if
```

1    you could get the one that is the 300 series behind you.

2         Way back at the beginning, we talked about

3    Arthur Watson's loan related to the Rockin M property.

4    You've reviewed that loan file?

5    A.    Yes.

6    Q.    Can you please look at Government's Exhibit 301 in

7    evidence here.  Did you see this document in the loan file

8    for Arthur Watson?

9    A.    Yes, I did.

10   Q.    What is it?

11   A.    It's an application or 1003.

12   Q.    Can we go to page 2 of this application, please.  I'm

13   sorry.  Back to page 1.  It's at the bottom.  Where does it

14   say that Arthur Watson works?

15   A.    Diamond Hill Financial.

16   Q.    For how long?

17   A.    Eight years.

18   Q.    And if we can zoom back out and then go to the next

19   page.

20        How much does it say he makes per month in the income

21   section?

22   A.    $10,864.26.

23   Q.    One moment, your Honor.

24        Can we look at page 3 of this document, please.  Do

25   you see that the details of transaction section is split

1    between pages 3 and 4?

2    A.      Yes.

3    Q.      Okay.  First on page 3 at the bottom here, what does

4    it list as the purchase price?

5    A.      $440,000.

6    Q.      And then if we go to page 4 on the top left, what is

7    indicated as the loan amount?

8    A.      $418,000.

9    Q.      And does that indicate to you that a down payment

10   would need to be made to complete this transaction at the

11   stated purchase price?

12   A.      Correct.

13   Q.      Zoom back out, please.

14           Can we go to -- can you please move to Government's

15   Exhibit 302 in your binder.  Did you see this document in the

16   loan file for Arthur Watson's Rockin M loan?

17   A.      Yes, I did.

18   Q.      Can you turn, please, to Government's Exhibit 303 not

19   in evidence yet.  Did you see this document in Arthur

20   Watson's loan file for the Rockin M property?

21   A.      Yes, I did.

22   Q.      This document was not filled out by JPMorgan Chase; is

23   that right?

24   A.      That is correct.

25   Q.      Okay.  And what is the name of the company at the top

 1   of this document?

 2   A.      It's Novelle.

 3   Q.      And to bring us back to what we discussed earlier,

 4   from reviewing this file, is it your understanding that

 5   Washington Mutual purchased this loan from Novelle?

 6   A.      That is correct.

 7   Q.      And when that happens, you receive the documents from

 8   the company that sells you the loan, and you rely upon them?

 9   A.      That is correct.

10           MR. HALES:  Move to admit Government's Exhibit 303,

11   your Honor.

12           THE COURT:  Exhibit 303 is received in evidence.

13                        (GOVERNMENT'S EXHIBIT 303,

14                        Verification of employment form,

15                        ADMITTED INTO EVIDENCE.)

16   Q.      BY MR. HALES:  Who does this indicate verified

17   Arthur Watson's employment at Diamond Hill Financial?

18   A.      It looks like Leonard Williams.

19   Q.      And the phone number that was called, (916) 932-2083;

20   is that right?

21   A.      Correct.

22   Q.      Can you please look at Government's Exhibit 304 in

23   your binder.  Do you recognize that from Arthur Watson's loan

24   file related to Rockin M?

25   A.      Yes, I do.

1    Q.      What is that document?

2    A.      It's a WhitePages.com.

3    Q.      What's the purpose of keeping a document like this in

4    the loan file?

5    A.      It verifies a third-party source of where you got the

6    phone number for the employer.

7            MR. HALES:  Move to admit Government's Exhibit 304,

8    your Honor.

9            THE COURT:  Exhibit 304 is received in evidence.

10                          (GOVERNMENT'S EXHIBIT 304,

11                          WhitePages.com information for DHF,

12                          ADMITTED INTO EVIDENCE.)

13   Q.      BY MR. HALES:  How does that phone number listed here

14   for Diamond Hill compare to what we just saw on the previous

15   Exhibit 303?

16   A.      It's the same phone number.

17   Q.      Can you move next to Exhibit 305 in your binder.  Did

18   you see that document in Arthur Watson's loan file for

19   Rockin M?

20   A.      Yes.

21   Q.      And what's the purpose of keeping this document in the

22   loan file?

23   A.      It's an occupancy statement.

24   Q.      Is there an indication if Mr. Watson will be occupying

25   the property?

1    A.      Yes, there is.

2    Q.      Can you please move next to Government's Exhibit 306

3    in your binder.  Did you see those documents in

4    Arthur Watson's loan file for Rockin M Drive?

5    A.      Yes.

6    Q.      What do they appear to be?

7    A.      Bank statements.

8    Q.      What's the purpose of keeping bank statements in a

9    loan file?

10   A.      To support the assets.

11           MR. HALES:  Move to admit Government's Exhibit 306,

12   your Honor.

13           THE COURT:  Exhibit 306 is received in evidence.

14                       (GOVERNMENT'S EXHIBIT 306, Falsified

15                       Arthur Watson bank statements, 6/26/06

16                       through 5/25/07, from loan file,

17                       ADMITTED INTO EVIDENCE.)

18   Q.      BY MR. HALES:  Mr. Hellstrom, if these bank statements

19   are false, does that have the capacity to affect whether a

20   loan would be extended?

21   A.      It could.

22   Q.      Please move next to Government's Exhibit 310.  Did you

23   see that document in the Arthur Watson loan file for Rockin

24   M?

25   A.      Yes, I did.

1    Q.     And what is that document?

2    A.     It's a verification of deposit.

3    Q.     What's the purpose of keeping that in the loan file?

4    A.     This is to verify an asset.

5           MR. HALES:  Move to admit Government's Exhibit 310.

6           THE COURT:  Exhibit 310 is received in evidence.

7                         (GOVERNMENT'S EXHIBIT 310, B of A

8                          Verification of Deposit, ADMITTED INTO

9                          EVIDENCE.)

10   Q.     BY MR. HALES:  First, do you see the date at the

11   bottom right of this document?

12   A.     Yes, I do.

13   Q.     Is that June 29, 2007?

14   A.     Yes, it is.

15   Q.     If we can zoom back out.

16          What's the current balance that's listed for

17   Mr. Watson on that date?

18   A.     $9,625.87.

19   Q.     And if that turns out not to be the borrower's money

20   that's in the account, can that affect the decision whether

21   to extend this loan?

22   A.     It could.

23   Q.     Why is that?

24   A.     Well, if the asset is listed as the individual's

25   assets, that's where the asset should be coming from.  If

1     it's coming from another party, we need to know why.

2     Q.     Can you please turn next to Government's Exhibit 314

3     in your binder.  Did you see that document in Arthur Watson's

4     loan file for Rockin M?

5     A.     314?

6     Q.     314, yes.

7     A.     Yes.

8     Q.     What does that document appear to be?

9     A.     It's a rental agreement.

10    Q.     Related to what property?  Let me back up.  What's the

11    purpose of keeping a rental agreement document like this in

12    the loan file?

13    A.     It's an income documentation.

14    Q.     To verify a portion of the borrower's income?

15    A.     Correct.

16           MR. HALES:  Move to admit Government's Exhibit 314,

17    your Honor.

18           THE COURT:  Exhibit 314 is received in evidence.

19                          (GOVERNMENT'S EXHIBIT 314, Gidda Loop

20                           rental agreement from Rockin M loan

21                           file, ADMITTED INTO EVIDENCE.)

22    Q.     BY MR. HALES:  For what property does this appear to

23    be a rental agreement?  If you can read that.

24    A.     It looks like 864 Gidda Loop, Yuba City, California.

25    Q.     Can you move next to Government's Exhibit 315 in your

1    binder.  Did you see that document in Arthur Watson's loan

2    file for Rockin M?

3    A.      Yes.

4    Q.      What is that document?

5    A.      It's an underwriting transmittal letter.

6    Q.      What's the purpose of keeping this document in the

7    loan file?

8    A.      This is a summary from the underwriter of the actual

9    loan.

10           MR. HALES:  Move to admit Government's Exhibit 315,

11   your Honor.

12           THE COURT:  Exhibit 315 is received in evidence.

13                          (GOVERNMENT'S EXHIBIT 315, Uniform

14                          Underwriting Transmittal Summary,

15                          ADMITTED INTO EVIDENCE.)

16   Q.      BY MR. HALES:  Do you see where it lists loan-to-value

17   ratio as 95 percent?

18   A.      Yes.

19   Q.      Does that mean there's an assumption here that a down

20   payment is being made in connection with this transaction?

21   A.      Correct.

22   Q.      And if we can zoom back out.

23           This underwriting summary also is based, in part, on

24   the borrower's income that's listed here?

25   A.      Correct.

1    Q.      Can you please turn to Government's Exhibit 317 in

2    your binder.  Did you see this document in Arthur Watson's

3    loan file for Rockin M?

4    A.      Yes, I did.

5    Q.      What does it reflect?

6    A.      This is amended escrow instructions.

7    Q.      Is the main thing here that's being amended the

8    purchase price?

9    A.      Correct.

10   Q.      Please turn next to Government's Exhibit 318.  Did you

11   see that document in Arthur Watson's loan file for the

12   Rockin M property?

13   A.      Yes.

14   Q.      What is that?

15   A.      It's a settlement statement.

16   Q.      Sometimes also referred to as a HUD-1?

17   A.      Correct.

18   Q.      And again, the purpose of keeping this in the loan

19   file?

20   A.      This is a summary of the whole transaction.

21           MR. HALES:  Move to admit Government's Exhibit 318,

22   your Honor.

23           THE COURT:  Exhibit 318 is received in evidence.

24                       (GOVERNMENT'S EXHIBIT 318, Borrower's

25                        HUD-1, ADMITTED INTO EVIDENCE.)

1          THE COURT:  Did I receive 317?

2          THE CLERK:  It was received previously, your Honor.

3          MR. HALES:  It was already in, your Honor.

4          THE COURT:  All right.

5   Q.     BY MR. HALES:  Can we please go to page 3 of

6   Government's Exhibit 318.  Do you see at the top an amount

7   listed for buyer's funds to close?

8   A.     Yes.

9   Q.     What is that amount?

10  A.     $22,000.

11  Q.     Can you move next, please, to Government's

12  Exhibit 320.  Did you see that document in Arthur Watson's

13  loan file for the Rockin M property?

14  A.     Yes.

15  Q.     What is that document?

16  A.     A deed of trust.

17         MR. HALES:  Move to admit Government's Exhibit 320,

18  your Honor.

19         THE COURT:  Exhibit 320 is received in evidence.

20                    (GOVERNMENT'S EXHIBIT 320, Deed of

21                    Trust, ADMITTED INTO EVIDENCE.)

22  Q.     BY MR. HALES:  Again, is there an indication here that

23  this document has been recorded?

24  A.     Yes.

25  Q.     And if we zoom back out, do you see an address block

1    on the top?

2    A.     Yes, I do.

3    Q.     And again, Novelle was, from your review of this loan

4    file, Novelle was the company that originated this loan and

5    sold it to Washington Mutual?

6    A.     Correct.

7    Q.     And, lastly, if you could look at Government's

8    Exhibit 323 in your binder.  Do you recognize that document

9    from Arthur Watson's loan file for Rockin M?

10   A.     Yes.

11   Q.     What is that document?

12   A.     It's the assignment of the deed of trust.

13   Q.     And who is it assigning the deed to?

14   A.     Washington Mutual.

15          MR. HALES:  Move to admit Government's Exhibit 323,

16   your Honor.

17          THE COURT:  Exhibit 323 is received in evidence.

18                         (GOVERNMENT'S EXHIBIT 323, Assignment

19                          of Deed of Trust, ADMITTED INTO

20                          EVIDENCE.)

21   Q.     BY MR. HALES:  So basically is this the document

22   showing how Washington Mutual ended up with this loan?

23   A.     Correct.

24   Q.     And subsequently, the file went to JPMorgan Chase

25   because of the acquisition?

1    A.       That is correct.

2    Q.       Let me ask you, in the time frame of the Arthur Watson

3    Rockin M loan, for Washington Mutual, would it, for an

4    underwriter at that time, would it have been significant for

5    you to know if the borrower owned another home that was not

6    listed on their loan application?

7    A.       Yes.

8    Q.       Why would that be significant to know?

9    A.       Well, do they owe any liabilities on that property,

10   meaning do they have any other debts that we need to consider

11   in the loan file?

12   Q.       Can that affect the risk assessment on that particular

13   loan application?

14   A.       It could affect it.  Correct.

15   Q.       The same question for Washington Mutual in this time

16   frame.  What if the borrower had an arrangement with a friend

17   that the friend would be paying the mortgage instead of the

18   borrower?  Is that something that Washington Mutual would

19   have wanted to know when purchasing this loan?

20   A.       It could have been relevant.  Correct.

21   Q.       In what way could it be relevant?

22   A.       Well, why is somebody else paying for the mortgage?  I

23   mean they're giving a loan to somebody else and they're

24   purchasing the property, so why do we have a third party

25   that's now going to be making the payments?

1           MR. HALES:  One moment, your Honor.

2           THE COURT:  Yes.

3           MR. HALES:  Thank you.

4    Q.     BY MR. HALES:  Can you, lastly, turn to Government's

5    Exhibit 328 in your binder.  What is that document?

6    A.     It's a canceled check.

7    Q.     Looking at the amount that's listed on it, if you

8    recall, how does that compare to the mortgage amount in

9    connection with this Arthur Watson Rockin M loan?

10          MR. WISEMAN:  Objection.  The documents speak for

11   themselves.

12          THE COURT:  When you say how does it compare, what do

13   you mean?

14   Q.     BY MR. HALES:  Is that consistent with the mortgage

15   payments required on this loan, to your recollection?

16   A.     I'd have to look at another document to confirm that.

17   Q.     Could you take a minute and do that, if you remember

18   it being in the binder that we just went through.

19          I'll direct your attention to Government's

20   Exhibit 315, the uniform underwriting and transmittal

21   summary.  If we could put that up.  Do you see the line item

22   for first mortgage P&I?

23   A.     That's principal and interest.

24   Q.     Principal and interest?

25   A.     Yes.

 1    Q.      Does that amount match the amount that's shown on the

 2    check at Government's Exhibit 328?

 3    A.      Yes, it does.

 4            MR. HALES:  No further questions, your Honor.

 5            THE COURT:  Cross-examination.

 6            MR. WISEMAN:  Your Honor, may we take a break a bit

 7    early?  It's almost noon.

 8            THE COURT:  Well, if we do, we're going to come back

 9    early.

10            MR. WISEMAN:  That's fine.

11            THE COURT:  All right.  If you want, we'll take a

12    break now, and we'll come back at quarter to 1:00.

13            MR. WISEMAN:  That's fine.

14            THE COURT:  That's the break, ladies and gentlemen.

15    We'll resume at 12:45, quarter to 1:00.  Remember the

16    admonition.

17            (Lunch recess taken at 11:44 a.m.)

18

19

20

21

22

23

24

25

1                    SACRAMENTO, CALIFORNIA

2               TUESDAY, JULY 22, 2014, 12:45 P.M.

3                         ---oOo---

4          (Jury present.)

5          THE COURT:  Everyone is present.

6          Mr. Wiseman, are you ready to cross-examine?

7          MR. WISEMAN:  I am.  Thank you, your Honor.

8                      CROSS-EXAMINATION

9    BY MR. WISEMAN:

10   Q.     Good afternoon, Mr. Hellstrom.

11   A.     Good afternoon.

12   Q.     And you testified that you presently work for JPMorgan

13   Chase; correct?

14   A.     Correct.

15   Q.     And would you tell the ladies and gentlemen of the

16   jury what is JPMorgan Chase?  Is it a bank?

17   A.     Yes.  I work for the bank.  Correct.

18   Q.     You work for the bank?

19   A.     Yes.

20   Q.     And JPMorgan Chase at some point purchased, if I

21   understand your testimony, Washington Mutual; correct?

22   A.     That is correct.

23   Q.     Otherwise known as WaMu; right?

24   A.     Correct.

25   Q.     I'll refer to it as WaMu.  Do you recall when that

1    purchase of WaMu took place?

2    A.      Somewhere around September 25, 2008.

3    Q.      Around September 25, 2008?

4    A.      Correct.

5    Q.      And when JPMorgan Chase purchased WaMu, is it fair to

6    say that the bank, that is, JPMorgan, purchased all of the

7    assets of WaMu?

8    A.      Correct.

9    Q.      And WaMu, just so we all understand, WaMu, likewise,

10   was a bank; correct?

11   A.      Correct.

12   Q.      And in the 2005, let's say, to 2007 range, WaMu was in

13   the business of originating loans; correct?

14   A.      Correct.

15   Q.      And so by originating loans, is it fair to say that

16   they were in the retail business of funding loans for

17   borrowers?

18   A.      Correct.

19   Q.      And when JPMorgan purchased WaMu, it purchased all of

20   the outstanding loans that WaMu had made; correct?

21   A.      From what I understand, correct.

22   Q.      Okay.  And you testified earlier, if I recall

23   correctly, something about selling loans.  Were you asked

24   that question?

25           In other words -- well, let me rephrase it.  During

1    your tenure at JPMorgan Chase, has JPMorgan Chase sold loans

2    that it had originated?

3    A.      From my understanding, yes.

4    Q.      Okay.  So let's refer to the time frame of, let's say,

5    2005 to 2007.  And when did you start working there at

6    JPMorgan Chase?

7    A.      At WaMu was January 3, 2005.

8    Q.      Okay.  So you started with WaMu in '05, and then when

9    WaMu was purchased by JPMorgan Chase, you just transferred

10   over to JPMorgan Chase?

11   A.      That is correct.

12   Q.      So from 2005 to the purchase of -- I think you said

13   it's 2008, you were exclusively working for WaMu; correct?

14   A.      Correct.

15   Q.      So would it be fair to say that you were quite

16   familiar with how WaMu originated loans, residential mortgage

17   loans?

18   A.      Correct.

19   Q.      Okay.  And WaMu's business model back then was to

20   essentially sell the loans that it originated to the open

21   market; correct?

22   A.      Sell some of them, correct.

23   Q.      Okay.  So some of the loans were sold and some were

24   kept in house; correct?

25   A.      Correct.

1    Q.      And those loans that were kept in house, WaMu would be

2    servicing those loans.  Would that be accurate?

3    A.      Correct.

4    Q.      Okay.  But the loans that were sold to the open

5    market, they were sold to investors; correct?

6    A.      What I understand, correct.

7    Q.      And those loans were packaged in large pools, and

8    those pools were sold?  If you know.

9    A.      That's outside my job, so I don't know exactly how

10   they were packaged.

11   Q.      Do you know anything about the process that WaMu used

12   between 2005 and the time it got purchased by Chase, what

13   process they used to package and process their loans?

14   A.      No, I do not.

15   Q.      Okay.  During that time before WaMu was purchased by

16   Chase, you were, if I recall, in the underwriting section of

17   WaMu; correct?

18   A.      That is correct.

19   Q.      And as an underwriter, were you responsible for

20   underwriting specific loans?  Again, we're talking about 2005

21   to the purchase by Chase.  Did you actually underwrite loans

22   yourself?

23   A.      Yes, I did.

24   Q.      So you're familiar with the process of how the

25   underwriting takes place; correct?

1    A.     Correct.

2    Q.     And you've been asked a series of questions about

3    three particular loans in this case; right?

4    A.     Correct.

5    Q.     You were asked about the Arthur Watson loan, the

6    Juan Reynaga loan, and the Anthony Petri loan; correct?

7    A.     Correct.

8    Q.     And if I recall your testimony, the Watson loan was

9    a -- originated, in other words, the originator was Novelle;

10   correct?

11   A.     Correct.

12   Q.     And Novelle is -- is your understanding of Novelle

13   that it simply originated the loan and then sold it to WaMu?

14   A.     From what I understand, correct.

15   Q.     Okay.  And the Reynaga loan was originated with WaMu,

16   so your bank actually originated that; correct?

17   A.     Correct.

18   Q.     And then the Petri loan was originated with JPMorgan

19   Chase; correct?

20   A.     Correct.

21   Q.     So you, however, do not have -- strike that.  You were

22   not the underwriter in any of these three loans; correct?

23   A.     That is correct.

24   Q.     Okay.  So you did not make the decision to fund those

25   loans?

1    A.      I did not underwrite the loans; correct.

2    Q.      Right.  Is it fair to say that the underwriter makes

3    the decision to essentially decide whether to make the loan?

4    A.      Correct.

5    Q.      Okay.  So you've been asked questions about your

6    review of the file, and you're commenting based upon your

7    knowledge of WaMu's practices back in between 2005 and 2008;

8    correct?

9    A.      Correct.

10   Q.      But you don't know personally whether or not the

11   underwriter, the actual person who put their eyeballs on the

12   paper, whether that person, with any of these three loans,

13   actually went through the process completely and correctly;

14   correct?

15   A.      Correct.

16   Q.      Okay.  Because you haven't -- we don't have, so far,

17   we -- strike that.

18          In order to determine whether or not any of these

19   three loans were properly underwritten, that is, the process

20   of checking the facts, in order to determine that, it would

21   be best to have the actual person who did the underwriting;

22   correct?

23   A.      To these particular loans?

24   Q.      Yes.

25   A.      Correct.

1    Q.      Okay.  Now, you testified that for WaMu's purposes, it

2    was income, it was assets, it was credit, and it was

3    collateral that was important to the funding decision; i.e.,

4    the underwriting decision; correct?

5    A.      The underwriting decision.

6    Q.      Okay.  And would it not also be that the appraisal

7    would be a critical component of the underwriting decision?

8    A.      That's collateral.

9    Q.      Oh, that's collateral?

10   A.      Correct.

11   Q.      So part of collateral is the appraisal?

12   A.      Correct.

13   Q.      And if the appraisal -- well, let me ask it this way.

14   In this constellation of income, assets, credit, and

15   collateral, is there one particular factor that takes

16   precedent over the other?

17   A.      No.  They're all important.

18   Q.      They're all important.  They're all used together to

19   make the decision; correct?

20   A.      That's correct.

21   Q.      And if the collateral issue, let's say with an

22   appraisal, if the appraisal appears to be correct and nothing

23   concerning about the appraisal, but yet in a, for example --

24   let me start from the beginning to make it clear for the

25   record.

1          There is a difference between a full doc loan and a

2    stated income loan; correct?

3    A.     That is correct.

4    Q.     And a stated income loan, based upon your professional

5    experience, is what?  Describe this for the jury.  What is a

6    stated income loan?

7    A.     A stated income loan, you will state your income on

8    the application, and that is what we use to make a

9    determination.  You do not provide any income documents for

10   the loan.

11   Q.     Okay.  And you don't provide any other backup

12   documents; correct?  It's just the amount that you state as

13   your income is sufficient to make the loan happen?

14   A.     Correct.  If they qualify based upon what is stated on

15   the application and other parameters of the loan.

16   Q.     Right.  And would a stated income loan be

17   considered -- was it considered by WaMu between 2005 and 2008

18   a subprime loan?

19   A.     They fell under the subprime umbrella, but it went

20   into the prime side as well.

21   Q.     Okay.  But those stated income loans that were in the

22   subprime umbrella were inherently more risky; correct?

23   A.     I don't know that they're inherently more risky.  It

24   just -- it was a loan program offered at that time.

25   Q.     And the subprime stated income loan option or product

 1    that WaMu marketed, that was generally for what type of

 2    borrower?

 3    A.      It could be any type of borrower.

 4    Q.      Okay.  So what does subprime exactly mean?

 5    A.      Well, subprime normally means generally people with

 6    either less or, let's say, bad or less-than-stellar credit.

 7    Q.      Okay.  So if a borrower has less-than-stellar credit

 8    and is a subprime borrower, would it be fair to say that

 9    inherently creates more risk for the lender than a

10    nonsubprime?

11    A.      Yes.  Correct.

12    Q.      Okay.  So we have stated income loans, and then the

13    flip side of stated income loans, would it be fair to say,

14    were full doc loans; correct?

15    A.      Correct.

16    Q.      And a full doc loan means a variety of criteria are

17    supported by documentation; correct?

18    A.      Correct.

19    Q.      Okay.  And with a full doc loan, in your experience,

20    is the lender -- is it considered a better loan than a stated

21    income loan in terms of from the lender's point of view a

22    less risky loan?

23    A.      It can depending upon the parameters of the loan.

24    Q.      Okay.  All right.  So the collateral issue, as you

25    said, is the appraisal issue.  And the credit is the actual

```
 1    credit score, like a FICO score, correct, for the applicant?

 2    A.      Correct.

 3    Q.      And that's also considered in the mix; right?

 4    A.      Correct.

 5    Q.      And the assets would be the assets that the borrower

 6    is bringing to the table in the transaction?

 7    A.      Stated on the application, yes.  Correct.

 8    Q.      Okay.  And the income is the income amount that the

 9    borrower is stating on the loan; correct?

10    A.      Correct, supported by documentation.

11    Q.      Okay.  I want to pull up a document, and you can look

12    at the binder that Mr. Hales gave you, the white one.  It

13    should be in the white one.  This is Exhibit 510.  And I'll

14    pull it up on the screen for you.

15            Okay.  Do you see the document?  You can look at the

16    screen as well.  It's on the screen; right?

17    A.      Yes.

18    Q.      Now, you testified that this is a loan approval

19    summary; correct?

20    A.      Correct.

21    Q.      And what this document does, it reflects -- again,

22    this is Washington Mutual; correct?  This is a WaMu document;

23    correct?

24    A.      Correct.

25    Q.      And what does this document again reflect?
```

1    A.      It's a summary of the loan.  It will show you what

2    type of transaction it is, whether it's a purchase,

3    refinance.  If it's a purchase, purchase price, shows the

4    income, shows the loan to value, shows debt-to-income ratios,

5    things of that nature.

6    Q.      And you don't know who put these checkmarks right

7    here; correct?

8    A.      Correct.

9    Q.      And you don't know what those checkmarks represent;

10   correct?

11   A.      No.

12   Q.      I'm sorry?

13   A.      No.

14   Q.      Okay.  And you don't know, for example, whose

15   handwriting that is where it says "final" right here; right?

16   A.      No, I do not.

17   Q.      And you would be speculating if you tried to say what

18   that meant; correct?

19   A.      As final?

20   Q.      Yeah.

21   A.      I have a good idea what it means.

22   Q.      Okay.  What is your understanding of the word final

23   there?

24   A.      This would be the final result of the underwriting.

25   Q.      Okay.  This is the final result of the underwriting.

1    But basically looking at this document, you don't know -- you

2    don't have personal knowledge that the underwriter actually

3    went through the process that he or she's required to do to

4    make sure that all of these are verified; correct?

5    A.      Correct.

6    Q.      Okay.  And I want to have you look at another document

7    as well.  And I'll pull up Number 702.  Do you have 702 in

8    front of you?  I can pull it up on the screen for you as

9    well.  Do you see it on the screen?

10   A.      Yes.

11   Q.      Okay.  Again, you testified that this is a -- it

12   appears to be a loan application for Woodforest; correct?

13   A.      Correct.

14   Q.      And you testified that the loan application is

15   something that at the time WaMu considered in making a loan;

16   correct?

17           Well, the information that was contained in the loan

18   application was important to WaMu.  That is correct; right?

19   A.      Correct.

20   Q.      Again, since you didn't underwrite this loan, you

21   don't have any idea whether or not the actual underwriter

22   verified with documents the veracity of the information that

23   was placed on the loan document; correct?

24   A.      Correct.

25   Q.      And because we do know that, as you testified to, this

1    loan, this Woodforest loan for this borrower Petri, is a full

2    doc loan; correct?

3    A.      Correct.

4    Q.      And likewise, I'm going to show you Number 704.  And

5    you testified, you were asked about this document which is a,

6    purports to be a request for verification of employment;

7    correct?

8    A.      Correct.

9    Q.      Okay.  And you if you look at the bottom here, I'll

10   call it out for you, there is a signature there; correct?

11   A.      Correct.

12   Q.      You have no idea who that signature is, do you?

13   A.      No, I do not.

14   Q.      And you have no idea who prepared this document;

15   correct?

16   A.      Correct.

17   Q.      Okay.  And if you look at 708, which is the follow-up

18   document, do you see that on the screen, verbal

19   re-verification of employment, the borrower is Anthony Petri;

20   correct?

21   A.      Correct.

22   Q.      Again, well, let me ask you a question.  Do you have

23   any idea who this person is whose name appears at the bottom,

24   Amanda Tater?

25   A.      No, I do not.

1    Q.      Okay.  And so you don't know if Amanda Tater actually

2    reverified any employment concerning this Mr. Petri; right?

3    A.      Correct.

4    Q.      Okay.  And so without belaboring every document, it's

5    fair to say that the questions that you were asked by

6    Mr. Hales, you don't have personal knowledge as to whether or

7    not any of the information in any of these loan files was, in

8    fact, verified; correct?

9    A.      Correct.

10   Q.      And you don't know, for example, whether Mr. -- well,

11   have you ever heard -- you've heard the name Leonard

12   Williams, haven't you, in relating to this case; correct?

13   A.      Yes.

14   Q.      And you have no personal information or understanding

15   if Mr. Williams had any involvement in these loans being

16   originated; correct?

17   A.      I have no personal knowledge.

18   Q.      Okay.  And the underwriting process is an extremely

19   important procedure for the bank to follow; correct?

20   A.      Correct.

21   Q.      Because as you testified earlier, WaMu, at least for

22   some of its loans, was simply selling these loans on the open

23   market; correct?

24   A.      Correct.

25   Q.      And these lenders -- excuse me, these purchasers or

1    these investors of these loans were basically paying WaMu, if

2    you know, full value for the loans that they were buying.

3    A.       I do not know that.

4    Q.       You do not know that.  You don't know how that process

5    works at all?

6    A.       No, I do not.

7    Q.       Okay.  During the time that you were with WaMu between

8    2005 and 2008, it's fair to say, Mr. Hellstrom, that in your

9    experience, the underwriting process at WaMu was, shall we

10   say, not up to snuff.  Would that be a fair description?

11   Were there problems with how loans were being underwritten at

12   WaMu between 2005 and 2008?

13   A.       Not to my knowledge, no.

14   Q.       Not to your knowledge?

15   A.       I underwrote loans.

16   Q.       I'm sorry?

17   A.       I said I underwrote loans.

18   Q.       You underwrote loans?

19   A.       Yes.

20   Q.       Okay.  You underwrote loans between, for WaMu, between

21   2005 and the time it was purchased by Chase?

22   A.       Yes, I did.

23   Q.       And what office were you at when you were underwriting

24   loans during that period of time?

25   A.       Schaumburg, Illinois.

1    Q.       You were in the Illinois office?

2    A.       Correct.

3    Q.       And you're not familiar with any problems that were

4    occurring at WaMu with respect to underwriting; correct?

5    A.       Not that I'm aware of, no.

6    Q.       Are you familiar with a document called the "Wall

7    Street and Financial Crisis:  Anatomy of a Financial

8    Collapse"?

9    A.       No.

10   Q.       Are you familiar with the U.S. Senate Permanent

11   Subcommittee on Investigations?

12   A.       No.

13   Q.       Were you aware of the fact that the United States

14   Government investigated the lending and underwriting

15   practices of WaMu?

16   A.       Do I have firsthand knowledge?

17   Q.       No.  Are you aware that that occurred, that Senator

18   Carl Levin held investigations as to the WaMu underwriting

19   practices?

20   A.       I've heard something of it.

21   Q.       Have you ever leafed through this document?

22   A.       Through that book, no.

23   Q.       Have you ever discussed with any of your colleagues at

24   WaMu what Carl Levin and his investigative committee found?

25   A.       I can't recall.

1    Q.      Okay.  Let me read something to you and ask you if you

2    agree with this.

3            THE COURT:  You can ask him a question, but if you're

4    reading from a document that's not in evidence, I'm not going

5    to allow you to do that.

6    Q.      BY MR. WISEMAN:  Did you have any experience with

7    shoddy lending practices at WaMu while you were there?  Did

8    you personally?

9    A.      Did I personally?

10   Q.      Yes.

11   A.      No.

12   Q.      And you never had a loan in your experience that in

13   hindsight could have been more thoroughly investigated before

14   it was approved?

15   A.      I underwrote loans based upon the programs at the time

16   and the guidelines at the time, and if it met those

17   parameters, it was either approved, declined, or suspended.

18   Q.      Did you have any experience where loans -- while at

19   WaMu, did you have any experience where loans were

20   underwritten and funded without properly verifying the

21   information on the loan application?  Did you have any

22   personal knowledge of that?

23   A.      No.

24   Q.      Did you ever hear that that was a problem at WaMu?

25   A.      No.

1    Q.      Did you ever hear of problems at WaMu that loans were

2    simply being funded in order to immediately sell them on the

3    open market?

4    A.      No.

5    Q.      And you never heard anything about WaMu creating a

6    pool of junk loans?

7    A.      No.

8    Q.      Are you familiar with -- strike that.

9            JPMorgan ends up buying WaMu, as you testified, in

10   2008; correct?

11   A.      Correct.

12   Q.      Do you have any understanding of what the reason for

13   the purchase was?

14   A.      What the reason was?

15   Q.      Yeah.

16   A.      Why JPMorgan bought them, no.

17   Q.      Did you know that JPMorgan settled a case with the

18   United States Government in November of 2003 concerning its

19   own activities in the mortgage business?

20   A.      No.

21   Q.      And you've never seen any settlement document that

22   JPMorgan entered into with the United States government?

23   A.      From 2003, no.

24   Q.      Has anybody advised you that your employer, JPMorgan

25   Chase, settled a case with the United States Government based

1    upon their lending practices?

2    A.      In 2003, no.

3    Q.      I'm sorry.  2013.  I misspoke.  I apologize.  So in

4    light of November of 2013 is the correct date, are you

5    familiar with any settlement that the United States

6    Government entered into with your employer in 2013?

7    A.      I have read about some things, yes.

8    Q.      Okay.  What is your understanding of the purpose of

9    the settlement?

10   A.      Again, I don't know.

11   Q.      Do you remember if -- do you have any recollection

12   whether the settlement included improper and shoddy lending

13   practices at WaMu?

14   A.      I don't recall.

15   Q.      So if I understand your testimony, you don't have any

16   real understanding of any problem loan practices at WaMu

17   while you were there between 2005 and 2008?

18   A.      Correct.

19   Q.      And you have no understanding of the reasons or the

20   consequences of your employer settling a case with the United

21   States Government in November of 2013 concerning its loan

22   practices; correct?

23   A.      Correct.

24   Q.      And so the only thing that you can testify to, would

25   it be fair to say, Mr. Hellstrom, is your understanding of

1    what the underwriting criteria was at WaMu and also JPMorgan

2    Chase during the period of time that Mr. Hales asked you

3    about; correct?

4    A.      Correct.

5    Q.      And you have no understanding, no personal knowledge,

6    how these particular loans were underwritten, these three

7    loans in question; correct?

8    A.      Correct.

9    Q.      You have no knowledge of who actually underwrote those

10   loans; correct?

11   A.      No personal knowledge.

12   Q.      And so isn't it fair to say that with respect to these

13   three loans, you cannot conclude that any of the

14   misstatements had any effect on whether those loans were

15   going to be approved; isn't that fair?  You can't really say

16   that because you didn't underwrite them personally; correct?

17   A.      Correct.

18           MR. WISEMAN:  Thank you.  May I have a moment?

19           THE COURT:  Yes.

20   Q.      BY MR. WISEMAN:  And, Mr. Hellstrom, in reviewing the

21   loan files for these three loans, did you come across any

22   documents that indicated that JPMorgan Chase was required to

23   repurchase any of the loans it had funded?

24   A.      I believe one of them.

25   Q.      What loan do you recall that was for?

1    A.      I don't recall which one it was.

2    Q.      Do you recall the circumstances of JPMorgan Chase

3    being required to repurchase the loan?

4    A.      I don't recall.

5            MR. WISEMAN:  May I have a moment, your Honor?  I want

6    to pull up a document for this gentleman.

7            THE COURT:  Yes.

8    Q.      BY MR. WISEMAN:  In the blue binder before you,

9    Mr. Hellstrom, which is under the papers on your left, if you

10   would go to Exhibit Number, excuse me, Exhibit R.  The

11   binder's just to your left.  I apologize for the way in which

12   that was situated.  Do you see Exhibit R in front of you?

13   A.      Yes.

14   Q.      Do you recognize that document?

15   A.      Yes.

16   Q.      And that document was from the loan file for

17   Mr. Reynaga's loan; correct?

18   A.      It's for the Chase loan.

19   Q.      For the Chase loan.

20           MR. WISEMAN:  Your Honor, move to admit Defendant's R.

21           THE COURT:  Exhibit R is received in evidence.

22                        (DEFENDANT'S EXHIBIT R, Freddie Mac

23                        Letter, ADMITTED INTO EVIDENCE.)

24   Q.      BY MR. WISEMAN:  Now, Exhibit R, sir, is a letter from

25   a Veronica Lehman; correct?

```
 1                    THE COURT:  To Veronica Lehman.

 2     Q.      BY MR. WISEMAN:  Excuse me.  To Veronica Lehman;

 3     correct?

 4     A.      Correct.

 5     Q.      And that is from Freddie Mac; correct?

 6     A.      Correct.

 7     Q.      And who is Freddie Mac or what is Freddie Mac?

 8     A.      Freddie Mac actually purchased the loan from Chase.

 9     Q.      Freddie Mac purchased the loan from Chase.  So

10     Freddie Mac is a purchaser of Chase loans; correct?

11     A.      Of mortgages in general.

12     Q.      In general.  And so this document, would it be fair to

13     say -- have you ever had a chance to look at this document?

14     A.      No, I did not read it.

15     Q.      Okay.  But does this document -- take a moment to look

16     at it.  Does this document indicate that the loan that

17     Freddie Mac had purchased went through a quality control

18     review?

19     A.      Correct.

20     Q.      And that -- I'm looking at the first paragraph there,

21     and that Freddie Mac has determined that the attached

22     mortgages must be repurchased?

23     A.      Correct.

24     Q.      And that indicates that Freddie Mac required Chase to

25     repurchase that mortgage; correct?
```

1    A.      Correct.

2    Q.      And it had to repurchase that mortgage because there

3    was something wrong, according to Freddie Mac, with the

4    underwriting of this particular loan; correct?

5    A.      Correct.

6    Q.      Okay.  I want to have you look at Defendant's S.  Do

7    you recognize Defendant's S?

8    A.      Yes.

9    Q.      And this was taken from the Petri loan file; correct?

10   A.      Correct.

11           MR. WISEMAN:  Move to admit Defendant's S, your Honor.

12           THE COURT:  Exhibit S is received in evidence.

13                          (DEFENDANT'S EXHIBIT S, Chase letter

14                          1/19/11, ADMITTED INTO EVIDENCE.)

15   Q.      BY MR. WISEMAN:  Now, Mr. Hellstrom, this is a letter

16   that is to a Ms. Doris Young, a quality analyst manager at

17   RMIC Corp.  Do you know who RMIC is?

18   A.      I know who they are.  They're a mortgage insurer.  But

19   what capacity they played here, I don't know.

20   Q.      Sure.  What is your understanding of RMIC as a

21   mortgage insurer?  What do you mean by that?

22   A.      They offer private mortgage insurance for properties

23   that have an LTV over 80 percent.

24   Q.      So if you have a property with an LTV of over

25   80 percent, there is a process where there must be mortgage

1    insurance purchased; correct?

2    A.      Correct.

3    Q.      And that mortgage insurance is purchased by the

4    borrower?

5    A.      Correct.

6    Q.      So the mortgage insurer, in this case RMIC, is

7    insuring that the mortgage shall be paid in the event that

8    the borrower defaults.  Is that a fair assessment?

9    A.      It's to protect the interest of the bank due to the

10   loan to value.

11   Q.      And this letter is from Chase.  Now, Chase, so we're

12   all on the same page, when this letter says Chase at the top,

13   that means JPMorgan Chase; right?

14   A.      Correct.

15   Q.      Okay.  So this document to Ms. Young is a demand.

16   "Due to the demand letter we received, the underwriter did a

17   complete review of the underwriting file.  We determined that

18   the following material underwriting errors were made by RMIC

19   underwriter at the time of the approval."  Correct?

20   A.      That's what the letter says.

21   Q.      So it appears that Chase is determining that the

22   underwriter made a mistake in approving this particular loan;

23   correct?

24   A.      Correct.

25   Q.      And in making the mistake, it would be fair to say --

1   strike that.

2          And the letter goes on to indicate what the mistakes

3   were in the underwriting process; correct?

4   A.      Correct.

5   Q.      So it's fair to say, based upon this letter that your

6   employer sent to RMIC, that the actual process of

7   underwriting this Petri loan was inadequate and that Chase is

8   demanding to be compensated by RMIC; correct?

9   A.      Correct.

10  Q.      And have you seen any, in your career with WaMu, have

11  you ever seen a process where, for example, WaMu was required

12  to buy back a loan because of underwriting problems?

13  A.      I have seen it due to first payment defaults, yes.

14  Q.      But have you ever seen it due to an underwriting error

15  or an inadequate underwriting process that WaMu was required

16  to buy back a loan because, for example, the insurance or the

17  investor said this was a junk loan?

18  A.      Not personally.

19  Q.      Have you ever heard of a situation like that

20  occurring?

21  A.      I can't recall.

22          MR. WISEMAN:  Okay.  One second, your Honor.  Thank

23  you, your Honor.  No further questions.

24          THE COURT:  Redirect?

25          MR. HALES:  Yes, your Honor.

1                          REDIRECT EXAMINATION

2     BY MR. HALES:

3     Q.      Mr. Hellstrom, you've been working in an underwriting

4     capacity in some way or another for nine and a half years you

5     said?

6     A.      Longer than that.

7     Q.      Longer than that.  How many years total?

8     A.      Nine and a half years with present and approximately

9     four years with the company prior to Chase.

10    Q.      In your experience doing that, is it easier to do your

11    job as an underwriter when you're given truthful information

12    or false information in connection with a loan application?

13    A.      Truthful.

14    Q.      Would you say that it's easier to make underwriting

15    mistakes if you're given fraudulent information in connection

16    with the loan application?

17    A.      It can happen.

18    Q.      You were asked some questions about whether you

19    personally underwrote these particular loans that we talked

20    about today, the three, and you didn't; right?

21    A.      No, I did not.

22    Q.      But you do have an understanding as to the types of

23    things that can affect whether a loan will be extended both

24    at Washington Mutual back at that time and at JPMorgan Chase

25    as we discussed; correct?

1    A.      That is correct.

2    Q.      And the things like W-2s and pay stubs and so forth we

3    saw in the Petri Woodforest loan file, if documents of that

4    nature are, indeed, false, in your experience, can that have

5    an effect on the decision to extend a loan?

6    A.      Yes, it can.

7    Q.      And does it make it harder for you to assess whether

8    to extend that loan as an underwriter if you're given

9    documents of that nature that aren't truthful?

10   A.      That is correct.

11           MR. HALES:  One moment, your Honor.

12           THE COURT:  Yes.

13           MR. HALES:  Nothing further, your Honor.

14           THE COURT:  Any recross?

15                         RECROSS-EXAMINATION

16   BY MR. WISEMAN:

17   Q.      Mr. Hellstrom, just briefly.  In light of what

18   Mr. Hales asked you, when you were at WaMu, had you ever

19   heard of the term high-risk lending strategy?

20   A.      No.

21   Q.      Had you ever heard of -- was there any directive from

22   management while you were at WaMu that advised the

23   underwriters in the field, those folks that are doing the

24   underwriting, to avoid shoddy lending practices?

25   A.      I don't understand the question.

 1    Q.      Well, did you get any directive from management to say

 2    we're having problems with some of these loans, you guys have

 3    to tighten up on your underwriting reviews?

 4    A.      Underwriting guidelines always evolved, so there were

 5    times where we tightened up our guidelines, yes.

 6    Q.      Right.  And if during a particular time there was an

 7    underwriting rule or criteria and a particular loan was

 8    approved without complying with those underwriting criteria,

 9    would you consider that to be a problem loan?

10    A.      If the underwriter didn't follow the guidelines, yes.

11    Q.      And so you don't know with these particular loans in

12    question whether the particular underwriter, you do not know,

13    followed the proper guidelines; correct?

14    A.      Correct.

15            MR. WISEMAN:  Thank you.  No further questions.

16            THE COURT:  All right.  Thank you, Mr. Hellstrom.

17    You're excused.

18            Call your next witness.

19            MR. HALES:  The United States calls Anthony Petri.

20            Your Honor, may I approach to put a binder in place?

21            THE COURT:  Yes.

22            MR. HALES:  Thank you.

23            THE CLERK:  Sir, please step forward.  Please stand

24    here next to the court reporter and face me.  Raise your

25    right hand.

 1                          ANTHONY PETRI,

 2    a witness called by the Government, having been first duly

 3    sworn by the Clerk to tell the truth, the whole truth, and

 4    nothing but the truth, testified as follows:

 5              THE WITNESS:  Yes.

 6              THE CLERK:  Thank you.  You may be seated.  Please

 7    state your full name, spell your last name for the record.

 8              THE WITNESS:  Anthony Petri, P-E-T-R-I.

 9                         DIRECT EXAMINATION

10    BY MR. HALES:

11    Q.    Good afternoon, Mr. Petri.  How old are you?

12    A.    26.

13    Q.    Were you looking to buy a house in or around July and

14    August 2008?

15    A.    Yes.

16    Q.    Did you end up buying the property at 5548 Woodforest

17    in Sacramento in August 2008?

18    A.    Yes.

19    Q.    Who did you work with to buy that property?

20    A.    Leonard Williams and Josh Clymer.

21    Q.    Why were you looking for a property at that time?

22    What was your purpose?

23    A.    Just to get a second home rental.

24    Q.    Rental.  You wanted it as an investment property or to

25    live in?

1    A.        Investment.

2    Q.        And so you said your age in the beginning.   In

3    July 2008, you were 19 years old or 20; is that right?

4    A.        Correct.

5    Q.        How did you come to learn of Leonard Williams and

6    Josh Clymer?

7    A.        An associate I worked with at the dealership I worked

8    at.

9    Q.        What was that dealership?

10   A.        Auto West Dodge in Roseville.

11   Q.        That's where you were working in July 2008?

12   A.        Correct.

13   Q.        About how much money did you make there at that time

14   per month, if you recall?

15   A.        About 3,000 per month.

16   Q.        What was the name of your friend who told you about

17   Leonard Williams and Josh Clymer?

18   A.        His name was Tony.  I don't recall his last name.

19   Q.        He was a coworker of yours?

20   A.        Correct.

21   Q.        Did you eventually meet Leonard Williams and

22   Joshua Clymer in person?

23   A.        Yes.

24   Q.        How did your first meeting with them come about, if

25   you remember?

1    A.      We just met at their office off Watt.

2    Q.      Who all was there at that first meeting?

3    A.      Josh Clymer and Leonard Williams and Tony.

4    Q.      Tony came with you?

5    A.      Correct.

6    Q.      What did you discuss, generally speaking, during that

7    first meeting?

8    A.      Basically my intentions, what I wanted to do and how

9    their program worked in regards to me buying a home.

10   Q.      What were you told about how their program worked and

11   who told you, if you remember?

12   A.      We were all discussing it.  They told me that it

13   wouldn't cost me anything to buy a house and essentially I

14   would just buy a house from them.  They would deal with all

15   the financing and finding the house and everything.

16   Q.      Was it your understanding that you would need to put

17   any money down?

18   A.      No.

19   Q.      I should phrase that differently.  So your

20   understanding was that you would not need to put any money

21   down; is that right?

22   A.      Correct.  Yeah, I would not need to put any money

23   down.

24   Q.      During the course of that meeting, did you tell

25   Leonard Williams and Joshua Clymer where you worked and how

1    much money you made?

2    A.      Yes.

3    Q.      Did you give them at that point the true information

4    about where you worked and how much money you made?

5    A.      Yes.

6    Q.      What price range did you initially talk about for a

7    property that you were interested in?

8    A.      I initially wanted to buy a condo for around a hundred

9    thousand or so.

10   Q.      Did you already own another rental property at that

11   point?

12   A.      Yes.

13   Q.      What was that?

14   A.      It was a condo.

15   Q.      Where were you living at this time yourself?

16   A.      At my mom's house.

17   Q.      During that first meeting, who did most of the

18   talking?  Was it Mr. Williams, Mr. Clymer, or were all of you

19   conversing together?

20   A.      We were all conversing together.

21   Q.      And can you describe for a minute what the office was

22   like that you were in?  How many desks did there appear to be

23   in there?

24   A.      It was just a small normal, I guess, commercial

25   office.  There was two desks.

1    Q.      Did you see a white board in the office?

2    A.      I did.

3    Q.      What was on that white board, if you remember?

4    A.      Just a bunch of addresses.

5    Q.      Did Mr. Williams or Mr. Clymer tell you what that list

6    represented?

7    A.      Just properties that they were looking at, potential

8    properties.

9    Q.      During that first meeting, was there any discussion of

10   the potential to get cash back if you were to buy a property?

11   A.      Yes.

12   Q.      What was said about that in the first meeting and, if

13   you recall, who said it?

14   A.      It was a mix between Josh and Leonard basically.  It

15   varied by house.  It wasn't a set amount that I would

16   personally get.  It would just depend on the property.

17   Q.      Did you decide on a particular property at the end of

18   that very first meeting or had you not decided on a property

19   at that point?

20   A.      No, I saw a few properties.

21   Q.      After that first meeting, did you have some

22   communications with Mr. Williams and Mr. Clymer about

23   properties you were interested in?

24   A.      Yes.

25   Q.      How did those communications take place:  Email,

1    phone, fax?

2    A.      Phone and in person.

3    Q.      Who did you speak to during that time about properties

4    you were interested in?

5    A.      Both Leonard and Josh.

6    Q.      Who was identifying properties?  Was it just you or

7    did they identify properties for you as well?

8    A.      Both.

9    Q.      And if you recall, who sent you, between Mr. Williams

10   and Mr. Clymer, who sent you properties that had been

11   identified from their side?

12   A.      Both.

13   Q.      Both of them.  How many properties did you actually go

14   to look at while communicating with Mr. Williams and

15   Mr. Clymer?

16   A.      Three.

17   Q.      Let's talk about the first one.  Do you remember what

18   the first property was like and where it was?

19   A.      I believe it was in North Highlands.  It was a

20   run-down duplex.

21   Q.      Did you decide to buy that one?

22   A.      No.

23   Q.      Why not?

24   A.      It was just run-down.  Too much work.

25   Q.      For that duplex, was there any discussion of whether

1    you could get cash back if you bought it?

2    A.      Yes.

3    Q.      What was said about that and who said it to you?

4    A.      I was with Josh.  Roughly 50 to 70,000.

5    Q.      Mr. Williams did not go with you to look at that

6    duplex?

7    A.      No.

8    Q.      What about the second property that you looked at,

9    where was that property?

10   A.      It was in Elk Grove.

11   Q.      What do you remember about that one?

12   A.      It was a big house.  It was nice.  Had a pool.  It was

13   expensive, though, out of my budget that I wanted to do.

14   Q.      Who did you go to see that house with?

15   A.      Leonard.

16   Q.      Leonard Williams?

17   A.      Leonard Williams, yes.

18   Q.      Was there any discussion about whether you do get cash

19   back if you bought that house in Elk Grove?

20   A.      Yes.

21   Q.      Who said that to you?  Was it Mr. Williams?

22   A.      Yes.

23   Q.      What did he say?

24   A.      35,000.

25   Q.      Did you end up buying that house in Elk Grove?

```
 1    A.       No.

 2    Q.       Why not?

 3    A.       Just too expensive.  I didn't want to spend too much.

 4    Q.       What was the third property that you looked at?

 5    A.       The 5548 Woodforest house.

 6    Q.       Did you end up -- and you ultimately decided to buy

 7    that one?

 8    A.       Yes.

 9    Q.       Did you go to look at it several times before you

10    decided to buy it?

11    A.       Yes.

12    Q.       Who did you go to look at that property with?

13    A.       Both with Josh and Leonard.

14    Q.       And at that point was it still your intention to use

15    this as an investment property as opposed to living in it?

16    A.       Yes.

17    Q.       Did you make that clear to either Mr. Williams or

18    Mr. Clymer?

19    A.       Yes.

20    Q.       To whom did you make it clear?

21    A.       Both.

22    Q.       Both.  Okay.  Any of the times that you visited the

23    Woodforest property, did you meet any potential renters?

24    A.       Yes.

25    Q.       When you did that, who was with you during that visit
```

```
 1    to the property?

 2    A.      Josh.

 3    Q.      Joshua Clymer?

 4    A.      Yes.

 5    Q.      Let's talk about your -- well, let me ask you this.

 6    Did you ultimately apply for a loan to purchase the

 7    Woodforest property?

 8    A.      Yes.

 9    Q.      Who did you work with to prepare your loan

10    application?

11    A.      Both Josh and Leonard.

12    Q.      Did you give them some documents and information about

13    your income and employment and so on?

14    A.      Yes, pay stubs.

15    Q.      Anything else?

16    A.      W-2s.

17    Q.      The pay stubs and W-2s that you gave -- well, who

18    specifically did you give those to, if you recall?

19    A.      I just remember faxing them in to a fax machine.

20    Q.      Was it your understanding that was a fax machine in

21    their office?

22    A.      Yes.

23    Q.      From where had you gotten that fax number?  One of

24    them?

25    A.      Yes.
```

1    Q.      The information that you faxed in, your pay stubs and

2    W-2s, was that true information from your employment at the

3    auto dealership?

4    A.      Yes.

5    Q.      Did you ever fax to them any pay stubs or W-2s that

6    said you worked at Diamond Hill Financial?

7    A.      No.

8    Q.      Did you ever work at Diamond Hill Financial at all?

9    A.      No.

10   Q.      After you provided your information to them, were you

11   ever told whether you could get the loan you needed for the

12   Woodforest property based on your true employment and income

13   information?

14   A.      They said I could not.

15   Q.      When you say they --

16   A.      Josh and Leonard.

17   Q.      And was this another meeting that you had with them at

18   their office?

19   A.      Yes.

20   Q.      Who was present for that meeting?

21   A.      Josh and Leonard.

22   Q.      And yourself?

23   A.      Yes.

24   Q.      Anybody else?

25   A.      No.

1    Q.      What, as best you can recall, was said to you about

2    the fact that you couldn't qualify for the loan with your

3    true information?

4    A.      Just simply that.  That based on my income, I wouldn't

5    be able to get that property.

6    Q.      Do you recall anything in particular that Mr. Williams

7    said to you at that time?

8    A.      No.

9    Q.      You just holistically or generally speaking remember

10   what was said to you by Mr. Williams and Mr. Clymer during

11   that meeting?

12   A.      Correct.

13   Q.      Did you come up with a plan for how you might get the

14   loan anyway?

15   A.      I personally did not.

16   Q.      What do you mean when you say that?

17   A.      I didn't come up with it.  They said they were going

18   to take care of it, Josh and Leonard.

19   Q.      Did you eventually come to an understanding of what

20   the plan was to get you to qualify for a loan?

21   A.      Yes.

22   Q.      What was that?

23   A.      That I was gonna --

24           THE COURT:  If this is an understanding, can you find

25   out how he gathered that understanding, who told him?

 1              MR. HALES:  I was going to go to that next, but I can

 2     start.

 3              THE COURT:  Okay.  As long as we don't get into

 4     trouble here.

 5              MR. HALES:  Thank you, your Honor.

 6     Q.       BY MR. HALES:  First before you say what the

 7     understanding was, how did you come to the understanding of

 8     what the plan was to get you to qualify for a loan?

 9     A.       I was in their office.  We had a meeting.

10     Q.       And what did you learn during that meeting?

11     A.       That I was going to have pay stubs from Diamond Hill

12     Financial and W-2s as well showing my income.

13     Q.       And did you see your loan application at that time as

14     well?

15     A.       Yes.

16     Q.       Did you see where it listed you as working?

17     A.       Yes.

18     Q.       Where did it list you as working?

19     A.       Diamond Hill Financial.

20     Q.       Was that true?

21     A.       No.

22     Q.       Did you see the income that was listed for you on that

23     loan application?

24     A.       Yes.

25     Q.       And was it your true income?

```
1    A.       No.

2    Q.       Was it lower or higher?

3    A.       Higher.

4    Q.       At the point that you figured this out, did you have

5    any concerns about those documents?

6             THE COURT:  There's no objection, but I just don't

7    want to create any false impressions.  Is he saying this is

8    his idea or this is somebody else's idea, or if so, whose

9    idea was it?

10            MR. HALES:  Thank you.

11   Q.       BY MR. HALES:  Did this idea originate with you?

12   A.       No.

13   Q.       Did you come up with the idea to put Diamond Hill

14   Financial on your loan application?

15   A.       No.

16   Q.       Before you met Leonard Williams and Joshua Clymer, did

17   you have any idea what Diamond Hill Financial was?

18   A.       No.

19   Q.       When was the first time that you heard about Diamond

20   Hill Financial in connection with your loan application?

21   A.       In a meeting we had at their office.

22   Q.       And who first raised it or told you about it, if you

23   can recall?

24   A.       I don't recall exactly who.

25   Q.       There was no one at that meeting other than you,
```

1   Mr. Williams, and Mr. Clymer?

2   A.      Correct.

3   Q.      And the documents you spoke of, pay stubs, W-2s, loan

4   application, who handed those to you to look at during that

5   meeting?

6   A.      Josh.

7   Q.      Josh Clymer?

8   A.      Yes.

9   Q.      Now, when you saw what was listed as your employer on

10  that loan application, the pay stubs and the W-2, did you

11  have any concerns about that?

12  A.      Yes.

13  Q.      What was your concern?

14  A.      If it was legal or not.

15  Q.      Did you say anything about that concern to

16  Mr. Williams and Mr. Clymer?

17  A.      Yes.

18  Q.      What did you say?

19  A.      I asked them if it was legal.

20  Q.      What was said in response and who said it, as best you

21  can recall?

22  A.      It was a mutual conversation, and the exact words was

23  this is a gray area.  It's frowned upon.  Those were the

24  words.

25  Q.      And do you recall who specifically said that?

```
1    A.      No.

2    Q.      Throughout the duration of this meeting that we're

3    talking about, were both Mr. Williams and Mr. Clymer there

4    with you speaking the whole time?

5    A.      Yes.

6    Q.      Do you remember anything in particular that

7    Mr. Williams said to you when you expressed concern about

8    doing this?

9    A.      No, nothing extra other than what I just said.

10   Q.      Were you worried about what you would do if the lender

11   were to call and ask if you worked at Diamond Hill Financial?

12   A.      Yes.

13   Q.      Did you talk about that as well with Mr. Williams and

14   Mr. Clymer?

15   A.      Yes.

16   Q.      And how did they respond?  And if you recall, who said

17   what?

18   A.      They said they were gonna take care of it and that

19   their phone number was going to be listed.  And I don't

20   recall exactly who said it.

21   Q.      Okay.  This was still during the meeting with all

22   three of you present?

23   A.      Correct.

24   Q.      After that discussion, did you decide to go ahead and

25   sign the loan application?
```

1   A.      Yes.

2   Q.      Can you please look at Exhibit 702 in the binder in

3   front of you.  There are tabs at the top with numbers on

4   them, and that's how you can navigate through.  It should be

5   at the front.

6           MR. HALES:  May I approach, your Honor?

7           THE COURT:  Yes.  Again, though, it's right on the

8   screen.  He can just look at it there.

9           MR. HALES:  It's my fault.  I put the wrong binder.

10          THE COURT:  All right.  Any reason he can't look at it

11  on the screen?

12          MR. HALES:  No, your Honor, but I would like him to

13  have the full document in case he needs to reference anything

14  else, if that's all right.

15  Q.      BY MR. HALES:  Sorry about that.  Now, do you have

16  Exhibit 702 in front of you?

17  A.      Yes.

18  Q.      Do you see it on the screen as well?

19  A.      Yes.

20  Q.      Do you recognize this as the loan application that you

21  signed?

22  A.      Yes.

23  Q.      Do you see the amount of the loan that you're applying

24  for there?

25  A.      Yes.

1   Q.      What did you think that you were paying for the

2   Woodforest property throughout your discussions with

3   Mr. Williams and Mr. Clymer?

4   A.      240,000.

5   Q.      Did you ever think that you were going to have to pay

6   any more than that?

7   A.      No.

8   Q.      And what was your understanding based upon?

9   A.      They told me.

10  Q.      When you say they, do you remember specifically?

11  A.      Josh and Leonard.  They told me that was the cost of

12  the house that my loan was going to be for.

13  Q.      Was that during a meeting where both of them were

14  present?

15  A.      Yes.

16  Q.      Do you see the box where it says source of down

17  payment and below that gift funds, Janice Petri?

18  A.      Yes.

19  Q.      Who is Janice Petri?

20  A.      My mom.

21  Q.      I'm sorry.  It's Petri, not Petri.

22  A.      Yes.

23  Q.      I apologize.  Did your mom, Janice Petri, give you any

24  funds to help fund the down payment for this property?

25  A.      No.

1    Q.      Do you see where it says property will be, and then

2    colon, primary residence is checked?

3    A.      Yes.

4    Q.      At the time that you were signing this loan

5    application, that was not your intention to live in this home

6    as your primary residence, was it?

7    A.      No.

8    Q.      You had made that clear to Mr. Williams and

9    Mr. Clymer?

10   A.      Yes.

11   Q.      Please zoom back out.  Let's go to the second page of

12   the loan application.

13          This section, is this where you saw that it listed

14   Diamond Hill Financial as your employer?

15   A.      Yes.

16   Q.      That wasn't true?

17   A.      No.

18   Q.      And it wasn't true, therefore, that you had worked

19   there for two years and six months?

20   A.      No.

21   Q.      The portion of page 2 that we're seeing now, is that

22   the monthly income that you recall seeing when you signed

23   this, $11,200?

24   A.      Yes.

25   Q.      And I think you said it earlier, but at this time you

1    were making around $3,000 a month at the dealership?

2    A.      Yes.

3    Q.      If we can go to the next page, 3.  Do you see here a

4    column of assets listed on page 3 of this exhibit?

5    A.      Yes.

6    Q.      And in this section right here where it says gift from

7    Janice Petri and below $60,000, did that gift exist?  Did you

8    ever get $60,000 from your mom?

9    A.      No.

10   Q.      Zoom back out, please.

11           If we can go to the next page.  Do you see this

12   summary of transaction portion?

13   A.      Yes.

14   Q.      Now, do you recall ever knowing that the purchase

15   price was listed as $300,000 on this document?

16   A.      No.

17   Q.      You just thought you were paying the 240,000?

18   A.      Yes.

19   Q.      And if you look further down, there's an arrow where

20   it says cash from/to borrower and there's an amount just over

21   $58,000 listed.  Do you see that?

22   A.      Yes.

23   Q.      Did you have that amount of money available, in the

24   neighborhood of $60,000 at this time, to make a down payment

25   on the property?

1    A.      No.

2    Q.      Did you have any discussions with Mr. Williams and

3    Mr. Clymer about the down payment or getting a gift?

4    A.      They told me I didn't have to put down a down payment.

5    Q.      Were you ever asked if you could get a gift from your

6    mother of money?

7    A.      Yes.

8    Q.      Who asked you that?

9    A.      I don't recall.

10   Q.      Can you narrow it?

11   A.      Josh or Leonard.

12   Q.      It was Josh or Leonard?

13   A.      Yes.

14   Q.      Okay.  Zoom back out, please.

15           And then is that your signature at the bottom of the

16   document?

17   A.      Yes.

18   Q.      So you have a bit of a stylized signature?  It's not

19   your full name the way you sign it?

20   A.      Correct.

21           THE COURT:  It looks exactly like everybody else's

22   signature in this case.  That's the way people in this

23   generation sign things.

24   Q.      BY MR. HALES:  Based on that, let me make sure.  Do

25   you recognize that as being the way that you sign documents?

1    A.      Correct.

2    Q.      You do.  Okay.  Please go ahead and turn to

3    Government's Exhibit 701 in your binder.  Do you have that in

4    front of you?

5    A.      Yes.

6    Q.      Can you look through and tell us if those are your

7    initials on the bottom and your signature at the back of the

8    document on page 10.

9    A.      Those are my initials, and that's my signature.

10   Q.      Is this your purchase agreement for the Woodforest

11   property?

12   A.      Yes.

13           MR. HALES:  Move to admit Government's Exhibit 701,

14   your Honor.

15           THE COURT:  Exhibit 701 is received in evidence.

16                          (GOVERNMENT'S EXHIBIT 701, Purchase

17                          Agreement, ADMITTED INTO EVIDENCE.)

18   Q.      BY MR. HALES:  Do you see the purchase price listed

19   there of $350,000?

20   A.      Yes.

21   Q.      Do you recall ever thinking that you were paying

22   $350,000 for the Woodforest property?

23   A.      No.

24   Q.      Who did you understand that you were buying the

25   Woodforest property from?

1    A.      Josh and Leonard.

2    Q.      And can you look at page 8 of this exhibit for a

3    moment.  Do you see where -- sorry, I'll wait until you're

4    there.  Do you see where it says seller and below that Bay

5    Area Real Estate Holdings?

6    A.      Yes.

7    Q.      At the time that you were signing this document and

8    doing this transaction, did you know what Bay Area Real

9    Estate Holdings was?

10   A.      Josh and Leonard just said it's their real estate

11   company.

12   Q.      Did they say that to you during one of your in-person

13   meetings with them?

14   A.      Correct.

15   Q.      Can you flip, please, to Exhibit 703 in the binder.

16           Do you know what your mother's signature looks like?

17   A.      Yes.

18   Q.      Is that your mother's signature?

19   A.      No.

20   Q.      Do you know your mother's phone number?

21   A.      Yes.

22   Q.      Is that your mother's phone number on the line listed

23   down here?

24   A.      No.

25   Q.      Looking back up towards the top part of the

1   document -- well, we've already said it.  You never got a

2   gift of $60,000 from her; is that right?

3   A.      Correct.

4   Q.      Did you create this document?

5   A.      No.

6   Q.      Please turn next to 705 in your binder.

7           Now, are these the pay stubs that you saw when you

8   were going through your loan application with Mr. Williams

9   and Mr. Clymer?

10  A.      Yes.

11  Q.      Did you make these pay stubs?

12  A.      No.

13  Q.      And they're not true, are they?  You never worked for

14  Diamond Hill Financial?

15  A.      No, never worked for Diamond Hill Financial.

16  Q.      And you didn't make $7,000 a month at this time in

17  February or I guess March of 2008?

18  A.      No.

19  Q.      If we can look at the bottom of the page.  And then in

20  April of 2008, you didn't work for Diamond Hill or make

21  $7,400 a month?

22  A.      No.

23  Q.      Can you turn, please, to 706.  Do you recognize this

24  as one of the W-2s you saw when going through your loan

25  application?

1    A.      Yes.

2    Q.      Is this a true W-2 for you?

3    A.      No.

4    Q.      You didn't create this document?

5    A.      No.

6    Q.      Did you make $70,000 in 2006 even if you weren't

7    working at Diamond Hill Financial?

8    A.      No.

9    Q.      Do you recall how much you made in 2006, or not any

10   more?

11   A.      I believe with rental income from my rental, it was

12   around $40,000 or so.

13   Q.      If you can flip over to Exhibit 707.  Is this another

14   one of the W-2s that you saw when going through your loan

15   application?

16   A.      Yes.

17   Q.      And you didn't make $137,000 in 2007?

18   A.      No.

19   Q.      Were you still making about the same amount of money

20   in 2007 as you'd made in 2006?

21   A.      Yes.

22   Q.      In the neighborhood of $40,000?

23   A.      Yes.

24   Q.      Okay.  Mr. Petri, where did you go to sign your loan

25   application, if you can recall?

1    A.       Their office.

2    Q.       I'm sorry.  Not your loan application.  No, that's

3    what I did mean.  One moment.  I'm sorry.

4             I want to go back to the subject of cash back.  Once

5    you focused in on the Woodforest property, did you have an

6    expectation that you would be getting cash back at any point?

7    A.       Yes.

8    Q.       Why did you have that expectation?

9    A.       Josh and Leonard told me so.

10   Q.       How much did you initially expect to get in cash back?

11   A.       About 30,000.

12   Q.       And when you were told about that, was that in an

13   in-person meeting with Mr. Williams and Mr. Clymer, as best

14   you recall?

15   A.       Correct.

16   Q.       Did that $30,000 amount ever change?

17   A.       Yes.

18   Q.       What did it change to at first?

19   A.       15,000.

20   Q.       And who told you that it changed to 15,000, if you

21   remember?

22   A.       Josh.

23   Q.       Mr. Clymer?

24   A.       Josh Clymer, yes.

25   Q.       When you got closer to the time of closing, did that

```
1    cash back amount change again?

2    A.      Yes.

3    Q.      Who told you that it had changed?

4    A.      Mr. Clymer.

5    Q.      Did he say why?

6            MR. WISEMAN:  Your Honor, I'm going to object as to

7    hearsay.  I haven't objected to 801(d)(2)(E) foundational

8    requirements, but I would for the record object to that.

9            THE COURT:  I think the foundation is laid.  I'll

10   overrule the objection.

11           You may answer.

12           THE WITNESS:  He just said that there wasn't enough

13   profit for me to get that initial amount.

14   Q.      BY MR. HALES:  Now, do you recall where you went to

15   sign the closing documents for the Woodforest property?

16   A.      It was an escrow office in Roseville.

17   Q.      Was anyone else there besides you and the escrow

18   officer?

19   A.      Mr. Clymer.

20   Q.      And what series of events led to him being there, if

21   you recall?

22           MR. WISEMAN:  Calls for speculation.  I'll object.

23   Q.      BY MR. HALES:  Did you speak to Mr. Clymer on the

24   telephone that day?

25   A.      Yes.
```

1    Q.      What did you speak to Mr. Clymer about?

2    A.      He called me and told me the time and location, that

3    we're going to need to go sign the escrow documents.

4    Q.      Did you articulate any questions or concerns about the

5    transaction to Mr. Clymer that day?

6    A.      Yes.

7    Q.      What were your concerns that you had that day you were

8    about to close?

9    A.      The mortgage payment and the amount I'll be getting

10   back.

11   Q.      What did you ask Mr. Clymer about that?  You just

12   asked him both those questions?

13   A.      Correct.

14   Q.      What did he tell you in response?

15   A.      He kind of put me off and just told me to show up at

16   the escrow office.

17   Q.      What happened when you showed up at the escrow office?

18   A.      He told me I wasn't getting any cash back.

19   Q.      What did he tell you about your mortgage payments, if

20   anything?

21   A.      It was higher than what I originally wanted.

22   Q.      Did you have any hesitation about signing at that

23   point?

24   A.      Yes.

25   Q.      Why?

1    A.      Just didn't feel a hundred percent comfortable.

2    Q.      Did you ultimately sign anyway?

3    A.      Yes.

4    Q.      At the time that you were finalizing this transaction,

5    did you have any understanding as to whether it was a double

6    escrow?

7    A.      Yes.

8    Q.      How did you come to that understanding?  Where did you

9    hear that phrase?

10   A.      Just between the meetings between Mr. Clymer and

11   Leonard and myself.

12   Q.      Did you have any understanding as to whether

13   Mr. Williams and Mr. Clymer were making money out of the

14   transaction based on your conversations with them?

15   A.      Yes.

16   Q.      What was that understanding?

17   A.      That they were making some money on the difference

18   between what they were selling me the house for and what they

19   bought it for.

20   Q.      You didn't know how much?

21   A.      No.

22   Q.      After you bought 5548 Woodforest, did you try to get

23   some renters for the house?

24   A.      Correct.

25   Q.      And how did that eventually work out?

1    A.      It didn't.

2    Q.      Over the long-term, were you able to keep up with the

3    payments on the property?

4    A.      For a little while, for about six to seven months.

5    Q.      Then what happened?

6    A.      The renter in my condo left and left a squatter, so I

7    was paying two mortgages and paying for the renovation of

8    5548 Woodforest, so I essentially ran out of money.

9    Q.      Did you at some point seek a loan modification?

10   A.      Yes.

11   Q.      From whom did you seek that?

12   A.      Chase Bank.

13   Q.      Did you get it?

14   A.      Yes.

15   Q.      And at the time that you started having a hard time

16   making your payments, were you living in the Woodforest

17   property?

18   A.      No.

19           MR. HALES:  Can I have a moment, your Honor?

20           THE COURT:  Yes.

21           MR. HALES:  Nothing further at this time, your Honor.

22           THE COURT:  Mr. Wiseman, you may cross-examine.

23                         CROSS-EXAMINATION

24   BY MR. WISEMAN:

25   Q.      Good afternoon, Mr. Petri.

1          Mr. Petri, what we do know as true, that at 19 years

2     old, you wanted to buy an investment property; correct?

3     A.     Correct.

4     Q.     And you testified that you were hooked up some way

5     with Mr. Leonard -- with Mr. Williams and Mr. Clymer;

6     correct?

7     A.     Correct.

8     Q.     And you were asked -- well, as I understand your

9     testimony, at some point you were advised that your loan

10    application would not go through; is that correct?

11    A.     With my original income.

12    Q.     With your original income.  Isn't it true that it was

13    you, Mr. Petri, who came up with the idea of putting yourself

14    on as the employee of Diamond Hill Financial?

15    A.     No.

16    Q.     It was not your intention to have Diamond Hill

17    Financial listed as your employer so you can get this loan?

18    A.     No.

19    Q.     Okay.  But you, in fact, wanted to get this property;

20    correct?

21    A.     Correct.

22    Q.     And so when you discovered, even though you say it

23    wasn't your idea, that the loan application was going to

24    contain false information about your employment, you went

25    along with that; is that correct?

1    A.      Yes.

2    Q.      And you went along with that because you just wanted

3    to get this investment property; correct?

4    A.      I was told it was not illegal.

5    Q.      You were told that it was not illegal.  But at the

6    time that you did that, did you think it was legal?

7    A.      I wasn't a hundred percent sure.  That's why I asked.

8    Q.      Mr. Clymer told you essentially not to worry about it,

9    it's a gray area?

10   A.      Correct.

11   Q.      And your understanding was that meant that you can go

12   ahead and sign a loan application that contained information

13   that you work for a company you didn't work for?

14   A.      I wasn't a loan officer or real estate agent.

15   Q.      And Mr. Clymer did tell you, did he not, that it

16   didn't matter to the lender what was put on the loan

17   application; correct?

18   A.      Correct.

19   Q.      And you testified that you had to fax some documents

20   or you faxed your pay stub and W-2s into Mr. Clymer's office;

21   is that correct?

22   A.      Correct.

23   Q.      Let me show you a document.  I'm going to show you

24   Government's Exhibit 705.  Do you have that document in front

25   of you?  Do you have Number 705 in front of you?

1    A.      Yes.

2    Q.      And that is the pay stub that you were asked about;

3    correct?

4    A.      Yes.

5    Q.      But you don't know who prepared that pay stub, do you?

6    A.      No.

7    Q.      That pay stub just simply does not have your accurate

8    information, but you have no idea who the person was or

9    whoever it was that prepared that; correct?

10   A.      Correct.

11   Q.      As a matter of fact, any of the documents that you

12   were asked about that you testified are not accurate, you

13   have no idea who prepared those; correct?

14   A.      Not with 100 percent certainty, no.

15   Q.      Not with a hundred percent certainty.  Now, you

16   testified that you thought you were going to get $30,000 cash

17   back; is that correct?

18   A.      Correct.

19   Q.      So your motivation to do this deal was in order to get

20   money back in the transaction; correct?

21   A.      That was part of it.

22   Q.      And at the time that you signed the document, you

23   didn't think there was anything wrong with getting cash back

24   in the transaction; right?

25   A.      Correct.

1    Q.      You're 19, you're getting an investment property, and

2    also you're getting cash back; correct?

3    A.      Correct.

4    Q.      If you found out, as you testified to a moment ago,

5    that when you were going to close the transaction, Mr. Clymer

6    said hey, you're not going to get your 30, why did you go

7    through with the deal?

8    A.      I did have some money, so I figured I'd be -- the

9    property didn't cost me anything, so I figured for a

10   long-term investment, it would be okay.

11   Q.      So the property didn't cost you anything because you

12   didn't have to put a down payment; correct?

13   A.      Correct.

14   Q.      The property didn't cost you anything because you got

15   a loan for the financing of that property; correct?

16   A.      Correct.

17   Q.      And you got a loan with the understanding that you

18   were going to get some money back out of the transaction;

19   correct?

20   A.      Correct.

21   Q.      And you got a loan knowing that this statement that

22   your mother had given you a gift was incorrect; correct?

23   That was not true?

24   A.      Correct.

25   Q.      You saw that on the loan application; correct?

1   A.      Correct.

2   Q.      So did you ever think for a moment that it might

3   implicate your mother in some criminal conduct?

4   A.      No, not at the time.

5   Q.      Have you ever thought about that?

6   A.      Since then?

7   Q.      Yes.

8   A.      Yes.

9   Q.      Okay.  So at the time you didn't have any thought that

10  saying that your mother gave you a gift in order to make a

11  down payment that you never made, you weren't concerned about

12  her jeopardy; correct?

13  A.      Not at the time, I guess, no.

14  Q.      And you have no idea who prepared that loan statement

15  that indicates your mother gave you money; correct?

16  A.      Correct.

17  Q.      And at the time, however, you signed the loan, you

18  knew that that information was on the loan application;

19  correct?

20  A.      Correct.

21  Q.      And you said that at some point, you felt

22  uncomfortable with the deal; right?

23  A.      Correct.

24  Q.      And you felt uncomfortable not because there were

25  misstatements on the application, not that there were

1    misstatements on the actual purchase agreement, but you felt

2    uncomfortable because Josh Clymer just stiffed you out of 15

3    grand; right?

4    A.        Correct.

5    Q.        Now, Mr. Petri, you eventually got your mother in one

6    of the deals; correct?

7    A.        Correct.

8    Q.        So you actually brought your mother into a transaction

9    with Mr. Clymer; correct?

10   A.        Correct.

11   Q.        And you handled that transaction for her; correct?

12   A.        Correct.

13   Q.        She primarily worked with you to buy an investment

14   property; correct?

15   A.        Correct.

16   Q.        And this is in spite of the fact that you had

17   misgivings about your own deal?

18   A.        Correct.

19   Q.        And you testified, Mr. Petri, that you had filed for a

20   loan modification with Chase; correct?

21   A.        Correct.

22   Q.        And you filled out some documents, an application, I

23   presume, to get a loan modification; correct?

24   A.        Correct.

25   Q.        And did you put the accurate information on those

1    documents?

2    A.        Correct.

3    Q.        There's nothing on those that is not accurate?

4    A.        Not that I know of.

5    Q.        But yet when you were 19 to get an investment

6    property, you were willing to put your name on a document.

7    Did you know that those documents were signed under penalty

8    of perjury?

9    A.        Not at the time.  I didn't read them.

10   Q.        But you understood that these documents were

11   significant documents to get a transaction completed;

12   correct?

13   A.        Correct.

14   Q.        And you lied on those documents; correct?

15             THE COURT:  I understand a juror needs a break.  I was

16   hoping we could get to 2:30.  We'll take a 15-minute recess.

17             (Recess taken.)

18             THE COURT:  Everyone is present.

19             You may continue.

20             MR. WISEMAN:  Thank you, your Honor.

21                      CROSS-EXAMINATION, (Cont'd.)

22   BY MR. WISEMAN:

23   Q.      Mr. Petri, before you purchased this property that

24   you've been asked about, you had a conversation with someone

25   you worked for; correct?  Someone by the name of Tony; right?

1    A.      Right.

2    Q.      And the conversation that you had with Tony is that

3    you indicated that you wanted or you said that you wanted to

4    get a condominium about 60, $80,000, right, that you wanted

5    to buy?

6    A.      Correct.

7    Q.      But you also told Tony that you were qualified for a

8    loan for about a hundred to 120,000; right?

9    A.      I don't recall.

10   Q.      Do you recall telling Tony that you wanted to get into

11   a deal where you could get some cash back out of the

12   transaction?

13   A.      He brought it up.

14   Q.      He brought it up?

15   A.      Correct.

16   Q.      And you went along with that idea; right?

17   A.      Correct.

18   Q.      Okay.  Now, you said in -- you responded to one of my

19   earlier questions, Mr. Petri, that at some point you realized

20   that what you did was wrong in signing these documents with

21   false information; correct?

22   A.      Looking back at it, yes.

23   Q.      Looking back at it.  Did you realize that you did

24   something wrong around early 2012?

25   A.      In regards to?

1    Q.      In regards to signing false documents.  Let me ask it

2    this way.  When did you come, when did you get this epiphany

3    that what you did was wrong?

4    A.      After I signed the escrow documents.

5    Q.      After you signed the escrow documents.  And you were

6    interviewed by the FBI in the investigation of this case;

7    correct?

8    A.      Correct.

9    Q.      At the time that you were interviewed by the FBI, this

10   is after you signed, so you knew something was wrong;

11   correct?

12   A.      Correct.

13   Q.      And during your interview with the FBI, is it fair to

14   say that you knew that you could be criminally charged for

15   making false statements in a loan application?

16   A.      After I talked to them?  Is that what you're asking?

17   Q.      No.  I'm asking before you had the conversation with

18   the FBI, were you concerned that you could be charged with a

19   crime?

20   A.      Not particularly at the time.

21   Q.      After you had the conversation with the FBI, were you

22   concerned about whether you could be charged with a crime?

23   A.      Not particularly, no.

24   Q.      Nobody ever said to you, Mr. Petri, you committed a

25   crime by filing a false document?

1    A.      Afterwards they did state that it was a mistake or I

2    understood it was a mistake after I did it, yes.

3    Q.      So the FBI advised you that they understood it was

4    simply a mistake?

5    A.      No.  I knew it was a mistake after I signed the loan

6    documents.

7    Q.      And you mentioned that to the FBI?

8    A.      Correct.

9    Q.      And were you told in response or did you have some

10   understanding that you could have been -- you could be

11   prosecuted for that, for what you did?

12   A.      No, sir.

13   Q.      Nobody's ever said that to you?

14   A.      No one told me that I was going to get prosecuted for

15   what I did.

16   Q.      As you sit here right now, are you concerned about

17   being prosecuted for signing a document that had false

18   information?

19   A.      I understood it was wrong now.

20   Q.      Now you understand that it's wrong?

21   A.      Correct.  I'm not particularly worried that I'm going

22   to get prosecuted, no.

23   Q.      And why are you not worried that you may or may not

24   get prosecuted?  Why doesn't that cross your mind?

25   A.      Well, it crosses my mind, but it's not, I'm not --

1  Q.      And you want to make sure, is it fair to say, that you

2  don't get prosecuted; right?

3  A.      Correct.

4  Q.      And you want to make sure that what you say does not

5  get you prosecuted; right?

6  A.      I'm just telling the truth.

7  Q.      You have an incentive to basically say -- to minimize

8  your involvement and to cast the blame and responsibility on

9  somebody else; correct?

10  A.      No.

11  Q.      But, Mr. Petri, you already admitted you signed

12  something that was untruthful; correct?

13  A.      Correct.

14  Q.      That you lied on applications for loans; correct?

15  A.      Correct.

16  Q.      And now you're telling us that you're telling the

17  truth?

18  A.      Correct.

19          MR. WISEMAN:  No further questions.

20          THE COURT:  Any redirect?

21          MR. HALES:  Yes, your Honor.

22                      REDIRECT EXAMINATION

23  BY MR. HALES:

24  Q.      You were asked a few questions about when you realized

25  what you'd done was wrong, Mr. Petri.

```
 1    A.       Correct.

 2    Q.       Did you ever ask Mr. Williams or Mr. Clymer if you

 3    could back out of this deal?

 4    A.       Yes.

 5    Q.       When did you do that?

 6    A.       I believe the day after I signed the escrow documents.

 7    Q.       And why did you ask to back out?

 8    A.       Just didn't feel comfortable after I signed, buyer's

 9    remorse.

10    Q.       Who specifically did you contact about that?

11    A.       Mr. Clymer.

12    Q.       What did he say to you when you -- was it by

13    telephone?

14    A.       Correct.

15    Q.       What did he say to you when you asked to back out?

16    A.       He said there were going to be fees about $10,000 to

17    back out, escrow fees, things of that sort.

18    Q.       And so at that point, what did you decide?

19    A.       I didn't have $10,000 to pay, so I just said okay.

20    Q.       There was also mention of your mother's property.  Do

21    you recall that?

22    A.       Correct.

23    Q.       Did you have any concern about having false documents

24    in connection with her property?

25    A.       No.
```

1    Q.      Why not?

2    A.      Based on all of her documents, she qualified, I guess

3    you can say normally, for the loan.

4    Q.      Did you ever discuss with Mr. Williams or Mr. Clymer

5    about making sure there were no false documents in her loan

6    application?

7    A.      Correct.

8    Q.      Who did you discuss that with specifically, if you

9    recall?

10   A.      Both.

11   Q.      Both of them?

12   A.      Correct.

13   Q.      And what did you say about that?

14   A.      Those exact words.  Just to make sure that there was

15   no -- just using her original W-2 documents.

16           MR. HALES:  No further questions, your Honor.

17           THE COURT:  Any recross?

18                        RECROSS-EXAMINATION

19   BY MR. WISEMAN:

20   Q.      Mr. Petri, I want to make sure that I understand this.

21   You testified a moment ago that the day after you did this

22   deal, you had buyer's remorse; right?

23   A.      Yes.

24   Q.      And you had buyer's remorse because you didn't get

25   what you were supposed to get out of the transaction, among

1    other things; correct?

2    A.      Correct.

3    Q.      Even though you had buyer's remorse, after that

4    remorse, you put your mother in a deal with these folks;

5    correct?

6    A.      Correct.

7            MR. WISEMAN:  No further questions.

8            THE COURT:  Thank you, Mr. Petri.  You're excused.

9            Call your next witness.

10           MS. HEMESATH:  The government calls Stacy Frierson.

11           THE CLERK:  Please step forward.  Stand here in front

12   of the court reporter.  Face me, please.  Raise your right

13   hand.

14                        STACY FRIERSON,

15   a witness called by the Government, having been first duly

16   sworn by the Clerk to tell the truth, the whole truth, and

17   nothing but the truth, testified as follows:

18           THE WITNESS:  I swear.

19           THE CLERK:  Thank you.  You may be seated.  Please

20   state your full name, spell your last name for the record.

21           THE WITNESS:  Stacy Dolores Frierson, F-R-I-E-R-S-O-N.

22                      DIRECT EXAMINATION

23   BY MS. HEMESATH:

24   Q.      Good afternoon, Ms. Frierson.

25   A.      Good afternoon.

```
1    Q.      Where do you work?

2    A.      At U.S. Bank.

3    Q.      And in what capacity?

4    A.      I'm an investigator for corporate security.

5    Q.      Is that your title?

6    A.      Senior investigator.

7    Q.      And in that capacity, are you authorized to testify

8    about U.S. Bank documents?  And there's a binder at your

9    elbow behind you there, a white binder.  Go ahead and grab

10   that.

11   A.      Okay.

12   Q.      Please turn to what's tabbed as 23.

13           MR. WISEMAN:  I'm sorry.  What number?

14           MS. HEMESATH:  23.

15           THE WITNESS:  You said 23; right?  Okay.

16   Q.      BY MS. HEMESATH:  Yes.  Is U.S. Bank insured by the

17   FDIC?

18   A.      Yes.

19   Q.      And is that a copy of the certificate you see in front

20   of you?

21   A.      Yes, it is.

22           MS. HEMESATH:  Move to admit Government's Exhibit 23.

23           THE WITNESS:  I'm sorry?

24           THE COURT:  She's asking me to admit that into

25   evidence.  And Exhibit 23 is received in evidence.
```

1                                   (GOVERNMENT'S EXHIBIT 23, FDIC Insured

2                                   Certificate U.S. Bank, ADMITTED INTO

3                                   EVIDENCE.)

4    Q.     BY MS. HEMESATH:  Does U.S. Bank conduct banking

5    operations across the United States?

6    A.     Yes, they do.

7    Q.     Does it have branches across the United States?

8    A.     Yes, they do.

9    Q.     And is it a commercial bank?

10   A.     Yes.

11   Q.     Go ahead and turn to Government's Exhibit 7.  Did

12   Diamond Hill Financial maintain a bank account at U.S. Bank?

13   A.     Yes, they did.

14   Q.     And is this a document from that bank account?

15   A.     Yes.

16          MS. HEMESATH:  Move to admit Government's Exhibit 7.

17          THE COURT:  Exhibit 7 is received in evidence.

18                                  (GOVERNMENT'S EXHIBIT 7, DHF U.S. Bank

19                                  Account signature cards for account

20                                  x8373, ADMITTED INTO EVIDENCE.)

21   Q.     BY MS. HEMESATH:  If we can go to the next page,

22   please.  Who is the signator on that account?

23   A.     Leonard Williams.

24   Q.     Were any signatories added to the account at any other

25   time?

```
 1   A.      No.

 2   Q.      Go ahead and turn to Tab 13.  Did Bay Area Real Estate

 3   maintain a bank account with U.S. Bank?

 4   A.      Yes, they did.

 5   Q.      And is this a document pertaining to that account?

 6   A.      Yes.

 7           MS. HEMESATH:  Move to admit Government's Exhibit 13.

 8           THE COURT:  Exhibit 13 is received in evidence.

 9                         (GOVERNMENT'S EXHIBIT 13, U.S. Bank

10                          signature card for BARE account x7944,

11                          ADMITTED INTO EVIDENCE.)

12   Q.      BY MS. HEMESATH:  Who are the signatories on that

13   account?

14   A.      Joshua D. Clymer and Leonard Williams.

15   Q.      And down here at the bottom, this is the signature

16   block for that account?

17   A.      Yes, it is.

18   Q.      Were any other signators added to that account at a

19   later time?

20   A.      No.

21   Q.      Go ahead and look at what's tabbed 116 and 117,

22   please.  Do you recognize these as checks?

23   A.      Yes.

24   Q.      Related to the U.S. Bank account?

25   A.      Yes, for Diamond Hill Financial.
```

1            MS. HEMESATH:  Move to admit Government's Exhibits 116

2     and 117.

3            THE COURT:  Exhibits 116 and 117 are received in

4     evidence.

5                             (GOVERNMENT'S EXHIBIT 116, Rent check

6                             to DHF for Gidda Loop for $1,200

7                             5/30/97 and Counter Deposit, ADMITTED

8                             INTO EVIDENCE.)

9                             (GOVERNMENT'S EXHIBIT 117, Rent check

10                            to DHF for Gidda Loop $1,200 dated

11                            6/30/07, ADMITTED INTO EVIDENCE.)

12    Q.    BY MS. HEMESATH:  And if we could please put up side

13    by side page 2 of 116 and page 3 of 117.  And if we can make

14    them a little bit bigger.

15            To whom are these checks made payable?

16    A.    They're both made payable to Diamond Hill Financial,

17    Incorporated.

18    Q.    And were these, in fact, deposited into the Diamond

19    Hill Financial account?

20    A.    Yes, they were.

21    Q.    What's the memo line on each check, please?

22    A.    Rent 864 Gidda Loop.

23    Q.    And same on the second check?

24    A.    Yes.

25    Q.    Thank you.  Go ahead and look at Government's Exhibits

1    227 and 327.  Do you recognize these as checks for the

2    U.S. Bank account?

3    A.      Yes.

4            MS. HEMESATH:  Move to admit 227 and 327.

5            THE COURT:  Exhibits 227 and 327 are received in

6    evidence.

7                            (GOVERNMENT'S EXHIBIT 227, Check from

8                            DHF to J. Clymer for $8,697.55 dated

9                            6/25/07, memo Ceanothus, ADMITTED INTO

10                           EVIDENCE.)

11                           (GOVERNMENT'S EXHIBIT 327, Check from

12                           DHF to J. Clymer for $4,354 dated

13                           7/20/07, ADMITTED INTO EVIDENCE.)

14   Q.      BY MS. HEMESATH:  We can put them up side by side,

15   please.

16           To whom are these checks made payable?

17   A.      Josh Clymer.

18   Q.      And they are written out of the Diamond Hill bank

19   account?

20   A.      Yes.

21   Q.      Go ahead and look at 328, please.  Do you recognize

22   that as a check from this account?

23   A.      Yes.

24           MS. HEMESATH:  Move to admit 328.

25           THE COURT:  Exhibit 328 is received in evidence.

```
 1                              (GOVERNMENT'S EXHIBIT 328, Check from

 2                              DHF to Novelle Financial, $3,404.96

 3                              dated 10/4/07, ADMITTED INTO

 4                              EVIDENCE.)

 5    Q.      BY MS. HEMESATH:  This check is written out of the

 6    Diamond Hill Financial bank account?

 7    A.      Yes, it is.

 8    Q.      Who is it payable to?

 9    A.      Novelle Financial.

10    Q.      And the amount, please?

11    A.      $3,404.96.

12    Q.      And the memo line, please?

13    A.      Arthur Watson 3000001563.

14    Q.      Go ahead and look at what's tabbed 425 and 426.  Do

15    you recognize these as checks related to that bank account?

16    A.      Yes.

17            MS. HEMESATH:  Move to admit 425 and 426.

18            THE COURT:  Exhibits 425 and 426 are received in

19    evidence.

20                              (GOVERNMENT'S EXHIBIT 425, Check from

21                              BARE to DHF for $15,166 dated 2/21/08,

22                              memo escrow 60603635, ADMITTED INTO

23                              EVIDENCE.)

24                              (GOVERNMENT'S EXHIBIT 426, Check from

25                              BARE to Joshua Clymer for $15,166
```

 1                           dated 2/21/08, memo escrow 60603635,

 2                           ADMITTED INTO EVIDENCE.)

 3          THE COURT:  How many different checks are you going to

 4  have her --

 5          MS. HEMESATH:  I think that this will be less than ten

 6  total minutes, your Honor.  If we could put them up side by

 7  side, please.

 8          THE COURT:  Less than ten minutes?  My question was

 9  how many checks.

10          MS. HEMESATH:  13 more.

11          THE COURT:  Why don't you just offer them all at once,

12  and then it would be less than ten total minutes.

13          MS. HEMESATH:  I am going to offer 520, 521, 619, 719,

14  727, 720.  Pardon me.  Those are not checks.

15          THE COURT:  So 719 and 727, yes or no?

16          MS. HEMESATH:  719.  Not 726 or 727.

17          THE COURT:  All right.

18          MS. HEMESATH:  716, 717, and 718.

19          THE COURT:  All checks, right?  They're all checks?

20          MS. HEMESATH:  Let me just --

21          THE COURT:  All right.

22          MS. HEMESATH:  719 is a monthly statement.

23          THE COURT:  You didn't give me that.

24          MS. HEMESATH:  Okay.  Then I'll hold off on that.

25          THE COURT:  Exhibits --

1            MS. HEMESATH:  Everything is checks.

2            THE COURT:  Exhibits 425, 426, 520, 521, 619, 716,

3    717, 718, and 719 are received in evidence.

4                              (GOVERNMENT'S EXHIBIT 520, Check from

5                              BARE to DHF for $16,540.86 dated

6                              3/6/08, memo Trap Rock, ADMITTED INTO

7                              EVIDENCE.)

8                              (GOVERNMENT'S EXHIBIT 521, Check from

9                              BARE to Joshua Clymer for $16,540.86

10                             dated 3/6/08, memo Reynaga, ADMITTED

11                             INTO EVIDENCE.)

12                             (GOVERNMENT'S EXHIBIT 619, Check from

13                             BARE to Joshua Clymer for $36,258 on

14                             3/31/08, memo 11516 Linday, ADMITTED

15                             INTO EVIDENCE.)

16                             (GOVERNMENT'S EXHIBIT 716, Check from

17                             BARE to DHF for $5,000 dated 8/3/08,

18                             ADMITTED INTO EVIDENCE.)

19                             (GOVERNMENT'S EXHIBIT 717, Check from

20                             BARE to DHF for $11,599.07 dated

21                             8/5/08, ADMITTED INTO EVIDENCE.)

22                             (GOVERNMENT'S EXHIBIT 718, Check from

23                             BARE to Joshua Clymer for $16,599.07

24                             dated 8/7/08, memo 5548 Woodforest,

25                             ADMITTED INTO EVIDENCE.)

 1                         (GOVERNMENT'S EXHIBIT 719, Account

 2                         Statement for BARE U.S. Bank account

 3                         x7944, August 2008, ADMITTED INTO

 4                         EVIDENCE.)

 5         MS. HEMESATH:  And to clarify, 719 is the monthly

 6    statement, not a check.

 7         THE COURT:  All right.

 8    Q.    BY MS. HEMESATH:  Okay.  If we can please put up 425

 9    and 426 side by side.  There they are.

10         And which account are these checks written out of?

11    A.    Bay Area Real Estate Holdings, LLC.

12    Q.    To whom are they payable?

13    A.    Josh Clymer.

14         THE COURT:  She doesn't really have to say what they

15    are.  I think they speak for themselves.  They're all in

16    evidence now.

17         MS. HEMESATH:  Okay.  Thank you.

18         And can we please see 520 and 521.

19         THE COURT:  I said she didn't have to say what they

20    are.  They're all in evidence.

21         MS. HEMESATH:  All right.  Can we please see 719, the

22    monthly statement.  Move to admit 719, the monthly statement.

23         THE COURT:  That's in.  They're all in evidence, all

24    the ones I listed.

25    Q.    BY MS. HEMESATH:  All right.  This is the monthly

1    statement for which bank account?

2    A.      Bay Area Real Estate Holdings.

3    Q.      And for which month, please?

4    A.      August of 2008.

5    Q.      This section right here, the other deposits section,

6    what monies are coming into the bank account there?

7    A.      It looks like --

8            MR. WISEMAN:  Your Honor, I'll object.  The document

9    does speak for itself.

10           THE COURT:  When you say what monies are coming into

11   the bank account, what do you mean?

12   Q.      BY MS. HEMESATH:  What are those two deposits?  Where

13   are they coming from?

14           THE COURT:  Where are they coming from?  All right.

15   She can answer that question.

16           THE WITNESS:  Those two credits to the bank account

17   are two wire transfers originating from Bank of America.

18   Q.      BY MS. HEMESATH:  What's the amount on the first one?

19   A.      $15,000.

20   Q.      And the second one?

21   A.      $29,174.14.

22   Q.      And this document shows that those amounts were

23   actually received into the Bay Area Real Estate bank account?

24   A.      Yes.

25           MS. HEMESATH:  I'm going to move to admit also 726 and

1    727, which are certified business records out of the

2    Woodforest escrow file.

3            THE COURT:  Any objection?

4            MR. WISEMAN:  What's the sequence, your Honor, again?

5            THE COURT:  726 and 727, certified documents.

6            MR. WISEMAN:  No objection.

7            THE COURT:  Exhibits 726 and 727 are received in

8    evidence.

9                         (GOVERNMENT'S EXHIBIT 726, Outgoing

10                        Wire Request for $15,000, 8/1/08,

11                        ADMITTED INTO EVIDENCE.)

12                        (GOVERNMENT'S EXHIBIT 727, Outgoing

13                        Wire Request for $29,174.14, 8/5/08,

14                        ADMITTED INTO EVIDENCE.)

15   Q.     BY MS. HEMESATH:  And if we could put those up side by

16   side, please.

17          These are outgoing wire requests.  Do those correspond

18   to the amounts that we saw on that bank account statement?

19   A.     Yes.

20   Q.     Was U.S. Bank insured in August 2008 as well,

21   federally insured?

22   A.     Yes, they were.

23          MS. HEMESATH:  Thank you.  Nothing further.

24          THE COURT:  Any cross-examination?

25          MR. WISEMAN:  No, your Honor.

1              THE COURT:  Thank you, Ms. Frierson.  You're excused.

2         You may call your next witness.

3              MS. HEMESATH:  The United States calls Colleen Brown.

4              THE CLERK:  Please step forward.  Stand here next to

5    the court reporter and face me, please.  Please raise your

6    right hand.

7                          COLLEEN BROWN,

8    a witness called by the Government, having been first duly

9    sworn by the Clerk to tell the truth, the whole truth, and

10   nothing but the truth, testified as follows:

11             THE WITNESS:  I do.

12             THE CLERK:  Thank you.  You may be seated.  Please

13   state your full name and spell your last name for the record.

14             THE WITNESS:  Colleen Mary Louise Brown, B-R-O-W-N.

15                       DIRECT EXAMINATION

16   BY MS. HEMESATH:

17   Q.     Good afternoon, Ms. Brown.

18   A.     Hi.

19   Q.     Where do you work?

20   A.     SAFE Credit Union.

21   Q.     And in what capacity?

22   A.     In the compliance, service support and compliance

23   department.  I'm a senior service support and compliance

24   specialist.

25   Q.     Are you authorized to testify about SAFE Credit Union

1    bank documents?

2    A.      Yes, I am.

3    Q.      All right.  What kind of an institution is SAFE Credit

4    Union?

5            THE COURT:  It's a credit union.

6            THE WITNESS:  It's a financial institution.

7    Q.      BY MS. HEMESATH:  Does it send and receive funds

8    across state lines?

9    A.      Yes, it does.

10   Q.      How often?  On a daily basis?

11   A.      Yes.

12   Q.      All right.  Is it federally insured?

13   A.      Yes, it is.

14           MS. HEMESATH:  Move to admit Government's

15   Exhibit 24-A, a copy of the certificate.

16           THE COURT:  All right.  Exhibit 24-A is received in

17   evidence.

18                           (GOVERNMENT'S EXHIBIT 24-A, SAFE

19                           Credit Union NCUA Insurance

20                           Certificate, ADMITTED INTO EVIDENCE.)

21   Q.      BY MS. HEMESATH:  And this is the insurance that was

22   applicable in the 2007, 2008 time period?

23   A.      Correct.

24   Q.      Thank you.  Did Joshua Clymer maintain a bank account

25   at SAFE Credit Union?

```
1    A.        Yes.

2    Q.        Have you reviewed that account?

3    A.        Yes.

4    Q.        Was that account active in the years 2007, 2008?

5    A.        Yes.

6    Q.        I'm going to show you very quickly six checks already

7    in evidence, and I'd like for you to confirm that these were

8    deposited into Mr. Clymer's SAFE Credit Union account.

9    Please 227 and 327.  Were these deposited into Mr. Clymer's

10   account?

11   A.        Yes.

12   Q.        426 and 521.  Were these deposited in Mr. Clymer's

13   account?

14   A.        Yes.

15   Q.        619 and 718.  Were these deposited into Mr. Clymer's

16   account?

17   A.        Yes.

18             MS. HEMESATH:  Thank you.  Nothing further.

19             THE COURT:  Any cross-examination?

20             MR. WISEMAN:  No, your Honor.

21             THE COURT:  Thank you, Ms. Brown.  You're excused.

22             THE WITNESS:  Thank you.

23             THE COURT:  Call your next witness.

24             MR. HALES:  The United States calls Donna Allred.

25             May I approach, your Honor?
```

1          THE COURT:  There's nobody up there yet, but you can

2   put the books up there.

3          MR. HALES:  I was trying to get it done in advance.

4          Your Honor, the witness is in the restroom.  It will

5   just be a moment.

6          THE COURT:  Do you have somebody else after her?

7          MR. HALES:  We do.  Shall we wait or shall we call the

8   next witness?

9          THE COURT:  Depends on how long.  How long is the next

10  witness going to take after her?

11         MR. HALES:  Optimistically 15, 20 minutes.

12         THE COURT:  Let's call the next one.

13         MR. HALES:  Okay.  The United States then calls

14  Mark Zarate.

15         THE CLERK:  Please step forward.  Stand next to the

16  court reporter and face me.  Please raise your right hand.

17                      MARK ZARATE,

18  a witness called by the Government, having been first duly

19  sworn by the Clerk to tell the truth, the whole truth, and

20  nothing but the truth, testified as follows:

21         THE WITNESS:  Yes.

22         THE CLERK:  Thank you.  You may be seated.

23         MR. HALES:  Good afternoon, Mr. Zarate.

24         THE CLERK:  One moment, please.  Please state your

25  full name, spell your last name for the record.

1            THE WITNESS:  My full name is Mark Zarate.  My last

2    name is Zarate, Z-A-R-A-T-E.

3                         DIRECT EXAMINATION

4    BY MR. HALES:

5    Q.      Good afternoon, Mr. Zarate.  Please tell us where you

6    work.

7    A.      I work for the Butte County Clerk-Recorder's Office.

8    Q.      How long have you worked at the Butte County

9    Clerk-Recorder's Office?

10   A.      For ten and a half years.

11   Q.      Can you quickly tell us what does a county recorder's

12   office do?

13   A.      We record all real estate documents for the county.

14   We record all the bio records, birth, death, and marriage.

15   Q.      Go ahead.  Is that it?

16   A.      Yeah.

17   Q.      What is your current title at the Butte County

18   Recorder's Office?

19   A.      Project manager for the clerk-recorder's office.

20   Q.      What does that mean on a day-to-day basis?

21   A.      On a day-to-day basis, you do the regular recording

22   documents, issuing birth certificates, issuing marriage

23   licenses.  But as a project manager, I handle specific

24   projects, and one of the projects is electronic recording.

25   So instead of paper recording, we would get the document

1    electronically sent to us, and we would record it and then

2    send it back.

3    Q.    Have you also handled several rotations dealing with

4    all the mail that's sent and returned from the recorder's

5    office?

6    A.    Yes.  The scanning is part of the mail back, and I've

7    done that probably four or five times.

8    Q.    When is the first time you did that, if you remember?

9    A.    That would probably be 2004.

10   Q.    So you've been familiar with how the Butte County

11   Recorder's Office mails out and receives documents, at least

12   since that time?

13   A.    Yes.

14   Q.    Is it one of the main functions of your office to keep

15   copies of recorded documents?

16   A.    Yes.

17   Q.    And have you retrieved and provided certified copies

18   of various documents in relation to this case?

19   A.    Yes.

20   Q.    Does the recorder's office have a software system it

21   uses to track the recordings?

22   A.    Yes.

23   Q.    And related information?

24   A.    Yes.

25   Q.    What's the name of that system?

1    A.      It's recordable image -- I'm sorry.  The Recorder's

2    Information & Image Management System.

3    Q.      Do you refer to it as --

4    A.      As RiiMS.

5    Q.      RiiMS is an acronym?

6    A.      Yeah.  So we always go by that, so I sometimes forget

7    all of the names.

8    Q.      Was RiiMS in use at the Butte County Recorder's Office

9    in 2007?

10   A.      Yes.

11   Q.      Is the idea that there's a RiiMS record associated

12   with every recorded document in the office?

13   A.      Yes.

14   Q.      Did you also retrieve and provide RiiMS record

15   printouts for the recorded documents that you produced in

16   connection with this case?

17   A.      Yes.

18   Q.      Who makes the entries in the RiiMS system?  Who is

19   authorized to make those entries at the office?

20   A.      So only people that can record documents.  So if you

21   have like, you know, an extra help person wouldn't be able to

22   do that.  Just someone that records documents.

23   Q.      Is anything put into the RiiMS system?  Is there a

24   record made if the document is picked up in person as opposed

25   to being mailed out after it's recorded?

1    A.      Yes.  The system would be updated to show if someone

2    came into the office to pick it up.

3    Q.      Is one of the things that your office records deeds of

4    trust?

5    A.      Yes.

6    Q.      From your perspective as a recorder, what is a deed of

7    trust?

8    A.      Deed of trust is when a borrower takes out a loan from

9    like a bank.

10   Q.      And after it's recorded, who typically needs to get a

11   copy of that document?

12   A.      The original would go back to -- typically the bank

13   would request the original to go back to them.

14          MR. WISEMAN:  Your Honor, I'm going to object.  I

15   think this calls for expert opinion.

16          THE COURT:  Well, when he's asking him what a deed of

17   trust is, it does.  What happens in his office when somebody

18   files a deed of trust I think is within his realm.

19   Q.      BY MR. HALES:  How about I ask it this way.  Do you

20   mail out copies of deeds of trust after they're recorded?

21   A.      If they're requested by a customer, yes.

22   Q.      Okay.  In all the ten and a half years you've been at

23   the office, have you ever seen a deed of trust being picked

24   up by a bank or a lender in person?

25   A.      No.

1    Q.      There's a binder in front of you, and if you could

2    turn, there are tabs at the top with numbers on them.  If you

3    can turn to Exhibit 31.

4    A.      Okay.

5    Q.      Do you see that in front of you?

6    A.      Yes.

7    Q.      Okay.  Is that a deed of trust you pulled for this

8    case?

9    A.      Yes.

10   Q.      And it came from your office's files?

11   A.      Yes.

12   Q.      Is it certified?

13   A.      Yes.

14           MR. HALES:  Your Honor, move to admit Government's

15   Exhibit 31.

16           THE COURT:  Exhibit 31 is received in evidence.

17                         (GOVERNMENT'S EXHIBIT 31, Deed of

18                         Trust - Ceanothus to CIT 2007-0029173,

19                         ADMITTED INTO EVIDENCE.)

20   Q.      BY MR. HALES:  Who is the borrower listed on the face

21   of the deed of trust?

22   A.      So the borrower is --

23           MR. WISEMAN:  Again, your Honor, I'm going to object

24   if there's testimony that's expert opinion.

25           THE COURT:  Well, see, the borrower is not a concept

 1    within the deed of trust.  That's a loan concept.  You don't

 2    see anybody -- you don't see any name of the borrower on a

 3    deed of trust.  You see the trustee, the trustor, and the

 4    beneficiary.  Those are the parties to a deed of trust.  But

 5    you can ask him that.

 6    Q.    BY MR. HALES:  Well, why don't I move on.  Can we zoom

 7    out.

 8          Do you see an indication on the face of this document

 9    that it was, in fact, recorded, a recording stamp?

10    A.    Yes.

11    Q.    Can you tap on the screen where that is.

12          Can we blow that up.

13          You're familiar with the stamps from working in the

14    Butte County Recorder's Office?

15    A.    Yes.

16    Q.    First, can you tell us what that number represents?

17    A.    2007 would be the year that it was recorded.

18    Q.    And 29173, what does that represent?

19    A.    That is the document number assigned to the document,

20    and it goes in order.  So the first document of the first

21    year would get 1.  So this would be 29173 would be -- that's

22    in order.

23    Q.    So in your county, you don't use a book and page

24    number per se.  You just sequentially number the documents

25    that are recorded in your office?

1   A.      Yes.

2   Q.      And can we tell the date and time that this document

3   was recorded?

4   A.      Yes.  So it was recorded June 18, 2007, at 9:00 a.m.

5   Q.      If we can zoom back out.

6           Do you see this section of the document in the upper

7   left?

8   A.      Yes.

9   Q.      And earlier you said you mail out deeds of trust when

10  there's an instruction to do that.  Is this such an

11  instruction here?

12  A.      Yes.  So "when recorded mail to," that is the address

13  we would mail it to.

14  Q.      And I want to not necessarily with specific reference

15  to this document, but with documents of this nature related

16  to real estate, are you familiar with having a street address

17  and a legal description associated with properties?

18  A.      Yes.

19  Q.      And how do they relate?  What's the difference between

20  the two?

21  A.      Well, the legal description is talking about either

22  like the lot or, you know, the book and page of the map that

23  was recorded for that piece of property or it has like a

24  metes and bounds if it doesn't have a recorded map.  So that

25  would be the legal description.

1    Q.      Is there is a legal description at the back of this

2    deed of trust on page 6?

3    A.      Yes.

4    Q.      And that's what's shown here?

5    A.      Yes.

6    Q.      Can you please turn next to Exhibit 32 in the binder.

7    Do you recognize that?

8    A.      Yes.

9    Q.      Is that the RiiMS record for the deed of trust that we

10   just saw?

11   A.      Let me just double-check the number.  Yes.

12   Q.      And you verified that by checking the number

13   2007-0029173?

14   A.      Yes.

15   Q.      Okay.

16           MR. HALES:  Move to admit Government's Exhibit 32.

17           THE COURT:  Exhibit 32 is received in evidence.

18                         (GOVERNMENT'S EXHIBIT 32, RiiMS record

19                          for Deed of Trust 2007-0029173,

20                          ADMITTED INTO EVIDENCE.)

21   Q.      BY MR. HALES:  Now, if someone picks up a document in

22   person, where would that be reflected in the RiiMS record?

23   A.      So at the top where it says mailing information, you

24   would put in who picked it up on what date.

25   Q.      And if mailing information is blank, what does that

1   mean?  When do you actually populate that field in the RiiMS

2   system?

3   A.      It doesn't get populated unless there's a change.  So

4   since there's nothing in there, it hasn't been changed, which

5   means it never got sent back and no one ever came to pick it

6   up.  So it was mailed to the address on the document.

7   Q.      Can you turn next to Government's Exhibit 37 in your

8   binder.  Is that another deed of trust that you pulled in

9   connection with this case?

10  A.      Yes.

11  Q.      And is that document also certified?

12  A.      Yes.

13          MR. HALES:  Your Honor, move to admit Government's

14  Exhibit 37.

15          THE COURT:  Exhibit 37 is received in evidence.

16                          (GOVERNMENT'S EXHIBIT 37, Deed of

17                          Trust Rockin M to Novelle Financial

18                          2007-0033395, ADMITTED INTO EVIDENCE.)

19  Q.      BY MR. HALES:  And on this document, the number for it

20  then, like the last one, this one is 33395 and the year 2007?

21  A.      Yes.

22  Q.      When was it recorded?

23  A.      July 12, 2007, at 9:00 a.m.

24  Q.      And then if we zoom back out and look in the upper

25  left.

1           Do you see mailing instructions on that document?

2    A.     Yes.

3    Q.     And your ordinary practice would be to mail this

4    document to that address after recording?

5    A.     Yes.

6    Q.     Can you please look next at Government's Exhibit 38.

7    And you may have to look back again, but is this the RiiMS

8    record associated with the deed of trust we just saw?

9    A.     Yes.

10   Q.     And again, is there any indication on this -- move

11   Government's Exhibit 38 into evidence, your Honor.

12          THE COURT:  Exhibit 38 is received in evidence.

13                       (GOVERNMENT'S EXHIBIT 38, RiiMS record

14                        for Deed of Trust 2007-0033394,

15                        ADMITTED INTO EVIDENCE.)

16   Q.     BY MR. HALES:  Is there any indication in this RiiMS

17   record that it was either picked up in person or returned and

18   mailed out to another address?

19   A.     No.

20   Q.     From that, what do you conclude about whether this was

21   mailed out to the address on the face of the deed of trust?

22   A.     It was mailed to the address on there.

23   Q.     Can you please look next -- actually, let's -- does

24   your office also record grant deeds?

25   A.     Yes.

1    Q.     Did you pull copies of various grant deeds in

2    connection with this case?

3    A.     Yes.

4           THE COURT:  Let's get them all in at once instead of

5    going through one at a time.

6           MR. HALES:  Yes, your Honor.

7           Move into evidence, your Honor, Government's Exhibits

8    29, 30, 39, and 40.

9           THE COURT:  Exhibits 29, 30, 39, and 40, grant deeds,

10   are received in evidence.

11                              (GOVERNMENT'S EXHIBIT 29, Grant Deed

12                              Ceanothus to Arthur Watson

13                              2007-0029172, ADMITTED INTO EVIDENCE.)

14                              (GOVERNMENT'S EXHIBIT 30, RiiMS record

15                              for Grand Deed 2007-0029172, ADMITTED

16                              INTO EVIDENCE.)

17                              (GOVERNMENT'S EXHIBIT 39, Grant Deed

18                              Rockin M to Arthur Watson

19                              2007-0033394, ADMITTED INTO EVIDENCE.)

20                              (GOVERNMENT'S EXHIBIT 40, RiiMS record

21                              for Grant Deed 2007-0033394, ADMITTED

22                              INTO EVIDENCE.)

23          MR. HALES:  And I should clarify, your Honor.  29 and

24   39 are grant deeds and 30 and 40 are the RiiMS records of

25   which we've been speaking.

1          THE COURT:  Understood.

2     Q.     BY MR. HALES:  Can we put up 29 first, please.

3          If we can look in the upper right.  What's the number

4     of this document, the recording number?

5     A.     The number is 2007-0029172.

6     Q.     And when was it recorded?

7     A.     June 18, 2007, at 9:00 a.m.

8     Q.     And if we can zoom back out.

9          Is there mailing information in the upper left?

10    A.     Yes.

11    Q.     And can you please turn to Exhibit 30.  I'm blowing up

12    a portion of this.  Now, on this one, it appears different.

13    In the mailing info, there's some information filled in.  Can

14    you explain how you interpret that?

15    A.     So the document was mailed out, and it was returned by

16    the post office as undeliverable, and it didn't have a

17    forwarding address.  So if it doesn't have a forwarding

18    address, we either keep it or we give it to the title

19    company.  And this was given to Mid Valley Title Company on

20    7/19/2007.

21    Q.     And then if we can please put up Government's

22    Exhibit 39.

23          Is this another grant deed that you pulled in

24    connection with this case?

25    A.     Yes.

1    Q.      And what's the recording number of that document?

2    A.      2007-0033394.

3    Q.      When was it recorded?

4    A.      July 12, 2007, at 9:00 a.m.

5    Q.      And again, if we zoom back out and go to the upper

6    left, are there mailing instructions there?

7    A.      Yes.

8    Q.      And then if we look next at Government's Exhibit 40,

9    is that the RiiMS record for the grant deed we just looked

10   at?

11   A.      What was the prior exhibit again?

12   Q.      I believe we were just discussing --

13   A.      40?

14   Q.      One moment.  We were just discussing Government's

15   Exhibit 39, and now we're looking at the RiiMS record at

16   Exhibit 40.  Do you have that in front of you?

17   A.      Okay.  So 39, okay.  So yes, this would be the RiiMS

18   for that document.

19   Q.      For Government's Exhibit 39?

20   A.      Yes.

21   Q.      Okay.  And is there any indication here that this

22   document was either picked up in person or returned and then

23   mailed out again?

24   A.      No.

25   Q.      From that, what do you conclude about the mailing of

```
 1    this document?

 2    A.       That it was mailed to the address on the document.

 3             MR. HALES:  One moment, your Honor.

 4             THE COURT:  Yes.

 5             MR. HALES:  No further questions.

 6             THE COURT:  Cross-examination.

 7                         CROSS-EXAMINATION

 8    BY MR. WISEMAN:

 9    Q.       Good afternoon.

10    A.       Good afternoon.

11    Q.       Sir, you've been asked -- while this loads up, I just

12    want to ask you, you work at the Butte County Recorder's

13    Office; correct?

14    A.       Yes.

15    Q.       And you've worked there for a number of years;

16    correct?

17    A.       Correct.

18    Q.       And you testified about the RiiMS system.  And as I

19    understand your testimony, that's an electronic system to

20    track the recording of certain documents; correct?

21    A.       Yes.

22    Q.       And is that a substitute for manual recording

23    documents, actually hand recording?

24    A.       How do you mean?

25    Q.       Well, yeah, that's a poor question.  Let me rephrase
```

1    that.  The RiiMS system, the RiiMS system is a way in which

2    you've eliminated paper recordings of certain documents;

3    correct?

4    A.      So we still get the paper document.  We still examine

5    it.  What we do is we scan it into the RiiMS system so it

6    then becomes electronic, and that's where we index and verify

7    the information on the document.

8    Q.      What happens to the original of the paper document?

9    A.      So we keep the original and we back it up on film and

10   CD, and once we are satisfied that it's backed up, we mail it

11   back to the mailing address on the face of the document in

12   the upper left-hand corner.

13   Q.      Okay.

14           MR. WISEMAN:  Your Honor, I'm having some technical

15   difficulty, but let me ask if I can get the government, if

16   Donna can pull up -- would you mind pulling up 31, please.

17   Q.      BY MR. WISEMAN:  Do you have 31 up there?  Do you see

18   that, sir?

19   A.      Yes.

20   Q.      And you testified that this document is mailed, the

21   mailing is determined by this indication here; correct?  In

22   other words, this is who is supposed to receive the document

23   in the mail; right?

24   A.      Yeah.  When recorded mail to.

25   Q.      Right.  Is there anything on the face of the document

1  that confirms that the mailing took place?

2  A.      On the actual document?

3  Q.      Yes.

4  A.      No.

5  Q.      So there's nothing that confirms that it's been

6  mailed.  Okay.  Now, if I may get 32, for example.  Now, you

7  were asked about this document here.  Now, this is the RiiMS

8  printout; correct?

9  A.      Yes.

10  Q.      Now, is there anything on this document that indicates

11  that the deed of trust which is represented in 31 was, in

12  fact, mailed?

13  A.      We don't put on here anything that shows that it's

14  mailed out.  It only would show if it was not, if it came

15  back.

16  Q.      If it came back.  So the only -- so on the face of the

17  deed of trust, as you testified, there's nothing to indicate

18  that it was actually mailed?

19  A.      Yeah.  It wouldn't be on the face of the document

20  because we can't alter the document, so we wouldn't put that

21  on there.

22  Q.      Is there any way in the system to confirm that the

23  document was actually mailed?

24  A.      Not in the system, but I mean our policy is to mail it

25  back to the recorded address.  We don't keep them.  So that's

1    the only place it can go.

2    Q.      Understood.  So you don't keep them, but based upon

3    where it indicates on the top left of 31, if we can go back

4    to 31, what you testified to, this box here tells you where

5    to mail it, but yet there's nothing, as you've already said,

6    on this document to confirm that it was mailed.  It was just

7    your policy to mail it; right?

8    A.      We can't alter the document, so we wouldn't put

9    anything on the document to alter it by putting that we did

10   mail it out.

11   Q.      All right.  So is there -- and I think you just

12   testified to, in the RiiMS system, there is nothing that one

13   of the employees after they mailed the document encodes to

14   confirm mailing was done; correct?

15   A.      Not in the RiiMS system, no.

16   Q.      And there is nothing else in the county recorder's

17   office that's used to confirm that, in fact, the mailing was

18   done; correct?

19   A.      We have Outlook calendars that we do put on there when

20   we mail documents out for the specific day.

21   Q.      Okay.  But you have Outlook calendars that show that?

22   A.      Correct.

23   Q.      Okay.  And you weren't asked any questions about an

24   Outlook calendar; correct?

25   A.      No, because since this was 2007, the IS does not keep

1    the Outlook records that far.  IS.  I'm sorry, our IS

2    department.

3    Q.      Right.

4    A.      So the IT department who handles all of the electronic

5    stuff, they don't back up that far.

6    Q.      So just, lastly, so without seeing the Outlook

7    calendar, it's impossible to confirm that this particular

8    document, Number 31 and Number 29, were actually mailed;

9    right?

10   A.      Well, it's not impossible because we mailed them out.

11   There is no other place for it to go.

12   Q.      Okay.  It's your policy to mail them out?

13   A.      Well, I mean it's not just a policy.  It's probably

14   part of the Government Code that we mail them out.

15           MR. WISEMAN:  All right.  Thank you.  No further

16   questions.

17           THE COURT:  Anything else?

18           MR. HALES:  No, your Honor.

19           THE COURT:  Thank you, Mr. Zarate.  You're excused.

20           Next witness ready?

21           MR. HALES:  Yes.  Now the United States calls

22   Donna Allred, your Honor.

23           May I approach, your Honor, for exhibits?

24           THE COURT:  Yeah.

25           MR. HALES:  Thank you.

1         THE CLERK:  Please step forward.  Please stand next to

2    the court reporter and face me.  Please raise your right

3    hand.

4                         DONNA ALLRED,

5    a witness called by the Government, having been first duly

6    sworn by the Clerk to tell the truth, the whole truth, and

7    nothing but the truth, testified as follows:

8         THE WITNESS:  I do.

9         THE CLERK:  Thank you.  You may be seated.  Please

10   state your full name, spell your last name for the record.

11        THE WITNESS:  Donna Allred, A-L-L-R-E-D.

12                      DIRECT EXAMINATION

13   BY MR. HALES:

14   Q.    Good afternoon, Ms. Allred.

15   A.    Good afternoon.

16   Q.    Where do you work?

17   A.    I work for the county clerk/recorder's office here in

18   Sacramento.

19   Q.    How long have you worked at the Sacramento County

20   Recorder's Office?

21   A.    Almost 24 years.

22   Q.    What currently is your job title?

23   A.    Chief deputy clerk/recorder.

24   Q.    What does that mean on a day-to-day basis?  What are

25   your responsibilities right now?

1    A.      My responsibilities are the operations of the office.

2    I run our downtown facility and then two of our service

3    centers.

4    Q.      What were your responsibilities in 2008?

5    A.      It was the same thing.  I ran our downtown office, the

6    operations of our office, and then we had, in 2008, we had

7    one service center that I ran.

8    Q.      In 2008, did you have involvement overseeing the

9    recording and mailing of documents from the Sacramento County

10   Recorder's Office?

11   A.      Yes, I did.

12   Q.      And did you retrieve and provide certified copies of

13   certain recorded documents in connection with this case?

14   A.      Yes, I did.

15   Q.      Can you briefly talk us through what the steps are of

16   the recording process as it would take place at your

17   recorder's office in 2008?

18   A.      When a document comes in, my staff examines it to make

19   sure it meets the recording requirements.  And if it does, we

20   then record the document.  Once the document is recorded, it

21   then goes to our indexing department where they index the

22   information off the document.  And then it goes to our

23   imaging department where they scan the documents for

24   permanent record.  And once they've completed the process,

25   then they are -- the original document is mailed back to the

 1   customer.

 2   Q.      Do you wait a little bit of time before mailing it

 3   back to the customer?

 4   A.      It's about a five-day process.

 5   Q.      For all of the things that you just described?

 6   A.      Yes, to make sure and we QC our process.  And once

 7   we're complete, then we will mail the document back.

 8   Q.      And you supervise this process?

 9   A.      I supervise the recording of the documents.  In 2008,

10   I supervised the mailing back of the documents as well, but

11   the data entry and imaging department are managed by another

12   manager.

13   Q.      Is one of the types of documents that your office

14   records deeds of trust?

15   A.      Yes.

16   Q.      In your experience, after deeds of trust are recorded,

17   what is done with them?

18   A.      They are mailed back to the address, the "once

19   recorded mail back to" addresses in the upper left-hand

20   corner of the document.  It's part of the recording

21   requirement to have that information on there.

22   Q.      In your 24 years at the recorder's office, have you

23   ever seen a lender or bank come pick up a deed of trust in

24   person?

25   A.      No.

1              MR. HALES:  Your Honor, if I may, I think I'll move a

2      series of documents in to avoid having to --

3              THE COURT:  All right.

4              MR. HALES:  Exhibits 45, 51, 53, and 59 as certified

5      records from the Sacramento County Recorder's Office,

6      specifically deeds of trust.

7              THE COURT:  Exhibits 45, 51, 53, and 59 are received

8      in evidence.

9                          (GOVERNMENT'S EXHIBIT 45, Deed of

10                          Trust Baker to NL Inc., ADMITTED INTO

11                          EVIDENCE.)

12                          (GOVERNMENT'S EXHIBIT 51, Deed of

13                          Trust Trap Rock to WaMu, ADMITTED INTO

14                          EVIDENCE.)

15                          (GOVERNMENT'S EXHIBIT 53, Deed of

16                          Trust Linday to NL Inc., ADMITTED INTO

17                          EVIDENCE.)

18                          (GOVERNMENT'S EXHIBIT 59, Deed of

19                          Trust Woodforest to Chase, ADMITTED

20                          INTO EVIDENCE.)

21     Q.      BY MR. HALES:  Can you please open your binder, just

22     flip that over.  Do you see Exhibit 45 in front of you?

23     A.      Yes.

24     Q.      If we can put that up.  And if you can look in the

25     upper right.  First, what are these book and page numbers

1    here?

2    A.      The book is the actual date the document recorded, so

3    this would be February 21st of 2008.  And the page is the

4    sequence it was recorded.

5    Q.      And by sequence, you mean that's the page?

6    A.      That's the page number of the document, yes.

7    Q.      Okay.  And when was this document recorded?

8    A.      It recorded at 2:19 and 35 seconds in the afternoon.

9    Q.      On what day?

10   A.      And it was recorded on February 21st of 2008.

11   Q.      And if we zoom back out and look in the upper left,

12   are there mailing instructions?

13   A.      That's correct.

14   Q.      And does the recorder's office maintain an index for

15   documents that have been returned?

16   A.      Once they've gone out into the mail, if they're

17   returned back to us as undeliverable, we do keep them in our

18   grantee-grantor index showing that they were returned.

19   Q.      And for the documents that you have provided in

20   connection with this case, have you checked that index to see

21   if any of them were returned?

22   A.      I did check the index, and they were not returned.

23   Q.      They were not returned.  Okay.  And that includes this

24   document here?

25   A.      Yes.

1    Q.      Okay.  Can we zoom back out, please.

2            And in Sacramento County, is there -- do you also work

3    with what's called a street address and then a legal

4    description?  Do these documents have both of those

5    descriptions for properties?

6    A.      Yes, it does.

7    Q.      Okay.  And what's the distinction between the two in

8    Sacramento County?

9    A.      Well, the legal address is a portion of the document

10   that has their parcel number and then they're metes and

11   bounds of their property, and the property address is the

12   actual address of the property.

13   Q.      Do some documents that are recorded with your office

14   not have a street address on them?

15   A.      That's correct.

16   Q.      But just a legal description?

17   A.      Most of the documents only have a legal description.

18   The deeds of trust, it has the address as well.

19   Q.      Can you look at page 16 of Exhibit 45.  And just by

20   way of example, is this the legal description associated with

21   this deed of trust?

22   A.      Yes, it is.

23   Q.      And these descriptions should be unique within

24   Sacramento County?

25   A.      Yes.

1    Q.      So if you find another document with this same legal

2    description, they relate to the same property?

3    A.      Yes.

4    Q.      Okay.  Can you please turn next to Exhibit 51.  Is

5    this another document that you pulled from the Sacramento

6    County records for this case?

7    A.      Yes, it is.

8    Q.      And when was this document recorded?

9    A.      It was March 5th of 2008.

10   Q.      I'm sorry.  Do you need some water?  We have some.

11   A.      I'm fine.  I'm okay.

12   Q.      And at what time on March 5, 2008?

13   A.      It was 3:14 and 11 seconds in the afternoon.

14   Q.      And if we look, if we zoom back out and look in the

15   upper left-hand corner, do you see mailing instructions on

16   that document?

17   A.      Yes, I do.

18   Q.      And in the ordinary course of the business of your

19   office, would this have been sent out in the mail?

20   A.      Yes, it would.

21   Q.      So you checked the index for this document as well,

22   and it was not sent back?

23   A.      That is correct.

24   Q.      Okay.  Please turn next to Government's Exhibit 53.

25   Is this another deed of trust that you provided in connection

1    with this case?

2    A.      Yes, it is.

3    Q.      And what is the day and year that this was recorded?

4    A.      It was recorded March 28th of 2008.

5    Q.      And if we can zoom back out and look in the upper

6    left.

7            Are there mailing instructions?

8    A.      Yes, there is.

9    Q.      Did the index show that this document had been

10   returned?

11   A.      No, it did not.

12   Q.      Please turn to Exhibit 59 in the binder.  Is this

13   another document you pulled from the Sacramento County

14   Recorder files?

15   A.      Yes, it is.

16   Q.      Okay.  On what date and year was this recorded?

17   A.      It was recorded August 1st of 2008.

18   Q.      And if we zoom back out and look in the upper left of

19   page 1, are there mailing instructions on it?

20   A.      Yes, there is.

21   Q.      Was this document ever returned?

22   A.      No, it was not.

23   Q.      Are grant deeds another one of the genres of documents

24   that you record in your office?

25   A.      Yes, it is.

1    Q.      Did you also pull multiple grant deeds in connection

2    with this case?

3    A.      Yes, I did.

4            MR. HALES:  Your Honor, if I may, I'll move them in in

5    a bunch again.  Government's Exhibits 44 and 44-A, 50 and

6    50-A, 52 and 52-A, and 58 and 58-A.

7            THE COURT:  Exhibits 44, 44-A, 50, 50-A, 52-A --

8    excuse me, 52, 52-A, and 58 and 58-A are all received in

9    evidence.

10                            (GOVERNMENT'S EXHIBIT 44, Grant Deed

11                            Baker to BARE, ADMITTED INTO

12                            EVIDENCE.)

13                            (GOVERNMENT'S EXHIBIT 44-A, Grant Deed

14                            to Frye, ADMITTED INTO EVIDENCE.)

15                            (GOVERNMENT'S EXHIBIT 50, Grant Deed

16                            Trap Rock to BARE, ADMITTED INTO

17                            EVIDENCE.)

18                            (GOVERNMENT'S EXHIBIT 50-A, Grant Deed

19                            to Reynaga, ADMITTED INTO EVIDENCE.)

20                            (GOVERNMENT'S EXHIBIT 52, Grant Deed

21                            Linday to BARE, ADMITTED INTO

22                            EVIDENCE.)

23                            (GOVERNMENT'S EXHIBIT 52-A, Grant Deed

24                            to Lacie Clymer, ADMITTED INTO

25                            EVIDENCE.)

1                              (GOVERNMENT'S EXHIBIT 58, Grant Deed

2                              Woodforest to BARE, ADMITTED INTO

3                              EVIDENCE.)

4                              (GOVERNMENT'S EXHIBIT 58-A, Grant Deed

5                              to Anthony Petri, ADMITTED INTO

6                              EVIDENCE.)

7     Q.     BY MR. HALES:  Can we put 44 and 44-A side by side,

8     please.  Are these both grant deeds that you pulled from the

9     records in connection with this case?

10    A.     Yes, they are.

11    Q.     They are.  Okay.  And if we can look in the upper

12    right of each document.  Were these recorded on the same date

13    at the same time?

14    A.     They were recorded on the same date at the same time,

15    yes.

16    Q.     And if we can zoom back out.  And are there mailing

17    instructions in the upper left-hand corner of each document?

18    A.     Yes, there is.

19           THE COURT:  I'm just curious how they could both be

20    recorded at the same second.

21           THE WITNESS:  What it is is they came in in a batch.

22    Usually with title companies, they'll come in a batch, and we

23    batch them and then record them.  These don't have the

24    seconds behind them.  There would probably be a second or two

25    delay.

1               THE COURT:  Okay.  I missed that.

2               THE WITNESS:  Yeah.

3     Q.      BY MR. HALES:  So this is the mailing information I

4     had just asked about in the upper left?

5     A.      That is correct.

6     Q.      Okay.  And you checked the index for both these

7     documents?

8     A.      Yes.

9     Q.      To see if they'd ever been returned?

10    A.      That is correct.

11    Q.      Were they?

12    A.      No.

13    Q.      Take those down, please.  Can we put 50 and 50-A side

14    by side.

15            Are these also grant deeds that you pulled from the

16    Sacramento County records?

17    A.      Yes, they are.

18    Q.      Can we first look at the recording stamps.  Now, were

19    those documents also recorded on the same day at the same

20    time?

21    A.      Yes, they were.

22            THE COURT:  They are the same second.

23            THE WITNESS:  Yeah, they are.

24            THE COURT:  How does that happen?

25            THE WITNESS:  It's because we examine the documents as

1    a packet.

2              THE COURT:  But how does the stamp get put on them?

3              THE WITNESS:  We record them as a packet.  So they're

4    recording the label.  This probably came in right next to

5    each other.  They're in sequence, so they're recorded at the

6    same time because they were processed at the same time.

7              THE COURT:  I see.

8    Q.    BY MR. HALES:  So is there an employee in the office

9    who can enter the information related to these documents and

10   then the labels print simultaneously?  Is that what's

11   happening?

12   A.    What happens is the examiner will take a packet of

13   documents that are deposited, and they will examine those

14   documents.  Usually it's the title company that brings in a

15   packet.  And they're sequential documents.  So they will

16   examine them, and they -- we have to block the recording time

17   because we have to make sure they record at the same time

18   because they're a block of documents.  If we don't block

19   those, then other documents will come in place of.

20             THE COURT:  So you actually freeze the clock?

21             THE WITNESS:  We do.

22             THE COURT:  Okay.

23             THE WITNESS:  For a period of documents, for a package

24   of documents, yes.

25   Q.    BY MR. HALES:  And if we can -- so these were recorded

1   on March 5th of 2008?

2   A.      Yes, that's correct.

3   Q.      And if we can zoom back out on each of them.

4          Is there mailing information in the upper left-hand

5   corner?

6   A.      Yes, there is.

7   Q.      Okay.  And you checked the index for both of these

8   documents as well to see if they've been returned?

9   A.      That's correct.

10  Q.      And were either of them returned?

11  A.      No.

12  Q.      52 and 52-A, please.  Are these two more grant deeds

13  that you pulled from the Sacramento County Recorder's

14  records?

15  A.      That is correct.

16  Q.      And again, if we can look at the stamps.  Were these

17  both recorded on March 28, 2008?

18  A.      That is correct.

19  Q.      At the same time?

20  A.      Yes.

21  Q.      And if we zoom out again, are there mailing

22  instructions in the upper left of each document?

23  A.      Yes, there is.

24  Q.      And you checked in the index for both of these

25  documents?

1    A.       Yes.

2    Q.       Is there any indication that they'd ever been

3    returned?

4    A.       No.

5    Q.       And then, lastly, if we can look at 58 and 58-A side

6    by side.  Can we look at the stamps first, please.  On what

7    day were these two documents recorded?

8    A.       August 1, 2008.

9    Q.       Were they recorded at the same time?

10   A.       Yes, they were.

11   Q.       And if we zoom back out, in the upper left, are there

12   mailing instructions?

13   A.       Yes, there is.

14   Q.       Did you check the county recorder's index to see if

15   either of these documents had been returned?

16   A.       Yes, and they have not.

17   Q.       They have not.  Okay.

18            MR. HALES:  No further questions, your Honor.

19            THE COURT:  Any cross-examination?

20            MR. WISEMAN:  No, your Honor.

21            THE COURT:  Thank you, Ms. Allred.  You're excused.

22            Call your next witness.

23            MS. HEMESATH:  The United States calls Andy Harrison.

24            THE CLERK:  Sir, please step forward.  Stand next to

25   the court reporter and face me.  Please raise your right

1    hand.

2                     ANDREW JAMES HARRISON,

3    a witness called by the Government, having been first duly

4    sworn by the Clerk to tell the truth, the whole truth, and

5    nothing but the truth, testified as follows:

6              THE WITNESS:  I do.

7              THE CLERK:  Thank you.  You may be seated.

8              THE WITNESS:  Thank you.

9              THE CLERK:  Please state your full name, spell your

10   last name for the record.

11             THE WITNESS:  Andrew James Harrison, H-A-R-R-I-S-O-N.

12                     DIRECT EXAMINATION

13   BY MS. HEMESATH:

14   Q.    Good afternoon, Mr. Harrison.

15   A.    Good afternoon.

16   Q.    Where do you work?

17   A.    I work for the IRS Criminal Investigation Division in

18   Redding, California.

19   Q.    And in what capacity?

20   A.    I'm a special agent, which is a criminal investigator.

21   Q.    How long have you worked there?

22   A.    Since June of 1995, just over 19 years.

23   Q.    What are some of your job responsibilities as a

24   special agent?

25   A.    I investigate allegations pertaining to financial

1    crimes, specifically tax crimes, obviously, being with the

2    IRS criminal division.  And we also investigate crimes in the

3    arena of money laundering and crimes that affect Bank Secrecy

4    Act laws.

5    Q.     What's your educational background?

6    A.     I have a bachelor degree in accounting and then

7    required training for this job.

8    Q.     What type of training?

9    A.     Federal Law Enforcement Training Center where, you

10   know, we received the law enforcement training as well as the

11   specialized training in investigating the financial crimes

12   that we're charged with investigating.

13   Q.     And any training since you attended that initial?

14   A.     Yes.  Not annually, but most years we receive some

15   form of continuing professional education just pertaining to

16   updates in the laws or new investigative techniques.

17   Q.     And do you have experience in conducting financial

18   analyses in connection with the types of investigations that

19   you discussed?

20   A.     I do.  In addition to investigating tax crimes, I've

21   been involved in numerous investigations involving schemes to

22   defraud and the money laundering acts that may or may not be

23   associated with them.

24   Q.     Have you been involved in an investigation of

25   Leonard Williams, Josh Clymer, and Tony Symmes?

1    A.      Yes, I have.

2    Q.      And in what capacity?

3    A.      Primarily reviewing documents to ascertain evidence of

4    a violation of financial crimes.  I've assisted with

5    interviews.  That would be the primary function.  I was

6    called in to not only assist with the interviews but review

7    documents.

8    Q.      As part of your investigation, did you receive copies

9    of the Diamond Hill Financial formation documents?

10   A.      Yes.

11   Q.      If you would look in the binder that's tabbed

12   Government's Exhibit 1.

13   A.      Yes.

14   Q.      Is this a document you received during the course of

15   your investigation?

16   A.      Yes, it is.

17           MS. HEMESATH:  Move to admit Government's Exhibit 1.

18           THE COURT:  Exhibit 1 is received in evidence.

19                        (GOVERNMENT'S EXHIBIT 1, DHF, Inc.

20                        Corporate Documents, ADMITTED INTO

21                        EVIDENCE.)

22   Q.      BY MS. HEMESATH:  What is this document?

23   A.      This is from the Secretary of State registering

24   Diamond Hill Financial as a corporation in Wyoming, the

25   jurisdiction of Wyoming, but this is from California

1    Secretary of State.

2    Q.     All right.  So down here.  And where is this document

3    from?

4    A.     This was obtained from the Secretary of State of

5    California.

6    Q.     Okay.  And if we could look at page 2 of this, please.

7    A.     Yes.

8    Q.     Who is the registered CEO of Diamond Hill Financial?

9    A.     Leonard Williams.

10    Q.     All right.  Go ahead and look at what's tabbed

11    Government's Exhibit 4.

12    A.     Okay.

13    Q.     Do you recognize that document?

14    A.     I do.

15    Q.     Did you obtain that document in the course of your

16    investigation?

17    A.     Yes.

18    Q.     And you recognize this as a corporate document from

19    Diamond Hill Financial?

20    A.     Correct.

21           MS. HEMESATH:  Move to admit Government's Exhibit 4.

22           THE COURT:  Exhibit 4 is received in evidence.

23                        (GOVERNMENT'S EXHIBIT 4, DHF

24                        Resolution for Blanket Authority to

25                        Sell Assets, ADMITTED INTO EVIDENCE.)

1    Q.      BY MS. HEMESATH:  Who is signing this document?

2    A.      Leonard Williams.

3    Q.      And what does this document give Josh Clymer the

4    authority to do?

5    A.      Authority to sell assets.

6            MR. WISEMAN:  Objection.  I'm going to object as to

7    it's an opinion.

8            THE COURT:  Yes.  Sustained.  The answer is stricken.

9    Q.      BY MS. HEMESATH:  All right.  Look at the top portion

10   here.

11   A.      Okay.

12   Q.      In this document, who is being authorized to sell any

13   or -- sell all or any part of the property --

14           THE COURT:  That's the same question.  All he is is an

15   IRS investigator that gets documents from other places.  He

16   has no special ability to read or interpret this document.

17           MS. HEMESATH:  May I ask one follow-up question?

18           THE COURT:  Let's see what it is.

19   Q.      BY MS. HEMESATH:  Do you recognize the name

20   Christopher Washington from your investigation?

21           MR. WISEMAN:  Objection.  Relevancy.

22           THE COURT:  Sustained.

23   Q.      BY MS. HEMESATH:  Go ahead and look at what's tabbed

24   Government's Exhibit 5.

25   A.      Yes.

1    Q.    Do you recognize this document as one received during

2    your investigation, another corporate document?

3    A.    Yes.

4          MS. HEMESATH:  Move to admit Government's Exhibit 5.

5          THE COURT:  Exhibit 5 is received in evidence.

6                          (GOVERNMENT'S EXHIBIT 5, DHF

7                          Resolution to Appoint a Treasurer,

8                          ADMITTED INTO EVIDENCE.)

9    Q.    BY MS. HEMESATH:  And who is signing this document?

10   A.    Leonard Williams.

11         MS. HEMESATH:  All right.  I would ask to publish now

12   Government's Exhibit 61, already in evidence.

13         THE COURT:  Certainly.

14   Q.    BY MS. HEMESATH:  Do you recognize this photograph?

15   A.    I do.

16   Q.    What is the address on this house?

17   A.    7320 Florinda Way in Sacramento.

18   Q.    And is that an address that you recognize from the

19   investigation in this case?

20   A.    Yes.

21   Q.    Are you aware if Diamond Hill Financial ever bought

22   this property?

23   A.    I'm not aware.

24   Q.    Go ahead and turn to Tab 12.

25   A.    Okay.

```
 1    Q.      Do you recognize this?

 2    A.      Yes.

 3            MS. HEMESATH:  Move to admit Government's Exhibit 12

 4    as a certified public record.

 5            MR. WISEMAN:  Can I just know what it is first?

 6            MS. HEMESATH:  It's the Bay Area Secretary of State.

 7            MR. WISEMAN:  No objection.

 8            THE COURT:  Exhibit 12 is received in evidence.

 9                            (GOVERNMENT'S EXHIBIT 12, Bay Area

10                            Real Estate Holdings LLC Corporate

11                            Documents, ADMITTED INTO EVIDENCE.)

12    Q.    BY MS. HEMESATH:  What is this document?

13    A.      This was a document obtained from the Secretary of

14    State pertaining to Bay Area Real Estate, LLC.  It's a

15    domestic limited liability corporation in California.  It

16    says at the time that this document was issued, in good

17    standing.

18    Q.      All right.  If we can look at the next page, please.

19    A.      Yes.

20    Q.      Who registered this company with the State of

21    California?

22    A.      Leonard Williams.

23    Q.      Go ahead and look at what's tabbed 553.

24    A.      Okay.

25    Q.      Do you recognize this document?
```

 1    A.       I do.

 2    Q.       How do you recognize it?

 3    A.       It was in a file that I reviewed.

 4    Q.       Was it a loan file or an escrow file?

 5    A.       Yes.  I believe it was an escrow file or it was an

 6    escrow file that was part of a loan file.

 7             MS. HEMESATH:  Move to admit Government's Exhibit 553

 8    as a certified business record.

 9             THE COURT:  Did you say 53 or 553?

10             MS. HEMESATH:  553, please.

11             THE COURT:  Exhibit 553 is received in evidence.

12                          (GOVERNMENT'S EXHIBIT 553, Fax from

13                          Leonard Williams to escrow officer

14                          dated 2/14/08 with attachments,

15                          ADMITTED INTO EVIDENCE.)

16    Q.       BY MR. HALES:  And this is the fax cover sheet of this

17    document?

18    A.       Correct.

19    Q.       And what is being faxed?

20    A.       Well, the sender is providing the filing with the

21    Secretary of State showing that Bay Area Real Estate is an

22    LLC and then the supporting documents which name the owners

23    of that corporation.

24    Q.       So if we look at page 2.

25    A.       Okay.

1    Q.      What's being faxed is the certified public record with

2    the Secretary of State?

3    A.      Correct.

4    Q.      And let's look at page 4, please.

5    A.      Okay.

6    Q.      What is this portion of the document?

7    A.      The operating guidelines and operational agreement for

8    Bay Area Real Estate, LLC.

9    Q.      And this is also something that was faxed in that

10   package?

11   A.      It was all part of the same fax, yes.

12   Q.      Okay.  And if we look at page 5.

13   A.      Yes.

14   Q.      What does this document indicate is the ownership

15   interest in Bay Area Real Estate?

16           MR. WISEMAN:  Objection.  Speaks for itself, the

17   document.

18           THE COURT:  Sustained.

19   Q.      BY MS. HEMESATH:  And if we look at page 17, please.

20   A.      Okay.

21   Q.      Which members of Bay Area Real Estate signed this

22   document?

23   A.      Leonard Williams.

24           MR. WISEMAN:  Objection.

25           THE COURT:  Is there an objection?

```
 1              MR. WISEMAN:  I'm sorry.  Same objection.  It speaks
 2     for itself.  It's right there.
 3              THE COURT:  Sustained.  This is all the best evidence
 4     rule.
 5     Q.      BY MS. HEMESATH:  Go ahead and turn to Tab 26, please.
 6     A.      Okay.
 7     Q.      Do you recognize this document?
 8     A.      I do.
 9     Q.      What is it?
10     A.      It's the history of the real estate license of
11     Leonard Williams which was obtained from the Bureau of Real
12     Estate in California.
13              MS. HEMESATH:  Move to admit Government's Exhibit 26,
14     a certified public record.
15              MR. WISEMAN:  I'm going to object on relevancy.  It
16     may be a certified record, but it's irrelevant.
17              THE COURT:  Well, I haven't seen it yet.  This is 26?
18     Pertaining to which property?
19              MS. HEMESATH:  This is the licensing certification,
20     your Honor.
21              THE COURT:  Let me look.  If there's no objection as
22     to foundation, I'm going to overrule the relevance objection.
23     Exhibit 26 is received in evidence.
24                              (GOVERNMENT'S EXHIBIT 26, Certified CA
25                              Bureau of Real Estate History
```

 1                      Certification for Leonard Williams,

 2                      ADMITTED INTO EVIDENCE.)

 3   Q.      BY MS. HEMESATH:  Does this document indicate that

 4   Leonard Williams was a licensed real estate person?

 5   A.      Yes.

 6   Q.      Was his license once housed with the broker Great

 7   American Mortgage?

 8   A.      Yes.

 9           MR. WISEMAN:  I'm going to object.  The document

10   speaks for itself.  It is the best evidence.

11           THE COURT:  Sustained.

12   Q.      BY MS. HEMESATH:  And one more.  Let's look at 107,

13   please.

14   A.      Okay.

15   Q.      Do you recognize that?

16   A.      I do.

17   Q.      How do you recognize it?

18   A.      Part of a loan file.

19   Q.      On which property?

20   A.      It was one of Mr. Watson's properties.  It would have

21   been Ceanothus or, I'd have to look, the Rockin M.  I'm not

22   sure which one of those two this was on.

23   Q.      Could it have also been the Gidda Loop?

24   A.      It could have been the Gidda Loop, yeah, Mr. Watson's

25   property, correct.

1        MS. HEMESATH:  I'm going to move to admit 107,

2   certified business record from the Gidda Loop loan file.

3        THE COURT:  Exhibit 107 is received in evidence.

4                         (GOVERNMENT'S EXHIBIT 107, Letter to

5                          Arthur Watson, ADMITTED INTO

6                          EVIDENCE.)

7        THE COURT:  There's no sense in asking him any

8   questions about it.  He really doesn't even know which

9   property it pertains to.

10        MS. HEMESATH:  I'll move on.

11        THE WITNESS:  I believe I saw more than one of these

12   type of documents for this person.

13   Q.     By MS. HEMESATH:  Which bank accounts did you

14   investigate in order to complete your work on this case?

15   A.     I examined U.S. Bank accounts that were in the name of

16   Diamond Hill Financial, a U.S. Bank account, and Bay Area

17   Real Estate.  SAFE Federal Credit Union bank account in the

18   name of Josh Clymer.

19   Q.     And did you also review the loan and escrow files that

20   correspond to the properties in this case?

21   A.     Yes.

22   Q.     And approximately how many pages per loan file?

23   A.     Hundreds, depending on the loan file.

24   Q.     And per escrow file?

25   A.     Similar.  Some might have been short, but the majority

 1    of them were quite voluminous.

 2    Q.      What about county recorder documents, did you review

 3    those?

 4    A.      Yes.

 5    Q.      Did you create summary charts after your review of

 6    those documents?

 7    A.      Yes, I did.

 8    Q.      And do your charts represent your analysis on six of

 9    the properties that you're familiar with based on your

10    investigation in this case?

11    A.      Yes.

12           MS. HEMESATH:  Move to admit Government's Exhibit 802

13    through 807, summary charts.

14           THE COURT:  Those are six charts?

15           MS. HEMESATH:  Yes.

16           THE COURT:  All right.

17           MR. WISEMAN:  Your Honor, my objection, as we stated,

18    the charts are not admissible and shouldn't be admissible.

19    He can testify about them.

20           THE COURT:  Well, the rule provides for charts to be

21    admitted if the underlying documents are made available.

22    What's your objection?

23           MR. WISEMAN:  Well, not only do the underlying

24    documents have to be made available, but the witness in

25    preparing the charts has to testify that he relied upon those

1      documents.

2            THE COURT:  Oh, yes.  Do you want to lay a further

3      foundation as to how it was prepared?

4      Q.      BY MS. HEMESATH:  How did you prepare the charts in

5      this case?

6      A.      In each case the -- anything on that chart represented

7      a number or a date that I saw on a document in either a loan

8      file, a title and escrow file, or county records or a bank

9      record also.

10     Q.      And to determine which dates and numbers were

11     relevant, did you have to review the entire file for those

12     properties?

13     A.      Yes.

14     Q.      And similarly, you reviewed the whole of the bank

15     accounts?

16     A.      Correct.

17            THE COURT:  I'm not sure whether there's still an

18     objection or, if so, what the objection is.  Rule 1006

19     provides that the proponent may use a summary chart or

20     calculation to prove the content of voluminous writings,

21     et cetera, that cannot be conveniently examined in court.

22     The proponent must make the originals or duplicates available

23     for examination or copying, or both, by the other parties.

24     And the court may order that they be produced in court.

25            Is there still an objection?

1                    You're turning the microphone off.

2               MR. WISEMAN:  I think the government's made a

3     sufficient foundation for the admission of the chart.

4               THE COURT:  All right.  Then what are the numbers?

5               MS. HEMESATH:  802 through 807, six charts.

6               THE COURT:  Exhibits 802, 803, 804, 805, 806, and 807

7     are received in evidence.

8                                   (GOVERNMENT'S EXHIBIT 802, Summary

9                                   Chart - Ceanothus, ADMITTED INTO

10                                  EVIDENCE.)

11                                  (GOVERNMENT'S EXHIBIT 803, Summary

12                                  Chart - Rockin M, ADMITTED INTO

13                                  EVIDENCE.)

14                                  (GOVERNMENT'S EXHIBIT 804, Summary

15                                  Chart - Baker Ave., ADMITTED INTO

16                                  EVIDENCE.)

17                                  (GOVERNMENT'S EXHIBIT 805, Summary

18                                  Chart - Trap Rock, ADMITTED INTO

19                                  EVIDENCE.)

20                                  (GOVERNMENT'S EXHIBIT 806, Summary

21                                  Chart - Linday Way, ADMITTED INTO

22                                  EVIDENCE.)

23                                  (GOVERNMENT'S EXHIBIT 807, Summary

24                                  Chart - Woodforest, ADMITTED INTO

25                                  EVIDENCE.)

1    Q.      BY MS. HEMESATH:  And we can start with 802, please.

2    This is a summary chart you made?

3    A.      Yes.

4    Q.      And it corresponds to which property?

5    A.      2640 Ceanothus Avenue.

6    Q.      Who was the buyer on that property?

7    A.      Arthur Watson.

8    Q.      And the seller?

9    A.      Was Tony Symmes, his business Ceanothus Traditions.

10   Q.      And would you, please, beginning here at the top,

11   describe for us what's going on in the box labeled escrow.

12   A.      Sure.  The box is simply to represent what happened

13   within the escrow, the title and escrow company and lender

14   were all aware of.  And in that process, Arthur Watson and

15   Tony Symmes came to an agreement for Mr. Watson to purchase

16   this property for $375,000.  In connection with that sale,

17   Mr. Watson obtained a loan from CIT Group for that amount,

18   $375,000.  That money was wired into the escrow account at

19   Affordable Escrow, the loan from CIT was wired, actually went

20   through a title and escrow company in Chico.

21   Q.      And this arrow over here.

22   A.      Yes.

23   Q.      That shows how much money the seller received in

24   escrow?

25   A.      Yes.

1    Q.      All right.  Then how did you determine that this was a

2    hundred percent financing sale?

3    A.      Well, the loan was the same as the sales price on the

4    HUD-1.

5    Q.      All right.  Now, why don't you describe for us,

6    please, this area that's labeled outside escrow.

7    A.      Sure.  After the seller received his funds, a check

8    was issued for $46,250 to Diamond Hill Financial.  That check

9    was deposited to the Diamond Hill Financial bank account at

10   U.S. Bank.

11           THE COURT:  Who is this picture?  Who is that a

12   picture of?

13           THE WITNESS:  That's Leonard Williams.

14           THE COURT:  All right.  If you say so.

15   Q.      BY MS. HEMESATH:  Where did you obtain that

16   photograph?

17   A.      I believe it's a DMV photograph.

18   Q.      All right.  I believe we left off right here.  Did you

19   see this $46,250 check deposited into the Diamond Hill

20   Financial account?

21   A.      I did.  I did see a check from Tri Counties Bank from

22   Ceanothus Traditions' account payable to Diamond Hill

23   Financial, then saw that check deposited into the Diamond

24   Hill Financial account at U.S. Bank.  And immediately after

25   that, I saw these other checks written, starting on the left

1   with the check to Arthur Watson, who I know is the buyer, and

2   in the memo section, it said consultant on the check that was

3   issued from the Diamond Hill Financial account.

4         There was another $1,300 check issued to Arthur

5   Watson.  And in this instance, the memo section said

6   Ceanothus, so obviously I correlated it to this transaction.

7         There was another check to Arthur Watson for $2,000.

8   It said Ceanothus.  However, this check was issued in July.

9   I believe this check may have actually been in connection

10   with the second property on my second chart, but in an

11   abundance of caution, I actually showed this check here as

12   associated with this property because it said Ceanothus on

13   it.

14   Q.    Okay.  So let me see if I understand.  What criteria

15   did you use to decide what to include in these arrows going

16   out of that $46,000 check?

17   A.    Sure.  Thank you.  Primarily, the memo section if it

18   told me what the check was for and, second, the dates, in

19   that the other checks were issued immediately after the

20   deposit of the $46,250.  So time and memo section.

21   Q.    All right.  And you also saw a check written to

22   Josh Clymer approximate in time to this transaction?

23   A.    Yes, that's correct.

24   Q.    And then how did you calculate this amount over here,

25   "remains in DHF account"?

1    A.      That's just the amount subtracting these other four

2    payments.

3    Q.      And did you look in the Diamond Hill Financial bank

4    account and confirm that that --

5    A.      I did.  I think there was actually a little bit more

6    than that in there.  Maybe there was a small balance prior to

7    that.  But I know that at least that amount was in there

8    subsequent to these checks being issued.

9    Q.      All right.  What did your investigation reveal as to

10   whether this property was defaulted on?

11   A.      It was defaulted on.

12   Q.      All right.  Can we please see Government's

13   Exhibit 803.

14           THE COURT:  Before you get to 803, it may sound like

15   small talk, but I don't think these pictures ought to be part

16   of the exhibit.  The exhibit is supposed to reflect the

17   documents that he reviewed and to be a compilation and

18   explanation of the documents.  I don't think those pictures

19   should be part of it.  So I'm going to instruct the jury to

20   disregard the photographs.  And then when we come to the

21   break later this evening, get those pictures off the

22   exhibits.

23           MS. HEMESATH:  Yes, sir.

24           THE COURT:  All right.

25   Q.      BY MS. HEMESATH:  But if I may clarify, why did you

1    assign only Mr. Williams to the Diamond Hill Financial bank

2    account?

3    A.      It was the only signature on that account.

4    Q.      Okay.  All right.  Chart 803.  Which property does

5    this correspond to?

6    A.      This is 3294 Rockin M Drive in Chico, California.

7    Q.      And why don't you walk us through the escrow box again

8    on this one.

9    A.      Okay.  So similarly, Mr. Symmes, this time through his

10   Rockin M business, sold this property to Arthur Watson.  The

11   agreed upon sales price was $440,000.  For this purchase,

12   Mr. Watson obtained a loan from Novelle Financial Services

13   for $418,000.  The down payment amount that I have listed

14   here is derived from a couple of places.  The settlement

15   statement, there's a difference between the loan and the

16   price, and it lists in there from seller -- excuse me, from

17   buyer, and it had this amount.  That's all I know about that.

18   Q.      On this one how were the loan funds transmitted from

19   Novelle into the title company?

20   A.      Via wire.

21   Q.      All right.  And then the outside escrow portion.

22   A.      Okay.  Similarly here, we have a -- I saw a check

23   issued to Diamond Hill Financial, $30,000.  And I saw that

24   check deposited to the Diamond Hill Financial bank account at

25   U.S. Bank.  And then subsequent to that, I saw a check issued

1    to Josh Clymer in this amount, 4,354.

2           Now, if you look again, what we don't have here is

3    that other check to Mr. Watson for 2,000 I listed on the

4    Ceanothus property.  If you were to add that check to

5    Mr. Clymer's check to the amount that remains in the Diamond

6    Hill Financial account, that would bring you to your 30.  It

7    looks like there's a $2,000 disparity, but because I didn't

8    know which property this $2,000 check was associated with, I

9    attributed it to both.

10   Q.    Okay.  And that's a conservative practice?

11   A.    That would be a conservative, right.  I'm showing that

12   as an expense for the purchase of that property on both

13   sides.  It should only apply to one.  I don't know which one.

14   Q.    Okay.  And so these two numbers added together add up

15   to less than the 30,000, and that's because that $2,000

16   Arthur Watson check could go with this property or it could

17   go with the other one?

18   A.    That's what it is, yes.

19   Q.    Okay.  And we may not have covered this on the

20   previous one, but why is this section here labeled "outside

21   escrow"?

22   A.    This was a concession made by the seller that was not

23   listed anywhere in title and escrow, any documents that the

24   lender would have.  That's why it's separated down here

25   below.

1        MR. WISEMAN:  I'm going to object and move to strike.

2   The witness doesn't know if it was a concession or not

3   outside of escrow.

4        THE COURT:  I don't know what he means by a

5   concession.  Maybe he knows and maybe he doesn't.  I just

6   don't understand what he means by concession.

7   Q.     BY MS. HEMESATH:  Did you see this $30,000 check to

8   Diamond Hill Financial appear anywhere in the escrow file?

9   A.     No.

10  Q.     How about this $22,000 down payment, were you able to

11  review the escrow file for that down payment?

12  A.     I was.  I did not see the 22,000 ever come into the

13  escrow.  I just saw the representation that it was to be

14  funds from the buyer.

15  Q.     All right.  And if we could please move on to Chart

16  804.  For which property is this chart?

17  A.     This is for 4824 Baker Avenue in Sacramento.

18  Q.     And is this a double escrow up here at the top?

19  A.     Yes, it is.

20  Q.     Please explain to us how that worked here.

21  A.     Well, there's two transactions.  In the first

22  transaction, Bay Area Real Estate is purchasing the property

23  from Nha Duong.  And as part of this same escrow, Bay Area

24  Real Estate is selling the property to Mr. Frye.

25  Q.     Is it fair to say that Bay Area Real Estate here is

1    buying this property with this money?

2              MR. WISEMAN:  Objection.  That calls for an opinion.

3              THE COURT:  Well, he's here to give some opinions

4    based on the material he's reviewed.

5              MR. WISEMAN:  Well, he's not a real estate expert, and

6    there's no testimony that he understands double escrows.

7              THE COURT:  You can cross-examine him about that.

8    Maybe you're right.  But I'll overrule the objection.

9              Based upon your review of these records, can you

10   answer the question?

11             THE WITNESS:  Yes, sir.

12             THE COURT:  Go ahead.

13             THE WITNESS:  Yes.  $312,995 is a wire that comes in

14   from First Collateral which was obtained from the loan

15   through NL, Inc.  The HUD-1, I think it's evidence number

16   452, will show this payment, gross amount due to seller,

17   being paid to Mr. Duong.  So from the Chicago Title files, I

18   can see that the money comes in from the loan for Mr. Frye

19   and ultimately ends up paying off the first seller,

20   Mr. Duong.

21   Q.      BY MS. HEMESATH:  All right.  Is there any other

22   source of money into this transaction other than this loan

23   amount and this stated down payment?

24   A.      No.

25   Q.      Okay.  And the two pieces of property are bought and

1    sold on the same day?

2    A.      Yes.

3    Q.      Which day is that?

4    A.      February 21, 2008.

5    Q.      And why is this listed here, stated down payment?

6    A.      Well, there's money that comes, there's 38,000 that

7    comes in from one individual and there's 1,000 that comes in

8    from Mr. Frye.  And that's, in essence, the difference from

9    the loan and the final price after costs are associated with

10   the price of the real estate.

11   Q.      What does this figure here represent, the $50,000

12   check to Bay Area Real Estate?

13   A.      That was a check from this escrow, upon the close of

14   escrow, to Bay Area Real Estate.

15   Q.      And you saw that deposited into the Bay Area Real

16   Estate account?

17   A.      I did.

18   Q.      Okay.  Would it be fair to describe that amount as

19   their profit on this sale?

20           MR. WISEMAN:  Objection.  It calls for speculation.

21           THE COURT:  Overruled.

22           Go ahead.

23           THE WITNESS:  Yes, I believe it is.

24           THE COURT:  You believe it is?

25           THE WITNESS:  Yes.  It's the difference from the price

1    to what proceeds were left at the end of the day.  And after

2    everyone's paid off, that's the money that's left.  That's

3    the profit.

4    Q.      BY MS. HEMESATH:  And then out of the Bay Area Real

5    Estate account, did you see other checks written?

6    A.      I did.

7    Q.      Please describe them.

8    A.      So there was three checks.  The first one for $15,166

9    to Josh Clymer, then there's a check also for $15,166 to

10   Diamond Hill Financial, and there's also a check for 17,859

11   to Josh Frye.

12   Q.      Why did you write "outside escrow" next to the

13   Josh Frye check?

14   A.      Those numbers or payments aren't represented in the

15   escrow anywhere.

16   Q.      Did your investigation reveal if any other checks were

17   written out of the Bay Area Real Estate account that relate

18   to this transaction?

19   A.      Yes, I believe it did.

20   Q.      What checks are those?

21           MR. WISEMAN:  I'm going to object to relevancy.

22           THE COURT:  Overruled.

23           THE WITNESS:  So based on a date and an escrow number

24   in the memo section, I see a $2,000 check issued to Jan

25   Vawter.

```
 1    Q.      BY MS. HEMESATH:  Do you also recognize that name from
 2    your investigation?
 3    A.      Yes, I do.
 4    Q.      What did your investigation reveal as to whether this
 5    property was defaulted on?
 6    A.      It was defaulted on.
 7    Q.      Let's move to 805, please.
 8    A.      Okay.
 9    Q.      This chart corresponds to which property?
10    A.      2976 Trap Rock Way in Sacramento.
11    Q.      Is this another double escrow sale?
12    A.      Yes.
13    Q.      Please walk us through the top portion.
14    A.      Okay.  So Bay Area Real Estate purchases this property
15    on March 5th for an agreed upon price of 279,000 from the
16    seller, CMO Trust.  As part of the same transaction, Bay Area
17    Real Estate sells the property to Mr. Reynaga for a sales
18    price of $420,000.  In connection with this purchase,
19    Mr. Reynaga obtains a loan of 336,000 and --
20    Q.      How were those funds sent into escrow?
21    A.      Via wire.
22    Q.      All right.  And then those are the funds that are used
23    to complete the sale on the first portion of the escrow?
24    A.      Yes.
25    Q.      All right.  What does this $40,000 wire to Bay Area
```

1    Real Estate represent?

2    A.      The remainder of the funds out of escrow.  The profit

3    to Bay Area Real Estate.

4    Q.      And then did you see these two checks written out of

5    the Bay Area Real Estate bank account?

6    A.      Yes, I did.

7    Q.      And why did you attribute them to the sale?

8    A.      The check for $16,540 to Mr. Clymer, in the memo

9    section, it stated Reynaga.  And the $16,540 check to Diamond

10   Hill Financial, it stated Trap Rock in the memo section.

11   Q.      Any other checks that correspond to this transaction

12   that you'd like to note?

13   A.      Well, there is perhaps one.  I see a check, by date,

14   it's dated March 6th to James P. Ludes for $5,000, and it

15   says Reynaga in the memo section.  I don't know what it's

16   for.

17   Q.      Do you recognize that name from your investigation?

18   A.      I heard the name.  I don't know anything about this

19   person.

20   Q.      All right.  If we could please see Chart 806.  Which

21   chart does this -- or which property does this chart

22   correspond to?

23   A.      11516 Linday Way in Gold River.

24   Q.      And who is the buyer on that property?

25   A.      On March 28, 2008, Bay Area Real Estate purchases this

1    property from EDHC.  And as part of that same transaction on

2    that same date, this property is sold by Bay Area Real Estate

3    to Lacie Clymer for $478,000.

4    Q.      And how were the funds sent from the lender into

5    escrow?

6    A.      Via wire.

7    Q.      And then, once again, these funds are used to pay off

8    the first leg of the transaction?

9    A.      That's correct.

10   Q.      What does this sum represent?

11   A.      The profit to Bay Area Real Estate for the sale to

12   Lacie Clymer.

13   Q.      And how is that sent to the Bay Area Real Estate bank

14   account?

15   A.      Via wire.

16   Q.      And then two checks back out of the Bay Area Real

17   Estate bank account?

18   A.      That's correct.

19   Q.      To whom?

20   A.      The first check for 36,258 was to Josh Clymer, and the

21   other check for 9,500 was to Lacie Clymer.  And both of these

22   checks in the memo section was written 11516 Linday.

23   Q.      All right.  And why did you write outside escrow next

24   to this one?

25   A.      There's no indication of these payments within the

1     escrow file.

2     Q.       What did your investigation reveal as to whether this

3     property was defaulted on?

4     A.       It was.

5     Q.       And, finally, let's look at 807.

6     A.       Okay.

7     Q.       Which property does this correspond to?

8     A.       5548 Woodforest Drive in Sacramento.

9     Q.       Another double escrow property?

10    A.       Yes.

11    Q.       Who is the buyer on this one?

12    A.       Bay Area Real Estate once again is the first buyer,

13    buying it from Lehman Brothers for $179,000.  And as part of

14    this same transaction, Bay Area Real Estate is selling it to

15    Mr. Petri for $300,000.

16    Q.       And how does the money flow through this transaction?

17    A.       The loan is obtained of $240,000, which is wired into

18    the escrow account, and those funds are then used to pay off

19    Lehman Brothers for the first purchase.

20    Q.       And down here, why did you attribute two wires to

21    this?

22    A.       Well, there were two wires out of this escrow.  Both

23    going to Bay Area Real Estate, both going to the same account

24    at U.S. Bank.

25    Q.       And then you saw these checks come out of the Bay Area

1    Real Estate account?

2    A.     Yes.  Those two checks, 5,000 to Diamond Hill

3    Financial and 11,599 to Diamond Hill Financial, I attribute

4    those by date and amount because the amount, if you add it

5    up, they're the same as the amount issued on the other check

6    to Josh Clymer.  And on that one, the memo section, it does

7    say 5548 Woodforest.

8          MS. HEMESATH:  All right.  If we can please pull up

9    Government's Exhibit -- is 717 in evidence?

10         THE CLERK:  What did you say?  I'm sorry.  7 what, 17?

11         MS. HEMESATH:  Yes.

12         THE CLERK:  717.

13   Q.     BY MS. HEMESATH:  All right.  So this is one of the

14   checks?

15   A.     Yes.

16   Q.     And then this is written out of the Bay Area Real

17   Estate account into the Diamond Hill account?

18   A.     Yes.

19   Q.     And if we could see 716.

20          This is the other check written that corresponds to

21   the same transaction?

22   A.     Yes, that's correct.

23   Q.     And it goes from which account to which account?

24   A.     It's issued from the Bay Area Real Estate Holdings

25   U.S. Bank account payable to Diamond Hill Financial, which is

1    then deposited into the Diamond Hill Financial account also

2    at U.S. Bank.

3    Q.      And 718, please.

4    A.      So this is a check from Bay Area Real Estate Holdings,

5    LLC.

6            MR. WISEMAN:  I'm going to object, your Honor.  The

7    document speaks for itself.  It's already in evidence.  Best

8    evidence rule.

9            THE COURT:  Well, I don't know what he's going to say

10   about it.  If he's going to tie it in to one of these charts,

11   then that's a different question.

12   Q.      BY MS. HEMESATH:  Is this check represented on the

13   chart we just saw?

14   A.      Yes.

15   Q.      And is 719 in evidence?  All right.  Let's see 719.

16           Does part of your training include the tracing of

17   money in bank accounts?

18   A.      Yes.

19   Q.      Please describe what that is for us.

20   A.      This is the bank statement for the period of time that

21   encompassed those transactions that we just discussed,

22   including the two deposits from the title company.  One for

23   15,000.  Yes, right there.  Those two deposits were received

24   as evidenced by this bank statement as well as the checks

25   that we just identified were issued, and the dates and the

1    issuance of these checks is confirmed on these statements.

2    Q.    So the top portions here where it says wire credit and

3    wire credit, that's the money coming into which bank account?

4    A.    That's the money coming into the Bay Area Real Estate

5    U.S. Bank account.

6    Q.    Okay.  And then down here in the check section, are

7    these those checks that we just saw?

8    A.    Yes.

9    Q.    On your chart.  And then also some additional checks

10   not on your chart?

11   A.    Yes.

12   Q.    Okay.  Are there any other sources of money into this

13   bank for this month?

14   A.    Not in this period.  If you were to scroll up just a

15   touch, you'd see that the starting balance prior to those

16   deposits $35.49.

17   Q.    Can we catch a little bit what's to the left of that.

18        Walk us through that again, please.  What's the

19   beginning balance of the bank account?

20        MR. WISEMAN:  Again, I'm going to object as to

21   relevance and the fact that the document speaks for itself.

22        THE COURT:  No.  Overruled.

23        THE WITNESS:  Sure.  The beginning balance on

24   August 1st is $35.49.

25   Q.    BY MS. HEMESATH:  And then the deposits in?

1    A.       $44,174 which is represented by those two deposits we

2    just discussed from wires in from the escrow company.

3    Q.       And then the checks paid out?

4    A.       Yes.

5    Q.       How much?

6    A.       $44,174.22.

7    Q.       And then how much is left in the bank account at the

8    end of the month?

9    A.       $35.41.

10   Q.       Is it fair to say that the majority of the checks

11   going out, the money, is the 5,000, 11,000, and $16,000

12   checks that are represented on your chart?

13   A.       Yes.

14   Q.       And if we could see 807 one more time.  That's these

15   checks down here?

16   A.       Correct.

17   Q.       Did your investigation reveal whether this property

18   was defaulted on?

19   A.       It did.  It was.

20   Q.       Did you have occasion to interview Mr. Williams in

21   connection with your investigation of this case?

22   A.       Yes, I did.

23   Q.       When did that interview take place?

24   A.       I believe it was in 2009, perhaps March of 2009.

25   Q.       Would it refresh your recollection to review -- did

1    you memorialize that interview when it occurred?

2    A.      I did.

3    Q.      And would it refresh your recollection to review?

4    A.      Sure.  Okay.  Yes, March 19th of 2009.

5    Q.      Did you ask Leonard Williams whether he was the

6    president of Diamond Hill Financial?

7    A.      Yes.

8    Q.      What was his answer?

9    A.      That he was or is at the time.

10   Q.      Did you ask him if he knew Garret Gililland?

11   A.      Yes.

12   Q.      And what was his answer?

13   A.      He knew Garret Gililland.

14   Q.      Did he tell you whether he did any deals with

15   Garret Gililland?

16   A.      Yes.  He told me he did two homes deals with

17   Mr. Gililland.

18   Q.      And who did he say was the buyer on those deals?

19   A.      Arthur Watson.

20   Q.      Was Mr. Williams asked whether Arthur Watson worked

21   for him at Diamond Hill Financial?

22   A.      Yes.

23   Q.      And what was his answer?

24   A.      He told me that he did work for him at Diamond Hill

25   Financial.

1    Q.    Was Mr. Williams asked about the loan applications for

2    the Ceanothus and Rockin M properties?

3    A.    Yes, as pertaining to the amounts indicated on

4    Watson's loan applications as income.

5    Q.    What did he tell you with regard to whether those were

6    truthful income amounts?

7    A.    He said that was accurate.

8    Q.    Was Mr. Williams asked whether he received money from

9    the Ceanothus and Rockin M deals?

10   A.    Yes.

11   Q.    How much did he say he received?

12   A.    He said he received two checks for $76,000.

13   Q.    Did he tell you whether he knows Mr. Symmes

14   personally?

15   A.    He did not know Mr. Symmes personally.

16   Q.    Did he tell you how he received those checks?

17   A.    He told me he received those checks through the mail.

18   That was agreed upon with Mr. Gililland.

19   Q.    Was Mr. Williams asked a second time in this interview

20   whether Arthur Watson worked for Diamond Hill Financial and

21   was paid as indicated on the loan applications?

22   A.    Yes.

23   Q.    And what was his answer?

24   A.    He again responded in the affirmative.

25         MS. HEMESATH:  No further questions.

1          THE COURT:  All right.  Let's see if we can get

2     started with the cross-examination before we have to adjourn.

3          Mr. Wiseman.

4          MR. WISEMAN:  May I have a moment, your Honor?

5          THE COURT:  Yes.

6                      CROSS-EXAMINATION

7     BY MR. WISEMAN:

8     Q.    Good afternoon, Agent Harrison.

9     A.    Good afternoon.

10    Q.    I pronounced it right, Harrison?

11    A.    Yes, sir.

12    Q.    Now, in your investigation of this case, you came to

13    learn, did you not, that there were essentially two types of

14    deals that this case represents; correct?

15    A.    Yes, sir.

16    Q.    There was the Tony Symmes transactions; correct?

17    A.    Correct.

18    Q.    And there were the transactions that occurred in the

19    Sacramento area; correct?

20    A.    Yes, sir.

21    Q.    And in your review of the voluminous title documents

22    and escrow files and loan documents for the Ceanothus and

23    Rockin M transactions, right, those transactions, the

24    substance of which were different than the Sacramento

25    transactions; correct?

```
 1    A.      I actually think they were very similar.

 2    Q.      Well, let me ask you this.  In the Symmes

 3    transactions, the property went from Tony Symmes to the

 4    buyer; correct?

 5    A.      Correct.

 6    Q.      And, for example, with Ceanothus, it was Tony Symmes'

 7    company, Ceanothus Traditions or whatever it was called, to

 8    Mr. Watson; correct?

 9    A.      Yes, sir.

10    Q.      Likewise with Rockin M, it was the transaction from

11    Rockin M, Inc., or whatever Mr. Symmes called it, to

12    Mr. Watson; correct?

13    A.      That's correct.

14    Q.      So those were just, for lack of a better description,

15    a typical real estate transaction; correct?

16    A.      Okay.

17    Q.      Okay.  And so the deeds --

18    A.      I appreciate what you're saying there, yeah.

19    Q.      The deeds reflected that, right, that you reviewed?

20    A.      Right.

21    Q.      Whereas the transactions in the Sacramento area which

22    occurred in 2008, all the transactions you've talked about

23    occurred in 2008; correct?

24    A.      Yes, sir.

25    Q.      Those were, as you described it, a double escrow;
```

1    right?

2    A.       Yes, sir.

3    Q.       And it's also described as a concurrent transaction;

4    correct?

5    A.       Okay.  Yes, sir.

6    Q.       So you had a situation where simultaneously there were

7    essentially two transactions occurring; correct?

8    A.       Yes, sir.

9    Q.       Okay.  So on one side, there would be a seller who

10   would be selling a piece of property to, for example, Bay

11   Area Real Estate; correct?

12   A.       Yes.

13   Q.       And then simultaneously, Bay Area Real Estate would be

14   selling to a buyer; right?

15   A.       Right.

16   Q.       Okay.  And that double escrow or concurrent

17   transaction is, likewise, reflected in the county recorder

18   documents that you looked at in your comprehensive

19   investigation; correct?

20   A.       Yes, sir.

21   Q.       Okay.  Now, sir, you mentioned when you were asked a

22   question with your charts about the flow of money, and you

23   used the word profit; right?

24   A.       Yes, sir.

25   Q.       Now, you're trained as an accountant; correct?

1    A.      Yes, sir.

2    Q.      You understand what the concepts of accounting are;

3    correct?

4    A.      Yes, sir.

5    Q.      And isn't the notion or the term profit a term of art

6    in accounting?

7    A.      Yes, sir.

8    Q.      So would it be more accurate to say the money that

9    went to Bay Area Real Estate -- I'll slow down -- were simply

10   the proceeds of the transaction; correct?

11   A.      They were the proceeds.  And I would, if this helps

12   you out, I'd call it gross profit from the purchase price to

13   the sales price.  That would be the gross profit.  There

14   could be other expenses there I don't know about.

15   Q.      And so we don't know if the amount represents merely

16   gross profit or net profit; right?

17   A.      Right.  I just can say that on this transaction, that

18   was the profit that went out to either Bay Area Real Estate

19   or Diamond Hill Financial.

20   Q.      Would it be fair to say it was simply the proceeds of

21   the transaction that went to Bay Area Real Estate?

22   A.      That would also be fair.

23   Q.      Okay.  And it is correct that with respect to the

24   Tony Symmes transactions, I'll call them the Chico

25   transactions; right?

1    A.       Yes.

2    Q.       Because those occurred up in Chico; right?

3    A.       Yes, sir.

4    Q.       That Bay Area Real Estate was not involved in those

5    transactions; correct?

6    A.       Correct.

7    Q.       Okay.  And in your investigation, did you learn that

8    Josh Clymer did not intend to engage in those Chico

9    transactions?

10   A.       I don't recall.

11   Q.       Did you interview Mr. Clymer?

12   A.       I was not in on that interview.

13   Q.       Did you have any opportunity to speak to Mr. Clymer

14   about this investigation?

15   A.       I reviewed the memoranda.  I'm just trying to think as

16   to what -- I'd have to refresh and look at it.

17   Q.       Okay.  Let me see if I can -- if you saw the

18   memorandum of the interview, would it help your recollection?

19   A.       Yes, sir.

20            MR. WISEMAN:  Okay.  May I approach, your Honor?

21            THE COURT:  Do you know what he has there?  All right.

22   You may approach the witness.

23            MR. WISEMAN:  Excuse me, your Honor.  Let me get the

24   pinpoint cite.

25   Q.       BY MR. WISEMAN:  Sir, I want to just direct your

1     attention to page 4 of that document.

2     A.      Okay.

3     Q.      And take a look at that and tell me if it refreshes

4     your recollection about anything that Mr. Clymer may have

5     said.

6              MS. HEMESATH:  Objection.  Hearsay.

7              THE COURT:  Why isn't that hearsay, Mr. Wiseman?  It's

8     different when it's offered by the defendant than when it's

9     offered by the government.

10             MR. WISEMAN:  Well, your Honor, I'm trying to see if

11    this refreshes his recollection about -- I'm not asking for

12    the truth of the matter asserted.  Well, perhaps we should

13    just let him see if his recollection is refreshed, and then

14    we can move from there.

15             THE COURT:  Go ahead.  But it sounds like it's going

16    to be hearsay.

17             MR. WISEMAN:  Okay.  Let's see.

18             THE WITNESS:  Yes, it's coming back to me.

19    Q.      BY MR. WISEMAN:  Okay.  So your recollection is

20    refreshed.  Now, based upon your refreshed recollection, did

21    you come to learn that Mr. Clymer was not involved with the

22    Chico transactions, specifically Ceanothus and Rockin M?

23             MS. HEMESATH:  Objection.  Hearsay.

24             THE COURT:  Sustained.

25    Q.      BY MR. WISEMAN:  In your investigation of the

1    Ceanothus and the Rockin M transactions, it's correct to say

2    that they were involved with Diamond Hill Financial; correct?

3    A.     My investigation showed that Clymer also received some

4    money on these transactions.

5    Q.     Well, he may have received money through your

6    investigation, but the transactions themselves were with

7    Diamond Hill Financial; correct?

8    A.     Correct.

9    Q.     And you testified that you had an interview with

10   Mr. Williams; correct?

11   A.     Yes.

12   Q.     And that interview was memorialized in a memorandum of

13   interview; correct?

14   A.     Yes.

15   Q.     Okay.  And those -- by the way, was that interview you

16   had with Mr. Williams recorded in any fashion?

17   A.     Not to my knowledge.

18   Q.     Is it your habit as a special agent with the Criminal

19   Investigation Division to record any interviews?

20   A.     We don't record interviews unless there's an

21   authorization to do it.

22   Q.     So you typically don't record the interviews?

23   A.     I don't.

24   Q.     So your recollection of what Mr. Williams said is

25   based upon essentially your recollection and your memorandum?

1    A.      Yes, sir.

2    Q.      Okay.  And were you able to -- well, strike that.  In

3    your investigation -- may I approach the witness, your Honor?

4    I may need the document back.

5            THE COURT:  Get it back?  Yes.

6    Q.      BY MR. WISEMAN:  And in your investigation, sir, did

7    you investigate any alleged gift that was involved in one of

8    the Sacramento properties?

9    A.      Yes.  I believe there was a report of a gift on one of

10   the deals.

11   Q.      And did you come to learn that the gift dealt with an

12   Anthony Petri and the Woodforest property?

13   A.      Yes.

14   Q.      Okay.  And did you come to learn that it was

15   Josh Clymer's mother who was --

16           MS. HEMESATH:  Objection.  Hearsay.

17           THE COURT:  Let's hear the question.

18   Q.      BY MR. WISEMAN:  Did you come to learn that

19   Josh Clymer -- strike that.  Let me start it this way.

20           Have you ever heard in your investigation the name

21   Wendy Clymer?

22   A.      Yes.

23   Q.      What is your understanding of Wendy Clymer's role, if

24   any, in this case?

25   A.      Josh Clymer's mother.

1     Q.     Okay.  Josh Clymer's mother.  And in your

2     investigation, did you come to learn that it was Josh

3     Clymer's mother who represented Mr. Petri or Petri in his

4     transaction on Woodforest?

5     A.     I believe that it was her phone number that was used

6     as some kind of a -- perhaps for verification on the

7     representation that was made to the title and escrow company

8     and ultimately the lender that this gift was, in fact, a

9     gift.

10    Q.     Okay.  Let's break that down for a minute.  Let me go

11    back to my first question, and then I'll parse it into the

12    other question.

13    A.     Okay.

14    Q.     In your investigation, did you learn, just yes or no,

15    did you learn that Josh Clymer's mother, Wendy, represented

16    Mr. Petri in his transaction to purchase Woodforest?  Did you

17    learn that it was Mrs. -- that it was Wendy Clymer who was

18    Anthony Petri's real estate agent?

19    A.     Okay.  Yes.

20    Q.     Okay.  Did you also learn in your investigation that a

21    telephone number that was listed, noted on a letter, a gift

22    letter, was purported to say that Mr. Petri's mother gifted

23    him money to purchase that property?

24    A.     Yes.

25    Q.     You're with me; right?

1    A.      Yep.

2    Q.      Did you learn that the telephone number was associated

3    with Wendy Clymer?

4    A.      Yes, sir.

5            MR. WISEMAN:  Thank you.

6            THE COURT:  All right.  It's 4:30.  I know I rode you

7    a little hard today, ladies and gentlemen, but I'm trying to

8    move this case along.  We'll break for the evening and resume

9    tomorrow morning at 9:00 o'clock.

10           Have a nice evening.  Remember the admonition.

11           (Jury not present.)

12           THE COURT:  The jurors are outside the courtroom.

13   Now, Counsel, with regard to these summary charts, if

14   Mr. Wiseman doesn't care, I'm not going to order you to do

15   anything with regard to the pictures.  But unless he agrees

16   to leave the pictures on there, I don't think it's a good

17   idea.  They're not part of the records that he reviewed, and

18   putting a picture of Mr. Williams whenever he has Diamond

19   Hill Financial could be prejudicial as well as putting

20   pictures of both Clymer and Williams whenever he has Bay Area

21   Real Estate may be prejudicial.

22           So unless Mr. Wiseman wants them to stay on there, I'm

23   going to ask you to redo those, and wherever you have that

24   Diamond Hill Financial, just have Diamond Hill Financial and

25   not a picture of Mr. Williams, and then wherever you have Bay

1    Area Real Estate, just write a box with Bay Area Real Estate

2    in it and not a picture of Clymer and Williams.

3            MR. WISEMAN:  Your Honor, I agree, and I would make

4    that request of the government to redact the photos.

5            THE COURT:  All right.  So you have the evening, and

6    whoever the artist was that put it together for you can redo

7    it.

8            MS. HEMESATH:  Your Honor, I think there's a

9    foundation for including the photos.  The bank signature

10   cards are what we used to attribute those people to those

11   bank accounts.

12           THE COURT:  Well, unless he testifies that he got

13   those pictures from the bank records.  He said he got it from

14   DMV.  Unless he testifies that those are the pictures that

15   came from the bank records, then it's not part of the bank

16   records.  And under the rule, this exhibit is supposed to

17   summarize the records, not editorialize on them.

18           MR. WISEMAN:  And I think, your Honor, that's -- I was

19   going to renew my objection to the admissibility of the

20   charts.  Certainly I think they can be used to illustrate the

21   witness's testimony, but having them go into the jury room as

22   an exhibit, I would --

23           THE COURT:  Well, that's what Rule 1006 talks about.

24   It talks about actually putting them in evidence.

25           MR. WISEMAN:  That's my understanding of the rule, but

1  the foundation, and I reread it briefly, the foundation is

2  that the underlying documents are such that they cannot be

3  conveniently reviewed by the jury.

4      THE COURT:  No, he said that.  He said there were

5  volumes and volumes of records.

6      MR. WISEMAN:  Understood, your Honor.  But my point is

7  this.  He's testifying about volumes of records; however, the

8  underlying records, the important ones at least, are already

9  in evidence that will go before the jury.

10     THE COURT:  That's a good point.  Let me ask

11  government counsel here.  Mr. Wiseman makes the point that

12  you're not summarizing all these voluminous records.  What

13  you're, in effect, summarizing is the exhibits that are

14  already in evidence.

15     MS. HEMESATH:  No, your Honor.  The escrow leg on the

16  charts for the first leg of the escrow, none of those are in

17  evidence and, similarly, some of the wires are not in

18  evidence.  So this was based on his summary review of those

19  escrow files.

20     THE COURT:  All right.  Well, it's almost an academic

21  distinction because even where an expert witness such as this

22  summarizes only exhibits that are in evidence, they are

23  allowed to use a chart like this.  And then the only

24  difference is it's technically not in evidence, but they're

25  allowed to show it to the jury.  So it's almost an academic

1    distinction whether you say it's evidence or whether you say

2    it's something that he shows to the jury.

3          MR. WISEMAN:  Your Honor, it may be academic, but I

4    think it may have real practical effects because this is a

5    document, if the Court allows its admissibility, is going to

6    go into the jury room which may create a situation where the

7    jurors are reluctant to go to the underlying documents.  I

8    respectfully disagree with counsel's representation.  I think

9    most of the stuff that is represented in the chart is based

10   upon documents --

11         THE COURT:  Why don't we talk about this later and

12   give you a chance, Mr. Wiseman, to consider what the

13   government has said about whether this does or does not, in

14   fact, summarize only exhibits that are in evidence.  And then

15   for either that reason or other reasons, we can discuss

16   whether those charts ought to go into the jury room.  There

17   might be other reasons why the Court would not send the

18   charts into the jury room.  It may place too much stress on

19   some exhibits as opposed to others, and there are reasons

20   that the Court might consider whether to send those charts

21   into the jury room.  So we'll talk about that later.  I have

22   not yet decided.

23         MR. WISEMAN:  Understood.  Thank you, your Honor.

24         MR. HALES:  May I make one point and ask one question,

25   your Honor?

```
 1              THE COURT:  Yes.

 2              MR. HALES:  Sorry to try your patience.

 3              THE COURT:  It's not my patience.  I'm worried about

 4    the reporter.

 5              MR. HALES:  On the charts themselves, if we take out

 6    the pictures, can we put the names associated with Diamond

 7    Hill based on the foundation that he has reviewed the

 8    signature card?  And only Mr. Clymer and Mr. Williams are on

 9    that signature card.

10              THE COURT:  No, no.  You put the name of the

11    corporation on there, and you have him testify, as he already

12    has with regard to one of those corporations, that the only

13    name on the signature card is Williams or that the two names

14    on the cards are Clymer and Williams, whatever.  Have him

15    testify to that.  And, you know, the jury can remember

16    things.  They don't have to have everything written on a

17    piece of paper for them.

18              MR. HALES:  I just wanted to make sure I understood

19    what the Court was saying.  The other point was that one of

20    the things Mr. Harrison testified about was that, for

21    example, the cash back, where he put outside escrow, that

22    there was no mention of that in the entire escrow file.

23    Those files are hundreds of pages.  So to establish that and

24    to actually show the jury that based on documents is, is it

25    on page 447, is it on page 448, and go through the whole
```

1    thing.

2          THE COURT:  That's a good reason for saying that it

3    comes in under Rule 1006 rather than as a demonstrative

4    exhibit.  But think about that, and I'll give it some careful

5    thought before I decide whether it goes in the jury room.

6          MR. HALES:  Thank you.

7          (Proceedings concluded at 4:36 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          I certify that the foregoing is a correct transcript

2      from the record of proceedings in the above-entitled matter.

3

4

5                              /s/ Kelly O'Halloran

6                              KELLY O'HALLORAN, CSR #6660

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25