IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

---oOo---

BEFORE THE HONORABLE WILLIAM B. SHUBB, JUDGE

---oOo---

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                No. 2:08-cr-376 WBS

LEONARD WILLIAMS,

        Defendant.

_____/

---oOo---

REPORTER'S TRANSCRIPT

JURY TRIAL

VOLUME 5

WEDNESDAY, JULY 23, 2014

---oOo---

Reported by:      KELLY O'HALLORAN, CSR #6660

APPEARANCES

For the Plaintiff:


        UNITED STATES ATTORNEY'S OFFICE
        501 I Street, Suite 10-100
        Sacramento, CA  95814
        BY:  CHRISTOPHER HALES
             AUDREY B. HEMESATH
             Assistant U.S. Attorneys

For the Defendant:

        WISEMAN LAW GROUP, P.C.
        1477 Drew Avenue, Suite 106
        Davis, CA  95616
        BY:  JOSEPH J. WISEMAN, Attorney at Law
             JENNIFER NOBLE, Attorney at Law

INDEX

|                                           | PAGE |
|-------------------------------------------|------|
| Government rests                          | 909  |
| Rule 29 motion                            | 925  |
| Settlement of instructions                | 930  |
| Government closing argument               | 954  |
| Defense closing argument                  | 991  |
| Government rebuttal closing argument      | 1016 |

                          SACRAMENTO, CALIFORNIA

                   WEDNESDAY, JULY 23, 2014, 9:00 A.M.

                              ---oOo---

1    (Jury present.)

2        THE COURT:  Good morning, ladies and gentlemen.

3    Everyone is present and appears ready to go.

4        Mr. Wiseman, you were in the process of

5    cross-examining Mr. Harrison.

6        MR. WISEMAN:  Your Honor, I have no further questions

7    for Mr. Harrison.

8        THE COURT:  No further questions.  Any redirect?

9        THE DEFENDANT:  My apologies.  Your Honor, the Court

10   needs to be made aware that at 8:57 last night, I received an

11   email from Joseph Wiseman that said he was not going --

12       THE COURT:  Just a minute.  I'm going to ask you to

13   address me outside the presence of the jury.  All right?  And

14   when I speak, you stop speaking.

15       THE DEFENDANT:  Your Honor, he said he wasn't going to

16   put on a defense.

17       THE COURT:  Would you please wait until I excuse the

18   jury?  Ladies and gentlemen, please step outside.  Remember

19   the admonition.  Disregard what has gone on since you came in

20   the courtroom.

21       THE DEFENDANT:  If you believe in the America I

22   believe in, please don't participate in this railroad.

1              (Jury not present.)

2              THE COURT:  Mr. Hales, I would like to have your

3    advice on what you think I should do in response to this

4    outburst.  And I'll give you some time to think about it,

5    maybe consult with somebody else in your office, because I

6    want to do the right thing.

7              MR. HALES:  Thank you, your Honor.

8              THE COURT:  We'll take a five-minute recess.

9              (Recess taken.)

10             (Jury not present.)

11             THE COURT:  We're meeting outside the presence of the

12   jury.  The defendant is present.  The reason for the extended

13   delay was that I wanted to make sure that there were enough

14   security officers in the courtroom to preserve order in the

15   event that things became disrupted again.

16             Now, I asked you to tell me what you think I ought to

17   do about this, Mr. Hales.

18             MR. HALES:  Yes, your Honor.  Mr. Wiseman advised me

19   that he's likely to ask for a mistrial.  The government's

20   position is that there are no grounds for a mistrial at this

21   time.  The defendant cannot invite a mistrial by his own

22   conduct.

23             Our belief is that there should be a curative

24   instruction given at some point.  We don't have the language

25   on that.  And if the Court was inclined to give one now, we

1    could go downstairs and draft it.

2         THE COURT:  Well, instinctively I told the jury to

3    disregard what went on.  I tried my best to shut him up, and

4    he just kept yelling into the microphone, and I tried to yell

5    louder, and he just kept getting louder and louder, and he

6    wouldn't stop.  And then as the jury was filing out, he

7    continued to stand up, look at the jury, and shout at them.

8         MR. HALES:  It was at least apparent to the government

9    counsel, your Honor, that the Court was simply trying to

10   preserve order in the face of all that.  And the government

11   counsel, we observed the same things you just described that

12   happened.  One additional suggestion we had is that the

13   defendant be admonished not to do this again.  And if there

14   are further disruptions, something that can be done is that

15   he can be removed from the courtroom and be forced to watch

16   the proceedings remotely if order can't be maintained in the

17   courtroom.  And I think that would be appropriate because,

18   frankly, the government's assessment of this is that it's at

19   least in part designed to create exactly this kind of

20   problem.

21        THE COURT:  Not in part.  In total.

22        MR. HALES:  In total to create --

23        THE COURT:  This is an educated man.  This is not some

24   ignorant defendant.  He has been involved in the system now

25   for a long time.  I have no doubt that this was a deliberate

1    effort to create a mistrial.

2            Mr. Wiseman, what did you want to say?

3            MR. WISEMAN:  Your Honor, I think the Court did what

4    it -- I agree with government's counsel about the Court's

5    response to the outburst.  Nevertheless, I am compelled to

6    ask for a mistrial because of the effect of the outburst on

7    the jury.  As the Court knows, what he said is that he's --

8    I'm paraphrasing -- sounds like he's getting railroaded.  And

9    that not only do I think his comments and outbursts

10   prejudiced the jury against him, but I think his comments and

11   outbursts prejudiced the jury against me in the sense that

12   now I have to do a closing argument, the jury knowing that

13   this individual has no respect for what I'm doing, and I'm

14   completely undermined.

15           THE COURT:  But what's your answer to the government's

16   point that the defendant can't create a mistrial by his own

17   misconduct?  The system would never function.  We're back to

18   the Chicago Seven, or whatever it was, back in '60s.

19           MR. WISEMAN:  Your Honor, I understand the Court's

20   point.  I haven't had an opportunity to do the research on

21   that exact point on an invited mistrial by the defendant, but

22   I don't believe that it was a deliberate -- just my sense of

23   seeing the outburst, it was a deliberate, calculated attempt

24   to derail the trial.

25           THE COURT:  Well, here's in part the reason I come to

 1    that conclusion.  He had all night and this morning before

 2    trial to talk to you about whether you were going to

 3    cross-examine this witness, whether you were going to put on

 4    a defense, whether he was going to testify, and any other

 5    details that he wanted to talk to you about.  And my

 6    observation is that, as he told me, there is now good

 7    communication between you and him.

 8           THE DEFENDANT:  May I address your Honor?

 9           THE COURT:  No.  And if you continue to disrupt these

10    proceedings, Mr. Williams, you're going to leave in shackles.

11           MR. WISEMAN:  Your Honor.

12           THE COURT:  No, I'm not finished.

13           MR. WISEMAN:  I'm sorry.

14           THE COURT:  He waited until the jury was seated and he

15    had them as an audience before standing up, not only

16    addressing me, but as the jury walked out of the courtroom,

17    looking right at them and shouting at them.  Now, if he

18    wanted to address me before the jury came in, he could have

19    told you that he wanted to address me, as apparently he has

20    done before, because that's why we met Monday morning without

21    the jury.  He told you that he wanted to talk to me, and we

22    arranged for him to do that.  If he wanted to talk to me

23    before the jury came in, there was ample opportunity for him

24    to do that.

25           I am compelled to conclude that this is a cunning

1    effort on his part to create a mistrial because he knows

2    there is no way a jury is going to find him not guilty in the

3    face of this overwhelming evidence that the government has

4    presented and that he has heard.  That's why I come to that

5    conclusion.

6          Now, if you have some cases about mistrials and

7    talking about how or when a court can grant a mistrial when

8    it was caused by the defendant's own misconduct, I'll look at

9    it.

10         MR. WISEMAN:  And we're in the process of getting that

11   for the Court now.  I just don't have them presently.

12         THE COURT:  He asked to address me.  So you go back

13   and talk to him, and you tell me what it was he wanted to

14   say, and I'll hear what you have to say.

15         (Discussion held off the record between Mr. Wiseman

16   and the defendant.)

17         MR. WISEMAN:  Mr. Williams has advised me that he

18   wants to address the Court concerning this case, just in

19   general about this case.  I suspect it's going to be about my

20   defense strategy.  And I will say, though, what may have

21   precipitated this, and I think Mr. Williams is trying to say

22   something about this, is an email I sent him yesterday.  I'm

23   not going to get into the details to violate any

24   attorney-client privileges.  But it was an email I sent last

25   night to him about 9:00 o'clock p.m. telling him what I, as

 1    his lawyer, decided to do with respect to the remainder of

 2    the case.  And I think Mr. Williams wants to address that.

 3            THE COURT:  Okay.  I'll address that with him.  But I

 4    want to say, Mr. Williams, that notwithstanding my view of

 5    the evidence and notwithstanding how strong I think the

 6    evidence has been so far in this trial against you, I want

 7    you to have a fair trial.  That is my job.  When you stand up

 8    in the presence of that jury and misbehave the way you did,

 9    you are doing the worst thing you can possibly imagine for

10    yourself if you ever wanted to have a chance of acquittal.

11    So come up here now and tell me what you wanted to tell me.

12            MR. WISEMAN:  Your Honor, my only concern is that

13    Mr. Williams does that in the presence of government counsel.

14            MR. HALES:  We should probably excuse ourselves.

15            THE COURT:  All right.  I'm also mindful of the public

16    trial aspect.  And I am always reluctant to close the

17    courtroom to spectators and members of the public because

18    I've seen litigation on that subject.  Every time he asks to

19    address me in camera, I have to do that.  So as long as he

20    agrees that everybody should be excluded from the courtroom,

21    I'll do it.  But if he wants to talk in the presence of God,

22    the United States Attorney and everybody else in the

23    courtroom, then I'm going to let him do that.

24            Do you want me to clear the courtroom of the

25    prosecutor?

 1                THE DEFENDANT:  No, your Honor.

 2                THE COURT:  All right.  Go ahead.

 3                MR. WISEMAN:  I want to make sure I understand.

 4       Excuse me for a second.

 5                (Discussion held off the record between Mr. Wiseman

 6       and the defendant.)

 7                MR. WISEMAN:  Okay.

 8                THE DEFENDANT:  Your Honor, I apologize for wasting

 9       your time.  Mr. Wiseman lied to me, he lied to you, and he

10       lied to them when he said he was going to put on a defense.

11       It's obvious he was not going to do that because of that odd

12       question he asked them in the beginning about if Mr. Williams

13       decided not to put on a case, would it unfairly ruin your

14       chances to render a fair decision or however he phrased it.

15       I'm not sure.  That, to me, told me that that email that I

16       got last night was a plan.  He planned to do this from the

17       beginning.  He lied to the Court.  He wasted two weeks of the

18       Court's time, wasted two weeks of the jury's time, wasted two

19       weeks of my time.  He planned it all along.

20                THE COURT:  Is that what you wanted to tell me?

21                THE DEFENDANT:  I'm simply a man here, your Honor,

22       trying to get a fair shot at due process.  That's it.  And

23       that's clearly not happening.

24                THE COURT:  So have you said what you wanted to say?

25                THE DEFENDANT:  I have.

1           THE COURT:  The only thing I can say in response to

2    that, Mr. Williams, is that I've seen -- you may not

3    believe this -- hundreds of trials.  And that's one of the

4    most common things that defense attorneys will say at the

5    beginning of a trial.  Why do they say that?  Because they

6    want to keep their options open.  They want to see how the

7    case presented by the government proceeds, and then they want

8    to make an educated decision whether to call witnesses and,

9    if so, which witnesses to call and whether to advise their

10   client to testify or not.  That depends in almost every case

11   upon how the government's evidence proceeds.  So I've just

12   heard that in almost every trial.

13           The next thing I want to say to you is -- I'm sure

14   Mr. Wiseman told you this -- the decision of what witnesses

15   to call and what questions to ask is the lawyer's decision.

16   But the decision of whether you want to testify, that's your

17   decision.  So I just want to make sure that you don't think

18   Mr. Wiseman has ordered you not to testify or has ordered you

19   to testify.  That's your call.  Do you understand that?

20           THE DEFENDANT:  In all fairness, your Honor, why on

21   Earth would I not want my attorney to put on a defense?

22           THE COURT:  I'm not asking you to ask me questions.

23   I'm asking you if you understand what I just said.

24           THE DEFENDANT:  I do, your Honor.

25           THE COURT:  And do you understand that the decision of

1    whether to testify or not is your decision?

2          THE DEFENDANT:  I do, your Honor.

3          THE COURT:  All right.  So you're going to make that

4    decision.  Mr. Wiseman is going to make the decision of what

5    witnesses to call.  He's going to listen to you before he

6    makes that decision.  And I assume you've had a chance to

7    tell him what you think about the witnesses he ought to call.

8          THE DEFENDANT:  Actually, no.

9          THE COURT:  Okay.  Well, tell him.

10         THE DEFENDANT:  When I got the email, I just

11   automatically assumed it was a high-tech lynching.  I haven't

12   seen anything like this since the slave days.  I didn't even

13   know it still existed.

14         THE COURT:  Mr. Wiseman, has he told you what

15   witnesses he wants to call?

16         MR. WISEMAN:  Well, your Honor, I'm a little

17   uncomfortable responding to the Court's inquiry in front of

18   government's counsel.

19         THE COURT:  My question is did he tell you what

20   witnesses he wanted to call?

21         MR. WISEMAN:  We asked him a series of --

22         THE COURT:  Not which witnesses.  Just did he tell

23   you.

24         THE DEFENDANT:  All four.

25         THE COURT:  He says all four.

1          MR. WISEMAN:  No.  Your Honor --

2          THE COURT:  As a matter of fact, I think I saw the

3     memo where he did that.  So I think I do know the answer to

4     that question, and obviously you got the memo.

5          MR. WISEMAN:  I got the memo.  I made a calculated

6     decision, spent a good deal of time looking at all the

7     witnesses that we could have called.  Those witnesses that

8     were subpoenaed, in fact, subpoenas were issued to witnesses,

9     but based upon what I considered the results of

10    cross-examination yesterday and the previous days, at what I,

11    in my professional judgment, elicited from the witnesses, I

12    do not believe that those witnesses that Mr. Williams wanted

13    me to call that I had originally under subpoena would have

14    done anything of any benefit to Mr. Williams.

15         THE COURT:  All right.  Well, I'm not going to get

16    into the details while the government attorney is here, but I

17    just wanted to know that you did listen to him and read what

18    he had to say and that you've made your decision.

19         MR. WISEMAN:  Correct.

20         THE COURT:  All right.  Now, maybe I should not ask

21    you this in the presence of government counsel either, but

22    since Mr. Williams seems to want to air his dirty linen in

23    public, I do want to know at some point in time whether he's

24    going to testify and, if so, whether that's his own decision.

25    So how do you want me procedurally to address that?  Do you

1    want me to excuse everybody and ask him?

2            MR. WISEMAN:  Yes.  I think that would be the

3    appropriate thing.

4            THE COURT:  All right.  I am going to do that.

5            THE DEFENDANT:  I can answer now without having to

6    excuse everybody.

7            THE COURT:  Okay.  You see, here's my dilemma.  If I

8    excuse everybody, I'm bending over backwards to make sure

9    that his attorney-client privilege is protected and to make

10   sure that his tactical position vis-à-vis the government is

11   preserved.  But then I run the risk of him saying he wanted

12   everybody present, and he was denied a public trial.  So

13   since he wants to tell me in the presence of everybody in the

14   courtroom, then I'm going to let him do that.  Just tell me.

15           THE DEFENDANT:  Let's continue the high-tech lynching,

16   sir.

17           THE COURT:  What does that mean?

18           THE DEFENDANT:  Let's continue.

19           THE COURT:  I need -- okay.  I am going to excuse

20   everybody because I need to ask him a question which he very

21   cunningly has declined to answer.

22           (Proceedings held in camera.)

23           (Proceedings resumed in open court.)

24           THE COURT:  The U.S. Attorney is back in court.  The

25   following proceedings are on the record.  Mr. Williams has

1    been remanded to the custody of the marshal for the remainder

2    of this trial.  He will be present during the trial, and he

3    will not be shackled in the presence of the jury.  There will

4    be no indicia of his being in custody in the presence of the

5    jury.  But during the breaks and evening recesses, he will be

6    in the custody of the marshal.

7           I'm going to hear argument on the motion for mistrial

8    sometime later today after both of you have had an

9    opportunity to present to the Court any points and

10   authorities relating to when and if a court should grant a

11   motion for mistrial when it's been occasioned by the

12   misconduct of the defendant himself.

13          In the meantime, I'm going to have the jury come back,

14   and we're going to proceed with the evidence in this case.

15   All right.

16          MS. HEMESATH:  Just to clarify, we would not do

17   instructions and closing before we heard that motion or we

18   would go all the way through?

19          THE COURT:  No.  If I can hear the motion before you

20   do instructions and closing, I'll do that.  When do you plan

21   on finishing?

22          MS. HEMESATH:  This is our last witness.

23          THE COURT:  All right.  I know whether the defendant

24   is going to testify, but I can't tell you until you rest.

25          MS. HEMESATH:  We'll do that now then.

1          THE COURT:  No, don't rest yet.

2          MS. HEMESATH:  No.

3          THE COURT:  We'll bring the jury back, and you're

4   going to rest?

5          MR. HALES:  Yes, your Honor.

6          THE COURT:  All right.  What are you going to do,

7   Mr. Wiseman?

8          MR. WISEMAN:  Your Honor, I'm going to ask the Court

9   to entertain motions, appropriate motions.

10         THE COURT:  Let's bring the jury back, and we'll tell

11  them what we're doing.  Yes.

12         THE MARSHAL:  Your Honor, can we have one second for

13  security purposes?

14         THE COURT:  Yes, before the jury comes in.

15         (Brief recess.)

16         THE COURT:  All right.  So the marshals are in the

17  back of the courtroom, and they're seated.  Let's bring the

18  jury back.  The defendant is present.

19         (Jury present.)

20         THE COURT:  All right.  Ladies and gentlemen, the

21  jurors are all present.  I'm instructing you to disregard

22  anything that you heard or saw when we came in earlier this

23  morning and pretend that we're just starting now.  Good

24  morning, ladies and gentlemen.

25         All right.  Mr. Wiseman, do you have any questions,

1    further questions on cross-examination for Mr. Harrison?

2              MR. WISEMAN:  No further questions.  Thank you, your

3    Honor.

4              THE COURT:  Mr. Hales, any redirect?

5              MS. HEMESATH:  No, thank you, your Honor.

6              THE COURT:  Oh, Ms. Hemesath, you did the direct

7    examination.  Thank you, Mr. Harrison.  You may step down.

8    You're excused.

9              THE WITNESS:  Thank you, sir.

10             MS. HEMESATH:  The United States rests.

11             THE COURT:  The government rests.  Is there a matter

12   you want to take up outside the jury?

13             MR. WISEMAN:  Yes, your Honor.

14             THE COURT:  All right.  Ladies and gentlemen, this is

15   that portion of the trial where the Court needs to confer

16   with the attorneys regarding the exhibits and any motions

17   that they have to make to the Court as well as to agree upon

18   the instructions I'm going to give you on the applicable law

19   because, as I told you at the beginning of the trial, the

20   next phase of the trial is the arguments of counsel which

21   will begin with an argument on behalf of the government and

22   then Mr. Wiseman's argument on behalf of Mr. Williams and

23   then a rebuttal argument on behalf of the government.  After

24   their arguments, I instruct the jury on the law.  But when

25   they present their arguments to you, the lawyers need to know

1    how I am going to instruct you on the law.  So I have to talk

2    with them, listen to their suggestions as to how I should

3    instruct you on the law, and then I decide upon the

4    instructions that I'm going to give based upon the evidence

5    and the arguments that they've made to me.  And then I

6    provide them with a copy of the instructions that I'm going

7    to give to you.  Then in the process of their final arguments

8    to you, they're allowed to refer to my instructions.  So they

9    can say the judge is going to instruct you as follows, and

10   here is how I think you should apply that instruction to the

11   evidence that you've heard.  That's going to take a little

12   while.  So I wasn't aware of the precise timing, but I think

13   I need the rest of the morning to hear what they have to say

14   and to write out my instructions and to give them to the

15   lawyers.

16         So I'm going to ask you to come back at 1:30 this

17   afternoon.  Luckily, it's a little bit nicer day than we've

18   had, so you can do whatever you want and come back at 1:30

19   this afternoon to hear the arguments of counsel.  Remember

20   although you've heard all the evidence, there are still parts

21   of the trial that you have not heard.  So you still have to

22   keep an open mind, and you still have to follow all the other

23   parts of the Court's admonition to you.  So leave your books

24   on your seats, and we'll see you all back here at 1:30.

25         (Jury not present.)

1            THE COURT:  Mr. Wiseman, I did not ask in the presence

2     of the jury whether you intended to call any witnesses

3     because I thought that would be more prejudicial to

4     Mr. Williams, knowing what I know, than it was simply to

5     assume that you were not going to and then let the jury

6     wonder -- let the jury not have to wonder.  Do you agree with

7     that?

8            MR. WISEMAN:  I do.

9            THE COURT:  All right.  Do you agree, Counsel?

10           MS. HEMESATH:  We do.

11           MR. HALES:  Yes.

12           THE COURT:  All right.

13           MR. WISEMAN:  Your Honor, there's only one issue I

14    think in terms of evidence I don't recall the Court having

15    ruled on, which was my motion in limine with respect to the

16    Levin report.

17           THE COURT:  I ruled to the extent that I said I wasn't

18    going to let you just put the report in evidence.

19           MR. WISEMAN:  Correct.

20           THE COURT:  I told you I was going to let you ask

21    questions about it.  And if the questions were appropriate,

22    you could ask them.  If there was an objection and I didn't

23    think the question was appropriate, I would sustain the

24    objection.  You asked questions, and there was no objection,

25    so the answers you got were pretty neutral because nobody --

1    or at least the one witness you asked about it didn't know

2    anything about it.

3            MR. WISEMAN:  Right.

4            THE COURT:  So I don't know that there's anything more

5    for me to rule upon with regard to that motion.

6            MR. WISEMAN:  Well, my only conundrum is in closing

7    argument, since it hasn't been admitted or any portion of has

8    been admitted, I don't want to argue a point that evidence

9    has not been introduced over.  And so I think that in light

10   of the questions I asked the witness, I think I should be

11   permitted to allude to the report.

12           THE COURT:  You know, what I would think you could do

13   is you could say he doesn't even know about a report, and

14   this is a report that came from the Senate, and he didn't

15   even know about it.  That shows how little he knows about how

16   his bank is being run.

17           MR. WISEMAN:  And that's precisely what I intended to

18   do, but I did not want to do that in the face of not having

19   the report actually in evidence.

20           THE COURT:  I think what I just said is fair.  It may

21   stretch it a little bit in your favor.  But what would not be

22   fair would be to allow you to suggest what's in that report.

23           MR. WISEMAN:  That's fine.

24           THE COURT:  Okay.  Now, give me a little time, and

25   I'll give you a little time.  You can come back and make your

1    motion for mistrial.  If there are any other motions you want

2    to make, you can make those.  I'll get my draft instructions,

3    and we can go over those.  Let's come back here at 10:15.

4         MS. HEMESATH:  Your Honor, we had one more thing

5    hanging out there.  And that was the summary charts.  We did

6    take the pictures off last night and replaced them.  The one

7    I'm intending to use in my closing no longer has images on

8    it.

9         THE COURT:  How about the others?

10         MS. HEMESATH:  There are no more images on any chart.

11         THE COURT:  Did you show those to Mr. Wiseman?

12         MR. WISEMAN:  I did get to see them, but I think the

13   underlying issue still is unresolved, and I think the Court

14   hasn't ruled on it.  And that is I still believe that the

15   charts themselves, even with the redacted portions of the

16   photographs, should not be introduced as evidence that will

17   go back to the jury room.

18         THE COURT:  Can I see the charts as they have been

19   modified?

20         MR. HALES:  Yes, your Honor.  May I approach, your

21   Honor?

22         THE COURT:  Yes.  Can you point to which parts of

23   these charts you think relate to documents that the witness

24   reviewed and were made available but are not in evidence?

25         MS. HEMESATH:  Yes.  Can we pull them up on the

1    screen?

2          THE COURT:  You can put them on the screen.

3          MS. HEMESATH:  So on this one, on 802, just this fact

4    is not in evidence.  That's based on review of the bank

5    account.

6          THE COURT:  Okay.  It's $32,552.45 remains in DHF

7    account.

8          MS. HEMESATH:  Yes.

9          THE COURT:  And so how was that derived?

10          MS. HEMESATH:  That is derived by his review of the

11    bank account records.

12          THE COURT:  Why is that in red?  Is that because it

13    was something outside the exhibits?

14          MS. HEMESATH:  We put it in red because it's not a

15    hard number that ties to a specific exhibit, and it is not

16    pegged a specific date in the bank account.  He gave

17    testimony as to how he derived that number.

18          THE COURT:  All right.  Well, I see that you've got

19    other things in red, and I understand 803.  Why is the

20    $15,000 in 804 in red?

21          MS. HEMESATH:  So on this one, that is the check that

22    goes into the Diamond Hill Financial account.  So that is the

23    account controlled solely by Mr. Williams, and that is funds

24    that we argue are to his benefit exclusively.

25          THE COURT:  So the red are the ones that you want to

 1    argue to the jury went to him.

 2          MS. HEMESATH:  Yes.  Also on this 804 chart, this is

 3    another example where there's more that is not in evidence.

 4          THE COURT:  Tell me which ones.

 5          MS. HEMESATH:  I'm circling on the screen right now,

 6    your Honor.  So basically the entire first escrow portion and

 7    as well this concept, the outside escrow concept.  And I

 8    should have mentioned that on the 802.  Anywhere where the

 9    term "outside escrow" is written, that's based on the

10    agent's -- he testified that is based on his review of the

11    escrow files.

12          THE COURT:  Well, in effect, isn't everything below

13    the blue line outside of escrow?  Isn't that outside of

14    escrow?

15          MS. HEMESATH:  On the first two charts, the Tony

16    Symmes' charts, yes.

17          THE COURT:  What's the sense of the blue line on the

18    other charts then?

19          MS. HEMESATH:  It shows -- so this right here, the

20    $50,000 check, that is the monies that were made on the flip

21    sale in the second escrow.

22          THE COURT:  Why do you draw a blue line there?

23          MS. HEMESATH:  Sorry.  I'm just showing you where I'm

24    talking about that number.  That's not outside escrow because

25    that is the money that was made on the second transaction.

 1          THE COURT:  So now I know that everything below the

 2   blue line is not necessarily outside of escrow.  What is the

 3   meaning of having a blue line there?

 4          MS. HEMESATH:  The meaning is to show that the real

 5   estate portion of the transaction is done, and now this goes

 6   into the transfer of monies down here.

 7          THE COURT:  So is it that what's above the blue line

 8   is the real estate portion and what's below the blue line is

 9   what happens afterwards?

10          MS. HEMESATH:  Correct.

11          THE COURT:  Okay.

12          MS. HEMESATH:  And on this chart, the outside escrow

13   portion only refers to this.  That is the check that is

14   outside escrow.

15          THE COURT:  Here's my observation.  And I'm not ruling

16   because I haven't decided what to do.  But this is kind of a

17   hybrid exhibit.  It's not what you typically see under

18   Rule 1006 where they're just a bunch of numbers and they're

19   added up from exhibits or documents that were made available,

20   and they're put on some kind of a -- I can't remember the

21   name of the term -- on a spreadsheet.  That's the more

22   typical 1006 summary exhibit that goes to the jury.

23          The other type of exhibit is what looks like a

24   flowchart, and it's used by an expert witness to explain his

25   analysis.  And those typically are not 1006 exhibits.

1    They're illustrative of the witness's testimony.  The former

2    are exhibits that go into the jury room.  The latter

3    typically do not go into the jury room.

4         So I have to decide whether this is more like a visual

5    aid to assist the expert's testimony or whether it's more

6    like a summary or compilation of evidence that goes into the

7    jury room.  And I see the elements of both here, so I have to

8    decide which way to handle it.

9         Now, I'm not sure it makes a lot of difference, but

10   given the strength of the government's evidence -- and I

11   don't know why you need this in the jury room.  And if we're

12   going to err, why not just keep it outside the jury room, let

13   you use it in your argument and talk about it?

14        MS. HEMESATH:  I think that's probably fine, your

15   Honor.  My only concern is that it was my understanding that

16   for demonstrative aids, all of the elements of the chart did

17   have to be in evidence, and there are things on this chart

18   which are not in evidence.

19        THE COURT:  Well, I don't think you're right that

20   everything has to be in evidence, because I think I have seen

21   expert witnesses give visual aids that relate to literature

22   and other things that experts are allowed to consider that

23   are not necessarily in evidence.  In other words, if it's not

24   error to --

25        MR. WISEMAN:  Your Honor.

1              THE COURT:  I don't know that you're right on that,

2      but maybe you are.

3              MR. WISEMAN:  Your Honor, my view is this.  My view is

4      that this should not go into the jury room as evidence

5      because I agree with the Court's --

6              THE COURT:  I know.  But what's your answer to the

7      question that if it doesn't go in as evidence, then it's even

8      worse to allow a witness to refer to it because it has

9      information on it which is not in evidence?

10             MR. WISEMAN:  Well, if the point of the chart or the

11     use of the chart will be simply to assist counsel in closing,

12     then during the break, I'll look at the case law on that

13     particular issue, if, in fact, there's information on the

14     chart that's not supported by admissible evidence.  So I'll

15     look at that.

16             THE COURT:  But see, that's the point.  It is

17     admissible evidence because it's his opinion based upon the

18     documents that he reviewed which were made available to the

19     defense.  So that was admissible.  His opinion that went into

20     these numbers is admissible, and he already said it was.  So

21     I think that's what I'm inclined to do, to just not allow

22     these diagrams themselves to go into the jury, but that the

23     witness has already used them to illustrate his testimony,

24     and I'll let counsel on either side use those same exhibits

25     in argument, but they won't go in the jury room.

 1              MR. WISEMAN:  That's fine.

 2              THE COURT:  Okay.  That's what I'm going to do.

 3              MS. HEMESATH:  Thank you.

 4              THE COURT:  So let's come back here in 15 minutes.

 5              (Recess taken.)

 6              (Jury not present.)

 7              THE COURT:  The defendant is present.  We're meeting

 8    outside the presence of the jury.

 9              Mr. Wiseman, did you want to make your motion?

10              MR. WISEMAN:  Yes, your Honor.  But before I make my

11    motion under Rule 29, I did want to respond to the Court's

12    earlier comment about providing additional time to look at

13    any cases with respect to this unfortunate outburst.  And if

14    the Court wants me to address that first --

15              THE COURT:  I thought we were going to address the

16    motion for mistrial before the Rule 29 motion.  So why don't

17    you tell me what you wanted to say about that.

18              MR. WISEMAN:  Sure.  We looked at the case law, and it

19    appears that U.S. vs. McCormac, which is 309 F.3d 623, a

20    Ninth Circuit 2002, seems to be the salient case on point.

21    That was a case in which the Ninth Circuit upheld the

22    district court's discretion not to declare a mistrial when,

23    in fact, there was an outburst.  Nevertheless, there's

24    language in McCormac that says the district court can grant a

25    mistrial if the outburst had substantially prejudiced the

1    jury.  And certainly curative instructions can be used to

2    sort of minimize any prejudicial effect of the outburst.

3           But in this particular case, based upon the intensity

4    and the nature of the outburst, I do believe that the jury is

5    unduly prejudiced against Mr. Williams and therefore suggest

6    and request that the Court grant a mistrial based upon that.

7           If the Court is inclined not to grant a mistrial based

8    upon my view of the prejudicial effect on the jury, the Court

9    also has the option to poll the jury as to if the outburst

10   had any prejudicial effect on them.

11          There's a case, U.S. vs. Cunningham.  It's 194

12   Fed.Appx.  I'm not sure, your Honor, if it's a published

13   case, but it's at 582.  So 194 Fed.Appx. at 582.  It's out of

14   the Eleventh Circuit.  And that case does allude to one

15   curative method the Court could use to ensure that the jury

16   is not unduly prejudiced, and that would be to poll the jury.

17          THE COURT:  Well, what would I ask them if I polled

18   them?

19          MR. WISEMAN:  Well, I think they would have to be

20   asked whether or not Mr. Williams' outburst prejudiced their

21   view of him and whether or not it would have any effect on

22   their ability to render a fair, impartial, and just verdict

23   in the case.

24          THE COURT:  Did you have anything else to add?

25          MR. WISEMAN:  No.  With respect to that issue, no.

1          THE COURT:  Let me hear from the government with

2     respect to this last suggestion that the Court might want to

3     consider polling the jury.

4          MR. HALES:  From the government's perspective, we've

5     had limited time to look at this.  We haven't found a

6     Ninth Circuit case that says that that's what should be done

7     here.  And from our perspective, the disruption was not so

8     severe or extended that -- it seems that polling the jury

9     would draw more attention to it.

10          THE COURT:  Let me say this with regard to McCormac.

11     There is that language that Mr. Wiseman just mentioned.  But

12     when you look at the facts of McCormac, they are not only

13     parallel to the facts here, but arguably the disruption was

14     even greater.  What happened there, it almost sounds like

15     this case.  The judge came out and asked the defense counsel

16     if he was ready for trial.  Defense counsel said, "Yes, your

17     Honor."  Then the defendant said, "Defendant is not ready for

18     trial, your Honor."  The court then immediately said, "You're

19     in contempt."  The defendant said, "That's fine, your Honor."

20     The court said, "Be seated."  And then the defendant made

21     this little speech:  "No, your Honor.  I am not going to

22     proceed with any trials.  I told you that already.  I feel

23     that this is a biased situation, and there's not going to be

24     any justice served by wasting the jurors' time."

25          The court said, "Just a moment."

1             The defendant said, "No."

2             The court said, "Be quiet, please."

3             The defendant said, "No."

4             Then the court said, "I want the marshal to remove the

5     defendant and bring her to my chambers.  I'll see counsel in

6     chambers, please."

7             So in that case, the court actually in the presence of

8     the jury adjudicated the defendant in contempt which

9     conceivably could be more prejudicial than what occurred

10    here.  The court also in that case, in the jurors' presence,

11    ordered the marshals to remove the defendant from the

12    courtroom, which did not occur here, and could, quite

13    arguably, be more prejudicial to the defendant in that case

14    than what occurred here.  The court, nevertheless, affirmed

15    the trial court's denial of a mistrial by saying that

16    although there was no finding that the defendant's outburst

17    was calculated with malign purpose to delay the trial -- and

18    let me stop there.  That is also different from this case.  I

19    have, as I said, to my own surprise, seen hundreds of jury

20    trials, and I have a pretty good understanding of what's

21    going on out there.  And there's no doubt in my mind that

22    that was precisely Mr. Williams' purpose here.

23            But to go on, they said:  "We must consider effect:

24    the district court would have been de facto granting a

25    continuance by declaring a mistrial and summoning new jurors.

1    We decline to find that the district court abused its

2    discretion in denying a mistrial when the defendant's own

3    misconduct caused the alleged impartiality of the jurors and

4    the court took reasonable steps to ensure the jurors could

5    serve impartially."

6         Well, here, I took I think even further steps than the

7    court did in that case because I instructed them immediately

8    to disregard what went on.  And then after the delay, I

9    further instructed them to just disregard everything that had

10   gone on earlier and to pretend we were just starting the

11   trial again.  And it just worked out perfectly because that's

12   something that the jurors can compartmentalize and put out of

13   their minds.

14        The court cited Williams vs. Woodford where the

15   Ninth Circuit had previously said, "The Sixth Amendment

16   affords no relief when the defendant's own misconduct caused

17   the alleged juror partiality and the trial judge employed

18   reasonable means under the circumstances to preserve the

19   trial's fairness."  And they cited a Seventh Circuit case

20   holding that a defendant should not profit from his own

21   misconduct.

22        Now, the court in McCormac apparently did afford the

23   prospective jurors an opportunity to voice any potential

24   impact of the outburst on their partiality.

25        I'm not going to exercise my discretion to do that

KELLY O'HALLORAN, OFFICIAL COURT REPORTER, USDC -- (916) 448-2712

1    here.  One of the reasons was mentioned by the government.

2    It calls undue further attention to the outburst which we're

3    hoping they could put out of their mind for purposes of their

4    deliberations.

5           Beyond that, we have to be realistic.  A juror is not

6    going to admit that they're biased even if they are.  I can't

7    structure a voir dire that would be any semi-accurate measure

8    of whether the outburst had some kind of a lasting impression

9    on the jury.  I couldn't just ask one question.  I could.  I

10   could say:  Are any of you biased against the defendant

11   because of his outburst?  And I know that no hands would go

12   up.  I could ask.  But the reason I'm not going to ask is

13   that it's not going to elicit any kind of a meaningful

14   response, and it is further going to call attention to the

15   incident, which I do not want to do.

16          If I tried further to structure a series of questions

17   that would elicit some subconscious effect that this had on

18   the jury, it would be even worse.

19          The defendant can't expect to stand up here and throw

20   the gauntlet down to the Court, challenge me, challenge the

21   jurors, and then put us all on the defensive.  I'm not going

22   to do that.  So the motion for mistrial is denied.

23          Just because the case has an interesting name, I'll

24   also cite United States vs. Williams in the Ninth Circuit,

25   428 Fed.Appx. 723, where the court said, "The Sixth Amendment

1    'affords no relief when the defendant's own misconduct caused

2    the alleged juror partiality and the trial judge employed

3    reasonable means under the circumstances to preserve the

4    trial fairness.'"

5         So let's go on now to the Rule 29 motion.

6         MR. WISEMAN:  Okay.  Your Honor, on behalf of

7    Mr. Williams, I'm making a motion for acquittal under Rule 29

8    of the Federal Rules of Criminal Procedure.  And let me

9    address it this way because I have three points to raise.

10        One of the primary reasons I'm asking for a Rule 29

11   deals with the structure of the government's case.  As the

12   Court knows, this case, the indictment alleges a conspiracy,

13   but the evidence that was presented before the jury in this

14   case really indicated and reflected and established two

15   separate conspiracies.  It was the conspiracy with the

16   alleged or inferential conspiracy between Symmes and

17   Gililland and the two properties, the Ceanothus property and

18   Rockin M property, that Mr. Williams was allegedly involved

19   in.  There was no evidence that I could recall that suggested

20   that Josh Clymer was involved in those two -- in Tony Symmes'

21   related properties.  As a matter of fact, those two

22   properties were involved -- Diamond Hill was involved in

23   those properties.  And as the Court knows from the testimony,

24   the Bay Area Real Estate was a company that Mr. Clymer and

25   Mr. Williams established sometime thereafter.

1          And I believe I elicited testimony from, it may have

2    been Agent Harrison, about his understanding in investigating

3    the case of Mr. Clymer's involvement in the Ceanothus and the

4    Rockin M transactions.  And my recollection of his testimony

5    is that it was established that Mr. Clymer was not involved

6    in those.

7          So the concern I have is that the jury has evidence of

8    what really, in fact, are two separate conspiracies, and I'm

9    concerned that they're not going to be able to parse the

10   difference and they're going to render a verdict based upon a

11   multiplicitous issue.  In other words, two separate

12   conspiracies rather than one.

13         THE COURT:  Are you saying that the Symmes and

14   Gililland transactions are separate from the Ceanothus and

15   Rockin M?

16         MR. WISEMAN:  No.  The Symmes, Gililland transactions

17   are the Rockin M and Ceanothus transactions.

18         THE COURT:  So what is the other conspiracy you're

19   talking about?

20         MR. WISEMAN:  The other conspiracy would be the

21   conspiracy that Josh Clymer and Mr. Williams was involved in

22   with respect to Bay Area Real Estate which involved simply

23   the Sacramento property.  So you have a difference in the

24   company structures and also you have a difference in the

25   location of the properties.  So that's the distinction.

1              And the jury, I believe the evidence has been

2    conflated in the sense that the jury heard evidence through

3    Mr. Symmes' testimony and Agent Harrison's testimony

4    concerning these two wholly unrelated properties.  And there

5    is no connection, factual connection, between Mr. Clymer and

6    the Ceanothus and Rockin M transactions.  And so it's a

7    multiplicitous issue, and I think the jury is going to have a

8    tough time segregating the two.  And now that that evidence

9    is in, I don't think the jury can make a decision that is

10   limited to the conspiracy that Mr. -- the alleged conspiracy

11   that Mr. Williams and Mr. Clymer are involved in.

12             THE COURT:  Let me ask the government.  First, you

13   understand that when you allege a conspiracy in the

14   indictment, you have to prove that conspiracy and not some

15   other conspiracy.  You also understand that when there are

16   multiple conspiracies which are separate, they have to be

17   charged separately and cannot be lumped together in one

18   count.

19             So what I want you to explain to me is why you think

20   the Symmes, Gililland transactions regarding Ceanothus and

21   Rockin M are part of the same conspiracy as the Sacramento

22   properties in which Clymer and Williams were involved with

23   Bay Area Real Estate.  And in the process of that, tell me

24   what you think the evidence is of Williams' involvement, if

25   any, in the Ceanothus and Rockin M transactions.

1          MR. HALES:  Mr. Williams' involvement in the Ceanothus

2    and Rockin M?

3          THE COURT:  Yes.

4          MR. HALES:  Mr. Williams or Mr. Clymer, to clarify?

5          THE COURT:  Well, both.

6          MR. HALES:  Okay.  Well, first there's a unifying

7    feature across five out of the six transactions presented,

8    including the two Chico properties, Rockin M and Ceanothus.

9    Diamond Hill Financial is listed as the employer for the

10   people on the loan applications, and the witnesses testified

11   that that was Leonard Williams' idea to do that.  The

12   indictment alleges that Mr. Williams conspired with

13   Mr. Clymer and others in order, you know, known and unknown

14   to the grand jury, to carry out these transactions.

15   Government's Exhibit 327 shows a check made out to Josh

16   Clymer from the proceeds of one of the Chico transactions.

17   The memo is Chico property.  And which --

18         MS. HEMESATH:  This one's from Rockin M.

19         MR. HALES:  So that check comes right after the

20   Rockin M transaction, so Joshua Clymer receives proceeds from

21   that.  There's also evidence in the record of a document that

22   appears to be signed by Mr. Williams appointing Mr. Clymer

23   the treasurer of Diamond Hill Financial, which is the entity

24   both listed as the employer for Mr. Watson on the Chico

25   properties and is also the entity that receives the kickback

1    checks from Mr. Symmes.

2           THE COURT:  See, that's all the more reason why, just

3    to digress for a minute, it was not a good idea for you to

4    have Mr. Williams' picture whenever you had Diamond Hill

5    because you want to say they're both involved in it now.  But

6    go ahead.

7           MR. HALES:  Well, that was for purposes of the bank

8    records to illustrate who controls the account.  I do

9    understand what you're saying.

10          THE COURT:  Go ahead.

11          MR. HALES:  But yes, going as far back as, I think it

12   is October of 2006 when Mr. Clymer is appointed as the

13   treasurer of Diamond Hill Financial, and the name of the

14   buyer on that document is actually one of the buyers in the

15   indictment.  That wasn't presented in trial, but it helps to

16   illustrate, you know, the involvement going through time.

17          And just because they're in different cities or just

18   because the real estate transactions, you know, were done in

19   a slightly different manner doesn't change the fact that it

20   was Mr. Williams conspiring with others, including Mr. Clymer

21   and the buyers and so forth, and that including the Chico

22   properties discussed, Mr. Clymer got proceeds out of that.

23          THE COURT:  Mr. Wiseman, when there's a common plan

24   and Mr. Williams is involved in all the various

25   transportations, why isn't that sufficient to characterize it

1    as a conspiracy even though he may not have been involved

2    with the same people on each of the transactions?

3                MR. WISEMAN:  Is your Honor referring to Mr. Clymer or

4    Mr. Williams?

5                THE COURT:  I mean to refer to Mr. Williams because

6    he's the defendant here.  And if he's involved in multiple

7    transactions, even though they may be with different people

8    but there's a common scheme on his part, why isn't that a

9    single conspiracy?

10               MR. WISEMAN:  Well, that's precisely the point I'm

11   trying to articulate.  It may have been a common scheme on

12   Mr. Williams' part, but Mr. Clymer was not involved in the

13   Ceanothus and Rockin M.

14               THE COURT:  Well, I'm accepting that premise in my

15   question, because in order to be guilty of the conspiracy,

16   every conspirator doesn't have to be involved in every

17   transaction.  As a matter of fact, there is an instruction, I

18   don't know whether I'm giving it in this case, but for a

19   defendant to be guilty of a conspiracy, he doesn't even have

20   to know all the other conspirators.

21               MR. WISEMAN:  Correct.

22               THE COURT:  So if there's a common scheme and the

23   defendant is involved in that scheme and there are multiple

24   transactions as a part of that scheme, even though he's not

25   involved with the same people on each of those transactions

1     why isn't it properly characterized as a single conspiracy?

2          MR. WISEMAN:  Well, my view is that it wasn't -- the

3     evidence doesn't suggest one overarching scheme.  The other

4     point that distinguishes the Bay Area Real Estate

5     transactions from Ceanothus and Rockin M was the structure of

6     the deals.  Ceanothus and Rockin M were not double escrows.

7     They were of a different quality.  And the government made a

8     big deal about, or attempted to make a big deal, about the

9     double escrows.  And I pointed out with one of the government

10    witnesses, I think it was Mr. Harrison, Agent Harrison, that,

11    in fact, they were two separate types of transactions.

12         So even though Mr. Williams is alleged to have been

13    involved in each, there is a qualitative difference between

14    the first two, Ceanothus and Rockin M, with Symmes and

15    allegedly Gililland and Bay Area Real Estate that was

16    exclusively with Clymer.  That's my point.

17         THE COURT:  I understand why you're making the point

18    because I saw the communications from your client, and I know

19    he wants to emphasize that the transactions are structured

20    differently.  But as I attempted to explain to him, that's

21    not the important thing.  And as you attempted to explain to

22    him in your communications with him, how they're structured

23    is not the important thing.  If they're fraudulent, that's

24    the important thing.  And so it's not that they're structured

25    differently.  But you do say there is not one overarching

1    scheme.  And I want to ask the government to tell me why you

2    say it's one overarching scheme.

3         Tell me again.  Maybe you've addressed it, but I want

4    to make sure I understand your theory that you're going to

5    argue and that you expect the jury to accept that this is one

6    overarching, big scheme.

7         MR. HALES:  The overarching scheme is Mr. Williams

8    conspiring with others, including the buyers, including

9    Mr. Clymer, including for the Chico properties Mr. Gililland

10   and Mr. Symmes.  So the things that are unifying at least are

11   to have fraudulent information in loan applications,

12   including that the buyers work at Diamond Hill Financial, to

13   falsify how long they've worked there, to falsify their

14   income, to falsify their assets, to falsify the true purchase

15   price by giving kickbacks in several instances, to falsify

16   the true purchase price by foregoing down payments in almost

17   all instances.  I think the first of the Chico properties was

18   a hundred percent financing and after that, the second Chico

19   property, there was a $22,000 down payment that's never made.

20        The same thing happens in all of the Sacramento

21   properties.  Mr. Frye doesn't make a down payment.

22   Mr. Reynaga fakes the $84,000 down payment with Mr. Williams.

23   Lacie Clymer doesn't make the roughly hundred-thousand-dollar

24   down payment that the transaction implies to the lender.  And

25   Mr. Petri.  And then there's, you know, the falsified gift

 1   information in the others as well.  But that's the core of

 2   it, is the false information in the loan applications.

 3          And as I said in my opening, not every transaction is

 4   identical, and it does not have to be, and not every

 5   transaction has to involve every one of the different

 6   conspirators.

 7          And I do think that instruction to which you alluded

 8   needs to be given in this case because of the argument that's

 9   being made right now.  It's not true that Mr. Clymer had to

10   be involved in exactly the same way in the Chico

11   transactions.  What they have to be is part of an overarching

12   conspiracy, and that conspiracy is Mr. Williams working with

13   the buyers to do fraudulent transactions in this manner.

14   Whether it's a one-shot deal or a double escrow, it just

15   doesn't matter.  The fraud is to lie in these loan

16   applications and trick the lenders, get these loans to come

17   in, and then split up the proceeds.  And that's uniform

18   across all six deals.

19          MR. WISEMAN:  Let me just respond briefly, if I may.

20          THE COURT:  Yes.

21          MR. WISEMAN:  Your Honor, the point that can't be

22   avoided is that the time frame of the transactions is

23   different.  I mean the Rockin M and Ceanothus occur in 2007.

24   The Sacramento transactions occur the next year.  There is no

25   evidence before the jury that Mr. Clymer entered the

1   conspiracy at the time that the Ceanothus and Rockin M

2   transactions occurred.  And as the Court knows, to be guilty

3   as a coconspirator or criminally liable, you have to join the

4   conspiracy knowing.  And there's no evidence that Mr. Clymer

5   at the time that he received his check said yeah, I knew that

6   Mr. Williams was doing these deals with Tony Symmes, and I

7   wanted to benefit from the fruit thereof.  There is no

8   evidence.  The government could have called Mr. Clymer to

9   testify.

10          THE COURT:  I don't know if they could have.  He

11   probably would have claimed the Fifth.

12          MR. WISEMAN:  Well, we don't know that.  We don't know

13   how that would have been resolved.  But they didn't.  And so

14   therefore we're left not knowing if Mr. Clymer entered,

15   joined with Mr. Williams at the time of the Rockin M and

16   Ceanothus transactions.  And I'll just in closing restate

17   what I said before.

18          Therefore, the jury has information concerning two

19   transactions that are wholly separate and apart from the

20   transactions with Clymer and Williams with Bay Area Real

21   Estate.  There is nothing.  No witness concerning Ceanothus

22   or Rockin M mentioned Mr. Clymer's name.  Contrast that with

23   all of the Sacramento transactions where it was Clymer and

24   Williams.  Clymer and Williams.  Mr. Reynaga, I think it was,

25   said well, they were 50/50, or maybe it was Mr. Petri.  So

1    you have this distinction in transactions, you have a

2    distinction in time, and you have a distinction in the actual

3    evidence that the jury heard.  There's nothing to suggest

4    that Clymer was involved in the first two.

5              THE COURT:  I understand what you're saying.  I've

6    already pointed out that the coconspirators don't have to all

7    even know each other.  But another concept in a conspiracy is

8    that one can join the conspiracy late, and he can become a

9    coconspirator if he knows the object of the conspiracy and

10   works to further it, even though he joined in midstream, so

11   to speak.

12             Here the indictment alleges that the conspiracy took

13   place over a period of time between October of 2006 and

14   August of 2008.  The fact that Mr. Clymer may have not been

15   in the conspiracy for that entire period of time does not

16   negate the fact that Mr. Williams is a coconspirator.

17             If I was the United States Attorney, I might have

18   charged this differently.  I might have charged it as a

19   substantive offense and relied upon an aiding and abetting

20   theory, but that's not my call.  Having decided to charge it

21   as a conspiracy, I don't think it's necessarily wrong to

22   characterize it as a single conspiracy.  I think if the

23   United States Attorney had charged this as two separate

24   conspiracies, you might even have a better argument, that

25   this is one big conspiracy, and it's not properly charged as

1    two conspiracies.  So I'm going to deny the Rule 29 motion.

2         Of course, it's up to the United States Attorney to

3    persuade the jury that this is a single conspiracy, and you

4    may make the same argument that you did here with me to the

5    jury.

6         MR. WISEMAN:  So that's one aspect of the Rule 29.

7    The other aspect of the Rule 29, the other basis for the

8    Rule 29 is the issue of materiality.  Putting aside whether

9    or not the government has sufficient evidence to prove one

10   conspiracy or not, as the Court knows, a key element, an

11   essential element of the underlying crime which the

12   conspiracy relates to is this materiality issue.  And that is

13   did the false misleading statements, were they material to

14   the decision maker.  And I am, frankly, awestruck by the fact

15   that the government did not have one person with any personal

16   knowledge as to the underwriting criteria used, what

17   decisions were made, how they were made with any of the loans

18   in question here.

19        The government brought in people who testified about

20   what they understood at the time, but nobody had personal

21   knowledge and nobody could say that, in fact, those

22   misstatements had an influence on the decision maker.

23        THE COURT:  Mr. Wiseman, I think the government

24   slam-dunked you with materiality in this case.  I've seen a

25   number of these mortgage cases go to trial.  And on previous

 1    occasion, I have thought myself that it would be a good

 2    defense tactic to argue materiality because the government

 3    would just sort of breeze past that element.  But I think the

 4    fact that defense lawyers have made that argument has opened

 5    the government's eyes, and they came in this case with one

 6    witness after the other.

 7         MR. WISEMAN:  But, your Honor, my point is that none

 8    of the witnesses they came in with had -- I mean I asked --

 9    the Court heard the questions -- they had no knowledge as to

10    the individual loans in question.

11         THE COURT:  They don't have to have anything to do

12    with the loans in question.  They testified ad infinitum

13    about how each one of these false representations would or

14    could have influenced the bank in determining whether to

15    approve the loan.  Now, the fact that they didn't make that

16    decision themselves doesn't detract from the force of that

17    evidence.

18         And there's nobody in here.  Now, the next trial

19    around, there may be some defense witness that somebody can

20    find on the defense side that would come in here and

21    contradict the witnesses the government calls.  But until

22    that happens, the evidence of materiality is overwhelming.

23    So that part of the motion is denied.

24         MR. WISEMAN:  That was the basis for the motion.

25         THE COURT:  All right.  Now, let me just look at

1    something on the instructions here.

2          I'm going to have to add an instruction here based

3    upon our discussion that I didn't have in the draft I was

4    going to give you.  So give me back the draft that I gave

5    you.  Give me a minute.  I already had that instruction typed

6    up, but I took it out.  I'm going to put it back in, and

7    we'll be back here within five minutes to give you the

8    correct draft.

9          (Recess taken.)

10          (Jury not present.)

11          THE COURT:  All right.  The defendant is present.

12    We're still meeting outside the presence of the jury.

13          Let me just go over my proposed instructions with you

14    so you know where they come from and what they address.

15    Number 1 is boilerplate.  Number 2 is defendant is presumed

16    to be innocent.  Number 3 is reasonable doubt.  Number 4,

17    boilerplate what the evidence is.  Number 5, things to

18    consider in evaluating the testimony.  Number 6, direct and

19    circumstantial evidence.  Number 7, what to consider in

20    determining credibility.  Number 8, defendant's not

21    testifying.  Number 9, I took this from one that the

22    government proposed.  And I think you must have assumed you

23    were going to call some other witnesses here when you

24    proposed it because you had Joshua Clymer in here as well.

25    So I've changed that.  It refers now to Anthony Symmes.

KELLY O'HALLORAN, OFFICIAL COURT REPORTER, USDC -- (916) 448-2712

 1          MR. HALES:  I don't recall if it came out if

 2     Ms. Sawyer had -- oh, it did.  It did.  She verified her use

 3     immunity.  That's right.

 4          THE COURT:  Use immunity came out on her, but my

 5     question is did the fact that Anthony Symmes received

 6     benefits from the government in connection with the case come

 7     out?  I don't recall that.

 8          MR. HALES:  I'm not sure if it did, your Honor.

 9          THE COURT:  Well, what you have in here with regard to

10     Symmes, you say:  This witness testified at trial pursuant to

11     the terms of a plea agreement he entered into with the

12     government.  Anthony Symmes previously received benefits from

13     the government in connection with this case.

14          He may have said that he testified pursuant to a plea

15     agreement, but I don't even remember that for sure.

16          MR. HALES:  I can check the government's notes, your

17     Honor.  I think we put that in expecting that he would be

18     crossed on that.  What I recall is that Ms. Hemesath fronted

19     that he had pleaded guilty and that he had gone to jail.

20          THE COURT:  Did he receive benefits from the

21     government or not?  If he did, even though it wasn't in

22     evidence, I'll leave this in.

23          MR. HALES:  He did, your Honor.  He received a 5K.

24          THE COURT:  So you want me to leave that in?

25          MR. WISEMAN:  Yes.

1          THE COURT:  I'll leave it in.

2          MR. WISEMAN:  Although, your Honor, if I may, with

3    respect to the first sentence, "You have heard testimony from

4    Anthony Symmes, a witness who has pled guilty to a crime

5    arising out of the same events for which the defendant is on

6    trial," I'm concerned about that language there because,

7    again, it goes back to my argument that they were two

8    separate conspiracies.

9          THE COURT:  Well, if you want, I'll say -- well, I

10   don't know.

11         MR. WISEMAN:  You can say that --

12         THE COURT:  I don't -- I wasn't here when Mr. Symmes

13   pled guilty.  I wasn't the judge.  I don't know what he pled

14   guilty to.

15         MR. HALES:  I can represent to the Court that one of

16   the properties listed in the factual basis of his plea

17   agreement is the Ceanothus property that was discussed at

18   length during this trial.

19         THE COURT:  Well, it's not essential to the

20   instruction whether it's the same events for which the

21   defendant is on trial or not.

22         MR. HALES:  It's not.

23         THE COURT:  So has pled guilty to a crime.

24         MR. WISEMAN:  Or pled guilty to a crime.  Yeah, that's

25   fine.

 1              THE COURT:  Fair enough?

 2              MR. WISEMAN:  Yeah.

 3              MR. HALES:  Fair enough.

 4              THE COURT:  All right.  So let's move on unless

 5     there's some further discussion on Number 9.  The next one,

 6     the government submitted one that says, "You've learned that

 7     Anthony Symmes was an informant who was involved with the

 8     government's investigation of the case."  I don't know that

 9     they learned that.

10              MR. HALES:  Mr. Wiseman asked if he wore a wire, and

11     he affirmed that he had.  Details were not gone into further

12     about it, but that question was made, perhaps prompted by our

13     submission of that jury instruction, I don't know, but it did

14     come up.

15              THE COURT:  Do you want this one in, Mr. Wiseman?

16     It's actually arguably a pro government instruction because

17     it says, "Law enforcement officers may engage in stealth and

18     deception, such as the use of informants and undercover

19     agents, in order to investigate criminal activities."  But if

20     you want it, Mr. Wiseman, I'll put it in.  But if you don't

21     want it --

22              MR. WISEMAN:  I don't need that in.

23              THE COURT:  All right.  We'll leave that one out then.

24     It's not one that I included in your package.  It's one that

25     I left out.

 1           So Number 10, defendant made a statement.  Number 11,

 2     expert witness.  Now, Number 12 I've modified a little bit

 3     because I'm not going to put the charts in evidence.  So if

 4     you look to see how it reads now, it more accurately reflects

 5     that they're not actually evidence in the case.

 6           MS. HEMESATH:  So we conferred about this over the

 7     break because my understanding is that they were admitted

 8     during the testimony.

 9           THE COURT:  They were, but they're not going to go

10     back into the jury room.

11           MS. HEMESATH:  So what we were considering was to have

12     it state instead:  These charts and summaries were admitted

13     in evidence but will not go into the jury room with you.

14           THE COURT:  That's very good.  Do you agree with that,

15     Mr. Wiseman?

16           MR. WISEMAN:  Yes.

17           THE COURT:  Do you agree?

18           MR. WISEMAN:  We --

19           THE COURT:  Instead of saying they were not admitted

20     into evidence, because the jury is likely to remember that I

21     said they were in evidence.

22           MR. WISEMAN:  Right.

23           THE COURT:  So I'm going to say these charts and

24     summaries were admitted in evidence but will not go into the

25     jury room with you.

1                    MR. WISEMAN:  That's fine.

2                    THE COURT:  And then the rest of it takes care of what

3       you were concerned with.  The rest of the instruction says,

4       "They are not themselves evidence or proof of any facts.  If

5       they do not correctly reflect the facts or figures shown by

6       the evidence in the case, you should disregard these charts

7       and summaries and determine the facts from the underlying

8       evidence."

9                    MR. WISEMAN:  That's fine.

10                   MR. HALES:  That's where we do have an issue, your

11      Honor, though, because at the time we closed our case, those

12      charts were in evidence, and so we did not submit, for

13      example, the purchase agreement and other documents on the

14      first escrows.

15                   THE COURT:  But you submitted testimony.  That's the

16      reason I let that stay in the charts.  His testimony supports

17      those parts of the chart that were not actually derived from

18      exhibits that are in evidence.

19                   MR. HALES:  Okay.  I want to make sure that in the

20      Court's view then, that means that we're not commenting on

21      things that are not in evidence if we argue in the closing

22      the facts from those first escrows where the documents aren't

23      in, but the agent did testify about them.

24                   THE COURT:  But we looked at those exhibits, and the

25      information on those exhibits either comes from another

1   exhibit in the case or from the witness's, the expert

2   witness's, own testimony that he gathered that information

3   from what he reviewed.  So that's testimony.  His testimony

4   is evidence in the case.

5           MR. HALES:  Okay.  I think that answers --

6           THE COURT:  You can argue anything on those exhibits.

7           MR. HALES:  Thank you, your Honor.

8           MR. WISEMAN:  Okay.

9           THE COURT:  All right.

10          MR. WISEMAN:  Your Honor, before we continue, with

11  respect to how the jury should evaluate the witnesses, this

12  would relate to the previous instruction, 9.

13          THE COURT:  Let me look at your proposed instruction.

14  Hold on a second.

15          MR. WISEMAN:  And that's on page 2 of our proposed.

16          THE COURT:  I know.  I know.  Wait a minute.

17          MR. WISEMAN:  Actually, this was a supplemental

18  instruction.

19          THE COURT:  I know.  Don't worry.  Let me go through

20  your instructions, Mr. Wiseman, because they're all covered

21  somewhere in mine, and I'm going to tell you where.

22          First of all, you want an instruction that they heard

23  testimony from Joshua Frye, Juan Reynaga, and Anthony Petri,

24  witnesses who admitted to falsifying documents but who were

25  not charged.  And then the next paragraph says:  For this

1    reason, you should consider the extent to which or whether

2    their testimony may have been influenced by this factor.  And

3    this factor is the fact that they admitted to falsifying

4    documents.

5         So when somebody just admitted to a crime, but he

6    didn't testify that he got a deal from the government or that

7    he was a cooperating witness or any of those other things

8    that go along with that standard instruction, you can't tell

9    the jury that they're to consider that fact in giving his

10   testimony less weight or considering it with more caution

11   because he hasn't gotten any benefits.

12        MR. WISEMAN:  I understand.  And my alternative

13   suggestion would be that we just delete the second sentence

14   and beginning on the third sentence just say you -- perhaps

15   maybe you therefore should examine the testimony -- the last

16   sentence of the proposed instruction -- of Josh Frye, Juan

17   Reynaga, and Anthony Petri with greater caution than that of

18   other witnesses.

19        THE COURT:  But why should they consider the testimony

20   of a witness who has simply admitted to falsifying documents

21   with any greater caution than they consider the testimony of

22   any other witness?

23        MR. WISEMAN:  Well, because they admitted that they

24   lied.  They admitted they falsified something.  So I think

25   their credibility is in question.

 1              THE COURT:  Okay.  So let's go back then.  If that's

 2      your point, let's go back to the credibility --

 3              MR. WISEMAN:  Okay.

 4              THE COURT:  -- instruction.  And there's one that I

 5      could include, whether the witness on a prior occasion has

 6      testified falsely or something like that.  Let me find the

 7      form.  I'll get that.

 8              MR. WISEMAN:  Okay.

 9              THE COURT:  And I wanted to tell you, while I'm

10      waiting to get that, the next instruction regarding Arthur

11      Watson's use of drugs, I put that in Instruction Number 7.

12              MR. WISEMAN:  Okay.

13              THE COURT:  And it's Item Number 7.  Whether the

14      witness was under the influence of any drug or alcoholic

15      beverage at the time of the events in question.

16              MR. WISEMAN:  Okay.

17              THE COURT:  Okay.  So that's covered there.  And then

18      the next one had to do with charts and summaries, and we've

19      just dealt with that.  And the next one had to do with expert

20      witnesses.  We've dealt with that.  And then your last one is

21      the elements of the offense, and we're going to get to that.

22              So I think I've covered everything once we get that

23      added factor in Number 7 that you've raised in your

24      supplemental instructions.

25              All right.  So the next, from 13, 14, 15, 16, 17, 18,

1    19, 20, all relate to the charges, and you can look those

2    over and tell me if you have any comment on them.  And then

3    21 is the money laundering count, and 22 is the aiding and

4    abetting theory on the money laundering count.

5         Note that the aiding and abetting instruction only

6    relates to the money laundering counts.  Because on a

7    previous occasion, I folded in to the government's strenuous

8    argument that I give an instruction that you can aid and abet

9    a conspiracy because I thought it hurt them more than I

10   thought it hurt the defendant, but I thought it was wrong and

11   confusing, and now I've got the defendant arguing that it

12   hurt him somehow.  So I'm not going to do that again.  So the

13   aiding and abetting instruction only goes to the money

14   laundering count.

15        Then the rest of them are boilerplate closing

16   instructions.  Why don't you take a look at those.  And if

17   there's anything else you wanted to discuss, let me know.

18        Well, I just looked at the Ninth Circuit's draft, and

19   it doesn't have anything, so we can add something ourselves

20   here in Number 7.  Between 5 and 6, we could say:  Whether

21   the witness on some prior occasion has lied or testified

22   falsely.  Would that be sufficient?

23        MR. WISEMAN:  Had lied or testified falsely.

24        THE COURT:  Right.  Has lied or testified falsely.

25        MR. WISEMAN:  Yes.  On a previous occasion.

1          THE COURT:  Yes.  On some prior occasion, has lied or

2     testified falsely.  That used to be in the instructions

3     because that's a common way to impeach a witness's testimony

4     with a previous inconsistent statement or something.

5          Any problem with that?

6          MR. HALES:  No.  It just occurs to me, your Honor,

7     that I don't know there's any indication any of those

8     witnesses actually testified falsely.

9          THE COURT:  That's why I said lied or testified

10    falsely.

11         MR. HALES:  Okay.  No.

12         THE COURT:  Because you can impeach a witness with

13    something that he said that was a lie if it's material.

14         MR. HALES:  I think that's fine.

15         THE COURT:  All right.

16         MR. WISEMAN:  Speaking of materiality, your Honor, I

17    don't see in the instructions concerning the elements --

18    maybe I didn't see it.  Oh, never mind.  I'm looking at 18.

19    Yeah, I'm looking at Instruction 18.  May I have a moment?

20         If I may address 18, your Honor.  Our proposed

21    instruction, which was included in page 6 of our supplemental

22    instruction, had a variation of the materiality standard.

23    I'm requesting that the materiality instruction, proposed

24    Instruction Number 18 that the Court has given, be changed

25    to:  The statements made or facts omitted as part of the

 1    scheme were material, that is, they had a natural tendency to

 2    influence or are capable of influencing the decision of the

 3    decision-making body to which it was addressed as opposed

 4    to --

 5          THE COURT:  Well, what about the rest of the sentence

 6    that says to part with money or property?

 7          MR. WISEMAN:  Let me confer.

 8          THE COURT:  I would have no problem with that.  Let me

 9    ask if this is what you want.

10          MR. WISEMAN:  Sure.

11          THE COURT:  On line 4, do you want me to change "a" to

12    "the" and after decision-making body add:  To which the

13    statements were addressed?

14          MR. WISEMAN:  Yes.

15          THE COURT:  Any problem with that?

16          MR. HALES:  No, your Honor.  I believe that language

17    is a direct quote from -- I don't know how to say it --

18    Kungys vs. United States, 485 U.S. 759 at 770.  And given

19    that, I think it's hard to argue so long as the money or

20    property portion is maintained at the end of the sentence.

21          THE COURT:  It will be maintained.  I can see why this

22    is better than the language that is in the instruction

23    because it's more specific.  You know, a decision-making body

24    could be some idiot standing on a corner, but that's not the

25    question.  It's the question of this decision-making body.

1        MR. HALES:  I think that improves the instruction.

2        THE COURT:  All right.  So we'll make that change.

3        MR. WISEMAN:  So the language would be --

4        THE COURT:  "Under the third element, statements made

5    or facts omitted pursuant to the scheme are material if they

6    had a natural tendency to influence, or were capable of

7    influencing, the decision-making body to which they were

8    addressed to part with money or property."

9        MR. WISEMAN:  That's fair.

10        THE COURT:  All right.  Any other suggestions with

11    regard to any of the remaining instructions?

12        MR. HALES:  No comments up through Instruction 22,

13    your Honor.  And I think that gets through the substantive

14    instructions.

15        MR. WISEMAN:  Your Honor, I just want to go back to

16    one point -- and I don't know if we've addressed it -- with

17    respect to the proposed instruction that's on page 2 of the

18    defendant's supplemental instruction.  This is, again, going

19    back to the instruction concerning the testimony of Josh Frye

20    and Juan Reynaga and Anthony Petri.  If we can resolve that

21    instruction.  The addition I'd like to make to that is that

22    the name Arthur Watson should be included in that too.

23        THE COURT:  No, but we're not going to have any names

24    in it, you see, because what we did was we went back and

25    modified Instruction Number 7.  We added a factor here

1    between Number 5, which is whether other evidence

2    contradicted the witness's testimony, and Number 6, which was

3    the reasonableness of the witness's testimony.  We added

4    whether the witness on some prior occasion has lied or

5    testified falsely.

6              MR. WISEMAN:  That's fine.

7              THE COURT:  So have you gone over all the other

8    proposed instructions?

9              MR. WISEMAN:  Yes.

10             THE COURT:  Any other objections, exceptions, or

11   proposed modifications?

12             MR. WISEMAN:  No, your Honor.

13             THE COURT:  All right.  I'll get this draft to you

14   before we break here, and then you'll have it before you go

15   to lunch.  It will be in the final form.

16             There's one other matter.  I pointed out to you that I

17   deliberately refrained from calling upon you to present any

18   evidence or calling any witnesses in the presence of the jury

19   because of the incident that occurred previously, and I

20   didn't want to highlight it any further.  But just in terms

21   of trial structure, do you think I ought to, when the jury

22   comes back, make sure that the record reflects and that they

23   understand that I didn't cut you off; that you have elected

24   not to call any witnesses?

25             MR. WISEMAN:  Yes, I think that would be appropriate.

1    And my suggestion would simply have the Court ask me that

2    specific question, which is usually asked at trial when the

3    government rests.

4        THE COURT:  All right.  So enough time has passed

5    between the incident and now that you think there's no harm

6    in my asking that in the presence of the jury?

7        MR. WISEMAN:  I don't think there's harm in asking

8    that.  I just would ask the Court -- I don't want to do a

9    redo -- I would just ask the Court to admonish Mr. Williams

10   not to engage in another outburst because I don't want to

11   revisit that issue.

12       THE COURT:  All right.  Did you hear what Mr. Wiseman

13   just said, Mr. Williams?

14       THE DEFENDANT:  I did, your Honor.

15       THE COURT:  Are you going to say anything when the

16   jury comes in?

17       THE DEFENDANT:  I have no plans on doing that, your

18   Honor.  No, I'm not.

19       THE COURT:  All right.  Then 1:30.  Stick around until

20   my law clerk gets you the instructions, and then we'll just

21   see you back at 1:30 with the arguments.

22       MR. WISEMAN:  Very well.

23       THE COURT:  Oh, the verdict form.  Did you see the

24   verdict form?  It's pretty basic, pretty simple.  I just want

25   to make sure we don't have any misprints or anything

1    erroneous in the verdict form.

2            MR. WISEMAN:  It appears to be fine.

3            MS. HEMESATH:  Looks good.

4            THE COURT:  All right.

5            (Lunch recess taken at 11:43 a.m.)

1                    SACRAMENTO, CALIFORNIA

2              WEDNESDAY, JULY 23, 2014, 1:30 P.M.

3                          ---oOo---

4          (Jury not present.)

5          THE COURT:  All right.  Are we ready to bring the jury

6   in?

7          MR. WISEMAN:  Yes, your Honor.

8          MR. HALES:  Yes.

9          THE COURT:  Very well.

10         (Jury present.)

11         THE COURT:  The jurors are all present.  The defendant

12  is present with counsel.

13         Mr. Wiseman, do you wish to call any witnesses or

14  present any evidence on behalf of the defendant?

15         MR. WISEMAN:  The defense rests.

16         THE COURT:  The defense rests.  Both sides have

17  rested.  We will now proceed with the arguments.

18         Who is going to present the argument on behalf of the

19  government?

20         MS. HEMESATH:  I am, your Honor.

21         THE COURT:  Ms. Hemesath, you may proceed.

22         MS. HEMESATH:  Thank you.

23         Good afternoon.  I'm going to begin a presentation

24  now, and the goal here is to match the evidence that you have

25  heard and seen during the trial with the verdict form that's

1    going to be waiting for you when you return to the jury

2    deliberation room.

3            I first want to begin with a note about how we

4    organized our exhibits.  We broke them into groups by

5    hundreds.  So beginning with the 100 series, that

6    corresponded to the Gidda Loop property that you heard Arthur

7    Watson testify about.

8            The 200 series corresponds to the Ceanothus property

9    you also heard Arthur Watson testify about.  So the loan

10   application for that property, the purchase agreement, those

11   are all in the 200 series.

12           The 300 series is the Rockin M property, also

13   Arthur Watson.

14           The 400 series, Joshua Frye, Baker Avenue.

15           500 series, Trap Rock, Juan Reynaga.

16           600 series, Lacie Clymer, Linday.

17           700 series, Woodforest and Anthony Petri.

18           And one more group, that's the zero to 100 series.

19   That is everything that's background information, corporate

20   documents, county recorder documents; a miscellaneous

21   category.

22           One thing that is not an exhibit and will not be with

23   you in the jury room is this presentation.  So to the extent

24   you're inclined to take notes, I would urge you to do so

25   because you're not going to be able to refer back to these

1    slides.

2          Count 1, conspiracy to commit mail and wire fraud.

3    There are two elements to this conspiracy count.  First, that

4    there was an agreement to commit either mail fraud or wire

5    fraud or both, and, second, Mr. Williams joined the

6    conspiracy knowing the objective and intending to help

7    accomplish it.

8          Let's start with the agreement.  There's no

9    requirement that the government prove a formal agreement or

10   that the coconspirators agreed on every detail of this

11   scheme, but they must have done more than just meet or

12   discuss matters of common interest or acted in similar ways.

13   And we have evidence here that they did more than that.  The

14   agreement was to commit mail and wire fraud, using the mails

15   and wires in furtherance of mortgage fraud.

16         You heard a lot of testimony about the agreement.

17   Arthur Watson testified that he and Mr. Williams agreed to

18   submit false loan applications to buy properties.

19   Tony Symmes testified that he, as the seller of these

20   properties, agreed with Garret Gililland and, by extension,

21   with Mr. Williams, to give money back outside of escrow on

22   these deals.

23         Joshua Frye, Lacie Clymer, Juan Reynaga, and

24   Anthony Petri all testified that they agreed with Williams

25   and Mr. Clymer to submit false loan applications.

1          Mr. Williams' agreement with Josh Clymer is

2     documented, and you see evidence of that agreement here when

3     Leonard Williams gives Josh Clymer authority to sell assets

4     for Diamond Hill Financial.  This is Government's Exhibit 4.

5          You also see it here.  This is the bank signature card

6     for the Bay Area Real Estate bank account.  Both signatures

7     on the card, Josh Clymer, Leonard Williams.  This is

8     Government's Exhibit 13.

9          Here's another one.  The signature page from the Bay

10    Area Real Estate corporate documents.  50/50 partners, Joshua

11    Clymer and Leonard Williams.  This is Government's

12    Exhibit 553.

13         There's more evidence of the agreement.  What about

14    the checks?  Here's an example.  The check Leonard Williams

15    writes to Joshua Clymer on the Rockin M deal.  This is

16    Government's Exhibit 327.  Memo line, Chico property.

17    Diamond Hill Financial check signed by Leonard Williams,

18    endorsed by Joshua Clymer, and deposited into his account.

19         The loan applications.  Those are also evidence of

20    Williams' and others' agreement to commit mail and wire

21    fraud.  This is Joshua Clymer's sister Lacie's loan

22    application representing that she works at Diamond Hill

23    Financial.  Alongside it, Leonard Williams' representation to

24    the lender that this employment is true.

25         Lacie testified that she worked with her brother,

1    Joshua Clymer, on this deal, but here is Leonard Williams

2    buttressing the lies on the application.  That's evidence of

3    an agreement too.  The document at the top of the screen is

4    Government's Exhibit 602.  The bottom of the screen,

5    Exhibit 603.

6         You heard testimony of conversations that witnesses

7    participated in with Leonard Williams and Joshua Clymer.

8    Josh Frye testified about his visits to the Watt Avenue

9    office of Bay Area Real Estate where he spoke with both of

10   them about how to get the deal done on Baker Avenue.

11        Juan Reynaga testified that he went out to look at

12   properties with both Leonard Williams and Joshua Clymer.

13        Anthony Petri, meeting both of them in the Watt Avenue

14   office, conversations with both of them about how to proceed

15   with the loan application.

16        The conspiracy in this case was bigger than just the

17   agreement between Williams and Clymer.  You heard

18   Tony Symmes.  He was part of the conspiracy, even though he

19   and Mr. Williams never actually met.

20        Through Garret Gililland, another coconspirator,

21   Williams agreed to find a buyer for the houses that Symmes

22   wanted to sell, and they all agreed to misrepresent to the

23   lender the true purchase price of the house.

24        And all of the buyers we heard from, they're part of

25   the conspiracy.  They may not have understood the full extent

1    or have taken the time to read the documents that they were

2    signing, but they were part of the agreement to make

3    misrepresentations to the lenders for the purposes of getting

4    a house or cash or both.

5         To prove a conspiracy, the government does not need to

6    prove that there was an agreement on every detail.  There is

7    not a requirement that all members joined at the same time.

8    Members can come in earlier or later.  Mere association with

9    or meetings with someone is not enough to establish the

10   conspiracy, but association or similar conduct may be

11   evidence to consider.

12        The agreement may be proved by direct or

13   circumstantial evidence.  In this case, we have both.  Direct

14   evidence is something a witness saw, did, or heard.  It can

15   be documentary.  Circumstantial evidence is where you rely on

16   your common sense to make an inference.  The example that's

17   often given is if you see someone inside a building holding a

18   wet umbrella, you may use your common sense and infer that

19   the weather outside is rainy.

20        In this case, the direct evidence of the agreement,

21   some of the documents we just saw, the conversations

22   testified to by the witnesses.  The circumstantial evidence,

23   it's that common sense portion.  Leonard Williams verified

24   employment at Diamond Hill because he understood that that

25   was an important factor in getting these loans funded.

1          You may infer that he would not have falsely verified

2     employment if he were not part of the agreement to commit

3     mail and wire fraud.

4          You will hear in the instructions that you may

5     consider both direct and circumstantial evidence in

6     determining whether there is an agreement.

7          All right.  Mail and wire fraud.  Mail and wire fraud

8     are not the actual charged crime here, but they are the

9     object of the conspiracy.  You must agree on the particular

10    crime that the conspirators agreed to commit, or if it's

11    both, you must all agree that the object was to commit both

12    wire and mail fraud.  So wire fraud, mail fraud, or both, you

13    must all agree.

14         What's mail fraud?  It's a scheme to obtain money or

15    property through material misrepresentations.  Participation

16    in the scheme must be knowing, and the defendant must possess

17    an intent to defraud.  But there's an important point to make

18    about the intent to defraud, and that is that reckless

19    disregard for falsity is the same thing.

20         Under the law, someone who has a reckless indifference

21    as to whether the statements are false is just as culpable as

22    someone who knows that they're false.

23         The last element of mail fraud is proof of mailing.  A

24    mailing is caused when one knows that the mails will be used

25    in the ordinary course of business or when such use can be

1    reasonably foreseeable.  The requirement is not that the

2    actual false fraudulent document be sent by mail but rather

3    that the use of the mail is an important part of the scheme.

4         And here, that's the mailing of the deeds of trust,

5    the mailing of the grant deeds, an essential part of a real

6    estate transaction, as you heard from the county recorder's

7    offices.

8         And the term mail includes both mail by the U.S. mail

9    and also commercial carriers operating in interstate

10   commerce.

11        Those are the nuts and bolts of mail fraud, which is

12   one of the objects of the conspiracy in this case, I submit

13   to you.

14        The second object, wire fraud.  These are very

15   similar.  This is the same.  A scheme to obtain money or

16   property through material misrepresentations, knowing

17   participation and intent to defraud.  And then this is the

18   third element, that an interstate wire communication

19   occurred.

20        That's going to be here, the wiring of the funds from

21   the lender into the escrow company and also out of escrow

22   into the Bay Area Real Estate bank account.  And this is a

23   multiple object conspiracy, so you may find that the

24   agreement was either mail fraud or wire fraud or both.

25        So that's the agreement.  That's mail and wire fraud.

1           What was the scheme?  How did this work?

2           The scheme is pretty simple.  It's to get money out of

3     these houses.  To get the lenders to fund loans that resulted

4     in money to Williams and his coconspirators.

5           Lying on loan applications.  You saw a lot of evidence

6     of this.  The lies on the loan applications allowed them to

7     secure loans to unqualified buyers.

8           The second part of the scheme, inflating the purchase

9     price.  The purpose of inflating the purchase price was to

10    get as big a loan as possible.  That pot of money needed to

11    be big for there to be money left over at the end for the

12    coconspirators.

13          Inflating the purchase price here included a failure

14    to disclose that the seller was not actually getting the down

15    payment on these properties and, second, a failure to

16    disclose cash going back to the buyer outside of escrow.

17    That cash going back to the buyer outside of escrow was what

18    Williams and his coconspirators used to induce the buyers, to

19    give them an incentive, to do the deal.

20          I'm going to walk you through a lot of what the

21    specific misrepresentations that you saw were, but I want you

22    to keep in mind that the end goal was really getting the

23    money out of the houses.  And so in a certain sense, it isn't

24    really necessary to focus as much on the details of each

25    transaction but, rather, keeping in mind why is it that they

1    were taking these steps on these loan applications.

2          So the end goal are these, the checks.  This is on the

3    Ceanothus property, top one, to Diamond Hill Financial,

4    that's Government's Exhibit 223, and then the check to

5    Josh Clymer, 227.

6          Rockin M, top one, to Diamond Hill Financial,

7    Government's 326-A, and then to Josh Clymer, 327.

8          Baker Avenue, 425 to Diamond Hill Financial.  426 to

9    Josh Clymer.

10          Trap Rock.  520 to Diamond Hill Financial.  Excuse me,

11    Exhibit Number 520 to Diamond Hill Financial.  And please

12    recall the only signator on the Diamond Hill Financial bank

13    account, Leonard Williams.

14          And then 521, Exhibit 521, the check to Josh Clymer on

15    that property.

16          Linday Way.  You may recall that's the property with

17    Josh Clymer and his sister.  In lieu of showing you the

18    checks, I'm going to show you this chart which I submit to

19    you really represents nothing more than a sausage factory to

20    turn the loan amount on the top, there $382,000 from NL,

21    Inc., into the payout checks on the bottom.  This is a very

22    elaborate way of turning that loan amount into those checks.

23    It's a complicated way of extracting cash from a home loan.

24          This was a home loan that Lacie Clymer was not

25    qualified for but was funded, nonetheless, because of the

1    lies by Mr. Williams about her employment and others.  He

2    verified employment.  And then down at the bottom, the check

3    to Lacie Clymer, he wrote that check out of the Diamond Hill

4    Financial account, which is cash back outside of escrow and

5    undisclosed to the lender.

6         I'm going to save the Woodforest checks until the end

7    because those are our money laundering counts, and I'll spend

8    a little bit more time walking you through those.

9         So the criminal scheme here was to get lenders to fund

10   the loans that would result in money to Mr. Williams,

11   Mr. Clymer, and others.

12        All right.  How did they do it?  Loan applications.

13   You didn't see a single truthful loan application in this

14   entire trial.  And the lies on the loan applications were not

15   small.  They were whoppers.  They went right to the heart of

16   what the lenders were looking for to determine the

17   qualification of these buyers to take out these loans.

18        Remember the testimony of Josh Frye.  He testified

19   that he originally submitted a loan application with his true

20   income and asset information on it and that that application

21   was rejected.  When he went to apply for a loan for the Baker

22   property with Diamond Hill and Bay Area Real Estate, his new

23   loan application prepared with Mr. Williams and Mr. Clymer

24   was approved.  How was it approved?  With the

25   misrepresentations on the loan application.  These are the

1   misstatements, that the borrowers worked at Diamond Hill

2   Financial.

3           You saw this on Arthur Watson's application, you saw

4   it on Josh Frye's application, Lacie Clymer's application,

5   and Anthony Petri.  You heard from every single one of those

6   witnesses that this was simply untrue.  None of them ever

7   worked a single day at Diamond Hill Financial.

8           You observed these witnesses here in court.  You saw

9   their demeanor.  You may take their word for it.  You may

10  also apply your common sense and decide is it plausible that

11  these individuals, in fact, worked at Diamond Hill Financial.

12          Arthur Watson, is it plausible that he was a marketing

13  director at Diamond Hill Financial for eight years?  This is

14  Arthur Watson's Ceanothus application.  There it is at the

15  bottom, Diamond Hill Financial.  Sorry.  That was

16  Government's 302.  This is the Rockin -- sorry, 202.  This is

17  the Rockin M loan application, Government's 301.  Same thing

18  at the bottom, Diamond Hill Financial, Arthur Watson.

19          Joshua Frye's application on Baker Avenue, Exhibit

20  402.  Diamond Hill Financial.  Worked on the job two years,

21  six months.

22          Lacie Clymer's application for Linday Way,

23  Government's Exhibit 602.  Worked at Diamond Hill Financial

24  three years.

25          This is Anthony Petri on the Woodforest loan

1     application.  Employer, Diamond Hill Financial, two years,

2     six months.

3          You didn't hear any testimony that these individuals

4     knew each other, yet they were all working at the same

5     company.  You didn't hear any testimony about any of them

6     ever having seen anyone else in that office that might match

7     the description of these buyers.

8          Let's go back to the case of Arthur Watson for a

9     minute.  Remember he testified about a first house, the

10    Gidda Loop house, that he bought with the assistance of

11    Mr. Williams.  This is the one where he testified he

12    initially got the $15,000 cash back, so the first deal.

13    Remember that Mr. Williams was actually the one who submitted

14    this loan application on that property.  This is Government's

15    Exhibit 107.  "Congratulations.  Your loan application which

16    was submitted by Leonard Williams of Great American Mortgage

17    has been approved."  This is the loan application on that

18    property.  And Mr. Watson's true employer is listed on this

19    one.

20         You heard Mr. Watson testify yes, I was a handyman.  I

21    worked at D and W Handyman Services.  This is in the year

22    2006.  This is Government's Exhibit 102.  In 2006,

23    Mr. Williams, who submitted this loan application, knew and

24    told the truth that Arthur Watson worked as a handyman at D

25    and W Handyman Services, and yet on every document that

 1   follows and even when interviewed by law enforcement, as you

 2   heard through the testimony of Special Agent Harrison,

 3   Leonard Williams misrepresents that Arthur Watson works for

 4   him at Diamond Hill Financial as a marketing director.

 5        This is one year later.  This is the Ceanothus

 6   application.  Right there at the bottom, there's the lie

 7   about Diamond Hill Financial employment.  It is not possible

 8   for Arthur Watson to have worked eight years at Diamond Hill

 9   Financial if just one year before his true employer was D and

10   W Handyman.  Leonard Williams knew Watson's true employer was

11   the handyman.  It was submitted on the Gidda loan application

12   that he himself submitted.

13        The employment verifications.  This is the phone

14   number for Diamond Hill Financial from the signature card

15   that you saw received through the U.S. Bank exhibit.  This is

16   Government's Exhibit 7.

17        These are all the instances of employment verification

18   you saw in this case.  Starting up here on the Ceanothus

19   property, Diamond Hill Financial letterhead.  "To whom it may

20   concern:  I am writing this letter regarding my marketing

21   director Arthur Watson.  Due to the fact that Arthur Watson's

22   job is an Internet-based position, his work can be done from

23   any location and is therefore not dependent on him living in

24   Sacramento."  Because he's buying a house in Yuba City;

25   right?  "If you have any questions, please do not hesitate to

1    call me directly.  Regards," signature Leonard Williams,

2    "CEO/president."

3          Recall Mr. Watson's testimony.  He did not even own a

4    computer.  Over here.  Again, Ceanothus.  Remember this

5    witness, Jessica Sawyer, she worked with Garret Gililland,

6    and she testified about this email informing Mr. Williams the

7    lender will be calling to verify the information for Watson's

8    employment.  "Please verify the following information.  He is

9    a marketing director and has worked at Diamond Hill from

10   February 5th, '99 to present.  He makes 9,400 monthly.  If

11   you have any questions, please call me.  Thank you, Jessica."

12   She testified they did have telephone conversations.

13         And then the next thing you know, same property, still

14   Ceanothus, this is from the loan file.  Applicant current

15   employment verification.  That is their computer system.

16   Employer, Diamond Hill Financial.  Job title, marketing

17   director.  Time on job, eight years.  Verbal VOE verified

18   with Leonard Williams CEO/president.  "Arthur currently

19   working as marketing director, date of hire as of February

20   5th, 1999, total of eight years, three months."

21         Next property, Rockin M.  Different lender.  Telephone

22   verification of employment.  This is Government's Exhibit

23   303.  Borrower information, Arthur Watson.  Employer, Diamond

24   Hill Financial.  Telephone number, same one that you see

25   there.  Start date, February 5, 1999.  Verified with Leonard

 1    Williams.  Phone number, same as above.

 2         Baker Avenue, different lender, NL, Inc.  Borrower

 3    name, Joshua Frye.  Employer, Diamond Hill Financial.

 4    Employment verified by Leonard.  Telephone number, same as

 5    you see on there.

 6         Next property, Lacie Clymer, NL, Inc., same lender.

 7    Employer, Diamond Hill Financial.  Employment verified by

 8    Leonard Williams.  Phone number, same as you see on the

 9    screen.  This is Government's Exhibit 603.

10         And on the Woodforest, Anthony Petri.  Two

11    verifications of employment from that lender.  One written.

12    Sales manager.  Signature down at the bottom.  Date, June 24,

13    2008.  And then again, by telephone, re-verification of

14    employment.  Borrower, Anthony Petri.  Employer, Diamond Hill

15    Financial.  Person contacted, Leonard.  This is Government's

16    Exhibit 708.

17         In addition, remember the testimony that there was

18    another layer of checks in place on these employment

19    verifications.  The individuals at the lenders, at least some

20    of the lenders who testified, had to do an independent

21    confirmation that the phone number for the company Diamond

22    Hill was the phone number for that company by looking it up

23    on the Internet, printing it out, and putting that sheet of

24    paper into the loan file that they had independently

25    confirmed that this was the phone number for Diamond Hill

1    Financial.

2         In one of the loan files, there was even a lookup

3    where the lender had gone onto an online salary checker to

4    see if the level of income represented matched what one might

5    typically expect for that position.  That was the sales

6    representative position, and that's Government's Exhibit 433

7    in the Joshua Frye loan application.

8         The point of these verifications, I submit to you,

9    means that it matters to the lenders whether these buyers

10   actually work where they say that they do.  If it didn't

11   matter, you could put anything you wanted on the loan

12   application, and there would be no point to the verification

13   process.  But it did matter what answer was given when they

14   called to make the employment check.  And Mr. Williams knew

15   that it mattered, and that's why he lied on these employment

16   verifications, because if he told the truth that these people

17   did not work at Diamond Hill Financial, these loans might not

18   get funded.  He had to sustain the lie to get these loan

19   applications approved.  That's the first type of

20   misrepresentation on the loan applications.

21        The second misrepresentation on the loan applications

22   is the monthly income.  On Arthur Watson's Ceanothus

23   application, his income is stated as $11,552 per month.  On

24   Rockin M, it is stated as $10,473.26 per month.  And you

25   heard his testimony that in reality, he made a fraction of

1    that.

2          On Joshua Frye's application, his income is stated as

3    $7,292 per month.  His testimony was at the time, he actually

4    had no steady job and that he estimated he made perhaps 5 or

5    $6,000 for that entire year.

6          Lacie Clymer's loan application.  Her income at

7    Diamond Hill is stated as $8,893, and her testimony was that

8    her actual income from working part time at Aaron Brothers

9    and Pottery Barn was maybe 2 to $300 per month.

10          Finally, Anthony Petri's loan application put his

11   income at $11,200 per month.  He testified that the truth was

12   that he made $3,000 at a car dealership and another $1,000 in

13   rental income.  Don't forget that on the Anthony Petri

14   application, his income amount was supported by

15   documentation, a full documentation loan.  These are the W-2s

16   and pay stubs.  But if Petri never worked at Diamond Hill

17   Financial, these earnings statements are not real.  This is

18   Government's Exhibit 705.  This W-2 is not real.  This is his

19   2006 purported W-2.  This is Government's Exhibit 706.  And

20   this one purportedly from 2007, Government's Exhibit 707.

21          Here's one more example of income falsification on

22   loan applications, and that's back in the Arthur Watson

23   Ceanothus and Rockin M deals.  You recall that Mr. Watson

24   testified that he never moved to the Gidda Loop property in

25   Yuba City.  That that was always meant to be for renters, to

1    generate rental income.  But not rental income for

2    Mr. Watson.  Rental income for Mr. Williams.  Yet on Arthur

3    Watson's loan applications, a representation is made to the

4    lenders that he is receiving rental income from the Gidda

5    Loop property.  But this isn't true.  Mr. Williams is the one

6    who gets and keeps the rental income from the Gidda Loop

7    property.  There is the check, rent, Gidda Loop, in the memo

8    line.  This is Government's Exhibit 117, an example of the

9    rental check which it was confirmed was deposited into the

10   Diamond Hill Financial bank account.

11          The next category of misstatements on the loan

12   applications was in the assets.  And you remember the

13   testimony from the lender witnesses that assets are important

14   because they may be needed to complete the transaction in

15   giving the down payment.  Also, they show some cash reserves

16   in case anything comes up financially for the borrower.  And

17   they show the ability to save.

18          Beginning again with Arthur Watson, the representation

19   on his loan application was that he had $10,093 in his Bank

20   of America account.  And this representation to the lender

21   was backed up by what looked like copies of his Bank of

22   America bank account statements.  But as we learned in the

23   testimony from the Bank of America witness, the loan file

24   copies of the monthly bank statements were not authentic.

25          I'll put one more example up here, or I'm putting one

1    example up here to show you the real and the not authentic.

2    But all 12 months of these bank statements are in evidence,

3    and I invite you to review them back in the jury room, and

4    you can compare face to face, month to month, what these look

5    like.

6            The Bank of America certified copies of the bank

7    statements are Government's Exhibit 230.  The Ceanothus loan

8    file copies are 209-A.  The real one on your screen is the

9    one on the left, and the loan file is the one on the right.

10   And this particular month is the statement for the month

11   beginning April 26, 2006.

12           Mr. Johnson from Bank of America also testified that

13   the loan file copies of Mr. Watson's Bank of America

14   statements purportedly shown in the Rockin M loan file were

15   not true copies and did not match the certified copies of the

16   Bank of America monthly statements for that file.

17           Here's an example of that.  On the top is Government's

18   Exhibit 306, the loan file copy.  On the bottom is the

19   certified Bank of America statement from the same month.

20           Recall the testimony of Mr. Watson.  He testified that

21   Mr. Williams told him that he needed bank account statements

22   for the loan applications.  Mr. Watson testified that he gave

23   Mr. Williams his account information and access information.

24   Mr. Watson testified that he did not himself falsify these

25   documents, he did not ask anyone else to do it, and remember

1    he did not even have a computer.  The next thing we know is

2    that these falsified bank records turn up in the loan files

3    for Mr. Watson's loan applications.  The applications that

4    Mr. Watson testified the only person he worked with to

5    prepare was Mr. Williams.

6         There's one more piece of evidence on Arthur Watson's

7    assets, and you may recall this from the testimony of

8    Jessica Sawyer.  This is the $8,000 that goes into the Watson

9    bank account to make it look like he had more cash in the

10   bank at that particular moment in time than he really did.

11   You saw an email, and I just cut out the relevant part of

12   that email that she testified to.  This is the email where

13   she and -- Jessica Sawyer and Garret Gililland are discussing

14   the need for the $8,000.  And this is Government's

15   Exhibit 307.  "Watson:  Need check for 22,000 and 8,000 in

16   Bank of America account ASAP."  And the bolded part which is

17   the original email, "Leonard said that he was faxing a copy

18   of check today to Sandra and Carlos."  And here's the check.

19   Mr. Williams giving Mr. Watson the $8,000.  This is

20   Exhibit 308.  And from the loan file on that property, Rockin

21   M, a verification of the deposit into Arthur Watson's

22   account.  This is Government's Exhibit 310.

23        Why is the lender verifying this deposit?  Because it

24   was important to them that the borrower actually have the

25   amount of assets that they said they did.  If it wasn't

1      important, why go through this rigamarole of lying on the

2      loan application, depositing $8,000 into Mr. Watson's account

3      that wasn't really his, waiting until it's verified, and then

4      immediately after this check, Mr. Watson is giving the $8,000

5      right back to Mr. Williams.

6           You may recall his testimony on this subject.  He had

7      absolutely no memory of getting $8,000 on this property.  He

8      remembered that, to the contrary, on this third property,

9      Rockin M, he got no money out of the deal.  This $8,000 was

10     never his to keep, but that's not the impression that the

11     lender was given.

12          There are other misrepresentations of assets in these

13     loan files.  The supposed $60,000 in Joshua Frye's bank

14     account, he testified that that was not true.  The supposed

15     $147,000 in Lacie Clymer's bank account.  You may recall when

16     we saw her bank account statement put up on the screen here,

17     the balance in her bank account for that month was $12.  The

18     supposed $84,000 down payment in Juan Reynaga's purchase that

19     was to have come from his brother's gift after winning big in

20     Las Vegas, that was a fiction.  Mr. Reynaga testified to

21     that.  And Anthony Petri, a supposed $60,000 in a gift from

22     his mother, also a fiction.  He testified that that money

23     never existed.

24          One more category of misrepresentations is the primary

25     residence.  Each of these loan applications represented that

1      the buyer would live in the house as a primary residence.

2      And you heard testimony from the lenders as to why this

3      factor is important.  People treat their own homes

4      differently than they do for investment properties.  It is

5      riskier to lend money on an investment property.

6           You heard testimony from Mr. Walsh at CIT that his

7      company simply didn't offer 100 percent financing loans on

8      investment properties during the time period in question.

9      But that's exactly what the Ceanothus, Arthur Watson property

10     was, a 100 percent financing on an investment property.

11     Mr. Watson never even went to Chico to see the house.

12          It is the buyer's signatures on all of these documents

13     that represent that they are going to live in the house as a

14     primary residence.  It's on the loan application, and it's in

15     the affidavits of occupancy that you also saw.  But you have

16     to ask yourselves whose idea it was to make this

17     representation.  Is it plausible that Arthur Watson was aware

18     that the lenders had a policy not to give 100 percent

19     financing on investment properties and therefore better

20     include the paperwork and make the representation that this

21     is a primary residence?  No.  You can observe Mr. Watson's

22     demeanor in this court and conclude that that idea came from

23     somewhere else.  And again, the only person that he worked

24     with on these deals was Leonard Williams.

25          I want to speak for a minute about coschemer

1   liability.  We do not know with certainty who filled out

2   which portions of these loan applications and submitted it to

3   the lender, and we do not have to prove that.  In a

4   conspiracy case, each member of the conspiracy is responsible

5   for his coconspirator's actions.  Even if Mr. Williams did

6   not know what his coconspirators said or did, he is still

7   responsible for their actions if those actions were a

8   reasonably foreseeable part of the scheme.

9          Whether it was Josh Clymer or Leonard Williams or the

10   buyers themselves or any other member of the conspiracy who

11   filled out these loan applications together or separately,

12   what matters is that Leonard Williams could reasonably

13   foresee that fraudulent loan applications were going out to

14   these lenders.  And once those loan applications go out, he

15   backs up the lie on the verifications of employment.  That is

16   willful participation with intent to advance the purpose of

17   the conspiracy.

18          In addition to the verifications of employment, I want

19   to take a minute to stress the evidence of Mr. Williams'

20   involvement in all stages of this conspiracy.  And I pulled

21   together some examples of documents that bear his signature

22   so you can take a look.

23          All right.  Up here, you remember the testimony of

24   Terrance Murrell who briefly signed on as chief financial

25   officer of Diamond Hill Financial, only to have a change of

1   heart later.  He testified that this is Leonard Williams'

2   signature.  You also have the bank account signature card for

3   Diamond Hill Financial, Leonard Williams' signature.  But

4   look at this one.  Also a bank signature card.  I submit to

5   you this is a different version of Leonard Williams'

6   signature.  This is the Diamond Hill Financial signature

7   card.  This is the Bay Area Real Estate signature card.  This

8   one, Joshua Clymer.  This one, Leonard Williams.

9          Up here, this is the Gidda Loop loan application.

10  Signature down at the bottom.  Up here, that's Arthur Watson.

11  Down here, that's Leonard Williams signing the Gidda Loop

12  loan application as the representative taking the information

13  for government monitoring purposes.

14         This is the letter in the Ceanothus loan file, the I

15  am writing regarding my marketing director, Arthur Williams

16  (sic).  That's his signature on that letter.  This is his

17  signature depositing the check on the Gidda Loop rent into

18  the Diamond Hill Financial bank account.

19         Another, Williams' signature.  This one is on the

20  payout check on the Ceanothus property to Joshua Clymer

21  signed by Leonard Williams and then deposited here by

22  Joshua Clymer.

23         This one, the check to Lacie Clymer on the Linday Way

24  property out of the Bay Area Holdings bank account signed by

25  Leonard Williams.

1          And on this one, Exhibit 717, out of the Bay Area bank

2     account into the Diamond Hill Financial account, written by

3     Leonard Williams, and then deposited by Leonard Williams.

4          You see examples of that in every loan file of every

5     property that we have presented to you in this case,

6     Mr. Williams is touching a lot of the documents.

7          There is a second type of misrepresentation in these

8     loans, and that's what I mentioned before, the purchase

9     price.  There are various aspects to this misrepresentation.

10    And again, not every property has every type of

11    misrepresentation but, instead, a combination depending on

12    what Williams and Clymer believed the lender would require of

13    them on that particular transaction.

14         Remember the testimony from the lenders that the value

15    of the house is a key piece of information that they use in

16    determining whether to fund a loan.  Remember the testimony

17    that they would never give a loan in excess of the value of

18    the house.  Remember the testimony that they would use

19    whichever was lower, the appraisal or the purchase price.  So

20    even if these houses are appraised at a higher amount, the

21    lenders still want to know the true purchase price to know

22    how big a loan to fund.  Inflating the purchase price of the

23    properties was an inherent part of the scheme.

24         Remember the testimony of Terrance Murrell who

25    Williams approached early on about doing a double escrow

1   deal.  He gave Murrell two properties that he wanted

2   Mr. Murrell to buy as investment properties, and he told

3   Mr. Murrell that these properties were in the $400,000 range.

4   This is a photograph, as identified by Mr. Murrell, of one of

5   those houses.  And Mr. Murrell's instant reaction that there

6   was no way this house was worth the $400,000 that Leonard

7   Williams was telling him it was worth, and Mr. Murrell's

8   testimony was that he walked away from this deal.

9          On Ceanothus, the price was also misrepresented.  On

10   the purchase agreement, the price is stated as $375,000.  But

11   remember the testimony of Tony Symmes, the seller, who told

12   you that the true purchase price he was willing to accept on

13   this house was $325,000 and that anything over that amount in

14   the loan was money for Gililland and Williams.

15          Rockin M, same thing.  Tony Symmes' real purchase

16   price, $375,000.  What was stated on the loan application was

17   $440,000.  This price was also in the purchase agreement

18   which the lender got a copy of and testified that it would be

19   something you would rely upon.

20          Baker Avenue.  The stated purchase price was $350,000.

21   That's put in the purchase agreement between Joshua Frye and

22   Bay Area Real Estate.  Joshua Frye 's loan amount was only

23   for $315,000.  And his testimony was that he did not have any

24   money of his own to put in and that he did not recall any

25   discussion of having to make a down payment.  I submit to you

1    that the true purchase price of this property was $315,000.

2         Trap Rock, Juan Reynaga.  The real purchase price

3    Mr. Reynaga testified to, based on his conversations with

4    Mr. Williams and Mr. Clymer, was the loan amount, $336,000.

5    But the purchase price stated on the loan application was

6    $420,000.

7         Lacie Clymer, similar to Joshua Frye.  No real

8    conversation with Williams or Clymer about what the actual

9    price would be, but her testimony, backed up by her $12 bank

10   account, was that there was no money for the

11   hundred-thousand-dollar down payment that was required on

12   this property and that the lender relied upon in determining

13   whether to fund the loan.  I submit to you that the only real

14   money in this house was the money from the funded loan of

15   $382,000.

16        And, finally, Woodforest and Anthony Petri.  He

17   testified that the real price he negotiated with Mr. Williams

18   and Mr. Clymer was $240,000, yet the purchase price stated on

19   his loan application was $300,000.

20        Hand in hand with the misrepresentations about the

21   purchase price of the properties were the misrepresentations

22   about the down payments.  You heard testimony from the

23   lenders that down payments are important because they give

24   skin in the game.  When a borrower has some of his own money

25   tied up in the house, that makes the loan less risky from the

1    lenders' perspective.  You heard testimony that people are

2    less likely to default on house payments when their own money

3    is also invested in the house in the form of a down payment.

4         On Rockin M where there is supposed to be a $22,000

5    down payment, you've heard testimony from both Tony Symmes

6    and Arthur Watson that the down payment was never given and

7    never expected.  And this is from Government's Exhibit 318.

8         On Baker Avenue, on the sale in the second part of the

9    double escrow from Bay Area Real Estate to Josh Frye, you

10   heard testimony from Josh Clymer that he had no money for the

11   down payment, he had no idea who Chahal Hardip was, the

12   stated source of the down payment in that escrow, and yet

13   checked on his loan application, is any part of this down

14   payment borrowed, answer, no.  This is Government's

15   Exhibit 402.

16        On Trap Rock, the down payment was the $84,000, but

17   you heard testimony from Juan Reynaga that he had an

18   agreement with Williams and Clymer that the $84,000 check he

19   brought to escrow would never be cashed, and he knew it

20   couldn't be because this money was not real.  It never

21   existed.  The supposed gift letter based on the supposed

22   winnings from Las Vegas were a fiction.  And in this sale,

23   Williams and Clymer are, as the sellers of the property in

24   the second leg of the transaction, willing to forego that

25   down payment because they know that eventually they will get

1      a portion of the real money which is the loan coming in from

2      the top.  And this is the gift letter affidavit.  This is

3      Government's Exhibit 505.

4            Linday Way, same thing.  Lacie Clymer did not have

5      $96,000 for a down payment.  Joshua Clymer, her brother,

6      acting as Bay Area Real Estate, seller, he didn't demand it

7      because, I submit to you, he knew she didn't have it and

8      because the money he was really after was the loan funds,

9      which he got, keeping $36,000 for himself and giving Lacie

10     $9,500.  And this is Government's Exhibit 602.

11           Woodforest, the $60,000 down payment was foregone by

12     Bay Area Real Estate because they knew there was no $60,000

13     gift.  The $60,000 didn't exist, and they didn't demand it

14     because the down payment listed was merely a means of getting

15     the lender to fund as large a loan as possible to give

16     Mr. Williams and Mr. Clymer as much money as possible out of

17     this transaction.

18           There's one more aspect to the misrepresentation about

19     purchase price, and that has to do with the cash going back

20     to the buyer outside of escrow.  It is a fairly common sense

21     concept.  If I agree to sell this to you for a dollar, but we

22     also agree that you're going to give me back 50 cents, the

23     question is what's the real purchase price on this gadget?

24           Same concept.  If Bay Area Real Estate agrees to sell

25     a buyer a house for $350,000 but also agrees to give the

1    buyer back $20,000 at the end, what's the real sales price of

2    the house?

3           And this is where all the testimony about the HUD-1

4    settlement statements came in.  You heard testimony that all

5    of the monies changing hands in a real estate transaction are

6    to appear on a HUD-1, the summary settlement statement.  If a

7    seller did have an agreement with a buyer to give cash back,

8    there is a spot where that information could be added.

9           There's an example.  This is from the Joshua

10   Frye HUD-1.  This is Government's Exhibit 413.  Cash to

11   borrower.  And this one lists $3,141.26.  So you do see some

12   cash back listed to him there on the HUD-1.  And you remember

13   his testimony that there were two checks that he got back at

14   the end of the transaction.  He got back a $3,141 check.

15   That is Government's Exhibit 428.  But missing from the HUD-1

16   settlement statement is the second check written by Leonard

17   Williams, an additional $17,859 cash back not disclosed on

18   the HUD-1.  The lender had no way of knowing from these

19   documents that Joshua Frye was getting back $17,000 from the

20   seller of the house, Williams and Clymer.

21          Arthur Watson and Lacie Clymer got cash back in a

22   similar fashion, also undisclosed on their HUD-1s.  And

23   recall the testimony of Terrance Murrell who decided not to

24   do a deal with Mr. Williams but testified that Mr. Williams

25   offered him cash back as an incentive to get him to make the

1      investment.

2            That's the basic universe of misrepresentations in

3      this case.  False loan applications, false purchase price,

4      false down payments, undisclosed cash back outside of the

5      escrow.  Were the misrepresentations in this case material?

6      Did they have a natural tendency to influence?  Were they

7      capable of influencing the lenders in their decisions to fund

8      these loans?

9            You heard testimony that they were.  You heard

10     testimony from the lenders that the price of the property was

11     an important piece of information to them and that they would

12     never give a loan in excess of the value of the property.  A

13     misrepresentation of price goes to the value of the property.

14           You heard testimony from the lenders that it was

15     important to them to know if the borrowers could afford to

16     make the monthly mortgage payments.  And, of course, relevant

17     to that is how the monthly income matches up to the monthly

18     mortgage payments.

19           You heard testimony from the lenders that assets

20     matter because it shows ability to save, it's a safety net,

21     and, of course, the assets may be required to make the down

22     payment.  And, again, the down payment is important because

23     it makes the loan overall less risky for the lender.

24           So that's almost all of Count 1, the conspiracy to

25     commit mail or wire fraud or both.  The last element I need

1    to cover on Count 1 before moving on is the mail and wire

2    part.  Probably the simplest proof that a mailing actually

3    occurred here in furtherance of the fraud scheme is what

4    you've heard from Special Agent Harrison in describing his

5    interview with Mr. Williams, that Mr. Williams admitted to

6    him that he received the checks from Tony Symmes via the mail

7    as per his agreement with Garret Gililland.

8            There's also proof of mailings in the deeds of trust.

9    You heard testimony from the Sacramento County and Butte

10   County recorders of the system that they used to mail out

11   deeds of trust and that they had every reason to believe that

12   the trusts were actually mailed out in this case.

13          Here is an example.  On the left is Government's

14   Exhibit 59, the recorder version of the Woodforest property.

15   And on the right is Government's Exhibit 714 which came from

16   the Woodforest loan file.  This is evidence that the deed of

17   trust was mailed to the lender for inclusion in the loan file

18   after being recorded in the county clerk/recorder's office.

19   I'm not going to walk you through every property right now,

20   but they're in evidence, and remember just one example of a

21   mailing is enough for our burden of proof on Count 1.

22          Here's one more example.  In the grant deeds, this is

23   Government's Exhibit 44, when recorded, mail document to Bay

24   Area Real Estate.  And this is the grant deed on the first

25   escrow for the Baker Avenue property.

1              And it bears repeating that the government does not

2    have to prove that Mr. Williams himself mailed any documents.

3    Rather, you're looking to see whether the use of the mails

4    was reasonably foreseeable in the furtherance of the scheme.

5    And here the mailing of grant deeds and deeds of trust are an

6    essential and foreseeable part of a real estate transaction.

7              Wiring.  You have the testimony of the lenders, NL,

8    Inc., and CIT Group, as well as the testimony of Special

9    Agent Harrison that these loans were funded via wire from the

10   lenders into the escrow file -- or into escrow.  And in

11   addition to the loans being funded by escrow, there are two

12   additional wire requests in evidence, and these pertain to

13   the second leg escrow on the Woodforest property, the funds

14   going to Bay Area Real Estate as the seller of the house to

15   Anthony Petri.  These are Government's Exhibits 726 and 727.

16   The top two are the outgoing wire requests, and the bottom is

17   Exhibit 719 showing the monthly statement of Bay Area Real

18   Estate, the wires hitting the bank account.

19             All right.  That's it for Count 1, the conspiracy

20   count.

21             Lots of nitty-gritty, but these are the checks that

22   come at the end of each property transaction.  Ceanothus,

23   223.  Rockin M, 326-A.  Baker, 425.  Trap Rock, 520.  Linday

24   Way, 716.  Oh, pardon me.  Woodforest, 716, and Woodforest,

25   717.  Each written to Diamond Hill Financial and, one more

1     time, the sole signator on the Diamond Hill Financial bank

2     account, Leonard Williams.

3           Two more counts to go.  Counts 2 and 3, transactions

4     in criminally derived property or money laundering.  This is

5     the first money laundering account in Count 2, and these all

6     relate to the Woodforest Anthony Petri deal only.

7           The elements of transactions in criminally derived

8     property.  Mr. Williams knowingly engaged in a monetary

9     transaction.  And here, a monetary transaction means that the

10    deposit, withdrawal, or transfer was in or affected

11    interstate commerce.  That Mr. Williams knew that the

12    transaction involved criminally derived property, meaning

13    that the money was obtained from a criminal activity.  Third,

14    that the money was in excess of $10,000.  And, fourth, that

15    the money on the Woodforest deal here was, in fact, the

16    profit of mail or wire fraud.  Those are the elements for

17    both Counts 2 and 3.

18          The evidence on Count 2 is very straightforward, and

19    it is this check, Government's Exhibit 717.  This is a

20    monetary transaction.  It's moving the money from one bank

21    account, the Bay Area Real Estate bank account, into another

22    bank account, the Diamond Hill bank account.  From there, it

23    is available for Mr. Williams' use as he sees fit as the sole

24    signator on that account, and it has been one step removed

25    from the original transaction where Mr. Williams got it.

1          As explained to you by Agent Harrison, you see the

2     money from the Woodforest sale hit the Bay Area Real Estate

3     Holdings' checking account in these two wire amounts and then

4     the checks giving Mr. Williams and Mr. Clymer their money go

5     right back out in the same month.  This back account

6     statement is Government's Exhibit 719.

7          And this is the chart that corresponds to the

8     Woodforest deal.  So to recap, the money comes in from the

9     lender, $240,000, based on an untrue loan application.  It's

10    able to fund this portion of the sale.  But it's important to

11    note that these happen on the exact same day.  So Bay Area

12    Real Estate is able to sell the property to Mr. Petri after

13    becoming the buyer of the property in the first instance from

14    the original seller.  The money that it's able to -- how it's

15    able to make that purchase is with these loan funds.  This is

16    the double escrow deal.  And then this is what's left over

17    from the flip.  These two wire amounts, $29,000 and $15,000,

18    they're wired into the Bay Area Real Estate bank account and

19    then immediately after you see them paid out.  Three checks.

20    A $5,000 check to Diamond Hill Financial, an $11,000 check to

21    Diamond Hill Financial, and a $16,000 check to Josh Clymer.

22          You may have been wondering why we introduced evidence

23    that U.S. Bank and SAFE Credit Union are federally insured.

24    You'll hear in the jury instructions that's part of the

25    definition of a financial institution which is a term

1    relevant to the money laundering charges.  So here again is

2    proof that U.S. Bank was FDIC insured at the time of this

3    transaction.  This is Government's Exhibit 23.

4           I should clarify before I move on to Count 3.  That's

5    Count 2 right there.

6           This check over $10,000 into the Diamond Hill

7    Financial account, that's Count 3.

8           It's Josh Clymer who's getting this money, but it's

9    Leonard Williams who's writing him the check to give him that

10   money.  And the -- pardon me.  The act of writing him the

11   check counts in the money laundering count even though he's

12   not the one who's receiving the money.

13          So here's the proof of the SAFE Credit Union which is

14   where Josh Clymer's bank account was.  This is their federal

15   insurance.  And then this is the check to Josh Clymer.  This

16   is a monetary transaction.  Even though Mr. Williams is not

17   making the money, he's engaged in a monetary transaction by

18   transferring these funds to Mr. Clymer.  That's money

19   laundering for the purposes of Count 3.

20          And that's it.  Three counts.  One is the overall

21   conspiracy.  2 and 3 are these very specific checks that give

22   the payout to Williams and Clymer at the very end of the

23   scheme to defraud on the last property, Woodforest.

24          On the basis of all the evidence presented, we ask you

25   to return a verdict of guilty on all three counts.

1          Thank you very much for your service.

2          THE COURT:  We'll take a 15-minute recess now, ladies

3     and gentlemen.  Remember the admonition.

4          (Recess taken.)

5          (Jury not present.)

6          THE COURT:  All right.  Bring the jury in.

7          Everyone is present.  Mr. Wiseman, you may proceed

8     with your argument on behalf of the defendant.

9          MR. WISEMAN:  Thank you, your Honor.

10          Good afternoon, ladies and gentlemen.  When I was

11    preparing my closing argument, I started thinking back to

12    several days ago when I gave you my opening argument and even

13    before that when we were going through the voir dire process

14    and selecting you as jurors.  And one thing I said in my

15    opening argument to you is that you would have to, at the end

16    of the case, as you will soon do, what you're going to have

17    to do is decide two discrete issues here.  One is was there a

18    conspiracy, and who are the players in that conspiracy.  And

19    number two, the misstatements that have been alleged in this

20    case, if they had any material effect on the lenders.  That's

21    essentially what it is.  That's essentially what this case is

22    all about.  And that's how I want to address my closing

23    argument to you, sort of frame it with those two parameters

24    and two decisions that you have to confront in this case.

25          Now, Ms. Hemesath, the government seems to be

1    suggesting, if I understand their argument, that there was

2    some overarching conspiracy among a number of people known

3    and unknown to the grand jury as the indictment alleges.  And

4    the government is saying well, you can look at the conspiracy

5    to include the individual buyers of each of the properties

6    that has been the subject of this case which you heard about.

7          But I suggest to you, ladies and gentlemen, if the

8    government wanted to prove a conspiracy, an overarching

9    conspiracy, what better way to prove the conspiracy but to

10   have two people, one of whom's name has been mentioned just

11   briefly in this case, another person whose name has been

12   mentioned quite a bit.  Why, I ask, did the government not

13   present in that chair this elusive, mercurial, unknown Garret

14   Gililland who we've heard about?  And, secondly, why didn't

15   the government bring to that stand and ask questions to

16   Joshua Clymer?  What would be the easiest way -- what way

17   would be easier to prove this conspiracy?  But they didn't do

18   that.  You did not hear the testimony of either Mr. Gililland

19   or you didn't hear the testimony of this Josh Clymer.

20         So who did the government call to prove this

21   conspiracy?  And before I talk about the witnesses that the

22   government called to prove this conspiracy --

23              THE COURT:  Something is scraping your microphone.

24              MR. WISEMAN:  I'll lower it.  Pardon me, your Honor.

25              THE COURT:  So it doesn't brush against your jacket.

1          MR. WISEMAN:  There you go.  Turn it down if you need

2      to.

3          So let me just address the individuals who the

4      government did, in fact, call to prove this conspiracy.  But

5      before I do that, I want to frame what I want to say with a

6      couple jury instructions that you will hear from Judge Shubb.

7      At the end of the closing arguments, you're going to be

8      instructed.  And I want to point out a couple instructions.

9      You're going to hear one instruction, and I'm going to

10     paraphrase the instruction.  It says that in deciding the

11     facts of this case, you may have to decide which testimony to

12     believe and which testimony not to believe.  You may believe

13     everything a witness says, or part of it, or none of it.

14         Now, let me go down to the specifics.  And in making

15     that decision, in considering the testimony of a witness, you

16     can factor in to decide whether you want to believe that

17     witness a number of things, including whether the witness on

18     some prior occasion has lied or testified falsely.  And,

19     secondly, or in addition to that, you can decide to believe

20     or disbelieve a witness based upon whether the witness was

21     under the influence of any drug or alcoholic beverage at the

22     time of the events in question.

23         I want to frame those two -- that instruction with

24     respect to the witnesses that the government called to prove

25     or attempt to prove this conspiracy.

1          The first person that we heard from was Arthur Watson.

2     You heard from Arthur Watson.  You heard that Arthur Watson

3     was a friend of Mr. Williams way back when in the Air Force

4     days, and you heard about these two transactions that

5     Mr. Watson was involved in; the Ceanothus property as well as

6     the Rockin M property.  And you heard him testify about the

7     issue of working for Diamond Hill or not working for Diamond

8     Hill.  And I submit to you, if you listened to, if you

9     remember his testimony, he did not remember a whole lot.

10          He finally admitted upon cross-examination when I

11     asked him if he had, during the time in question, during the

12     time that he bought these properties, whether he had a

13     substance abuse problem, and he readily admitted it.  He

14     readily admitted that he was smoking crack cocaine at the

15     time.  And I do distinctly remember asking him:  Mr. Watson,

16     do you think that affected your memory?  And he said no.  But

17     the man was smoking crack cocaine during the time of the

18     events in question.

19          And based upon this jury instruction which Judge Shubb

20     will read to you, you can evaluate his testimony based upon

21     his addiction or his use of cocaine at the time that he

22     claims these events happened.

23          Likewise, the rest of these witnesses.  Let's look at

24     Josh Frye, the gentleman who bought Baker Avenue.  Josh Frye

25     testified that he was just a young man when he got involved

1    with Mr. Williams and Mr. Clymer and the purchase of that

2    property.  He was a recent licensee of the California

3    Department of Real Estate.  You remember he said that he just

4    got his license, and he was working as an intern somewhere,

5    yet he was licensed as a California real estate professional,

6    having taken the exam, understanding what the rules were to

7    be a professional real estate person in this state, and even

8    knowing what the law required of him, he admitted that he

9    signed loan documents that he knew were not truthful.  And

10   the other salient point about Mr. Clymer's (sic) testimony,

11   if you recall, is that basically he said it was Josh Clymer.

12            THE COURT:  You don't mean Mr. Clymer's testimony.

13            MR. WISEMAN:  Pardon me?

14            THE COURT:  You said Mr. Clymer's testimony.

15            MR. WISEMAN:  Excuse me.  I misspoke.  Mr. Frye's

16   testimony.  I'm speaking about Mr. Frye, Joshua Frye.

17            Thank you, your Honor.

18            Mr. Frye's testimony was, in addition to admitting

19   that he lied on the loan application knowingly, that he

20   admitted that he dealt with -- he didn't deal with

21   Leonard Williams.  He said that he dealt with Josh Clymer and

22   that he knew that it was Clymer's company he was buying from,

23   and he thought he was buying from Mr. Clymer.  You have to

24   use your own memory, but that's what I recall that Mr. Frye

25   said.

1          So you have Mr. Watson who is using crack cocaine.

2     You have Mr. Frye who is admitting that he committed a

3     falsehood on loan applications.  And the government wants you

4     to rely upon their testimony to establish this conspiracy.

5          Then we get to Anthony Petri, for example.  Mr. Petri,

6     this is the Woodforest property.  He was 26 years in -- he's

7     now 26 years old.  He was 19 or 20 when he got involved in

8     that property, in that Woodforest property, and you remember

9     what he said.  He said that he understood what he was doing.

10    He knew what he was doing was fraudulent.  He admitted to you

11    on the stand that he knew that by submitting that loan

12    application with the fraudulent information that was

13    contained therein was essentially a crime.  And I asked him,

14    I asked him, and I believe I asked Joshua Frye, weren't you

15    concerned about being prosecuted?  Did anybody say to you you

16    are subject to being indicted for this conduct?

17         And why, let me ask you, ladies and gentlemen, the

18    question that strikes me that I suggest you have to consider

19    is why is it only Leonard Williams who is sitting at that

20    table defending himself?  Why has the government not charged

21    a Mr. Watson or a Mr. Frye or a Mr. Petri who admitted that

22    they submitted false loan applications?  Indeed, it was

23    Mr. Petri who said that -- he claims that he had no idea who

24    prepared his loan application, but when he tried to back out,

25    you remember he said that he got buyer's remorse?  He got

1       buyer's remorse because he didn't get his -- he got stiffed

2       out of $15,000.  And who did he try to get the money back

3       from or get out of the deal with was Josh Clymer.  Again,

4       somebody that you have never heard from in this case.

5               Now, the only exception to that, the buyers who

6       admitted that they committed fraud on their loan

7       applications, was Lacie Clymer.  Lacie Clymer is Josh

8       Clymer's own sister.  And you heard from her testimony, and

9       she said it was her brother, not Leonard Williams, it was her

10      brother who got her in the deal.  She trusted her brother.

11      She didn't know what she was signing.  She didn't look at

12      what she was signing because she trusted her very own

13      brother.  This is her brother who is going to stiff his own

14      sister.

15              Maybe that's why the government hasn't called him.

16      Maybe he's got too much baggage.  But I suggest that you, to

17      render a decision, to decide there was a conspiracy between

18      Mr. Williams and Mr. Clymer, you should have had Mr. Clymer

19      on that stand.  The government should have put him on there

20      to explain, to say oh, yeah, we committed this conspiracy.

21      What would be the easier way?  Instead, they bring these

22      other witnesses.

23              Juan Reynaga.  Do you remember Juan Reynaga?  He was a

24      correctional officer, still is.  A guy who said I make a

25      hundred thousand, I think something like a hundred thousand

1    dollars to baby-sit.  This is a gentleman who is a sworn,

2    essentially law enforcement officer, works for the State of

3    California, admitted that he had to take an oath for his

4    office, and yet, in spite of that, and I believe I even asked

5    him, Mr. Reynaga, don't you think your obligation under that

6    oath translates to your everyday life and what you do every

7    day?  And he admitted that.  And yet he also admitted that he

8    knowingly signed a false loan application.  For what reason?

9    So he can get himself into a house.  That was it.  Readily

10   admitted.  Another person the government wants you to believe

11   to support this allegation of a conspiracy.

12        The other person that you heard from was this

13   Tony Symmes.  Remember Tony Symmes?  He's one of the early

14   guys.  He's one of the early witnesses that the government

15   called.  Mr. Symmes admitted that he pled guilty.  He

16   admitted that he committed a crime.  He admitted that he is

17   doing his time.  I think he said he's still doing his time,

18   if I recall.

19        And the important thing about Mr. Symmes' testimony is

20   as follows.  And one thing I want to note about Mr. Symmes'

21   testimony, if you recall, he had no idea who Leonard Williams

22   was.  He never met Leonard Williams.  He says this elusive,

23   ghostlike figure of Garret Gililland told Mr. Symmes to write

24   a check to Diamond Hill Financial for $46,000.  This is

25   Mr. Symmes, a convicted felon, who the government called.

1    And that is the witness that is part of the package the

2    government wants to present to you to convince you that

3    Mr. Williams was involved in a conspiracy.

4         And then there was Jessica Sawyer, the young woman

5    who, again, worked for this mysterious Garret Gililland and

6    testified under a grant of immunity.  In other words, she was

7    not going to be prosecuted for what she said in this

8    courtroom.

9         Let me read you a jury instruction which Judge Shubb

10   will address and read for you with respect to Mr. Symmes'

11   testimony and Ms. Sawyer's testimony.  And essentially I'm

12   going to just highlight it because you'll hear the whole

13   thing.  "In evaluating the testimony of Anthony Symmes and

14   Jessica Sawyer, you should consider the extent to which or

15   whether their testimony may have been influenced by any of

16   these factors."  And the factors are:  You heard testimony

17   from Anthony Symmes, a witness who pled guilty to a crime,

18   and you heard testimony from Jessica Sawyer, a witness who

19   received immunity.

20        And you'll be instructed that you can consider those

21   two factors in deciding how much weight to give their

22   testimony.  And it goes on to say you, ladies and gentlemen,

23   should examine the testimony of Anthony Symmes and Jessica

24   Sawyer with greater caution than that of other witnesses.

25   And that's in the jury instructions.

1           And I need to ask a question.  I suggest this question

2    to you.  Terrance Murrell.  What relevance really in the

3    grand -- in evaluating this case, in trying to decide whether

4    Mr. Williams was involved in a conspiracy and the other issue

5    you have to decide, what was the relevance of Mr. Murrell's

6    testimony?  It appeared to me that he was angry about

7    something, but really what did it bring into your evaluation

8    of this case?

9           Now, ladies and gentlemen, the other thing I want to

10   point to is that you heard this testimony about the different

11   structures of these deals.  And I think it was I who had

12   Agent Harrison talk about the two transactions, the Ceanothus

13   and the Rockin M transaction, which were different.  The

14   structure of those deals was different than the transactions

15   that occurred in Sacramento; the Petri transaction, the

16   Reynaga transaction, et cetera.

17          The difference is that the Ceanothus and Rockin M were

18   traditional, simple real estate transactions, buyer, seller.

19   In that case, Mr. Symmes' company selling to Mr. Watson.

20          If you look, however, at the transactions, and I think

21   counsel provided a chart for you, if you look at the

22   transactions concerning the Bay Area Real Estate properties,

23   it was a different setup.  It was, as you heard, considered a

24   double escrow or a concurrent transaction.  So what?

25          I think the government's trying to suggest simply

1     because in the double escrows, the transactions occurred

2     simultaneously, that there may be something improper about

3     that.  Was there anybody who's testified that a double escrow

4     was illegal?  If the government wanted to suggest that, you

5     would think that there would be a witness who would say that

6     double escrows are illegal.  There's nothing.

7           So I don't want you to be misled simply by looking at

8     the Sacramento-related transactions that simply because

9     they're of this different quality or they seem to have a

10    simultaneous transaction, that there is inherently something

11    wrong, because there's no evidence that they are.  You would

12    think that if there was something really amiss about those

13    transactions and how they were structured, the woman from the

14    Sacramento County Recorder's Office could have answered that,

15    but she wasn't even asked the question.

16          So I suggest not to get misled by the differences

17    between Ceanothus and Rockin M and Woodforest and the other

18    Sacramento properties.

19          And I think it's important to go back to one thing

20    that Lacie Clymer said and the relationship between

21    Lacie Clymer, Josh Clymer, her brother, and Wendy Clymer.  If

22    you remember, there was testimony that I elicited from

23    Special Agent Harrison about the Government's Number 703.

24    The Government's 703 is that gift letter that purported to

25    say that Anthony Petri's mother was gifting him a large sum

 1    of money for the down payment.  And the agent confirmed that

 2    it was Clymer's mother, in other words, Josh Clymer,

 3    Wendy Clymer's telephone number, that was associated with

 4    that transaction.

 5         So I'm suggesting to you, ladies and gentlemen, that

 6    the real culprit behind this, not a conspiracy, but somebody

 7    who was acting on his own, the mastermind behind this and the

 8    impetus behind these transactions, was Mr. Clymer.  And the

 9    government, I suggest, has not proved that there is a

10    conspiracy here.

11         Now, let me segue into something about that.  You

12    folks as jurors are stuck with what the indictment charges.

13    The indictment charges a conspiracy.  It doesn't charge what

14    we lawyers refer to as a substantive count.  It charges a

15    conspiracy.  And you heard counsel for the government give

16    you some background about what the jury instruction would be

17    on conspiracy.

18         So here is my point.  If you think that Mr. Williams

19    committed a crime, but you don't think he committed a

20    conspiracy, you don't think that he conspired, then that's

21    what you're stuck with.  He has to be acquitted because

22    that's what he's charged with.  The government has the choice

23    of bringing the charge, and they charged him with conspiracy.

24         And I suggest to you, if you break down the testimony,

25    break down the evidence that the government has presented to

1   prove this conspiracy, they haven't done that beyond a

2   reasonable doubt.

3          But even if you think Mr. Williams is guilty of

4   another charge and you don't think he's committed a

5   conspiracy, you can't convict him simply because you think he

6   did something else but the government didn't prove what he's

7   actually charged with.  That's an important point that I'm

8   sure you will consider.

9          So the government is suggesting that all the buyers

10  were part of the conspiracy, even though they don't have to

11  know each other or come into the conspiracy at different

12  times according to the government.  And you'll hear the jury

13  instruction, and you'll evaluate it yourself, whether or not

14  that supports a conspiracy charge.

15         And I suggest it doesn't, because in attempting to

16  support the conspiracy charge, the government has brought in

17  witnesses who you have heard from, all of whom, all of whom,

18  with maybe the exception of Lacie -- I'll give her a break,

19  I'll give her a little credit, maybe she was dumb, but

20  everybody else has baggage, everybody else's credibility can

21  and should be called into question.  And all of their

22  testimony, I suggest to you, based on the jury instruction,

23  should be considered with suspicion.

24         The second issue that you're going to have to confront

25  and decide is the issue of materiality, as I mentioned in my

1     opening statement to you.  The other thing I said, if you

2     recall in opening statement, I said you know, ladies and

3     gentlemen, there's going to be a lot of documents.  I think I

4     was right.  I said there are going to be a lot of documents

5     that are going to be introduced into this case, which there

6     were.  And I told you folks that you probably are not going

7     to hear me object to a lot of them.  And I really didn't,

8     because a lot of them were business records, a lot of them

9     speak for themselves.  You heard some of my objections when

10    counsel was trying to ask witnesses about it.

11         But, nevertheless, the documents are in evidence.

12    It's really not the volume of the documents.  It's not the

13    weight.  In other words, the actual bulk of how many

14    documents the government's going to present to you in a jury

15    room in a binder that determines anything.  It's really what

16    these documents prove.  And I think the documents can be

17    interpreted all sorts of ways.

18         But what is the best way to prove someone's case?  In

19    this instance, what is the best way to prove the conspiracy

20    charge?  And as I've said already, I suggest to you the best

21    way to prove the conspiracy charge, which did not happen

22    here, would be the testimony of Josh Clymer, the testimony of

23    this Garret Gililland fellow, which is the absence of which

24    is profound, in my view.

25         The issue of materiality.  Let me read the jury

1    instruction for you which you will hear from Judge Shubb on

2    materiality.  Again, let me set this up.  The notion of

3    materiality is that even if you find that there were

4    misstatements, rank misstatements, rank falsehoods on

5    documents, complete fabrications which were submitted to a

6    lender, even if you conclude that, it's at the end of the

7    analysis.  You have to conclude, because the law requires you

8    to, to conclude that those misstatements had a material

9    effect on the lender.

10          And the actual instruction which you will hear is,

11   "Statements made or facts omitted pursuant to the scheme are

12   material if they had a natural tendency to influence or were

13   capable of influencing, the decision-making body to which

14   they were addressed to part with money or property."  That's

15   the typically, you know, somewhat legalese, but that is, in

16   fact, what the instruction is you will hear.

17          So did these misstatements have a material effect on

18   the lender?  Who did the government bring to try to establish

19   that point?  Well, they had Mr. Walsh early on.  I think

20   Mr. Walsh may have been our first witness.  Mr. Walsh was

21   from CIT.  You remember Mr. Walsh?  He was the gentleman

22   who -- Kevin Walsh from CIT.  He was the gentleman who

23   testified about the materiality of the Arthur Watson

24   Ceanothus property which is the 200 series of the

25   government's exhibits.

1    And he talked about the fact that this was a stated

2    income loan.  And he also admitted that CIT had the ability

3    to verify income by virtue of requiring the 4506.  Remember

4    that 4506?  It's Defendant's A, which is the form that

5    Mr. Watson signed that allowed the lenders to go get his tax

6    return to verify his income.  As a matter of fact, I think

7    there -- strike that.

8    Let me just focus on Mr. Watson's situation.  So

9    Mr. Watson's situation is that he signed the 4506.  Mr. Walsh

10   said well, you know, the 4506 is really not that relevant to

11   us in our decision-making process because we don't get the

12   returns back from the IRS in time.  But I showed him the

13   form, and it says the IRS responds within ten days.

14   But the important thing that Mr. Walsh testified to,

15   and he sort of laid the foundation, was he acknowledged when

16   I asked him about what was happening in the real estate

17   market in 2005, 2006.  He actually, without my prompting,

18   used I think the term "implosion."  He talked about how this

19   crazy run-up of real estate simply imploded in 2008.

20   And when I probed him about what the milieu, if you

21   will, what was happening in the lending market back then, he

22   readily admitted that lenders were not paying attention to

23   loans or to buyers as diligently as they should have.  And I

24   think I asked him well, has there been a difference between,

25   in your experience, between what was happening in 2005 and

1    2006 and 2007 when it came to underwriting standards as

2    compared to what's happening today?  And he readily admitted

3    that there is a sea change.  And he admitted that back then,

4    things were far less strict, far less demanding on the

5    borrowers than they are today.  And the reason why that is

6    important is because it goes to the issue of materiality.

7         Mr. Walsh also said that he felt, industrywide, that

8    the underwriting standards were simply not being followed.

9    Now, yet the government called him to support the proposition

10   that the misstatements in Mr. Watson's loans had an effect on

11   CIT in its lending decision.

12        But one thing that he admitted to, as well as the

13   other two bank witnesses, he admitted he never spoke to the

14   actual underwriter who underwrote the loans.  He never spoke

15   to him or her, that individual.  I think I asked him, I said,

16   well, this is not done, you know, this underwriting process

17   is not some electronic situation where all the data is

18   encoded in electronic software and then of a sudden a

19   response or an answer is popped out.  He said no, there's

20   eyeballs on the paper.  Somebody, some live being, goes

21   through that paperwork to decide an underwriting decision to

22   make the loan.  And he did not speak to that person to

23   determine whether or not these misstatements on Mr. Watson's

24   loan had any effect on him or her to make the decision to

25   underwrite.

1       So I suggest the government has not proved

2   sufficiently that, with respect to those loans, that it was a

3   material effect.  In other words, the misstatements were

4   material on the lender.

5       Likewise, we heard the testimony of Kelly Updegraff.

6   And you recall she was from formerly NL, Inc., which is now

7   RPM Mortgage.  And she was asked about the Government's 400

8   series of exhibits.  The 400 and the 600.  Do you remember

9   the 400 was Frye's purchase, the Baker Avenue purchase.  And

10   the 600 series were Linday Way, which were Lacie Clymer's

11   purchase.  And she was the one who also said that she agreed

12   that there was a substantial change since the late '90s to

13   today in underwriting criteria.

14       She also testified about the process of what the

15   lenders did with these loans.  Remember she talked about --

16   she talked about loan originators, and she talked about banks

17   being correspondent banks, and she talked about the notion

18   that basically what NL, Inc., did is they simply funded the

19   loan and immediately, I think most of the loans, I think she

20   did say some loans they held, but the bulk of the loans they

21   simply sold to the open market, sold to Wall Street, and

22   obviously in order to do that, or there would be no reason

23   not to do it unless the originator was paid off the value of

24   the loan.

25       So she readily admitted that their business model was

1   not to get loans, keep loans in house, service loans.  Their

2   business model was to make the loans and move the loans out

3   and sell them.  And that is what was also substantiated by

4   the gentleman who came from WaMu who testified just

5   yesterday, Brett Hellstrom.

6          But I suggest, ladies and gentlemen, even though she

7   spoke about what happened at NL, Inc., and she was asked

8   questions about this effect, would this have been material,

9   would this have been a consideration that the underwriter

10  would have made in deciding on underwriting the loan.  In

11  spite of all that, she readily admitted, she admitted she

12  never spoke to the underwriter.  She never spoke to that live

13  person who had to make the decision, had to sit there and say

14  yeah, I made this approval based upon these loan docs and the

15  supporting docs.  She didn't speak to that person.

16         And why didn't the government bring the person who

17  relied upon these misstatements to testify that they, in

18  fact, relied?  There's no testimony from a live person, from

19  someone with -- I think I asked.  I said do you have personal

20  knowledge of the decision-making process of the person that

21  was responsible for making the decision to fund this loan,

22  and she said no.

23         The same is true of Brett Hellstrom, but

24  Brett Hellstrom, I suggest to you, was a bit more

25  problematic.  Excuse me.  He again talked about the process

 1    that in this case Washington Mutual where he worked and later

 2    JPMorgan Chase used to decide on whether to fund loans.  And

 3    he talked about how Washington Mutual was purchased in 2008.

 4    And he was the one who said well, Washington Mutual's

 5    business model was to sell some loans, keep some other loans

 6    in house, but yeah, he said that these misstatements affected

 7    the lender.  But again, he had no personal knowledge of the

 8    decision-making process that was used to decide to fund the

 9    loans in question on those properties.  He had not talked to

10    the underwriter.  He had no personal information.

11         Now, the problem with Mr. Hellstrom, Hellstrom rather,

12    in addition to not having spoken to the underwriter, was I

13    was asking him about Washington Mutual and Chase bank, his

14    employer, and I asked him:  Sir, are you aware of the fact

15    that there was a Senate investigation into shoddy lending

16    practices by WaMu during the time in question that these

17    loans were funded?  Had no idea.  He couldn't even admit that

18    during the time that he was at WaMu, at Washington Mutual,

19    that he had ever experienced any problems with the

20    underwriting process.  In spite of the fact that I asked him,

21    did anybody around at your work, around the water cooler, so

22    to speak, talk about an investigation, the Senate

23    investigative committee had started on WaMu's improper,

24    shoddy lending practices, and he didn't know.

25         He likewise had no idea about whether or not the

1    United States Government, the very government that is

2    prosecuting Mr. Williams, settled a case with his current

3    employer which is JPMorgan Chase.  No idea.

4         Now, my comment about that is that if you have an

5    individual who's testifying without personal knowledge and

6    testifying that these alleged misstatements affected his

7    company and has no idea about what's actually happening with

8    his company, I think you can evaluate his testimony as you

9    should, and I think you should not give it the value as

10   perhaps the government would want.

11        And I suggest, ladies and gentlemen, that the very

12   reason that you didn't hear from any of the underwriters, any

13   of the people who actually had their eyeballs on the paper

14   and had to make that call whether to fund the loans in

15   question, the reason you didn't hear from them is because I

16   suggest that they would say it didn't make a difference to

17   us.  Back then, it didn't make a difference, because those

18   companies were just simply in the business of funding what

19   they could, selling them off, and reaping the reward.

20        Now, I totally, I totally understand that maybe you

21   all might be saying to yourself well, you know, that's all

22   well and good, Mr. Wiseman, but you know, two wrongs don't

23   make a right.  Just because the banks may have been shoddy or

24   committed a crime themselves or whatever, two wrongs don't

25   make a right.  And I'm not suggesting that for a New York

 1    second.

 2         All I am suggesting to you, ladies and gentlemen, is

 3    that the government has not proved beyond a reasonable doubt,

 4    the standard that they are required to prove this case,

 5    beyond a reasonable doubt, that any misstatements that you

 6    heard about in this case, made by whomever, for whatever

 7    reason, the government hasn't proved that those misstatements

 8    had a material effect on the lender.

 9         And if you conclude, if you find after your

10    deliberations that the government has not proved that

11    Mr. Williams was involved in a conspiracy, that he conspired

12    to commit an illegal act, that you believe the government

13    hasn't proved its case beyond a reasonable doubt, then the

14    two other charges, which are the money laundering charges,

15    have to be -- there has to be an acquittal on those because

16    the money laundering charges are essentially part and parcel

17    of the conspiracy.

18         If the government hasn't proved the conspiracy, that

19    is, the conspiracy to commit this mail or wire fraud, then if

20    they haven't proved that, they haven't proved that the money

21    that they allege came from an illegal act, they can't convict

22    him on that.  You'd have to acquit him on that if they don't

23    prove the conspiracy.  So the conspiracy and money laundering

24    are intertwined.  Without one, you do not get the other two.

25         Now, I want to talk about something that we spent a

1   good deal of time, or at least I spent a good deal of time

2   with most of you during voir dire, and that is the standard,

3   the idea of the burden in this case.  And I asked you

4   directly that if the defendant did not put on a case, would

5   that affect your decision, and did you understand and did you

6   have any problems with this idea that throughout a trial, in

7   any courtroom in this country, a criminal trial, the

8   government, the prosecution, has the burden of proof

9   throughout the trial.  And the burden of proof is that they

10  have to prove a defendant's guilt beyond a reasonable doubt.

11       Now, you know, that's sort of a phrase that's bandied

12  around a lot because we all watch television shows, Law and

13  Order and what have you.  And you kind of hear that all of

14  the time, and maybe it's lost its legal significance in the

15  lay world.  But when one walks into a court of law, the

16  burden of proof and the standard is really the essence of why

17  we are here.  This is a burden that the government must carry

18  in this case and any other criminal case.  You have to be

19  convinced beyond a reasonable doubt of each and every element

20  of the charges.  Halfway down the goal line doesn't work for

21  the government.  It's each and every charge has to be proved

22  beyond a reasonable doubt.

23       And I asked you about that, and you all said that you

24  understand that, and you all said that if the defendant

25  decided not to put on a case, it wouldn't affect how you made

1   your decision.  Because that's the corollary, the flip side

2   of the burden that the government carries in every criminal

3   case, is that the defendant doesn't have to do a thing.  The

4   defendant doesn't have to do any lifting, let alone heavy

5   lifting.  It's the government's burden.

6          And there is something else, and I'm going to close by

7   talking about this.  There was something in the beginning of

8   the trial when Judge Shubb was talking about opening

9   statements, and he said that some lawyers talk about the

10  opening statement being like a box to a jigsaw puzzle.  In

11  the opening statement, the lawyer wants to give the jurors an

12  overview of the case.  Sort of give the jurors the final

13  picture of the jigsaw puzzle once it's completed.  And the

14  facts are all the little pieces of the jigsaw puzzle.  And

15  the lawyer's job is to put all the pieces together and say

16  aha, look, here's the box.  The box shows this picture.  Here

17  is the jigsaw puzzle after the pieces are together, and the

18  puzzle has to match the box.

19         And I was thinking about that, and I think that that

20  analogy is quite apt when it comes to understanding and

21  applying the burden of proof.  And let me tell you why.

22  After you put all these pieces together in this case, you go

23  back in that jury room and you look at all the exhibits and

24  you discuss the case among yourselves, which you're obviously

25  required to do, and you put all the pieces together, and you

1    kind of look at the box of the puzzle, the puzzle box, and

2    puzzle box is what the government has charged Mr. Williams to

3    alleged to have done.  And you look at the box and you see

4    the box and you see the charges, but then you look at all the

5    puzzle pieces together and you look at the pieces versus the

6    box and the pieces kind of look like what's on the box, but

7    you really can't make out exactly what it means.

8         Use that analogy.  I'm suggesting you can use that

9    analogy to help you with the burden of proof.  The government

10   has to prove his guilt, Mr. Williams' guilt, beyond a

11   reasonable doubt.  If you think he might be guilty, that is

12   not enough.  If the pieces kind of look, when you look at the

13   pieces, like what's on the box, but you are not convinced

14   beyond a reasonable doubt, even though you may think he did

15   something wrong, even though you may think a crime of some

16   sort has been committed, you've got to be convinced that the

17   pieces, when they're put together, convince you beyond a

18   reasonable doubt that they match what's on the box.

19        And I suggest to you, ladies and gentlemen, based upon

20   everything you've seen, based upon everything you've heard,

21   the government may have gotten close.  That's your decision

22   to decide.  But I suggest they have not gone past the goal

23   line when it comes to their burden.

24        Thank you for your time.

25        THE COURT:  Mr. Hales, are you going to present the

1    rebuttal argument on behalf of the government?

2         MR. HALES:  I am, your Honor.

3         THE COURT:  Would you like to proceed?

4         MR. HALES:  I would.  Thank you.  If I can have a

5    moment to put this on.

6         THE COURT:  Yes.

7         MR. HALES:  Good afternoon.  I want to start talking

8    about materiality.  I'm going to use this document camera to

9    show you a few things.

10        In his closing argument, defense counsel read you part

11   but not all of the jury instruction that you will be given

12   about materiality.  So I'm going to read the whole thing and

13   point out the sentence at the end that he did not read.

14        "Under the third element, statements made or facts

15   omitted pursuant to the scheme are material if they had a

16   natural tendency to influence, or were capable of

17   influencing, the decision-making body to which they were

18   addressed to part with money or property."  And then this

19   sentence that wasn't read which is, "The pertinent question

20   here is whether the statements or omissions were material,

21   not whether the lender was negligent."

22        This discussion about underwriting, were there shoddy

23   underwriting practices and so forth, this is not lie as much

24   as you want to to get money, and then if someone else doesn't

25   figure it out, it's their fault and you're okay.  The

1    question is not whether the mortgage lender was negligent.

2    That's in the jury instruction that you will be given by the

3    Court.

4        I want to talk about the evidence that showed that the

5    lies in these loan applications and that were shown

6    throughout the case mattered.  The first thing is how do you

7    know that it mattered based on the evidence.  They did it.  I

8    mean step back for a second in the case and think about that.

9    You know, over the span of time applying for multiple loans.

10   Why go to all this trouble?  Fraudulent W-2s, pay stubs, bank

11   account statements, false statements about where people work

12   and verifying that over and over on the telephone.  Why do

13   you do that and go to all that trouble?  Why would the

14   defendant and the others that he conspired with go to all

15   that trouble unless they believed that it really mattered, it

16   was going to have an effect.

17       That's not the only thing that you have to go on.  You

18   had lender witnesses here, Kevin Walsh from CIT,

19   Ms. Updegraff from NL, Inc., Mr. Hellstrom from

20   JPMorgan/WaMu, all of whom who have been in the lending

21   industry for years and talked about over and over the things

22   that matter to lenders, that can affect, that are capable.

23   You remember sometimes I would ask my questions of them:

24   Would that be capable of influencing the decision to extend

25   this loan?  That is what is in the jury instruction that I

1    just read to you.  It's not a question of going back

2    necessarily to the original underwriter and having them say

3    yes, for sure if I knew this, it would have changed the

4    lending decision.  It's looking at this, did the

5    misstatements have a tendency to influence, were they capable

6    of influencing the lending decision.

7          And each of them told you lies about where somebody

8    works and how long they've worked there, lies about how much

9    money they make, lies about assets, lies about how much money

10   is actually being paid for the house, all those things are

11   important to the lenders.  They affect their assessment of

12   the risk, how much money they're going to lend.  The same

13   answers from them over and over about that.  Yes, that can

14   affect the decision whether to extend this loan.

15         Still that's not all you have to go on about the

16   materiality issue.  I submit to you based on the evidence,

17   you can see that Leonard Williams knew that these lies

18   mattered.  And what are some of the ways that you can see

19   that?  From the outset, he suggested to Arthur Watson that

20   they put down on the loan application that he worked at

21   Diamond Hill Financial.  What does that tell you about, you

22   know, what Mr. Williams is thinking at that point?  You can

23   reach conclusions, make inferences based on the evidence

24   presented that he knew that they needed to do something like

25   that to get that loan approved.

 1          Joshua Frye, he testified he had applied for a loan
 2   before with his true information, and he hadn't gotten
 3   approved.  He also testified that when he went to
 4   Mr. Williams and Mr. Clymer, he first gave them his true
 5   employment information, and the answer he got back was you're
 6   not going to qualify for a loan with this, but here's what we
 7   can do instead.  And perhaps with some poor judgment,
 8   definitely with poor judgment, Mr. Frye went along with it
 9   and said yes, I'll sign this loan application saying I work
10   at Diamond Hill Financial and that I make all this money when
11   I don't have a steady job.
12          But where did the idea come from?  It didn't come from
13   him.  And what came in the context of Mr. Williams telling
14   Mr. Frye you won't qualify for a loan based on your true
15   information, that tells you that Mr. Williams understood
16   these lies were material.  They were necessary to getting
17   these loans to be funded and make these transactions go.
18          The same issue with Juan Reynaga about the down
19   payment.  Why go to the trouble of the fake check, the check
20   that won't be cashed, $84,000, the affidavit in filling that
21   out, why do you fill that out and give it to Washington
22   Mutual and why do you plan that?  Because you know that it
23   matters to the lender.  That if you don't do it, the loan
24   might not be extended.
25          Anthony Petri, same thing.  He was told, he couldn't

1     remember specifically by whom, by either Mr. Williams or

2     Mr. Clymer, that in a meeting they told him he wouldn't

3     qualify for a loan based on his true employment and income

4     information, and so they did what they did.  They had the

5     loan application that falsely stated he worked at Diamond

6     Hill Financial, false income, false W-2s, if you remember in

7     that application.  The false pay stubs.  And Mr. Petri went

8     along with that.

9          I submit to you based on the testimony of those

10    witnesses, and you can talk about you might be able to

11    isolate one of them and say you know what, I'm not sure that

12    you trust this person.  You know, Mr. Watson has taken some

13    criticism in the arguments here.  And maybe you could look at

14    him, I submit to you based on hearing him testify, and say,

15    you know, I'm not entirely sure.  But then if you look at the

16    stories of the other witnesses and all of the documents,

17    remember it's not just what the witnesses have said, but it's

18    all of the documents that corroborate all of, you know, what

19    they've told you.

20         The checks that came back.  You saw the $17,000 check

21    that Joshua Frye got back.  It's not just his word on that,

22    he got the check, and it wasn't in the escrow file.  It

23    wasn't disclosed.

24         So when you put it all together, the six properties

25    that I listed on the board at the beginning, and you think

1   about the connection between all of those, five out of the

2   six, you've got the employer that's listed on those is

3   Diamond Hill Financial.  The defendant, Leonard Williams',

4   company.  And if you look at Exhibit 1, which is the

5   corporate records, you'll see he's listed as the CEO and then

6   two more titles after that.  There's an additional copy

7   behind that, I think it's page 3 of Exhibit 1, where the only

8   other person who pops up as an officer of Diamond Hill

9   Financial is Terrance Murrell from whom you heard testimony

10  that he never actually acted as the CFO.

11          That's a unifying feature of these six transactions,

12  the listing of Diamond Hill Financial as the employer for

13  five out of the six.  The only one where it's not is

14  Mr. Reynaga with the false down payment.

15          So you've got why did they go to all this trouble.

16  You've got the testimony from the lenders.  You've got, you

17  know, the testimony from the buyers about how these

18  conversations went to tell you with the evidence that these

19  lies mattered and the people involved knew that the lies

20  mattered.  You've also got common sense.  That what the

21  lenders said in their testimony makes sense.  If you're going

22  to extend hundreds of thousands of dollars on a loan, you

23  want to know what that borrower makes in terms of money.  You

24  want to know where they work.  You want to know what their

25  assets are.

1        There were a lot of things said by the lender

2   witnesses.  I want to direct your attention to a couple in

3   particular.  If you remember Mr. Walsh testifying all the way

4   back about the very first property that Mr. Watson bought

5   where it was a hundred percent financing.  And he said at

6   that time we did not do a hundred percent financing on

7   investment properties.  Flat out didn't do it.  And that's

8   what that transaction was.  It said primary residence on the

9   loan application, but it wasn't.  Mr. Watson had never been

10  there, and he wasn't planning on living in the house.

11       With respect to that transaction, that's essentially

12  the end of the discussion.  The loan wouldn't have been

13  funded had the truth been told because they didn't do a

14  hundred percent financing on those transactions.

15       A similar thing with Ms. Updegraff from NL, Inc.  She

16  talked about the verifications of employment.  You saw the

17  forms for Mr. Frye and Ms. Clymer reflecting that someone

18  named, in one case Leonard and in the other case

19  Leonard Williams, were called at the same number that was on

20  the signature card for the Diamond Hill bank account.  And

21  she was asked, you know, what happens if you can't verify

22  this employment right before the loan funds, and she said

23  everything stops because it creates an issue.  You don't know

24  if the person is working anymore.  And at that point we stop.

25  It's not going to fund until we figure out what's going on.

1    Those are just a couple of things I want to point you to on

2    the issue of materiality.

3         I've said a little bit about this, but on the issue of

4    the witnesses and the fact that they lied, these buyers came

5    in, they admitted that they had lied on these documents.

6    Again, I submit to you listening to their stories across all

7    of these transactions, there are some eery similarities.  It

8    hangs together.  It makes sense.

9         And if you'll recall, Mr. Petri was asked wasn't it

10   your idea, you know, to put Diamond Hill Financial down on

11   your loan application.  And that was all the way in

12   August 2008.  He was the fifth one out of this group of

13   people to have Diamond Hill Financial on his loan

14   application.  I submit to you based on his testimony and

15   everything else you saw, it is simply not plausible that that

16   was his idea, and that this idea originated with

17   Mr. Williams, and it is a consistent theme throughout these

18   transactions.

19        Now, I want to talk a little bit about the conspiracy

20   as well, and I want you to be able to look at the

21   instructions with respect to conspiracy.  So excuse me a

22   moment while I look for it.

23        Here's one of the jury instructions that you'll be

24   given about the conspiracy.  And I'll highlight -- I guess

25   I'll do most of this and go through it.  "A conspiracy may

1    continue for a long period of time and may include the

2    performance of many transactions."  We have multiple

3    transactions in this case over a fairly long period, from

4    late 2006 into 2008.

5            "It is not necessary that all members of the

6    conspiracy join it at the same time, and one may become a

7    member of a conspiracy without full knowledge of all the

8    details of the unlawful scheme or the names, identities, or

9    locations of all of the other members."  Mr. Clymer didn't

10   have to know Mr. Symmes.  That's one thing that you can get

11   from this.  They don't all have to know each other.

12           "Even though a defendant did not directly conspire

13   with other conspirators in the overall scheme, the defendant

14   has, in effect, agreed to participate in the conspiracy if

15   the government proves each of the following beyond a

16   reasonable doubt."  And I'll slide it up.

17           "The defendant directly conspired with one or more

18   conspirators to carry out at least one of the objects of the

19   conspiracy;

20           "The defendant knew or had reason to know that other

21   conspirators were involved with those with whom the defendant

22   directly conspired;

23           "And the defendant had reason to believe that whatever

24   benefits the defendant might get from the conspiracy were

25   probably dependent upon the success of the entire venture."

KELLY O'HALLORAN, OFFICIAL COURT REPORTER, USDC -- (916) 448-2712

1    They don't all have to join at the same time.  Yes,

2  there are transactions in this case, two in Chico, and the

3  next four in Sacramento, but they all have unifying features

4  to them.  The Diamond Hill information that I talked about,

5  all the different types of lies on the loan applications,

6  that is the core of this conspiracy, is Mr. Williams

7  conspiring with others to put false information on loan

8  applications to get loans issued so that the money that's

9  left over can be divided up as the profits.  That is the core

10  of the conspiracy.

11    I'm going to read portions of what I think will be

12  Instruction Number 14 that also talks about the conspiracy.

13  And if you look at the bottom of the page here, I'm starting

14  here.  "For a conspiracy to have existed, it is not necessary

15  that the conspirators made a formal agreement or that they

16  agreed on every detail of the conspiracy."  And this is what

17  Ms. Hemesath either paraphrased or said directly in her

18  closing, but "It is not enough, however, that they simply

19  met, discussed matters of common interest, acted in similar

20  ways, or perhaps helped one another.  You must find that

21  there was a plan to commit at least one of the crimes alleged

22  in the indictment as an object of the conspiracy with all of

23  you agreeing as to the particular crime which the

24  conspirators agreed to commit."

25    And then we go on.  "One becomes a member of a

1    conspiracy by willfully participating in the unlawful plan

2    with the intent to advance or further some object or purpose

3    of the conspiracy, even though the person does not have full

4    knowledge of all the details of the conspiracy.  Furthermore,

5    one who willfully joins an existing conspiracy is as

6    responsible for it as the originators."  And I'll leave it up

7    for a moment so you can see the rest of it just so that I'm

8    giving you the complete picture.

9            And part of the reason I want to show that to you is

10   that defense counsel alluded to that in his closing about,

11   you know, the government will argue that people can come and

12   go and things can be different and so on.  This is the jury

13   instruction.  This is the law.  And I urge you to look at it

14   when you're deliberating and think about what it means.

15           That Mr. Clymer didn't necessarily -- he's one of the

16   conspirators in this case, but, you know, in terms of his

17   involvement, he didn't necessarily have to know all the

18   details of the Chico deals.  He didn't necessarily have to

19   know Mr. Symmes.  He did get money out of the Chico deals.

20   Those checks are in evidence.  They're in -- I believe one of

21   them's in the 320 range and the other one would be in the 220

22   range.  That's circumstantial evidence of his involvement.

23           But these jury instructions on conspiracy are

24   important to give, you know, the law on, you know, what is

25   and isn't a conspiracy in this context.  And I urge you to

1    look at those.

2         There were comments, defense counsel commented on who

3    the government called.  We've got a series of real estate

4    transactions with fraudulent information on loan

5    applications.  Who are you going to call?  You are going to

6    call the borrowers who are the ones who applied for these

7    loans because you need to know whether that information is

8    true or false and the lenders to whom those loan applications

9    were sent to find out if it mattered.  That makes sense.

10   Those are witnesses that you need to assess the case based on

11   these jury instructions, I submit to you.

12        There's also another way to look at some of these

13   witnesses the defense counsel spoke of.  Let's look at who

14   the buyers are from another perspective in these

15   transactions.  There's two old Air Force friends.  One of

16   them buys three houses.  He's been evicted and he's sort of

17   down on his luck.  And the defendant eventually gets him into

18   purchasing three houses total, one in Yuba City, two in

19   Chico, which he clearly cannot afford.  And then Mr. Murrell

20   who declined.  You know, he was a solicited buyer but

21   declined it.  So the defendant's Air Force friends.

22        And you've got two people who are 19 or 20 years old

23   at the time.  And Mr. Frye and Mr. Petri clearly made

24   mistakes in connection with this, but they were quite young.

25   You've got Joshua Clymer's sister, Lacie, who I submit to you

1    based on her testimony and I mean she said this, I submit to

2    you, was that she didn't pay attention to the details.  She

3    trusted her brother.  These are the buyers that the

4    defendant, Mr. Williams, and in several cases, in four of

5    those cases at least, with Mr. Clymer, that they found and

6    they worked with.  So those are the witnesses the government

7    called to tell you the story.

8           Mr. Symmes' testimony, you don't just have his word to

9    go on.  You have the checks that came from bank records.

10   You've seen them.  There was a $46,000 check and a $30,000

11   check.  And it's not just Mr. Symmes' word on the checks.

12   You have that Mr. Williams admitted receiving those checks

13   when he was interviewed by law enforcement.  That he received

14   them in the mail from Mr. Symmes just as he had agreed with

15   Mr. Gililland.

16          There was a comment about double escrows and no

17   witness said oh, those are illegal.  The government didn't

18   argue that and isn't arguing that here.  What I would submit

19   to you the evidence has showed in this case, however, is that

20   it is a good vehicle, or at least it was turned into a good

21   vehicle by the defendant and his coconspirators, for fraud.

22   And in the way they executed these double escrows, the only

23   way it worked was if they got that fraudulently obtained

24   loan, because remember, that's what pays off the first buyer

25   every time.  You can't buy and resell the property, in these

 1    double escrows the way they did it, without getting the

 2    fraudulently obtained loan.  That's where the fraud scheme

 3    lies is in those fraudulently obtained loans.

 4         So I want to be clear about what the government is

 5    arguing.  Not that the double escrow is inherently by itself

 6    illegal, but when you do it in the way that it was done here,

 7    when the defendant and his coconspirators do it that way with

 8    the Sacramento properties, that is fraudulent because the

 9    lenders were defrauded.

10         The issue about Joshua Clymer being the real culprit,

11    I submit to you that just doesn't fly.  Part of what was

12    argued for that was that, you know, it was Joshua Clymer's

13    mom who was the phone number on the gift letter in the

14    Anthony Petri loan file.  I submit to you that's not a fact

15    that helps the defense.  That's a fact that helps the

16    government.  It's supposed to be Anthony Petri's gift letter

17    in the loan file, and whose phone number is on there in case

18    anyone wants to call?  Someone associated with one of the

19    defendant's coconspirators, his mother, not Anthony Petri's

20    mother.

21         Further, on the issue of the comment that the real

22    culprit is Mr. Clymer, you've seen the checks.  Maybe you can

23    stop there, I would argue to you.  The checks, 50/50 on these

24    double escrows, except for Lacie Clymer's where Joshua Clymer

25    gets the 36 and Lacie gets 9,500.  For the rest of them, look

1     at the checks that go to the defendant, Mr. Williams, and the

2     Diamond Hill Financial account and the checks that go to

3     Mr. Clymer.  50/50.

4          You also have in evidence the agreement, the Bay Area

5     Real Estate Holdings, LLC, agreement that the two of them

6     had.  I think it's called the operating guidelines.  And if

7     you go back to about page 10 or 12 in that agreement, it says

8     that they hold that 50/50.  They're partners.  It's not

9     Joshua Clymer being the culprit here.  It's the two of them

10    working together.  And you heard that over and over from

11    these buyer witnesses.  Conversations that were so well

12    participated in by Mr. Williams and Mr. Clymer that Mr. Petri

13    couldn't even remember who said what because the three of

14    them are sitting there and it's just going around.  That's

15    the two of them working together to make this happen.

16         I showed you the jury instruction on materiality and

17    that, you know, the issue is not with materiality, that, you

18    know, negligence by the mortgage lenders.  But I also want to

19    call to your attention what Mr. Hellstrom said at the end of

20    his testimony, which is:  Is it easier to do your job as an

21    underwriter if you're given true information or false

22    information?  What I submit you've seen in this case is that

23    the lenders and the underwriters in these companies were

24    given false information on all these loan applications.

25         So there was some testimony on one of Mr. Hellstrom's

1    files about could underwriting mistakes have been made here.

2    Sure they could have in that situation if there was

3    fraudulent information in the loan file.  As he testified,

4    that makes it a lot more likely.  Even if that happened,

5    that's not the issue.

6         Another piece on the issue of selling loans the

7    defense counsel spoke about for a minute.  I want to call to

8    your attention Ms. Updegraff's testimony.  NL, Inc., did talk

9    about the fact -- she talked about the fact that NL, Inc.,

10   did sell, I believe she said a hundred percent of their loans

11   or close to it.  But recall what she also said.  I asked so

12   if you're selling the loans, do you even care if these

13   borrowers can actually repay the loan?  And she said yes.

14   And why did she say yes?  I asked her that.  She said that

15   they care because if there were misrepresentations, they

16   could be forced to buy back the loans.  With the implication

17   being, I argue to you, that they could suffer a loss as a

18   result of that.  And so they cared.  That's one of the

19   reasons that they would try to verify the employment at the

20   end.  So that if it didn't verify, they could shut it down

21   and see what was going on.

22        This is not a case about a Senate investigation.

23   We're not here for that.  It's about Leonard Williams and

24   whether there was a conspiracy to commit mail fraud and/or

25   wire fraud and the money laundering counts.  That's this

1    case.

2         The discussion of whether the banks engaged in shoddy

3    practices.  I submit to you the issue in this case is whether

4    Mr. Williams as a real estate professional conspiring with

5    others, including Mr. Clymer, engaged in incredibly shoddy

6    and, indeed, very illegal practices.  That's the issue in

7    this case.  Knowingly sending out these false loan

8    applications or participating in getting them created.

9         So at the beginning in my opening statement, I listed

10   off five things that I at the time argued to you I expected

11   that the evidence would show in this case.  I want to revisit

12   those.  One was that with the defendant's knowledge, loan

13   applications containing fraudulent information were submitted

14   to lenders in multiple loans, each in the hundreds of

15   thousands of dollars, were given out to underqualified

16   borrowers based on the false information.

17        I submit to you that that has been shown with the

18   testimony from those borrowers, the at times rather

19   painstaking going through these loan applications and picking

20   out all the pieces that were fraudulent, about where they

21   worked, their assets, their income, what the down payment was

22   going to be, what the purchase price was going to be.

23        Two, the defendant was a real estate professional who

24   was at the center of the scheme.  And I submit to you you

25   don't get much better evidence that he was at the center of

1    the scheme than all those verifications of employment and the

2    various files that Ms. Hemesath discussed in her closing

3    argument.  All of those suggesting that Leonard Williams

4    verified these people worked at Diamond Hill Financial.  And

5    the defendant's license history as a real estate professional

6    is Government's Exhibit 26.

7         The third thing was that the defendant not only knew

8    about the lies in the loan applications but that he suggested

9    them, encouraged them, and backed them up.  And I submit to

10   you that has been shown by the testimony of these borrowers

11   consistently that it was the defendant, Leonard Williams',

12   idea to put down Diamond Hill Financial.  Or in the case of

13   Lacie Clymer, consider the circumstantial evidence.  She

14   gives her information, she deals with Joshua Clymer, and then

15   the loan application comes back and she just signs it, and it

16   says she works for Diamond Hill Financial.  And then when NL,

17   Inc., has its verification page, who does it say they

18   verified it with?  Leonard Williams.

19        Fourth, that the defendant and Mr. Clymer profited

20   tens of thousands of dollars from these fraudulent deals.

21   You've now seen the checks, and you've heard Special Agent

22   Harrison's summary of these transactions, the money and where

23   it went.

24        And, finally, the fifth thing I said, several of the

25   home buyers later defaulted on the loans causing -- well,

1    I'll leave it at that, that the home buyers later defaulted

2    on the loans.  And you heard about that from several of these

3    borrowers.  And it shouldn't be a surprise.  When you think

4    about Joshua Frye without a steady job.  He's just taken on a

5    mortgage.  There's no way he's going to be able to keep up

6    with those payments and he didn't.

7         There are a couple of verifications of employment, one

8    of the last things that I want to leave you with.  I believe

9    it's in the Petri Woodforest file.  It's either Government's

10   Exhibit 704 or 708.  It's 704 because it's the handwritten

11   one, as I recall.

12        And if you look at that, one of the things that you

13   could do in the jury room is look at the income amounts that

14   are listed at the bottom.  First of all, I'll submit to you

15   that if you look at the bank records and the various checks

16   in the case and then you look in the bottom of Government's

17   Exhibit 704, that you will see that that is Leonard Williams'

18   signature at the bottom of that document verifying that

19   Anthony Petri works at Diamond Hill Financial.

20        And if you look a little bit above that, there's

21   two boxes for what the annual income has been for Mr. Petri

22   for the last two years.  Look at those numbers and then look

23   at the W-2s that were submitted with Mr. Petri's loan

24   application.  I believe those are Exhibits 706 and 707, if

25   I'm not mistaken.  And the amounts match exactly.  The

1    document that appears to have been filled out by hand by the

2    defendant, Mr. Williams, has exactly the amounts that are on

3    those fraudulent W-2s submitted with that loan file.

4        I submit to you that is very strong evidence

5    connecting Mr. Williams to these forged documents and to the

6    lies in these loan files.

7        And based on all the evidence, not just the things

8    that the witnesses have said, but the documents that you will

9    get back in the jury room with you, I submit and I request on

10   behalf of the government that you return a verdict of guilty

11   on all three counts as charged in this case.

12       Thank you.

13       THE COURT:  That concludes the arguments of counsel,

14   ladies and gentlemen.  I'm not going to instruct you this

15   afternoon.  It will take me about 30 to 40 minutes to

16   instruct you on the applicable law, and I think we wouldn't

17   have that time today.  Moreover, I think it's better to have

18   you come back fresh tomorrow morning, hear my instructions,

19   and then you can proceed with your deliberations on the case.

20   Remember you still haven't heard the law, so continue to heed

21   the Court's admonition.  Tomorrow morning at 9:00 o'clock.

22       (Jury not present.)

23       THE COURT:  All right.

24       MR. WISEMAN:  Your Honor, one thing, if I may, take

25   up.

1          THE COURT:  The jurors are outside the courtroom.

2     Yes.

3          MR. WISEMAN:  Thank you.  I would like to revisit

4     Mr. Williams' custody status.  I am hopeful that the short

5     amount of time that he has spent remanded has made an

6     impression on him.  To be quite frank with you, I have had no

7     conversation with him since that occurred.  But nevertheless,

8     I can only trust that that has and would request that perhaps

9     the Court revisit its earlier decision, and I'm asking the

10    Court to do that.

11         THE COURT:  I'm not going to change my earlier

12    decision.  I understand that you're hopeful that he has

13    changed his frame of mind, but I don't think that's true.  I

14    observed him during the course of arguments, and he was just

15    staring defiantly at one spot on the wall over there for the

16    entire time.  I think he is disengaged, let's put it that

17    way, from these proceedings, and I do not believe that I can

18    count on him to obey any of my orders at this point.

19         MR. WISEMAN:  Very well.

20         (Proceedings concluded at 4:07 p.m.)

21

22

23

24

25

1                I certify that the foregoing is a correct transcript

2        from the record of proceedings in the above-entitled matter.

3

4

5                               /s/ Kelly O'Halloran

6                               KELLY O'HALLORAN, CSR #6660

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        I certify that the foregoing is a correct transcript

2    from the record of proceedings in the above-entitled matter.

3

4

5                              /s/ Kelly O'Halloran

6                              KELLY O'HALLORAN, CSR #6660

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25