IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

---oOo---

BEFORE THE HONORABLE WILLIAM B. SHUBB, JUDGE

---oOo---

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                    No. CR. S-08-376

LEONARD WILLIAMS,

        Defendant.

_____/

---oOo---

REPORTER'S TRANSCRIPT

EVIDENTIARY HEARING

JUDGMENT & SENTENCING

MONDAY, JANUARY 26, 2015

---oOo---

Reported by:      KIMBERLY M. BENNETT, CSR #8953

RPR, CRR, RMR

APPEARANCES


For the Plaintiff:

        United States Attorney
        501 I Street
        Suite 10-100
        Sacramento, California  95814
        BY:  Christopher Stanton Hales
              Audrey Hemesath
              Assistant U.S. Attorneys


For the Defendant:

        Law Offices of Joseph J. Wiseman
        1477 Drew Avenue
        Suite 106
        Davis, California  95616
        BY:  Joseph J. Wiseman
              Jennifer Noble
              Attorneys at Law

INDEX

WITNESSES:                                          PAGE:

ANDREW HARRISON
DIRECT EXAMINATION BY MR. HALES                     6
CROSS-EXAMINATION BY MR. WISEMAN                    14

IRAY FREDERICK, JR.
DIRECT EXAMINATION BY MS. HEMESATH                  20
CROSS-EXAMINATION BY MR. WISEMAN                    27


GOVERNMENT EXHIBITS RECEIVED IN EVIDENCE

NO.:                                                PAGE:

901-910    ........................................  5
912-915    ........................................  5
917-941    ........................................ 5
900        ........................................ 19

1               SACRAMENTO, CALIFORNIA

2          MONDAY, JANUARY 26, 2015, 9:35 A.M.

3                    ---oOo---

4          THE CLERK:  Item 2, Criminal S-08-376; the United

5     States versus Leonard Williams.

6          MR. HALES:  Good morning, Your Honor.  Christopher

7     Hales and Audrey Hemesath on behalf of the United States.

8          MR. WISEMAN:  Good morning, Your Honor.  Joseph

9     Wiseman and Jennifer Noble on behalf of Mr. Williams, who is

10    present in court, in custody.

11         THE COURT:  We have an evidentiary hearing set for

12    today, correct?

13         MR. WISEMAN:  Apparently, that's what the government

14    wishes, yes, Your Honor.

15         THE COURT:  Well, that's what we set it for.

16         How many witnesses are you going to call?

17         MR. HALES:  Two, Your Honor.  Only one if the amounts

18    in the government's loss estimate table are not contested.

19    And I haven't discussed that with Mr. Wiseman this morning.

20         THE COURT:  Why don't we let Mr. Williams take a seat,

21    and we can proceed with the hearing.

22         MR. WISEMAN:  Very well.

23         MR. HALES:  Pursuant to stipulation, Your Honor, the

24    government would move to admit the following exhibits, marked

25    for the sentencing hearing, 901 through 910, 912 through 915,

1    and 917 through 941.

2              THE COURT:  Any objection?

3              MR. WISEMAN:  Pursuant to the stipulation, no

4    objection, Your Honor.

5              THE COURT:  That will be the order.  Exhibits 901

6    through 910, 912 through 915, and 917 through 941 are all

7    received in evidence.

8                        (GOVERNMENT'S EXHIBITS 901-910,

9                        912-915, 917-941 ADMITTED INTO

10                       EVIDENCE.)

11             MR. HALES:  Thank you, Your Honor.  The government

12   would call Special Agent Andrew Harrison.

13             THE CLERK:  Please stand next to the court reporter

14   and raise your right hand.

15                       ANDREW HARRISON,

16   a witness called by the Government, having been first duly

17   sworn to tell the truth, the whole truth, and nothing but the

18   truth, testified as follows:

19             THE WITNESS:  I do.

20             THE CLERK:  Thank you.  You may be seated.

21             THE COURT:  You'd be like Canada, you can just stand.

22             THE CLERK:  Please state your full name, spell your

23   last name for the record.

24             THE WITNESS:  My name is Andrew Harrison;

25   H-A-R-R-I-S-O-N.

1                            DIRECT EXAMINATION

2    BY MR. HALES:

3    Q.      Good morning, Special Agent Harrison.

4    A.      Good morning.

5    Q.      Did you testify at trial in this case?

6    A.      I did.

7    Q.      Are you still employed as a Special Agent with the

8    IRS, criminal investigations?

9    A.      I am.

10   Q.      Have you had an opportunity to review records in this

11   case to verify the numbers in the loss estimate table

12   attached as Attachment B to the government's sentencing

13   memorandum?

14   A.      Yes.

15           THE COURT:  Wait.  Wait.  Let me find that.

16           MR. HALES:  Your Honor, if it's more convenient, I had

17   put a copy just inside of the Court's copy of the sentencing

18   exhibits, not in the rings, but rather in the binder.  But if

19   it's been removed, then --

20           THE COURT:  Here it is, yes.  All right.  Thank you.

21   Q.      BY MR. HALES:  So, Special Agent Harrison, you have

22   had a chance to review records to verify the numbers in this

23   table?

24   A.      Yes.

25   Q.      What records did you review in order to verify these

1    numbers?

2    A.       So, I reviewed HUD-1s, loan files, and county records,

3    including grant deeds, and deeds of trust, and ChoicePoint

4    database records.

5    Q.       What is ChoicePoint?

6    A.       It's a database comprised of county records.

7    Q.       Let's talk about the first column in the chart, the

8    loan column.  Do you see that?

9    A.       Yes.

10   Q.       And how, specifically, did you verify the numbers in

11   this column?

12   A.       The HUD-1 forms.

13   Q.       Did some of the transactions -- you reviewed HUD-1

14   forms related to each of the buyers and properties listed in

15   this table?

16   A.       That's correct.

17   Q.       For some of the transactions, was there more than just

18   one loan?

19   A.       Yes, that's correct.

20   Q.       So, for purposes of this table, what did you do when

21   there was more than just one loan?

22   A.       So, on a few of the properties, there were a first and

23   second loan, and I included those numbers, and they're

24   represented by the single entry on the loan amount on the

25   document you're referencing.

1    Q.      And did that occur with the X Street property?

2    A.      Yes, it did.

3    Q.      Did the -- the total amount of loans on the X Street

4    property go up from the table that was included in the PSR?

5    A.      Yes.  Upon a secondary review on the HUD-1, I observed

6    a second loan in the amount of $76,000 that I had previously

7    not observed, so I included that.  I notified you, and it was

8    changed.

9    Q.      Can you please look at Government's Exhibit 904 in

10   your binder.

11   A.      Yes, sir.

12   Q.      Directing your attention you to lines -- line 202 in

13   that document, is that where you located the additional loan

14   you just mentioned?

15   A.      Yes, that's the reference that I was citing

16   specifically.

17   Q.      And I went backwards, I should have asked you first,

18   what is document -- is Government's Exhibit 904?

19   A.      This is a HUD-1 form.

20   Q.      Specifically for Christopher Washington's purchase of

21   the X Street property?

22   A.      That's correct.

23   Q.      Let's talk briefly about the second column in the loss

24   estimate table.  What is this column intended to reflect?

25   A.      That's the resale value taken from the first fair

1  market transaction that I could locate downstream from the

2  foreclosure, subsequent to the foreclosure.

3  Q.      And were the ChoicePoint records your primary source

4  of information for these resale amounts?

5  A.      Yes.

6  Q.      Were there any instances where there was an ambiguity

7  to you about what the first fair market sale downstream was?

8  A.      Yes.

9  Q.      And did you, and in an effort to be conservative,

10  resolve those ambiguities in favor of the defendant?

11  A.      I did.  Specifically on the Drusy property.

12          Would you like me to explain what my findings were

13  there?

14  Q.      Yes, please.

15  A.      Okay.  So, there was a transaction which looked like a

16  fair market transaction, where some kind of an investment

17  company, or something, purchased the property for, I believe,

18  285.  And then, within three months, they resold it for 410.

19          In some of these instances there were transactions

20  after the foreclosure that were related to the foreclosure,

21  so I would see that it was a foreclosure deed and not a

22  subsequent fair market sale.

23          In this instance, it did not say that it was a

24  foreclosure deed, but not being certain, I gave the --

25  Mr. Williams the benefit of the doubt on the dollar amount on

```
 1    this one, and I used the next sale, which was 410,000, which

 2    thereby reduced the harm that I might otherwise have alleged.

 3              THE COURT:  What do you mean by "a foreclosure deed"?

 4              THE WITNESS:  Sometimes, Your Honor, there are

 5    transactions so that the proper entity conducting the

 6    foreclosure -- loans have been sold or moved, repackaged --

 7    can claim the required title they need to legally conduct the

 8    foreclosure, is my understanding.

 9              THE COURT:  And then they record that?

10              THE WITNESS:  Yes, sir.

11              THE COURT:  It looks the same as a transaction?

12              THE WITNESS:  Well, it's qualified as a foreclosure

13    deed, not a grant deed with a subsequent deed of trust like

14    for the loan.  It's different.

15              THE COURT:  All right.

16    Q.    BY MR. HALES:  Special Agent Harrison, could you

17    please look at Government's Exhibit 930 in your binder, and

18    specifically at page 19.

19    A.    Okay.

20    Q.    The sale to CCF Ventures on this page for 285,000, is

21    that the transaction you were mentioning you did not use

22    because you were unsure about it?

23    A.    That's correct.

24    Q.    And if you flip a few pages over to page 23 in these

25    records --
```

```
 1   A.       Yes.
 2   Q.       -- is that the transaction there, to an individual
 3   buyer for 410,000, is that the figure you used for the loss
 4   estimate table?
 5   A.       It is.  And we see here that by looking at the
 6   transaction date, it's, like, three or four months later, the
 7   purchaser is an individual's name, not a company, however,
 8   they are both listed as grant deeds, indicating to me that --
 9            THE COURT:  Where are these page numbers?  I don't see
10   page numbers.
11            MR. HALES:  Your Honor, they're on -- I should have
12   clarified for the Court.  I put them on the Government's
13   Exhibit stickers.
14            THE COURT:  Well, I'm looking at Exhibit 930 --
15            MR. HALES:  Yes, Your Honor.
16            THE COURT:  Where is the page number?
17            MR. HALES:  It should be on the actual Government's
18   Exhibit sticker, written.
19            THE COURT:  I don't see it.
20            MR. HALES:  May I approach, Your Honor?
21            THE COURT:  Yes.
22            MR. HALES:  Thank you.
23            THE COURT:  You can approach my copy, if you want.
24   Maybe something is missing on mine.
25               (Discussion held off the record.)
```

1          THE WITNESS:  Do you want mine?

2          THE COURT:  Well, Mr. Hales says it's not on my copy,

3    so I'll either trade with him or trade with you.  I think

4    maybe it's better to trade with him, so you'll have the page

5    numbers.  Except, I've been writing on mine.

6          MR. HALES:  Would it be all right, Your Honor, if he

7    showed you the page?  It's, I think, the last --

8          THE COURT:  You said flip the page -- oh, wait, there

9    are some page numbers later on.  What page did you ask him to

10   flip to?

11         MR. HALES:  23, Your Honor.

12         THE COURT:  I do have page 23.

13         MR. HALES:  Oh, great.

14         THE COURT:  Okay.

15         MR. HALES:  I apologize for that.

16   Q.     BY MR. HALES:  Special Agent Harrison, are you on page

17   23?

18   A.     Yes.

19         MR. HALES:  And Your Honor has that page as well now?

20         THE COURT:  Yes.

21   Q.     BY MR. HALES:  So, the transaction reflected on this

22   page at $410,000, that's the figure that you verified for

23   purposes of the loss estimate table?

24   A.     That's correct.

25   Q.     And, again, the consequence of using that versus the

1    prior transaction was that the loss amount actually was

2    lower; is that correct?

3    A.    That's correct.

4    Q.    Let's talk next about the third column in the table.

5          How did you go about calculating the numbers in this

6    loss column?

7    A.    That is simply the loan amount, subtracting the resale

8    amount, and that is how I determined the loss amount, with

9    the exception of two properties, Ceanothus property and

10   Rockin M, where we received statements from the victims

11   specifying their losses.

12   Q.    Now, if you used the subtraction method for those two

13   properties instead of the estimate from the lenders,

14   approximately how much would the loss amount for those two be

15   reduced all together?

16   A.    The loss amount would be reduced in the neighborhood

17   of $70,000.  The total on the bottom you see there, at

18   1.19 million, would be reduced to about 1.84 million if we

19   had utilized my subtraction method versus taking the actual

20   victim statements.

21   Q.    And I want to ask you briefly about the structure of

22   four of the transactions on this table.

23         Did you review the escrow files for X Street, Lang

24   Avenue, La Solidad Way and Drusy Avenue?

25   A.    I did.

```
 1   Q.      What was the structure of those transactions?

 2   A.      Those were what we referred to as double escrows,

 3   where the -- a buyer resold the properties to another buyer,

 4   all as part of the same transaction.  In each of these

 5   instances, the original buyer in this series of transactions

 6   was Diamond Hill Financial, and resold to the buyers we

 7   discuss here.

 8   Q.      One more question, Special Agent Harrison.  For two

 9   properties, the resold and loss amounts show as N/A in the

10   table.  Why is that?

11   A.      Well, at the time we were researching this, we

12   couldn't find any indication of foreclosures connected to

13   those properties.

14           MR. HALES:  Thank you.

15           No further questions, Your Honor.

16           THE COURT:  Mr. Wiseman, you may cross-examine.

17                       CROSS-EXAMINATION

18   BY MR. WISEMAN:

19   Q.      Good morning, Agent Harrison.

20   A.      Good morning, sir.

21   Q.      You were asked to do this loss analysis by Mr. Hales,

22   I presume, correct?

23   A.      Yes, sir.

24   Q.      You sat through the trial, or most of the trial,

25   correct?
```

1    A.      I did not.  Because I was a witness, I was excluded

2    from the trial.  I came in to testify.

3    Q.      Okay.  You came in to testify.

4            Now, with respect to the loss amounts, as I understand

5    what you've done here, which is reflected in the chart, is

6    you took the original loan amount for the purchases of these

7    properties, correct?

8    A.      Yes, sir.

9    Q.      Okay.  For example, let's look at the first, Gidda

10   Loop, right there.  So, you looked at the original loan

11   amount of $365,000, correct?

12   A.      Yes, sir.

13   Q.      And then you determined what that property was

14   eventually resold for, correct?

15   A.      Yes, sir.

16   Q.      And in each case other than one, were you able to

17   confirm that the resale was as a result of a foreclosure?

18   A.      Yes, sir.  With -- I -- yes, the ones that were on

19   here were all foreclosed on and then resold.

20   Q.      So, meaning that the bank, the original lender, or a

21   lender, took back the property, correct, in a foreclosure?

22   A.      That's my understanding.

23   Q.      Okay.  And then at some point when the bank took back

24   the property, there was a subsequent sale of that property,

25   correct?

1    A.       Yes, sir.

2    Q.       Okay.  So, the loss amount in the third column on the

3    right is simply the difference between the loan amount versus

4    what you determined to be the resale, correct?

5    A.       Yes, sir.

6    Q.       You totaled that up and you got that $1.9 million

7    number, right?

8    A.       Yes.

9    Q.       Other than the Ceanothus property, and the Rockin M

10   property, did you speak with any of the lenders to determine

11   how much they actually recouped in the subsequent sale?

12   A.       No, sir.

13   Q.       Okay.  So, you don't know if any of these lenders

14   received some sort of bailout money that would offset their

15   loss, correct?

16   A.       Well --

17   Q.       Just yes or no.  You don't know if the lenders

18   received any benefit, like, from the bailout, the government

19   bailout, to offset the loss that's reflected --

20   A.       I would need to qualify my answer, because I do have a

21   situation that may fall into what you're looking for.  I

22   can't speak as to bailouts and government programs, but I

23   could tell you on a specific property, if you'd allow me to.

24   Q.       Sure.  Go right ahead.

25   A.       On the Baker property, for instance, I believe there

1    was a Fannie Mae repurchase, and then it was resold

2    subsequent to that.

3    Q.      Right.  But my point is, is that -- my point is -- let

4    me see if I can make myself clear.

5            My point is, you don't have any personal knowledge as

6    to whether or not the loss column reflects the true loss to

7    the lender?

8            In other words, you don't know if the lenders received

9    any benefit from any government agency to offset that loss

10   amount, correct?

11           MR. HALES:  Objection, relevance, and calls for a

12   legal conclusion.

13           THE COURT:  Let's find out what the answer is first,

14   and then we'll take up the question, after all the testimony

15   is completed, as to whether it is or isn't relevant to the

16   Court's determination of loss.

17           THE WITNESS:  Sure.  You're correct.  And I'd be happy

18   to explain why I -- why I finished with this method to

19   determine my numbers.

20   Q.      BY MR. WISEMAN:  Let me just ask you one last

21   question.

22   A.      Okay.

23   Q.      Did any of the so-called -- the victims, you used the

24   word the victims, have they filed -- has there been any

25   restitution claim filed on any of these properties to your

1   knowledge?  Restitution.

2   A.      I'm not aware of these -- I'm aware in this case

3   overall of a couple of claims, but not to these specifically.

4   I can't answer that right now.

5          MR. WISEMAN:  Thank you.  No further questions.

6          THE COURT:  Just to clarify before you're finished,

7   this hearing is only to determine loss amount, right?  Is

8   this hearing also to determine restitution?

9          MR. HALES:  No, it is not, Your Honor.

10          THE COURT:  We'll have that later, right?

11          MR. HALES:  We were going to ask the Court to delay

12   the restitution portion to a date in March, pending the

13   government's possible receipt of further information.

14          THE COURT:  That's my understanding of the customary

15   procedure, Mr. Wiseman.

16          MR. WISEMAN:  That's fine.  I just think that the

17   issue of -- if there is any restitution request is relevant

18   to the overall loss.

19          THE COURT:  I don't know that it is, because my

20   understanding is they are two separate questions.

21          MR. WISEMAN:  I agree with the Court, they are two

22   separate questions.  Although, I think the Court can consider

23   whether there's been any restitution claim.

24          THE COURT:  Any redirect?

25          MR. HALES:  No, Your Honor.

1           THE COURT:  Thank you.  You may step down.

2           THE WITNESS:  Thank you.

3           MS. HEMESATH:  The United States calls Iray Frederick.

4           THE COURT:  Did you offer this chart in evidence as

5     well?

6           MR. HALES:  I guess I should do that.  It's attached

7     to the government's sentencing memorandum, but I'll formally

8     offer it now, Your Honor.

9           THE COURT:  That will be what, Exhibit 900?

10          MR. HALES:  Yes, that number is open.

11          THE COURT:  All right.  Exhibit 900.

12          MR. HALES:  Thank you, Your Honor.

13          THE COURT:  Received in evidence.

14                          (GOVERNMENT'S EXHIBIT 900 ADMITTED

15                          INTO EVIDENCE.)

16          THE CLERK:  Please step forward.  Step forward, sir.

17          Stand next to the court reporter and raise your right

18    hand, please.

19                          IRAY FREDERICK, JR.,

20    a witness called by the Government, having been first duly

21    sworn to tell the truth, the whole truth, and nothing but the

22    truth, testified as follows:

23          THE WITNESS:  Yes.

24          THE CLERK:  Thank you.  You may be seated.

25          Please state your full name, spell your last name for

1    the record.

2              THE WITNESS:  Iray Frederick, Jr.  Last name spelled

3    F-R-E-D-E-R-I-C-K.

4              THE CLERK:  Your first name again?  I'm sorry.

5              THE WITNESS:  Iray.

6              THE CLERK:  Can you spell that, please?

7              THE WITNESS:  I-R-A-Y.

8                        DIRECT EXAMINATION

9    BY MS. HEMESATH:

10   Q.    Good morning, Mr. Frederick.

11   A.    Good morning.

12   Q.    Are you familiar with properties on Florinda, Lang and

13   La Solidad in Sacramento, California?

14   A.    Yes.

15   Q.    Were you involved in real estate transactions on these

16   three properties?

17   A.    Yes.

18   Q.    Did you work with Mr. Leonard Williams during these

19   property deals?

20   A.    Yes.

21   Q.    Please describe the deals as you understood them.

22             THE COURT:  Which one besides La Solidad?

23             MS. HEMESATH:  Lang and Florinda, Your Honor.

24             THE COURT:  Lang and Florinda.  All right.

25   Q.    BY MS. HEMESATH:  Go ahead, sir.

1   A.      Question again, please.

2   Q.      Please give us a description of the property deals as

3   you understood them.

4   A.      I was purchasing the properties from a client of

5   Mr. Williams.

6   Q.      And how did you know Mr. Williams?

7   A.      I met him around the time.  I didn't know him very,

8   very well, but I met him around that time.

9   Q.      Were you specifically looking for someone to buy

10  properties from?

11  A.      Yes and no.  I was looking, but I wasn't actively

12  looking.  I wanted to buy properties, yes.

13  Q.      What was your plan for buying properties?

14  A.      To eventually house homeless vets, and other homeless

15  people.

16  Q.      Were you looking for a property for you, yourself, to

17  move into?

18  A.      I had planned on moving into one of them, on La

19  Solidad.

20  Q.      Did you eventually move into the La Solidad property?

21  A.      No.

22  Q.      Why not?

23  A.      I was in the process of repairing it, and I never did

24  get it completely repaired.

25  Q.      And were you the actual buyer of these properties?

1    A.       No.

2    Q.       Who was?

3    A.       It was together with my stepdaughter and my wife.

4    Q.       And what's your stepdaughter's name?

5    A.       Chrislie Theus.

6    Q.       Why did you use Chrislie Theus as the buyer instead of

7    yourself?

8    A.       Because of credit problems that I had.

9    Q.       Did you discuss with Mr. Williams using a different

10   buyer on the loan application other than yourself?

11   A.       I don't recall.

12   Q.       Did you and Mr. Williams discuss pricing on these

13   properties?

14   A.       At some point, yes.

15   Q.       What was that discussion?

16   A.       I don't recall the whole discussion to what -- at the

17   time, but we did talk pricing.  He told me what he needed --

18   wanted for the properties -- what they wanted for the

19   properties.

20   Q.       Did you go look at these properties before you bought

21   them?

22   A.       Not all of them.

23            MR. WISEMAN:  Pardon me, Your Honor.  I'm going to

24   object on the grounds of relevancy.  I thought this is a loss

25   determination.

1          THE COURT:  What is the offer of proof with regard to

2     this witness?

3          MS. HEMESATH:  The offer of proof is that these three

4     properties ought to be included in the loss table.

5          THE COURT:  Well --

6          MS. HEMESATH:  If there is no objection --

7          THE COURT:  Lang and La Solidad are on there.  I don't

8     see Florinda on there.

9          MR. HALES:  Florinda is not, Your Honor.  And the

10    reason for that is that we were unable to get a full loan

11    file for that particular property in the investigation.  So,

12    it's just for Lang and La Solidad.

13         THE COURT:  All right.  Well, why are we presenting

14    testimony with regard to just two of those properties?  I

15    thought the claim was that all of them should be on the list.

16         Is there some reason that Mr. Wiseman -- Mr. Wiseman,

17    is there some reason you think that Lang and La Solidad are

18    different than the others?

19         MR. WISEMAN:  Well, they -- they were named in the

20    indictment, if I'm not mistaken.  I don't believe that there

21    was -- I think the problem is there wasn't testimony, if I

22    recall, at trial about these particular properties, and I

23    think the government now is trying to get that in.

24         THE COURT:  All right.  Okay.  Then I'll overrule the

25    objection.

1   Q.      BY MS. HEMESATH:  All right.  Did you go see any of

2   these properties before you purchased them?

3   A.      I saw La Solidad.  Lang -- there were people living in

4   Lang, and I couldn't get in.  So, Florinda, I didn't really

5   get a chance to see it at first, no.

6   Q.      What was your impression of La Solidad when you went

7   to see it?

8   A.      It needed work.  It needed work.  Yes.

9   Q.      Had you already discussed with Mr. Williams the price

10  for La Solidad before you went to see it?

11  A.      I don't recall.

12  Q.      Okay.  Do you recall the purchase price on La Solidad?

13  A.      Not really.  It was over 300,000, but I don't recall

14  exactly what the price was, no.

15  Q.      Do you recall when you went to see La Solidad of

16  having an impression of whether it was worth over 300,000?

17          MR. WISEMAN:  Objection, calls for speculation.

18          THE COURT:  Sustained.

19  Q.      BY MS. HEMESATH:  I believe I asked, "do you recall."

20          THE COURT:  It would be irrelevant if he did.

21          MS. HEMESATH:  All right.

22  Q.      BY MS. HEMESATH:  Did you make any down payment on any

23  of the three houses?

24  A.      No.

25  Q.      How were you going to pay the monthly mortgage payment

KIMBERLY M. BENNETT, OFFICIAL COURT REPORTER, USDC -- (916) 442-8420

1    on these houses?

2    A.      Well, my plan was -- like I said, I wanted to get

3    housing for vets, and other homeless people.  So, my plan was

4    to pay it through money coming from the state, or whoever

5    would pay for these people to be housed at the time.  The

6    person I was dealing with told me that we can get money from

7    the state for housing.  I mean -- yeah, for housing people.

8    So, I was going to pay the mortgage with that.

9    Q.      Did you, yourself, have enough income to pay the

10   mortgage on these houses?

11   A.      Not all of it, no.

12   Q.      Did you have an arrangement with Chrislie Theus that

13   she was going to be responsible for any portion of the

14   mortgage?

15   A.      No.

16   Q.      Did you get cash back on the purchase of these houses?

17   A.      Yes.

18   Q.      Do you recall how much?

19   A.      Not really exactly.  I think it was, like, around

20   30-40, something like that.  One of them might have been a

21   little bit more.  I'm not sure exactly how much it was.

22   Q.      So, to clarify, 30 or 40,000 for each house?

23   A.      Yes.

24   Q.      And one of them may have been a little bit more?

25   A.      Yes.

1    Q.     And did you end up getting renters into these houses?

2    A.     At some point, yes, I did, on Florinda.  And that was

3    basically where I got the rentals from.  The people on Lang,

4    I eventually got them to move out, and didn't get anybody in

5    there.  I was just trying to get ready to repair it.  La

6    Solidad, I eventually got one person in after I repaired it,

7    for a short-term.

8    Q.     Did you use a portion of the cash back that you got to

9    make the monthly mortgage payments?

10   A.     Oh, yes.  Yes.

11   Q.     And for how long were you able to continue making the

12   monthly mortgage payments?

13   A.     I don't recall exactly how long, but it was some

14   months.

15   Q.     Were you in real estate at the time that you made

16   these deals with Mr. Williams?

17   A.     Yes.  I was in real estate at the time, but I wasn't

18   doing sales, I was doing appraisals, basically, mostly, at

19   that time.

20   Q.     And did you hold a real estate license?

21   A.     Yes.

22   Q.     Were there any restrictions on your real estate

23   license?

24   A.     Yes.

25   Q.     Why were there restrictions?

1    A.       I had restrictions on my license because back in '95 I

2    had a issue that came up, and when I came up for the -- to

3    get my license in '99, they said I would have to -- I could

4    get my license, but it would be a restricted license.

5    Q.       When you bought these houses from Mr. Williams -- when

6    you bought these houses in doing the deal with Mr. Williams,

7    did you have any conversation with him about a double escrow?

8    A.       No.

9    Q.       Did you have any conversation with him about who the

10   sellers on these houses were?

11   A.       Well, I was told that it was a client of his.  I don't

12   recall the name of the people.

13   Q.       Do you recall who told you that?

14   A.       He told me when we talked.

15           MS. HEMESATH:  Nothing further.  Thank you.

16           THE COURT:  Cross-examination?

17                        CROSS-EXAMINATION

18   BY MR. WISEMAN:

19   Q.       Good morning.

20   A.       Good morning.

21   Q.       Now, sir, you were asked some questions about these

22   two properties, but I want to focus in.  At the time that you

23   purchased these properties, you had experience in real

24   estate, correct?

25   A.       Yes.

1   Q.      As a matter of fact, as you testified to, you had a

2   restricted real estate license, correct?

3   A.      Yes.

4   Q.      Which meant that you could not actually represent a

5   client in a real estate deal?

6   A.      That's not true.

7   Q.      Were you able to represent a client --

8   A.      Yes.

9   Q.      -- in a real estate deal?

10  A.      My restriction didn't have -- didn't prevent me from

11  doing any real estate sales at all.

12  Q.      Not at all.  But you -- now, the restriction that you

13  got was -- do you understand why your real estate was

14  restricted?

15  A.      Oh, yes.

16  Q.      What was that reason?  Why did the state restrict your

17  license?

18  A.      Why?  Because, like I said, at that time I had an

19  issue that came up where it was a felony, and they said I

20  could have a license.  But after going through an

21  investigation and everything, they find out that -- what

22  happened, and what I went through, my probationary period,

23  and did my restitution and everything, that I can get a

24  license but it would be restricted.

25  Q.      Okay.  And it's because of -- your license was

1    restricted because you suffered from a felony, correct?

2    A.      At that time, yes.

3    Q.      And was your license also restricted because of the

4    fact that you were not up front with the Department of Real

5    Estate concerning --

6    A.      No.  No.  I told them about it.  They were aware of

7    everything, that's why they restricted it.

8    Q.      Was there any information about a bankruptcy filing

9    that you did not disclose to the Department of Real Estate?

10   A.      No.

11   Q.      Okay.  And, so, it's your testimony that you had no

12   idea, even though you were -- you were experienced in real

13   estate, you had no idea these transactions were a double

14   escrow, is that your testimony?

15   A.      Right.

16   Q.      Did you look at any of the documents prior to signing

17   for the purchase of these properties?

18   A.      I don't recall.  I mean, I looked at them, I don't

19   recall reading everything.

20   Q.      Is that customary, that -- do you find it customary,

21   by the way, that folks don't read what's put in front of them

22   before they sign on real estate closings?

23   A.      Sometimes they'll read everything.  I didn't read

24   everything.  And at the time, like I said, I was doing

25   appraisals, and I wasn't really focusing on real estate that

1    much.  So, it was my negligence, yes.

2    Q.      It was your negligence, not looking through

3    everything?

4    A.      Right.

5           MR. WISEMAN:  No further questions.  Thank you.

6           THE COURT:  Any redirect?

7           MS. HEMESATH:  No.  Thank you, Your Honor.

8           THE COURT:  Thank you, Mr. Frederick.  You may step

9    down.  You're excused.

10          MR. HALES:  No further witnesses from the government,

11   Your Honor.

12          THE COURT:  Mr. Wiseman, what is your argument with

13   respect to the loss amount?

14          MR. WISEMAN:  Well, Your Honor, my view about the loss

15   amount is that it's not an accurate amount because I don't

16   think the government has established that the loss column is,

17   in fact, accurate.

18          I think the -- I'm sure the government is going to

19   take the position, well, the case law supports the notion

20   that one merely has to look at the loan amount and then

21   compare the resale amount, but I don't think that that, A, is

22   an adequate analysis.  And, number two, I don't think the

23   government sufficiently established that with respect to the

24   amount that they claim.

25          The other argument that I would make is that -- and if

1    the Court would allow me to make it now, I will, which is --

2    which I've argued before, the government is trying to say

3    that all of these properties should be put in the one loss

4    bucket, notwithstanding the fact that we know that the

5    testimony, and in even Mr. Clymer's position in 302, which

6    are not before the Court, that he knew nothing about the

7    Watson properties, the three Watson properties, the Gidda

8    Loop property, the Ceanothus, and one of the others.  So,

9    consequently, I don't believe those properties should be

10   calculated in this loss amount.

11           THE COURT:  Let's take the Watson properties first,

12   Mr. Hales.  What's the evidence that Mr. Williams had

13   knowledge of the Watson properties?

14           MR. HALES:  That Mr. Williams did or that Mr. Clymer

15   did, Your Honor?

16           THE COURT:  Do you argue that Mr. Clymer didn't or

17   Mr. Williams didn't?

18           MR. WISEMAN:  May I go to the podium, Your Honor?

19           THE COURT:  Yes.  Of course.  That's where you're

20   supposed to be.

21           MR. WISEMAN:  Here is -- I'm not comfortable sitting

22   there.

23           Here is the point that we've made in the sentencing

24   memorandum, that I'm going to make again this morning.  And

25   I'm going to answer the Court's direct question about why I

1    do not think this loss amount is accurate.

2          The government is trying to get -- get it both ways.

3    On one hand, the government is saying that Mr. Williams

4    should be responsible for all of these properties because

5    this was an overarching conspiracy with Mr. Clymer, and with

6    all the other individuals that testified, Mr. Symmes,

7    Mr. Gilliland, overarching conspiracy, and therefore

8    Mr. Williams should be responsible for all of these because

9    the government alleges it's part and parcel of the

10   conspiracy.

11         It's -- and the government knows this, Mr. Clymer is

12   clear that he did not know anything about the Watson

13   properties.  So, if he didn't know anything about the Watson

14   properties -- as a matter of fact, I think he said he even

15   came -- came into the conspiracy after that fact.  I think

16   the Watson properties should be taken out of the loss

17   calculation because they should not be part of the

18   conspiracy.

19         THE COURT:  How many of these properties was

20   Mr. Williams involved with directly?

21         MR. HALES:  Mr. Williams?

22         THE COURT:  Mr. Williams.

23         MR. HALES:  All of them.

24         THE COURT:  Oh.  So, what difference does it make

25   whether it was part of a conspiracy with Clymer or not?  If

1   Mr. Williams was involved in all of these, why shouldn't the

2   Court take them all into account?

3           MR. WISEMAN:  Because I don't believe that they --

4   that all of these properties, and I'm specific to the three

5   that Mr. Watson was involved in, were part of the conspiracy

6   the government alleged and tried to prove in this case.

7           THE COURT:  I understand your position.  I think that

8   if Mr. Williams was involved with all of them, that the Court

9   should take them into account.

10          Now, what is your other objection?

11          MR. WISEMAN:  Well, Your Honor -- with respect to the

12   loss amount?

13          THE COURT:  Yes.

14          MR. WISEMAN:  Well, I -- I have -- that was my

15   objection to the loss amount.  I don't think that the -- that

16   the government has proved the full loss amount accurately.

17   Because, as Mr. Harrison testified, he has no idea whether

18   any of these banks got any rebates from the government, or

19   credit from the government, that would reduce these loss

20   amounts.

21          THE COURT:  Do you have any authority that suggests

22   that the Court should deduct from the loss amount any

23   recovery that the banks might have received from the

24   government or any other source?

25          MR. WISEMAN:  I don't think there is case law that

1    supports that, but I think, as a matter of fundamental

2    fairness, the government should have the burden of proving

3    whether or not there has been any offset by any government

4    agency to the banks for purposes of the loss calculation.

5              THE COURT:  Don't lose sight of the fact that the

6    government is the people, the taxpayers.

7              Now, I don't think it would be consistent with our

8    other case law to deduct from the loss amount some recovery

9    that the victim may have received from another source.  For

10   example, insurance, if you steal something from somebody, and

11   it has a certain value, that's the loss amount.  The fact

12   that they may have been paid by the insurance company for the

13   loss doesn't reduce the loss amount.  If the government had

14   some bailout, why is that any different than insurance?

15             MR. WISEMAN:  Well, I think the insurance case is

16   pretty clear, in the sense that you can establish what the

17   insurance company paid the victim, and then you can easily

18   determine that the reserve from the insurance company was

19   reduced by a certain finite amount.

20             But my point is, Your Honor has seen case after case

21   with mortgage fraud, and the issue of materiality has come up

22   in numerous cases.  I think this whole area of loss in

23   mortgage fraud is, at best, mottled, and nobody can ever

24   really figure it out.  I don't think anybody alive is going

25   to ever be able to figure it out.

1          My position is -- and maybe I'm tilting at windmills,

2     but my position is, when you simply look at the loan amount

3     versus what was resold, and you get a net number, that that

4     is an inaccurate determination of a loss for purposes of

5     mortgage fraud.

6          THE COURT:  Well, to the extent that your argument is

7     that we ought to reduce the loss amount by any bailout or

8     other compensation the banks may have received from the

9     government, I'm going to reject that argument.  There is no

10    authority that I know of for that argument.

11         Now, is there some other argument with regard to the

12    loss amount?

13         MR. WISEMAN:  I have no other argument on loss amount.

14         THE COURT:  All right.  Well, then, I see no reason to

15    reject or disagree with Exhibit 900 here, and therefore the

16    Court finds that the loss amount is $1,917,414.

17         Now, do you want to proceed to argument on the other

18    portions of the presentence report?

19         MR. WISEMAN:  Sure.

20         THE COURT:  All right.  So, I don't know how far we

21    had gotten here with that process, but I think we need to

22    make sure that we have properly proceeded.

23         You've received a copy of the presentence report?

24         MR. WISEMAN:  Yes, Your Honor.

25         THE COURT:  And discussed it with Mr. Williams?

1          MR. WISEMAN:  Yes, Your Honor.

2          THE COURT:  Mr. Williams, have you received a copy of

3     the presentence report and discussed it fully with

4     Mr. Wiseman?

5          THE DEFENDANT:  I have, Your Honor.

6          THE COURT:  Now, with regard to the loss amount, the

7     Court has made its findings.

8          I have your sentencing memorandum, which objects to

9     certain other findings in the presentence report.  Do you

10    want to take those one at a time, Mr. Wiseman?

11         MR. WISEMAN:  Yes.  We can do that.  And my objections

12    begin on page 2 of my sentencing memorandum.

13         THE COURT:  Right.  With respect to page 2, that's the

14    loss amount.  So, where is your next objection that you'd

15    like to discuss?

16         MR. WISEMAN:  Well, I -- the Court heard my argument

17    with respect to why I think at least three of the properties

18    should be taken out of the loss amount.

19         THE COURT:  I know.  That's part of your loss amount.

20         MR. WISEMAN:  Correct.  That's part of my loss amount.

21         If you look at page 3 of the defendant's formal

22    objections, we object to paragraph -- excuse me, page 10,

23    paragraph 24 of the presentence report, which recommends a

24    two-level enhancement for sophisticated means under 2B1.1.

25    And we made a formal objection to that on the grounds that,

1    contrary to as I read the probation report, Diamond Hill

2    Financial and Bay Area Real Estate were not shell companies.

3    They were companies that Mr. Williams had, in effect, and

4    they were designed -- and there is ample testimony to support

5    this, they were designed to be real estate, if you will,

6    holding companies.  They were not shell corporations.  And I

7    think the notion that a two-level enhancement should be

8    applied on the grounds that they are -- they were sham

9    companies is inappropriate.

10        THE COURT:  I don't think the government argues they

11   were sham companies.

12        Mr. Hales, what is your argument with regard to

13   sophisticated means?

14        MR. HALES:  Well, first, shell companies aren't

15   necessary under the guideline or under the law.  And we

16   looked at a couple of cases, in particular, United States v.

17   Horob, 735 F.3d 866 at 872, where the Court discussed, in

18   imposing this enhancement, Horob did more than lie to obtain

19   a loan, he manipulated several people to lie for him, used

20   several different bank accounts, including accounts of other

21   people, to move funds around, and fabricated numerous

22   documents.  Moreover, the complicated and fabricated paper

23   trail made discovery of his fraud difficult.

24        And then at that point in the government's sentencing

25   memorandum, on page 5, we go through various pieces of the

1    evidence, and I could reiterate them here, but the basic gist

2    is the defendant's involvement, as proved at trial, in

3    talking to the straw buyers, telling them what to do on their

4    loan applications so that they could get them through, and

5    coaching the various forms of the lies.

6         With defendant Watson, there was evidence of seeding

7    money in a bank account.  With defendant Petri there was

8    discussion of fraudulent W-2s -- I mean with buyer Petri,

9    there was discussion of fraudulent W-2s and pay stubs.

10        And if the Court will remember, there was an

11   acquaintance of the defendant's, Terrance Murrell, who

12   testified, who was asked to buy a house, but ultimately

13   declined, and one of the things he testified about was the

14   defendant telling him -- the defendant saying, I can get you

15   a fake W-2, in the context of getting a loan.

16        Then there are also the numerous fraudulent

17   verification of employment documents that were shown at

18   trial.  And, you know, the point of that is using Diamond

19   Hill Financial, the defendant's company, to create this loop,

20   where the buyers say that that's where they work, and then

21   when the lender calls, they're calling to the defendant to

22   inquire and verify that employment, and he's using his

23   company in order to hide the fact that these aren't real

24   jobs.

25        THE COURT:  That's where Diamond Hill comes in, I

1    think, Mr. Wiseman, and it is part of an elaborate scheme

2    that made it difficult for the government to prove, and

3    therefore difficult for the jury to understand, and that's

4    exactly why a defendant would have such a scheme, it makes it

5    harder to uncover.

6         But I think the whole thing, taken together, to the

7    Court, clearly establishes a sophisticated means.

8         MR. WISEMAN:  Your Honor, if I may just point out one

9    thing.  Again, this goes back to how the government has, in

10   my view, packaged this case.  You know, to me, it's salient

11   that in Mr. Clymer's plea agreement, for example, there was

12   no sophisticated means --

13        THE COURT:  I'm going to get to Mr. Clymer a little

14   later here.  But this is -- this has nothing to do with

15   Mr. Clymer.  He may have -- he may have skated out of this

16   thing easier than he should have, but that is not the issue

17   here.  I'm looking at the evidence at the trial, and I think

18   that, to the Court, clearly demonstrates a sophisticated

19   means.  So, I'm going to include that enhancement.

20        MR. WISEMAN:  The next objection, Your Honor, we made

21   is on page 4 of defendant's sentencing memorandum.  We

22   objected to page 10, paragraph 28 of the PSR, which

23   recommends a four-level enhancement for leadership under

24   3B1.1 as well.

25        Our objection is -- as we state here in the motion, is

1    that the PSR only lists four individuals, not five, who

2    Williams recruited.  But, moreover, I don't think there was

3    evidence established by the government, either at trial or

4    certainly this morning, to establish that Williams organized,

5    led or supervised the straw buyers.  He gave them an

6    opportunity to buy some real estate, but he didn't do the

7    supervision, he didn't do the organizing of it.

8         THE COURT:  Here is the flaw in your argument:  The

9    defendant does not have to organize or lead all five of the

10   participants, he simply has to be an organizer or a leader of

11   a criminal activity that involved five or more participants.

12   And the government has listed eight participants with

13   criminal responsibility in the scheme.

14        So, what is your answer to that?

15        MR. WISEMAN:  Well, it -- he has to be -- he has to

16   participate in an organization that has, in this case, eight

17   individuals involved, but the question I have is what's the

18   level of participation that he has to have.

19        I think the government is trying to couch it that he

20   was some sort of, you know, like, boss of everybody, and I

21   don't think that was the -- that's established.

22        THE COURT:  Well, if you mean leader, that's what they

23   say they've established.  They point out that he recruited

24   Arthur Watson and directed him to make the false statements

25   on his loan applications.  He helped to recruit Joshua Frye,

1   directed Frye as to how to make the false statements in the

2   loan applications.  He directed Juan Reynaga to make a false

3   gift affidavit, fake down payment check, false statements in

4   his loan application.

5           MR. WISEMAN:  Well --

6           THE COURT:  Participated in directing Petri.

7           So, that is a leadership.  Whether you want to call it

8   a boss, he's a leader.

9           MR. WISEMAN:  My view is this:  I think the leadership

10  application under the guidelines really is designed for, sort

11  of, the quintessential drug conspiracy, where you have one

12  person who is at the top leading people.  This did not

13  happen -- that did not happen in this particular case.

14          THE COURT:  No, it's not a drug conspiracy, but it's a

15  mortgage conspiracy, and he and Clymer were at the apex of

16  this operation.

17          MR. WISEMAN:  But, for example, I don't think the

18  buyers were being paid for their services.  And the

19  government is going to argue that they got cash back in the

20  deals, but I just think it's a slight distinction between

21  what I view the classic leadership enhancement should be in a

22  particular case, and I don't think it fits here.

23          THE COURT:  It's not a classic drug case, I'll give

24  you that, but it is a classic mortgage fraud case, and he is

25  a leader in this whole course of conduct.  The buyers, in

 1     fact, were paid, but they don't have to be paid in order for

 2     him to be a leader.

 3           So, I'm going to accept the probation officer's

 4     recommendation with regard to the leadership enhancement.

 5           MR. WISEMAN:  Okay.  And I think the -- with respect

 6     to our formal objections to what the -- the probation office

 7     recommended, I think that's -- that concludes our objections

 8     to that.

 9           We did, however, object to the government's request

10     that Your Honor impose a two-level increase for obstruction,

11     but I think that's the government's burden to convince you.

12           THE COURT:  It is.  And let's proceed now.

13           This is the government's objection to the presentence

14     report.  You want the Court to add two levels for obstruction

15     of justice.  And I've read your memorandum, as well as the

16     transcript of the proceedings.

17           And I want to add something before we talk about it.

18     I'm not sure that I should add the two points; however, I do

19     want to make some further observations with regard to the

20     outburst that is the subject of this request.

21           The first is, I'm not sure the court reporter got

22     everything he said.  The reason for that is he stood up and

23     started to shout at the jury.  My reaction was to prevent the

24     jury from hearing what he was trying to tell them.  I tried

25     to shout him down.  And the louder I got, the louder he got,

1   and the louder he got, the louder I got.

2          I have my court reporters instructed, and I think

3   they're well trained, that when I'm speaking at the same time

4   anybody else is speaking, they take down what I say.  Now,

5   that may not be good advice, and maybe some courts would

6   disagree with that, but I want the record to show what I say.

7   I'm not talking to the wind, I'm talking for the record

8   whenever I speak in court.  And, as I recall, he had more to

9   say than what the court reporter may have taken down.  But,

10  what she did take down is accurate with regard to his

11  statements.

12         Now, I previously observed that, in the Court's

13  opinion, he was trying to create a mistrial.  And I still

14  believe that.  However, I believe he's even smarter than

15  that.

16         What happened was that he saw this case about to go to

17  the jury on a record that I believe he knew would result in

18  his conviction.  Up to that point, there was always hope in

19  his mind that something would happen that could result in

20  acquittal, but when he saw that Mr. Wiseman wasn't going to

21  present any more evidence, he knew the die was cast.  And

22  although he had agreed with his attorney that he wasn't going

23  to testify, he wanted to create an impression in the mind of

24  the jury that he was being prevented from testifying.  He

25  knew that his attorney wasn't going to call any more

1    witnesses, or any witnesses at all, but he wanted to create

2    in the mind of the jury the impression that he was being

3    railroaded, and that there were witnesses that he wanted to

4    call that he wasn't being permitted to call.  That's why he

5    said, "If you believe in the America I believe in, please

6    don't participate in this railroad."

7         It would be improper for me to speculate or rely upon

8    other things that I tend to recall he said, so I won't, but I

9    firmly believe that he had the intention to not only create a

10   mistrial, but if there wasn't going to be a mistrial, he

11   wanted to improperly suggest things to the jury that he knew

12   he was not properly permitted to tell them.

13        Now, having said that, and having made those findings,

14   the question is whether that is enough for a two-level

15   enhancement for obstruction of justice.  And Mr. Wiseman has

16   presented some cases that cause the Court some pause.

17        He points to the application notes -- application note

18   4 gives examples of things that are obstruction of justice.

19   And those examples Mr. Wiseman points out are:  Attempting to

20   threaten or influence a witness, committing perjury,

21   producing false documents, providing materially false

22   information, destroying evidence, failing to comply with an

23   injunction, and attempting to escape from custody.

24        Now, none of those occurred here.  It could be argued

25   that what he did was just as bad as some of those things, but

1      it's not any of those things.

2              Mr. Wiseman also points to application note 5, which

3      gives some examples of things that are not intended to

4      constitute obstruction of justice, which includes:  Giving

5      false identification at arrest, giving incomplete or

6      misleading information, fleeing arrest, or lying about drug

7      use to probation officers.  Now, this doesn't come within the

8      category of any of those things either.  And I think we'd all

9      agree that what occurred here was worse than any of those

10     other things.

11             So, we're in a never-never land, in-between the things

12     that the application notes say do constitute obstruction, and

13     those that the application notes say do not constitute

14     obstruction.

15             Mr. Wiseman has cited two cases, both outside the

16     Ninth Circuit, United States versus Greer from the Fifth

17     Circuit, and United States versus Gaskin from the Second

18     Circuit, which suggests that disruptive courtroom behavior by

19     itself may not be enough.  In Greer, there was also a finding

20     that the disruptive courtroom behavior was a part of a larger

21     attempt by the defendant to mislead the Court by feigning

22     incompetence.  And in United States versus Gaskin, the Court

23     distinguished between simply blowing off steam and intending

24     to threaten a witness.

25             I don't think Mr. Williams was just blowing off steam.

1    I think this was calculated on his part.  But, he didn't

2    intend to threaten a witness, he intended to influence a

3    jury; and he was unsuccessful, fortunately.  So, it -- making

4    a transparent attempt to influence a jury may not be as

5    serious as intending to threaten a witness.  So, I'm not so

6    sure that the Court would have firm ground to use this

7    conduct as a basis for a two-point enhancement.

8         The flip side of that, of course, is that if this is

9    not somehow sanctioned, every defendant knows that they're

10   free to do exactly what he did, and we can expect at the end

11   of every trial the defendant will stand up, shout at the jury

12   that it's a high-tech lynching, that he's being railroaded,

13   that he wants to call witnesses and his lawyer isn't letting

14   him call witnesses, and he's being prevent from testifying,

15   and the Court would have to somehow determine how to deal

16   with it.

17        My way of dealing with it may have been the best way,

18   to tell the jury to disregard it.

19        So, with all of that, Mr. Hales, tell me if you still

20   want me to add the two points and why.

21        MR. HALES:  The government does think it's

22   appropriate, Your Honor.  And a couple things to point out:

23        Obviously, the list of examples of covered conduct in

24   the guidelines is billed as non-exhaustive in the comments.

25        And then there is this statement, of course they can't

1     cover every, you know, possible thing that could fall under

2     this guideline, so -- so, it's mentioned, it's not subject to

3     precise definition, this is application note 3, and so

4     comparison of the examples set forth in the two lists,

5     application notes 4 and 5 that the Court ran through a moment

6     ago, should assist the Court in determining whether

7     application of this adjustment is warranted in a particular

8     case.

9          And, yes, the particular instance that happened here

10    is not listed in either of those lists, but a dividing line

11    that the government is arguing that it sees between these two

12    lists, you know, the less serious list of things listed

13    wouldn't necessarily grind the trial court proceedings to a

14    halt, or have a serious effect on the trial proceedings in

15    the same way that some of these other things would that are

16    listed.

17         And one of the things that the Court didn't mention in

18    enumerating the covered conduct in number 4 is simply failing

19    to appear as ordered for trial.  And the consequence of that,

20    of course, is the proceedings don't go forward, in the same

21    way that if the defendant had been successful here in causing

22    a mistrial, we wouldn't have been able to go forward and

23    would have had to go again later.

24         The -- in the government's view, the cases cited by

25    the defendant are distinguishable, at least in this sense,

1    from what happened in this trial, which is there is an

2    explicit finding on the record, and the Court has reiterated

3    it today, that there was a specific intent of the defendant

4    to cause a mistrial here.

5            THE COURT:  But I want to take that further.  I think

6    it was a dual intent.  And I want to make it clear that I

7    think he -- he also very, very clearly had in mind

8    influencing the jury, clearly.

9            MR. HALES:  The government agrees, Your Honor.  And we

10   looked for case law saying yes or no in this instance, and

11   didn't find one in the Ninth Circuit saying a defendant who

12   attempts to cause a mistrial should get this two-point bump.

13   We didn't see it one way or the other.  I did not find any

14   case at all directly on point to this.

15           But, given the things that are in the list of examples

16   of covered conduct, like unlawfully influencing a juror or a

17   co-defendant, witness, etc., or failing to appear, which

18   causes the trial proceedings not to go forward, and, frankly,

19   we also looked into the other enumerated one, conduct

20   prohibited by obstruction of justice provisions, and I didn't

21   feel that -- because the definition of "corruptly" in some of

22   those statutes is a bit of a morass legally, we didn't argue

23   that.

24           But, when taking the guidance from the commentary,

25   application note 3, and looking at, you've got one list of

1   things, kind of, in one category that I'm arguing would

2   severely damage the trial proceedings, and another set of

3   things that are relatively more ancillary to that, the

4   government is arguing that the Court would be on firm ground

5   to impose the obstruction of justice enhancement based on the

6   findings that the Court has made about what the defendant was

7   trying to achieve with this major disruption in the trial

8   proceedings.

9           THE COURT:  Wouldn't the Court be on firmer ground if

10  I did not add the points in the calculation of the

11  guidelines, but took into account his courtroom conduct in

12  deciding where to sentence within the guideline range, or

13  even outside the guideline range?

14          MR. HALES:  It would, Your Honor.  And if -- if the

15  Court doesn't feel that it's on comfortable enough ground to

16  impose the two levels, we would ask the Court to do that.

17          And, indeed, that's what the guideline says is

18  appropriate.  Other types of conduct that don't quite fit in

19  the examples of covered conduct can still be addressed in

20  that manner.

21          THE COURT:  It does say that, doesn't it?

22          MR. HALES:  It does, Your Honor.  So, that would be

23  appropriate if the Court feels that it's not quite there.

24          THE COURT:  All right.  Mr. Wiseman, what do you want

25  to say about this particular request?

1          MR. WISEMAN:  Your Honor, I -- I don't think Your

2     Honor should impose it.  And I'll tell you why.  And let me

3     address the sanctions.

4          I totally agree that the conduct should be sanctioned.

5     But, guess what?  You did sanction him.  You remanded him to

6     custody.  He's been sanctioned for the last how many months?

7     So, I think the sanction -- the sanction was sure and swift,

8     which is probably the best strategy for any punishment when

9     he -- when the outburst, which the Court had obviously seen.

10    So, I think there has been sanctions.

11         THE COURT:  Did I say the reason I was remanding him

12    to custody was a sanction for his outburst?

13         MR. WISEMAN:  I don't believe the Court did, but I

14    think in most cases that I've appeared before you on mortgage

15    fraud cases, most white-collar cases, even after a rendering

16    of guilt, most people in Mr. Williams' situation would not

17    have been remanded, at least in my experience in this

18    district.  So, I'm not suggesting Your Honor did that as a

19    result of the -- or as a consequence of the outburst, but he

20    certainly was sanctioned, in my view.

21         Now, I -- we cited Greer, as Your Honor pointed out,

22    and Gaskin, because they appear to be the only two cases that

23    are really somewhat on point.  And let me address those.

24         I think Greer is important because it refers to this

25    larger attempt by the defendant.  This was not a grandiose

1   design by Mr. Williams.

2          And let me contrast Mr. Williams' conduct -- albeit

3   I'm not condoning it, let me contrast Mr. Williams' conduct

4   with a case that I think Your Honor is familiar with, because

5   I was involved in it, Barker.  Mr. Barker's case, where he

6   calculated, day after day, to disrupt the entire proceedings

7   before you, and as a result of that, you let me out of that

8   case.  That's a clear, larger attempt to disrupt the judicial

9   process.  I don't think Mr. Williams' outburst satisfies that

10  criteria.

11         I think -- and I'll close by saying this.  I think

12  what Mr. -- my view of what Mr. Williams did was more like an

13  extreme blowing off of steam.  And the reason I say that is

14  because if I really felt that it was more than that, that it

15  was this calculated thing, then I think the relationship that

16  he and I have now wouldn't be there.  I mean, we're not

17  having -- look, if this was calculated, and it was more than

18  merely blowing off steam, you would have gotten letter after

19  letter from Mr. Williams since he's been in custody

20  explaining about my conduct.

21         THE COURT:  I may get some letters later on.

22         MR. WISEMAN:  Well, you haven't so far, and that's my

23  point.

24         THE COURT:  I would be surprised if I don't.

25         MR. WISEMAN:  My point, I think, is more of -- it was

1    just an outburst --

2          THE COURT:  I will bet that I get a 2255 alleging

3    ineffective assistance of counsel.

4          MR. WISEMAN:  I have no doubt.

5          THE COURT:  You have no doubt?

6          MR. WISEMAN:  I have no doubt.

7          THE COURT:  There you are.

8          MR. WISEMAN:  But my point is -- because that's what

9    his appellate lawyer will, undoubtedly, advise him to do.

10         THE COURT:  And one of the -- one of the arguments

11   that is going to be raised will relate to his so-called

12   outburst in court.  And one of the arguments that will be

13   raised is that you didn't call witnesses that he wanted you

14   to call.  And one of the arguments on appeal is going to be

15   to question how the Court handled that proceeding.

16         So, even though it didn't cause a mistrial, it has

17   caused mischief, which will continue to have to be dealt with

18   by the courts for years to come.

19         MR. WISEMAN:  Understood.  And I think that happens,

20   unfortunately, in a lot if not most cases.

21         But, I think with respect to what Your Honor is

22   required to do in determining whether the two levels is

23   appropriate, I think the case law -- it's not appropriate.  I

24   think you're -- I think you've alluded to a different route,

25   and that is sanction in another way.  I personally believe

1      he's been sanctioned.

2              THE COURT:  Well, if he was in custody, you wouldn't

3      even be able to make the argument that the Court could

4      sanction him by remanding him to custody.  So, how do you

5      sanction somebody if they're in custody and they do exactly

6      the same thing that Mr. Williams did?

7              MR. WISEMAN:  Well, in that case, if you had a

8      defendant who has been in custody pretrial, been in custody

9      during the trial and did the same thing, I think you can

10     easily -- Your Honor can easily do what the Court suggested,

11     which was give a -- depart upward, or give him a variance

12     upward from the recommended guidelines.  I think there are

13     ways to sanction this kind of behavior within a sentence the

14     Court is to impose.

15             My simple point is that I believe by remanding him to

16     custody, and I'm not suggesting that was the reason Your

17     Honor did that, but I think that he has been sanctioned for

18     that outburst.

19             THE COURT:  I think the question is close enough that

20     the Court will give Mr. Williams the benefit of the doubt

21     with regard to the calculation of the sentencing guidelines.

22     And the probation officer has not recommended it, and I will

23     not, even though I may have the discretion to do so, add the

24     two points based upon that outburst.  You both seem to

25     acknowledge that the Court can take it into account in

1    fashioning the sentence otherwise, so I will not add the two

2    points under the guidelines.

3         That means that the Court adopts the findings of the

4    probation officer in the presentence report, is that correct?

5         MR. HALES:  Yes, Your Honor.

6         THE COURT:  All right.  So, having discussed all of

7    the objections to the findings in the presentence report with

8    respect to the sentencing guidelines, the Court adopts the

9    findings in the presentence report and finds the applicable

10   offense level is 29, and the Criminal History Category is I.

11        Now, before I go on to hear what each of you has to

12   say with regard to various sentencing factors in

13   Section 3553(a), and your suggestions with regard to the

14   sentence, I think we'll take a short, ten-minute recess.

15        MR. HALES:  Thank you, Your Honor.

16        MR. WISEMAN:  Thank you, Your Honor.

17        (Recess taken.)

18        THE COURT:  All right.  I'd like to begin this

19   discussion with refreshing my recollection, if I did have a

20   recollection or any knowledge, with regard to Clymer.

21        I went back and I looked at the plea agreement, and it

22   agreed to a specific offense level of 19, and it didn't add

23   for complexity or role in the offense.

24        Where are we with regard to Mr. Clymer?

25        MR. HALES:  He will be sentenced soon, in a couple of

1      weeks, Your Honor.

2              THE COURT:  Is there a presentence report yet for

3      Mr. Clymer?

4              MR. HALES:  Yes, there is, Your Honor.  The draft came

5      out with a similar guideline range to Mr. Williams.  And when

6      I clarified for the probation officer that various pieces of

7      information obtained from Mr. Clymer's cooperation could not

8      be used by the government under, I think it's, 1B1.8, or the

9      Court, pursuant to our proffer and plea agreements with

10     Mr. Clymer, then it was revised down either substantially

11     close to, or identical to, what is in the plea agreement.  I

12     believe that's correct.

13             THE COURT:  So, is there a 5K1.1 motion?

14             MR. HALES:  The government expects to make one, Your

15     Honor.

16             THE COURT:  I don't understand.  Mr. Clymer didn't

17     testify, did he?

18             MR. HALES:  No, he didn't, Your Honor.

19             THE COURT:  If he's going to cooperate, wouldn't you

20     think the first thing he would do is come here and come clean

21     in the trial?

22             MR. HALES:  Well, I have to say, I'm not -- that

23     wasn't, ultimately, his option.  The government concluded

24     that we didn't need him to make the case.  And I suppose

25     Mr. Wiseman could attest to this, that there were some things

 1    that he was -- I don't know how to phrase this -- it might

 2    have created some potential sideshows in the trial in terms

 3    of opinions of how things were back then, so to speak.

 4          THE COURT:  I don't understand at all.  If he's

 5    cooperating, how would that create a sideshow?  The only way

 6    I can think is if he's not cooperating, and he's going to get

 7    up and try to sell this story about how it's all the

 8    government's fault.

 9          MR. HALES:  Well, it's not -- it's not as if he said

10    he was not going to testify, the government affirmatively

11    made the decision not to call him at the trial.

12          THE COURT:  But why?  Because he was no good?

13          MR. HALES:  In some ways, yes, Your Honor.

14          THE COURT:  Then I don't know why he ought to get --

15    here is the problem:  I always struggle when I have two

16    defendants and I have to sentence one first, and I'm always

17    afraid that the sentences may be inconsistent; whereas if you

18    get them both there at the same time, I can make those

19    judgments.  I don't know what you're going to say about

20    Mr. Clymer, and I don't know what his lawyer is going to say

21    about him, but just looking at the -- at what we know from

22    the presentence report and the trial, I don't see a lot of

23    difference between Mr. Clymer and Mr. Williams.  But, yet,

24    you're telling me there is going to be, apparently, a wide

25    disparity.

1          MR. HALES:  Well --

2          THE COURT:  Go ahead.

3          MR. HALES:  I'm sorry, Your Honor, for interrupting.

4     I didn't mean to.

5          THE COURT:  No.  Go ahead.

6          MR. HALES:  I want to clarify a few things.

7          First of all, Mr. Clymer agreed to plead guilty a long

8     time ago.  And one of the pitches the government will make at

9     that point in a case like this is, you know, he had

10    information he could provide us, cooperation he could

11    provide, that would solidify our case against Mr. Williams,

12    and as to certain properties that we didn't have before we

13    met with Mr. Clymer, things that gave us comfort, things that

14    rounded out the factual picture, where we were a little bit

15    confused about his level of involvement and so forth.

16         But, of course, those things that he provided to us in

17    his proffer meeting we can't then turn around and use to

18    increase his guidelines range if we weren't a hundred percent

19    certain before we met with him that we could include those

20    properties in his loss amount.  But, after we met with him,

21    the things that we learned made us very confident that the

22    properties that we're talking about here need to be included

23    with respect to Mr. Williams.

24         And one of the other things that -- in talking to

25    Mr. Clymer and his counsel is, at that point we hadn't

1    prepared for trial, at that point we hadn't located

2    Mr. Frederick who testified today, or fully appreciated --

3              THE COURT:  But Mr. Frederick didn't testify at trial.

4              MR. HALES:  That's correct, Your Honor.  What I'm

5    trying to explain is, back at the time that we're negotiating

6    with Mr. Clymer, we're saying, we may find out more things

7    about more properties, and that may end up increasing your

8    sentence later, but as it -- you know, we will agree as it

9    stands now.

10             And what's happened is Mr. Williams made the choice to

11   go to trial, we've continued to investigate right up until --

12   it was either two weeks or one week ago when the agents found

13   Mr. Frederick and we interviewed him and turned over --

14             THE COURT:  The agents found Mr. Frederick?

15   Mr. Clymer didn't turn over Mr. Frederick?

16             MR. HALES:  Right.  But I -- correct.  I'm talking

17   about the incentives and the time sequence of what happens

18   when you have one person who pleads guilty earlier.

19             THE COURT:  I'm just not comfortable -- I'm not

20   comfortable with that.  I -- what -- I don't want to prejudge

21   Mr. Clymer, because his lawyer has a right to be heard, but

22   what are you going to be recommending with regard to

23   Mr. Clymer?

24             MR. HALES:  As far as a 5K, Your Honor?

25             THE COURT:  Yes.  As far as the guidelines and the 5K,

1        what are you going to be recommending?

2              MR. HALES:  The guidelines in accordance with the plea

3        agreement, which I believe ends up putting him at an offense

4        level of 19, because we can't deviate from that, and then

5        there will be a 5K recommendation.  I don't have approval yet

6        for what that will be.

7              THE COURT:  Okay.  You can't deviate from that.  I am

8        even more upset with your office's practice of entering into

9        plea agreements that tie your hands, and then coming in here

10       and saying, because we agreed to it in the plea agreement, we

11       can't argue because the Ninth Circuit will tell us that we

12       violated the plea agreement.

13             Now, are you telling me that he's going to have an

14       applicable offense level of 19, and Williams is going to have

15       an applicable offense level of 29, and the reason for that is

16       because you entered into an agreement with Mr. Clymer?

17             MR. HALES:  It goes beyond that.

18             One of the reasons for that is that Mr. Clymer's

19       cooperation helped us round out some of those additional

20       levels against Mr. Williams, our understanding of the fact

21       picture, and what actually happened back at the time.

22             THE COURT:  You'd have to be specific in order for me

23       to really understand that and perhaps agree with it.  But

24       which part of the -- which part of the guideline calculation

25       did it affect, the loss?

1           MR. HALES:  The loss is a major thing.  One of the

2      issues was -- and this will come out when Mr. Clymer is

3      sentenced, he was 19 or 20 years old at the time he started

4      working with Mr. Williams, who was substantially older.  One

5      of the things we were unclear about was the extent of

6      Mr. Clymer's knowledge of what was going on very early on in

7      the alleged conspiracy --

8           THE COURT:  Let's back up while I'm still on this

9      subject, though.  Let's not get on a tangent.

10          The specific offense characteristics, paragraph 23 of

11     Mr. Williams' report, provides for a 16-point adjustment for

12     loss.  Now, what is that going to be for Mr. Clymer?

13          MR. HALES:  I believe it's 12, Your Honor.  If I could

14     grab my --

15          THE COURT:  All right.

16          MR. HALES:  -- sentencing guidelines.

17          THE COURT:  I assume it's the same base offense level,

18     right?

19          MR. HALES:  Yes, Your Honor.

20          THE COURT:  6.  So, if it's 12, then that brings it up

21     to 18.

22          MR. HALES:  I think the --

23          THE COURT:  And then on Williams you've got a

24     two-point enhancement for the use of Diamond Hill and BARE.

25          Is that in Mr. Clymer's?

1             MR. HALES:  No, it's not, Your Honor.

2             THE COURT:  Why not?

3             MR. HALES:  Mr. Williams was doing all of the

4    verifications of employment.

5             THE COURT:  All right.  Now, four-point adjustment for

6    role in offense.  You don't give that to Mr. Clymer?

7             MR. HALES:  We did not, Your Honor.

8             THE COURT:  Don't you honestly think, based on all the

9    arguments that you just made to me supporting the four-point

10   enhancement for Mr. Williams, that Mr. Clymer should have at

11   least some enhancement for role in the offense?

12            MR. HALES:  I have to differentiate between what I

13   knew at the time we negotiated with Mr. Clymer and what I

14   know after the trial, which is the main point of what I'm

15   trying to convey to the Court right now.

16            THE COURT:  I hear what you're conveying to the Court.

17   And, as I said, that bothers me more than the general

18   proposition of having to sentence two defendants at different

19   times.

20            What bothers me more is your office's practice of

21   entering into these plea agreements, and telling me to

22   sentence on the basis of some misunderstanding you had years

23   ago, rather than upon the facts as we now know them.  That's

24   really troublesome.

25            So, what are you going to ask me to sentence

1    Mr. Clymer to?

2         MR. HALES:  I don't know that yet, Your Honor.  It

3    will be something below -- something below 30 to 37 months --

4    something below 30 months, because that would be the low end

5    as we're required under the plea agreement.  And then I would

6    expect to make a 5K recommendation, the amount of which I

7    don't know yet because I don't have approval for it yet.

8         THE COURT:  You see the problem?  The only difference

9    between the two is that he is your pal now.  He's talked to

10   you.  You know him.  You really haven't gotten any

11   information from him that helped you with regard to

12   Mr. Williams, or that helped you with regard to any other

13   defendant.  But, yet, you are in here asking the Court to

14   sentence Mr. Williams to a term between 87 and 108 months,

15   and you may even ask for more, or I may even think that more

16   is appropriate, and then you're going to ask me to give

17   Mr. Clymer, based upon, as far as I can tell, that only

18   distinction, less than 30 months.

19        Don't you see the problem?

20        MR. HALES:  I see, Your Honor.  The one thing I would

21   disagree with, in terms of what the Court just said, is

22   saying that Mr. Clymer didn't give us anything of value.

23        I mean, an option that we kept open until the very end

24   of this trial was that if Mr. Williams testified, and

25   testified falsely, or in a manner that we thought was untrue,

1    and could be contradicted by Mr. Clymer, we would have called

2    him in rebuttal.

3            THE COURT:  Really?  I didn't know that.  Because

4    based upon what you said earlier, I thought he'd make such a

5    bad witness that you didn't want to call him.

6            MR. HALES:  No.  And I wanted to clarify on that

7    answer, Your Honor.  We could have used him in that situation

8    if we needed him, and we would have.  And the defense was

9    fully aware of what information Mr. Clymer could provide from

10   the stand, based on our disclosure of the summary from his

11   proffer.

12           THE COURT:  I think if I were one of the jurors in

13   this case, I would have wondered why you didn't call

14   Mr. Clymer.  I thought the reason you didn't call Mr. Clymer

15   was because he wouldn't agree to testify, and that he had a

16   perfect right not to testify under the Fifth Amendment.  So,

17   it didn't bother me because of my knowledge of the

18   Constitution and the rights that Mr. Clymer had, but I would

19   have thought that this jury would have wondered to the very

20   end, and maybe even talked about, well, why didn't they call

21   Mr. Clymer?

22           MR. HALES:  The way I would characterize it, Your

23   Honor, is that, in my view, from talking to him, he

24   understood and accepted that he had committed a crime

25   intellectually, but in some ways emotionally did not.

1          THE COURT:  That sounds a lot like Mr. Williams.

2          MR. HALES:  And in the government's view, that -- when

3     I talked about a sideshow, that may not be the right

4     phrase --

5          THE COURT:  Mr. Williams still doesn't think he did

6     anything wrong.  And what you're telling me about Mr. Clymer,

7     in a polite way, is pretty much the same thing.

8          MR. HALES:  It's of a different kind, Your Honor,

9     including, I think, because Mr. Clymer was much younger, as I

10    mentioned, about 20 years old at the time.  But also it's --

11    he realized what he had done and he pleaded guilty.

12         But, you know, the concern from the government's

13    perspective was, if there is still some of that, you know,

14    emotional part of him that hasn't fully accepted it, do we

15    want to deal with that at trial, and put it up ourselves

16    first, if we really don't need it.  And we decided, and I

17    think we were correct in the way the trial proceeded, that we

18    really did not need it.

19         THE COURT:  I hear you.

20         MR. HALES:  The government did not need it.

21         THE COURT:  I hear you.  But, you know, that's really

22    part of acceptance of responsibility.  It's not just

23    acknowledging that I'm guilty, technically, part of

24    acceptance of responsibility is what you call that emotional

25    acceptance of responsibility.  Or, as I would put it,

1   acceptance of culpability.

2          Well, anyway, look, I have to decide whether to

3   sentence Mr. Williams to something less in order to make it

4   closer to what I'm going to give Mr. Clymer, or to sentence

5   Mr. Clymer to something more in order to make it closer to

6   what I give to Mr. Williams, or to just live with the fact

7   that there is an inequitable disparity between the sentences

8   of these two defendants.  That's the position you've put me

9   in.

10          So, Mr. Wiseman, what would you like to say?

11          MR. WISEMAN:  Well, with respect to Mr. Clymer, I just

12   think the Court should know, if it doesn't know already, that

13   his plea agreement mandates that he be responsible for only

14   three properties, and not getting the guideline enhancements,

15   as Your Honor pointed out.

16          THE COURT:  Which three?  Which three?

17          MR. WISEMAN:  It is Baker, Linday Way and Woodforest.

18   And, remember, one of those was his sister's property.  So,

19   we note that on page 3 of our sentencing memorandum,

20   beginning at line 13.

21          THE COURT:  You know, Mr. Hales, I understand that you

22   got -- may have gotten some information from Mr. Clymer that

23   helped you to understand these properties, but you had to

24   know before you entered into this plea agreement that he was

25   responsible for more than three of these.  All the other

1    evidence that I've seen proves that beyond a reasonable

2    doubt.  So, how -- why would you just make him responsible

3    for three?  You had to know it from other evidence.

4         MR. HALES:  One of the concerns we had, and it's

5    something that Mr. Wiseman has hit over and over in this

6    case, was the Chico properties, as an example.  And that was

7    something that we had argued about.

8         What we learned about from Mr. Clymer was that he had

9    sat down with Mr. Williams -- we didn't know this beforehand

10   in the terms that Mr. Clymer told it to us, which is he had

11   sat down with Mr. Williams and Garret Gilliland about buying

12   these properties, and Mr. Clymer had decided he didn't want

13   to do it because he didn't think they were a good deal, and

14   then Mr. Williams had gone ahead and done the transactions

15   anyway, and after the fact they decided to divide up the

16   proceeds from that based on the running agreement they had

17   with how they ran their business.

18        THE COURT:  All right.

19        MR. HALES:  And another --

20        THE COURT:  I was going to say, for the purpose of

21   discussion, for those purposes, let's leave the Chico

22   properties out.  There are still nine other properties.  You

23   had to know that he was involved in more than three of them.

24        MR. HALES:  With respect to the X Street property,

25   Mr. Clymer confirmed for us that he knew that Mr. Washington

1     was receiving cash back outside of escrow.  Which that was --

2     to put that in time for the Court, that transaction happened

3     one week after Mr. Williams had filled out this document

4     that's in evidence appointing Mr. Clymer treasurer of Diamond

5     Hill, and allowing him to transfer assets to Christopher

6     Washington.

7              THE COURT:  So, you knew that --

8              MR. HALES:  From the --

9              THE COURT:  -- from other evidence.

10             MR. HALES:  Correct.  But what we didn't know from

11    that standpoint, if -- that was early in the conspiracy.

12    What we didn't know was, at that point, Mr. Clymer's level of

13    knowledge of that transaction, specifically the cash back,

14    which he confirmed for us in his proffer that he did know

15    about.

16             And then, from the government's perspective, that made

17    the transactions with Mr. Watson foreseeable as a part of the

18    conspiracy, because he received cash back as well, and then

19    Mr. Clymer received proceeds after the fact.

20             But before speaking to Mr. Clymer, it was unclear to

21    us the extent of his involvement or knowledge of all those

22    transactions.  And then --

23             THE COURT:  But the whole theory of the case doesn't

24    depend upon persons participating in or having specific

25    knowledge of specific transactions.  The whole theory of the

1    case is they're in this together, there are these

2    similarities in the transactions, and you want the jury to

3    make certain inferences which are not only legitimate but

4    compelling.

5            Now, given all that, I don't see why you didn't at

6    least hold him responsible for more than three properties.

7            You've put the Court in a very difficult position.

8            Go ahead, Mr. Wiseman.

9            MR. WISEMAN:  Well, Your Honor, what I'd like to do in

10   addressing the Court is I think we've already -- Your Honor

11   has already identified the issues of Mr. Clymer, but I'd like

12   to point out, to give the Court some relative understanding

13   of the entire case, because as I see it, the government has

14   couched this case as involving Mr. Gilliland, he was sort of

15   at the top of the pyramid, if you will, he was the one that

16   held all the properties.  Remember, we had Mr. Symmes

17   testify, so I went through the record of the other cases.

18   And let me give Your Honor an indication of what these other

19   individuals got who were involved in Gilliland.

20           William Baker, he got 18 months.  Shane Burreson, he

21   pled to money laundering, he got 23 months.  Christopher

22   Chiavola, if I recall, he was pretty high up in the Gilliland

23   organization, he got 22 months.  Niche Fortune, 57 months.

24   Garret Gilliland, the tip of the sphere, gets 94 months, and

25   he's already out.  Kesha Haynie pleads to -- gets convicted

1    after trial of mail fraud, 46 months.  Remy Heng, H-E-N-G,

2    straight probation.  Nicole Magpusao, time served; I couldn't

3    find out how much time she served.

4          THE COURT:  535 days.

5          MR. WISEMAN:  I'm sorry?

6          THE COURT:  535 days.

7          MR. WISEMAN:  And Brandon Resendez gets 9 months.  And

8    Symmes, if I recall correctly on cross-examination, I think

9    he got 48.

10          So, now the government wants Mr. Williams to get

11    substantially more than even the kingpin, if you will, this

12    Garret Gilliland.

13          THE COURT:  See, you're going to have to -- you know,

14    I sentenced Gilliland so long ago that I don't remember

15    anything about him.  You're going to -- somebody is going to

16    have to remind me, were they even part of the same

17    indictment?

18          MR. HALES:  May I respond, Your Honor?

19          THE COURT:  Yes.

20          MR. HALES:  I'm not -- I think you did not sentence

21    Mr. Gilliland.

22          THE COURT:  That explains why I don't remember.

23          MR. HALES:  I think it was Judge Garcia, Your Honor.

24          All of the defendants Mr. Wiseman just listed either

25    pled guilty, or in the one case of a trial, Ms. Haynie, she

1    entered into a sentencing agreement with the government in

2    which she waived appeal in exchange for the government's

3    recommendation of a lower sentence.

4         So, all of those sentences just read by Mr. Wiseman,

5    none of them are a free, after trial, open, you know, this is

6    what you get after trial --

7         THE COURT:  I know, but I've already told you my

8    feelings about that.

9         What is the relationship between Mr. Gilliland's case

10   and Mr. Williams' case.

11        MR. HALES:  So, initially Mr. Williams was charged, I

12   believe it was in the second superseding indictment --

13        THE COURT:  By the time I got this case, it was only

14   him and Clymer?

15        MR. HALES:  That's correct.

16        THE COURT:  That explains why I don't remember

17   Mr. Gilliland.

18        MR. HALES:  Mr. Williams was charged in the second

19   superseding indictment related to two of the Chico

20   properties, because those connected with Mr. Gilliland.  And

21   that was where the case and the investigation --

22        THE COURT:  Who is Gilliland?

23        MR. HALES:  He was, essentially, a recruiter of straw

24   buyers who operated in Chico.  Mr. Symmes and another witness

25   at trial, Jessica Sawyer, testified about Mr. Gilliland.  And

1    at least with respect to Mr. Symmes, who is a developer,

2    Mr. Gilliland would recruit buyers, and they would agree,

3    essentially, to inflate the purchase price of the homes.

4         THE COURT:  He'd recruit buyers for whom?  Is he even

5    mentioned in the presentence report?  Is Mr. Gilliland

6    mentioned in the presentence report?

7         MR. HALES:  I'm not sure that he is, but there was

8    substantial evidence about him at trial.

9         THE COURT:  Remind me what it was at trial, then,

10   because, quite frankly, I don't remember that.

11        MR. HALES:  On the Chico transactions, Jessica Sawyer,

12   she testified she worked in Mr. Gilliland's office, and she

13   testified about remembering speaking to Mr. Williams about

14   this transaction -- I'm sorry, Mr. Watson about the Chico

15   transactions.

16        And Mr. Symmes testified about the structure of his

17   fraudulent real estate transactions he would carry out with

18   Mr. Gilliland.  The nature of those was Mr. Symmes was a

19   developer, as the market went down, he couldn't move his

20   inventory, and he was teetering or having big problems if he

21   couldn't sell his houses.  Mr. Gilliland came in and said, I

22   will get you buyers if you will kickback money to me, and

23   some of the money to the buyers.  We'll inflate the purchase

24   price, you'll get the loan at an amount higher than, you

25   know, what Mr. Symmes was actually willing to accept for the

1    property, and then the difference between those two was their

2    fraud proceeds.  And that's essentially how it worked with

3    the Watson transactions up in Chico.  That's what was charged

4    in the second superseding indictment against Mr. Williams.

5         So, at the time it was just those two properties, and

6    it would have been a loss amount of on the order of $300,000.

7    My understanding from the prior AUSA on the case is that a

8    plea offer was extended just as to those two properties while

9    the second superseding indictment was in play.  It was

10   rejected.

11        As the government approached trial against

12   Mr. Williams, it learned more information about the -- the

13   whole sphere of Mr. Williams' activity, and further

14   information about the involvement of Mr. Clymer, and that is

15   what lead to the third superseding indictment that was

16   operative at the time we went to trial in this case.

17        THE COURT:  All right.

18        MR. WISEMAN:  My simple point, Your Honor --

19        THE COURT:  I see those as separate cases, to tell you

20   the truth.  I see Gilliland as a completely separate case.

21        MR. WISEMAN:  Well, the --

22        THE COURT:  I can't look at every case and try to make

23   them -- make the sentences the same when different judges

24   have sentenced different people in different cases.

25        MR. WISEMAN:  My point is, and I think the government

1   would -- I would imagine would concede that if you look at

2   the involvement of all the players who we heard testimony

3   about, that Mr. Gilliland was the most culpable in terms of

4   his activity.

5          And my point, simply, to Your Honor --

6          THE COURT:  I don't know that.  If the government

7   agrees to that, they agree to that.  My knowledge of

8   plaintiff Gilliland is limited to what may have been said at

9   trial and what Mr. Hales has just told me.  That doesn't

10  sound like he's any more culpable than Mr. Williams.

11         MR. WISEMAN:  He got 94 months.

12         But my point is -- let me move to, if I may, Your

13  Honor, to I think what the heart of the sentencing issue is

14  here.

15         I think what is -- what is key is looking at the 3553

16  factors with respect to Mr. Williams.  And I will tell you,

17  if you -- my view is this, if you look at Mr. Williams' life,

18  and I think the probation report does an admirable job of

19  laying it out, I think you see this conduct, at least my view

20  of Mr. Williams' conduct, it really is aberrant in the sense

21  that you can look back at his long military history, his

22  service, you can look back at all of his community service

23  which he's done, all of the activities he's done to better

24  his community, and you can't see, in my view, anything in

25  that history that would suggest that he would commit this

1    offense.

2          So, I believe that the -- that looking at the totality

3    of the circumstances, as the 3553 requires the Court to do,

4    this really is aberrant behavior.

5          His military career is remarkable.  I mean, we

6    indicated that -- I know the PSR indicates it, he had various

7    honors while he was in the military.  He didn't do anything

8    to suggest that he got into any trouble during his military

9    service.  He volunteers for Loaves and Fishes, and Masons, he

10   was involved in Masons for years.  He was the elections

11   supervisor for eight consecutive cycles up in -- I believe

12   it's Placer County.

13         And my point being is that if you look at -- I agree

14   with Your Honor, that in spite of the fact that we can't --

15   we can't, here this morning, adequately characterize

16   everybody's involvement in this case, I think what other

17   people got should instruct the Court as to what -- at least

18   in my view, what an appropriate sentence for Mr. Williams

19   will -- should be.  Albeit, he was the only one that went to

20   trial, but that's his right, and he's going to suffer the

21   consequences of that.

22         I don't think that this courtroom would be filled with

23   all these people who are here in support of Mr. Williams if

24   they thought he is an individual that deserves 108 months.

25         THE COURT:  I was going to ask you who those people

 1   are.  Are they --

 2          MR. WISEMAN:  They're all his supporters.  Family.

 3   Friends.  May I have a -- raised hands of the family members

 4   of Mr. Williams.  And the folks who are not family members

 5   who are supporting him.

 6          THE COURT:  All right.  So noted.

 7          Anybody here not to support him?

 8          MR. WISEMAN:  No victims.

 9          THE COURT:  Are there victims?  Yes, ma'am?

10          UNIDENTIFIED SPEAKER:  I'm just here to observe.

11          THE COURT:  You're an observer.

12          Is there anybody here that is a victim or -- okay.

13          MR. HALES:  I'm not aware of any.

14          MR. WISEMAN:  So, Your Honor, I think that I'll close

15   by this:  That under the 3553(a)(6), as Your Honor knows,

16   there needs to be a sentence that avoids unwarranted

17   sentencing disparity among defendants.  And I know there is a

18   big argument about, well, you know, within a case there --

19   the issue of disparity is not something the Court needs to

20   look at.

21          THE COURT:  That's true.  It's not in that category.

22          MR. WISEMAN:  It's not --

23          THE COURT:  But you need to look at it, you just

24   commit error if you call it disparity.

25          MR. WISEMAN:  That's true.  But I think, nevertheless,

1    in fashioning a sentence that looks at the 3553(a) factors,

2    that the Court can look to what other individuals have gotten

3    with respect to the -- their offense conduct.  So, I don't

4    need to cite what the factors are, Your Honor is well aware

5    of them.

6          I think that in the totality of the circumstances, and

7    looking at other mortgage fraud cases that I have been

8    involved in before you, and before other judges, looking at

9    Mr. Williams' background and characteristics, and slotting

10   this criminal conduct within the confines of his entire life,

11   I don't see that a sentence of more -- you know, I argued for

12   30 months in -- I believe it was 30 months in our sentencing

13   memorandum.  And now that -- in light of what I hear

14   Mr. Clymer is likely to get, maybe I should have asked for 24

15   months.

16         But, having said that, I think a sentence between 30

17   months and 60 months is more than adequate.  I would

18   recommend no more than 48 months.

19         THE COURT:  Mr. Hales, was there anything else you

20   wanted to say?

21         MR. HALES:  There are a few things, Your Honor.

22         First, just to note -- and I -- I think it's clear how

23   the Court feels about this, but I want to note that the

24   government did include a fair bit of authority in its

25   sentencing memorandum that -- I'm quoting here from a First

1    Circuit case, but there are other authorities discussed, the

2    quote is, "A defendant who chooses to enter into a plea

3    bargain is not similarly situated to a defendant who contests

4    the charges against him."

5          THE COURT:  Well, isn't that taken into account when

6    you assess the two points for acceptance of responsibility?

7    Should it go beyond that?

8          MR. HALES:  Courts have said that it goes beyond that,

9    particularly in the instance of charge bargaining.

10          And the authority for that is discussed, in part, on

11    pages 12 and 13 of the government's sentencing memorandum.

12    So, that's the 3553(a)(6) point that I wanted to make.

13          More broadly, with respect to Mr. Gilliland and some

14    of the others mentioned, it's not just that they pleaded,

15    it's that some of them cooperated, and that needs to be taken

16    into account as well.

17          THE COURT:  I don't remember seeing any of them at

18    trial.  I don't know whether they had anything to add at

19    trial, though, either.  I don't know who they are, most of

20    them.

21          MR. HALES:  And as far as the other 3553 factors, I'll

22    be brief.

23          The Court saw the evidence in this case, and saw what

24    the buyers were like.  You know, one of the things that stuck

25    out to the government was Mr. -- how impressionable some of

1    the buyers were.  Mr. Frye talked about how he had to learn

2    how to use -- around the time he was doing this, he was

3    getting into real estate, and he was learning how to use the

4    telephone, to talk to people on the telephone in a competent

5    way.  I mean, he was an easily-manipulated person who was

6    manipulated by the defendant.

7            There is also the instance of Arthur Watson who was an

8    Air Force friend.  We talk about -- Mr. Wiseman talks about

9    the military history.  I mean, one of the first people that

10   the defendant used in this scheme was a friend of his from

11   the Air Force, who had a drug problem, was having financial

12   issues.  And the condensed version of the narrative with him

13   is that the defendant helped build up his credit score, then

14   used that to get him to buy three houses in this scheme, or

15   that are on the loss estimate table, made some promises to

16   him about getting renters and so forth, and then just left

17   Mr. Watson holding the bag and didn't follow through on those

18   promises.

19           And I don't want to suggest that the buyers didn't

20   play their own role in this scheme, but at the same time I

21   think the Court can appreciate, from the evidence that was

22   presented, the degree to which Mr. Williams was taking

23   advantage of, you know, this friend, Mr. Watson, and other

24   people that he recruited, and helping them carry out this

25   scheme.

1            And when thinking about the rest of his life, and

2     whether that's an aberration, also take into account that the

3     first time he is approached by agents -- this was the last

4     thing said by Special Agent Harrison at trial, when he's

5     approached by agents, one of the first things he says is that

6     he claims Arthur Watson worked for him at Diamond Hill

7     Financial, and that was just flat out false.  That was his

8     first response to law enforcement inquiry in this case.

9            I think those are 3553 factors that go against the

10    defendant in this case, and to be weighed in the balance.

11           THE COURT:  Mr. Williams, what would you like to say

12    on your own behalf?

13           THE DEFENDANT:  Thank you, Your Honor, for allowing me

14    to address the Court.

15           I will be brief in saying that I accept full

16    responsibility for all my actions, and I respectfully request

17    that the Court take into consideration my community service,

18    work at Loaves and Fishes, my 14-election span as an election

19    official with the Placer County Board of Elections, and my

20    20-plus years of unblemished service in the defense of this

21    country, both military and civilian, thank you, when

22    determining the severity of my sentence.  Thank you.

23           THE COURT:  The Court has given careful consideration

24    to all of the relevant sentencing factors in Section 3553(a).

25    And I have attempted to reconcile the sentence of

1    Mr. Williams with the sentence of other defendants, not only

2    in this but other cases, and in particular what the Court

3    might do with Mr. Clymer.  I'll have to deal with Mr. Clymer

4    when he comes up in the next couple of weeks.

5            The guidelines here are 87 to 108 months.  I've

6    already suggested to you that although I do not add any

7    points for the outburst here in court, that it has to somehow

8    be considered in the sentencing, otherwise it would result in

9    an invitation to anyone who might want to engage in that kind

10   of unacceptable conduct, which has not only had an effect on

11   the trial, but is also going to be the subject of much

12   discussion, I'm sure, in the post-trial proceedings.

13           Now, I've taken into account all these people here,

14   believe me.  And I want everybody to know that it didn't take

15   Mr. Williams to mention it for the Court to consider his

16   military service.  He was the recipient of many awards, which

17   are listed on page 13 of the presentence report in paragraph

18   53, and I take into account his military service.  And, quite

19   frankly, it's probably the most important factor, if not the

20   only factor, that has resulted in the Court not sentencing

21   him to 108 months, which I feel otherwise might be

22   appropriate within the guidelines, but to send out the right

23   message to people that might want to disrupt the proceedings

24   of this Court.  But, I'm not going to do that.  I'm going to

25   sentence him within the guidelines.

1          And the only reason you're getting a sentence at the

2     bottom of the guidelines is because of your military service.

3          Therefore, pursuant to the Sentencing Reform Act of

4     1984, it is the judgment of the Court that the defendant is

5     hereby committed to the custody of the Bureau of Prisons to

6     be imprisoned for a term of 87 months on each of Counts 1, 2

7     and 3, to be served concurrently to each other, for a total

8     term of 87 months.

9          The defendant shall pay a special penalty assessment

10    of $300, payment to begin immediately.  The Court finds that

11    Mr. Williams does not have the ability to pay a fine, and

12    therefore the imposition a fine will be waived.

13         Upon release from imprisonment, the defendant shall be

14    placed on supervised release for a term of 36 months on each

15    of Counts 1, 2 and 3, all to be served concurrently to each

16    other for a total term of 36 months.

17         Within 72 hours of release from the custody of the

18    Bureau of Prisons, the defendant shall report, in person, to

19    the probation office in the district to which he is released.

20         While on supervised release, the defendant shall not

21    commit another federal, state, or local crime, shall not

22    possess a firearm, ammunition, destructive device, or any

23    other dangerous weapon, and shall not illegally possess

24    controlled substances.

25         He shall cooperate in the collection of DNA, as

1   directed by the probation officer, and shall comply with the

2   standard conditions which have been recommended by the United

3   States Sentencing Commission and adopted by this Court.

4          The mandatory drug testing condition will be suspended

5   based upon the Court's determination that Mr. Williams poses

6   a low risk of future substance abuse.

7          Mr. Wiseman, have you gone over the special conditions

8   on page 20 of the presentence report with Mr. Williams?

9          MR. WISEMAN:  Yes, Your Honor.

10         THE COURT:  Have you read those special conditions?

11         MR. WISEMAN:  Yes, we've read them all.

12         THE COURT:  Do you understand those, Mr. Williams?

13         THE WITNESS:  Yes, I do, Your Honor.

14         THE COURT:  The Court adopts the special conditions

15   recommended by the probation officer on page 20 of the

16   presentence report, and imposes all of those listed as

17   special conditions.

18         Mr. Williams, you have a right to appeal from your

19   conviction.  You also have a right to appeal from your

20   sentence.

21         If you wish to appeal, you must file written notice of

22   appeal within 14 days from the date of entry of judgment.  If

23   you cannot afford the cost of an appeal, you will be

24   permitted to proceed without the payment of costs.  If you

25   request it, the clerk of the court will prepare and file a

1    notice of appeal on your behalf.  If you cannot afford

2    counsel, one will be appointed to represent you on appeal.

3            Is there anything else?

4            MR. WISEMAN:  Yes, Your Honor.  The -- I'd request the

5    Court recommend the institution of Terminal Island in

6    Southern California for Mr. Williams' housing.

7            THE COURT:  Any objection?

8            MR. HALES:  No objection to that, Your Honor.

9            And as far as other items, we would request that the

10   restitution portion of the sentence be put off in accordance

11   with 18 U.S.C. 3364(d)(5), to a date on either March 16th or

12   March 23rd.  I'm not sure which was more convenient for

13   Mr. Wiseman.

14           THE COURT:  Any preference, Mr. Wiseman?

15           MR. WISEMAN:  The 23rd is fine.

16           THE COURT:  All right.  The restitution hearing will

17   be set for 9:30 a.m. on March the 23rd.

18           The Court will recommend that Mr. Williams be

19   incarcerated at the federal institution at Terminal Island,

20   California, insofar as that recommendation accords with

21   security classification and space availability.

22           MR. WISEMAN:  I have another request, Your Honor.

23           Mr. Williams has been housed on the second floor in

24   the medical wing of the Sacramento County Jail.  The reason

25   for that is he needs to sleep with what is called a CPAP

1    machine for sleep apnea issues, so, he's been there since the

2    beginning of his term.  I'm going to ask the Court to allow

3    Mr. Williams to self surrender.  I'm asking the Court to let

4    him out, give him a date to appear, so he can make sure that

5    the Bureau of Prisons has his CPAP machine for him.  I'm just

6    concerned it's going to get lost in transit.

7              THE COURT:  I wouldn't be concerned about that.  He

8    can bring it to their attention, and I'm sure there are other

9    CPAP machines that they could make available to him when he

10   gets there.

11             MR. WISEMAN:  Well, I'm concerned about transit.  But,

12   the Court has made its decision.

13             Lastly, I sought to have the public defender have

14   counsel to step in for purposes of the appeal.  They were not

15   able to get somebody today.  I would ask -- I'm not sure with

16   the restitution hearing, if I were asked -- if I were to ask

17   to be relieved presently, I just want to make sure that

18   Mr. Williams' notice of appeal is filed by the appropriate

19   attorney.

20             THE COURT:  If you're willing to handle the

21   restitution hearing, I think it would be more than

22   appropriate for you to do that rather than have some lawyer

23   that's not familiar with the case try to handle it.

24             MR. WISEMAN:  All right.  Well, I'll -- if that's the

25   Court's wishes, I'll stay in.

1          THE COURT:  I don't want to saddle you with the

2     appeal, but I do think that unless there is some other reason

3     that you shouldn't handle the restitution hearing, it would

4     make a lot of sense for you to do that.

5          MR. WISEMAN:  Very well.

6          THE COURT:  If you can work the paperwork so that

7     another attorney is appointed for the appeal and you handle

8     the restitution hearing, that would be the way to do it.

9          MR. WISEMAN:  That's what we'll do.  Thank you, Your

10    Honor.

11         THE COURT:  All right.

12         MR. HALES:  Did the Court advise the defendant of his

13    appellate rights, Your Honor?

14         THE COURT:  Where were you?

15         MR. HALES:  Taking notes, and obviously behind what

16    you were saying, and so I didn't catch up.

17         THE COURT:  I did.

18         MR. HALES:  You did.  Thank you, Your Honor.

19              (Proceedings adjourned, 11:35 a.m.)

20                      ---oOo---

21

22

23

24

25

1                         REPORTER'S CERTIFICATE

2

3                             ---oOo---

4    STATE OF CALIFORNIA     )
     COUNTY OF SACRAMENTO     )

5

6        I, KIMBERLY M. BENNETT, certify that I was the Official

7    Court Reporter, and that I reported verbatim in shorthand

8    writing the foregoing proceedings; that I thereafter caused

9    my shorthand writing to be reduced to typewriting, and the

10   foregoing pages constitute a complete, true, and correct

11   record of said proceedings:

12           COURT:   U.S. District Court
                      Eastern District of California
13
             JUDGE:   Honorable WILLIAM B. SHUBB, Judge
14
             CASE:    UNITED STATES OF AMERICA vs. LEONARD
15                    WILLIAMS

16           DATE:    JANUARY 26, 2015

17       IN WITNESS WHEREOF, I have subscribed this certificate at
     Sacramento, California.
18
                            /s/ Kimberly M. Bennett
19                          KIMBERLY M. BENNETT
                            CSR No. 8953, RPR, CRR, RMR
20

21

22

23

24

25