15-10050

# IN THE UNITED STATES COURT OF APPEAL
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

LEONARD WILLIAMS,

Defendants-Appellants.

---

## APPELLANT'S OPENING BRIEF

---

Filed on behalf of Appellant, Leonard Williams

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

The Honorable William B. Shubb, United States District Judge

TIMOTHY E. WARRINER (SBN 166128)
Attorney at Law
428 J Street, Suite 350
Sacramento, CA 95814
(916) 443-7141
Attorney for Defendant-Appellant,
LEONARD WILLIAMS

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................. 2

TABLE OF AUTHORITIES ........................................................... 5

STATEMENT OF JURISDICTION ................................................ 8

BAIL STATUS ............................................................................... 9

ISSUES PRESENTED FOR REVIEW ........................................... 9

STATEMENT OF THE CASE ........................................................ 10

STATEMENT OF FACTS ............................................................... 11

   I.  Summary ............................................................................. 11

   II.  Transactions Involving Arthur Watson ............................... 12
      A.  Gidda Loop, Yuba City, California ................................ 12
      B.  Chico Transactions ...................................................... 13
         1.  Ceanothus ............................................................. 14
         2.  Rockin M. Drive .................................................... 15
         3.  Involvement of Anthony Symmes and Garret Gililland ..................... 15

   III. Sacramento Transactions Involving Joshua Clymer ................... 16
      A.  Property Purchased by Joshua Frye ................................ 16
      B.  Property Purchased by Juan Reynaga ............................. 16
      C.  Property Purchased by Anthony Petri ............................ 17
      D.  Property Purchased by Lacie Clymer ............................ 17

SUMMARY OF ARGUMENTS ...................................................... 18

ARGUMENT .................................................................................. 19

   I.  Mr. Williams was Deprived of His Sixth Amendment Right to Counsel When the Court Denied His Requests for Substitute Appointed Counsel. .. 19
      A.  Introduction ................................................................ 19
      B.  Standard of Review ...................................................... 20
      C.  Williams' Requests for Substitute Appointed Counsel .......... 20

1.  September 2, 2011 Request ................................................................ 20
2.  February 11, 2013 Request ............................................................... 23
3.  July 21, 2014 Request ...................................................................... 26
D.  In Relation to the First and Second Requests for Substitute Counsel, The Court's Inquiries Were Inadequate ..................................................... 28
1.  First request—September 2, 2011. .................................................. 29
2.  Second request—February 11, 2013. .............................................. 30
E.  The Conflict Was Extreme, Resulting in a Breakdown in Communications. .................................................................................. 31
F.  The Requests Were Timely. ............................................................. 33
G.  The Judgment Should Be Reversed. ................................................. 34

II.  The District Court's Failure to Give a Specific Unanimity Instruction was Error Violating Mr. Williams' Substantial Right to a Unanimous Jury Verdict. ............................................................................................... 34
A.  Standard of Review .......................................................................... 34
B.  Pursuant to *United States v. Lapier*, the Court Erred by Not Giving a Specific Unanimity Instruction. ....................................................... 35
1.  Overarching Conspiracy Alleged .................................................... 37
2.  Genuine Possibility of Juror Confusion ......................................... 38
3.  Defense Counsel's Motion for New Trial Was Sufficient to Preserve the Issue for Appeal. Alternatively, The Error Was Plain. ......................... 42

III.  The Indictment Was Constructively Amended When the Prosecutor Argued To The Jury That The Alleged Conspiracy Was Proven By Virtue of Mr. Williams' Agreements With The Buyers. Alternatively, There Was a Fatal Variance. ............................................................................................. 44
A.  Standard of Review .......................................................................... 44
B.  The Indictment Does Not Allege the Buyers Were Co-conspirators. ..... 44
C.  The Prosecutor's Argument Constructively Amended the Indictment. Alternatively, There Was a Fatal Variance. The Error Was Plain. ......... 46

IV.  There Was Insufficient Evidence That The Mailings of The Recorded Deeds of Trust Were in Furtherance of an Ongoing Scheme. There is Also Insufficient Evidence of Interstate Wiring. .................................................... 49
A.  Standard of Review .......................................................................... 49
B.  There Was Insufficient Evidence That The Mailings Were Part of an Ongoing Scheme. ............................................................................. 50
C.  There Is Insufficient Evidence of Interstate Wire Communications. ...... 52

D.  The Entire Conviction Must be Reversed Because There is Insufficient Evidence of the "Specific Unlawful Activity" Which Serves as the Basis for Counts Two and Three. .................................................................. 53

V.  The Court Erred in Imposing a 4-Level Leadership Enhancement. The Case Should be Remanded for Resentencing....................................................... 53
    A.  Standard of Review ................................................................................. 53
    B.  The Leadership Enhancement Does Not Apply to Mr. Williams Because He Did Not Exercise Control Over Another Participant. ........................ 54
        1.  Basis for Enhancement In PSR ......................................................... 54
        2.  Trial Evidence Concerning Mr. Williams' Role ................................ 55
        3.  Sentencing Proceeding ..................................................................... 56
    C.  Imposition of the Leadership Enhancement Was Erroneous. The Matter Should Be Remanded for Resentencing. ................................................. 56

CONCLUSION ................................................................................................ 57

WORD COUNT CERTIFICATION ................................................................ 58

STATEMENT OF RELATED CASES ............................................................. 59

CERTIFICATE OF SERVICE ......................................................................... 60

# TABLE OF AUTHORITIES

## CASES

*Brown v. Craven*, 424 F.2d 1166 (9th Cir. 1970) ....................................... 19, 32, 34

*Jackson v. Virginia*, 443 U.S. 307 (1979)................................................. 49

*Kann v. United States*, 323 U.S. 88 (1944)............................................... 51

*Lafler v. Cooper*, 132 S. Ct. 1376 (2012) ................................................ 32

*Missouri v. Frye*, 132 S. Ct. 1399 (2012) ................................................ 32

*Stirone v. United States*, 361 U.S. 212 (1960)........................................... 48

*United  States v. Jinian*, 725 F.3d 954 (9th Cir. 2013) ............................... 52

*United States v. Adelzo-Gonzalez*, 268 F.3d 772 (9th Cir. 2001) .......... 28, 31, 32, 33

*United States v. Corona-Garcia,* 210 F.3d 973 (9th Cir. 2000) ............................ 20

*United States v. D'Amore*, 56 F.3d 1202 (9th Cir. 1995) ........................................ 28

*United States v. Dunn*, 758 F.2d 30, 35 (9th Cir. 1985) ......................................... 47

*United States v. Echeverry*, 718 F.2d 974 (9th Cir. 1983)....................................... 36

*United States v. Fisher*, 3 F.3d 456 (9th Cir. 1993)................................................. 47

*United States v. Garcia*, 924 F.2d 925 (9th Cir. 1991)............................................ 28

*United States v. Gonzalez*, 113 F.3d 1026 (9th Cir. 1997) ........................ 28, 29, 49

*United States v. Gonzalez-Aparicio*, 663 F.3d 419 (9th Cir. 2011) ........................ 35

*United States v. Harper*, 33 F.3d 1143 (9th Cir. 1994) ........................................... 54

*United States v. Kenny*, 645 F.2d 1323 (9th Cir. 1981) .................................... 40, 46

*United States v. Kessi*, 868 F.2d 1097 (9th Cir. 1989) ............................................ 48

*United States v. Lapier*, 796 F.3d 1090 (9th Cir. 2015) .................................. passim

*United States v. Lazarenko*, 564 F.3d 1026 (9th Cir. 2009) .................................... 50

*United States v. Lo*, 231 F.3d 471 (9th Cir. 2000) ................................................... 51

*United States v. Lopez-Sandoval,* 146 F.3d 712 (9th Cir. 1998) ............................ 54

*United States v. Manarite*, 44 F.3d 1407 (9th Cir. 1995) ........................................ 50

*United States v. McClendon*, 782 F.2d 785 (9th Cir. 1986) .................................... 28

*United States v. Miller*, 471 U.S. 130 (1985) ......................................................... 48

*United States v. Moore*, 159 F.3d 1154 (9th Cir. 1998) .................................... 20, 34

*United States v. Musa*, 220 F.3d 1096 (9th Cir. 2000) ............................................ 32

*United States v. Nevils*, 598 F.3d 1158 (9th Cir. 2009) ........................................... 49

*United States v. Nguyen*, 262 F.3d 998 (9th Cir. 2001).......................................... 32

*United States v. Olano*, 507 U.S. 725 (1993) ......................................................... 35

*United States v. Olson*, 925 F.2d 1170 (9th Cir. 1991)........................................... 49

*United States v. Payseno*, 782 F.2d 832 (9th Cir. 1986)......................................... 36

*United States v. Pazsint*, 703 F.2d 420 (9th Cir. 1983) ........................................... 47

*United States v. Reed*, 575 F.3d 900 (9th Cir. 2009) .............................................. 34

*United States v. Shipsey*, 190 F.3d 1081 (9th Cir. 1999)......................................... 44

*United States v. Swank*, 676 F.3d 919 (9th Cir. 2012)............................................ 53

*United States v. Torres-Rodriguez*, 930 F.2d 1375 (9th Cir. 1991)........................ 28

*United States v. Vowiell*, 869 F.2d 1264 (9th Cir. 1987) .......................................... 47

*United States v. Whitney*, 673 F.3d 965 (9th Cir. 2012) .................................... 54, 57

## <u>STATUTES</u>

18 U.S.C. § 3231 ........................................................................................................ 8

28 U.S.C. § 1291 ........................................................................................................ 8

United States Sentencing Guideline § 3B1.1(a) .................................................... 54

## <u>RULES</u>

Federal Rules of Criminal Procedure, Rule 52, subdivision (b) ............................ 35

Federal Rules of Criminal Procedure, Rule 29 ...................................................... 42

15-10050

# IN THE UNITED STATES COURT OF APPEAL
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

LEONARD WILLIAMS,

Defendants-Appellants.

## APPELLANT'S OPENING BRIEF

## STATEMENT OF JURISDICTION

The district court had jurisdiction over this criminal case pursuant to 18 U.S.C. § 3231. Mr. Williams was sentenced to serve 87 months in the United States Bureau of Prisons on January 26, 2015. ER[1] 14. The judgment was filed on January 29, 2015. ER 13-18. Mr. Williams' notice of appeal was timely filed on February 4, 2015. ER 12. This matter falls within the court's jurisdiction as set forth in 28 U.S.C. § 1291.

//

---

[1] "ER" refers to the Excerpts of Record.

## BAIL STATUS

Mr. Williams is serving the 87 month sentence imposed by the district court at USP Lompoc, Lompoc, California. His estimated release date, according to the Bureau of Prisons' website, is November 12, 2020.

## ISSUES PRESENTED FOR REVIEW

I. Mr. Williams made multiple requests for substitute appointed counsel due to a breakdown in communications. Did the court deprive Mr. Williams of his Sixth Amendment right to counsel by denying the requests?

II. The evidence tended to show two conspiracies. Did this evidence create a potential for juror confusion, thereby requiring the court to give a specific unanimity instruction?

III. The indictment alleged a conspiracy between Mr. Williams and Joshua Clymer. Did the government constructively amend the indictment by arguing that the conspiracy was proven because of Williams' agreements with the homebuyers?

IV. The only evidence to support use of mail was the mailing of recorded deeds of trust to the lenders. Was there sufficient evidence to show that the mailings were in furtherance of an ongoing scheme and of interstate wiring?

V. Was there sufficient evidence showing Mr. Williams' control of other participants to support the 4-level leadership enhancement?

## STATEMENT OF THE CASE

Attorney Joseph Wiseman was first appointed to represent Mr. Williams on June 21, 2010. ER 93.

On September 2, 2011, Mr. Williams requested the substitution of appointed counsel due to the "complete breakdown in their relationship." The court denied the request. ER 19-23.

A Third Superseding Indictment (the "Indictment") was filed February 23, 2012. ER1-11. Count one alleged a conspiracy to commit mail fraud and wire fraud in violation of 18 U.S.C. § 1349. ER 1-7. Counts two and three of the Indictment alleged money laundering, in violation of 18 U.S.C. § 1957. ER 7-8. The Indictment also included a criminal forfeiture allegation. ER 8-9.

On February 11, 2013, Mr. Williams again requested a change of appointed counsel. After an in camera hearing, the court denied the request. ER 24-36.

Mr. Williams' jury trial began on July 8, 2014. ER 102-103. On July 21, 2014, Mr. Williams requested that new counsel be appointed to represent him. The court denied the motion. ER 37-72. On July 24, 2014, the jury returned guilty verdicts on all counts. ER 104.

On January 26, 2015, the court sentenced Mr. Williams to an 87-month term of imprisonment in the Bureau of Prisons. In addition, the court ordered a 36-month term of supervised release and a $300 special assessment. ER 14, 17.

A timely notice of appeal was filed on February 4, 2015. ER 12.

## STATEMENT OF FACTS

### I.     Summary

Mr. Williams was engaged in the real estate business in 2007 and 2008. He was a licensed real estate agent and the owner and operator of two businesses connected with his real estate business: Diamond Hill Financial and Bay Area Real Estate Holdings, LLC. RT[2] 855.

The government presented evidence of seven real estate transactions in which Mr. Williams was involved. The first three transactions, occurring in 2007, involved a property in Yuba City and two properties in Chico, California. The remaining transactions involved properties in the Sacramento area. Joshua Clymer, a co-defendant, was involved in the latter four transactions. All of the transactions involved similar misrepresentations. These included: falsified statements on loan applications about the buyer's qualifications, including claims that the buyer worked for Diamond Hill Financial, statements that the property was going to be occupied by the owner, false down payments, inflated purchase prices that were hidden from the lender, and payments made out of escrow to the buyers.

//

---

[2] "RT" refers to the reporter's transcript.

## II.   Transactions Involving Arthur Watson

Arthur Watson became friends with Mr. Williams in the Air Force Reserves. RT 335. He contacted Mr. Williams about doing credit repair. Mr. Williams helped him improve his credit score. RT 339. Mr. Watson met with Mr. Williams at Mr. Williams' office on Watt Avenue 15-20 times. RT 339. Watson saw Joshua Clymer, who he believed was Mr. Williams' partner, at the office. RT 340. There was no evidence that Mr. Clymer helped Mr. Watson with any of the transactions.

### A.   Gidda Loop, Yuba City, California

Mr. Williams proposed to Mr. Watson the idea of purchasing a home on Gidda Loop, in Yuba City. Mr. Williams would provide Watson with funds to make the mortgage payments. RT 341. Mr. Williams was going to handle the payments after Watson made the first three months' payments. RT 343-344. The monthly payments were $2,800. RT 344. Mr. Williams told Mr. Watson they may have to rent out the home until it could be sold. RT 344. Mr. Watson did not know how much the Gidda Loop home cost. RT 352. The price was not important at the time because Mr. Williams said he would make the payments after the first three months. RT 353.

Mr. Watson worked with Mr. Williams to prepare the loan application. RT 349. He did not work with Mr. Clymer or anyone else. RT 350. The loan application was completed in 2006. *Ibid*. Mr. Watson did not fill out the

12

information on the loan application. *Ibid*. At the time of the loan application, Mr. Watson was doing handyman work making between $500 and $1,000 a month. *Ibid*. He did not receive a regular salary. *Ibid*.

The application stated the property would be his primary residence. An occupancy statement also stated he was going to reside there. RT 358. However, Mr. Watson was not going to live there. RT 352. He told Mr. Williams he was not going to move to Yuba City. RT 353. The application stated his base employment income was $6,150 a month, however, at no time did Mr. Watson earn that amount in a month. *Ibid*. He was getting $4,000 a month in retirement benefits, but had no other income. *Ibid*. A witness testified that the misrepresentations in the loan application could affect the bank's decision to make the loan. RT 713-724.

Mr. Watson received from Mr. Williams a $14,993 cashiers' check, dated September 5, 2006, for the purchase of the Gidda Loop property. RT 361. After Mr. Watson became the owner of the Gidda Loop home, Mr. Williams rented it out. *Ibid*. The rent was paid to Mr. Williams. RT 361-362. Mr. Watson never met the renters or visited the house. RT 362.

### B. Chico Transactions

Following the Gidda Loop transaction, in 2007 Mr. Watson purchased two other properties, located in Chico, California, with the assistance of Mr. Williams. RT 364. Mr. Watson was to receive cash back from the real estate transactions. RT

362. Mr. Williams stated he would take care of the mortgage payments for the properties. RT 364.

   1. *Ceanothus*

With the help of Mr. Williams, Mr. Watson purchased the Ceanothus property in 2007. *See* Gov. Exh. 802. The loan application for the property falsely stated that Mr. Watson worked for Diamond Hill Financial. RT 365. Mr. Watson discussed with Mr. Williams that the loan application would say he worked for Mr. Williams. RT 366. The application stated that Mr. Watson was making $11,522, but he was actually making much less than that. RT 365. Mr. Watson did not falsify his monthly bank statements, but gave Mr. Williams access to his bank account so that Williams could view the statements. RT 368. Mr. Watson kept an average balance in the checking account of a couple of hundred dollars. RT 367.

Mr. Watson believed he received a $2,000 check on July 24, 2007 as a result of the Ceanothus transaction. RT 371-372. Mr. Watson did not recall receiving other checks from Diamond Hill Financial, including one referring to him as a consultant. RT 372-373. Mr. Watson never moved in to the Ceanothus property. RT 374. Mr. Williams was to take care of the mortgage payments for the property. RT 374-375.

//

### 2.  Rockin M. Drive

Mr. Watson purchased a third property in Chico located on Rockin M.

Drive. Mr. Williams told him he would receive $2,000. RT 375; *see* Gov. Exh.

803. Mr. Williams assisted with the transaction. Mr. Watson did not complete the

loan application, but signed it. RT 379. Mr. Watson discussed with Mr. Williams

that the application would state he was working for Diamond Hill Financial. RT

379. Like the other loan applications, this application contained false statements

about Mr. Watson's monthly income, account balance, and his intent to occupy the

residence. RT 381-382. Mr. Watson never moved into the third property. Mr.

Williams was to make the mortgage payments. RT 385.

### 3.  Involvement of Anthony Symmes and Garret Gililland

Anthony Symmes was a builder of the Ceanothus and Rockin M. properties.

He worked with Garret Gililland to find buyers for his homes. RT 408. Mr.

Gililland was a co-defendant who worked with Mr. Williams in 2007 to find

homebuyers. RT 441. Mr. Symmes testified at trial pursuant to a cooperation

agreement. RT 419.

Mr. Symmes requested $325,000 for the Ceanothus home. RT 410. Mr.

Gililland found the buyer for the property. After the transaction closed, Mr.

Symmes would pay to Mr. Gililland the difference between the sale price and the

amount Symmes agreed to take for the home. RT 416. Mr. Symmes made a

$46,000 payment to Diamond Hill Financial in relation to the Ceanothus property.
The payment was not disclosed to the lender on the HUD 1. RT 417.

Mr. Symmes worked with Mr. Gililland to sell the Rockin M. property. The
purchase price was $450,000, however, Symmes was willing to accept $375,000.
RT 423-424. After the transaction closed, Symmes paid $30,000 to Diamond Hill
Financial. RT 429.

## III.   Sacramento Transactions Involving Joshua Clymer

### A.   Property Purchased by Joshua Frye

Joshua Frye worked with Mr. Williams and Mr. Clymer to purchase the
Baker Avenue property in February of 2008. RT 480-481. Mr. Frye met Mr.
Williams and Mr. Clymer at a real estate seminar. RT 481. Mr. Frye understood
that he would not qualify for the property unless the loan application was falsified,
and he knowingly signed the false application. RT 488. Mr. Frye received
approximately $20,000 from the transaction. RT 506.

### B.   Property Purchased by Juan Reynaga

Juan Reynaga purchased the Trap Rock Way property with the assistance of
Mr. Williams and Mr. Clymer. RT 623-624. Mr. Reynaga was aware that in order
to get the property, an un-deposited check would be made to appear as though it
was a gift from his brother, giving the appearance of a down payment even though

there were insufficient funds to support it. RT 634-637. Mr. Reynaga stated that he did not receive any payment outside escrow for the purchase. RT 642.

### C.   Property Purchased by Anthony Petri

Anthony Petri purchased the Woodforest property with the help of Mr. Williams and Mr. Clymer. RT 755. A friend referred him to Mr. Williams and Mr. Clymer. RT 757. Mr. Petri knew that in order to get the loan for the property, his employment and income would have to be falsified on the loan application. RT 764-769. He signed a loan application that contained false information. RT 771-779. Mr. Williams and Mr. Clymer told Mr. Petri that he would receive $30,000 cash back from the transaction. RT 779. However, when Mr. Petri showed up at the escrow office, Mr. Clymer stated he would not get any cash back. RT 781. Mr. Petri knew that Mr. Clymer and Mr. Williams were making money on the difference between the sale price and the price the purchase price. RT 782.

### D.   Property Purchased by Lacie Clymer

Josh Clymer suggested to his sister Lacie that she buy a house for investment purposes. RT 608. She did not look closely at the paperwork she was signing and trusted her brother. RT 614. She testified that she did not know the information in the application would be false. RT 615. She was told she would get $10,000 from the loan proceeds. RT 617.

//

## SUMMARY OF ARGUMENTS

I.     Denial of Requests for Substitute Counsel. Mr. Williams made timely requests for the substitution of appointed counsel due to a complete breakdown in communication with counsel. Mr. Williams did not trust his appointed counsel and their relationship was argumentative and contentious. The court's denial of Williams' requests for substitute counsel was an abuse of discretion.

II.    Failure to Give Specific Unanimity Instruction. The evidence tended to show two conspiracies—one involving Chico properties occurring in 2007, and the other involving Sacramento properties occurring in 2008. Because of the potential for juror confusion, the court should have given a specific unanimity instruction requiring the jurors to agree as to what conspiracy their verdict was based upon, including the identity of the conspirators.

III.   Constructive Amendment or Alternatively, Fatal Variance. The Indictment alleges a conspiracy between Mr. Williams and Joshua Clymer. However, the government argued to the jury that a guilty verdict could be based upon the agreements between Mr. Williams and the homebuyers—a theory that was never presented to the grand jury. The government's argument resulted in a constructive amendment of the indictment, or alternatively, a fatal variance.

IV.    Insufficient Evidence of Mailing In Furtherance of Ongoing Scheme. The only evidence concerning use of the mails was that recorded deeds of trust were

returned to the lenders through the mails. This evidence was insufficient to show that the mailings were in furtherance of an ongoing scheme. There was also insufficient evidence of interstate wiring.

V.    <u>Insufficient Evidence that Williams Controlled Others.</u> The 4-level leadership enhancement requires proof that Mr. Williams exercised control over other participants. There is no evidence that he controlled another participant.

## ARGUMENT

**I.    Mr. Williams was Deprived of His Sixth Amendment Right to Counsel When the Court Denied His Requests for Substitute Appointed Counsel.**

### A.    Introduction

At the time he was indicted for crimes relating to his real estate business, Mr. Williams was an honorably discharged war veteran with no significant criminal history. The court appointed attorney Joseph Wiseman for Mr. Williams. Mr. Williams made two pre-trial requests for the substitution of a new court appointed lawyer. A third request was made during trial. The District Court's denial of these requests was erroneous. The complete breakdown in communication – evidenced by Mr. Williams' dissatisfaction, distrust, and concern about his appointed defense counsel – required substitution of new counsel.

This court in *Brown v. Craven*, 424 F.2d 1166, 1170 (9th Cir. 1970) stated that "to compel one charged with [a] grievous crime to undergo a trial with the assistance of an attorney with whom he has become embroiled in irreconcilable

conflict is to deprive him of the effective assistance of any counsel whatsoever."

The breakdown in communications between Mr. Williams and his appointed

lawyer resulted in such an irreconcilable conflict. In denying replacement counsel,

the district court abused its discretion given 1) the extent of the conflict, 2) the

court's inadequate pre-trial inquiries; and 3) the timeliness of Mr. Williams' pre-

trial requests. *See United States v. Moore*, 159 F.3d 1154, 1158-59 (9th Cir. 1998).

The judgment should be reversed.

### B.   <u>Standard of Review</u>

The denial of a motion for substitution of counsel is reviewed for abuse of

discretion. *United States v. Corona-Garcia,* 210 F.3d 973, 976 (9th Cir. 2000), *cert.*

*denied*, 531 U.S. 898 (2000). The same standard of review applies to a Sixth

Amendment claim based upon the denial of a motion for substitution of counsel.

*United States v. Moore*, 159 F.3d 1154, 1158-59 & n. 3 (9th Cir. 1998).

### C.   <u>Williams' Requests for Substitute Appointed Counsel</u>

#### 1.   *September 2, 2011 Request*[3]

After the court vacated the trial date,[4] Mr. Williams' counsel advised the

court that Mr. Williams wished for the court to appoint new counsel. ER 19.

---

[3] The Honorable Edward J Garcia was assigned the case at the time of Mr.
Williams' September 2, 2011 request for new counsel. On November 30, 2012, the
case was reassigned to the Honorable William B. Shubb due to the retirement of
Judge Garcia. ER 99.

Defense counsel requested that the proceeding be held outside the presence of the

public and the United States Attorney due to the possible disclosure of confidential

information. ER 19-20. The court denied this request, commenting, "I've never

heard of such a thing. I've been here for 26 years." *Ibid*.

Mr. Williams stated, "I feel that me and Mr. Wiseman have had a complete

breakdown in communications. And because of that breakdown, I don't feel that I

can adequately assist him in my defense." ER 20.  Responding to the court's

question about the nature of the breakdown, Mr. Williams stated, "we have a

serious conflict in how I should be defended." *Ibid*.

The court stated,

> Generally speaking, there's only about three things a defendant can
> control in his own defense during a trial when he's charged with a crime.
> That is whether to plead guilty or not guilty, whether to testify at the trial,
> and to request a jury trial. Legal matters and matters of defense are up to
> your lawyer. You happen to have a highly skilled lawyer. You probably
> couldn't do any better. In fact, I know you couldn't unless you go out and
> hire your own lawyer, which I'll consider if you want to do that. But I don't
> play the attorney game. I don't willy-nilly fire lawyers because their clients
> are not in love with them any more. ¶ Do you understand me? ER 20-21.

Mr. Williams responded, "The breakdown in communications is the first

thing that you mentioned." ER 20. Court: "You mean whether to plead or not

plead?" Williams: "That's correct." Court: "That's no problem. That's your

choice." The court stated, "That's no basis for relieving your attorney, Mr.

---

[4] The parties stipulated to vacate the trial date because of new discovery. The
matter was calendared for trial setting. RT 8; ER 97.

Williams. Do you understand me?" 9/2/11 RT 14; ER 22. Mr. Williams then

enquired, "May I make another comment?" *Ibid*. The court responded, ". . . you're

digging your hole deeper, but go ahead." *Ibid*.

Mr. Williams' defense counsel interjected that, "the problem goes beyond

what Mr. Williams represented to the Court. The problem is it goes beyond more

than strategy and what strategy to take in this case and whether counsel believes

that the defendant should plead guilty and the defendant wishing to go to trial. ¶

The problem is I'm speaking Chinese and he's speaking Portuguese, and we are

not communicating. And as a result of that breakdown, I cannot, I believe,

adequately give him advice that he can process to make an informed and intelligent

decision as to how to proceed." 9/2/11 RT 14; ER 22. Defense counsel indicated

that the CJA administrator was notified about the problem and that a new lawyer

would be available to take over the case. Defense counsel commented, "in the

posture of the case, I think it's appropriate because I do believe that there is a

breakdown." *Ibid*.

The court denied the request for a new appointed counsel. Responding to

defense counsel's comments, the court stated, "I still don't think that's a sufficient

reason to replace you, Mr. Wiseman. It occurs to me that Mr. Williams is going to

be speaking the wrong language to any attorney that's appointed to represent him."

9/2/11 RT 14-15; ER 22-23.

The court then directed comments at Mr. Williams, stating, "I don't know what your problem is, Mr. Williams, but I don't play the attorney game, that is, let you switch lawyers just because you feel you ought to switch lawyers or because you don't want to take the advice of an experienced trial criminal lawyer. ¶ Do you understand me?" 9/2/11 RT 15; ER 23. Williams: "I do, your honor." *Ibid*. The court instructed, "what I suggest you do, Mr. Williams, for the first time of your life, bend, get along with your attorney. You don't have to love him. He doesn't have to like you. Do you understand that?" *Ibid*. Williams: "I do, your honor." *Ibid*.

### 2.    *February 11, 2013 Request*

Mr. Williams made another request for substitution of appointed counsel at the February 11, 2013 status conference. There was no trial date set at the time of the request. At the request of Mr. Williams' defense counsel, the court cleared the courtroom so the proceedings could be held in camera. 2/11/13 RT 3.

Defense counsel described the problems between himself and Mr. Williams as "historic in nature." 2/11/13 RT 5; ER 30. Counsel advised that after Judge Garcia denied the request for new counsel, "things have not gotten better . . . ." Counsel described the circumstance as a "complete breakdown," commenting, "it has impacted [Mr. Williams'] willingness to take my advice or have confidence that I'm doing the best for him." *Ibid*. Defense counsel stated, "there . . . is a

differing of opinion as to how to proceed," and that "the differences of opinion have implicated our ability to communicate about the case. ¶ So, there really is kind of a shutdown of communication, and that's the problem as I see it." *Ibid*.

Mr. Williams commented that he "went into real estate, and I may have made some lapses in judgment for which I lost my ability to practice real estate for. I do not think that those lapses, because I believe the law is a precise science, do not constitute illegal, and I believe that Mr. Wiseman does. So, there is a problem. If he doesn't believe in my innocence, I don't feel he can accurately represent me in court." 2/11/13 RT 5-6; ER 30-31.

The court responded, "Mr. Wiseman is trained in the law, you're not. I don't know what your disagreement is on the law, but my concern would be, if I get another lawyer, that lawyer may well read the law the same as Mr. Wiseman, and you're not going to be in any better position than you have been for the last three or four years that Mr. Wiseman has been representing you. ¶ So, what would I accomplish?" 2/11/13 RT 6-7; ER 31-32. Mr. Williams stated it was his intent to retain his own lawyer. He requested that the court appoint a new lawyer in the event he was unable to retain one. 2/11/13 RT 7; ER 32.

The court responded, "The taxpayer's money is going to be wasted. What you're asking me to do is take a lawyer that has been on the case now since, what, 2008, five years, and relieve him, bring another lawyer in here, and you say that

lawyer has to be brought up to speed. So, that lawyer has to learn everything that Mr. Wiseman has learned in the five years he's been representing you, and you want the government to pay for that, but it's only a stopgap measure, because you're going to bring in a third lawyer that you're going to pay." 2/11/13 RT 7-8; ER 32-33.

The court directed questions to defense counsel concerning fees paid by the court, commenting, "Mr. Wiseman, I can understand why you want out of this, but you've probably already taken a lot of government money to represent Mr. Williams. ¶ . . . And you don't want to refund that money." 2/11/13 RT 8; ER 33. The court enquired, "How much money would you say you've gotten representing Mr. Williams so far?" *Ibid.* Defense counsel responded, "we've billed quite a bit." *Ibid.* The court stated to defense counsel, "I'd think you would be trying to work more with Mr. Williams to cement the relationship rather than coming to the Court trying to bail out of the relationship." 2/11/13 RT 9; ER 34. Counsel responded that he filed the motion for new counsel "because it was Mr. Williams' request that I do so." *Ibid.* Counsel informed the court that Mr. Williams has always stated he was trying to retain counsel, but was unable, financially, to secure an attorney. *Ibid.*

The court stated that if the only reason Mr. Williams wants a new lawyer "is that he doesn't like your assessment of the law, in other words, he doesn't like your

interpretation of the law, I don't think that's sufficient grounds." 2/11/13 RT 9-10;

ER 34-35. Defense counsel responded, "the problem is more than merely a

disagreement on the law. ¶ My view of the case and how the – what the outcome of

the case is is different [than Mr. Williams' view]." 2/11/13 RT 10; ER 35.

The court stated, "if the only reason that you want to get a different lawyer is

because you don't agree with Mr. Wiseman's interpretation of the law, I don't

think that's a sufficient reason." 2/11/13 RT 11; ER 36. Mr. Williams responded,

"It's not that I just don't agree with his interpretation . . . .  I don't agree with his

ability to represent me." *Ibid*. The court denied the motion for new counsel. *Ibid*.

The court then set a trial date for September 3, 2013. 2/11/13 RT 9; ER 34.

### 3.    *July 21, 2014 Request*

After trial had commenced, Mr. Williams again requested new counsel. The

court held an in camera proceeding. 7/21/14 RT 2-3; ER 42-43. Mr. Williams

provided documents to the court. 7/21/14 RT 4; ER 44. The court allowed Mr.

Williams to make a statement to the court. The following summarizes the points

articulated by Mr. Williams:

> *Mr. Williams requested replacement of counsel, complaining that
>
> Mr. Wiseman pressed him to plea bargain before he understood the facts of
>
> the case. *Ibid*.

*Mr. Wiseman refused to produce a "comprehensive plan for his defense." 7/21/14 RT 5; ER 45.

*Mr. Wiseman failed to make points necessary to oppose the government's case. *Ibid*.

*Mr. Wiseman failed to distinguish between the Williams / Clymer transactions, and the way the Chico transactions were structured. 7/21/14 RT 6-7; ER 46-47.

The court stated Mr. Williams was "delusional," remarking, "you have a strange idea about what ought to be your defense." 7/21/14 RT 8; ER 48.

The court indicated that it had reviewed correspondence, provided by Mr. Williams, between Mr. Williams and his counsel. 7/21/14 RT 20; ER 60. The court questioned how there could be a breakdown in communications given the correspondence. *Ibid*. Mr. Williams responded that, "it is a breakdown of communications because we had to resort to written correspondence back and forth and not be on the same page as far as strategy as we proceed forward." 7/21/14 RT 21; ER 61. Mr. Williams denied that he was seeking delay, stating that he is "simply a man who suddenly realized that I had to get very proactive in my own defense after seeing what was going on." *Ibid*.  The court denied the request for new counsel. 7/21/14 RT 32; ER 52.

//

## D.    In Relation to the First and Second Requests for Substitute Counsel, The Court's Inquiries Were Inadequate.

Before ruling on a motion to substitute counsel due to an irreconcilable conflict, a district court must conduct "such necessary inquiry as might ease the defendant's dissatisfaction, distrust, and concern." *United States v. Garcia*, 924 F.2d 925, 926 (9th Cir. 1991). During the inquiry, the court "may need to evaluate the depth of any conflict between defendant and counsel, the extent of any breakdown in communication, how much time may be necessary for a new attorney to prepare, and any delay or inconvenience that may result from substitution." *United States v. Adelzo-Gonzalez*, 268 F.3d 772, 777 (9th Cir. 2001).

A judgment can be reversed and the case remanded for a new trial due to the inadequacy of an inquiry concerning substitution of counsel, as it is essential to the court's exercise of discretion. *United States v. Gonzalez*, 113 F.3d 1026, 1029 (9th Cir. 1997), *United States v. Torres-Rodriguez*, 930 F.2d 1375, 1381 (9th Cir. 1991). "Before the district court can engage in a measured exercise of discretion, it must conduct an inquiry adequate to create "sufficient basis for reaching an informed decision."" *United States v. D'Amore*, 56 F.3d 1202, 1205 (9th Cir. 1995), *overruled on other grounds (*quoting *United States v. McClendon*, 782 F.2d 785, 789 (9th Cir. 1986)).

//

1.      *First request—September 2, 2011.*

At the outset, the court refused to hold an in camera proceeding, asserting that the court had never heard of such a procedure being used. 9/2/11 RT 12; ER 32. But case law provides that the hearings are to be provided in camera so that the defendant is not left unrepresented. *See United States v. Gonzalez*, 113 F.3d at 1029. A defendant may be reluctant to discuss intimate matters when the public and the prosecutor are present. By refusing to clear the court, the court's hearing was inadequate as a matter of law and constituted an abuse of discretion as it did not create an environment where the court could understand the nature and extent of the conflict with counsel.

The court's inquiry was cursory, and inadequate. The court asked what the problem was. It did not probe into the reasons for the breakdown in communications. The court did not attempt to understand if there was a clash of personalities between defense counsel and Mr. Williams resulting in mistrust and an inability to communicate effectively. Instead, the court asserted, "I don't play the attorney game." 9/2/11 RT 13; ER 33. When Mr. Williams attempted to provide more information to the court, the court responded that he was "digging a deeper hole." 9/2/11 RT 14; ER 34. The court never discerned the underlying cause of the conflict with counsel and the resulting breakdown in communications. The

court blamed Mr. Williams stating, "I don't know what your problem is." 9/2/11 RT 15; ER 35.

There was never any evaluation of inconvenience, nor was there an evaluation of the time needed for a new attorney to prepare. The court's retort—"I don't play the attorney game"—could suggest that it was refusing, under any circumstance, to appoint a new attorney. There was no basis for the court to find that Mr. Williams was engaging in gamesmanship because he had never before requested that new counsel be appointed. The court abused its discretion by assuming that Mr. Williams was attempting to manipulate system without conducting an investigation and making findings to support the conclusion. The court's intransigence supports that the hearing was inadequate and that the failure to appoint counsel was an abuse of discretion. The trial date was being continued due to the release of new discovery, so appointment of new counsel would not have delayed trial. The CJA administrator had been contacted and a new attorney was available to take the case. There would be no inconvenience. It was error to deny the first request.

>    2.    *Second request—February 11, 2013.*

The court's inquiry at Mr. Williams' second request was also inadequate. Defense counsel informed the court that the breakdown in communications was serious. The court, however, failed to probe deeply into the nature of the

relationship with counsel. *Adelzo-Gonzalez*, 268 F.3d at 778. Instead, the court informed Mr. Williams that a disagreement about the law was not a reason for a new attorney. The court ignored comments indicating that there was a lack of trust between the attorney and client. 2/11/13 RT 11; ER 31. Similar to *Adelzo-Gonzalez*, 268 F.3d at 778, "[t]here were clear indications of serious discord and friction" between attorney and client.

The court then focused upon the expense to the court of assigning a new attorney. This was an improper basis of inquiry, as it does not relate to whether or not substitution of counsel would result in inconvenience. The court failed to conduct the hearing in a way to ease the distrust between counsel and client. Instead, the comments of the court informed Mr. Williams that his concerns were legally inadequate and that he would be forced to proceed with Mr. Wiseman as his counsel. The court did not evaluate the time for a new attorney to prepare, and the extent of any delay or inconvenience. An evaluation of these factors strongly favored the substitution of new appointed counsel because at the time, there was no trial date set.

### E. The Conflict Was Extreme, Resulting in a Breakdown in Communications.

Defense counsel consistently, at each request for new counsel, characterized the conflict as resulting in a complete breakdown in communications. Counsel likened the extent of the conflict to speaking two different languages. 9/2/11 RT

14; ER 34. There was no trust between client and attorney. The lack of trust

between attorney and client was a factor evaluated in *United States v. Adelzo-*

*Gonzalez*, 268 F.3d at 779; s*ee Brown v. Craven*, 424 F.2d at 1170 (Court's inquiry

must ease the client's "dissatisfaction, distrust, and concern"). The deep seeded

nature of the conflict is shown by Williams' repeated requests for new counsel, and

defense counsel's consistent description of the problem as an inability to

communicate, and inability to trust. The break in communications is analogous to

that in *Adelzo-Gonzalez*. There, the court found that "the relationship between

Adelzo-Gonzalez and the appointed counsel was antagonistic, lacking in trust, and

quarrelsome." *Adelzo-Gonzalez*, 268 F.3d at 780.

       The focus upon whether counsel was providing adequate representation was

erroneous. "Even if a defendant's counsel is competent, a serious breakdown in

communication can result in an inadequate defense." *United States v. Musa*, 220

F.3d 1096, 1102 (9th Cir. 2000), *United States v. Nguyen*, 262 F.3d 998 (9th Cir.

2001). Adequate legal representation involves effective communication between

attorney and client as well as a level of trust. Mr. Williams had other options, such

as entering into a plea bargain, or just pleading guilty. He was entitled to conflict

free legal representation at all stages of the case, including the decision whether to

enter a plea or accept a plea bargain. *See Lafler v. Cooper*, 132 S. Ct. 1376 (2012),

and *Missouri v. Frye*, 132 S. Ct. 1399 (2012). Given the breakdown in

communications, he could not adequately consider and evaluate these options in order to make an appropriate choice how to proceed.

**F.    The Requests Were Timely.**

At the time of the first request on September 2, 2011, trial was continued due to the release of voluminous discovery—substituting counsel would not have delayed trial. 9/2/11 RT 4-8; ER 97. In *Adelzo-Gonzalez*, the court found that a request made six weeks in advance of trial was timely. 268 F.3d at 780. There was no finding by the court that the request was untimely.

The second request, made 17 months before trial, was also timely. There was no trial date set at the time the request for substitute counsel was made, and there was no finding by the court that Mr. Williams' request was untimely. 2/11/13 RT 7-9; ER 27-29.

The third request was made during trial. It was made at that late stage because Mr. Williams was forced to do so after his first two requests were denied. The third request shows the depth of the conflict with his attorney and highlights the complete lack of trust between Mr. Williams and his counsel. The relationship was so strained that Mr. Williams did not trust his attorney to conduct cross-examination, and wanted to see the questions the attorney would ask. The court's finding that the request "appears to be for purposes of disrupting these proceedings which the defendant now perceives as going unfavorably for him" is erroneous in

light of the two prior, timely, requests Mr. Williams made. 7/21/14 RT 29; ER 49.

Even if the court may have been correct in denying the request as untimely, that

denial does not affect the two prior timely requests which should have been

granted. Based upon the abuse of discretion in denying the first two requests, the

judgment should be reversed.

### G. The Judgment Should Be Reversed.

No prejudice need be shown when the breakdown of a relationship between

attorney and client due to irreconcilable differences results in a constructive denial

of counsel. *Moore*, 159 F.3d 1158. "[I]f the relationship between lawyer and client

completely collapses, the refusal to substitute new counsel violates [a defendant's]

Sixth Amendment right to effective assistance of counsel . . . ." *Moore* at 1158,

citing *Brown v. Craven*, 424 F.2d 1166, 1170. Thus, the court need not inquire

whether Mr. Williams was prejudiced. The judgment should be reversed.

## II. The District Court's Failure to Give a Specific Unanimity Instruction was Error Violating Mr. Williams' Substantial Right to a Unanimous Jury Verdict.

### A. Standard of Review

In reviewing jury instructions, the relevant inquiry is whether the

instructions as a whole are misleading or inadequate to guide the jury's

deliberation. *See United States v. Reed*, 575 F.3d 900, 926 (9th Cir. 2009).

When a defendant raises an issue on appeal that was not raised before the district court, the court of appeals may review only for plain error. *See* Fed. R. Crim. P. 52(b); *United States v. Olano*, 507 U.S. 725, 730-36 (1993). Under the plain error standard, relief is not warranted unless there has been: 1) error, 2) that was plain, 3) that affected substantial rights, and 4) that seriously affected the fairness, integrity, or public reputation of the judicial proceedings. *See United States v. Gonzalez-Aparicio*, 663 F.3d 419, 428 (9th Cir. 2011). Plain error is invoked to prevent a miscarriage of justice or to preserve the integrity and the reputation of the judicial process. *See Olano*, 507 U.S. at 736.

**B.**　**Pursuant to *United States v. Lapier*, the Court Erred by Not Giving a Specific Unanimity Instruction.**

In *United States v. Lapier*, 796 F.3d 1090, 1096 (9th Cir. 2015), the indictment alleged a single overarching conspiracy to distribute methamphetamine. The trial evidence, though, "tended to show" two conspiracies: one between Lapier and his first supplier (Kanyid), and a later conspiracy between Lapier and his second supplier (Boucher). *Ibid*.

The Court found that the district court plainly erred by failing to give a specific unanimity instruction because "[s]ome jurors might have convicted on the basis of the Lapier-Kanyid conspiracy and others might have convicted on the basis of the Lapier –Boucher conspiracy." *Lapier*, 796 F.3d at 1093. A similar problem arises in the instant matter because the trial evidence tended to show two

separate conspiracies: the first, a conspiracy with Symmes / Gililland involving the Chico properties, and the second, a conspiracy with Joshua Clymer, involving the Sacramento properties.

The legal basis for the *Lapier* holding is that a specific unanimity instruction is required if there is a "genuine possibility of jury confusion" or a possibility "that a conviction may occur as the result of different jurors concluding that the defendant committed different acts." *United States v. Payseno*, 782 F.2d 832, 836 (9th Cir. 1986); *Lapier*, 796 F.3d at 1096. The *Lapier* court writes that the jurors must "unanimously agree that the defendant is guilty of participating in a particular conspiracy –i.e., of forming an agreement with at least one other particular individual to pursue a particular criminal goal." *Lapier*, 796 F.3d at 1096.

Because of the genuine possibility of juror confusion, the generalized unanimity instruction given by the court, that the jurors' verdicts must be unanimous, was insufficient. ER 73-75. Instead the "trial judge must augment the general instruction to ensure the jury understands its duty to unanimously agree to a particular set of facts." *United States v. Echeverry*, 718 F.2d 974, 975 (9th Cir. 1983). The court should have instructed the jury that it must unanimously agree upon the conspiracy engaged in by Mr. Williams, including and the identity of the person or persons with whom Mr. Williams conspired.

//

36

### 1.     Overarching Conspiracy Alleged

The Third Superseding Indictment alleged a single, overarching, conspiracy to commit mail / wire fraud. Paragraph 10 of the Third Superseding Indictment describes the time frame and object of the conspiracy: "Beginning not later than in or about October 2006 and continuing through in or about August 2008, in the State and Eastern District of California, and elsewhere, defendants LEONARD WILLIAMS and JOSHUA CLYMER did knowingly and intentionally combine, conspire, confederate, and agree with each other and with others known and unknown to the grand jury to commit [mail / wire fraud]." ER 2-3.

The Third Superseding Indictment provides as "ways and means" that, "Between in or about October 2006 through in or about August 1, 2008, defendants LEONARD WILLIAMS, JOSHUA CLYMER, and others known and unknown to the Grand Jury, recruited various individuals, including family members, investors and straw or nominal purchasers, to purchase residential real properties, in various communities in the State and Eastern District of California, including those listed below:" ER 4. A chart lists 11 properties as well as the initials of each purchaser. ER 5. The indictment describes the fraudulent scheme involving, among other things, credits back to purchasers that were concealed from the lenders, and causing the preparation of materially false loan applications. ER 6.

//

2.      *Genuine Possibility of Juror Confusion*

In a manner that is similar to *United States v. Lapier*, the trial evidence

"tended to show" not one conspiracy, but two, thereby creating the risk of juror

confusion:

> Conspiracy #1 – Chico Properties. In 2007, and with the assistance of
>
> Mr. Williams, Mr. Watson purchased two properties in Chico: one on
>
> Ceanothus Avenue and the other on Rockin M Drive. RT 365, 378. The
>
> seller of the properties was Mr. Symmes, who had pled guilty to conspiracy
>
> and mail fraud and was testifying pursuant to an agreement to cooperate
>
> with the government. RT 410, 419-420. Mr. Symmes was associated with
>
> Mr. Gililland, who was also indicted. RT 407. Mr. Gilliland would find
>
> buyers for the homes and arrange for loans. RT 408. Mr. Symmes was aware
>
> that the purchase price for the Ceanothus and Rockin M. homes would be
>
> inflated. RT 412. After the transaction closed, Mr. Gililland would collect
>
> the difference between the inflated price and the price that Mr. Symmes
>
> agreed to take for the home. RT 416. In relation to these transactions, Mr.
>
> Symmes wrote checks to Diamond Hill Financial outside of escrow. RT 417,
>
> 429. There is no evidence that Mr. Clymer interacted with Watson, Symmes,
>
> or Gililland, or was aware of these transactions, though he received a check

from Diamond Hill Financial with "Ceanothus" written in the "memo" part of the check. RT 802; *see* Gov. Exh. 227.

Conspiracy #2 – Sacramento Properties. There was evidence that both Mr. Williams and Mr. Clymer were involved in the following transactions occurring in 2008: Baker Avenue, Linday Way, Trap Rock Way, and Woodforest. Symmes / Gililland had no involvement in these transactions. All of the transactions involved use of a double escrow: Bay Area Real Estate would purchase the property, and as part of the same escrow, would sell it to the purchaser. RT 866, 870, 872, 873.

The court in *Lapier* discussed that in evaluating whether there was a genuine possibility of jury confusion, the court is to consider a number of factors including: the text of the indictment, the "clarity and presentation of the government's argument," the complexity of the evidence, and the "clarity or ambiguity of the jury instructions." *Lapier*, 796 F.3d at 1096-1097. When applied to the matter at hand, these factors show a genuine possibility of jury confusion. The indictment is general, lumping all of the transactions together during a single timeframe. ER 1-11. The evidence was complex in that it tended to show two conspiracies, and the jury instructions did not provide clarification as only a general unanimity instruction was given – one that would not have alerted the jurors that they needed to agree upon the conspiracy and the identity of the conspirators. ER 73-75.

Adding to the confusion, the government argued that in addition to an agreement between Mr. Williams and Mr. Clymer, a conspiratorial agreement could be found between Mr. Williams and the buyers—i.e., Watson, Frye, L. Clymer, Reynaga, and Petro. RT 956; ER 76. The presentation of this theory is confusing because the Third Superseding Indictment, which was read in its entirety to the jury, does not allege that the buyers were conspirators. ER 1-11. Although it generally refers to others "known and unknown to the grand jury," the description of "ways and means" is narrow, describing Mr. Williams and Joshua Clymer recruiting "various individuals, including family members, investors and straw or nominal purchasers, to purchase residential real properties." ER 4-7. In this way, the "ways and means" description excludes buyers as co-conspirators in the single, overarching conspiracy. This interpretation is consistent with law, as the buyers could not be members of the overarching conspiracy because they served only as spokes in a wheel conspiracy. *See United States v. Kenny*, 645 F.2d 1323, 1334-1335 (9th Cir. 1981).

The defense argument highlighted the evidence tending to show separate conspiracies, focusing upon the difference in how the Chico transactions were structured in comparison to the Sacramento transactions, which involved the use of double escrows. RT 1000-1001; ER 77-78. This added to the potential for juror

confusion as the evidence supporting multiple conspiracies was laid out for the jury.

In *Lapier*, the court found it significant that "there was no evidence that [the two drug suppliers] had any agreement with each other or acted pursuant to a single conspiracy involving them both and spanning the single time period charged in the indictment." *Id*. at 1097. This fact was significant because it supported the existence of two conspiracies – i.e., separate facts that could support the jury's guilty verdict. This circumstance is analogous as there is no evidence that Joshua Clymer was involved in a conspiracy with Symmes / Gililland. The Chico transactions involving Symmes / Gililland, occurring in 2007, are set apart from the Sacramento transactions, all of which occurred in 2008.

The district court recognized the possibility of the jurors finding multiple conspiracies. This shows that juror confusion was possible and that a specific unanimity instruction was required. Defense counsel addressed the issue of there being multiple conspiracies during argument concerning the Rule 29 motion. RT 934; ER 80. In denying the motion, the court remarked, "Of course, it's up to the United States Attorney to persuade the jury that this is a single conspiracy, and [defense counsel] may make the same [multiple conspiracy] argument that you did here with me to the jury." RT 936; ER 82.

A similar colloquy concerning multiple conspiracies also occurred in the *Lapier* case. In *Lapier*, the court referenced that during a colloquy between the district court and the government, "the district court indicated its belief that the government had introduced evidence of two separate conspiracies . . . ." *Lapier*, 796 F.3d at 1097. This acknowledgement by the district court, and the prosecutor's statement that it was "possible" there were two conspiracies, was significant to the Court's decision that evidence of two conspiracies created confusion. *Ibid*.

The Court in *Lapier* concluded, "the indictment was sufficiently broad and the evidence sufficiently complex as to create a risk that different jurors voted to convict on the basis of different facts establishing different offenses. In these circumstances, the district court was required to give a specific unanimity instruction *sua sponte*." *Lapier*, 796 at 1097. In the instant matter, the indictment was broad, and the evidence complex, suggesting two possible conspiracies. A specific unanimity instruction was needed.

> 3. *Defense Counsel's Motion for New Trial Was Sufficient to Preserve the Issue for Appeal. Alternatively, The Error Was Plain.*

Defense counsel filed a post-verdict motion for new trial and motion pursuant to Rule 29 of the Federal Rules of Criminal Procedure. ER 104. This motion argues that because of the multiple conspiracies, a "danger may be that some members of the jury found Williams guilty of the Symmes / Gililland conspiracy, but other members found Williams guilty on the charged Williams /

Clymer conspiracy. In either case, all members would have found Williams guilty of conspiracy without unanimity." ER 84. Although defense counsel did not request a specific unanimity instruction, the motion for new trial presented the issue squarely to the district court. The district court's denial of the motion shows that a request for a specific unanimity instruction would have been futile because the court viewed it as unnecessary. ER 85 ("The government charged and submitted sufficient evidence to prove a single conspiracy lasting a little more than one year in which the defendant worked with several individuals to submit fraudulent loan applications in order to profit from the proceeds of those loans"). The district court's denial of the Rule 29 motion made during trial also shows that a request for a specific unanimity instruction would have been futile. RT 935-936; ER 81-82. Therefore, the error should be deemed preserved despite the failure to request a specific unanimity instruction.

Alternatively, the error was plain. In *Lapier*, the Court found that that the failure to give a specific unanimity instruction was plain error, jeopardizing the right to a unanimous jury verdict. *Lapier*, 796 F.3d at 1097-1098. The court found that "a conviction notwithstanding a genuine possibility of jury confusion and risk of a nonunanimous verdict seriously affects the fairness and integrity of judicial proceedings because it jeopardizes Lapier's constitutional rights." *Id*. at 1098. The *Lapier* Court rejected the government's argument that the error did not materially

affect the verdict: "Having determined that the possibility of jury confusion about what acts formed the basis of his conviction was "genuine," we are "not free to speculate" about what his jury might have concluded had it been properly instructed." *Ibid*. Following *Lapier*, this court should reverse the judgment and remand for a new trial.

**III.    The Indictment Was Constructively Amended When the Prosecutor Argued To The Jury That The Alleged Conspiracy Was Proven By Virtue of Mr. Williams' Agreements With The Buyers. Alternatively, There Was a Fatal Variance.**

    **A.    <u>Standard of Review</u>**

When the defendant fails to object to a constructive amendment, review is limited to plain error. *See United States v. Shipsey*, 190 F.3d 1081, 1085 (9th Cir. 1999). The plain error standard of review has been set forth in relation to Argument II and is incorporated herein by reference.

    **B.    <u>The Indictment Does Not Allege the Buyers Were Co-conspirators.</u>**

Part I of the Third Superseding Indictment makes allegations specific to Mr. Williams and Joshua Clymer. ER 1-2. It includes allegations concerning their use of Diamond Hill Financial and Bay Area Real Estate Holdings. ER 2.  Paragraph 8 provides that Williams and Clymer "acted as business partners, with defendant WILLIAMS often providing loan brokering services and defendant CLYMER often acting as the real estate salesperson." ER 2-3. Paragraph 9 states that

Williams and Clymer "used Diamond Hill and Bay Area Real Estate to operate a property flipping scheme that included . . . re-selling the properties the same day for as much as $100,000 over the acquisition price to individuals whom defendants recruited as investors and straw purchasers; arranging mortgage loans for purchasers that included materially false statements concerning income, employment history, assets, and intent to occupy the properties as primary residence; and providing funds back to the purchasers outside of escrow while concealing these payments from the lenders making the loans." ER 3.

Part II of the Indictment lists the objects of the conspiracy as the commission of mail and wire fraud. ER 3-4. It describes the "ways and means" of the conspiracy. ER 4. Paragraph 12 states that Williams and Clymer "and others known and unknown to the Grand Jury, recruited various individuals, including family members, investors and straw or nominal purchasers, to purchase residential real properties." ER 4. The Indictment includes a chart listing specific properties and the initials of the purchasers. ER 4-5.

The plain meaning of the indictment, including the "ways and means" description, excludes buyers as co-conspirators in the single, overarching conspiracy involving co-conspirators Williams and Clymer. Although language stating "others known and unknown to the Grand Jury" is used in the "ways and means" description, that section distinguishes between conspirators and persons

recruited by the conspirators. ¶ 12; ER 4. Thus, the grand jury did not indict based

upon the theory that Williams and the buyers had conspired, but indicted upon the

theory that Williams and Clymer were the conspirators.

Pursuant to law the buyers could not be members of the overarching

conspiracy because they were merely "spokes" in a "wheel conspiracy." *See*

*United States v. Kenny*, 645 F.2d at 1334-1335. In *Kenny*, the court discussed that a

"wheel" conspiracy "requires that the Government supply proof that the spokes are

bound by a "rim"; that is, the circumstances must lead to an inference that some

form of overall agreement exists." There was no evidence of an agreement among

the buyers, or the buyers' knowledge concerning an overall conspiracy. This legal

background should be taken into account in interpreting the indictment as it

supports that a conspiracy between Williams and the buyers was not the theory of

the indictment. It would be error to interpret the indictment as alleging a

conspiracy when, legally, there could be none because of the lack of a "rim" to the

wheel conspiracy. *Kenny*, 645 F.2d at 1334-1335.

### C.     The Prosecutor's Argument Constructively Amended the Indictment. Alternatively, There Was a Fatal Variance. The Error Was Plain.

A constructive amendment "occurs when the charging terms of the

indictment are altered, either literally or in effect, by prosecution or court after the

grand jury has last passed upon them." *United States v. Dunn*, 758 F.2d 30, 35 (9[th]

46

Cir. 1985). A variance is "when the charging terms remain unchanged but when the facts proved at trial are different from those alleged in the indictment." *United States v. Fisher*, 3 F.3d 456, 462 (9th Cir. 1993). A constrictive amendment is prejudicial *per se* and grounds for reversal of a conviction. *Id.* at 463; *Dunn*, 758 F.2d at 35. Even evaluated under the plain error standard, a constructive amendment which ""destroy[s] the defendant's substantial right to be tried only on charges presented in an indictment returned by a grand jury"" constitutes plain error. *See United States v. Vowiell*, 869 F.2d 1264, 1271 (9th Cir. 1987), *quoting United States v. Pazsint*, 703 F.2d 420, 424 (9th Cir. 1983). Variance, on the other hand, is grounds for reversal if it affected the defendant's "substantial rights." *Fisher*, at 463.

The prosecutor's closing argument urged the jury to find the conspiracy by virtue of Mr. Williams' conspiratorial agreements with the buyers. The prosecutor argued: "The agreement was to commit mail and wire fraud . . . ¶ You heard a lot of testimony about the agreement. Arthur Watson testified that he and Mr. Williams agreed to submit false loan applications to buy properties. . . . ¶ Joshua Frye, Lacie Clymer, Juan Reynaga, and Anthony Petri all testified that they agreed with Williams and Mr. Clymer to submit false loan applications." RT 956; ER 76. This argument effectively altered the charging terms of the indictment by presenting a theory that was not put before the grand jury. Thus, the argument

47

constitutes a constructive amendment. *See Stirone v. United States*, 361 U.S. 212, 215-216, 218-219 (1960).

The amendment, by adding the theory that there was an overarching conspiracy by virtue of the agreements with the buyers and Mr. Williams, had the effect of broadening the indictment, and violated the grand jury clause of the Fifth Amendment. *United States v. Miller*, 471 U.S. 130, 134 (1985). It was not a mere variance from the indictment. Instead, it was a new theory never presented to the grand jury. Even if the error is deemed a variance, however, the plain error standard is met.

"Plain error is highly prejudicial error affecting substantial rights." *United States v. Kessi*, 868 F.2d 1097, 1102 (9th Cir. 1989). The error was prejudicial because it affected Mr. Williams' ability to prepare for trial. Had his counsel been placed on notice that the agreement between Mr. Williams and the buyers would be argued as sufficient to prove the overall conspiracy, his counsel could have questioned the buyers concerning their lack of any knowledge concerning the overall scheme, and unawareness of other similarly situated buyers. Counsel could have highlighted to the jury that the agreements between Williams and the buyers were "spokes" without a "rim," or overarching agreement among the buyers. The government's theory of a conspiracy between Williams and all the buyers had the effect of neutralizing defense counsel's argument that the Chico transactions were

separate from the Sacramento transactions, and that Clymer, not Williams, was the responsible party or "mastermind." RT 1000-1002; ER 77-79. If the jury were to have followed the prosecutor's argument, Mr. Williams could have been convicted based upon his agreements with the buyers, regardless of whether there was a conspiratorial agreement between Williams and Clymer.

The error seriously affected the fairness, integrity, or public reputation of the judicial proceedings. *See United States v. Gonzalez-Aparicio*, 663 F.3d at 428. "Requiring the proof [at trial] to remain true to the indictment enables the grand jury to serve its function of protecting the citizenry." *United States v. Olson*, 925 F.2d 1170, 1175 (9th Cir. 1991). Thus, a violation of the grand jury clause seriously affected the proceedings constituting plain error.

**IV.  There Was Insufficient Evidence That The Mailings of The Recorded Deeds of Trust Were in Furtherance of an Ongoing Scheme. There is Also Insufficient Evidence Interstate Wiring.**

**A.  Standard of Review**

The standard of review for determining whether there was sufficient evidence to support a conviction is set forth in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." This court in *United States v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2009) set forth an analytical

framework for *Jackson* sufficiency of evidence claims. It established a "two-step" inquiry: first, the court is to consider the evidence presented at trial in the light most favorable to the prosecution; and second, viewing the evidence in that light, the court must determine whether the evidence is adequate to allow a rational trier of fact to find the essential elements of the crime beyond a reasonable doubt.

### B.   There Was Insufficient Evidence That The Mailings Were Part of an Ongoing Scheme.

To support a mail fraud charge, the mailings must be "incident to the execution of the scheme" and not "part of an after-the-fact transaction that, although foreseeable, was not in furtherance of the defendant's fraudulent scheme." *United States v. Lazarenko*, 564 F.3d 1026, 1036 (9th Cir. 2009). In *Lazarenko*, the court concluded that no rational trier of fact could find wire transfers made three or four years after funds were wired into the account were in furtherance of the fraud. *Id*. at 1037. The court found that nothing in the evidence supported an inference that subsequent transfers were a part of the scheme as it was originally conceived, and that the transfers were simply a delayed link in the fraudulent chain. *Ibid; see also United States v. Manarite*, 44 F.3d 1407, 1413 (9th Cir. 1995) (finding that mailings and phone calls made after a "one shot" credit scam was completed were not in furtherance of an ongoing scheme). In the matter at bar, there is insufficient evidence that the mailings from the county recorders'

offices to the lenders were in furtherance of the scheme. The mailings were "after the fact" as the deeds of trust had already been recorded, and the loans funded.

The use of the mails is an essential element of proof. "The federal mail fraud statute does not purport to reach all frauds, but only those limited instances in which the use of the mails is a part of the execution of the fraud, leaving all other cases to be dealt with by appropriate state law." *Kann v. United States*, 323 U.S. 88, 95 (1944). As a result, the court must "be scrupulous in reviewing the evidence to assure that the mailing element is adequately proven." *United States v. Lo*, 231 F.3d 471, 477 (9th Cir. 2000).

The only evidence supporting the mailing requirement was that the county recorders offices returned recorded deeds of trust to the lender through the mails. No evidence was presented concerning the significance of the mailings to the scheme. While there was some evidence that the deed of trust secured the loan, there was no evidence presented concerning why it was important that that a deed of trust, once recorded, be returned by mail to the lender. RT 692.

The witnesses from the county recorder's office did not establish that the mailings were in furtherance of the fraudulent scheme. These witnesses, from the offices of the Butte and Sacramento County Clerk-Recorder, testified that recorded deeds of trust are mailed to the address on the deed of trust. RT 816, 821, 833. The mailing of the recorded deeds of trust is not in dispute, however. These witnesses

did not establish that the mailing of the recorded deeds of trust was anything other than "after the fact."

### C.     There Is Insufficient Evidence of Interstate Wire Communications.

The government may attempt to argue that even if there were a deficiency in showing the use of the mails in furtherance of the scheme, the judgment should be upheld based upon the use of wire communications. However, there was insufficient evidence concerning the use of interstate wire communications. Although the government need not prove Mr. Williams knew of the interstate nature of any wire transfer, it must nonetheless prove that an interstate wire communication occurred. *See United  States v. Jinian*, 725 F.3d 954, 965-967 (9th Cir. 2013).

The government's evidence did not show that an interstate wire transfer occurred. Witness Kevin Walsh, worked for the lender CIT in 2007. RT 229. While he testified to the use of wires to transfer money, he did not testify concerning the interstate nature of the wiring. RT 276. Similarly, Keli Updegraff, who worked for Nigerian Loans, testified that the loan funds were wired, but didn't testify concerning the interstate nature of the wiring. RT 569. The focus of the testimony of Mr. Wals and Ms. Updegraff was upon the materiality of the representations in the loan applications. Agent Harrison, an IRS agent, testified

that funds were wired, but did not testify to the interstate nature of the wiring. RT 860, 864. Thus, there is insufficient evidence that an interstate wiring occurred.

**D.    The Entire Conviction Must be Reversed Because There is Insufficient Evidence of the "Specific Unlawful Activity" Which Serves as the Basis for Counts Two and Three.**

Due to the insufficiency of evidence, the judgment should be reversed in its entirety. Not only is count one (mail / wire fraud conspiracy) subject to reversal, but the judgment in relation to counts two and three should also be reversed as count one serves as the "specific unlawful activity" for the money laundering violations. Due to the insufficiency of the evidence, the retrial of any of the counts is barred. *Burks v. United States*, 437 U.S. 1, 11 (1978) ("The Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding.").

**V.    The Court Erred in Imposing a 4-Level Leadership Enhancement. The Case Should be Remanded for Resentencing.**

**A.    Standard of Review**

The district court's interpretation of the Guidelines is reviewed de novo and factual findings are reviewed for clear error. *United States v. Swank*, 676 F.3d 919, 921 (9th Cir. 2012). There is an intra-circuit conflict as to whether the standard of review for the application of the guidelines to the facts is de novo or abuse of discretion. *Id.* at 921-22.

//

**B.** **The Leadership Enhancement Does Not Apply to Mr. Williams Because He Did Not Exercise Control Over Another Participant.**

Mr. Williams did not exercise the requisite control over others for application of the leadership enhancement, even if his role is considered central to the offense. Under United States Sentencing Guideline § 3B1.1(a), if the defendant was an "organizer or leader of a criminal activity that involved five or more participants," the offense level is increased 4-levels. Conduct integral to the success of the criminal enterprise or reflecting a high degree of culpability is insufficient to support a leadership enhancement unless a defendant has exercised control over others. *United States v. Whitney*, 673 F.3d 965, 975 n6, 976 (9th Cir. 2012), citing *United States v. Lopez-Sandoval,* 146 F.3d 712, 717 (9th Cir. 1998) and *United States v. Harper*, 33 F.3d 1143, 1151 (9th Cir. 1994). There is insufficient basis to support imposition of the leadership enhancement.

*1.    Basis for Enhancement In PSR*

The PSR recommends a 4-level increase for role in the offense pursuant to § 3B1.1(a). PSR, p. 10 ¶ 28. As justification for the recommendation, the PSR states that "Williams organized this mortgage fraud scheme by setting up shell companies named Diamond Hill and BARE. He recruited various straw buyers (Arthur Watson, Joshua Frye, Juan Reynaga, and Anthony Petri). Because

Williams was an organizer who recruited straw buyers, and this offense involved five or more participants, four levels apply." *Ibid*.

The PSR does not include facts supporting that Mr. Williams controlled another participant. Mr. Williams and Joshua Clymer are co-participants, but there is nothing to support that Williams controlled Clymer. PSR, p. 6 ¶s 4-5. The notation that Mr. Williams "recruited" straw buyers is not a sufficient basis for the court to find that Williams exercised control over them. It is disputed that Mr. Williams "recruited" straw buyers. Although some testified to having more knowledge than others, the buyers were knowing participants in the scheme. They received or were promised payments outside of escrow, or engaged in the transaction. PSR ¶ 6 (Watson), ¶10 (Frye), ¶11 (Reynaga), ¶12 (Petri), ¶13 (L.Clymer). They were not unwitting individuals controlled by Mr. Williams— they were involved because of the financial benefit to them. In any event, the term "recruitment" does not mean control.

### 2. *Trial Evidence Concerning Mr. Williams' Role*

The evidence at trial did not show that Mr. Williams controlled Clymer or any of the straw buyers. None of the straw buyers functioned as Mr. Williams' subordinate. They all entered into the transactions because of the financial benefit to them. None of the straw buyers was "directed" to make false statements on the loan applications.

3.    *Sentencing Proceeding*

Mr. Williams defense counsel objected to the imposition of the leadership enhancement, arguing there was no evidence to establish Mr. Williams "organized, led or supervised the straw buyers." 1/26/15 RT 40; ER 86. Defense counsel disputed that Mr. Williams was the "boss of everybody." *Ibid*. Defense counsel also filed a written objection to the enhancement on the ground that there was no showing that Mr. Williams exercised control over other participants in the offense. ER 89-90.

In response to the defense objections, the court referred to the government's arguments that Mr. Williams recruited and helped to recruit straw buyers, and that he allegedly "directed" the false statements in the loan applications. 1/26/15 RT 40-41; ER 86-87. The court expressed, "So, that is a leadership. Whether you want to call it a boss, he's a leader." *Ibid*. The court found that Mr. Williams was "a leader in this whole course of conduct," and found that the leadership enhancement recommended by the probation officer was appropriate 1/26/15 RT 41-42; ER 87-88.

**C.    Imposition of the Leadership Enhancement Was Erroneous. The Matter Should Be Remanded for Resentencing.**

Assisting the straw buyers does not show an exercise of control over them, nor does inserting false information in the loan applications. There are no facts to support that Mr. Williams controlled the straw buyers. The government's claim

56

that Mr. Williams "directed" straw buyers to make false statements is unsupported. The term "directed" is conclusory and is not supported by actual facts. Control over others is an essential element of the enhancement. *Whitney*, 673 F.3d at 975 n6. There is no evidence that Mr. Williams controlled others to assist in the commission of the offense, such as having employees or other subordinates, whom he controlled, conduct parts of the scheme, or assist in the commission of the offense. Imposition of the enhancement was clear error. Therefore, the case should be remanded for resentencing.

## CONCLUSION

The court should reverse the judgments for all counts. Because the specific unlawful activity constituting money laundering is premised upon the mail / wire fraud, counts two and three should also be reversed. If the court finds insufficient evidence of mailing, all counts should be reversed and retrial bared under double jeopardy principles.

DATED: January 11, 2015

/s/ Timothy E. Warriner
Attorney for Appellant,
Leonard Williams

## WORD COUNT CERTIFICATION

I certify that, per the software program utilized to prepare this brief ( ), this brief contains 11,505 words, excluding those portions of the brief which are not required to be in the word count. I further certify the font is 14 point Times New Roman.

DATED:      January 11, 2016

/s/ Timothy E. Warriner
Attorney for Appellant,
Leonard Williams

## STATEMENT OF RELATED CASES

The undersigned is not aware of any related pending cases.

DATED:      January 11, 2016

/s/ Timothy E. Warriner
Attorney for Appellant,
Leonard Williams

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing APPELLANT'S

OPENING BRIEF with the Clerk of the Court for the United States Court of

Appeals for the Ninth Circuit by using the appellate CM/ECR system on January

11, 2016.

I certify that all participants in the case are registered CM/ECR users and

that service will be accomplished by the appellate CM/ECR system.

DATED:     January 11, 2016

/s/ Timothy E. Warriner
Attorney for Appellant,
Leonard Williams