**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED

DEC 14 2016

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| UNITED STATES OF AMERICA, | No.   15-10050 |
| Plaintiff-Appellee, | D.C. No. 2:08-cr-00376-WBS-GGH-6 |
| v. | |
| LEONARD WILLIAMS, | MEMORANDUM* |
| Defendant-Appellant. | |

Appeal from the United States District Court
for the Eastern District of California
William B. Shubb, District Judge, Presiding

Argued and Submitted November 17, 2016
San Francisco, California

Before:  SCHROEDER, WARDLAW, and OWENS, Circuit Judges.

Leonard Williams ("Williams") appeals his conviction and sentence

following a jury trial for conspiracy to commit mail fraud and wire fraud under

18 U.S.C. § 1349 and for money laundering under 18 U.S.C. § 1957.  We have

jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

---

    *   This disposition is not appropriate for publication and is not precedent
except as provided by Ninth Circuit Rule 36-3.

1.     The district court did not plainly err in failing to give the jury a specific unanimity instruction.  Williams argues for the first time on appeal that he was entitled to such an instruction because the evidence tended to show two conspiracies, producing a "genuine possibility of jury confusion."  *See United States v. Lapier*, 796 F.3d 1090, 1096 (9th Cir. 2015) (citation and internal quotation marks omitted).  He contends that jurors may have found that he conspired based on different sets of facts, without "unanimously agree[ing] that [Williams was] guilty of participating in a *particular* conspiracy."  *See id.* (emphasis added).

However, the government's evidence in fact tended to show only a single conspiracy, with Williams and Joshua Clymer as the principal co-conspirators. Whereas *Lapier* featured two conspiracies with "no evidence" of any overlap, here the government presented evidence that Clymer and Williams were involved in every transaction.  *See id.* at 1097.  The government introduced evidence that, prior to the Chico Transactions, Clymer became treasurer of the company through which Williams laundered money, received "blanket authority" to sell its assets, and met with Arthur Watson, the Chico homebuyer.  Though the Chico and Sacramento Transactions involved different collaborators and transactional structures, this was nevertheless consistent with a single conspiracy, because a conspiracy "can include

subgroups or subagreements, and the evidence does not have to exclude every hypothesis other than that of a single conspiracy."  *See United States v. Bauer*, 84 F.3d 1549, 1560 (9th Cir. 1996) (citation omitted).

  **2.**  Nor did the district court plainly err in failing to find a constructive amendment or variance.  Williams argues for the first time on appeal that the government presented "facts . . . at trial distinctly different from those set forth in the [third amended indictment]," *see United States v. Baghat*, 436 F.3d 1140, 1145 (9th Cir. 2006) (citation and internal quotation marks omitted), because the indictment focused on Williams and Clymer as co-conspirators, whereas at trial the government stated that the buyers "all testified that they agreed with Mr. Williams and Mr. Clymer to submit false loan applications."  However, paragraph ten of the indictment alleges that Williams and Clymer "agree[d] with each other and with others known and unknown to the grand jury to . . . [fraudulently] obtain funds from lenders and participants in the secondary loan market . . . ."  Given that the buyers were necessarily involved in obtaining loans, and that they are mentioned

by name elsewhere in the indictment, the indictment must be read to encompass them.[1]

Moreover, at trial, the government continued to focus on the theory that Williams and Clymer were the main co-conspirators. Thus, the government did not so substantially change its theory at trial that it was "impossible to know whether the grand jury would have indicted for the crime actually proved." *See id.* (citation and internal quotation marks omitted). Nor were the facts the government sought to prove at trial so "materially different" from those included in the indictment that they constituted a material variance. *See id.* at 1146.

3.      Sufficient evidence supported Williams's conviction for conspiracy to commit mail and wire fraud. *See* 18 U.S.C. § 1349. Contrary to Williams's contentions, mailings of the recorded deeds of trust to the lenders were not "part of . . . after-the-fact transaction[s]" that were "incident to the execution of the scheme." *See United States v. Lazarenko*, 564 F.3d 1026, 1036 (9th Cir. 2009) (citation and internal quotation marks omitted). To the contrary, they were "incident to an *essential* part of the scheme" because they provided evidence of

---

[1]While Williams argues that paragraph twelve should be read to exclude the buyers because it only refers to those who "recruited" individuals to purchase properties, this paragraph does not purport to exhaustively list those involved in the scheme.

collateral necessary to secure the loans. *See Schmuck v. United States*, 489 U.S.

705, 711 (1989) (emphasis added) (citation and internal quotation marks omitted).

Williams also argues that the government did not present sufficient evidence

of the interstate nature of the wire transfers. *See* 18 U.S.C. § 1343.  However, the

use of the wire system is by its very nature interstate, because "[w]ires are channels

or instrumentalities of interstate commerce." *See United States v. Jinian*, 725 F.3d

954, 968 (9th Cir. 2013); *United States v. Ripinsky*, 109 F.3d 1436, 1444 (9th Cir.

1997) (construing 18 U.S.C. § 1957); *United States v. Wright*, 625 F.3d 583,

594–95 (9th Cir. 2010) ("the very interstate nature of the internet favor[s] finding

that the [transmissions] traveled in interstate commerce," at least where no

evidence is presented that transactions were purely intrastate) (citation and internal

quotation marks omitted).  Moreover, there is "no dispute that the deposits in this

case involved financial institutions engaged in interstate activities," and indeed,

several of the banks involved were "large, well-known institutions" headquartered

outside of California, including Bank of America, U.S. Bank, and JP Morgan

Chase & Co.  *See Ripinsky*, 109 F.3d at 1445.

The government established that CIT, the lender for the mortgage loan

associated with 2640 Ceanothus Drive in Chico, operated its consumer loan

servicing system out of New Jersey and New York.  It also established that

5

Clymer's bank, SAFE Credit Union, sent and received funds across state lines. Williams wrote checks to Clymer to pay him for his role in the fraud, which was "part of the execution of the scheme as conceived by [Williams] at the time," serving to maintain an "ongoing fraudulent venture." *See Jinian*, 725 F.3d at 961–62 (quoting *Schmuck*, 489 U.S. at 711, 715). The process of check clearing may form the factual basis for wire fraud. *Id*. at 962. Thus, viewing the evidence in the light most favorable to the government, a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

4.      The district court did not err in imposing a four-level leadership enhancement pursuant to U.S.S.G. § 3B1.1(a). The evidence showed that Williams exercised a significant degree of control over others, doing much more than "merely suggest[ing] committing the offense." *See* § 3B1.1(a) cmt. n.4. He organized the fraud, recruited others into the scheme, directed payments to confederates through his companies, instructed buyers to make false statements on loan applications about their income and employment status, helped buyers inflate their bank statements, and verified false information for lenders, among other things. This is sufficient control to qualify for a leadership enhancement. *See* § 3B1.1(a) cmt. n.4 (noting leadership and organizational factors to consider).

6

**5.**     The district court did not abuse its discretion in denying Williams's

requests to substitute counsel.  Williams contends that the court forced him to

proceed with a lawyer with whom he was "embroiled in irreconcilable conflict."

*See Brown v. Craven*, 424 F.2d 1166, 1170 (9th Cir. 1970).  However, the conflict

between Williams and his counsel was not "so great that it resulted in a total lack

of communication preventing an adequate defense."  *United States v. Musa*,

220 F.3d 1096, 1102 (9th Cir. 2000).  The transcripts of hearings before the district

court and the sealed correspondence between Williams and his counsel establish

that they disagreed over how to interpret the law, over trial strategy, and over

whether Williams should enter a plea agreement.  These are not the types of

disputes that jeopardize a defendant's Sixth Amendment right to counsel.

*See United States v. Rogers*, 769 F.2d 1418, 1424 (9th Cir. 1985) (counsel's

pessimistic assessment of case and reasonable plea recommendation not sufficient

grounds for substituting counsel); *United States v. Reyes-Bosque*, 596 F.3d 1017,

1034 (9th Cir. 2010) (disagreement over litigation tactics not sufficient grounds for

substituting counsel).  While Williams repeatedly stated that he distrusted his

lawyer, he did not allege that his lawyer distrusted *him* in a manner that

"substantially interfered with the appointed counsel's ability to provide adequate

representation."  *See United States v. Adelzo-Gonzalez*, 268 F.3d 772, 780 (9th Cir.

2001).  Williams had no Sixth Amendment right to a "meaningful relationship" with his attorney, *see United States v. Schaff*, 948 F.2d 501, 505 (9th Cir. 1991) (citation and internal quotation marks omitted), or to "conflict free" representation, as he contends on appeal.

Moreover, the court made sufficiently specific inquiries into the disagreement between Williams and his attorney to determine whether substitution was warranted.  *See Adelzo-Gonzalez*, 268 F.3d at 777.  At the first hearing, Judge Garcia asked enough questions to clarify that the disagreement involved whether to enter a plea agreement.  Williams argues that the court's refusal to clear the courtroom rendered its hearing "inadequate as a matter of law." *United States v. Gonzalez*, 113 F.3d 1026, 1029 (9th Cir. 1997) (failing to hold an evidentiary hearing to allow potentially dispositive testimony by an independent witness was an abuse of discretion).  But Williams cites no case that establishes that a district court abuses its discretion any time it fails to seal the courtroom to hear a motion to substitute counsel.  The court did not abuse its discretion by failing to do so here, because it was able to learn the essence of the dispute in open court.  Moreover, at the second hearing, Judge Shubb made an inquiry that was sufficient to establish that Williams and his attorney disagreed about how the law applied to the facts of the case, affording Williams several opportunities to rebut this interpretation.

Given that the district court's inquiry was sufficient and that the conflict between Williams and his attorney was not extensive enough to justify substitution, we need not consider the timeliness of Williams's motions to substitute counsel.  *See Adelzo-Gonzalez*, 268 F.3d at 777–80.

**AFFIRMED.**