McGREGOR W. SCOTT
United States Attorney
CHRISTOPHER S. HALES
AUDREY B. HEMESATH
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone:  (916) 554-2700
Facsimile:   (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO.  2:08-CR-00376-WBS-AC |
| Plaintiff, | UNITED STATES'S OPPOSITION TO DEFENDANT'S SECTION 2255 MOTION |
| v. | |
| LEONARD WILLIAMS, | |
| Defendants. | COURT: Hon. Allison Claire |

# TABLE OF CONTENTS

Table of Contents .................................................................................................................... i

Table of Authorities ............................................................................................................. iii

I.     INTRODUCTION ......................................................................................................... 1

II.    FACTS ......................................................................................................................... 1

    A.    Williams conspired with Joshua Clymer and others to carry out a mortgage fraud scheme in Chico and Sacramento. ................................................................ 2

    B.    Williams controlled Diamond Hill Financial, Inc., and used it as the fraudulent employer for multiple buyers and to handle fraud proceeds. ................................ 2

    C.    Williams and Clymer controlled Bay Area Real Estate Holdings, LLC, and used it to buy and sell properties, as well as receive proceeds of their fraud. .... 3

    D.    Williams and Clymer directed multiple buyers to obtain home loans using fraudulent statements about employment, income, assets, down payments, and intent to occupy the homes, then structured the transactions so they could profit from the fraud proceeds. ...................................................................... 4

        1.    964 Gidda Loop – Arthur Watson ............................................................ 4

        2.    2640 Ceanothus Avenue – Arthur Watson ............................................... 5

        3.    3294 Rockin M – Arthur Watson ............................................................. 7

        4.    4824 Baker Avenue – Joshua Frye .......................................................... 9

        5.    2976 Trap Rock Way – Juan Reynaga ................................................... 10

        6.    11516 Linday Way – Lacie Clymer ....................................................... 11

        7.    5548 Woodforest Avenue – Anthony Petri ........................................... 12

    I.    Williams unsuccessfully sought substitute counsel based upon complaints about his trial counsel's view of the case, advice about pleading guilty, and trial tactics, and the Ninth Circuit affirmed the denials of substitute counsel. ................. 14

III.   ARGUMENT ............................................................................................................. 15

    A.    Defendant is barred from relitigating denial of his requests for substitute counsel because that argument was already rejected on direct appeal. ........................... 15

    B.    Defendant's § 2255 motion should be denied because its allegations are conclusory and do not warrant an evidentiary hearing. ...................................... 15

    C.    In any event, defendant fails to show that his counsel's performance was so unreasonable as to deprive Williams of his Sixth Amendment right to counsel. ............. 17

D.      If the Court does not deny defenddant's motion, it should find a waiver of attorney-client privilege and grant the government leave to take discovery of previously privileged information............................................................................20

IV.      CONCLUSION............................................................................................................21

# TABLE OF AUTHORITIES

## Cases

*Bittaker v. Woodford,*
   331 F. 3d 715 (9th Cir. 2003) ................................................................. 20

*Cullen v. Pinholster,*
   563 U.S. 170 (2011) .............................................................................. 18

*Davis v. United States,*
   417 U.S. 333 (1974) .............................................................................. 15

*Farrow v. United States,*
   580 F.2d 1339 (9th Cir. 1978) ............................................................... 17

*Florida v. Nixon,*
   543 U.S. 175 (2004) .............................................................................. 19

*Johnson v. Yates,*
   No. CIVS06-554 MCE CHSP, 2009 WL 2705877 (E.D. Cal. Aug. 25, 2009) .................................. 17

*Odom v. United States,*
   455 F.2d 159 (9th Cir. 1972) ................................................................. 15

*Shah v. United States,*
   878 F.2d 1156 (9th Cir. 1989) ............................................................... 16

*Strickland v. Washington,*
   466 U.S. 668 (1984) ................................................................... 17, 18, 20

*Taylor v. Illinois,*
   484 U.S. 400 (1988) .............................................................................. 19

*United States v. Berry,*
   814 F.2d 1406 (1987) ............................................................................. 17

*United States v. Hearst,*
   638 F.2d 1190 (9th Cir. 1980), 451 U.S. 938 (1981) ......................................... 16

*United States v. Johnson,*
   988 F.2d 941 (9th Cir. 1993) ................................................................. 16

*United States v. Leonti,*
   326 F.3d 1111 (9th Cir. 2003) ............................................................... 16

*United States v. Quan,*
   789 F.2d 711 (9th Cir. 1986) ............................................................ 1, 17

*United States v. Schaflander,*
   743 F.2d 714 (9th Cir. 1984) ............................................................ 16, 17

*United States v. Scrivner,*
   189 F.3d 825 (9th Cir. 1999) ................................................................. 15

*United States v. Williams,*
   673 Fed.Appx. 620 (9th Cir. 2016) .......................................................................... 1, 14, 15

*Wade v. Calderon,*
   29 F.3d 1312 (9th Cir. 1994) ................................................................................. 17

## Statutes

28 U.S.C. §2255 .................................................................................................. 1, 21

Rule 6, 28 U.S.C. foll. §2255 .................................................................................. 1, 20

# I.   **INTRODUCTION**

This was a mortgage fraud case.  A jury convicted defendant of money laundering and conspiracy to commit mail and wire fraud, and he was sentenced to 87 months imprisonment.  ECF 557, 582, 584.  The Ninth Circuit affirmed defendant's conviction and sentence, 1) finding that sufficient evidence supported defendant's conviction and his four-level leadership enhancement, 2) finding that the trial court properly denied defendant's requests for substitute trial counsel, and 3) rejecting all of defendant's remaining appellate arguments.  *United States v. Williams*, 673 Fed.Appx. 620, 621-24 (9th Cir. 2016).  Defendant now claims ineffective assistance of trial counsel in his motion pursuant to 28 U.S.C. §2255.  ECF 645.  Defendant's motion contains a series of conclusory statements about supposed documents, witnesses, and strategies that he claims would have exonerated him, without specifying a single example.  The Court can and should deny defendant's conclusory motion, and no evidentiary hearing is necessary.  *See United States v. Quan*, 789 F.2d 711, 715 (9th Cir. 1986) (the court may deny relief on a §2255 motion without an evidentiary hearing if the motion contains no more than conclusory allegations).

If for any reason the Court does not deny defendant's petition on the papers, the government requests that the Court find a waiver of the attorney-client privilege by the defendant, and permit full discovery of formerly privileged materials on all subjects raised in defendant's motion in the forms permitted by the Rules Governing Section 2255 Proceedings for the United States District Courts.  *See* Rule 6, 28 U.S.C. foll. §2255 (permitting discovery including depositions, interrogatories, documents requests, and requests for admissions once leave of court is granted).

# II.   **FACTS**

The trial evidence of Williams's guilt and his leadership role in the charged offenses was overwhelming.  As the Ninth Circuit observed in affirming the conviction and sentence, Williams "organized the fraud, recruited others into the scheme, directed payments to confederates through his companies, instructed buyers to make false statements on loan applications about their income and employment status, helped buyers inflate their bank statements, and verified false information for lenders, among other things."  *Williams*, 673 Fed.Appx. at 623.  Below the government recounts just

some of the overwhelming trial evidence of this conduct, to demonstrate why defendant's conclusory claims are not credible and warrant no relief.

### A.  Williams conspired with Joshua Clymer and others to carry out a mortgage fraud scheme in Chico and Sacramento.

Williams was a licensed real estate salesperson who participated in a mortgage fraud conspiracy from late 2006 into 2008.  SER 1259-61.[1]  Williams and his partner, codefendant Joshua Clymer, helped home buyers secure loans based on fraudulent loan applications and fraudulently structured transactions.[2]

Williams and Clymer recruited the home buyers into the conspiracy with various promises, including cash back after purchase, little or no money down, and/or illusory "equity" in the home that resulted from faked down payments.  They then helped buyers secure loans based on fraudulent information, including lies about the buyers' employment, income, and assets, and intent to occupy the residences.  For example, Williams told several buyers to falsely represent on loan applications that they worked for his company, Diamond Hill Financial, Inc., and Williams then helped back up these lies by providing numerous written and verbal verifications of employment to the lenders.  SER 251-53, 374-75, 388:15-24, 503-04, 511, 547-48, 563-64, 594-95, 628-29, 719-26, 733-736, 784-90, 1425, 1429, 1431, 1540, 1558, 1647, 1654, 1830, 1834-39.

In addition to the six properties focused on at trial, at sentencing the government presented evidence of five additional properties included in the conspiracy, leading to a total of eleven properties considered for loss purposes.  SER 1891, 1134-1148:15, 1164:14-16; PSR ¶ 15.  Nine of those 11 properties foreclosed, leading to total losses of $1,917,414 from the conspiracy.  SER 1891, 1134-1148:15, 1164:14-16.

### B.  Williams controlled Diamond Hill Financial, Inc., and used it as the fraudulent employer for multiple buyers and to handle fraud proceeds.

On September 15, 2006, Williams registered Diamond Hill Financial, Inc., with the California

---

[1] "SER" refers to the government's Supplemental Excerpts of Record on direct appeal, which consist of the transcripts and exhibits from trial and sentencing.  "ER" refers to the defendant's Excerpts of Record on direct appeal.  The government is lodging concurrently with this opposition a disc containing PDFs of the SER and ER, which together total approximately 2,000 pages.

[2] Clymer pleaded guilty to conspiracy to commit mail and wire fraud before trial.  ECF 510.

Secretary of State as a "Financial Management Consultant" business that had previously been incorporated in Wyoming.  SER 1250-53.  Williams listed himself as Diamond Hill's president and chief executive officer.  SER 1251.  On October 9, 2006, Williams appointed Clymer as treasurer of Diamond Hill.  SER 1255.  The same day, Williams executed a "Resolution for Blanket Authority to Sell Assets" permitting Clymer to sell assets of Diamond Hill.  SER 1254.[3]

Diamond Hill was then falsely listed as the employer for the home buyers in five out of the six transactions focused on at trial,[4] as indicated below:

| Date | Address | Buyer | False Employer |
|------|---------|-------|----------------|
| 6/18/07 | 2640 Ceanothus Ave. Chico | Arthur Watson | Diamond Hill |
| 7/12/07 | 3294 Rockin M Dr. Chico | Arthur Watson | Diamond Hill |
| 2/21/08 | 4824 Baker Ave., Sacramento | Joshua Frye | Diamond Hill |
| 3/5/08 | 2976 Trap Rock Way, Sacramento | Juan Reynaga | N/A |
| 3/28/08 | 11516 Linday Way, Gold River | Lacie Clymer | Diamond Hill |
| 8/1/08 | 5548 Woodforest Dr., Sacramento | Anthony Petri | Diamond Hill. |

SER 1425, 1540, 1647-48,1780-81,1829-30.  Following each of these six transactions, Williams paid Clymer a share of the fraud proceeds by check.  SER 1495, 1638, 1683, 1753, 1816, 1871.

Williams was the sole signatory on Diamond Hill's bank account at US Bank.  SER 1256-57, 819:11-820:1.  Two of the checks Williams wrote to Clymer following fraudulent transactions came from the Diamond Hill account.  SER 1495, 1638.

**C.** **Williams and Clymer controlled Bay Area Real Estate Holdings, LLC, and used it to buy and sell properties, as well as receive proceeds of their fraud.**

In April 2007, Williams and Clymer formed the company Bay Area Real Estate Holdings, LLC ("BAREH") and Williams registered it with the California Secretary of State.  SER 1755-56.  The stated purpose of the company was "real estate investing," and Williams and Clymer each owned 50% of the

---

[3] At one point Williams and his Air Force friend Terrence Murrell discussed having Murrell work for Diamond Hill Financial.  Williams took Murrell to a US Bank branch and had Murrell sign a document stating that Murrell owned 82% of Diamond Hill Financial, but this was not true.  Murrell never actually worked for Diamond Hill Financial or owned any part of it.  SER 477:25-479:14, 486:6-492:15.

[4] The third superseding indictment specified a total of 11 properties, and at trial, the government elected to focus on six of those.  ER 4-5.

USA's Opposition to §2255 Motion
U.S. v. Williams, 2:08-cr-376 WBS-AC

company.  SER 1757-58, 1770-71.  BAREH's principal location was 3550 Watt Avenue in Sacramento, which was where Williams and Clymer had their office.  SER 1758.  Williams and Clymer used BAREH to buy and sell properties, and to receive proceeds of their fraud.

Both Williams and Clymer were signatories on BAREH's bank account at US Bank.  SER 1258, 820:2-20.  Four of the checks Williams wrote to Clymer following fraudulent transactions came from the BAREH account.  SER 1683, 1753, 1816, 1871.

D.     **Williams and Clymer directed multiple buyers to obtain home loans using fraudulent statements about employment, income, assets, down payments, and intent to occupy the homes, then structured the transactions so they could profit from the fraud proceeds.**

1.     **964 Gidda Loop – Arthur Watson**

Williams recruited his old Air Force friend Arthur Watson as a buyer for three houses in 2006 and 2007.  SER 343:5-345:4, 340:4-341:5.  In 2006 Watson was struggling financially, had recently been evicted from an apartment, was working as a handyman, and had entered debt consolidation.  SER 345:5-347:16.  He was making between $500 and $1,000 per month for handyman work, receiving approximately $4,000 per month in retirement benefits, and did occasional jobs as a deejay.  SER 359:13-23, 362:14-22, 400:4-11.

Prior to the home purchases, Williams helped Watson repair his credit score, which had gone down.  SER 347:2-348:18, 399:5-15.  Williams and Watson discussed the credit repair at Williams's office on Watt Avenue.  SER 348:19-25.  In the course of Watson's 15 to 20 visits to the Watt Avenue office, Watson met one other person who worked there named "Josh," who he knew as Williams's work partner.  SER 349:11-21 .

The first house Williams convinced Arthur Watson to buy was 964 Gidda Loop in Yuba City for $365,000 in August 2006.  SER 1398.  At first, Watson told Williams that he "really didn't want [the Gidda Loop house]," but Williams promised to give Watson $14,000 for buying it.  SER 350:4-352:22, 400:25-401:15.  Williams also told him that Watson would not have to make a down payment and would only have to make the first three monthly mortgage payments, after which Williams said he would take over the payments and then sell the house.  SER 350:7-13, 351:17-352:11, 401:10-19, 352:23-354:1.  Watson agreed to buy the house and did not pay attention to the purchase price. SER 1398, 352:15-16,

363:20-364:6, 365:15-24.

Williams worked with Watson on the loan application for Gidda Loop; Watson did not fill it out himself.  SER 1406-10, 354:2-22, 358:12-359:4.  The monthly income listed on the loan application was inflated.  SER 1407, 362:10-24.  The loan application also falsely represented that the Gidda Loop house would be Watson's primary residence, despite the fact that Watson did not intend to move in and had told Williams he was not moving to Yuba City.  SER 351:1-5, 362:4-9, 1406, 1411.  Watson did not read the documents he signed for the Gidda Loop loan, and he was not worried because "Leonard was handling it, and I trusted him."  SER 367:25-368:4, 369:13-20.

Following Watson's purchase of the Gidda Loop property, Williams provided Watson a cashier's check for $14,993.  SER 1412; 370:2-11.  Watson did not move into Gidda Loop; instead Williams rented it out and collected the rent himself.  SER 370:14-371:6; 1413-15.  Watson spent the kickback he received from Williams on bills, dental work, his car, and his mortgage payments.  SER 371:14-21.

## 2. **2640 Ceanothus Avenue – Arthur Watson**

After Watson's first purchase, Williams offered him another $2,000 cash back to purchase a second house, this time at 2640 Ceanothus Avenue in Chico in June 2007.[5]  SER 371:22-25, 1419, 1425.  Watson could not afford it, but agreed after Williams said he would make sure the mortgage was paid.  SER 372:1-5, 372:20-373:24.  Watson did not put any of his own money into this transaction because he did not have any to put in.  SER 373:1-5.  The purchase price was $375,000, which Williams did not discuss with Watson.  SER 1419, 378:10-18.  With Williams's help, Watson applied for and received a $375,000 loan (100% financing) from lender CIT Group to purchase Ceanothus.  SER 242:16-21, 244:1-9, 383:2-4, 860:1-20, 1425-28, 1879.

Williams worked with Watson on the loan application for Ceanothus.  SER 373:16-19, 246:11-247:13, 1425-28.  The loan application submitted to the lender was full of false information that Williams helped to back up.  It stated that Watson worked for Diamond Hill and made $11,552 a month.  SER 1425-26.  Yet Watson never worked for Diamond Hill and was not making nearly that much

---

[5] Watson only recalled being offered $2,000, however checks entered into evidence appeared to indicate he may have received as much as $5,000 total for the Ceanothus purchase.  SER 1494, 1497, 1498, 380:19-383:1.

USA's Opposition to §2255 Motion
U.S. v. Williams, 2:08-cr-376 WBS-AC

money at the time.  SER 374:11-375:16, 340:4-343:4, 359:13-23, 362:14-22, 400:4-11.  Williams told

Watson that Williams would put Diamond Hill as Watson's employer on the loan application.  SER

374:23-375:6.  CIT Group received a written verification of employment dated May 7, 2007, claiming

that Watson worked for Diamond Hill.  SER 1430, 259:4-260:7.  CIT Group records further indicate that

they verified Watson's employment with "Leonard Williams CEO/President" verbally by phone on May

24, 2007, and that Williams told them Watson had been working for Diamond Hill as a "Marketing

Director" for eight years and three months.  SER 1431, 251:19-253:14.

Fraudulently inflated bank statements were submitted with Watson's loan application for

Ceanothus, and Watson did not submit them himself or ask anyone to do so.  SER 1499-1540 (real bank

statements), 329:13-334:21, 1434-74 (fake bank statements); 264:7-267:7, 378:1-5.  Watson had given

Williams the necessary information for Williams to access Watson's Bank of America monthly

checking account statements online.[6]  SER 375:25-377:25.  Watson's loan application falsely

represented that Watson had $10,093 in his bank account, but Watson testified that at the time he

typically only had "a couple hundred" dollars in his account, and his real bank account statements

showed that he had less than $400 in his account on the day he signed his loan application.  SER 376:17-

24, 1426-27, 1539, 329:1-25, 332:23-333:1.

Watson's loan application package for Ceanothus also falsely stated that he intended to occupy

Ceanothus as his primary residence and that he was receiving $3,800 per month in rental income from

the Gidda Loop property in Yuba City, both of which were false.  SER 246:11-19, 249:7-14, 260:8-

261:17, 379:19-380:9, 1425, 1432.  To back up the employment and primary residence lies, Williams

sent CIT Group a letter on Diamond Hill letterhead referring to Watson as his "Marketing Director," and

explaining that Watson could telecommute and therefore did not need to live in Sacramento for his job.

SER 1429, 257:25-259:3.

The seller of the Ceanothus house was Anthony Symmes, a Chico home developer who was

himself engaging in fraud at the time because of the downturn in the housing market and his slowing

---

[6] Watson testified that, at least as of 2006, he did not have his own computer.  SER 349:22-
350:3.

ability to sell houses.[7]  SER 419:23-421:22, 424:17-425:4, 1418.  Symmes relied on Garret Gililland, also a fraudster,[8] to locate buyers for the homes he was selling; Symmes and Gililland would conduct transactions at inflated purchase prices, and, once Symmes got paid, he would kick back some of the purchase price to Gililland and/or the buyer, without the kickbacks ever being disclosed to the buyer's lender.  SER 422:9-11, 422:19-424:1, 430:19-431:19.  In the case of 2640 Ceanothus, Gililland brought Williams and the buyer Watson into the transaction.  SER 453:14-458:2.

Symmes agreed to accept $325,000 for the Ceanothus house, but Watson purchased it for $375,000 and secured a loan for that amount, leaving a difference of approximately $50,000, minus a few costs.  SER 425:17-428:3, 1419, 1480-81, 1879.  Symmes subsequently obtained a cashier's check for $46,250 payable to Diamond Hill as the kickback for this transaction, which was never disclosed to the lender, the escrow officer, or the appraiser.  SER 277:20-281:4, 432:1-433:8; 1493, 1477-79, 1879.

Williams deposited the $46,250 kickback check into the Diamond Hill bank account on June 21, 2007.  SER 1492-93, 1879.  Four days later, Williams wrote a check to Clymer for $8,697.55 from the Diamond Hill account with the memo "Ceanothus Property."  SER 1495.  In June and July 2007, Williams wrote Watson a series of three checks totaling $5,000 with memos "Ceanothus," "Consultant," and "Ceanothus Chio [sic]."  SER 1494, 1497, 1498, 380:19-382:19.  These checks to Watson were likewise not disclosed to the lender.  SER 1477-79.

### 3.  3294 Rockin M – Arthur Watson

In July 2007, Williams convinced Watson to buy a third property at 3294 Rockin M in Chico for $440,000.  SER 1545, 1607-08, 1881, 384:13-24.  Rockin M was another Anthony Symmes property and the deal was structured similarly to Ceanothus.  SER 1881, 435:14 -436:14.  Watson was not enthusiastic about purchasing a third house because "I know that I couldn't afford to pay for it, and I was relying on Leonard."  SER 386:1-5.  Williams offered to pay Watson $2,000 to buy Rockin M, and Watson agreed.  SER 386:14-19.[9]  Watson did not recognize the address of the house, know what size

---

[7] Symmes pleaded guilty in a related case, cooperated in the government's investigation, and was sentenced to 60 months.  *See United States v. Symmes*, Case No. 2:10-cr-200 EJG (E.D. Cal.); SER 434:13-23.

[8] Gililland pleaded guilty in this case, cooperated with the government's investigation, and was sentenced to 94 months.  CR 215, 217, 433, 440.

[9] Watson testified he never received the $2,000, but based on timing, it is conceivable that the

loan he had applied for, or how much he was paying for the house.  SER 387:23-388:6.  With Williams's help, Watson secured a $418,000 loan, and the lender was led to believe he was making a $22,000 down payment, which was false.  SER 387:4-7, 1606-08, 739:25-742:10, 884:3-886:14.

Again, Watson did not fill out the loan application, but worked with Williams on it, and again Diamond Hill was falsely listed as Watson's employer.  SER 387:4-388:14, 1540.  Williams promised to say Watson worked for Diamond Hill if necessary, even though that was false.  SER 388:15-24.  The loan application inflated Watson's income, stating falsely that he made over $10,000 per month.  SER 1541, 389:3-9.  Once again, falsely inflated bank statements were submitted to the lender with the loan application.  SER 1561-95 (falsified bank statements from loan file), 737:2-21, 1499-1539 (real bank statements); 329:1-25, 332:23-333:1.

Williams also seeded Watson's bank account with $8,000 from Diamond Hill on June 29, 2007, and that exact sum was returned from Watson to the Diamond Hill account after the lender had verified Watson's bank account balance.  SER 1597-1603, 737:22-739:1.  There was no legitimate debt between Diamond Hill and Watson at the time.  SER 392:20-394:7.[10]

Following close of the Rockin M transaction, Symmes wrote a $30,000 kickback check to Diamond Hill from one of his business accounts.  SER 1637, 442:25-444:4.  This check was not disclosed in escrow.  SER 886:7-9, 1609-13, 431:9-19, 442:13-444:4.  Williams deposited this check on July 20, 2007.  The same day, Williams wrote a check to Clymer out of the Diamond Hill account for $4,354 with the memo "Chico Property."  SER 1637-38, 1881, 884:21-885:1.[11]

An IRS Criminal Investigations special agent interviewed Williams in March 2009.  Williams stated that he was the president of Diamond Hill Financial, and he acknowledged knowing Garrett Gililland.  SER 897:20-898:13.  Williams admitted to doing two home transactions with Garrett

---

third of the Ceanothus checks discussed above was also to compensate him for Rockin M.  *See* SER 1498 (check for $2,000 dated July 24, 2007, which is after the Rockin M purchase closed, but with the memo "Ceanothus").

[10] Additional fraud on the Rockin M transaction included failure to disclose Watson's ownership and indebtedness on the Ceanothus property, and failure to disclose the agreement for Williams to pay the mortgage instead of Watson.  SER 1540-44, 744:2-25.

[11] As noted above, on July 24, 2007, Williams wrote a check to Watson for $2,000, but the memo on that check said "Ceanothus."  SER 1498.

Gilliland, that the buyer was Arthur Watson, and that Williams had received approximately $76,000 from the Ceanothus and Rockin M transactions in checks through the mail, per an agreement with Gilliland.  SER 898:14-19, 899:8-12.  However, when asked if Watson worked for him at Diamond Hill, Williams falsely claimed that Watson did work at Diamond Hill and falsely stated that the income listed on Watson's loan applications was accurate.  SER 898:20-25, 899:19-24.

### 4.   **4824 Baker Avenue – Joshua Frye**

In December 2006, Williams and Clymer met buyer Joshua Frye at a real estate seminar in Sacramento.  At the time, Frye was 21 years old, had no steady job or income, and had just gotten his real estate license.  SER 496:5-25.  Williams and Clymer pitched Frye on buying an "investment" property and said they could help with the loan.  SER 497:3-24.  In early 2007, Frye met with both Williams and Clymer in person at their Watt Avenue office in Sacramento, and they discussed the 4824 Baker Avenue property.  SER 498:19-500:6.  Williams did most of the talking and brought up the topic of providing cash back to Frye for buying the house.  SER 500:15-24.  They also discussed the need to fill out a loan application and gather financial information.  SER 500:25-501:2.

After Frye provided his true financial information by email, he met again with Williams and Clymer at the Watt Avenue office.  SER 501:18-502:12, 502:24-503:13.  Williams told Frye that Frye would not qualify for a loan with his true financial information; Williams proposed instead that they state that Frye worked at Diamond Hill and received a salary there, which was not true.  SER 503:8-504:14, 547:22-548:5.  Frye expressed concern about doing this, but Williams told Frye it "would be fine."  SER 504:17-23; 549:19-550:2.  On February 14, 2008, Clymer emailed Frye a loan application stating falsely that Frye worked for Diamond Hill and made over $7,000 per month, and told Frye to "Just sign the 1003 [loan application].  Ignore the rest of the convo.  Fax it back to [number]."  SER 1686-97, 507:22, 526:23-25.  Frye signed the loan application and it was submitted to the lender.  SER 1647-51, 506:24-507:8, 510:14-511:2; 511:13-24, 560:3-12.  Frye's loan application also contained falsely inflated assets and falsely indicated that Frye would be making a down payment of approximately $35,000, which he never did.  SER 512:3-513:14, 1649-50.

Frye's purchase price was $350,000, and he obtained a loan for $315,000.  SER 1639,1647, 1883.  The Baker Avenue transaction was structured as a double escrow.  BAREH (Williams and

Clymer's company ) bought the property from a seller for $250,000, and resold it to Frye on the very same day for $350,000.  SER 1297-1302, 1883, 886:15-888:4.  In the end, BAREH cleared $50,191 from the transaction, and out of that Williams paid a kickback to Frye of $17,859, and wrote checks splitting most of the remainder equally between himself and Clymer.  SER 1682-84, 1883, 886:15-889:15.  The kickback to Frye was not disclosed to the lender.  SER 1663-65, 889:12-15, 520:5-524:10, 579:24-581:15, 558:18-559:12.

### 5.   **2976 Trap Rock Way – Juan Reynaga**

In March 2008, Juan Reynaga was referred to Williams and Clymer by another real estate agent. SER 643:15-645:9.  Reynaga met Williams, and Williams pitched Reynaga on buying a house with only $1,000 down.  SER 646:11-18.  Reynaga met with Williams and Clymer at two different properties to look, but did not buy either.  SER 647:4-649:18.  Eventually Reynaga agreed to buy a house at 2976 Trap Rock Way in Sacramento.  He worked with both Williams and Clymer to apply for his loan.  SER 649:25-650:17.  Reynaga viewed Clymer as his real estate agent and Williams as his "broker."  SER 664:8-13.  Reynaga was the lone exception whose employment information was not falsified as Diamond Hill.  The fraud on Reynaga's transaction was a falsified down payment.

Reynaga's purchase contract and loan application stated that his purchase price was $420,000. SER 1698, 1708.  However, this price was false.  Reynaga was unwilling to pay $420,000, and, from the beginning, he had an agreement with Williams and Clymer that he would only pay approximately $333,000 for the house, which he expected to be the amount of his loan.[12]  SER 651:15-652:13. Reynaga's transaction was structured to appear as if he was making a down payment of approximately $84,000.  SER 1721, 1726, 1728, 704:25-705:12, 708:14-709:13.  Multiple documents were submitted to the lender making it appear as if Reynaga had received an $84,000 gift from his brother, and then paid those funds to BAREH as a down payment.  SER 1717-20, 699:3-703:16.

In truth, there was no gift from Reynaga's brother and there never was an $84,000 down payment.  Reynaga told Williams he had no more than $15,000 to put into the transaction.  SER 653:17-25.  Williams told Reynaga to "write down a check for $84,000, but we'll take care of it.  Don't worry

---

[12] Reynaga's recollection was slightly lower than the actual loan amount, $336,000.  SER 1726, 1728.

about it." SER 654:1-5.  Reynaga knew the check would never be cashed because Williams told him it would not, so Reynaga followed Williams's direction and wrote out the $84,000 check with the memo "Down Payment." SER 654:10-15, 656:5-657:15, 1720.  Clymer advised Reynaga how to fill out a gift letter reflecting the fake gift from Reynaga's brother; Reynaga filled it out and it was submitted to the lender.  SER 654:17-656:4.  When Reynaga told Williams that the brother did not actually have $84,000 to give as a gift, Williams advised Reynaga to "just say that he won it in Las Vegas, and he gave me the money." SER 655:20-25.  Clymer was present at the closing, and Reynaga signed the closing documents knowing they contained false information about the down payment.  SER 659:25-661:2.

Reynaga's transaction was a double escrow, with BAREH buying the house from a seller for $279,000 and then reselling it on the very same day to Reynaga for a supposed $420,000.  SER 1320-25, 1885; 890:7-21.  In the end, BAREH cleared $40,000 from the transaction, and out of that Williams wrote a check to Clymer for $16,540.85, and a check in an identical amount to Diamond Hill, whose bank account he controlled.  SER 1752-53, 1885, 890:25-891:10.

### 6. **11516 Linday Way – Lacie Clymer**

Near the end of 2007, Clymer recruited his sister, Lacie Clymer, to buy a house.  SER 622:3-623:12.  At the time, Lacie was working part time at two retail stores, making $200 to $300 per month, and had no savings.  SER 623:15-624:14; 1789-92.  She and Clymer did not discuss the purchase price, and Lacie knew little about the details of the transaction, simply trusting that she would buy the house with loans and rent out rooms to cover the mortgage.  SER 625:14-627:16.

Lacie's loan application falsely stated that she worked at Diamond Hill making $8,893 per month.  SER 1780-81, 589:15-591:14; 628:24-629:4.  It also falsely stated that she had over $147,000 in assets, and falsely indicated that she would be making a down payment of approximately $96,000.  SER 1782-83, 591:15-592:20, 629:20-23, 630:8-14.  The loan application stated that the Linday Way house would be Lacie's primary residence, but her intention was to rent it out.  SER 1780, 1787-88, 595:10-596:2, 627:13-16.[13]  Lacie did not understand that she was buying the house from her brother's company BAREH; instead she viewed Clymer as her real estate agent.  SER 628:3-5, 631:11-12.

---

[13] Lacie ended up moving into the Linday Way house three months after closing, but was unaware she was required to.  SER 1787, 630:15-22.

USA'S OPPOSITION TO §2255 MOTION
U.S. V. WILLIAMS, 2:08-CR-376 WBS-AC

On March 28, 2008, the lender NL Inc. verified Lacie's employment at Diamond Hill with Williams by telephone. SER 1785, 594:4-595:8. The lender's record of this verification indicates that Williams identified himself as "Human Resources Manager" for Diamond Hill and confirmed that Lacie had worked there for over three years. SER 1785-86, 1794, 597:17-598:24, 600:15-601:5. The Linday Way transaction closed on the same day, March 28, 2008. SER 1796.

Lacie's purchase price was $478,000, and she obtained a loan for $382,400. SER 1772, 1780, 1793, 1796, 1887, 587:17-590:10. Her transaction was also a double escrow, with BAREH buying the house from a seller for $315,000 and then reselling it on the very same day to her for a stated $478,000. SER 1346-51, 1887, 891:20-892:15. In the end BAREH cleared $47,758.38 from the transaction, and out of that Williams wrote a kickback check to Lacie for $9,500, and a check to Clymer for $36,258. SER 1816, 1817, 1887, 632:2-633:3, 892:10-22. Clymer told Lacie that she "would receive $10,000 back left over from the loan." SER 632:5-7. The kickback to Lacie was not disclosed to the lender. SER 1796-98, 892:23-893:1. Joshua Clymer paid the mortgage on Linday Way for a few months, after which no one paid and the property went into foreclosure. SER 633:10-16.

### 7. 5548 Woodforest Avenue – Anthony Petri

Anthony Petri met Williams and Clymer through a friend in July 2008. SER 775:11-776:8. At the time, Petri was 20 years old and worked at a car dealership making approximately $3,000 per month. SER 776:5-15. Petri met in person with Williams and Clymer at their office, and they pitched Petri to buy a house from them with no money down and saying that he could get cash back for buying a property. SER 777:6-23, 778:17-20, 779:9-16.

Petri looked at three houses. Clymer went with Petri to the first house and told him he could get $50,000 to $70,000 cash back if he bought it. SER 780:17-781:4. Williams went with Petri to the second house and told him he could get $35,000 cash back if he bought it. SER 781:8-782:3. Finally, Petri agreed to buy the Woodforest house after visiting it several times with both Williams and Clymer. SER 782:4-13, 775:16-20. Petri initially expected to get $30,000 cash back based on a meeting with Williams and Clymer, but later Clymer told him that number had gone down, and only at closing did Clymer tell Petri there would be none at all. SER 799:4-801:18.

Petri was clear with Williams and Clymer that he wanted to buy the Woodforest house as an

investment property.  SER 782:14-21.  He provided them his true employment information, including his pay stubs and W-2 tax forms.  SER 783:9-784:4.  After providing this information, Petri met in person with Williams and Clymer again, and they advised him he could not get the necessary loan for the Woodforest house based on his true employment and income information.[14]  SER 784:10-785:12.  Williams and Clymer told Petri they would "take care of it."  SER 785:13-18.

Petri applied for a $240,000 loan to purchase the Woodforest property.  SER 1829, 714:3-20.  His loan application stated falsely that he worked for Diamond Hill and made $11,200 per month.  SER 1830, 784:8-9, 786:13-787:1, 716:1-717:2.  False earnings statements and W-2s from Diamond Hill were submitted with his loan application.  SER 1835-37, 797:6-798:23; 720:25-724:6.  Williams provided a written verification of employment to the lender stating falsely that Petri had worked for Diamond Hill for over two years as a "sale manager" and listing income amounts consistent with the fraudulent earning statements and W-2s.  SER 1834, 1835-37, 719:19-720:24.  The lender's records indicate they verified this employment again telephonically on July 23, 2008, with "Leonard" at the same phone number seen in other verifications of employment in this case.  SER 1838; compare 1785-86, 1654-55, 1558-59, 724:7- 726:2.

Petri's loan application also falsely stated that the Woodforest house would be his primary residence, and that he had received a $60,000 gift from his mother.  SER 1829, 1831-32, 791:16-792:10, 793:3-9, 797:1-2; 714:7-715:25, 717:3-18, 718:22-699:18.  The fake $60,000 gift was the supposed source of an approximate $60,000 down payment that the lender was led to believe Petri was making, but Petri never made any such down payment.  SER 793:14-794:13, 1832, 1840, 1846, 1877, 717:19-718:19; 726:3-728:4.  A letter that purported to be from Petri's mother was submitted to the lender regarding the $60,000 gift, but neither the signature nor the phone number listed belonged to Petri's mother.  SER 1833, 796:15-24.

When Petri learned that his loan application package contained false information about his employment and income, he raised concerns with Williams and Clymer during an in-person meeting with them.  SER 787:11-788:19.  Williams and Clymer told him it was a "grey area" and that it was

---

[14] Petri was clear that this was in a meeting with both Williams and Clymer but he could not specifically remember who said what.  SER 785:6-11.

"frowned upon," but that they would "take care of it" because it was "their phone number that was going to be listed." SER 788:20-789:23. Petri decided to sign the loan application. SER 789:24-790:1.

Petri obtained the $240,000 loan. SER 1840, 1889, 893:5-19, 729:15-25. His transaction also involved a double escrow, with BAREH buying the house from the seller for $179,000 and then reselling it on the very same day to Petri. SER 1370-76, 1889, 893:5-19.

        a.    **Williams laundered fraud proceeds from Anthony Petri's purchase of 5548 Woodforest Avenue.**

BAREH cleared approximately $44,174 from the Woodforest transaction, and out of that Williams wrote a check to Clymer for $16,599.07, and two checks totaling the exact same amount ($5,000 plus $11,599.07) made out to Diamond Hill, whose bank account he personally controlled. SER 1256-57, 1258, 1869-71, 1875-76, 1889, 893:20-894:7, 817:24-820:1, 826:21- 828:19.

Before the wires entered the BAREH account from Petri's transaction on August 4 and 5, 2008, the BAREH account balance was only $35.49. SER 1872-74. The two money laundering counts were based on the check for $16,599.07 to Clymer and the check for $11,599.07 to Diamond Hill that Williams wrote within the following week, during which there were no other deposits to the BAREH account. SER 1870-72, 895:15-897:9; ER 7-8.[15]

**I.**    **Williams unsuccessfully sought substitute counsel based upon complaints about his trial counsel's view of the case, advice about pleading guilty, and trial tactics, and the Ninth Circuit affirmed the denials of substitute counsel.**

Twice before and once during trial, Williams claimed a breakdown with his trial counsel and sought new counsel. SER 1108-1112; ER 27-34; 37-66. Among other things, defendant complained that his trial lawyer did not believe in his innocence and had advised him to plead guilty. SER 1110:15-23; ER 28:22-33:1. On direct appeal the Ninth Circuit held that the district court did not abuse its discretion in denying these requests because "the transcripts of hearings before the district court and the sealed correspondence between Williams and his counsel establish that they disagreed over how to

---

[15] The government does not recount here the various mailings and wires proven during the trial, since that component of the proof was directly litigated and resolved in favor of the government on direct appeal. *See Williams*, 673 Fed.Appx. at 623.

interpret the law, over trial strategy, and over whether Williams should enter a plea agreement." *Williams*, 673 Fed.Appx. at 624.  The Ninth Circuit specifically held that "[t]hese are not the types of disputes that jeopardize a defendant's Sixth Amendment right to counsel," and affirmed defendant's conviction and sentence.  *Id.* (citations omitted).

### III.   ARGUMENT

#### A.   Defendant is barred from relitigating denial of his requests for substitute counsel because that argument was already rejected on direct appeal.

Defendant devotes multiple paragraphs to discussing the district court's denials of his requests for substitute counsel.  *See*, *e.g.*, Mot. at ¶¶ 21, 24, 25, 27, 28, 31.  To the extent the Court might read defendant's motion to argue that he was denied his Sixth Amendment right to counsel when the district court denied those substitution requests, that claim is barred because the Ninth Circuit Court of Appeals already rejected it on direct appeal, making it law of the case.  *See Williams*, 673 Fed.Appx. at 624 ("the district court's inquiry was sufficient and … the conflict between Williams and his [trial] attorney was not extensive enough to justify substitution").

A defendant may not use a § 2255 motion to relitigate an issue that was already raised and decided on direct appeal.  *See United States v. Scrivner*, 189 F.3d 825, 828 (9th Cir. 1999); *Odom v. United States*, 455 F.2d 159, 160 (9th Cir. 1972) ("The law in this circuit is clear that when a matter has been decided adversely on appeal from a conviction, it cannot be litigated again on a 2255 motion."). This bar to relitigation may be overcome only by a pertinent intervening change in the law, which defendant has not claimed or shown.  *See Davis v. United States*, 417 U.S. 333, 345-47 (1974).  Because the substitution of counsel issue has already been conclusively resolved against defendant on direct appeal, he cannot raise the issue again here, and this Court should reject and disregard any such arguments it may discern in defendant's motion.

#### B.   Defendant's § 2255 motion should be denied because its allegations are conclusory and do not warrant an evidentiary hearing.

Substitution issue aside, the remainder of defendant's motion presumes the existence of exculpatory documents, witnesses, and trial strategies that he contends his trial counsel should have found and presented, without specifying even one example that can be analyzed against the backdrop of

the trial evidence summarized above. *See, e.g.*, Mot. at ¶¶ 6, 7, 8, 9, 14, 29, 31, 32, 34, 35.  For instance, he refers to an "expected" defense "presentation" or "case" that he claims his lawyer truncated without justification, but he never explains anything about that supposed defense case, identifies any witnesses or documents that he contends should have been a part of it, or explains how they would have mattered. Mot. at ¶¶7, 8, 9, 14, 29, 32, 34.[16]  Several times, defendant claims there were exculpatory witnesses that his lawyer should have subpoenaed and called, but he never identifies anyone by name, provides any proffered testimony or a good-faith basis for it, or gives any reason to believe the testimony might have mattered.  Mot. at ¶¶ 8, 9, 14.  Similarly, defendant makes multiple references to supposedly exculpatory "documents," "exculpatory exhibits," and other unspecified "exculpatory evidence" that his lawyer should have presented, without identifying any such evidence or explaining how it might have reasonably have affected the outcome at trial.  Mot. at ¶¶ 7, 8, 9, 14, 32, 34.[17]  Finally, defendant provides no facts to justify his vague assertions that the government's evidence was "insufficient," "false," "inaccurate," and "incomplete."  Mot. at ¶¶ 6, 31, 35.

The law is clear that conclusory statements like those appearing throughout defendant's brief are inadequate to warrant relief or even an evidentiary hearing.  "Merely conclusory [sic] statements in a § 2255 motion are not enough to require a hearing." *United States v. Hearst*, 638 F.2d 1190, 1194 (9th Cir. 1980) (quotations omitted), *cert. denied*, 451 U.S. 938 (1981); *see also United States v. Johnson*, 988 F.2d 941, 945 (9th Cir. 1993); *Shah v. United States*, 878 F.2d 1156, 1161 (9th Cir. 1989) ("Mere conclusory allegations do not warrant an evidentiary hearing.").  An evidentiary hearing is only required where "the movant has made specific factual allegations that, if true, state a claim on which relief could be granted." *United States v. Schaflander*, 743 F.2d 714, 717 (9th Cir. 1984); *see also United States v. Leonti*, 326 F.3d 1111, 1116 (9th Cir. 2003).  Consequently, the court may deny a defendant relief on his

---

[16] See, for example, Mot. at ¶7 ("counsel … had no intention of presenting the entire case"; "counsel inexplicably and prematurely terminated the Movant's defense presentation"; counsel did not "present[] all of the available exculpatory evidence"); ¶8 (counsel "fail[ed] to present exculpatory evidence, witnesses, or critical mitigating exhibits"; ¶9 (counsel "fail[ed] to properly locate and subpoena witnesses"); ¶14 (counsel "failed to submit readily available exculpatory exhibits" and "failed to properly interview and then subpoena witnesses"); ¶29 (counsel "basically stated that he had elected not to present the expected defense").

[17] Defendant makes the related contention that his counsel failed to review the case discovery, Mot. at ¶14, but likewise provides no facts in support of that conclusory statement.

§ 2255 motion without an evidentiary hearing if the motion, like defendant's here, contains only "conclusory allegations unsupported by facts and refuted by the record." *United States v. Quan*, 789 F.2d 711, 715 (9th Cir. 1986); *see also Farrow v. United States*, 580 F.2d 1339, 1360-61 (9th Cir. 1978).

More particularly, a defendant's assertion that defense counsel failed to call or interview witnesses "is deficient where there is no showing what the interview would have disclosed, what testimony could have been offered, and how it would have changed the outcome of the case." *Johnson v. Yates*, No. CIVS06-554 MCE CHSP, 2009 WL 2705877, at *6 (E.D. Cal. Aug. 25, 2009), *citing United States v. Berry*, 814 F.2d 1406, 1409 (1987) (defendant cannot show prejudice when he "offers no indication what these witnesses would have testified to"). Likewise, "[a] claim of failure to investigate must show what information would have been obtained, and how, assuming the evidence is admissible, it would have produced a different result at trial." *Johnson*, 2009 WL 2705877 at *6, *citing Strickland*, 466 U.S. at 694, *and Wade v. Calderon*, 29 F.3d 1312, 1316–19 (9th Cir. 1994) (overruled on other grounds). And where a defendant like Williams "asserts that he had a meritorious defense which counsel failed to present," his ineffective assistance claim fails when "he does not identify the meritorious defense" and "simply does not allege what more counsel should have done." *Johnson*, 2009 WL 2705877 at **5-6.

That is the situation here. Defendant has made no "specific factual allegations that, if true, state a claim on which relief could be granted," because he has not made any specific factual allegations in his motion at all. *Schaflander*, 743 F.2d at 717. While courts construe pro se §2255 petitions liberally, the foregoing authority makes clear that they do not and should not infer facts when the petition merely offers conclusory statements. The absence of specific allegations prevents the Court from applying the *Strickland* test in any meaningful way, and defendant's conclusory petition can and should be denied on this basis without a hearing.

### C.      In any event, defendant fails to show that his counsel's performance was so unreasonable as to deprive Williams of his Sixth Amendment right to counsel.

Even if the Court looked beyond the conclusory nature of defendant's motion to consider his ineffective assistance claim under *Strickland*, defendant has failed to show that (1) his counsel's performance fell below an objective standard of reasonableness as measured by "prevailing professional

norms" and (2) that counsel's performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984).

In evaluating counsel's performance, the relevant inquiry is whether "counsel's assistance was reasonable considering all of the circumstances." *Id.* A court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. Even if the defendant shows that his counsel's performance was unreasonable, he must also show that, but for counsel's errors, there is a reasonable probability that the outcome of the proceeding would have been different in order to prevail on his claim. *Id.* at 694. Thus, the court is required "not simply to give the attorneys the benefit of the doubt, but to affirmatively entertain the range of possible reasons [the defendant's] counsel may have had for proceeding as they did." *Cullen v. Pinholster*, 563 U.S. 170, 196 (2011) (citations and quotations omitted).

Defendant identifies nothing to suggest his trial counsel's performance was unreasonable by prevailing norms, or that he could have suffered any prejudice in light of the trial evidence. For example, defendant complains that his trial counsel did not file "routine" pre-trial motions and did not cross-examine witnesses to his satisfaction, yet he fails to address the actual record in the case. Mot. at ¶¶ 14, 31, 32, 34. In reality, defense counsel filed at least 10 trial pleadings and motions during the pendency of the case, including a motion to sever (ECF 204), a motion to exclude a tape recording (ECF 205); a joinder in a motion to dismiss (ECF 208, 209); a trial brief (ECF 518), proposed jury instructions (ECF 519), a motion to exclude other acts evidence (ECF 521), a motion to exclude evidence that defendant lost his real estate license (ECF 522), a motion to exclude vouching and portions of witness plea agreements (ECF 523), a motion to admit a Senate report on the mortgage crisis (ECF 524), and a motion contesting admissibility of the government's summary charts (ECF 525). Defense counsel also cross-examined the government's witnesses throughout the trial, spanning approximately 160 pages of transcript. Trial Tr. 280-318, 386-403, 431-437, 450-456, 477-480, 513-534, 586-606, 645-662, 666-668, 783-794, 753-754, 826-830, 880-889, 895. And at the end of the government's case in chief, defense counsel made a multi-part Rule 29 motion on defendant's behalf, and later a written motion for a new trial. *See* Trial Tr. 925-938; ECF 558. This record belies defendant's contentions that his right to cross-examine witnesses was "squandered," or that "routine" motions were not filed on his behalf (see

1    Mot. at ¶¶ 14, 32), and he identifies nothing of his attorney's performance in this record that fell below
2    an objective standard of reasonableness.[18]

3         Defendant also complains generally that his trial counsel did not put on a defense case, even
4    though he never explains of what that case would have consisted.  Mot. at ¶¶ 7, 8, 9, 21, 29, 31.  As
5    defendant admits, this was not ultimately his decision to make.  It is axiomatic that "the [defense] lawyer
6    has—and must have—full authority to manage the conduct of the trial" and "has authority to manage
7    most aspects of the defense without obtaining his clients' approval."  *Taylor v. Illinois*, 484 U.S. 400,
8    418 (1988); *Florida v. Nixon*, 543 U.S. 175, 187 (2004).  Defendant concedes that decisions regarding
9    "trial strategy and tactics, such as what evidence should be introduced" are decisions a defense lawyer
10   may make "without the defendant's consent."  Mot. at ¶ 32.

11        Nevertheless, the attorney-client communications defendant himself submitted to the Court make
12   clear that trial defendse counsel was consulting with defendant regarding trial strategy, while
13   appropriately using his own judgment to reject some of the ill-advised, misguided, and legally baseless
14   tactics that defendant was demanding.  *See* ECF 548 through 548-7.

15        By way of example, defendant demanded that counsel call a "Broker" and a bank witness in the
16   misguided belief that the structure of the real estate transactions (double escrow versus not double
17   escrow) was the only factor determining their illegality in this case.  ECF 548 at 1; 548-4 at 2.  Counsel
18   understandably responded "I am at a loss as to the benefit of trying to distinguish your 'double-escrows'
19   … The issue is not that you used a double-escrow to structure the deals; rather it is that you … did not
20   disclose that the buyer was getting cash back at the close of the transactions, and actively misled the
21   lender as to the buyer's employment."  ECF 548-1 at 2.  Defendant also demanded that counsel call
22   Joshua Clymer, defendant's coconspirator who had already pleaded guilty to the conspiracy and had a
23   cooperation agreement with the government, and defense counsel carefully considered the issue with a
24   long list of pros and cons that he supplied to defendant before ultimately making the decision not to call
25   Clymer.  ECF 548 at 2; 548-1 at 1; 548-2 at 1-4; ECF 510, 511.  Defendant also demanded his counsel

26
27        [18] Defendant's attempt to convert cross-examination into a component of the trial that he is
     constitutionally entitled to control is contradicted by the very authority he cites, *Florida v. Nixon*, 543
     U.S. 175, 187 (2004), which confirms that a client has ultimate authority only over "whether to plead
28   guilty, waive a jury, testify in his or her own behalf, or take an appeal."  *Id*.; *compare* Mot. at ¶ 32.

advance a "robo-signing" argument to strike various real estate documents from the record (see ECF 548 at 2), and in response counsel provided and explained his research that this issue was totally irrelevant to the trial because "the robo-signing was an issue at foreclosure and not when the County Recorder recorded the original deed when a transaction was completed." ECF 548-1 at 3; ECF 548-3 at 1-3. Similarly, defendant demanded that portions of Arthur Watson's testimony be stricken from the record due to Watson's admitted crack use (see, e.g., ECF 548 at 2) and trial counsel accurately responded that the drug use "goes to the weight the jury is to give [Watson's] testimony" and "does not require his testimony to be stricken." ECF 548-1 at 3; *see also* ECF 548-6 at 2.

The topics discussed between defendant and his counsel in ECF 548 through 548-7 continue on and on. Together they reflect a defendant with unrealistic expectations, in denial about the evidence against him, making a series of ultimatums to his attorney that were alternately unwise, legally baseless, irrelevant, and likely to backfire. *See* ECF 548 through 548-7. Through it all, his attorney strove to get his client to understand how dire the situation was, and to explain the sensible reasons for the strategic trial decisions he was making. Id. These communications themselves demonstrate that defense counsel's ultimate decision whether to present various defense witnesses was carefully thought out, strategic, and sensible in the overall context of this case. Nothing in defendant's motion shows otherwise, and his motion fails both *Strickland* prongs and should be denied.

> **D.** **If the Court does not deny defenddant's motion, it should find a waiver of attorney-client privilege and grant the government leave to take discovery of previously privileged information.**

If the Court does not reject defendant's petition based on the arguments herein, the government hereby requests that the Court find, pursuant to *Bittaker v. Woodford*, 331 F. 3d 715, 716-17 (9th Cir. 2003), that defendant has waived attorney-client privilege as to all subject matter set forth in his motion, and permit the government leave to conduct discovery of previously privileged materials pursuant to Rule 6 of the Rules Governing Section 2255 Proceedings for the United States District Courts. *See* Rule 6, 28 U.S.C. foll. §2255. As permitted by Rule 6, the discovery requested by the government will include depositions, interrogatories, documents requests, and requests for admissions, and will include a request by the government for all of the "numerous letters" defense counsel sent to defendant "during the course of [his] representation … describing what I think the government will be able to prove and

1  urging [defendant] to consider settling the case." ECF 548-1 at1.  If defendant's motion is not denied

2  and the Court finds a waiver, the government will submit the specific proposed discovery requests for

3  the Court's review at that time.

4  **IV.**    **CONCLUSION**

5         For all the reasons stated herein, defendant's motion pursuant to 28 U.S.C. §2255 should be

6  denied.

7   Dated:  June 27, 2018                                    MCGREGOR W. SCOTT
                                                             United States Attorney
8

9                                             By:   /s/ CHRISTOPHER S. HALES
                                                    CHRISTOPHER S. HALES
10                                                  Assistant United States Attorney